**CT Corporation**

**Service of Process Transmittal**
09/26/2016
CT Log Number 529905618

TO:   Chris Dzbanski
      Ford Motor Company
      1 American Rd, Whq 421-E6
      Dearborn, MI 48126-2798

RE:   **Process Served in California**

FOR:  Ford Motor Company  (Domestic State: DE)

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | Hector Cazares, Pltf. vs. Ford Motor Company, etc., et al., Dfts. |
| **DOCUMENT(S) SERVED:** | Summons, Complaint, Notice(s), Attachment(s) |
| **COURT/AGENCY:** | Los Angeles County - Superior Court - Hill Street, CA<br>Case # BC635153 |
| **NATURE OF ACTION:** | Product Liability Litigation - Lemon Law - 2011 Ford Fiesta, VIN:<br>3FADP4FJ7BM207799 |
| **ON WHOM PROCESS WAS SERVED:** | C T Corporation System, Los Angeles, CA |
| **DATE AND HOUR OF SERVICE:** | By Process Server on 09/26/2016 at 15:00 |
| **JURISDICTION SERVED :** | California |
| **APPEARANCE OR ANSWER DUE:** | Within 30 days after service |
| **ATTORNEY(S) / SENDER(S):** | Mark O'Connor<br>O'Connor & Mikhov LLP<br>1801 Century Park East, Suite 2300<br>Los Angeles, CA 90067<br>310-552-2250 |
| **ACTION ITEMS:** | CT has retained the current log, Retain Date: 09/27/2016, Expected Purge Date:<br>10/02/2016<br><br>Image SOP<br><br>Email Notification, Chris Dzbanski  cdzbansk@ford.com<br><br>Email Notification, Mary Ann MacKinnon  mmackin1@ford.com |
| **SIGNED:**<br>**ADDRESS:**<br><br>**TELEPHONE:** | C T Corporation System<br>818 West Seventh Street<br>Los Angeles, CA 90017<br>213-337-4615 |

Page 1 of  1 / DS

Information displayed on this transmittal is for CT Corporation's record keeping purposes only and is provided to the recipient for quick reference. This information does not constitute a legal opinion as to the nature of action, the amount of damages, the answer date, or any information contained in the documents themselves. Recipient is responsible for interpreting said documents and for taking appropriate action. Signatures on certified mail receipts confirm receipt of package only, not contents.



SUM-100

# SUMMONS
## *(CITACION JUDICIAL)*

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*

FORD MOTOR COMPANY, a Delaware Corporation, and DOES 1
through 10, inclusive

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*

HECTOR CAZARES

> FOR COURT USE ONLY
> *(SOLO PARA USO DE LA CORTE)*
>
> CONFORMED COPY
> ORIGINAL FILED
> Superior Court of California
> County of Los Angeles
>
> SEP 23 2016
>
> Sherri R. Carter, Executive Officer/Clerk
> By: _____ , Deputy
> Mina Ahmadi

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

| The name and address of the court is:<br>*(El nombre y dirección de la corte es):* | CASE NUMBER:<br>*(Número del Caso):* |
|---|---|
| Stanley Mosk Courthouse<br>111 North Hill Street<br>Los Angeles, CA 90012 | **BC 635153** |

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
O'Connor & Mikhov LLP
1801 Century Park East, Suite 2300, Los Angeles, CA 90067
(310) 552-2250

| DATE:<br>*(Fecha)* SEP 23 2016 | Clerk, by<br>*(Secretario)* Ishayla Chambers | , Deputy<br>*(Adjunto)* |

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010)).*

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*

3. ☑ on behalf of *(specify):*   FORD MOTOR COMPANY, a Delaware Corporation

   under: ☑ CCP 416.10 (corporation)          ☐ CCP 416.60 (minor)
          ☐ CCP 416.20 (defunct corporation)   ☐ CCP 416.70 (conservatee)
          ☐ CCP 416.40 (association or partnership) ☐ CCP 416.90 (authorized person)
          ☐ other *(specify):*
4. ☐ by personal delivery on *(date):*

[SEAL]

Page 1 of 1

1

**O'CONNOR & MIKHOV LLP**
Mark O'Connor (SBN 157680)

2

Steve Mikhov (SBN 224676)
Lauren A. Ungs (SBN 273374)

3

1801 Century Park East, Suite 2300
Los Angeles, CA 90067

4

Telephone: (310) 552-2250

5

Fax: (310) 552-7973
Email: laurenu@omlawllp.com

6

7

Attorneys for Plaintiff,
HECTOR CAZARES

8

9

SUPERIOR COURT OF CALIFORNIA
COUNTY OF LOS ANGELES

10

BC 6 3 5 1 5 3

11

**HECTOR CAZARES,**

Case No.:

12

Unlimited Jurisdiction

13

Plaintiff,

**COMPLAINT FOR:**

14

1.  **BREACH OF EXPRESS**

15

vs.

    **WARRANTY – VIOLATION OF
    SONG-BEVERLY ACT**

16

2.  **BREACH OF IMPLIED
    WARRANTY – VIOLATION OF
    SONG-BEVERLY ACT**

17

3.  **FRAUDULENT INDUCEMENT –**

18

    **CONCEALMENT**
4.  **FRAUDULENT INDUCEMENT –**

19

**FORD MOTOR COMPANY, a Delaware
Corporation, and DOES 1 through 10,**

    **INTENTIONAL
    MISREPRESENTATION**

20

**inclusive,**

5.  **FRADULENT INDUCEMENT –
    NEGLIGENT**

21

Defendant.

    **MISREPRESENTATION**

22

23

*Assigned for All Purposes to the
Honorable*

24

Department

25

26

27

28

-1-

Cazares v. Ford - COMPLAINT

CONFORMED COPY
ORIGINAL FILED
Superior Court of California
County of Los Angeles

SEP 2 9 2016

Sherri R. Carter, Executive Office/Clerk
By: _____, Deputy
Ishayla Chambers

BY FAX

Plaintiff, HECTOR CAZARES, alleges as follows against Defendant, FORD MOTOR COMPANY (Hereinafter "Ford"), and DOES 1 through 10 inclusive, on information and belief, formed after an inquiry reasonable under the circumstances:

## GENERAL ALLEGATIONS

1.  Plaintiff, HECTOR CAZARES, is an individual residing in the City of Hawthorne, County of LOS ANGELES, and State of California.

2.  Defendant Ford Motor Company is and was a Delaware Limited Liability Company registered to do business in the State of California with its registered office in the City of Los Angeles, County of Los Angeles, and State of California.

3.  This cause of action arises out of the warranty obligations of Ford Motor Company for a vehicle purchased by Plaintiff and for which Ford Motor Company issued a written warranty. Plaintiff also alleges that Ford concealed a known defect from Plaintiff. The defective component is called the DPS6 PowerShift Transmission (Hereinafter "PowerShift Transmission"). The PowerShift Transmission is an "automated manual" transmission used by Ford in their 2011-2013 Ford Fiesta vehicles and 2012-2011 Ford Fiesta vehicles. Ford also misrepresented to Plaintiff the type of transmission the PowerShift transmission is/was.

4.  Plaintiff does not know the true names and capacities, whether corporate, partnership, associate, individual or otherwise of Defendant issued herein as Does 1 through 10, inclusive, under the provisions of section 474 of the California Code of Civil Procedure. Defendant Does 1 through 10, inclusive, are in some manner responsible for the acts, occurrences and transactions set forth herein, and are legally liable to Plaintiff. Plaintiff will seek leave to amend this Complaint to set forth the true names and capacities of the fictitiously named Defendant, together with appropriate charging allegations, when ascertained.

5.  All acts of corporate employees as alleged were authorized or ratified by an officer, director or managing agent of the corporate employer.

6.  Each Defendant whether actually or fictitiously named herein, was the principal, agent (actual or ostensible), or employee of each other Defendant and in acting as such principal or

-2-

Cazares v. Ford - COMPLAINT

1    within the course and scope of such employment or agency, took some part in the acts and

2    omissions hereinafter set forth by reason of which each Defendant is liable to Plaintiff for the

3    relief prayed for herein.

4        7.  On  January  29,  2012,  Plaintiff  purchased  a  used  2011  Ford  Fiesta,  VIN:

5    3FADP4FJ7BM207799, ("the Vehicle"), and express warranties accompanied the sale of the

6    vehicle to Plaintiff by which Ford Motor Company undertook to preserve or maintain the utility

7    or performance of Plaintiff's vehicle or provide compensation if there was a failure in such

8    utility or performance. The sales contract is attached and incorporated by its reference as Exhibit

9    1.

10       8.  The vehicle was delivered to Plaintiff with serious defects and noneonformities to

11   warranty and developed other serious defects and nonconformities to warranty including, but not

12   limited to a transmission.

13       9.  Plaintiff hereby revokes acceptance of the sales contract.

14

15                    **The DPS6 PowerShift Transmission Defect**

16       10. The Vehicle was manufactured by Ford and delivered to Plaintiff with a PowerShift

17   Transmission.  Ford offered the PowerShift Transmission as the sole "automatic transmission"

18   option in the Subject Vehicle.

19       11. The PowerShift Transmission is neither a traditional manual transmission, nor a typical

20   automatic transmission, but is a computerized "automated manual" transmission.

21       12. Traditional  manual  transmissions  use  a  driver-controlled  clutch.   By  pressing  and

22   releasing  a  foot  pedal,  the  driver  causes  the  clutch  to  mechanically  engage  and  disengage  the

23   engine  from  the  transmission,  allowing  the  vehicle  to  travel  continuously  while  the  driver

24   manually changes gears. Because a clutch allows for transfer of virtually all of the engine's

25   power  to  the  transmission,  a  properly  designed  and  operating  manual  transmission  is  highly

26   efficient.  However,  operation  of  a  manual  transmission  can  be  difficult  for  less  experienced

27   drivers,  and  can  result  in  the  vehicle  jerking  or  shuddering  during  improper  operation,  manual

28   transmissions are disfavored by some consumers.

13. In contrast, typical automatic transmissions free the driver from operating the clutch through the use of a fluid-filled device called a torque converter. The torque converter substitutes for the manual transmission's clutch, transmitting power from the engine to the transmission through a fluid medium.

14. While automatic transmissions offer increased comfort and convenience, they are generally less fuel efficient and slower-shifting than manual transmissions because the torque converter transfers power through fluid less efficiently than a mechanical clutch.

15. Ford marketed and sold its PowerShift Transmission as an automatic transmission that offered the "best of both worlds" combining a manual transmission's fuel economy with an automatic transmission's ease of operation and shift quality.

16. Ford's PowerShift Transmission, while sometimes referred to as an automatic, is actually a set of computerized manual transmissions. It lacks a torque converter, instead using two clutches to mechanically engage and disengage the engine and transmission. Whereas similar "automated manual" transmissions on the market use "wet" clutches bathed in oil, Ford's PowerShift Transmission clutches lack the oil pumps and other components of a wet clutch system, and instead operate "dry."

17. Ford designed the PowerShift Transmission in an effort to meet heightened governmental and consumer expectations for fuel economy, performance, convenience, and efficiency. Ford designed and marketed its PowerShift Transmission as a more advanced and fuel efficient automatic transmission. According to Ford's press release dated March 10, 2010, "PowerShift with dry-clutch facings and new energy-saving electromechanical actuation for clutches and gear shifts saves weight, improves efficiency, increases smoothness, adds durability and is sealed with low-friction gear lubricant for the life of the vehicle. The transmission requires no regular maintenance."

18. In theory, a computer-controlled, automated manual transmission may provide the convenience of an automatic transmission without sacrificing the fuel efficiency and shift speed of a manual transmission. In practice, however, Ford's PowerShift Transmission is plagued by numerous problems and safety concerns.

19.     Plaintiff is informed and believe, and based thereon allege, that the PowerShift Transmission is defective in its design and/or manufacture in that, among other problems, the transmission consistently slips, bucks, kicks, jerks, harshly engages, has premature internal wear, sudden acceleration, delay in downshifts, delayed acceleration, difficulty stopping the vehicle, and, eventually, premature transmission failure (the "Transmission Defect").

20.     The Transmission Defect causes unsafe conditions in vehicles equipped with the PowerShift Transmission, including, but not limited to suddenly lurching forward, delayed acceleration, and sudden loss of forward propulsion.  These conditions present a safety hazard because they severely affect the driver's ability to control the car's speed, acceleration, and deceleration.  For example, these conditions make it difficult to safely merge into traffic.  Even more troubling, the Transmission Defect can cause the vehicle to fail to downshift and decelerate, but instead continue to transfer power to the transmission and even surge the engine's RPMs, when the brakes are depressed.  As a result, drivers of vehicles equipped with the PowerShift Transmission have reported their vehicles lurching forward into intersections at red lights due to the failure of their braking efforts to stop the car.

21.     On information and belief, the Transmission Defect also causes premature wear to the PowerShift Transmission's clutch plates and other components, which results in premature transmission failure and requires expensive repairs, including premature transmission replacement.

22.     As early as 2010, Ford knew or should have known that the PowerShift Transmission contained one or more design and/or manufacturing defects that negatively affect drivability and cause safety hazards.

23.     Plaintiff is informed and believe, and based thereon allege, that prior to sale of the Vehicle, Ford knew, or should have known, about the Transmission Defect through its exclusive knowledge of non-public, internal data about the Transmission Defect, including: pre-releasing testing data; early consumer complaints about the Transmission Defect to Ford's dealers who are Ford's agents for vehicle repairs; dealership repair orders; testing conducted in response to those complaints; technical service bulletins ("TSBs") developed by Ford and communicated to its

1   dealers and authorized repair facilities; the existence of substantially identical defects in

2   substantially identical European and Australian model vehicles released prior to Ford's

3   marketing and sale of the PowerShift Transmission domestically; and other internal sources of

4   information possessed exclusively by Ford and its agents. Nevertheless, Ford and its agents have

5   actively concealed the Transmission Defect, and failed to disclose this defect to Plaintiff at the

6   time of purchase of the Vehicle or thereafter.

7       24.    Before offering vehicles equipped with the PowerShift Transmission (which Ford

8   internally refers to as the "DPS6 automatic transmission") in the United States, Ford offered

9   substantially identical vehicles, equipped with a similar dual-clutch transmission, in Europe and

10  Australia. Although the domestic version of the transmission utilizes dry clutches as opposed to

11  the European and Australian version's wet clutches, Ford acknowledges that the transmission

12  offered for sale in the United States is "derivative" of the design from the European and

13  Australian models. European and Australian versions of the dual-clutch transmission suffered

14  from similar defects known to Ford as alleged herein.

15      25.    In addition to obtaining years of feedback and testing from its European and

16  Australian dual-clutch transmission, according to Ford, its team:

17          "logged approximately three years or 6,000 man-hours of
            computer aided mathematical modeling, simulation and analysis of
18          engine speeds, torque and clutch capacity in only 24 months real
19          time to prove the THF concept was production ready."

20      26.    In addition, Ford boasted about its extensive testing of the vehicle in its marketing

21  brochures that were publicly distributed:

22          "Obsessive was the starting point. You'll enjoy every drive because
            Focus engineers obsessed over every last detail. Focus was
23          thoroughly tested in an assortment of harsh environments and
            situations to make sure you get a car beyond your wildest
24          imagination."

25      27.    The PowerShift Transmission uses a program called Torque Hole Filling ("THF"),

26  which is a combination of computer algorithms and computer aided tools to fill the torque hole,

27  or what is more commonly perceived as a hesitation, while shifting. Ford claimed its THF

28  technology would create a smoother driving experience for the customer to promote sales.

-6-

28.     Despite these claims, consumers have not experienced a smoother driving experience from THF or any other technology incorporated in the PowerShift Transmission. Multiple reviews in automotive journals and customer complaints have documented and confirmed that the PowerShift transmission has continuously exhibited the defects, malfunctions, maladjustments, and nonconformities that the Plaintiff now complains of.

