```
 1              SUPERIOR COURT OF THE STATE OF CALIFORNIA

 2                    FOR THE COUNTY OF LOS ANGELES

 3     DEPARTMENT 58              HON. JOHN P. DOYLE, JUDGE

 4   ARIEL MYERS,                    )
                                     )
 5              PLAINTIFF,           )
                                     )
 6     V.                            )
                                     ) CASE NO. BC638302
 7   FORD MOTOR COMPANY,             )
                                     )
 8              DEFENDANT(S).        )
                                     )
 9   _____)

10

11

12            REPORTER'S TRANSCRIPT OF PROCEEDINGS

13                  THURSDAY, MARCH 29, 2018

14                      MORNING SESSION

15   APPEARANCES:

16   FOR PLAINTIFF:    THE ALTMAN LAW GROUP
                       BY:  BRYAN ALTMAN, ESQ.
17                     6300 WILSHIRE BOULEVARD
                       LOS ANGELES, CALIFORNIA 90048
18                     323.653.5581

19
     FOR PLAINTIFF:    WIRTZ LAW APC
20                     BY: RICHARD M. WIRTZ, ESQ.
                       4370 LA JOLLA VILLAGE DRIVE
21                     SUITE 800
                       SAN DIEGO, CALIFORNIA 92122
22                     858.259.5009

23
     FOR DEFENDANTS:   SNELL & WILMER LLP
24                     BY: WARREN E. PLATT, ESQ.
                           KATIE A. RICHARDSON, ESQ.
25                     600 ANTON BOULEVARD
                       SUITE 1400
26                     COSTA MESA, CALIFORNIA 92626
                       714.427.7000
27

28   REPORTED BY      MARCO NEILLY, CSR NO. 13564, CLR
```

OFFICIAL REPORTER PRO TEMPORE

1  FORD DOCUMENTS AND ANNOUNCEMENTS TO THE PUBLIC AND
2  INTERACTIONS WITH BOTH THE PUBLIC AND THE PLAINTIFF
3  REGARDING THE DPS6 TRANSMISSION ISSUES.  I WAS ASKED TO
4  OBSERVE IF FORD KNEW ABOUT THESE PROBLEMS WITH THE DPS6,
5  WHEN THEY KNEW ABOUT IT, DID THEY INFORM THE PUBLIC ON A
6  TIMELY BASIS OF THE PROBLEMS, OR DID THEY CONCEAL OR
7  OMIT THESE PROBLEMS TO THE PUBLIC AND THEN TO THE
8  PLAINTIFF.
9       I ALSO WAS ASKED TO LOOK AT THE FINANCIAL
10 REPORTS TO SEE IF THESE -- THE PROBLEMS WITH THE DPS6
11 TRANSMISSION WERE DISCLOSED IN THE FINANCIAL STATEMENTS,
12 I.E., IN THE 10K'S AND THE FOOTNOTES OF THE 10K'S.  AND
13 THEN I WAS ASKED TO LOOK AT THE CORPORATE, I GUESS,
14 CORPORATE POLICIES OR CORPORATE BEHAVIOR CONSIDERING
15 DISCLOSURE OF THESE DPS6 ISSUES.
16      LASTLY, I WAS ASKED TO COMPUTE DAMAGES, THE
17 UNDERLYING DAMAGES RELATING TO THE DPS6 ON THE -- FOR
18 THE PLAINTIFF ON A RESTITUTION BASIS AND THEN TO
19 QUANTIFY THE AMOUNT, IF ANY, OF PUNITIVE DAMAGES.
20    Q  I'M NOT ASKING YOU TO OPINE WHETHER THEY'RE
21 WARRANTED, BUT I WILL GET INTO THIS SUBSEQUENTLY.  BUT
22 LET ME -- YOU'VE GIVEN US SOME IDEA -- WELL, IS THERE
23 MORE?
24    A  THAT'S IT -- AND JUST TO LOOK IF THESE
25 NONDISCLOSURES WERE MATERIAL TO THE BUYING DECISION.
26    Q  SURE.  YOU'VE TOUCHED A LITTLE BIT ON THIS IN
27 YOUR RESPONSE, BUT LET ME ASK YOU IN PARTICULAR:  WHAT
28 DOCUMENTS DID YOU REVIEW IN ORDER TO FULFILL THE TASKS

