1

**KNIGHT LAW GROUP, LLP**

2
Steve Mikhov (SBN 224676)
1801 Century Park East, Suite 2300

3
Los Angeles, CA 90067
Telephone: (310) 552-2250

4
Fax: (310) 552-7973

5

6
**LAW OFFICES OF MICHAEL H. ROSENSTEIN**
Michael H. Rosenstein (SBN 169091)

7
1801 Century Park East, Suite 2300
Los Angeles, CA 90067

8
Telephone: (310) 286-0275
Fax: (310) 286-0274

9

10
Attorneys for Plaintiff,
**ALEJANDRO G. SUAREZ**

11

12
**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

13
**COUNTY OF LOS ANGELES**

14

15

16
| | |
|---|---|
| **ALEJANDRO G. SUAREZ,** | Case No.: BC610430 |
| Plaintiff, | **PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR ATTORNEY'S FEES, COSTS AND EXPENSES** |
| vs. | |
| **FORD MOTOR COMPANY, a Delaware Corporation, and DOES 1 through 10, inclusive,** | [Filed Concurrently with Plaintiff's Notice of Motion and Motion for Attorney's Fees, Costs and Expenses; Declarations of Steve Mikhov and Michael Rosenstein] |
| Defendants. | *Assigned for All Purposes to the Honorable Gregory W. Alarcon* |
| | Date:  April 10, 2018 |
| | Time: 8:30 a.m. |
| | Dept.: 36 |
| | RES ID: 180222292055 |

17

18

19

20

21

22

23

24

25

26

27

28

TABLE OF CONTENTS

Page(s)

I.    INTRODUCTION ..................................................................................................1

II.   STATEMENT OF FACTS ....................................................................................2

III.  ARGUMENT AND ANALYSIS ...........................................................................6

    A.    Plaintiff's Attorneys Are Entitled to Fees, Costs and Expenses in this
        Action..........................................................................................................6

    B.    The Hourly Rates Sought by Plaintiff's Attorneys Are Reasonable.................7

        1.    The Nature and Complexity of the Litigation Support the
            Attorney's Fees Requested ..................................................................8

        2.    The Firm's Skill Justifies the Amount of Attorney's Fees
            Sought ..............................................................................................10

    C.    The Settlement Amount Does Not Limit the Attorney's Fee Recovery..........11

    D.    Plaintiff Should Be Granted a Lodestar Multiplier........................................12

    E.    Plaintiff is Entitled to Recover All Costs and Expenses Reasonably
        Incurred in Connection with this Action.......................................................14

IV.   CONCLUSION...................................................................................................15

1

## TABLE OF AUTHORITIES

2

Page(s)

3

Cases

4

*Cazares v. Saenz,*
    (1989) 208 Cal.App.3d 279 ..................................................................13

5

*City of Riverside v. Rivera*
    (1986) 477 U.S. 561 ............................................................................11

6

7

*Dietrich v. Dietrich*
    (1953) 41 Cal.2d 497 ............................................................................8

8

9

*En Palm, LLC v. Teitler*
    (2008) 162 Cal.App.4th 770 ..................................................................9

10

11

*Goglin v. BMW of North America, LLC*
    (2016) 4 Cal.App.5th 462 ............................................................. 7, 12

12

13

*Graciano v. Robinson Ford Sales*
    (2006) 144 Cal.App.4th 140 ........................................................ passim

14

*Graham v. DaimlerChrysler Corp.*
    (2004) 34 Cal.4th 553 ......................................................................6, 13

15

16

*Hadley v. Krepel*
    (1985) 167 Cal.App.3d 677 ..................................................................15

17

18

*Harman v. City and County of San Francisco*
    (2007) 158 Cal.App.4th 407 ................................................................12

19

20

*Horsford v. Bd. of Trustees of Cal. State Univ.*
    (2005) 132 Cal. App. 4th 359 ...............................................................13

21

*In re Chiron Corp. Securities Litigation*
    (N.D. Cal. Nov. 30, 2007) No. C-04-4293 VRW, 2007 WL 4249902 .........................13

22

23

*Independent Federation of Flight Attendants v. Zipes*
    (1989) 491 U.S. 754 ............................................................................12

24

25

*Jensen v. BMW of North America, Inc.*
    (1995) 35 Cal.App.4th 112 ..................................................................15

26

27

*Ketchum v. Moses,*
    (2001) 24 Cal.4th 1122 ............................................................12, 13, 14

28

*La Mesa-Spring Valley School Dist. v. Otsuka*
    (1962) 57 Cal.2d 309 .................................................................................10

*Los Angeles Police Protective League v. City of Los Angeles*
    (1986) 188 Cal.App.3d 1 ...............................................................................8

*Mandel v. Lackner*
    (1979) 92 Cal.App.3d 747 .............................................................................6

*Molski v. Arclero Wine Group*
    (2008) 164 Cal.App.4th 786 ..........................................................................9

*PLCM Group v. Drexler, supra*
    (2000) 22 Cal.4th 1084 ............................................................................8, 13

*Reveles v. Toyota by the Bay*
    (1997) 57 Cal.App.4th 1139 ..........................................................................6

*Robertson v. Fleetwood Travel Trailers of California, Inc.*
    (2006) 144 Cal.App.4th 785 ................................................................. *passim*

*Serrano v. Priest*
    (1977) 20 Cal.3d 25 (Serrano III) ...............................................................13

*Serrano v. Unruh*
    (1982) 32 Cal.3d 621 .................................................................................6, 8

*Vo v. Las Virgenes Municipal Water District*
    (2000) 79 Cal.App.4th 440 ...........................................................................12

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR
ATTORNEY'S FEES, COSTS AND EXPENSES