29.     In a 2011 *New York Times* review of the Ford Focus, the reviewer stated that "Ford programmed the PowerShift Dual-clutch transmission to change gears in odd and infuriating ways" and that "[t]he transmission is often in the wrong gear at the wrong time, resulting in jerks, pauses and lethargic acceleration."

- 30. -    In response to these criticisms, Greg Burgess, an engineer at Ford, conceded in the same *New York Times* article that "[i]t is quite a challenge to deliver something that is very, very fuel efficient and yet feels like a conventional automatic, and there are some balances and some trade-offs that we make."

31.     In response to complaints about the Transmission Defect, in 2010 and 2011, Ford issued several Technical Service Bulletins ("TSBs") to its dealers and authorized repair facilities acknowledging defects in the PowerShift Transmission.  Ford's TSB from September 2010, covering the 2011 Ford Fiesta, informed dealers and service personnel of "concerns such as no engagement or intermittent no engagement in Drive or Reverse when shifting from Park to Drive or Reverse, grinding noise during engagement, and/or check engine light with transmission control module (CM) diagnostic trouble code..."

32.     Similarly, Ford's TSB released on January 1, 2011, covering the 2011 Ford Fiesta with the PowerShift Transmission, informs dealers and service personnel of problems with the PowerShift Transmission causing "a loss of power, hesitation, surge, or lack of throttle response while driving."

33.     Ford's TSB from March 31, 2011 also covering the 2011 Ford Fiesta, informs dealers of problems where the PowerShift Transmission "exhibit[s] a rattle/grind noise in reverse only."

///

34.     Ford issued two separate TSBs in May 2011, both covering the Ford Fiesta. These TSBs addressed problems with the PowerShift Transmission including "concerns in Drive or Reverse when shifting from Park to Drive or reverse, no engagement, delayed engagement, intermittent engagement, noise during engagement…"

35.     Another Ford TSB released in September 2011 advised dealers to reprogram the transmission computer if 2011 Ford Fiesta owners complained about "hesitation when accelerating from a low speed after coast down, harsh or late 1-2 upshift, harsh shifting during low-speed tip-in or tip-out maneuvers and/or engine r.p.m. flare when coasting to a stop."

36.     The 2012 Ford Focus was the subject of a September 2011 Ford TSB, which informed dealers and service personnel of transmission problems including: "RPM flare on deceleration coming to a  stop, rough idle on deceleration coming to a stop, intermittent engine idle fluctuations at a stop, intermittent vehicle speed control inoperative, intermittent harsh engagement/shift…"

37.     In May of 2012, Ford issued a "Customer Satisfaction Program: Program Number 12B37." In a letter sent to 2012 Ford Focus drivers, Ford indicated that drivers "may experience rough or jerky automatic transmission shifts. In addition, the vehicle may experience roll back when the driver is transitioning from the brake pedal to the accelerator pedal while on a slight incline." Significantly, Ford did not issue a recall and did not warn drivers of the safety risks associated with these known problems.

38.     Because Ford will not notify the public that the transmission is defective, Plaintiff (as well as members of the general public) is subjected to dangerous driving conditions that often occur without warning.

39.     Ford knew about, and concealed, the Transmission Defect present in the Vehicle, along with the Transmission Defect's attendant dangerous safety and drivability problems, from Plaintiff at the time of sale, repair, and thereafter. In fact, instead of repairing the defects in the PowerShift Transmission, Ford either refused to acknowledge their existence, or performed superficial and ineffectual software upgrades that simply masked the symptoms of the Transmission Defect.

1    40.    If Plaintiff knew about these defects at the time of sale, Plaintiff would not have

2    purchased the Vehicle or would have paid substantially less for it.

3    41.    As a result of Plaintiff's reliance on Ford and its agent's omissions and/or

4    misrepresentations, Plaintiff suffered an ascertainable loss of money, property, and value to the

5    Vehicle.  Additionally, as a result of the Transmission Defect, Plaintiff were harmed and suffered

6    actual damages in that the Vehicle's transmission is substantially certain to fail before its

7    expected useful life has run.

8

9                    **Ford Had Exclusive Knowledge of the Transmission Defect**

10    42.    Ford had superior and exclusive knowledge of the Transmission Defect, and knew or

11    should have known that the Transmission Defect was not known or reasonably discoverable by

12    Plaintiff, before Plaintiff purchased the Vehicle.

13    43.    Plaintiff is informed and believe and based thereon allege that before Plaintiff

14    purchased the Vehicle, and since at least 2010, Ford knew about the Transmission Defect

15    through sources not available to consumers, including pre-release testing data, early consumer

16    complaints about the transmission defects to Ford and its dealers, testing conducted in response

17    to those complaints, high failure rates and replacement part sales data, aggregate data from Ford

18    dealers, among other internal sources of aggregate information about the problem including, but

19    not limited to, similar defects in the substantially identical European and Australian models.

20    44.    Before the Vehicle was available for sale in the United States, Ford offered the same

21    vehicles, equipped with a similar dual-clutch transmission, in Europe and Australia.  Although

22    the United States version utilizes dry-clutches as opposed to the European and Australian

23    version's wet-clutches, Ford acknowledged in its own press release that the transmission offered

24    for sale in the United States is a "derivative" of the design of the European and Australian

25    models.  European and Australian versions of the dual-clutch transmission suffered from similar

26    defects as alleged herein.

27    45.    In addition to having access to years of analysis and feedback concerning the prior

28    dual-clutch design, Ford also acknowledged in its own press releases the extensive pre-release

1   testing and computer aided modeling, simulation, and analysis it conducted before bringing the

2   PowerShift Transmission to the United States market.

3       46.     Ford was also aware of the Transmission Defect through the numerous complaints it

4   received, both from consumers and from automotive journalists, who roundly criticized the

5   performance of the PowerShift Transmission.  Indeed, a July 15, 2011 *New York Times* review of

6   the Ford Focus criticized the PowerShift transmission's "jerks, pauses and lethargic

7   acceleration."  In that same article, Greg Burgess, a Ford engineer, admitted that Ford made

8   "tradeoffs" in terms of drivability in order to "deliver something that is very, very fuel efficient."

9       47.     The review went on to state: "the logical explanation is that they [the Ford Engineers]

10  were given a fuel economy target and no option but to meet it. -One might wonder why a top

11  executive didn't step in to keep the transmission from reaching market."

12      48.     The existence of the Transmission Defect is a material fact that a reasonable

13  consumer would consider when deciding whether to purchase or lease a vehicle equipped with a

14  PowerShift Transmission.  Had Plaintiff known that the Vehicle was equipped with a defective

15  transmission, they would not have purchased the Vehicle equipped with the PowerShift

16  Transmission or would have paid substantially less for it.

17      49.     Reasonable consumers, like Plaintiff, reasonably expect that a vehicle's transmission

18  is safe, will function in a manner that will not pose a safety hazard, and is free from defects.

19  Plaintiff further reasonably expect that Ford will not sell or lease vehicles with known safety

20  defects, such as the Transmission Defect, and will disclose any such defects to its consumers

21  when it learns of them.  They did not expect Ford to fail to disclose the Transmission Defect to

22  them and to continually deny the defect.

23

24              **Ford's Failure to Disclose the PowerShift Transmission Defect**

25      50.     Ford has never disclosed the PowerShift Transmission defect to Plaintiff prior to the

26  purchase of the Subject Vehicle or at any point during ownership of the Subject Vehicle, and

27  Ford has never instructed its dealerships to disclose the PowerShift Transmission defect to

28  drivers or potential purchasers or lessees of vehicles equipped with the PowerShift Transmission.

-10-

51.     The PowerShift Transmission defect was not known or reasonably discoverable by the Plaintiff before purchase or lease, or without experiencing the defect first hand and exposing themselves to an unreasonable safety risk.

52.     Ford has remained silent even as it issued service bulletins, conducted internal investigations, and witnessed the failure of the transmission in earlier models of their vehicles distributed in Europe and Australia.

53.     Ford's refusal to publically acknowledge the defect has created widespread confusion. Ford's failure to notify consumers, dealerships, or auto-technicians prevents the PowerShift Transmission problem from being efficiently diagnosed. Drivers are led to believe that the problems they are experiencing with the transmission in their vehicle are actually "normal characteristics" of the transmission. Likewise, the lack of information makes it less likely that dealerships and auto-technicians will be able to diagnose and fix the PowerShift Transmission defect, or advise Plaintiff about the dangers of driving the Subject Vehicle.

54.     As a result of Ford's inaction and silence, Plaintiff was entirely unaware that Plaintiff purchased, and continues to drive, an unsafe and unreliable vehicle. As Ford knows, a reasonable person would consider the PowerShift Transmission defect important and would not purchase or lease a vehicle equipped with the PowerShift Transmission defect were the defect disclosed in advance, or would pay substantially less for the vehicle.

**Ford Has Actively Concealed the Transmission Defect**

55.     While Ford has been fully aware of the Transmission Defect affecting the Vehicle, Ford and its agents actively concealed the existence and nature of the Transmission Defect from Plaintiff at the time of purchase, repair, and thereafter.  Specifically, Ford failed to disclose or actively concealed, at and after the time of purchase or repair:

> a.  any and all known material defects or material nonconformity of the Vehicle, including the defects relating to the PowerShift Transmission;
>
> b.  that the Subject Vehicles, including their PowerShift Transmission, were not in good working order, were defective, and were not fit for the intended purposes;

and

    c. that Subject Vehicles and their PowerShift Transmission were defective, despite the fact that Ford learned of such defects through alarming failure rates, customer complaints, as well as through other internal sources, as early as 2010.

56.     As a result of the Transmission Defect, Ford was inundated with complaints regarding the PowerShift Transmission. In July 2011, Ford implemented a communications strategy intended to enlighten consumers about some of the behavior characteristics of the PowerShift Transmission in order to "improve customer expectations." In a memo with instructions sent to Ford dealers and service personnel, which Ford intended its dealers and service personnel to communicate to consumers, Ford noted that some of the common and normal characteristics of the PowerShift Transmission include double clicking metal sounds, coast down whine, low speed grinding, and reverse gear whine.

57.     However, despite Ford's public insistence that these behavioral characteristics of the PowerShift Transmission were normal, in 2010 and 2011, Ford issued several TSBs to its dealers in the United States acknowledging defects in the PowerShift Transmission. Ford's TSB from September 2010, covering the 2011 Ford Fiesta, informs dealers how to address and attempt to repair the PowerShift Transmission in response to "concerns such as no engagement or intermittent no engagement in Drive or Reverse when shifting from Park to Drive or Reverse, grinding noise during engagement, and/or a check engine light with transmission control module (TCM) diagnostic trouble code…"

58.     Ford's TSB released on January 1, 2011, covering the 2011 Fiesta with the PowerShift Transmission, informs dealers of problems with the PowerShift Transmission causing "a loss of power, hesitation, surge, or lack of throttle response while driving."

59.     Ford's TSB from March 31, 2011, also covering the 2011 Ford Fiesta, informs dealers of problems where the PowerShift Transmission "exhibit[s] a rattle/grind noise in reverse only."

60.     Ford issued two separate TSBs in May 2011, both covering the Ford Fiesta. These TSBs addressed problems with the PowerShift Transmission including "concerns in Drive or

-12-

1  Reverse when shifting from Park to Drive or reverse, no engagement, delayed engagement,

2  intermittent engagement, noise during engagement…"

3      61.      On information and belief, another Ford TSB released in September 2011 advised

4  dealers to reprogram the transmission computer if 2011 Fiesta owners complained about

5  "hesitation when accelerating from a low speed after coast down, harsh or late 1-2 upshift, harsh

6  shifting during low-speed tip-in or tip-out maneuvers and/or engine r.p.m. flare when coasting to

7  a stop."

8      62.      The 2012 Ford Focus was the subject of a Ford TSB in September 2011, which

9  informed dealers of transmission problems including: "RPM flare on deceleration coming to a

10  stop, rough idle on deceleration coming to a stop, intermittent engine idle fluctuations at a stop,

11  intermittent vehicle speed control inoperative, intermittent harsh engagement/shift…"

12      63.      In December of 2011, *Motor Trend* magazine called these efforts by Ford a "stealth

13  upgrade" and noted that while "[t]here's no official recall or service campaign… anybody who

14  complains or requests an upgrade at the dealership can have their powertrain control computer

15  re-flashed."

16      64.      On information and belief, the software upgrades recommended and encouraged by

17  the various TSBs issued by Ford were completely ineffective at addressing the Transmission

18  Defect.

19      65.      When consumers present vehicles equipped with the PowerShift Transmission to an

20  authorized Ford dealer for repair to the transmission, rather than inform consumers of the

21  Transmission Defect or conclusively repair the problem under warranty, Ford's dealers and

22  authorized repair facilities either inform consumers that their vehicles are functioning properly,

23  or perform superficial and ineffectual software updates that delay or mask the manifestation of

24  the Transmission Defect in an attempt to avoid more comprehensive and expensive repairs or

25  replacements under the warranty.

26      66.      To this day, Ford still has not notified Plaintiff that the Vehicle suffers from a

27  systemic defect that causes the transmission to malfunction.

28

Cazares v. Ford - COMPLAINT

## PLAINTIFF'S EXPERIENCES

67.  The Vehicle was equipped with a DPS6 Ford PowerShift Transmission.

68.  On or about January 29, 2012, Plaintiff visited South Bay Ford in Hawthorne, California in hopes of purchasing a Ford Fiesta vehicle. Plaintiff walked the dealership in search of a vehicle to meet Plaintiff's needs, assisted by a salesperson. Plaintiff was specifically searching for a Ford Focus vehicle with an automatic transmission for a smoother and more effortless drive. In searching the car inventory on the car lot, Plaintiff reviewed the window stickers of multiple Ford Focus vehicles that caught her eye.  The window stickers on these vehicles identified them as having an automatic transmission. Plaintiff identified a 2011 Ford Fiesta she as interested in purchasing. Plaintiff's conversations with the salesperson, the window sticker on the vehicle, and a test drive of the vehicle all reinforced Plaintiff's belief that the Vehicle was in fact equipped with an automatic transmission.  The salesperson never disclosed to Plaintiff that the vehicle was not actually equipped with an automatic transmission.  Plaintiff relied on the statements on the window sticker and marketing materials they had received about the Ford Fiesta.

69.  Prior to purchasing the Vehicle, Plaintiff reviewed marketing brochures, viewed television commercials and/or heard radio commercials about the qualities of the Ford Fiesta. Plaintiff also relied on Ford's reputation as an established and experienced auto manufacturer; Plaintiff relied on the statements made during the sales process by Ford's agents and within the marketing brochures provided by Ford.  However, Ford and its authorized agents did not publicly or privately disclose to Plaintiff any information about the Transmission Defect. These omissions were material to Plaintiff's decision to purchase the Vehicle.  Had Ford and/or its authorized agents publicly or privately disclosed the Transmission Defect before Plaintiff purchased the Vehicle, Plaintiff would have been aware of such disclosures, and would not have purchased the Vehicle.

70.  On or around September 8, 2014, Plaintiff delivered the Vehicle to an authorized Ford repair facility for repair. Plaintiff complained that the transmission jerks on takeoff and makes clunking noises. The repair facility recalibrated the PCM and TCM. The Vehicle not returned to

1   Plaintiff the same day. When the Vehicle was returned to Plaintiff, the service technician

2   represented to Plaintiff that the Vehicle had been repaired and was safe to drive. Plaintiff

3   reasonably relied on this representation by the service technician at the authorized Ford repair

4   facility. All repairs were covered under Ford's written warranty.