```
 1    FIRST PRIORITY OF A CPA.
 2         Q    YOU'VE BEEN INVOLVED IN THE FINANCIAL FIELD AND
 3    ACCOUNTING FOR HOW MANY YEARS, DR. LUNA?
 4         A    SINCE THE BEGINNING OF THE '80S.  ABOUT 30 --
 5         Q    A LONG TIME.  OKAY.  LET'S GO TO THE NEXT ONE.
 6         A    38 YEARS OR SO.  ALL RIGHT.
 7         Q    AND THEN YOU'VE TALKED ABOUT -- YOU SAY "CFE
 8    MANUAL."  WHAT ARE YOU REFERRING TO?
 9         A    THERE IS A MANUAL PUT OUT BY THE ASSOCIATION OF
10    CERTIFIED FRAUD EXAMINERS.  THAT IS A RECOMMENDATION
11    GUIDE, I GUESS, AND IN THERE THERE'S DISCUSSION ON
12    OMISSIONS AND CONCEALMENTS AND MISREPRESENTATIONS AND
13    MATERIALITY THAT ONE IS NOT SUPPOSED TO -- WE TALKED
14    BEFORE THAT IF -- IF AN OMISSION OR A CONCEALMENT
15    WERE -- WOULD HAVE -- BY ONE ENTITY OR PERSON WOULD HAVE
16    CHANGED THE OPINION OR DECISION MAKING OF ANOTHER
17    REASONABLE PERSON -- THAT IS NOT BEING IN LINE WITH
18    THE -- FORD'S CODE OF CONDUCT.  AND THERE ARE CERTAIN
19    OTHER GUIDELINES IN THE CFE MANUAL AS WELL.
20         Q    DR. LUNA, LET ME TURN YOUR ATTENTION TO THE
21    ISSUE OF DAMAGES.  AND I DO NOT WANT YOU TO INCLUDE -- I
22    THINK YOU SAID 94 OR 100 DAYS OUT OF SERVICE --
23         A    RIGHT.
24         Q    -- JUST WITH RESPECT TO THE REPAIR
25    PRESENTATIONS YOU LOOKED AT.
26         A    RIGHT.
27         Q    LET'S ACTUALLY DEAL WITH MR. MYERS'S UNDERLYING
28    DAMAGES SO WE CAN GET THAT IN FRONT OF THE JURY.
```

49