1

## Statutes and Codes

2

California Code of Civil Procedure
Section 1032(a)(4) ..................................................................................6

3

4

California Code of Civil Procedure
Section 1033.5..........................................................................................15

5

California Code of Civil Procedure
Section 1794(d) ............................................................................ *passim*

6

7

California Code of Civil Procedure
Section 998............................................................................1, 2, 5, 6, 14

8

9

United States Code
Title 15, Section 2301 et seq. (Magnuson Moss Warranty Act)...........................12

10

11

United States Code
Title 42 § 1988 ........................................................................................11

12

13

## Other Authorities

14

Pearl, *California Attorney Fee Awards*
Sections 12.14A, 12.33 (2nd Ed. 2005) ...............................................6

15

16

Sen. Report No. 93-151,
1st Sess., pp. 23 (1973) ........................................................................12

17

18

19

20

21

22

23

24

25

26

27

28

iv

## I.    INTRODUCTION

On September 19, 2017, Ford filed an amended Code of Civil Procedure section 998 Offer and, after careful review of the amended terms of the second offer, in the amount of $110,000.00, which consisted of a full statutory "buy-back" of his defective vehicle, incidental and consequential damages, and a civil penalty. Plaintiff accepted the 998 offer on October 4, 2017. The final settlement is **over three-and-a-half times** the total amount Plaintiff paid for the vehicle in what defense routinely calls a "simple lemon law" action. Plaintiff obtained this extraordinary sum *without going to trial*. By any analysis, Plaintiff achieved a superlative settlement given Ford's initial refusal to even consider addressing Plaintiff's issues. The settlement is, in essence, one that few, if any, firms in this state could achieve for its clients. The excellent result was due to Plaintiff's attorneys' skill and expertise in lemon law cases but, arguably, the biggest factor in Plaintiff's success was Plaintiff's attorneys' zealous representation.

On April 23, 2014, Plaintiff purchased a new 2014 Ford Focus for $31,616.20. During his ownership of the vehicle, Plaintiff suffered through ongoing transmission problems, including persistent shuddering and jerking, requiring multiple repair visits. In a period of just over sixteen months, Plaintiff brought his vehicle in for repair a total of six (6) times, all specifically related to the transmission, but the problems continued. Ford applied its tried and true internal policy of ignoring its statutory obligations under the Song-Beverly Act. By doing so, Ford made a business decision that, by its actions, Plaintiff (like many consumers) would walk away and Ford would save money. Plaintiff could not afford to do that and so Plaintiff hired the Knight Law Group, LLP (formerly O'Connor and Mikhov, LLP, and hereafter "Knight Law") on a contingency basis to assist in vindicating his rights. Knowing that Ford had willfully violated Plaintiff's rights and had already rejected informal resolution, Knight Law was forced to file this case.

It should be noted that Plaintiff, like 100% of the clients of Knight Law, first tried to obtain resolution prior to hiring attorneys by contacting the manufacturer or by going through the Better Business Bureau (an established resolution process). Knight Law does not jump head first into litigation. **Every single one of the firm's clients** were denied or the terms of an offer sought to steal monies that the consumer was lawfully owed. In pursuing lemon law cases, Knight Law and

1

its associating attorneys are exposing the truth about some of these vehicle manufacturers and causing them to pay multiples of actual damages in the form of civil penalties (and punitive damages). The day Defendant starts honoring its obligations to consumers in this State is the day Knight Law goes out of business. This case, and others like it, could have been altogether avoided from the start. Much like products liability actions have paved the way for innovations in manufacturing, design and marketing standards, Plaintiff's counsel hopes that one day these lemon law cases add up to actually have an effect on the way manufacturers treat their consumers. The firm is willing to stand up to these mammoth companies, and then are vilified for doing so.

The Song-Beverly Act, Civil Code sections 1790, *et seq.*, entitles Plaintiff to seek reasonable attorney's fees, costs and expenses from Ford. Moreover, the 998 Offer to Compromise expressly provides Plaintiff is the prevailing party and entitled to this noticed motion for attorney's fees. Plaintiff now moves the Court: (1) for an award of attorney's fees pursuant to Civil Code section 1794(d) under the "lodestar" method in the amount of $78,480.00, (2) for a reasonable, modest, "lodestar" modifier of 1.5 under California law, in the amount of $39,240.00, and (3) to award actual costs and expenses incurred in the amount of $12,497.82. (Civ. Code § 1794(d).) Plaintiff requests a total of $130,217.82 in attorney's fees, costs and expenses. (Declaration of Steve Mikhov ("SM Dec.") ¶ 2, Exs. A-B; Declaration of Michael Rosenstein ("MR Dec.") ¶ 8, Ex. A.)

## II.    STATEMENT OF FACTS

Plaintiff purchased a new 2014 Ford Focus on April 23, 2014 for a purchase price of $23,180.00—adding taxes, fees, and an optional service contract, the total purchase price was $31,616.20. (SM Dec., ¶ 3, Ex. C.) The vehicle was distributed by Ford Motor Company, which provided an express written warranty. (SM Dec., ¶ 3.) After approximately one month and less than 300 miles of ownership, the vehicle began exhibiting transmission problems. (SM Dec., ¶ 4.) First, Plaintiff brought the vehicle in to a Ford-authorized repair facility for maintenance because the transmission shuddered violently. (*Id.*) After three (3) days, the repair facility returned the vehicle to the Plaintiff and informed Plaintiff that the transmission was operating as it was designed to and that the vehicle was safe to drive. (*Id.*) The problem persisted, however, and less than one

1    (1) month after the previous repair, Plaintiff again delivered his vehicle to a Ford-authorized repair

2    facility with complaints of the transmission shuddering on acceleration. (*Id.*)  The facility could