5       71.   On or around June 9, 2015, Plaintiff again delivered the Vehicle to an authorized Ford

6   repair facility for repair with complaints of the transmission jerking and hesitating on

7   accelerationand stops. The repair facility technicians ordered a new clutch and returned the

8   vehicle to Plaintiff. The service technician represented to Plaintiff that the Vehicle was safe to

9   drive. Plaintiff reasonably relied on this representation by the service technician at the authorized

10   Ford repair facility. All repairs were covered under Ford's written warranty.

11       72.   On or around November 4, 2015, Plaintiff delivered the Vehicle to an authorized Ford

12   repair facility for repair. Plaintiff complained that the transmission jerks on takeoff. The repair

13   facility replaced the clutch, rest the clutch, replaced the input shaft seals, and performed TCM

14   adaptive learning. The Vehicle was returned to Plaintiff the same day. When the Vehicle was

15   returned to Plaintiff, the service technician represented to Plaintiff that the Vehicle had been

16   repaired and was safe to drive. Plaintiff reasonably relied on this representation by the service

17   technician at the authorized Ford repair facility. All repairs were covered under Ford's written

18   warranty.

19       73. On or around March 17, 2016, Plaintiff delivered the Vehicle to an authorized Ford repair

20   facility for repair. Plaintiff again complained that the transmission jerks on takeoff. The repair

21   facility ordered a replacement clutch and performed recal repairs of replacing all door latches.

22   The Vehicle was not returned to Plaintiff until the next day. When the Vehicle was returned to

23   Plaintiff, the service technician represented to Plaintiff that the Vehicle had was safe to drive.

24   Plaintiff reasonably relied on this representation by the service technician at the authorized Ford

25   repair facility. All repairs were covered under Ford's written warranty.

26       74.   On or around May 26, 2016, Plaintiff delivered the Vehicle to an authorized Ford

27   repair facility for repair. The repair facility technicians replaced the clutch, and performed TCM

28   adaptive learning. The Vehicle was then returned to Plaintiff, and the service technician

1   represented to Plaintiff that the Vehicle had been repaired and was safe to drive. Plaintiff

2   reasonably relied on this representation by the service technician at the authorized Ford repair

3   facility. All repairs were covered under Ford's written warranty.

4

5   <u>All Statute of Limitations Periods are Tolled by the Discovery Rule and the<br>Doctrine of Fraudulent Concealment</u>

6

7   75. Ford misrepresented the qualities of the transmission in the Vehicle to Plaintiff at the

8   time of the sale of the vehicle. Ford also concealed the fact that the transmission was defective.

9   76. Ford continued to misrepresent its ability to repair the vehicle in conformity with the

10  warranty throughout the warranty period.

11  77. At all relevant times, Ford was aware of the defects in the Powershift transmission.

12  78. As described in more detail above, as early as 2010, Ford began issuing significant

13  technical service bulletins to its authorized dealers explaining the widespread issues with the

14  Powershift transmission. At no point prior to the sale of the vehicle to Plaintiff or during

15  Plaintiff's ownership of the Vehicle did Ford or an authorized dealer ever inform Plaintiff of the

16  ongoing defect or the fact that Plaintiff's Vehicle was not actually equipped with an automatic

17  transmission.

18  79. Ford had a duty to disclose the concealed facts alleged above because Ford knew that

19  Plaintiff did not know a material fact and further knew that such facts were not readily accessible

20  to the Plaintiff because Ford actively concealed those facts.

21  80. Ford had a duty to disclose the concealed facts alleged above because Ford made

22  misrepresentations in its marketing materials and window stickers and through its authorized

23  sales representatives about the quality, characteristics, and safety of the Powershift transmission.

24  81. Ford had a duty to disclose the concealed facts alleged above because Ford actively

25  concealed material facts in order to induce a false belief.

26  82. Ford intended for Plaintiff to rely on those misrepresentations to conceal the fact that the

27  defective Powershift Transmission could not be repaired.

28  ///

83. Prior to the sale of the Vehicle, and at all times thereafter, Defendant therefore failed to disclose the existence of the vehicle's inherent defects to Plaintiff, and Defendant failed to disclose its inability to repair these inherent defects, which prevented the Vehicle from conforming to its applicable warranties. In effect, after the sale of the Vehicle, Defendant fraudulently concealed from purchasers, including Plaintiff, the fact that the dealers were not properly repairing the defects to the Powershift transmission, and knew that the limited work that Ford had authorized its dealerships to perform on those vehicles would not properly repair them. Ford also continued to conceal the fact that Plaintiff's vehicle was not in fact equipped with an automatic transmission as advertised.

84. On or around July 2014, Plaintiff received a letter in the mail from Ford informing Plaintiff of a "Customer Satisfaction Program." That letter stated "[o]n your vehicle, it may be possible for the PowerShift 6-speed Automatic Transmission to exhibit excessive transmission clutch shudder during light acceleration. This condition may be caused by fluid contamination of the clutch due to leaking transmission seals." The letter further stated that Ford was extending the warranty on the "clutch and transmission input shaft seals as well as the transmission software calibration, to a total of seven (7) years or 100,000 miles from the warranty start date, whichever occurs first." The letter suggests that the Vehicle is equipped with a manual transmission by providing several "normal operating characteristics" that are associated with a manual transmission in addition to stating the PowerShift transmission uses "the advantages of a manual transmission." This was the earliest date that Ford made any attempt to notify Plaintiff of any of the known defects in the transmission or the implication that the vehicle was actually equipped with a manual transmission. This date was the earliest date that Plaintiff could have had any sort of notice of the facts which give rise to Plaintiff's fraud causes of action. Ford did not disclose any of this information prior to the sale of the vehicle to Plaintiff or at any earlier date during ownership. Accordingly, Plaintiff could not have discovered Plaintiff's claims prior to July 2014. Plaintiff could not, through reasonable and diligent investigation, have discovered such on an earlier date because of Ford's fraudulent misrepresentations and concealment of the defects in the PowerShift transmission in Plaintiff's vehicle, as previously alleged above, and

1  because of the repeated false assurances of Ford and its service dealership agents made to

2  Plaintiff, on which Plaintiff reasonably relied, that Ford had and would repair any problems with

3  the transmission in Plaintiff's vehicle that occurred during the express warranty period.  The

4  statute of limitations for each of Plaintiff's claims against Ford was therefore tolled under the

5  delayed discovery rule and the doctrine of fraudulent concealment until Plaintiff could have first

6  discovered on or around July 2014, that Ford had misrepresented the characteristics of the

7  transmission and concealed the known defects during the ownership of the Vehicle.

8       85. Because Ford failed to disclose these foregoing facts to Plaintiff, all statute of limitations

9  periods with respect to sale of the Vehicle were tolled by the doctrines of fraudulent

10 concealment, the discovery rule, and/or equitable tolling.  As alleged herein, Ford wrongfully

11 concealed the fact (1) that the Vehicle was equipped with a manual transmission (the PowerShift

12 transmission), and (2) that its dealerships were making inadequate repairs that were incapable of

13 addressing the root cause of the Vehicle's malfunctions.

14      86. Plaintiff did not discover the operative facts that are the basis of the claims alleged herein

15 because the facts were concealed in confidential and privileged documents, which a consumer

16 would not know about and could not obtain.

17      87. No amount of diligence by Plaintiff could have led to the discovery of these facts because

18 they were kept secret by Ford and, therefore, Plaintiff was not at fault for failing to discover

19 these facts.

20      88. Plaintiff did not have actual knowledge of facts sufficient to put them on notice.  Plaintiff

21 did not know, nor could have known, about Ford's inability to repair the defects in its PowerShift

22 transmission because, as alleged above, Ford kept this information highly confidential, and its

23 dealership assured Plaintiff that its repairs were effective.

24 All Statute of Limitations Periods are Tolled by the Tolling Doctrine Established in *American*

25 *Pipe & Construction Co. v. Utah* (1974) 414 U.S. 538 As a Result of the Class Action *Vargas v.*

26 *Ford Motor Company*

27      89. Plaintiff gave timely notice of Plaintiff's claims against Ford in the present action as

28 putative class members in a class action, *Vargas v. Ford Motor Company*, United States District

-18-

Cazares v. Ford - COMPLAINT

1   Court, Central District of California, Case No. 2:12-cv-08388 ABC (FFMx), which was filed on

2   September 28, 2012. That action was filed within three years of the date of Plaintiff's discovery

3   of their claims against Ford in the present action, as previously described in detail above.

4       90. There is no prejudice to Ford in gathering evidence to defend against Plaintiff's

5   individual claims because the class definition in the class action complaint within which Plaintiff

6   were putative class members and the allegations in the class action lawsuit, *Vargas v. Ford*

7   *Motor Company*, United States District Court, Central District of California, Case No. 2:12-cv-

8   08388 ABC (FFMx), put Ford on notice of the facts that give rise to Plaintiff's individual action,

9   the witnesses necessary for Ford to defend Plaintiff's individual action, and the causes of action

10   against Ford asserted in Plaintiff's individual action.

11       91. *Vargas v. Ford Motor Company*, United States District Court, Central District of

12   California, Case No. 2:12-cv-08388 ABC (FFMx) alleged the material facts on behalf of Plaintiff

13   as putative class members as are being alleged by Plaintiff in the present individual action.

14       92. The facts alleged in *Vargas v. Ford Motor Company*, United States District Court,

15   Central District of California, Case No. 2:12-cv-08388 ABC (FFMx) are substantially similar, if

16   not identical to the facts alleged herein.

17       93. The allegations in *Vargas v. Ford Motor Company*, United States District Court, Central

18   District of California, Case No. 2:12-cv-08388 ABC (FFMx) are based on the same subject

19   matter and similar evidence as the instant complaint. Those allegations concern the same

20   evidence, memories, and witnesses as the subject matter in the instant complaint.

21       94. The *Vargas* class action certainly protected the efficiency and economy of litigation

22   because that class action is protecting the rights of thousands of consumers nationwide through a

23   single action.   Consumer class actions regarding defective vehicles brought against

24   manufacturers are regularly certified, making a class action lawsuit an efficient means of

25   pursuing such claims.

26       95. The tolling of Plaintiff's individual statute of limitations encourages the protection of

27   efficiency and economy in litigation as promoted by the class action devise, so that putative class

28   members would not find it necessary to seek to intervene or to join individually because of fear

1 the class might never be certified or putative class members may subsequently seek to request

2 exclusion.

3    96. The running of all statute of limitations on each of Plaintiff's claims asserted against Ford

4 in the present action were therefore tolled by *American-Pipe* tolling during the entire pendency

5 of the *Vargas* class action (i.e., from the date on which the *Vargas* class action was filed on

6 September 28, 2012 to the date on which Plaintiff filed the instant action).

7

8 <u>All Statute of Limitations Periods are Tolled Under California Law by the Doctrine of Equitable Tolling As a Result of the Class Action *Vargas v. Ford Motor Company*</u>

9

10    97. Plaintiff gave timely notice of Plaintiff's claims against Ford in the present action as

11 putative class members in a class action, *Vargas v. Ford Motor Company*, United States District

12 Court, Central District of California, Case No. 2:12-cv-08388 ABC (FFMx), which was filed on

13 September 28, 2012.  That action was filed within three years of the date of Plaintiff's discovery

14 of their claims against Ford in the present action, as previously described in detail above.

15    98. There is no prejudice to Ford in gathering evidence to defend against Plaintiff's

16 individual claims because the class definition in the class action complaint within which Plaintiff

17 were putative class members and the allegations in the class action lawsuit, *Vargas v. Ford*

18 *Motor Company*, United States District Court, Central District of California, Case No. 2:12-cv-

19 08388 ABC (FFMx), put Ford on notice of the facts that give rise to Plaintiff's individual action,

20 the witnesses necessary for Ford to defend Plaintiff's individual action, and the causes of action

21 against Ford asserted in Plaintiff's individual action.

22    99. *Vargas v. Ford Motor Company*, United States District Court, Central District of

23 California, Case No. 2:12-cv-08388 ABC (FFMx) alleged the material facts on behalf of Plaintiff

24 as putative class members as are being alleged by Plaintiff in the present individual action.

25    100.    The facts alleged in *Vargas v. Ford Motor Company*, United States District Court,

26 Central District of California, Case No. 2:12-cv-08388 ABC (FFMx) are substantially similar, if

27 not identical to the facts alleged herein.

28 ///

101.     The allegations in *Vargas v. Ford Motor Company*, United States District Court, Central District of California, Case No. 2:12-cv-08388 ABC (FFMx) are based on the same subject matter and similar evidence as the instant complaint.  Those allegations concern the same evidence, memories, and witnesses as the subject matter in the instant complaint.

102.     The *Vargas* class action certainly protected the efficiency and economy of litigation because that class action is protecting the rights of thousands of consumers nationwide through a single action.  Consumer class actions regarding defective vehicles brought against manufacturers are regularly certified, making a class action lawsuit an efficient means of pursuing such claims.

103.     Plaintiff acted reasonably and in good faith in filing the instant action.  Shortly after discovering Ford's fraudulent behavior, Plaintiff filed the instant action to pursue their individual rights without delay.

104.     The tolling of Plaintiff's individual statute of limitations encourages the protection of efficiency and economy in litigation as promoted by the class action devise, so that putative class members would not find it necessary to seek to intervene or to join individually because of fear the class might never be certified or putative class members may subsequently seek to request exclusion.

105.     The running of all statute of limitations on each of Plaintiff's claims asserted against Ford in the present action were therefore tolled by *American-Pipe* tolling during the entire pendency of the *Vargas* class action (i.e., from the date on which the *Vargas* class action was filed on September 28, 2012 to the date on which Plaintiff filed the instant action).

## FIRST CAUSE OF ACTION

### Violation of the Song-Beverly Act – Breach of Express Warranty

106.     Plaintiff incorporates herein by reference each and every allegation contained in the preceding and succeeding paragraphs as though herein fully restated and re-alleged.

107.     Express warranties accompanied the sale of the vehicle to Plaintiff by which Ford undertook to preserve or maintain the utility or performance of Plaintiff's vehicle or provide

1  compensation if there was a failure in such utility or performance.

2  108.    The vehicle was delivered to Plaintiff with serious defects and nonconformities to

3  warranty and developed other serious defects and nonconformities to warranty including, but not

4  limited to a transmission.

5  109.    Pursuant to the Song-Beverly Consumer Warranty Act (herein after the "Act") Civil

6  Code sections 1790 *et seq.* the vehicle constitutes "consumer goods" used primarily for family or

7  household purposes, and Plaintiff have used the vehicle primarily for those purposes.

8  110.    Plaintiff is a "buyer" of consumer goods under the Act.

9  111.    Defendant Ford is a "manufacturer" and/or "distributor" under the Act.

10  112.    The foregoing defects and nonconformities to warranty manifested themselves within

11  the applicable express warranty period. The nonconformities substantially impair the use, value

12  and/or safety of the vehicle.

13  113.    Plaintiff delivered the vehicle to an authorized Ford repair facility for repair of the

14  nonconformities.

15  114.    Defendant was unable to conform Plaintiff's vehicle to the applicable express

16  warranty after a reasonable number of repair attempts.

17  115.    Notwithstanding Plaintiff's entitlement, Defendant Ford has failed to either promptly

18  replace the new motor vehicle or promptly make restitution in accordance with the Song-Beverly

19  Act.

20  116.    By failure of Defendant to remedy the defects as alleged above, or to issue a refund or

21  replacement, Defendant is in breach of its obligations under the Song-Beverly Act.

22  117.    Under the Act, Plaintiff is entitled to reimbursement of the price paid for the vehicle

23  less that amount directly attributable to use by the Plaintiff prior to discovery of the

24  nonconformities.

25  118.    Plaintiff is entitled to all incidental, consequential, and general damages resulting

26  from Defendant's failure to comply with their obligations under the Song-Beverly Act.