```
 1            AS A DEMONSTRATIVE, TO KIND OF FOCUS THE
 2   DISCUSSION, CAN YOU TELL THE JURY WHAT SCHEDULE 1 IS AND
 3   WALK US THROUGH THIS.
 4       A    SCHEDULE 1 GOES TO THE UNDERLYING DAMAGES.  THE
 5   FIRST LINE IS THE CONTRACT PAYMENTS THAT WERE MADE FOR
 6   THE VEHICLE: WHAT DID HE PAY FOR THE VEHICLE AND ALL THE
 7   PAYMENTS HE MADE TO DATE, UP UNTIL THE TIME THAT HIS CAR
 8   GOT TOTALED ON THE VEHICLE.  AND THAT WAS $17,948.
 9       Q    AND YOU GET THAT FROM THE RETAIL INSTALLMENT
10   SALES CONTRACT?
11       A    YES, I DO.
12       Q    AND THEN YOU FACTOR IN ADDITIONAL DAMAGES
13   RELATED TO THE ACTUAL FINANCING OF THAT VEHICLE?
14       A    RIGHT, THE FINANCING, HIS OUT-OF-POCKET
15   PAYMENTS ON THAT VEHICLE.
16       Q    OKAY.
17       A    THEN WE HAVE RELATED REPAIR COSTS AND THAT --
18   WE HAVE A "0" BECAUSE THOSE COSTS WERE COVERED UNDER
19   WARRANTY.  SO HE WASN'T OUT OF POCKET ON THOSE.  SO WE
20   START WITH COMPENSATORY OF 17,948.  NOW, THE BALANCE
21   THAT WAS STILL OWED BY HIM AS OF THE TIME OF THE LOSS
22   WAS 22,631.
23       Q    IN OTHER WORDS, HE'S STILL RESPONSIBLE FOR THAT
24   MONEY?
25       A    YES, HE WAS.
26       Q    GOT IT.  AND --
27       A    SO THAT BROUGHT US, THEN, UP TO 40,579.  THEN
28   WHAT'S CALLED COVER DAMAGES.  BECAUSE THE -- HIS VEHICLE
```

```
 1    WAS IN THE SHOP FOR SO LONG, 94 DAYS FOR THAT, OR
 2    113 DAYS FOR EVERYTHING, HE COULDN'T -- HE FELT IT
 3    WASN'T ECONOMICAL FOR HIM TO KEEP RENTING A CAR, SO HE
 4    BOUGHT A REPLACEMENT CAR AS A SECONDARY SOURCE WHEN HIS
 5    VEHICLE WAS IN THE SHOP, TO DRIVE AROUND; AND HE PAID
 6    $6,000 FOR HIS MITSUBISHI AND THAT'S WHAT HE TESTIFIED
 7    TO.  SO WE'RE NOW UP TO 46,579.
 8            THERE WERE OTHER OUT-OF-POCKET COSTS, REPAIR
 9    COSTS, INSURANCE, REGISTRATION COST; THOSE TOTALED
10    $7,785.  SO IN TOTAL, THE TOTAL UNDERLYING DAMAGES ARE
11    54,364.
12       Q   SO YOU DO THE UNDERLYING DAMAGES.  THAT'S THE
13    ACTUAL -- JUST PURE DAMAGES BASED ON HOW HE'S BEEN
14    HARMED?
15       A   RIGHT.
16       Q   OKAY.  NOW, I'M NOT ASKING YOU WHETHER PUNITIVE
17    DAMAGES ARE WARRANTED, BUT I WANT YOU TO INDULGE ME.  AS
18    AN EXPERT, IF YOU TOOK THE COMPENSATORY DAMAGES AND
19    MULTIPLIED IT BY NINE TIMES, WHAT WOULD THE AMOUNT OF
20    THAT BE?
21       A    IF I STARTED WITH THE 46,579, WHICH IS BEFORE
22    THESE OTHER OUT-OF-POCKET DAMAGES, THE FIGURE WOULD BE
23    419,211.
24       Q   $419,000 AND 211 CENTS?
25       A   NO, $211.  $419,211.
26       Q   NOW, IF YOU WERE TO DO THE NINE TIMES,
27    HOWEVER --
28       A   WELL, WAIT, I'M NOT FINISHED YET.
```

1    Q    OKAY.  GO AHEAD.
2    A    IF YOU STARTED WITH THE 54,364, NINE TIMES OF
3    THAT WOULD BE 489,276.
4    Q    OKAY.  SO IF WE USE THE COMPLETE COVER DAMAGES,
5    THE COMPENSATORY DAMAGES, THE OUT-OF-POCKET DAMAGES, AND
6    WE USE THAT FIGURE, AND THEN PUNITIVE DAMAGES, AS THE
7    COURT WILL INSTRUCT THE JURY, ARE DESIGNED TO PUNISH AND
8    DISCOURAGE IMPROPER BEHAVIOR, AND WE USE THE NINE TIME
9    FIGURE, THEN THE AMOUNT THAT WE'RE LOOKING AT IS
10   $521,009; IS THAT CORRECT?
11   A    IT IS, BUT THERE'S TWO OTHER STEPS, IF I COULD.
12   Q    SURE.
13   A    BESIDES THE PUNITIVE DAMAGES ON THAT OF
14   489,276, ASSUMING NINE TIMES, THERE'S ALSO THE
15   UNDERLYING COMPENSATORY DAMAGES WHICH WAS THE 54,364,
16   AND THAT GETS YOU UP TO 543,640.  AND THEN I SUBTRACTED
17   OUT, HE HAD RECEIVED SOME INSURANCE AND GAP CONTRACT
18   MONEY OF 22,631 WHEN HIS CAR WAS TOTALED.  SO THAT
19   REDUCES THE TOTAL DAMAGE UP TO $521,009.
20   Q    SO WHAT'S THAT -- I'M SORRY.  CAN YOU READ THAT
21   NUMBER FOR ME AGAIN SO THAT?
22   A    521009.
23   Q    NOW, ONE OF THE THINGS THAT WE LOOK AT, AND THE
24   COURT WILL INSTRUCT THE JURY, WE ANTICIPATE, IS YOU LOOK
25   AT -- IN ORDER FOR A PUNITIVE DAMAGES ASSESSMENT, YOU
26   LOOK AT THE ACTUAL NET WORTH OF THE -- OF THE ACTOR WHO
27   ACTED IMPROPERLY, TORT FEASOR, YOU KNOW, THE -- IN THIS
28   CASE, FORD, THE DEFENDANT.