3    not find anything wrong with Plaintiff's vehicle and a service technician again represented to

4    Plaintiff that Plaintiff's vehicle was safe to drive. (*Id.*)  The problem persisted even after the repair

5    facility replaced the clutch and reprogrammed the powertrain control module ("PCM") and

6    transmission control module ("TCM"). (*Id.*)  In total, Plaintiff delivered the vehicle to Ford-

7    authorized repair facilities no less than six (6) times in the first 14,000 miles of ownership to

8    address its multiple transmission defects. (*Id.*)

9        Despite the ongoing repairs and continued manifestation of problems, Ford refused to

10   acknowledge the defective nature of Plaintiff's vehicle. (SM Dec., ¶ 5.)  At all times, however,

11   Ford had direct, contemporaneous knowledge of the vehicle's serious defects, which it records in

12   a database called "OASIS" and a warranty repair history database called "AWS" as they are

13   reported. (*Id.*)  These repair records indicate each time the vehicle is presented for repair during

14   the warranty period, as well as every time the Ford repair facility finds a problem/defect

15   attributable to Ford and charges Ford for the work. (*Id.*)

16        Despite Ford's affirmative duty under the Song-Beverly Act to repurchase or replace a

17   defective vehicle after a reasonable number of repair attempts, Ford never offered Plaintiff a

18   buyback or replacement. (SM Dec., ¶ 6.)  Given that Ford disregarded every opportunity to do

19   right by its customer, Plaintiff was forced to retain counsel and file suit. (SM Dec., ¶ 7.)

20        Plaintiff contacted Knight Law and told the firm about the problems with his vehicle and

21   the way Ford treated him. (SM Dec., ¶ 8.)  After reviewing the repair history and discussions with

22   Plaintiff, Knight Law agreed to represent Plaintiff and bear the risk of litigating the case on a fully

23   contingent basis. (*Id.*)  Because Knight Law's compensation was purely contingent, the firm faced

24   a genuine risk of not being paid for its services for years, if at all, while advancing thousands of

25   dollars in costs and expenses on Plaintiff's behalf. (*Id.*)  In taking on this duty, the firm was facing

26   a litigation behemoth — Ford is a multi-billion-dollar company, with a virtually infinite litigation

27   war-chest, that wages a battle of attrition that most firms cannot withstand. (*Id.*)

28        As a result of Ford's failure to fix the material defects associated with Plaintiff's vehicle,

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR
ATTORNEY'S FEES, COSTS AND EXPENSES

1    or otherwise comply with the Song-Beverly Act, Plaintiff filed a complaint in this action on

2    February 16, 2016, alleging, in part, willful violations of the Song-Beverly Act and seeking civil

3    penalties. (SM Dec., ¶ 9.)  Defendant demurred and moved to strike Plaintiff's Complaint on or

4    around March 23, 2016.  (*Id.*)

5              On March 25, 2016, Ford petitioned to coordinate this case along with hundreds of other

6    cases like it involving the well-known, defective diesel engine with a Petition for Coordination

7    of Add-On Cases, causing Plaintiff time and expense to oppose. (SM Dec., ¶ 10.) As coordination

8    would unduly delay resolution of the cases and lead to substantial prejudice to clients who would

9    be stuck driving defective vehicles, Plaintiff opposed the Petition.  (*Id.*)

10             Defendant's position in the litigation required extensive efforts on the part of Plaintiff's

11   counsel, and they promptly began working up their case on behalf of Plaintiff. (SM Dec., ¶ 11.)

12   Written discovery was drafted and served on Defendant on or about October 13, 2016, consisting

13   of 44 requests for admissions, 92 requests for production of documents, 87 special interrogatories,

14   and 26 form interrogatories. (*Id.*)  Plaintiff benefitted from Knight Law's expertise in litigating

15   against Ford <u>as just 3.8 hours were billed for drafting the entirety of this discovery</u>.  (*Id.*)

16   Plaintiff's counsel are able to use existing files as templates to conserve time and litigate

17   efficiently. (*Id.*) Written discovery of this magnitude, drafted from scratch and without the benefit

18   of Plaintiff's attorneys' vast knowledge, experience and specialized expertise, would have taken

19   multitudes of the time expediently managed here.  (*Id.*)

20             Meanwhile, on or about January 25, 2017, almost twelve months after the complaint was

21   filed in this action, Ford finally filed its answer, denying all liability and asserting numerous

22   affirmative defenses. (SM Dec., ¶ 12.)  Ford also filed a demand for a jury trial at this time.  (*Id.*)

23             With the absence of a reasonable settlement offer from Ford accounting for its willful

24   violation of the Song-Beverly Act, the case appeared likely to go to trial. (SM Dec., ¶ 13.)

25   Accordingly, on or about March 3, 2017, Michael Rosenstein of the Law Offices of Michael H.

26   Rosenstein formally associated into the case as lead trial counsel.  (*Id.*; MR Dec., ¶ 11, Ex. C.)

27             Meanwhile, Plaintiff's counsel continued working up the case for Plaintiff.  In March 2017,

28   Plaintiff noticed and deposed several Ford employees, including Ford's PMK and PMQ, service

1    advisors and service technicians. (SM Dec., ¶ 14.) These depositions were needed to obtain

2    information regarding repairs to the vehicle, authenticate the repair orders, and rebut Ford's

3    anticipated argument that the problems with Plaintiff's vehicle were somehow caused by

4    Plaintiff's neglect or abuse. (*Id.*) True to form, Ford served an objection to the noticed deposition

5    of their PMK. (*Id.*)

6           On or about March 23, 2017, after more than a year of litigation, Ford finally made a

7    settlement offer by serving Plaintiff with a Code of Civil Procedure section 998 Offer to

8    Compromise ("998 Offer") for $110,000.00. (SM Dec., ¶ 15.)  The offer contained vague,

9    ambiguous, and uncertain terms. (*Id.*) The offer failed to include any details pertaining to when

10   Plaintiff would be entitled to payment and whether Ford would be subject to penalty for late

11   payment. (*Id.*)  Additionally, the offer left Plaintiff responsible for paying out of pocket for any

12   attorney fees incurred in post-offer clarification, enforcement of the offer, or any appeals or writs

13   following related rulings. (*Id.*)  Plaintiff rejected the inadequate offer. (*Id.*)

14          Meanwhile, due to Defendant's improper objections and/or incomplete and evasive

15   responses to Plaintiff's discovery, Plaintiff began "meet and confer" efforts in December 2016.