27  119.    Plaintiff is entitled under the Song-Beverly Act to recover as part of the judgment a

28  sum equal to the aggregate amount of costs and expenses, including attorney's fees, reasonably

-22-

Cazares v. Ford - COMPLAINT

1  incurred in connection with the commencement and prosecution of this action.

2      120.   Plaintiff is entitled in addition to the amounts recovered, a civil penalty of up to two

3  times the amount of actual damages in that Ford, has willfully failed to comply with its

4  responsibilities under the Act.

5

6                                **SECOND CAUSE OF ACTION**

7             **Violation of the Song-Beverly Act – Breach of Implied Warranty**

8      121.   Plaintiff incorporates herein by reference each and every allegation contained in the

9  preceding and succeeding paragraphs as though herein fully restated and re-alleged.

10     122.   Ford and its authorized dealership at which Plaintiff purchased the Subject Vehicle

11 had reason to know the purpose of the Subject Vehicle at the time of sale of the Subject Vehicle.

12 The sale of the Subject Vehicle was accompanied by an implied warranty of fitness.

13     123.   The sale of the Subject Vehicle was accompanied by an implied warranty that the

14 Subject Vehicle was merchantable pursuant to Civil Code section 1792.

15     124.   The Subject Vehicle was not of the same quality as those generally acceptable in the

16 trade because it was equipped with a defective transmission.

17     125.   The Subject Vehicle was not fit for the ordinary purpose for which such goods are

18 used because it was equipped with a defective transmission.

19     126.   The Subject Vehicle did not measure up to the promises or facts stated on the

20 container or label because it was equipped with a defective transmission.

21     127.   The Subject Vehicle did not measure up to the promises or facts stated on the

22 container or label because it was equipped with an automated manual transmission rather than

23 the automatic transmission as labeled.

24     128.   Plaintiff is entitled to justifiably revoke acceptance of the Subject Vehicle under Civil

25 Code section 1794, *et seq*; Plaintiff hereby revoke acceptance of the Subject Vehicle.

26     129.   Plaintiff is entitled to replacement or reimbursement pursuant to Civil Code section

27 1794, *et seq.*

28 ///

---

1   130.   Plaintiff is entitled to rescission of the contract pursuant to Civil Code section 1794, *et*

2   *seq.* and Commercial Code section 2711.

3   131.   Plaintiff is entitled to recover any "cover" damages under Commercial Code sections

4   2711, 2712, and Civil Code section 1794, *et seq.*

5   132.   Plaintiff is entitled to recover all incidental and consequential damages pursuant to

6   1794 *et seq* and Commercial Code sections 2711, 2712, and 2713 *et seq.*

7

8   **THIRD CAUSE OF ACTION**

9   **Fraudulent Inducement – Concealment**

10   131.   Plaintiff incorporates herein by reference each and every allegation contained in the

11   preceding and succeeding paragraphs as though herein fully restated and re-alleged.

12   132. Ford and its agents intentionally concealed and failed to disclose facts relating to the

13   Transmission Defects as explained in detail in paragraphs 8-64.

14   133. Defendant was the only party with knowledge of the Transmission Defects because that

15   knowledge came from internal reports such as pre-release testing data, customer complaints

16   made directly to Defendant, and technical service bulletins.   None of this information was

17   available to the public, nor did Defendant publicly or privately disclose any of the information to

18   Plaintiff. Ford had exclusive knowledge of the defect as described in detail in paragraphs 40-47.

19   134. Ford actively concealed information from the public, preventing Plaintiff from

20   discovering any of the concealed facts as described in detail in paragraphs 53-64.

21   135. Prior to the date of sale, on the date of sale, and on the date of each of the repair

22   attempts, Defendant had an opportunity to disclose to Plaintiff, but instead concealed from and

23   failed to disclose to Plaintiff, any of the known irreparable issues with the Vehicle.

24   136. Ford intended to deceive Plaintiff by concealing the known issues with the PowerShift

25   Transmission, including the Transmission Defect, in an effort to sell the Vehicle at a maximum

26   price.

27   137. Ford knew of the specific transmission issues affecting the Vehicle, including the

28   Transmission Defect, prior to the sale of the Vehicle. For example, in 2010, Ford released a TSB

after months of research relating to "concerns such as no engage or intermittent no engage in Drive or Reverse when shifting from Park to Drive or Reverse" for certain vehicles equipped with the PowerShift Transmission.  Plaintiff's vehicle was sold after Ford acknowledged these problems in a TSB without any sort of disclosure being made to the Plaintiff.  When Plaintiff experienced repeated problems with the shifting of the transmission in the Vehicle, and at each time Plaintiff brought the Vehicle to Ford's authorized repair facility for evaluation and repair, Ford and its agents continued to conceal the known Transmission Defect and repeatedly represented to Plaintiff that it was able to fix the issue.

138.  Plaintiff did not know about the Transmission Defects at the time of sale.  Plaintiff also did not know of the irreparable nature of the problems at the time of any of the repair attempts because Ford and its agents repeatedly represented that it was able to fix the vehicle upon return of the Vehicle to Plaintiff.

139.  Had Ford and/or its agents publicly or privately disclosed the Transmission Defect to Plaintiff at or prior to the sale, Plaintiff would not have purchased the Vehicle.

140.  Plaintiff was harmed by Defendant's concealment of the Transmission Defect because Plaintiff was induced to enter into the sale of a vehicle that Plaintiff would not have otherwise purchased.

141.  Defendant's concealment of the defects was a substantial factor in causing Plaintiff's harm.

## FOURTH CAUSE OF ACTION

### Fraudulent Inducement – Intentional Misrepresentation

142.  Plaintiff incorporates herein by reference each and every allegation contained in the preceding and succeeding paragraphs as though herein fully restated and re-alleged.

143.  Ford drafted, produced, and distributed marketing brochures to the public containing factual representations about the PowerShift Transmission.  Ford's marketing brochure for the Vehicle represented the PowerShift Transmission had the following qualities:

-25-

1        a.  "An available PowerShift 6-speed automatic transmission can provide torque to

2            the wheels 100% of the time during shifts, for an extra-connected feel."

3   144.  Unfortunately, the Vehicle as delivered to Plaintiff had extremely poor handling on all

4 roads, as Plaintiff's drive was repeatedly interrupted by jerky shifts and hesitation.  Plaintiff's

5 Vehicle was also not equipped with an "automatic" transmission, contrary to Ford's suggestion

6 that the transmission is a traditional "automatic."  Plaintiff's Vehicle in fact contained an

7 unproven automated dual clutch manual transmission.  Plaintiff's Vehicle did not have seamless

8 gear changes – it experienced jerky gear changes and hesitation between shifts, which

9 necessitated several repairs and repeated reprogramming of the transmission control module –

10 none of which were sufficient to resolve the Transmission Defect.

11   145.  Ford made such representations regarding PowerShift Transmission in the 2011 Ford

12 Fiesta despite its extensive internal knowledge of the Transmission Defect and other problems.

13 Ford's knowledge of the Transmission Defect is laid out in detail in paragraphs 8-47.

14   146.  Ford informed its dealers and authorized service facilities and personnel, about

15 common behavior characteristics of the PowerShift Transmission in July 2011.  In a memo with

16 instructions sent to Ford dealers and authorized service personnel, Ford noted that some of the

17 common characteristics of the PowerShift Transmission include double clicking metal sounds,

18 coast down whine, low speed grinding, and reverse gear whine.  Despite this admission by Ford

19 to its dealers, repair facilities, and agents, Ford continued to represent to the public that the

20 PowerShift Transmission offered "great handling on all roads," and "the performance of a

21 manual," and seamless gear changes for amazing responsiveness," a wildly different picture from

22 the reality.  Ford made the statements in its marketing brochures recklessly and without regard

23 for their truth.

24   147. In addition, Ford misrepresented the type of transmission equipped in the Vehicle.

25 Throughout its marketing brochure, Ford states that the vehicle is equipped with a 6-speed

26 automatic transmission.  That representation is false.  The vehicle is actually equipped with the

27 Ford PowerShift Transmission, which is in fact a dual clutch transmission, which operates using

28 direct mechanical engagement and disengagement similar to a manual transmission.  This

information is material for a consumer to know in making a purchasing decision, because unlike a traditional automatic transmission, Ford's PowerShift dual clutch transmission powers the drive wheels through a clutch, rather than a torque converter.  The use of a clutch can result in a substantially jerkier ride than that produced using a torque converter, particularly in an unproven design.  Plaintiff would not have purchased the Vehicle had Plaintiff known the vehicle's transmission technology would cause the drive to be jerky, unreliable, and dangerous as a result of the unproven dual-clutch (rather than automatic) system.

148.  Defendants intended that Plaintiff rely on the representations made in the marketing brochure related to the transmission in inducing Plaintiff to purchase the Vehicle.

149.  Plaintiff reasonably relied on Defendant's representations related to the transmission being "automatic" and providing a smooth ride, because Ford was the manufacturer of the vehicle and claimed to have performed and relied upon extensive pre-release testing of the PowerShift Transmission.  Ford was in a superior position of knowledge.

150.  Plaintiff was harmed by purchasing a vehicle that Plaintiff would not have purchased had they known the true facts about the transmission, and the Transmission Defects, affecting it.

151.  Plaintiff's reliance on Defendants' representations about the transmission qualities was a substantial factor in Plaintiff's harm, as Ford and its agents were the exclusive source of information about the qualities of the transmission.

## FIFTH CAUSE OF ACTION

### Fraudulent Inducement – Negligent Misrepresentation

152.  Plaintiff incorporates herein by reference each and every allegation contained in the preceding and succeeding paragraphs as though herein fully restated and re-alleged.

153.  At the time Ford made the misrepresentations identified in paragraph 141 above, they had no reasonable grounds for believing the representations to be true, because Ford was simultaneously issuing internal memoranda to its agents and dealerships about the characteristics of the PowerShift Transmission causing "a loss of power, hesitation, surge, or lack of throttle

response while driving."  None of those characteristics can be reasonably construed to provide "great handling on all roads," "seamless gear changes," or "amazing responsiveness," as the PowerShift Transmission was described to the Plaintiff in marketing materials.   Ford's knowledge of the Transmission Defect is outlined in more detail in paragraphs 8-47.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against Ford, as follows:

   a.  For general, special and actual damages according to proof at trial;

   b.  For rescission of the purchase contract and restitution of all monies expended;

   c.  For diminution in value;

   d.  For incidental and consequential damages according to proof at trial;

   e.  For civil penalty in the amount of two times Plaintiff's actual damages;

   f.  For prejudgment interest at the legal rate;

   g.  For injunctive and equitable relieve;

   h.  For punitive damages;

   i.  For reasonable attorney fees and costs of suit; and

   j.  For such other relief as the Court deems just and proper under the circumstances.

Dated: September 23, 2016

O'CONNOR & MIKHOV LLP

MARK O'CONNOR (SBN 157680)
STEVE MIKHOV (SBN 224676)
LAUREN A. UNGS (SBN 273374)
AMY MORSE (SBN 290502)
Attorneys for Plaintiff,
HECTOR CAZARES

# Exhibit 1

# RETAIL INSTALLMENT SALE CONTRACT — SIMPLE FINANCE CHARGE

| Dealer Number | Contract Number | U.S. Number | Stock Number |
|---|---|---|---|

| Buyer Name and Address (Including County and Zip Code) | Co-Buyer Name and Address (Including County and Zip Code) | Creditor-Seller (Name and Address) |
|---|---|---|

You, the Buyer (and Co-Buyer, if any), may buy the vehicle below for cash or on credit. By signing this contract, you choose to buy the vehicle on credit under the agreements on the front and back of this contract. You agree to pay the Creditor - Seller (sometimes "we" or "us" in this contract) the Amount Financed and Finance Charge in U.S. funds according to the payment schedule below. We will figure your finance charge on a daily basis. The Truth-In-Lending Disclosures below are part of this contract.

| New Used | Year | Make and Model | Odometer | Vehicle Identification Number | Primary Use For Which Purchased |
|---|---|---|---|---|---|
| | | | | | ☐ personal, family or household ☐ business or commercial |

## FEDERAL TRUTH-IN-LENDING DISCLOSURES

| ANNUAL PERCENTAGE RATE The cost of your credit as a yearly rate. | FINANCE CHARGE The dollar amount the credit will cost you. | Amount Financed The amount of credit provided to you or on your behalf. | Total of Payments The amount you will have paid after you have made all payments as scheduled. | Total Sale Price The total cost of your purchase on credit, including your down payment of is |
|---|---|---|---|---|
| % | $ (e) | $ | $ (e) | $ (e) |

(e) means an estimate

### YOUR PAYMENT SCHEDULE WILL BE:

| Number of Payments | Amount of Payments | When Payments Are Due |
|---|---|---|
| One Payment of | | |
| One Payment of | | |
| Payments | | Monthly, Beginning |
| Payments | | Monthly, Beginning |
| One Final Payment | | |

**Late Charge.** If payment is not received in full within 10 days after it is due, you will pay a late charge of 5% of the part of the payment that is late.
**Prepayment.** If you pay off all your debt early, you may be charged a minimum finance charge.
**Security Interest.** You are giving a security interest in the vehicle being purchased.
**Additional Information:** See this contract for more information including information about nonpayment, default, any required repayment in full before the scheduled date, minimum finance charges, and security interest.

### ITEMIZATION OF THE AMOUNT FINANCED (Seller may keep part of the amounts paid to others.)

1. Total Cash Price
   A. Cash Price of Motor Vehicle and Accessories ........ $ (A)
      1. Cash Price Vehicle $
      2. Cash Price Accessories $
      3. Other (Nontaxable)
         Describe $ N/A
         Describe $ N/A
   B. Document Preparation Fee (not a governmental fee) ... $ (B)
   C. Smog Fee Paid to Seller ........ $ (C)
   D. (Optional) Theft Deterrent Device (to whom paid) ..... $ (D)
   E. (Optional) Theft Deterrent Device (to whom paid) ..... $ (E)
   F. (Optional) Theft Deterrent Device (to whom paid) ..... $ (F)
   G. (Optional) Surface Protection Product (to whom paid) . $ (G)
   H. (Optional) Surface Protection Product (to whom paid) . $ (H)
      Sales Tax (on taxable items in A through H) ........ $ (I)
   J. Optional DMV Electronic Filing Fee ........ $ (J)
   K. (Optional) Service Contract (to whom paid) ....... $ (K)
   L. (Optional) Service Contract (to whom paid) ....... $ (L)
   M. (Optional) Service Contract (to whom paid) ....... $ (M)
   N. (Optional) Service Contract (to whom paid) ....... $ (N)
   O. (Optional) Service Contract (to whom paid) ....... $ (O)
   P. Prior Credit or Lease Balance paid by Seller to ...... $ (P)

      (see downpayment and trade-in calculation)
   Q. (Optional) Gap Contract (to whom paid) ........ $ (Q)
   R. (Optional) Used Vehicle Contract Cancellation Option Agreement ... $ (R)
   S. Other (to whom paid) ........ $ (S)

## STATEMENT OF INSURANCE

NOTICE: No person is required, as a condition of financing the purchase of a motor vehicle to purchase or negotiate any insurance through a particular insurance company, agent or broker. You are not required to buy any other insurance to obtain credit. Your decision to buy or not buy other insurance will not be a factor in the credit approval process.

### Vehicle Insurance

| | Term | Premium |
|---|---|---|
| $ Ded. Comp., Fire & Theft | Mos. | $ |
| $ Ded. Collision | Mos. | $ |
| Bodily Injury Limits | Mos. | $ |
| Property Damage $ Limits | Mos. | $ |
| Medical $ | Mos. | $ |

Total Vehicle Insurance Premiums $ (a)

UNLESS A CHARGE IS INCLUDED IN THIS AGREEMENT FOR PUBLIC LIABILITY OR PROPERTY DAMAGE INSURANCE, PAYMENT FOR SUCH COVERAGE IS NOT PROVIDED BY THIS AGREEMENT.