16   (SM Dec., ¶ 16.)

17          On or about April 7, 2017, Ford propounded requests for admissions, requests for

18   production of documents, special interrogatories and form interrogatories upon Plaintiff.  (SM

19   Dec., ¶ 17.)  Plaintiff again benefitted from Knight Law's expertise as just 3.4 hours were billed

20   for drafting responses to the entirety of this discovery. (*Id.*) In May 2017, Ford also noticed the

21   deposition of Plaintiff and made a demand for inspection of Plaintiff's vehicle. (*Id.*) On May 17,

22   2017, the court elected to continue trial for five weeks to July 7, 2017.  (SM Dec., ¶ 18.)

23   Unsatisfied with the court's decision, on June 7, 2017, Defendant notified Plaintiff that it intended

24   to apply ex parte for an order to reopen discovery to depose witnesses, and/or in the alternative,

25   for an evidence sanction, and/or in the alternative, continuing the current trial date, and extending

26   all discovery deadlines in accordance with the new trial date. (*Id.*)

27          Nineteen (19) months after this case began, and with trial imminent, Ford served Plaintiff

28   with an Amended Offer to Compromise pursuant to the Code of Civil Procedure section 998

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR
ATTORNEY'S FEES, COSTS AND EXPENSES

1   ("Amended 998 Offer"). (SM Dec., ¶ 19, Ex. D.)  The Amended 998 Offer, which offered Plaintiff

2   $110,000.00 was accepted by Plaintiff on October 4, 2017.  (*Id.*)  This settlement amount was

3   inclusive of a full statutory "buy-back" of his defective vehicle, incidental and consequential

4   damages, and <u>maximum two-time civil penalty</u> under the Song- Beverly Act. (*Id.*)

5          Plaintiff, as the prevailing party in this action, has made every reasonable effort to resolve

6   the payment of Plaintiff's attorney's fees by Ford but was forced to file this Motion with the Court.

7   (SM Dec., ¶ 20).

8                        **III.    ARGUMENT AND ANALYSIS**

9          **A.    <u>Plaintiff's Attorneys Are Entitled to Fees, Costs and Expenses in this Action</u>**

10         Plaintiff is the prevailing party in this action and, under the Song-Beverly Act, entitled to

11  recoup all reasonable attorney's fees, costs and expenses as the prevailing parties.  (Code Civ.

12  Proc. § 1032(a)(4); Civ. Code § 1794(d); *Graham v. DaimlerChrysler Corp.* (2004) 34 Cal.4th

13  553, 557; *Reveles v. Toyota by the Bay* (1997) 57 Cal.App.4th 1139.)  Absent a contrary showing,

14  both the number of hours that the prevailing party's attorney spent litigating the case and his or

15  her regular hourly rate are presumed to be reasonable.  (*Serrano v. Unruh* (1982) 32 Cal.3d 621,

16  639 (counsel is entitled to all hours actually spent, absent a showing of "special circumstances"

17  that would render such an award unjust); *Mandel v. Lackner* (1979) 92 Cal.App.3d 747, 761 an

18  attorney's regular hourly rate is entitled to a presumption of reasonableness); Pearl, <u>California</u>

19  <u>Attorney Fee Awards</u>, at §§ 12.14A, 12.33 (2nd Ed. 2005.)

20         In prosecuting this case, the efforts of Plaintiff's counsel amount to $78,480.00, including

21  drafting this motion and time anticipated to be spent preparing the reply and attending the hearing.

22  (SM Dec., ¶ 2, Ex. A.; MR Dec., ¶ 8, Ex. A.)  Plaintiff's counsel also requests a modest 1.5

23  enhancement, in the amount of $39,240.00, to account for the delay in payment and contingent

24  risk posed by this case.  Lastly, the reimbursable costs and expenses set forth in Plaintiff's

25  memorandum of costs are $12,497.82.  (SM Dec., ¶ 2, Ex. B.)    In total, Plaintiff requests

26  $130,217.82. (SM Dec., ¶ 2, Exs. A-B; MR Dec., ¶ 8, Ex. A.)

27         While Ford will surely claim these amounts are unreasonable, Ford's own counsel admits

28  in a declaration filed in federal court that "it is not uncommon, and in fact quite regular, for

1  attorney's fee and cost awards (*or resolutions through informal discussions* with opposing

2  counsel) to exceed $100,000.00." (SM Dec., ¶ 37, Ex. F, p. 3, ¶ 4.) Few, if any, manufacturers

3  cause this much work to be performed in allegedly "simple lemon law actions."