You may buy the physical damage insurance this contract requires (see back) from anyone you choose who is acceptable to us. You are not required to buy any other insurance to obtain credit.

Buyer X
Co-Buyer X
Seller X

If any insurance is checked below, policies or certificates from the named insurance companies will describe the terms and conditions.

### Application for Optional Credit Insurance

☐ Credit Life ☐ Buyer ☐ Co-Buyer ☐ Both
☐ Credit Disability (Buyer Only)

| | Term | Exp. | Premium |
|---|---|---|---|
| Credit Life | Mos. | | $ |
| Credit Disability | Mos. | | $ |
| Total Credit Insurance Premiums | $ | | |

Insurance Company Name

Home Office Address

Credit life insurance and credit disability insurance are not required to obtain credit. Your decision to buy or not buy credit life and credit disability insurance will not be a factor in the credit approval process. They will not be provided unless you sign and agree to pay the extra cost. Credit life insurance is based on your original payment schedule. This insurance may not pay all you owe on this contract if you make late payments. Credit disability insurance does not cover any increase in your payment or in the number of payments. Coverage for credit life insurance and credit disability insurance ends on the original due date for the last payment unless a different term for the insurance is shown above.

You are applying for the credit insurance marked above. Your signature below means that you agree that: (1) You are not eligible for insurance if you have reached your 65th birthday (2) You are eligible for disability insurance only if you are working for wages or profit 30 hours a week or more on the Effective Date. (3) Only the Primary Buyer is eligible for

A. License Fees ........................................... $ _____ (B)
B. Registration/Transfer/Titling Fees ..................... $ _____ (B)
C. California Tire Fees .................................... $ _____ (C)
D. Other .................................................. $ _____ (D)
**Total Official Fees (A through D)** ..................... $ _____ (2)

3. **Amount Paid to Insurance Companies**
   (Total premiums from Statement of Insurance column a + b) ... $ _____ (3)

4. ☐ Smog Certification or ☐ Exemption Fee Paid to State ..... $ _____ (4)

5. **Subtotal** (1 through 4) ........................... $ _____ (5)

6. **Total Downpayment**
   A. Agreed Trade-In Value Yr _____ Make _____ ... $ _____ (A)
      Model _____ Odom _____
      VIN _____
   B. Less Prior Credit or Lease Balance ................. $ _____ (B)
   C. Net Trade-In (A less B) (indicate if a negative number) ... $ _____ (C)
   D. Deferred Downpayment ............................. $ _____ (D)
   E. Manufacturer's Rebate ............................. $ _____ (E)
   F. Other _____ ..................................... $ _____ (F)
   G. Cash ............................................. $ _____ (G)
   **Total Downpayment** (C through G) ................. $ _____ (6)
   (If negative, enter zero on line 6 and enter the amount less than zero as a positive number on line 1P above)

7. **Amount Financed** (5 less 6) ...................... $ _____ (7)

---

**SELLER ASSISTED LOAN**
BUYER MAY BE REQUIRED TO PLEDGE SECURITY FOR THE LOAN, AND WILL BE OBLIGATED FOR THE INSTALLMENT PAYMENTS ON BOTH THIS RETAIL INSTALLMENT SALE CONTRACT AND THE LOAN.

Proceeds of Loan From: _____
Amount $ _____ Finance Charge $ _____
Total $ _____ Payable In _____
installments of $ _____ $ _____
from this Loan is shown in item 6D.

---

**AUTO BROKER FEE DISCLOSURE**
If this contract reflects the retail sale of a new motor vehicle, the sale is not subject to a fee received by an autobroker from us unless the following box is checked:

☐ Name of autobroker receiving fee, if applicable:

---

**SELLER'S RIGHT TO CANCEL** If Buyer and Co-Buyer sign here, the provisions of the Seller's Right to Cancel section on the back giving the Seller the right to cancel if Seller is unable to assign this contract to a financial institution will apply.

X _____ X _____
Buyer      Co-Buyer

---

**OPTION:** ☐ You pay no finance charge if the Amount Financed, item 7, is paid in full on or before _____ , Year _____ . **SELLER'S INITIALS** _____

---

THE MINIMUM PUBLIC LIABILITY INSURANCE LIMITS PROVIDED IN LAW MUST BE MET BY EVERY PERSON WHO PURCHASES A VEHICLE. IF YOU ARE UNSURE WHETHER OR NOT YOUR CURRENT INSURANCE POLICY WILL COVER YOUR NEWLY ACQUIRED VEHICLE IN THE EVENT OF AN ACCIDENT, YOU SHOULD CONTACT YOUR INSURANCE AGENT.
WARNING:
YOUR PRESENT POLICY MAY NOT COVER COLLISION DAMAGE OR MAY NOT PROVIDE FOR FULL REPLACEMENT COSTS FOR THE VEHICLE BEING PURCHASED. IF YOU DO NOT HAVE FULL COVERAGE, SUPPLEMENTAL COVERAGE FOR COLLISION DAMAGE MAY BE AVAILABLE TO YOU THROUGH YOUR INSURANCE AGENT OR THROUGH THE SELLING DEALER. HOWEVER, UNLESS OTHERWISE SPECIFIED, THE COVERAGE YOU OBTAIN THROUGH THE DEALER PROTECTS ONLY THE DEALER, USUALLY UP TO THE AMOUNT OF THE UNPAID BALANCE REMAINING AFTER THE VEHICLE HAS BEEN REPOSSESSED AND SOLD.
FOR ADVICE ON FULL COVERAGE THAT WILL PROTECT YOU IN THE EVENT OF LOSS OR DAMAGE TO YOUR VEHICLE, YOU SHOULD CONTACT YOUR INSURANCE AGENT.
THE BUYER SHALL SIGN TO ACKNOWLEDGE THAT HE/SHE UNDERSTANDS THESE PUBLIC LIABILITY TERMS AND CONDITIONS.

S/S X _____ X _____

Payoff Agreement: Seller relied on information from you and/or the lienholder or lessor of your trade-in vehicle in arriving at the payoff amount shown in item 6B of the Itemization of Amount Financed as the "Prior Credit or Lease Balance." Seller agrees to pay the payoff amount shown in item 6B to the lienholder or lessor of the trade-in vehicle, or its designee. If the actual payoff amount is more than the amount shown in 6B, you must pay the Seller the excess on demand. If the actual payoff amount is less than the amount shown in 6B, Seller will refund the difference to you. Except as stated in the "NOTICE" on the back of this contract, any assignee of this contract will not be obligated to pay the Prior Credit or Lease Balance shown in 6B or any refund due from the Seller.

Buyer Signature X _____ Co-Buyer Signature X _____

---

**Notice to buyer: (1) Do not sign this agreement before you read it or if it contains any blank spaces to be filled in. (2) You are entitled to a completely filled in copy of this agreement. (3) You can prepay the full amount due under this agreement at any time. (4) If you default in the performance of your obligations under this agreement, the vehicle may be repossessed and you may be subject to suit and liability for the unpaid indebtedness evidenced by this agreement.**

If you have a complaint concerning this sale, you should try to resolve it with the seller.
Complaints concerning unfair or deceptive practices or methods by the seller may be referred to the city attorney, the district attorney, or an investigator for the Department of Motor Vehicles, or any combination thereof.
After this contract is signed, the seller may not change the financing or payment terms unless you agree in writing to the change. You do not have to agree to any change, and it is an unfair or deceptive practice for the seller to make a unilateral change.

Buyer Signature X _____ Co-Buyer Signature X _____

---

*The Annual Percentage Rate may be negotiable with the Seller. The Seller may assign this contract and retain its right to receive a part of the Finance Charge.*

---

**THERE IS NO COOLING-OFF PERIOD UNLESS YOU OBTAIN A CONTRACT CANCELLATION OPTION**
California law does not provide for a "cooling-off" or other cancellation period for vehicle sales. Therefore, you cannot later cancel this contract simply because you change your mind, decide the vehicle costs too much, or wish you had acquired a different vehicle. After you sign below, you may only cancel this contract with the agreement of the seller or for legal cause, such as fraud. However, California law does

---

"Covered" in your policy for details) if you want to buy the credit insurance.

Date _____ X _____ _____
        Buyer Signature      Age

Date _____ X _____ _____
        Co-Buyer Signature   Age

**OPTIONAL GAP CONTRACT** A gap contract (debt cancellation contract) is not required to obtain credit and will not be provided unless you sign below and agree to pay the extra charge. If you choose to buy a gap contract, the charge is shown in item 1Q of the Itemization of Amount Financed. See your gap contract for details on the terms and conditions it provides. It is a part of this contract.

Term _____ Mos. _____
                    Name of Gap Contract

I want to buy a gap contract.

Buyer Signs X _____

**OPTIONAL SERVICE CONTRACT(S)** You want to purchase the service contract(s) written with the following company(ies) for the term(s) shown below for the charge(s) shown in item 1K, 1L, 1M, 1N, and/or 1O.

1K Company _____
Term _____ Mos. or _____ Miles
1L Company _____
Term _____ Mos. or _____ Miles
1M Company _____
Term _____ Mos. or _____ Miles
1N Company _____
Term _____ Mos. or _____ Miles
1O Company _____
Term _____ Mos. or _____ Miles
Buyer X _____

**HOW THIS CONTRACT CAN BE CHANGED.** This contract contains the entire agreement between you and us relating to this contract. Any change to the contract must be in writing and both you and we must sign it. No oral changes are binding.

Buyer Signs X _____
Co-Buyer Signs X _____

---

YOU AGREE TO THE TERMS OF THIS CONTRACT. YOU CONFIRM THAT BEFORE YOU SIGNED THIS CONTRACT, WE GAVE IT TO YOU, AND YOU WERE FREE TO TAKE IT AND REVIEW IT. YOU ACKNOWLEDGE THAT YOU HAVE READ BOTH SIDES OF THIS CONTRACT INCLUDING THE

E. Manufacturer's Rebate ........................ $ _____ (E)
F. Other _____ $ _____
G. Cash ........................................ $ _____ (G)
**Total Downpayment (C through G)** .............. $ _____ (6)
(If negative, enter zero on line 6 and enter the amount less than zero as a positive number on line 1P above)

7. **Amount Financed** (5 less 6) ................ $ _____ (7)

purchase the service contract(s) written with the following company(ies) for the term(s) and charge(s) shown in item 1K,1L, 1M, 1N, and/or 1O.

| | | | |
|---|---|---|---|
| 1K Company | ___ | | Miles |
| Term N/A | Mos. or | | Miles |
| 1L Company | N/A | | |
| Term N/A | Mos. or | | Miles |
| 1M Company | N/A | | |
| Term N/A | Mos. or | | Miles |
| 1N Company | N/A | | |
| Term N/A | Mos. or | | Miles |
| 1O Company | N/A | | |
| Term N/A | Mos. or | | Miles |
| Buyer X | _____ | | |

---

**SELLER ASSISTED LOAN**
BUYER MAY BE REQUIRED TO PLEDGE SECURITY FOR THE LOAN, AND WILL BE OBLIGATED FOR THE INSTALLMENT PAYMENTS ON BOTH THIS RETAIL INSTALLMENT SALE CONTRACT AND THE LOAN.

Proceeds of Loan From: $ _____
Amount $ _____ Finance Charge $ _____
Total $ _____ Payable in _____
installments of $ _____ $ _____
from this Loan is shown in item 6D.

**AUTO BROKER FEE DISCLOSURE**
If this contract reflects the retail sale of a new motor vehicle, the sale is not subject to a fee received by an autobroker from us unless the following box is checked:

☐ Name of autobroker receiving fee, if applicable:

**HOW THIS CONTRACT CAN BE CHANGED.** This contract contains the entire agreement between you and us relating to this contract. Any change to the contract must be in writing and both you and we must sign it. No oral changes are binding.

Buyer Signs X _____
Co-Buyer Signs X _____

---

**SELLER'S RIGHT TO CANCEL.** If Buyer and Co-Buyer sign here, the provisions of the Seller's Right to Cancel section on the back giving the Seller the right to cancel if Seller is unable to assign this contract to a financial institution will apply.
X _____          X _____
Buyer                Co-Buyer

---

**OPTION:** ☐ You pay no finance charge if the Amount Financed, item 7, is paid in full on or before _____, Year _____   SELLER'S INITIALS _____

---

THE MINIMUM PUBLIC LIABILITY INSURANCE LIMITS PROVIDED IN LAW MUST BE MET BY EVERY PERSON WHO PURCHASES A VEHICLE. IF YOU ARE UNSURE WHETHER OR NOT YOUR CURRENT INSURANCE POLICY WILL COVER YOUR NEWLY ACQUIRED VEHICLE IN THE EVENT OF AN ACCIDENT, YOU SHOULD CONTACT YOUR INSURANCE AGENT.
**WARNING:**
YOUR PRESENT POLICY MAY NOT COVER COLLISION DAMAGE OR MAY NOT PROVIDE FOR FULL REPLACEMENT COSTS FOR THE VEHICLE BEING PURCHASED. IF YOU DO NOT HAVE FULL COVERAGE, SUPPLEMENTAL COVERAGE FOR COLLISION DAMAGE MAY BE AVAILABLE TO YOU THROUGH YOUR INSURANCE AGENT OR THROUGH THE SELLING DEALER. HOWEVER, UNLESS OTHERWISE SPECIFIED, THE COVERAGE YOU OBTAIN THROUGH THE DEALER PROTECTS ONLY THE DEALER, USUALLY UP TO THE AMOUNT OF THE UNPAID BALANCE REMAINING AFTER THE VEHICLE HAS BEEN REPOSSESSED AND SOLD.
FOR ADVICE ON FULL COVERAGE THAT WILL PROTECT YOU IN THE EVENT OF LOSS OR DAMAGE TO YOUR VEHICLE, YOU SHOULD CONTACT YOUR INSURANCE AGENT.
THE BUYER SHALL SIGN TO ACKNOWLEDGE THAT HE/SHE UNDERSTANDS THESE PUBLIC LIABILITY TERMS AND CONDITIONS.
S/S X _____                          X _____

Payoff Agreement. Seller relied on information from you and/or the lienholder or lessor of your trade-in vehicle to arrive at the payoff amount shown in item 6B of the Itemization of Amount Financed as the "Prior Credit or Lease Balance." Seller agrees to pay the payoff amount shown in 6B to the lienholder or lessor of the trade-in vehicle, or its designee. If the actual payoff amount is more than the amount shown in 6B, you must pay the Seller the excess on demand. If the actual payoff amount is less than the amount shown in 6B, Seller will refund the difference to you. Except as stated in the "NOTICE" on the back of this contract, any assignee of this contract will not be obligated to pay the Prior Credit or Lease Balance shown in 6B or any refund due from the Seller.
Buyer Signature X _____                          Co-Buyer Signature X _____

Notice to buyer: (1) Do not sign this agreement before you read it or if it contains any blank spaces to be filled in. (2) You are entitled to a completely filled in copy of this agreement. (3) You can prepay the full amount due under this agreement at any time. (4) If you default in the performance of your obligations under this agreement, the vehicle may be repossessed and you may be subject to suit and liability for the unpaid indebtedness evidenced by this agreement.