**B.  The Hourly Rates Sought by Plaintiff's Attorneys Are Reasonable**

5  The Court of Appeal has expressly held that the lodestar method applies to determining

6  attorney's fees under the Song-Beverly Act. (*Robertson v. Fleetwood Travel Trailers of*

7  *California, Inc.* (2006) 144 Cal.App.4th 785, 817.) The calculation of reasonable attorney's fees

8  under the Song-Beverly Act is based on the lodestar method, which entails multiplying the number

9  of hours reasonably expended by a reasonable hourly rate. (*Graciano v. Robinson Ford Sales*

10  (2006) 144 Cal.App.4th 140, 154; *Robertson, supra,* 144 Cal.App.4th at 817) The prevailing buyer

11  has the burden of showing that the fees incurred were "allowable," "reasonably necessary to the

12  conduct of the litigation," and "reasonable in amount." (*Goglin v. BMW of North America, LLC*

13  (2016) 4 Cal.App.5th 462, 470.) In making such an evaluation, a court may consider "factors such

14  as the complexity of the case and procedural demands, the skill exhibited and the results achieved."

15  (*Id.*)

16  In *Goglin v. BMW*, the appellate court recently affirmed the trial court's award of over

17  $185,000 in attorneys' fees and costs for a plaintiff who settled her claims against BMW under

18  the Song-Beverly Act. (*Id.* at 464.) The court also found plaintiff's counsel's hourly rate of $575

19  per hour was reasonable as supported by exhibits to counsel's declaration indicating various state

20  and federal courts had previously awarded him comparable hourly rates. (*Id.* at 473-74.) The

21  trial court was not obliged to consider that defendants paid their counsel a much lower hourly

22  rate. (*Id.* at 474.)

23  In *Robertson*, the trial court awarded $231,187.45 in fees based on $145,080.50 in fees

24  through trial, plus a "multiplier" of 1.5 for a total of $217,620.75, and $13,566.70 for the

25  attorney's fee motion. (*Id.* at 817.) The appellate court upheld the ruling. (*Id.* at 822.)

26  In *Graciano*, the trial court initially rejected plaintiff's lodestar fees of $109,468.50 and

27  request for a multiplier of 2.0. In particular, the trial court reduced the plaintiff's attorney's hourly

28  rate from the requested $350/hour to $250/hour, which was the court's mandated maximum rate

1    for expert testimony.   The appellate court reversed, reasoning a court should determine the

2    prevailing rate in the community for comparable professional legal services.  (*Graciano, supra,*

3    144 Cal.App.4th at 156 (*citing PLCM Group v. Drexler* (2000) 22 Cal.4th 1084, 1095).)  The

4    court found the plaintiff's unrebutted declarations established the proper hourly rate at $350 and

5    reducing that rate to $250 was an abuse of discretion.  (*Id.*)  The court also reaffirmed attorney's

6    fees <u>are not limited to a proportion</u> of the recovery.  (*Id.* at 164.)  On remand, the trial court found

7    that the lodestar rate of $350/hour was reasonable *and added* a multiplier of 2.0 for a total fee

8    award of over $380,000.  The attorney from *Graciano*, Hallen D. Rosner, now charges $620/hour.

9    (SM Dec., ¶ 54 (a).)

10          Furthermore, the California Supreme Court has expressly ruled that prevailing parties who

11    are entitled to recover their attorney's fees are *also entitled* to recover their fees for the time spent

12    preparing fee applications such as this one.  (*Serrano v. Unruh, supra,* 32 Cal.3d at 631; *Los*

13    *Angeles Police Protective League v. City of Los Angeles* (1986) 188 Cal.App.3d 1, 17; *Robertson,*

14    *supra,* 144 Cal.App.4th at 817 (awarding $13,566.70 in fees for a fee motion).)

15          Consideration of the "lodestar" factors compels an award of attorney's fees based on (i)

16    the hourly rates set forth of in the declarations filed concurrently herewith (SM Dec., ¶¶ 43-52;

17    MR Dec., ¶¶ 3, 5-7), (ii) a survey of rates charged by other well-known consumer law attorneys

18    (SM Dec., ¶ 54), (iii) over three dozen court orders confirming the reasonableness of Plaintiffs'

19    counsels' hourly rates and time billed in other Song-Beverly Act cases (SM Dec., ¶¶ 56-100, Exs.

20    G-YY), and (iv) a National Survey further supporting the reasonableness of the hourly rates. (MR

21    Dec., ¶ 9, Ex. B at pp. 42-25.)  Plaintiff's counsels' rates are within the range of rates charged by

22    other attorneys with similar experience in this area of law.

23          **1.      The Nature and Complexity of the Litigation Support the Attorney's**

24          **Fees Requested**

25          Determining the amount of reasonable attorney's fees may involve consideration of the

26    nature and complexity of the case.  (*Dietrich v. Dietrich* (1953) 41 Cal.2d 497, 506; *Graciano,*

27    *supra,* 144 Cal.App.4th at 147.)  Ford routinely claims that cases like this one are "simple lemon

28    law cases" and, therefore, Plaintiff's fee requests are always unjustified as excessive.  This case

8

required a range of specialized knowledge including: (1) an understanding of the full scope of consumer protection laws, which are highly nuanced; (2) knowledge of the intricacies of automobiles and the lexicon associated with them, as well as knowledge concerning how to investigate issues with automobiles; and (3) knowledge of auto manufacturers' and dealers' policies and protocols for repairing vehicles and complying with their legal obligations. (SM Dec., ¶ 103.) Plaintiff's attorneys have acquired knowledge and insight about Ford over the course of many years of litigation, and this experience typically results in significantly higher judgments or settlements for their clients, just like Plaintiff here. Plaintiff's attorneys have dared to make these matters more complex, testing the boundaries of car manufacturer's cheating ways. The firm's attorneys have traveled all over the country to depose individuals from the auto industry, including New Jersey, Texas, Michigan, Florida and Utah as well as countless counties throughout California. The firm has successfully fought to compel the production of millions of internal communications and confidential documents from Ford. No other firm is litigating "simple lemon law" cases like Knight Law and its associating attorneys.