If you have a complaint concerning this sale, you should try to resolve it with the seller.
Complaints concerning unfair or deceptive practices or methods by the seller may be referred to the city attorney, the district attorney, or an investigator for the Department of Motor Vehicles, or any combination thereof.
After this contract is signed, the seller may not change the financing or payment terms unless you agree in writing to the change. You do not have to agree to any change, and it is an unfair or deceptive practice for the seller to make a unilateral change.
Buyer Signature X _____                          Co-Buyer Signature X _____

**The Annual Percentage Rate may be negotiable with the Seller. The Seller may assign this contract and retain its right to receive a part of the Finance Charge.**

**THERE IS NO COOLING-OFF PERIOD UNLESS YOU OBTAIN A CONTRACT CANCELLATION OPTION**
California law does not provide for a "cooling-off" or other cancellation period for vehicle sales. Therefore, you cannot later cancel this contract simply because you change your mind, decide the vehicle costs too much, or wish you had acquired a different vehicle. After you sign below, you may only cancel this contract with the agreement of the seller or for legal cause, such as fraud. However, California law does require a seller to offer a 2-day contract cancellation option on used vehicles with a purchase price of less than $40,000, subject to certain statutory conditions. This contract cancellation option requirement does not apply to the sale of a recreational vehicle, a motorcycle, or an off-highway motor vehicle subject to identification under California law. See the vehicle contract cancellation option agreement for details.

YOU AGREE TO THE TERMS OF THIS CONTRACT. YOU CONFIRM THAT BEFORE YOU SIGNED THIS CONTRACT, WE GAVE IT TO YOU, AND YOU WERE FREE TO TAKE IT AND REVIEW IT. YOU ACKNOWLEDGE THAT YOU HAVE READ BOTH SIDES OF THIS CONTRACT, INCLUDING THE ARBITRATION CLAUSE ON THE REVERSE SIDE, BEFORE SIGNING BELOW. YOU CONFIRM THAT YOU RECEIVED A COMPLETELY FILLED-IN COPY WHEN YOU SIGNED IT.

Buyer Signature X _____          Date _____          Co-Buyer Signature X _____          Date _____
Co-Buyers and Other Owners — A co-buyer is a person who is responsible for paying the entire debt. An other owner is a person whose name is on the title to the vehicle but does not have to pay the debt. The other owner agrees to the security interest in the vehicle given to us in this contract.
Other Owner Signature X _____          Address _____

**GUARANTY:** To induce us to sell the vehicle to Buyer, each person who signs as a Guarantor individually guarantees the payment of this contract. If Buyer fails to pay any money owing on this contract, each Guarantor must pay it when asked. Each Guarantor will be liable for the total amount owing even if other persons also sign as Guarantor, and even if Buyer has a complete defense to Guarantor's demand for reimbursement. Each Guarantor agrees to be liable even if we do one or more of the following: (1) give the Buyer more time to pay one or more payments; (2) give a full or partial release to any other Guarantor; (3) release any security; (4) accept less from the Buyer than the total amount owing; or (5) otherwise reach a settlement relating to this contract or extend the contract. Each Guarantor acknowledges receipt of a completed copy of this contract and guaranty at the time of signing.
Guarantor waives notice of acceptance of this Guaranty, notice of the Buyer's non-payment, non-performance, and default; and notices of the amount owing at any time, and of any demands upon the Buyer.

Guarantor X _____          Date _____          Guarantor X _____          Date _____
Address _____                                     Address _____

Seller Signs _____          Date _____          By X _____          Title _____

CM-010

**ATTORNEY OR PARTY WITHOUT ATTORNEY** *(Name, State bar number, and address):*
Steve Mikhov (SBN 224676)
O'Connor & Mikhov LLP
1801 Century Park East, Suite 2300, Los Angeles, CA 90067
TELEPHONE NO.: (310) 552-2250    FAX NO.: (310) 552-7973
ATTORNEY FOR *(Name):* HECTOR CAZARES

SUPERIOR COURT OF CALIFORNIA, COUNTY OF Los Angeles
STREET ADDRESS: 111 North Hill Street
MAILING ADDRESS: 111 North Hill Street
CITY AND ZIP CODE: Los Angeles, CA 90012
BRANCH NAME: Stanley Mosk Courthouse

CASE NAME:
HECTOR CAZARES v. FORD MOTOR COMPANY, a Delaware Corporation, et al.

**FOR COURT USE ONLY**
CONFORMED COPY
ORIGINAL FILED
Superior Court of California
County of Los Angeles

SEP 23 2016

Sherri R. Carter, Executive Officer/Clerk
By: _____, Deputy
Ishayla Chambers

| CIVIL CASE COVER SHEET | Complex Case Designation | CASE NUMBER: BC 635153 |
|---|---|---|
| [X] Unlimited (Amount demanded exceeds $25,000) [ ] Limited (Amount demanded is $25,000 or less) | [ ] Counter [ ] Joinder Filed with first appearance by defendant (Cal. Rules of Court, rule 3.402) | JUDGE: DEPT: |

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check **one** box below for the case type that best describes this case:

**Auto Tort**
[ ] Auto (22)
[ ] Uninsured motorist (46)
**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
[ ] Asbestos (04)
[ ] Product liability (24)
[ ] Medical malpractice (45)
[ ] Other PI/PD/WD (23)
**Non-PI/PD/WD (Other) Tort**
[ ] Business tort/unfair business practice (07)
[ ] Civil rights (08)
[ ] Defamation (13)
[ ] Fraud (16)
[ ] Intellectual property (19)
[ ] Professional negligence (25)
[ ] Other non-PI/PD/WD tort (35)
**Employment**
[ ] Wrongful termination (36)
[ ] Other employment (15)

**Contract**
[X] Breach of contract/warranty (06)
[ ] Rule 3.740 collections (09)
[ ] Other collections (09)
[ ] Insurance coverage (18)
[ ] Other contract (37)
**Real Property**
[ ] Eminent domain/Inverse condemnation (14)
[ ] Wrongful eviction (33)
[ ] Other real property (26)
**Unlawful Detainer**
[ ] Commercial (31)
[ ] Residential (32)
[ ] Drugs (38)
**Judicial Review**
[ ] Asset forfeiture (05)
[ ] Petition re: arbitration award (11)
[ ] Writ of mandate (02)
[ ] Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
[ ] Antitrust/Trade regulation (03) -
[ ] Construction defect (10)
[ ] Mass tort (40)
[ ] Securities litigation (28)
[ ] Environmental/Toxic tort (30)
[ ] Insurance coverage claims arising from the above listed provisionally complex case types (41)
**Enforcement of Judgment**
[ ] Enforcement of judgment (20)
**Miscellaneous Civil Complaint**
[ ] RICO (27)
[ ] Other complaint *(not specified above)* (42)
**Miscellaneous Civil Petition**
[ ] Partnership and corporate governance (21)
[ ] Other petition *(not specified above)* (43)

2. This case [ ] is [X] is not complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. [ ] Large number of separately represented parties    d. [ ] Large number of witnesses
   b. [ ] Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve    e. [ ] Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   c. [ ] Substantial amount of documentary evidence    f. [ ] Substantial postjudgment judicial supervision
3. Remedies sought *(check all that apply):* a. [X] monetary  b. [X] nonmonetary; declaratory or injunctive relief  c. [X] punitive
4. Number of causes of action *(specify):* 5
5. This case [ ] is [X] is not a class action suit.
6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*
Date: 9/23/16
Steve Mikhov
_____(TYPE OR PRINT NAME)_____    _____(SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)_____

**NOTICE**
• Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
• File this cover sheet in addition to any cover sheet required by local court rule.
• If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
• Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

Form Adopted for Mandatory Use
Judicial Council of California
CM-010 [Rev. July 1, 2007]

**CIVIL CASE COVER SHEET**

Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;
Cal. Standards of Judicial Administration, std. 3.10
www.courtinfo.ca.gov

CM-010

## INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET

**To Plaintiffs and Others Filing First Papers.** If you are filing a first paper (for example, a complaint) in a civil case, you **must** complete and file, along with your first paper, the *Civil Case Cover Sheet* contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check **one** box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the **primary** cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $25,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment. The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases only, parties must also use the *Civil Case Cover Sheet* to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

### CASE TYPES AND EXAMPLES

**Auto Tort**
  Auto (22)–Personal Injury/Property
    Damage/Wrongful Death
  Uninsured Motorist (46) *(if the*
    *case involves an uninsured*
    *motorist claim subject to*
    *arbitration, check this item*
    *instead of Auto)*
**Other PI/PD/WD (Personal Injury/ Property Damage/Wrongful Death) Tort**
  Asbestos (04)
    Asbestos Property Damage
    Asbestos Personal Injury/
      Wrongful Death
  Product Liability *(not asbestos or*
    *toxic/environmental)* (24)
  Medical Malpractice (45)
    Medical Malpractice–
      Physicians & Surgeons
    Other Professional Health Care
      Malpractice
  Other PI/PD/WD (23)
    Premises Liability (e.g., slip
      and fall)
    Intentional Bodily Injury/PD/WD
      (e.g., assault, vandalism)
    Intentional Infliction of
      Emotional Distress
    Negligent Infliction of
      Emotional Distress
    Other PI/PD/WD
**Non-PI/PD/WD (Other) Tort**
  Business Tort/Unfair Business
    Practice (07)
  Civil Rights (e.g., discrimination,
    false arrest) *(not civil*
    *harassment)* (08)
  Defamation (e.g., slander, libel)
    (13)
  Fraud (16)
  Intellectual Property (19)
  Professional Negligence (25)
    Legal Malpractice
    Other Professional Malpractice
      *(not medical or legal)*
  Other Non-PI/PD/WD Tort (35)
**Employment**
  Wrongful Termination (36)
  Other Employment (15)

**Contract**
  Breach of Contract/Warranty (06)
    Breach of Rental/Lease
      Contract *(not unlawful detainer*
      *or wrongful eviction)*
    Contract/Warranty Breach–Seller
      Plaintiff *(not fraud or negligence)*
    Negligent Breach of Contract/
      Warranty
    Other Breach of Contract/Warranty
  Collections (e.g., money owed, open
    book accounts) (09)
    Collection Case–Seller Plaintiff
    Other Promissory Note/Collections
      Case
  Insurance Coverage *(not provisionally*
    *complex)* (18)
    Auto Subrogation
    Other Coverage
  Other Contract (37)
    Contractual Fraud
    Other Contract Dispute
**Real Property**
  Eminent Domain/Inverse
    Condemnation (14)
  Wrongful Eviction (33)
  Other Real Property (e.g., quiet title) (26)
    Writ of Possession of Real Property
    Mortgage Foreclosure
    Quiet Title
    Other Real Property *(not eminent*
      *domain, landlord/tenant, or*
      *foreclosure)*
**Unlawful Detainer**
  Commercial (31)
  Residential (32)
  Drugs (38) *(if the case involves illegal*
    *drugs, check this item; otherwise,*
    *report as Commercial or Residential)*
**Judicial Review**
  Asset Forfeiture (05)
  Petition Re: Arbitration Award (11)
  Writ of Mandate (02)
    Writ–Administrative Mandamus
    Writ–Mandamus on Limited Court
      Case Matter
    Writ–Other Limited Court Case
      Review
  Other Judicial Review (39)
    Review of Health Officer Order
    Notice of Appeal–Labor
      Commissioner Appeals

**Provisionally Complex Civil Litigation (Cal. Rules of Court Rules 3.400–3.403)**
  Antitrust/Trade Regulation (03)
  Construction Defect (10)
  Claims Involving Mass Tort (40)
  Securities Litigation (28)
  Environmental/Toxic Tort (30)
  Insurance Coverage Claims
    *(arising from provisionally complex*
    *case type listed above)* (41)
**Enforcement of Judgment**
  Enforcement of Judgment (20)
    Abstract of Judgment (Out of
      County)
    Confession of Judgment *(non-*
      *domestic relations)*
    Sister State Judgment
    Administrative Agency Award
      *(not unpaid taxes)*
    Petition/Certification of Entry of
      Judgment on Unpaid Taxes
    Other Enforcement of Judgment
      Case
**Miscellaneous Civil Complaint**
  RICO (27)
  Other Complaint *(not specified*
    *above)* (42)
    Declaratory Relief Only
    Injunctive Relief Only *(non-*
      *harassment)*
    Mechanics Lien
    Other Commercial Complaint
      Case *(non-tort/non-complex)*
    Other Civil Complaint
      *(non-tort/non-complex)*
**Miscellaneous Civil Petition**
  Partnership and Corporate
    Governance (21)
  Other Petition *(not specified*
    *above)* (43)
    Civil Harassment
    Workplace Violence
    Elder/Dependent Adult
      Abuse
    Election Contest
    Petition for Name Change
    Petition for Relief From Late
      Claim
    Other Civil Petition

| SHORT TITLE: CAZARES v. FORD MORTOR COMPANY, et al. | CASE NUMBER BC 635153 |
| --- | --- |

# CIVIL CASE COVER SHEET ADDENDUM AND
# STATEMENT OF LOCATION
## (CERTIFICATE OF GROUNDS FOR ASSIGNMENT TO COURTHOUSE LOCATION)

> This form is required pursuant to Local Rule 2.0 in all new civil case filings in the Los Angeles Superior Court.

**Item I.** Check the types of hearing and fill in the estimated length of hearing expected for this case:

JURY TRIAL? ☑ YES   CLASS ACTION? ☐ YES   LIMITED CASE? ☐ YES   TIME ESTIMATED FOR TRIAL 5   ☐ HOURS/ ☑ DAYS

**Item II. Indicate** the correct district and courthouse location (4 steps – If you checked "Limited Case", skip to Item III, Pg. 4):

**Step 1:** After first completing the Civil Case Cover Sheet form, find the main Civil Case Cover Sheet heading for your case in the left margin below, and, to the right in Column **A**, the Civil Case Cover Sheet case type you selected.

**Step 2:** Check **one** Superior Court type of action in Column **B** below which best describes the nature of this case.

**Step 3:** In Column **C**, circle the reason for the court location choice that applies to the type of action you have checked. For any exception to the court location, see Local Rule 2.0.