Moreover, Ford made this matter even more complex by maintaining it had no liability and declining to submit any reasonable offers to settle the matter for over nineteen months of litigation. Ford should have acknowledged the material defects in Plaintiff's vehicle and resolved the matter before this case was ever filed. Ford engaged in expensive litigation, including denying all liability, asserting multiple affirmative defenses, stone-walling Plaintiff's discovery efforts, and forcing Plaintiff's counsel to expend numerous hours tirelessly preparing for trial. Ford easily could have resolved this matter earlier and saved tens of thousands in attorney's fees, costs and expenses. Ford ultimately came around to doing the right thing, but not before causing substantial fees to be incurred.

When Ford causes the entirety of fees to be incurred, it has no legitimate basis for complaining about the amount of attorney's fees reasonably and actually incurred. "A party cannot litigate tenaciously and then be heard to complain about the time necessarily spent by the opposition in response." (*En Palm, LLC v. Teitler* (2008) 162 Cal.App.4th 770, 786; *see also Molski v. Arclero Wine Group* (2008) 164 Cal.App.4th 786.)

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR ATTORNEY'S FEES, COSTS AND EXPENSES

2.   **The Firm's Skill Justifies the Amount of Attorney's Fees Sought**

A trial court may also take into account the skill of the attorneys when determining reasonable attorney's fees. (*La Mesa-Spring Valley School Dist. v. Otsuka* (1962) 57 Cal.2d 309, 316.)  Despite the case's difficulties, Plaintiff ultimately recovered $110,000.00 in damages, which is over three times the vehicle's purchase price (nearly four years ago).  The vehicle was no more or less defective on the date of settlement than it was when Plaintiff first asked for his money back before hiring legal counsel, so there is no rational explanation why Ford waged a lengthy and costly legal battle only to settle for a sum essentially equal to Plaintiff's best possible outcome via trial on the merits.

The final resolution in this case is the direct result of the skill and preparation of Plaintiff's attorneys, who specialize in consumer law and did not balk at Ford's aggressive litigation tactics.  Plaintiff's attorneys know the many nuances in these types of cases, and this experience has enabled them to develop litigation strategies that are highly effective and both cost and time efficient.  This experience provided a resolution to this matter far beyond that which Ford was previously willing to entertain.  Plaintiff's attorneys' specialized knowledge and experience in lemon law frequently results in outcomes far better than those obtained by attorneys who do not specialize in this specific area of law.  Because of this experience, knowledge and expertise, *Plaintiff went from a zero offer to a $110,000.00 settlement.*

Counsels' skill is evidenced by the size of the settlement as well as the nominal time expended on litigation tasks, which results in lower overall billing.  Plaintiff's attorneys do not spend inordinate time researching because they specialize in this area of law.  (SM Dec., ¶ 104.)  Nor do they spend unreasonable time preparing pleadings and other documents because they are able to use documents from other cases that need only be edited, rather than written from scratch.  While substantial fees have been incurred, those fees were caused by Ford and led to the execution of effective strategies that typically result in superlative results for Knight Law clients, like Plaintiff here.

On the other side, Ford is represented by large national firms—now totaling **eleven** separate law firms—with attorneys who specialize in representing automobile manufacturers in

10

1   lemon law cases. (SM Dec., ¶ 35.)  Ford is a corporate behemoth with the resources to easily

2   overwhelm a consumer or an inexperienced attorney. It is Defendant and its bevy of attorneys

3   that drive this litigation and then settle for an amount they knew the entire time would be

4   satisfactory, but instead waited until the eve of trial while amassing their billable hours.  Based

5   on a random sample of cases, 74% of the cases against Ford were settled six months before trial

6   instead of much earlier. (SM Dec., ¶ 33.)  Of those cases, 50% were settled just one month before

7   trial. Plaintiff required skilled and experienced attorneys to prosecute his claims against Ford and

8   its formidable resources.  Plaintiff's attorneys were well-suited for the task.  Now, Ford's appears

9   to have dug its heals even deeper by outright proclaiming in a letter that Ford is no longer willing

10  to discuss settlement, does not want to engage in any further mediations and fully intends to bring

11  every case to trial unless the firm's clients accept Ford's existing offers.  (SM Dec., ¶ 36, Ex. E.)

12  To date, 25% of all of 55 cases that Knight Law and its trial attorneys have taken to trial since

13  2012 have involved Ford as the named defendant. (SM Dec., ¶ 31.)

14          As such, Plaintiff's counsel request to be compensated not only for the quantity of the

15  work but for the quality of the work.  To do so, the firm calls upon a brave judiciary to award

16  counsel the compensation for their hard work.  Eventually, this litigation will reduce lawsuits and

17  the need for attorneys in this area of law, but change can and will only happen over time.

18          **C.**      **The Settlement Amount Does Not Limit the Attorney's Fee Recovery**

19          Plaintiff's settlement of $110,000.00 is substantial, but its size is irrelevant to the issue of

20  attorney's fees.  Depending upon the amount of Plaintiff's fees incurred in resolving the claim,

21  Ford may attempt to argue Plaintiff's attorneys' fees should be in proportion to Plaintiff's recovery,

22  but this position is starkly against the weight of California law.  The amount of attorney's fees

23  must not be tied to any percentage of recovery. (*Graciano*, *supra*, 144 Cal.App.4th at 164.)  In

24  fact, a trial court may abuse its discretion if it applies a rule of proportionality to a fee award.