> **Applicable Reasons for Choosing Courthouse Location (see Column C below)**

1. Class actions must be filed in the Stanley Mosk Courthouse, central district.
2. May be filed in central (other county, or no bodily injury/property damage).
3. Location where cause of action arose.
4. Location where bodily injury, death or damage occurred.
5. Location where performance required or defendant resides.
6. Location of property or permanently garaged vehicle.
7. Location where petitioner resides.
8. Location wherein defendant/respondent functions wholly.
9. Location where one or more of the parties reside.
10. Location of Labor Commissioner Office

BY FAX

**Step 4:** Fill in the information requested on page 4 in Item III; complete Item IV. Sign the declaration.

| | A<br>Civil Case Cover Sheet<br>Category No. | B<br>Type of Action<br>(Check only one) | C<br>Applicable Reasons -<br>See Step 3 Above |
| --- | --- | --- | --- |
| **Auto Tort** | Auto (22) | ☐ A7100 Motor Vehicle - Personal Injury/Property Damage/Wrongful Death | 1., 2., 4. |
| | Uninsured Motorist (46) | ☐ A7110 Personal Injury/Property Damage/Wrongful Death – Uninsured Motorist | 1., 2., 4. |
| **Other Personal Injury/ Property Damage/ Wrongful Death Tort** | Asbestos (04) | ☐ A6070 Asbestos Property Damage | 2. |
| | | ☐ A7221 Asbestos - Personal Injury/Wrongful Death | 2. |
| | Product Liability (24) | ☐ A7260 Product Liability (not asbestos or toxic/environmental) | 1., 2., 3., 4., 8. |
| | Medical Malpractice (45) | ☐ A7210 Medical Malpractice - Physicians & Surgeons | 1., 4. |
| | | ☐ A7240 Other Professional Health Care Malpractice | 1., 4. |
| | Other<br>Personal Injury<br>Property Damage<br>Wrongful Death<br>(23) | ☐ A7250 Premises Liability (e.g., slip and fall) | 1., 4. |
| | | ☐ A7230 Intentional Bodily Injury/Property Damage/Wrongful Death (e.g., assault, vandalism, etc.) | 1., 4. |
| | | ☐ A7270 Intentional Infliction of Emotional Distress | 1., 3. |
| | | ☐ A7220 Other Personal Injury/Property Damage/Wrongful Death | 1., 4. |

**CIVIL CASE COVER SHEET ADDENDUM**
**AND STATEMENT OF LOCATION**

| SHORT TITLE: CAZARES v. FORD MORTOR COMPANY, et al. | CASE NUMBER |
|---|---|

| | A Civil Case Cover Sheet Category No. | B Type of Action (Check only one) | C Applicable Reasons See Step 3 Above |
|---|---|---|---|
| **Non-Personal Injury/ Property Damage/ Wrongful Death Tort** | Business Tort (07) | ☐ A6029  Other Commercial/Business Tort (not fraud/breach of contract) | 1., 3. |
| | Civil Rights (08) | ☐ A6005  Civil Rights/Discrimination | 1., 2., 3. |
| | Defamation (13) | ☐ A6010  Defamation (slander/libel) | 1., 2., 3. |
| | Fraud (16) | ☐ A6013  Fraud (no contract) | 1., 2., 3. |
| | Professional Negligence (25) | ☐ A6017  Legal Malpractice | 1., 2., 3. |
| | | ☐ A6050  Other Professional Malpractice (not medical or legal) | 1., 2., 3. |
| | Other (35) | ☐ A6025  Other Non-Personal Injury/Property Damage tort | 2.,3. |
| **Employment** | Wrongful Termination (36) | ☐ A6037  Wrongful Termination | 1., 2., 3. |
| | Other Employment (15) | ☐ A6024  Other Employment Complaint Case | 1., 2., 3. |
| | | ☐ A6109  Labor Commissioner Appeals | 10. |
| **Contract** | Breach of Contract/ Warranty (06) (not insurance) | ☐ A6004  Breach of Rental/Lease Contract (not unlawful detainer or wrongful eviction) | 2., 5. |
| | | ☑ A6008  Contract/Warranty Breach -Seller Plaintiff (no fraud/negligence) | 2., 5. |
| | | ☐ A6019  Negligent Breach of Contract/Warranty (no fraud) | 1., 2., 5. |
| | | ☐ A6028  Other Breach of Contract/Warranty (not fraud or negligence) | 1., 2., 5. |
| | Collections (09) | ☐ A6002  Collections Case-Seller Plaintiff | 2., 5., 6. |
| | | ☐ A6012  Other Promissory Note/Collections Case | 2., 5. |
| | Insurance Coverage (18) | ☐ A6015  Insurance Coverage (not complex) | 1., 2., 5., 8. |
| | Other Contract (37) | ☐ A6009  Contractual Fraud | 1., 2., 3., 5. |
| | | ☐ A6031  Tortious Interference | 1., 2., 3., 5. |
| | | ☐ A6027  Other Contract Dispute(not breach/insurance/fraud/negligence) | 1., 2., 3., 8.. |
| **Real Property** | Eminent Domain/Inverse Condemnation (14) | ☐ A7300  Eminent Domain/Condemnation      Number of parcels_____ | 2. |
| | Wrongful Eviction (33) | ☐ A6023  Wrongful Eviction Case | 2., 6. |
| | Other Real Property (26) | ☐ A6018  Mortgage Foreclosure | 2., 6. |
| | | ☐ A6032  Quiet Title | 2., 6. |
| | | ☐ A6060  Other Real Property (not eminent domain, landlord/tenant, foreclosure) | 2., 6. |
| **Unlawful Detainer** | Unlawful Detainer-Commercial (31) | ☐ A6021  Unlawful Detainer-Commercial (not drugs or wrongful eviction) | 2., 6. |
| | Unlawful Detainer-Residential (32) | ☐ A6020  Unlawful Detainer-Residential (not drugs or wrongful eviction) | 2., 6. |
| | Unlawful Detainer- Post-Foreclosure (34) | ☐ A6020F Unlawful Detainer-Post-Foreclosure | 2., 6. |
| | Unlawful Detainer-Drugs (38) | ☐ A6022  Unlawful Detainer-Drugs | 2., 6. |

| SHORT TITLE CAZARES v. FORD MORTOR COMPANY, et al. | CASE NUMBER |
|---|---|

| | A. Civil Case Cover Sheet Category No. | B. Type of Action (Check only one) | C. Applicable Reasons See Step 3 Above |
|---|---|---|---|
| **Judicial Review** | Asset Forfeiture (05) | ☐ A6108  Asset Forfeiture Case | 2., 6. |
| | Petition re Arbitration (11) | ☐ A6115  Petition to Compel/Confirm/Vacate Arbitration | 2., 5. |
| | Writ of Mandate (02) | ☐ A6151  Writ - Administrative Mandamus | 2., 8. |
| | | ☐ A6152  Writ - Mandamus on Limited Court Case Matter | 2. |
| | | ☐ A6153  Writ - Other Limited Court Case Review | 2. |
| | Other Judicial Review (39) | ☐ A6150  Other Writ /Judicial Review | 2., 8. |
| **Provisionally Complex Litigation** | Antitrust/Trade Regulation (03) | ☐ A6003  Antitrust/Trade Regulation | 1., 2., 8. |
| | Construction Defect (10) | ☐ A6007  Construction Defect | 1., 2., 3. |
| | Claims Involving Mass Tort (40) | ☐ A6006  Claims Involving Mass Tort | 1., 2., 8. |
| | Securities Litigation (28) | ☐ A6035  Securities Litigation Case | 1., 2., 8. |
| | Toxic Tort Environmental (30) | ☐ A6036  Toxic Tort/Environmental | 1., 2., 3., 8. |
| | Insurance Coverage Claims from Complex Case (41) | ☐ A6014  Insurance Coverage/Subrogation (complex case only) | 1., 2., 5., 8. |
| **Enforcement of Judgment** | Enforcement of Judgment (20) | ☐ A6141  Sister State Judgment | 2., 9. |
| | | ☐ A6160  Abstract of Judgment | 2., 6. |
| | | ☐ A6107  Confession of Judgment (non-domestic relations) | 2., 9. |
| | | ☐ A6140  Administrative Agency Award (not unpaid taxes) | 2., 8. |
| | | ☐ A6114  Petition/Certificate for Entry of Judgment on Unpaid Tax | 2., 8. |
| | | ☐ A6112  Other Enforcement of Judgment Case | 2., 8., 9. |
| **Miscellaneous Civil Complaints** | RICO (27) | ☐ A6033  Racketeering (RICO) Case | 1., 2., 8. |
| | Other Complaints (Not Specified Above) (42) | ☐ A6030  Declaratory Relief Only | 1., 2., 8. |
| | | ☐ A6040  Injunctive Relief Only (not domestic/harassment) | 2., 8. |
| | | ☐ A6011  Other Commercial Complaint Case (non-tort/non-complex) | 1., 2., 8. |
| | | ☐ A6000  Other Civil Complaint (non-tort/non-complex) | 1., 2., 8. |
| **Miscellaneous Civil Petitions** | Partnership Corporation Governance (21) | ☐ A6113  Partnership and Corporate Governance Case | 2., 8. |
| | Other Petitions (Not Specified Above) (43) | ☐ A6121  Civil Harassment | 2., 3., 9. |
| | | ☐ A6123  Workplace Harassment | 2., 3., 9. |
| | | ☐ A6124  Elder/Dependent Adult Abuse Case | 2., 3., 9. |
| | | ☐ A6190  Election Contest | 2. |
| | | ☐ A6110  Petition for Change of Name | 2., 7. |
| | | ☐ A6170  Petition for Relief from Late Claim Law | 2., 3., 4., 8. |
| | | ☐ A6100  Other Civil Petition | 2., 9. |

LACIV 109 (Rev. 03/11)
LASC Approved 03-04

**CIVIL CASE COVER SHEET ADDENDUM
AND STATEMENT OF LOCATION**

Local Rule 2.0
Page 3 of 4

| SHORT TITLE: CAZARES v. FORD MORTOR COMPANY, et al. | CASE NUMBER |
|---|---|

**Item III.** Statement of Location: Enter the address of the accident, party's residence or place of business, performance, or other circumstance indicated in Item II., **Step 3** on Page 1, as the proper reason for filing in the court location you selected.

| REASON: Check the appropriate boxes for the numbers shown under Column C for the type of action that you have selected for this case.<br><br>☐1. ☑2. ☐3. ☐4. ☐5. ☐6. ☐7. ☐8. ☐9. ☐10. | ADDRESS:<br>5100 W Rosecrans Ave |
|---|---|
| CITY:<br>Hawthorne | STATE:<br>CA | ZIP CODE:<br>90250 |

**Item IV.** *Declaration of Assignment*: I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct and that the above-entitled matter is properly filed for assignment to the ___Stanley Mosk___ courthouse in the ___Central___ District of the Superior Court of California, County of Los Angeles [Code Civ. Proc., § 392 et seq., and Local Rule 2.0, subds. (b), (c) and (d)].

Dated: ___9/23/16___

_____
(SIGNATURE OF ATTORNEY/FILING PARTY)

**PLEASE HAVE THE FOLLOWING ITEMS COMPLETED AND READY TO BE FILED IN ORDER TO PROPERLY COMMENCE YOUR NEW COURT CASE:**

1. Original Complaint or Petition.

2. If filing a Complaint, a completed Summons form for issuance by the Clerk.

3. Civil Case Cover Sheet, Judicial Council form CM-010.

4. Civil Case Cover Sheet Addendum and Statement of Location form, LACIV 109, LASC Approved 03-04 (Rev. 03/11).

5. Payment in full of the filing fee, unless fees have been waived.

6. A signed order appointing the Guardian ad Litem, Judicial Council form CIV-010, if the plaintiff or petitioner is a minor under 18 years of age will be required by Court in order to issue a summons.

7. Additional copies of documents to be conformed by the Clerk. Copies of the cover sheet and this addendum must be served along with the summons and complaint, or other initiating pleading in the case.

LACIV 109 (Rev. 03/11)
LASC Approved 03-04

**CIVIL CASE COVER SHEET ADDENDUM
AND STATEMENT OF LOCATION**

Local Rule 2.0
Page 4 of 4

SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
NOTICE OF CASE ASSIGNMENT - UNLIMITED CIVIL CASE (NON-CLASS ACTION)

Case Number _____

BC 6 3 5 1 5 3

## THIS FORM IS TO BE SERVED WITH THE SUMMONS AND COMPLAINT

Your case is assigned for all purposes to the judge indicated below. There is more information on the reverse side of this form.

| ASSIGNED JUDGE | DEPT | ROOM | ASSIGNED JUDGE | DEPT | ROOM |
|---|---|---|---|---|---|
| Hon. Kevin C. Brazile | 1 | 534 | Hon. Elizabeth Allen White | 48 | 506 |
| Hon. Barbara A. Meiers | 12 | 636 | Hon. Deirdre Hill | 49 | 509 |
| Hon. Terry A. Green | 14 | 300 | Hon. Teresa A. Beaudet | 50 | 508 |
| Hon. Richard Fruin | 15 | 307 | Hon. Michael J. Raphael | 51 | 511 |
| Hon. Rita Miller | 16 | 306 | Hon. Susan Bryant-Deason | 52 | 510 |
| Hon. Richard E. Rico | 17 | 309 | Hon. Howard L. Halm | 53 | 513 |
| Hon. Stephanie Bowick | 19 | 311 | Hon. Ernest M. Hiroshige | 54 | 512 |
| Hon. Dalila Corral Lyons | 20 | 310 | Hon. Malcolm H. Mackey | 55 | 515 |
| Hon. Robert L. Hess | 24 | 314 | Hon. Michael Johnson | 56 | 514 |
| Hon. Yvette M. Palazuelos | 28 | 318 | Hon. John P. Doyle | 58 | 516 |
| Hon. Barbara Scheper | 30 | 400 | Hon. Gregory Keosian | 61 | 732 |
| Hon. Samantha Jessner | 31 | 407 | Hon. Michael L. Stern | 62 | 600 |
| Hon. Daniel S. Murphy | 32 | 406 | Hon. Mark Mooney | 68 | 617 |
| Hon. Michael P. Linfield | 34 | 408 | Hon. William F. Fahey | 69 | 621 |
| Hon. Gregory Alarcon | 36 | 410 | Hon. Suzanne G. Bruguera | 71 | 729 |
| Hon. Marc Marmaro | 37 | 413 | Hon. Ruth Ann Kwan | 72 | 731 |
| Hon. Maureen Duffy-Lewis | 38 | 412 | Hon. Rafael Ongkeko | 73 | 733 |
| Hon. Elizabeth Feffer | 39 | 415 | Hon. Teresa Sanchez-Gordon | 74 | 735 |
| Hon. David Sotelo | 40 | 414 | Hon. Gail Ruderman Feuer | 78 | 730 |
| Hon. Holly E. Kendig | 42 | 416 | | | |
| Hon. Mel Red Recana | 45 | 529 | Hon. Steven J. Kleifield | 324 | CCW |
| Hon. Frederick C. Shaller | 46 | 500 | *Provisionally Complex Non-class Action Cases Assignment is Pending Complex Determination | 324 | CCW |
| Hon. Debre K. Weintraub | 47 | 507 | | | |

### *Complex

All non-class action cases designated as provisionally complex are forwarded to the Supervising Judge of the Complex Litigation Program located in the Central Civil West Courthouse (600 S. Commonwealth Ave., Los Angeles 90005), for complex/non-complex determination pursuant to Local Rule 3.3(k). This procedure is for the purpose of assessing whether or not the case is complex within the meaning of California Rules of Court, rule 3.400. Depending on the outcome of that assessment, the case may be reassigned to one of the judges of the Complex Litigation Program or reassigned randomly to a court in the Central District.

Given to the Plaintiff/Cross-Complainant/Attorney of Record on _____   SHERRI R. CARTER, Executive Officer/Clerk

By _____, Deputy Clerk
      Ishayla Chambers

## INSTRUCTIONS FOR HANDLING UNLIMITED CIVIL CASES

The following critical provisions of the Chapter Three Rules, as applicable in the Central District, are summarized for your assistance.

### APPLICATION

The Chapter Three Rules were effective January 1, 1994. They apply to all general civil cases.

### PRIORITY OVER OTHER RULES

The Chapter Three Rules shall have priority over all other Local Rules to the extent the others are inconsistent.

### CHALLENGE TO ASSIGNED JUDGE

A challenge under Code of Civil Procedure section 170.6 must be made within **15** days after notice of assignment for all purposes to a judge, or if a party has not yet appeared, within 15 days of the first appearance.

### TIME STANDARDS

Cases assigned to the Individual Calendaring Court will be subject to processing under the following time standards:

**COMPLAINTS:** All complaints shall be served within 60 days of filing and proof of service shall be filed within 90 days of filing.

**CROSS-COMPLAINTS:** Without leave of court first being obtained, no cross-complaint may be filed by any party after their answer is filed. Cross-complaints shall be served within 30 days of the filing date and a proof of service filed within 60 days of the filing date.

A Status Conference will be scheduled by the assigned Independent Calendar Judge no later than 270 days after the filing of the complaint. Counsel must be fully prepared to discuss the following issues: alternative dispute resolution, bifurcation, settlement, trial date, and expert witnesses.

### FINAL STATUS CONFERENCE

The Court will require the parties at a status conference not more than 10 days before the trial to have timely filed and served all motions in limine, bifurcation motions, statements of major evidentiary issues, dispositive motions, requested jury instructions, and special jury instructions and special jury verdicts. These matters may be heard and resolved at this conference. At least 5 days before this conference, counsel must also have exchanged lists of exhibits and witnesses and have submitted to the court a brief statement of the case to be read to the jury panel as required by Chapter Eight of the Los Angeles Superior Court Rules.