25          The U.S. Supreme Court has previously considered the question of proportionality in

26  attorney fee awards and held: "[w]e reject the proposition that fee awards under [42 U.S.C.] section

27  1988 should necessarily be proportionate to the amount of damages a civil rights Plaintiff actually

28  recovers." (*City of Riverside v. Rivera* (1986) 477 U.S. 561, 574; *see also* Sen. Report No. 93-

1   151, 1st Sess., pp. 23-24 (1973) (attorney's fees under the Magnuson Moss Warranty Act are based

2   on actual time, not a percentage of the recovery); *Robertson, supra,* 144 Cal.App.4th at 820;

3   *Independent Federation of Flight Attendants v. Zipes* (1989) 491 U.S. 754, fn.2 (fee shifting

4   provisions under Magnuson-Moss and Song-Beverly "are to be interpreted alike"); *Goglin, supra,*

5   5 Cal.App.5th at 468-69 (affirming award of $185,000 in fees and costs in a Song-Beverly Act

6   case that settled for $75,000); *Vo v. Las Virgenes Municipal Water District* (2000) 79 Cal.App.4th

7   440, 446 (affirming $470,000 fee award after $40,000 judgment because the defendant was

8   excessively litigious and took a non-settlement posture); *Harman v. City and County of San*

9   *Francisco* (2007) 158 Cal.App.4th 407 (affirming award of approximately $1.1 million in fees

10   where plaintiffs recovered $30,300).)

11   It is not uncommon for attorney's fees and costs to exceed the client's damages, even

12   though they are efficiently incurred. The Legislature acknowledged that substantial work might

13   be needed to prosecute such claims against large corporations, which is the reason behind the fee

14   shifting provision of the Song-Beverly Act. (SM Dec., ¶ 102.) Otherwise, consumers would be

15   left without opportunity for redress when their damages were not enough for an attorney to take

16   the case on a contingent fee or hourly rate basis. "The purpose of statutory attorney fee provisions

17   is to provide financial incentives necessary for the private enforcement of important civil rights."

18   (*Ketchum v. Moses* (2001) 24 Cal.4th 1122, 1132.) Thus, the Song-Beverly Act gives consumers

19   the opportunity to seek legal redress even if their damages would not be high enough to warrant

20   legal representation.

21   The award of attorney's fees *cannot* be limited by the damages recovered by Plaintiff. Any

22   argument by Ford to the contrary would be entirely insincere, as the law is clear on this point.

23   *Ketchum, supra*, 24 Cal.4th at 1132. Regardless of the amount of attorney's fees earned, they may

24   not be tied to Plaintiff's settlement. (*Id.* at 164.)

25   **D.   Plaintiff Should Be Granted a Lodestar Multiplier**

26   As part of the Song-Beverly Act, a prevailing buyer may also receive a lodestar multiplier,

27   sometimes referred to as an adjustment or enhancement. (*Robertson, supra,* 144 Cal.App.4th at

28   817.) Once a lodestar amount is determined, which involves a "careful compilation of the actual

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR
ATTORNEY'S FEES, COSTS AND EXPENSES

1   time spent and reasonable hourly compensation for each attorney," (*Id.* at 819 (*citing Serrano v.*

2   *Priest* (1977) 20 Cal.3d 25, 48-49 (*Serrano III*)), the amount may then be augmented by taking

3   various relevant factors into account, including (1) the novelty and difficulty of the questions

4   involved and the skill displayed in presenting them; (2) the extent to which the nature of the

5   litigation precluded other employment by the attorneys; and (3) the contingent nature of the fee

6   award, based on the uncertainty of prevailing on the merits and of establishing eligibility for the

7   award. (*Id.*; *see also Graham, supra,* 34 Cal.4th at 579; *PLCM Group v. Drexler* (2000) at 1096.)

8   "[T]he purpose of a fee enhancement is primarily to compensate the attorney for the prevailing

9   party at a rate reflecting the risk of nonpayment in contingency cases." (*Ketchum, supra,* 24

10  Cal.4th at 1138; *Cazares v. Saenz* (1989) 208 Cal.App.3d 279, 287-88 (risk factor alone justifies

11  a 2.0 multiplier for a 50% chance of prevailing).)  "A 50 percent chance of recovery implies a

12  multiplier of 2, a 25 percent chance of recovery implies a multiplier of 4, and so on." (*In re*

13  *Chiron Corp. Securities Litigation* (N.D. Cal. Nov. 30, 2007) No. C-04-4293 VRW, 2007 WL

14  4249902, *9.)  Plaintiff asks for far less.

15       In *Robertson*, a case brought under the Song-Beverly Act, the court ruled that the

16  "statutory language in section 1794(d) is reasonably compatible with a lodestar adjustment

17  method of calculating attorney fees, including use of fee multipliers," and the court granted a 1.5

18  multiplier.   (144 Cal.App.4th at 817, 819.)

19       In *Graciano*, the appellate court actually *increased* the trial court's award of fees after

20  finding that the lodestar rate of $350/hour was reasonable and adding a 2.0 multiplier for a total

21  award of over $380,000.  (144 Cal.App.4th at 156.)

22       The lodestar is intended to reflect the basic fee for comparable non-contingent legal

23  services and should be enhanced by an appropriate multiplier to reflect the risk and delay in

24  payment associated with taking a contingent case, as well as the result achieved.  The lodestar

25  "multiplier" is meant to increase or decrease the fee award based on factors not already taken into

26  account when setting the hourly rate, such as the risk of taking a case on a contingency basis, and

27  delay in receiving payment. (*See Horsford, supra,* 132 Cal. App. 4th at 394-95.)

28  //

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR ATTORNEY'S FEES, COSTS AND EXPENSES

1    In *Ketchum*, the California Supreme Court wrote, "[a] contingent fee contract, since it

2    involves a gamble on the result, may properly provide for a *larger compensation* than would

3    otherwise be reasonable." ((2001) 24 Cal.4th 1122, 1132 [emphasis added].)