### SANCTIONS

The court will impose appropriate sanctions for the failure or refusal to comply with Chapter Three Rules, orders made by the Court, and time standards or deadlines established by the Court or by the Chapter Three Rules. Such sanctions may be on a party or if appropriate on counsel for the party.

**This is not a complete delineation of the Chapter Three Rules, and adherence only to the above provisions is therefore not a guarantee against the imposition of sanctions under Trial Court Delay Reduction. Careful reading and compliance with the actual Chapter Rules is absolutely imperative.**

## VOLUNTARY EFFICIENT LITIGATION STIPULATIONS



**Superior Court of California
County of Los Angeles**



**Los Angeles County
Bar Association
Litigation Section**

**Los Angeles County
Bar Association Labor and
Employment Law Section**



**Consumer Attorneys
Association of Los Angeles**



**Southern California
Defense Counsel**



**Association of
Business Trial Lawyers**



**California Employment
Lawyers Association**

The Early Organizational Meeting Stipulation, Discovery Resolution Stipulation, and Motions in Limine Stipulation are voluntary stipulations entered into by the parties. The parties may enter into one, two, or all three of the stipulations; however, they may not alter the stipulations as written, because the Court wants to ensure uniformity of application. These stipulations are meant to encourage cooperation between the parties and to assist in resolving issues in a manner that promotes economic case resolution and judicial efficiency.

*The following organizations endorse the goal of promoting efficiency in litigation and ask that counsel consider using these stipulations as a voluntary way to promote communications and procedures among counsel and with the court to fairly resolve issues in their cases.*

**◆Los Angeles County Bar Association Litigation Section◆**

**◆ Los Angeles County Bar Association
Labor and Employment Law Section◆**

**◆Consumer Attorneys Association of Los Angeles◆**

**◆Southern California Defense Counsel◆**

**◆Association of Business Trial Lawyers◆**

**◆California Employment Lawyers Association◆**

| NAME AND ADDRESS OF ATTORNEY OR PARTY WITHOUT ATTORNEY: | STATE BAR NUMBER | Reserved for Clerk's File Stamp |
|---|---|---|
| TELEPHONE NO.:            FAX NO. (Optional):<br>E-MAIL ADDRESS (Optional):<br>ATTORNEY FOR (Name): | | |

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES**

COURTHOUSE ADDRESS:

PLAINTIFF:

DEFENDANT:

| **STIPULATION – DISCOVERY RESOLUTION** | CASE NUMBER: |
|---|---|

**This stipulation is intended to provide a fast and informal resolution of discovery issues through limited paperwork and an informal conference with the Court to aid in the resolution of the issues.**

**The parties agree that:**

1. Prior to the discovery cut-off in this action, no discovery motion shall be filed or heard unless the moving party first makes a written request for an Informal Discovery Conference pursuant to the terms of this stipulation.

2. At the Informal Discovery Conference the Court will consider the dispute presented by parties and determine whether it can be resolved informally. Nothing set forth herein will preclude a party from making a record at the conclusion of an Informal Discovery Conference, either orally or in writing.

3. Following a reasonable and good faith attempt at an informal resolution of each issue to be presented, a party may request an Informal Discovery Conference pursuant to the following procedures:

    a. The party requesting the Informal Discovery Conference will:

        i. File a Request for Informal Discovery Conference with the clerk's office on the approved form (copy attached) and deliver a courtesy, conformed copy to the assigned department;

        ii. Include a brief summary of the dispute and specify the relief requested; and

        iii. Serve the opposing party pursuant to any authorized or agreed method of service that ensures that the opposing party receives the Request for Informal Discovery Conference no later than the next court day following the filing.

    b. Any Answer to a Request for Informal Discovery Conference must:

        i. Also be filed on the approved form (copy attached);

        ii. Include a brief summary of why the requested relief should be denied;

| SHORT TITLE: | CASE NUMBER: |
|---|---|
| | |

    iii.    Be filed within two (2) court days of receipt of the Request; and

    iv.    Be served on the opposing party pursuant to any authorized or agreed upon method of service that ensures that the opposing party receives the Answer no later than the next court day following the filing.

  c.  No other pleadings, including but not limited to exhibits, declarations, or attachments, will be accepted.

  d.  If the Court has not granted or denied the Request for Informal Discovery Conference within ten (10) days following the filing of the Request, then it shall be deemed to have been denied.  If the Court acts on the Request, the parties will be notified whether the Request for Informal Discovery Conference has been granted or denied and, if granted, the date and time of the Informal Discovery Conference, which must be within twenty (20) days of the filing of the Request for Informal Discovery Conference.

  e.  If the conference is not held within twenty (20) days of the filing of the Request for Informal Discovery Conference, unless extended by agreement of the parties and the Court, then the Request for the Informal Discovery Conference shall be deemed to have been denied at that time.

4.  If (a) the Court has denied a conference or (b) one of the time deadlines above has expired without the Court having acted or (c) the Informal Discovery Conference is concluded without resolving the dispute, then a party may file a discovery motion to address unresolved issues.

5.  The parties hereby further agree that the time for making a motion to compel or other discovery motion is tolled from the date of filing of the Request for Informal Discovery Conference until (a) the request is denied or deemed denied or (b) twenty (20) days after the filing of the Request for Informal Discovery Conference, whichever is earlier, unless extended by Order of the Court.

It is the understanding and intent of the parties that this stipulation shall, for each discovery dispute to which it applies, constitute a writing memorializing a "specific later date to which the propounding [or demanding or requesting] party and the responding party have agreed in writing," within the meaning of Code Civil Procedure sections 2030.300(c), 2031.320(c), and 2033.290(c).

6.  Nothing herein will preclude any party from applying *ex parte* for appropriate relief, including an order shortening time for a motion to be heard concerning discovery.

7.  Any party may terminate this stipulation by giving twenty-one (21) days notice of intent to terminate the stipulation.

8.  References to "days" mean calendar days, unless otherwise noted.  If the date for performing any act pursuant to this stipulation falls on a Saturday, Sunday or Court holiday, then the time for performing that act shall be extended to the next Court day.

| SHORT TITLE: | CASE NUMBER: |
|---|---|
| | |

## The following parties stipulate:

Date:

_____
(TYPE OR PRINT NAME)

➤ _____
(ATTORNEY FOR PLAINTIFF)

Date:

_____
(TYPE OR PRINT NAME)

➤ _____
(ATTORNEY FOR DEFENDANT)

Date:

_____
(TYPE OR PRINT NAME)

➤ _____
(ATTORNEY FOR DEFENDANT)

Date:

_____
(TYPE OR PRINT NAME)

➤ _____
(ATTORNEY FOR DEFENDANT)

Date:

_____
(TYPE OR PRINT NAME)

➤ _____
(ATTORNEY FOR _____)

Date:

_____
(TYPE OR PRINT NAME)

➤ _____
(ATTORNEY FOR _____)

Date:

_____
(TYPE OR PRINT NAME)

➤ _____
(ATTORNEY FOR _____)

| NAME AND ADDRESS OF ATTORNEY OR PARTY WITHOUT ATTORNEY: | STATE BAR NUMBER | Reserved for Clerk's File Stamp |
|---|---|---|
| TELEPHONE NO.:      FAX NO. (Optional):<br>E-MAIL ADDRESS (Optional):<br>ATTORNEY FOR (Name): | | |

## SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

COURTHOUSE ADDRESS:

PLAINTIFF:

DEFENDANT:

| STIPULATION – EARLY ORGANIZATIONAL MEETING | CASE NUMBER: |
|---|---|

**This stipulation is intended to encourage cooperation among the parties at an early stage in the litigation and to assist the parties in efficient case resolution.**

**The parties agree that:**

1. The parties commit to conduct an initial conference (in-person or via teleconference or via videoconference) within 15 days from the date this stipulation is signed, *to discuss and consider whether there can be agreement on the following:*

   a. Are motions to challenge the pleadings necessary? If the issue can be resolved by amendment as of right, or if the Court would allow leave to amend, could an amended complaint resolve most or all of the issues a demurrer might otherwise raise? If so, the parties agree to work through pleading issues so that a demurrer need only raise issues they cannot resolve. Is the issue that the defendant seeks to raise amenable to resolution on demurrer, or would some other type of motion be preferable? Could a voluntary targeted exchange of documents or information by any party cure an uncertainty in the pleadings?

   b. Initial mutual exchanges of documents at the "core" of the litigation. (For example, in an employment case, the employment records, personnel file and documents relating to the conduct in question could be considered "core." In a personal injury case, an incident or police report, medical records, and repair or maintenance records could be considered "core.");

   c. Exchange of names and contact information of witnesses;

   d. Any insurance agreement that may be available to satisfy part or all of a judgment, or to indemnify or reimburse for payments made to satisfy a judgment;

   e. Exchange of any other information that might be helpful to facilitate understanding, handling, or resolution of the case in a manner that preserves objections or privileges by agreement;

   f. Controlling issues of law that, if resolved early, will promote efficiency and economy in other phases of the case. Also, when and how such issues can be presented to the Court;

   g. Whether or when the case should be scheduled with a settlement officer, what discovery or court ruling on legal issues is reasonably required to make settlement discussions meaningful, and whether the parties wish to use a sitting judge or a private mediator or other options as

| SHORT TITLE: | CASE NUMBER: |
|---|---|
| | |

·discussed in the "Alternative Dispute Resolution (ADR) Information Package" served with the complaint;

h.  Computation of damages, including documents, not privileged or protected from disclosure, on which such computation is based;

i.  Whether the case is suitable for the Expedited Jury Trial procedures (see information at **www.lacourt.org** under "*Civil*" and then under "*General Information*").

2.  The time for a defending party to respond to a complaint or cross-complaint will be extended to _____ for the complaint, and _____ for the cross-
<br>        (INSERT DATE)                                        (INSERT DATE)
<br>complaint, which is comprised of the 30 days to respond under Government Code § 68616(b), and the 30 days permitted by Code of Civil Procedure section 1054(a), good cause having been found by the Civil Supervising Judge due to the case management benefits provided by this Stipulation. A copy of the General Order can be found at *www.lacourt.org* under "*Civil*", click on "*General Information*", then click on "*Voluntary Efficient Litigation Stipulations*".

3.  The parties will prepare a joint report titled "Joint Status Report Pursuant to Initial Conference and Early Organizational Meeting Stipulation, and if desired, a proposed order summarizing results of their meet and confer and advising the Court of any way it may assist the parties' efficient conduct or resolution of the case.  The parties shall attach the Joint Status Report to the Case Management Conference statement, and file the documents when the CMC statement is due.

4.  References to "days" mean calendar days, unless otherwise noted.  If the date for performing any act pursuant to this stipulation falls on a Saturday, Sunday or Court holiday, then the time for performing that act shall be extended to the next Court day

The following parties stipulate:

Date:

_____          ➢ _____
<br>          (TYPE OR PRINT NAME)                                      (ATTORNEY FOR PLAINTIFF)
Date:

_____          ➢ _____
<br>          (TYPE OR PRINT NAME)                                      (ATTORNEY FOR DEFENDANT)
Date:

_____          ➢ _____
<br>          (TYPE OR PRINT NAME)                                      (ATTORNEY FOR DEFENDANT)
Date:

_____          ➢ _____
<br>          (TYPE OR PRINT NAME)                                      (ATTORNEY FOR DEFENDANT)
Date:

_____          ➢ _____
<br>          (TYPE OR PRINT NAME)                                      (ATTORNEY FOR _____)
Date:

_____          ➢ _____
<br>          (TYPE OR PRINT NAME)                                      (ATTORNEY FOR _____)
Date:

_____          ➢ _____
<br>          (TYPE OR PRINT NAME)                                      (ATTORNEY FOR _____)

| NAME AND ADDRESS OF ATTORNEY OR PARTY WITHOUT ATTORNEY: | STATE BAR NUMBER | Reserved for Clerk's File Stamp |
|---|---|---|
| TELEPHONE NO.:   FAX NO. (Optional): E-MAIL ADDRESS (Optional): ATTORNEY FOR (Name): | | |

### SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

COURTHOUSE ADDRESS:

PLAINTIFF:

DEFENDANT:

| **INFORMAL DISCOVERY CONFERENCE** (pursuant to the Discovery Resolution Stipulation of the parties) | CASE NUMBER: |
|---|---|

1. This document relates to:

   ☐ Request for Informal Discovery Conference
   ☐ Answer to Request for Informal Discovery Conference

2. Deadline for Court to decide on Request: _____ (insert date 10 calendar days following filing of the Request).

3. Deadline for Court to hold Informal Discovery Conference: _____ (insert date 20 calendar days following filing of the Request).

4. **For a Request for Informal Discovery Conference, <u>briefly</u> describe the nature of the discovery dispute, including the facts and legal arguments at issue.  For an Answer to Request for Informal Discovery Conference, <u>briefly</u> describe why the Court should deny the requested discovery, including the facts and legal arguments at issue.**

**INFORMAL DISCOVERY CONFERENCE**
(pursuant to the Discovery Resolution Stipulation of the parties)

| NAME AND ADDRESS OF ATTORNEY OR PARTY WITHOUT ATTORNEY: | STATE BAR NUMBER | Reserved for Clerk's File Stamp |
|---|---|---|
| TELEPHONE NO.:                    FAX NO. (Optional): <br> E-MAIL ADDRESS (Optional): <br> ATTORNEY FOR (Name): | | |

### SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

COURTHOUSE ADDRESS:

PLAINTIFF:

DEFENDANT:

| STIPULATION AND ORDER – MOTIONS IN LIMINE | CASE NUMBER: |
|---|---|

**This stipulation is intended to provide fast and informal resolution of evidentiary issues through diligent efforts to define and discuss such issues and limit paperwork.**

**The parties agree that:**

1. At least _____ days before the final status conference, each party will provide all other parties with a list containing a one paragraph explanation of each proposed motion in limine. Each one paragraph explanation must identify the substance of a single proposed motion in limine and the grounds for the proposed motion.

2. The parties thereafter will meet and confer, either in person or via teleconference or videoconference, concerning all proposed motions in limine. In that meet and confer, the parties will determine:

   a. Whether the parties can stipulate to any of the proposed motions. If the parties so stipulate, they may file a stipulation and proposed order with the Court.

   b. Whether any of the proposed motions can be briefed and submitted by means of a short joint statement of issues. For each motion which can be addressed by a short joint statement of issues, a short joint statement of issues must be filed with the Court 10 days prior to the final status conference. Each side's portion of the short joint statement of issues may not exceed three pages. The parties will meet and confer to agree on a date and manner for exchanging the parties' respective portions of the short joint statement of issues and the process for filing the short joint statement of issues.

3. All proposed motions in limine that are not either the subject of a stipulation or briefed via a short joint statement of issues will be briefed and filed in accordance with the California Rules of Court and the Los Angeles Superior Court Rules.

| SHORT TITLE: | CASE NUMBER: |
|---|---|
| | |

## The following parties stipulate:

Date: _____

_____
(TYPE OR PRINT NAME)

➤ _____
(ATTORNEY FOR PLAINTIFF)

Date: _____

_____
(TYPE OR PRINT NAME)

➤ _____
(ATTORNEY FOR DEFENDANT)

Date: _____

_____
(TYPE OR PRINT NAME)

➤ _____
(ATTORNEY FOR DEFENDANT)

Date: _____

_____
(TYPE OR PRINT NAME)

➤ _____
(ATTORNEY FOR DEFENDANT)

Date: _____

_____
(TYPE OR PRINT NAME)

➤ _____
(ATTORNEY FOR _____)

Date: _____

_____
(TYPE OR PRINT NAME)

➤ _____
(ATTORNEY FOR _____)

Date: _____

_____
(TYPE OR PRINT NAME)

➤ _____
(ATTORNEY FOR _____)

## THE COURT SO ORDERS.

Date: _____

_____
JUDICIAL OFFICER