4        A contingent fee must be higher than a fee for the same legal services paid as they
         are performed.  The contingent fee compensates the lawyer not only for the legal
5        services he renders but for the loan of those services.  The implicit interest rate on
         such a loan is higher because the risk of default (the loss of the case, which cancels
6        the debt of the client to the lawyer) is much higher than that of conventional loans.
         (Posner, Economic Analysis of Law (4th ed.1992) pp. 534, 567, emphasis added.)
7        A lawyer who both bears the risk of not being paid and provides legal services is
8        not receiving the fair market value of his work if he is paid only for the second of
         these functions.  If he is paid no more, competent counsel will be reluctant to
9        accept fee award cases.

10

11   (*Id.* at 1132 [citations omitted; emphasis added].) Throughout the litigation, there always existed

12   the real possibility Plaintiff would not prevail.  Indeed, Defendants' first 998 Offer created

13   *additional risk* because Plaintiff would need to prevail with civil penalties at trial, since anything

14   less would have cut off attorney's fees as of the date of the offer.  The risk was further

15   compounded by the fact that Plaintiff's attorneys advanced all litigation costs and expenses. Thus,

16   if Plaintiff did not prevail, his attorneys would have suffered a loss of hundreds of hours in

17   uncompensated work and thousands of dollars in out-of-pocket expenses.

18       Further, unlike Ford's attorneys, who are paid monthly regardless of outcome, Plaintiff's

19   attorneys are not paid at all if they lose, and need to absorb significant delay in being paid if

20   Plaintiff does win. Plaintiff requests a 1.5 enhancement based on the contingent risk and the delay

21   in payment. Courts have awarded a multiplier to Plaintiff's counsel in numerous cases.  (SM Dec.,

22   ¶¶ 71, 75, 84, 85, 87, 88, 92, 98, 99, 100, Exs. V, Z, II, JJ, LL, MM, QQ, WW, XX, YY.)

23   **E.**   **Plaintiff is Entitled to Recover All Costs and Expenses Reasonably Incurred**

24        **in Connection with this Action**

25       Under the Song-Beverly Act, a prevailing buyer shall be allowed to recover as part of the

26   judgment a sum equal to the aggregate amount of costs and expenses.  (Civ. Code § 1794(d)

27   [emphasis added].)  The California Legislature intended the word "expenses" to cover outlays not

28   included in the detailed statutory definition of "costs," and the Song-Beverly Act's legislative

14

history demonstrates the Legislature exercised its power to permit recovery of a host of litigation expenditures beyond those permitted by Code of Civil Procedure § 1033.5. (*Jensen v. BMW of North America, Inc.* (1995) 35 Cal.App.4th 112, 137-138.)

A verified memorandum of costs generally satisfies the moving party's burden of establishing costs were necessarily incurred. (*Hadley v. Krepel* (1985) 167 Cal.App.3d 677, 682.) The verified memorandum of costs demonstrates what Plaintiff's attorneys incurred in costs and expenses prosecuting this matter, which counsel advanced on Plaintiff's behalf. (SM Dec. ¶ 2, Ex. B; Civ. Code § 1794(d).) The burden shifts to Ford to properly rebut the claimed costs.

## IV.   CONCLUSION

For the reasons above, Plaintiff respectfully requests this Honorable Court award attorney's fees, costs and expenses as follows:

| | |
|---|---|
| Lodestar Fees: | $ 78,480.00 |
| +Lodestar Enhancement: | $ 39,240.00 |
| Total Fees Requested: | $117,720.00 |
| +Costs and Expenses: | $ 12,497.82 |
| **=Total Fees and Costs/Expenses:** | **$130,217.82** |

Dated: March 14, 2018

**KNIGHT LAW GROUP, LLP**

Steve Mikhov (SBN 224676)
Attorney for Plaintiff,
**ALEJANDRO G. SUAREZ**

PROOF OF SERVICE
(Code of Civil Procedure §1013a)

I am employed in the County of Los Angeles, State of California.  I am over the age of 18 years and not a party to the within action. My business address is 1801 Century Park East, Suite 2300, Los Angeles, CA 90067.

I served the foregoing document described as:

**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR ATTORNEY'S FEES, COSTS AND EXPENSES**

Said document was served on the interested parties in this action, by placing true copies thereof enclosed in sealed envelopes, with postage prepaid, addressed as follows:

| | |
|---|---|
| Peter A. Strotz, Esq. | Michael H. Rosenstein, Esq. |
| KING & SPALDING LLP | Law Offices of Michael H. Rosenstein |
| 633 W. 5TH Street, Suite 1700 | 1801 Century Park East., Suite 2300 |
| Los Angeles, CA 90071 | Los Angeles, CA 90067 |
| **Counsel for Defendant,** | mrosenstein@rose-lawoffice.com |
| **FORD MOTOR COMPANY** | **Associated Counsel for Plaintiff,** |
| (via Overnight only) | **ALEJANDRO SUAREZ** |
| | (via E-mail only) |

XX    BY OVERNIGHT MAIL/DELIVERY: I caused such envelope to be delivered by hand to the office(s) of the addressee(s) via OVERNIGHT EXPRESS or by local courier service.

XX    BY E-MAIL OR ELECTRONIC TRANSMISSION: Based on a court order or an agreement of the parties to accept service by e-mail or electronic transmission, I caused the documents to be sent to the persons at the e-mail addresses listed above.  I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on March 14, 2018 at Los Angeles, California.

JENNIFER GUERRERO

-1-

PROOF OF SERVICE



RECEIVED

MAR 1 5 2018

BY: ..........................