**KNIGHT LAW GROUP, LLP**
Steve Mikhov (SBN 224676)
Amy Morse (SBN 290502)
1801 Century Park East, Suite 2300
Los Angeles, CA 90067
Telephone: (310) 552-2250
Fax: (310) 552-7973

**LAW OFFICE OF MICHAEL H. ROSENSTEIN**
Michael H. Rosenstein (SBN 169091)
1801 Century Park East, Suite 2300
Los Angeles, CA 90067
Telephone: (310) 286-0275
Fax: (310) 286-0274

Attorneys for Plaintiff,
**MARY A. JACQUEZ**

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

### COUNTY OF STANISLAUS

| | |
|---|---|
| **MARY A. JACQUEZ,** | Case No.: 2014395 |
| Plaintiff, | **PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR ATTORNEY'S FEES, COSTS AND EXPENSES** |
| vs. | |
| **FORD MOTOR COMPANY, a Delaware Corporation, and DOES 1 through 10, inclusive,** | |
| Defendants. | [Filed Concurrently with Plaintiff's Notice of Motion and Motion for Attorney's Fees, Costs and Expenses; Declarations of Steve Mikhov and Michael H. Rosenstein |
| | *Assigned for All Purposes to the Honorable John Freeland* |
| | Date: February 14, 2018 |
| | Time: 8:30 a.m. |
| | Dept.: 23 |

TABLE OF CONTENTS

Page(s)

I.   INTRODUCTION ................................................................................................1

II.  STATEMENT OF FACTS ...................................................................................2

III. ARGUMENT AND ANALYSIS .........................................................................6

    A.   Plaintiff's Attorneys Are Entitled to Fees, Costs and Expenses in this Action ..............6

    B.   The Hourly Rates Sought by Plaintiff's Attorneys Are Reasonable.............................7

        1.   The Nature and Complexity of the Litigation Support the Attorney's Fees Requested .................................................................................9

        2.   The Firm's Skill Justifies the Amount of Attorney's Fees Sought.................10

    C.   The Settlement Amount Does Not Limit the Attorney's Fee Recovery .....................12

    D.   Plaintiff Should Be Granted a Lodestar Multiplier.......................................13

        3.   The Lodestar Multiplier Should Be Granted in Contingent Cases Due to Risk and Delay of Payment.......................................................................14

    E.   Plaintiff is Entitled to Recover All Costs and Expenses Reasonably Incurred in Connection with this Action ...................................................................15

IV.  CONCLUSION................................................................................................16

i

1

<u>TABLE OF AUTHORITIES</u>

Page(s)

2

**Cases**

3

*Cazares v. Saenz*
    (1989) 208 Cal.App.3d 279 .................................................................................. 13

4

5

*In re Chiron Corp. Securities Litigation*
    (N.D. Cal. Nov. 30, 2007) No. C-04-4293 VRW, 2007 WL 4249902 .......................... 13

6

*City of Riverside v. Rivera*
    (1986) 477 U.S. 561 ...................................................................................... 12

7

8

*Dietrich v. Dietrich*
    (1953) 41 Cal.2d 497 ...................................................................................... 9

9

10

*En Palm, LLC v. Teitler*
    (2008) 162 Cal.App.4th 770 ............................................................................ 10

11

12

*Goglin v. BMW of North America, LLC*
    (2016) 4 Cal.App.5th 462, 470 ..................................................................... 7, 12

13

*Graciano v. Robinson Ford Sales*
    (2006) 144 Cal.App.4th 140 ................................................................... passim

14

15

*Graham v. DaimlerChrysler Corp.*
    (2004) 34 Cal.4th 553 .............................................................................. 6, 13

16

17

*Hadley v. Krepel*
    (1985) 167 Cal.App.3d 677 ............................................................................ 15

18

*Harman v. City and County of San Francisco*
    (2007) 158 Cal.App.4th 407 ........................................................................... 12

19

20

*Horsford v. Bd. of Trustees of Cal. State Univ.*
    (2005) 132 Cal.App.4th 359 ........................................................................ 9, 14

21

22

*Independent Federation of Flight Attendants v. Zipes*
    (1989) 491 U.S. 754 ..................................................................................... 12

23

*Jensen v. BMW of North America, Inc.*
    (1995) 35 Cal.App.4th 112 ............................................................................. 15

24

25

*Ketchum v. Moses*
    (2001) 24 Cal.4th 1122 ................................................................. 12, 13, 14, 15

26

*La Mesa-Spring Valley School Dist. v. Otsuka*
    (1962) 57 Cal.2d 309 ................................................................................... 11

27

28

*Los Angeles Police Protective League v. City of Los Angeles*
   (1986) 188 Cal.App.3d 1 ............................................................................ 8

*Mandel v. Lackner*
   (1979) 92 Cal.App.3d 747 ......................................................................... 7

*Molski v. Arclero Wine Group*
   (2008) 164 Cal.App.4th 786 ..................................................................... 10

*PLCM Group v. Drexler*
   (2000) 22 Cal.4th 1084 ............................................................................ 13

*Reveles v. Toyota by the Bay*
   (1997) 57 Cal.App.4th 1139 ....................................................................... 6

*Robertson v. Fleetwood Travel Trailers of California, Inc.*
   (2006) 144 Cal.App.4th 785 ............................................................... passim

*Serrano v. Unruh*
   (1982) 32 Cal.3d 621 ............................................................................ 7, 8

*Vo v. Las Virgenes Municipal Water District*
   (2000) 79 Cal.App.4th 440 ....................................................................... 12

**Statutes and Codes**

California Civil Code
   Section 1790 ....................................................................................... passim
   Section 1794(d) .................................................................... 2, 13, 15, 16

California Civil Procedure
   Section 998 ........................................................................................ 5, 15

Code of Civil Procedure
   Section 1033.5 ......................................................................................... 15

United States Code
   Title 42 Section 1988 .............................................................................. 12

**Other Authorities**

Pearl, *California Attorney Fee Awards* (2nd Ed. 2005) ................................... 7

Sen. Report No. 93-151, 1st Sess., pp. 23-24 (1973) ................................... 12

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR
ATTORNEY'S FEES, COSTS AND EXPENSES

# I.    INTRODUCTION

This case is about Defendant Ford Motor Company's (hereafter "Defendant" or "Ford") policy of taking advantage of California consumers, and Plaintiff Mary A. Jacquez's ("Plaintiff") more than two-year long battle to vindicate her rights.  Ford had three opportunities to avoid this lawsuit:  First it had an opportunity to build a quality car.  Then it had an opportunity to repair the material defects in Plaintiff's car within a reasonable number of repair attempts under California law.  Ford had a final opportunity to avoid this lawsuit when Plaintiff contacted Ford seeking a buy-back, but Ford summarily denied her lawful request despite its legal obligation.  Having squandered all three opportunities and violating the Song-Beverly Act in the process, Ford left Plaintiff with little choice but to pursue her rights in court.

On January 20, 2013, Plaintiff purchased a new 2013 Ford Focus for $23,016.35.  After approximately four months and under 6,000 miles of ownership, the vehicle began experiencing serious engine and transmission problems.  For the several months that followed, Plaintiff suffered through persistent engine and transmission problems, requiring multiple repair visits.  In a period of less than two years, Plaintiff took her vehicle in for repair a total of three (3) times, all specifically related to the engine and transmission, but the problems continued.

Plaintiff contacted Ford with the hope that Ford would repurchase her vehicle but Ford refused.  Rather, Ford applied its tried and true internal policy of ignoring its statutory obligations under the Song-Beverly Act.  By doing so, Ford made a business decision that, by its actions, Plaintiff (like many consumers) would walk away and Ford would save money.  With no further recourse, Plaintiff hired the Knight Law Group, LLP (formerly O'Connor and Mikhov, LLP, and hereafter "Knight Law") on a contingency basis to assist in vindicating her rights. Knowing that Ford had willfully violated Plaintiff's rights and that Ford had already rejected informal resolution, Knight Law was forced to file this case.

On July 24 2017, over two years after the complaint was filed in this action, Ford agreed to settle the case with Plaintiff for $125,000.00, which consisted of a full statutory "buy-back" of her defective vehicle, incidental and consequential damages, and a civil penalty. The final settlement is

1

1    **nearly five-and-a-half times** the total amount Plaintiff paid for the vehicle in what defense routinely

2    calls a "simple lemon law" action.  Plaintiff obtained this extraordinary sum *without going to trial*.

3    By any analysis, Plaintiff achieved a superlative settlement given Ford's initial refusal to even

4    consider a buyback of Plaintiff's vehicle.  The settlement is, in essence, one that few, if any, firms in

5    this state could achieve for its clients.  The excellent result was achieved due to Plaintiff's attorneys'

6    skill and expertise in lemon law cases but, arguably, the biggest factor in Plaintiff's success was

7    Plaintiff's attorneys' zealous representation.

8        The Song-Beverly Act, Civil Code sections 1790, *et seq.*, entitles Plaintiff to seek reasonable

9    attorney's fees, costs and expenses from Ford.  Moreover, as the prevailing party in this case,

10    Plaintiff is entitled to this noticed motion for attorney's fees.  Plaintiff now moves the Court: (1) for

11    an award of attorney's fees pursuant to Civil Code section 1794(d) under the "lodestar" method in

12    the amount of \$74,768.75, (2) for a reasonable, modest, "lodestar" modifier of 1.5 under California

13    law, in the amount of \$37,384.37, and (3) to award actual costs and expenses incurred in the amount

14    of \$18,942.75.  (Civ. Code § 1794(d).)  Plaintiff requests a total of \$131,095.87 in attorney's fees,

15    costs and expenses.  (Declaration of Steve Mikhov ("SM Dec.") ¶ 2, Exs. A-B; Declaration of

16    Michael H. Rosenstein ("MR Dec." ¶ 7, Ex. A.)

17                 **II.**       **STATEMENT OF FACTS**

18        Plaintiff purchased a new 2013 Ford Focus on January 20, 2013 for a total purchase price of

19    \$23,016.35, inclusive of taxes and fees.  (SM Dec., ¶ 3, Ex. C.)  The vehicle was distributed by Ford,

20    which provided an express written warranty.  (SM Dec., ¶ 3.)

21        After approximately just four months and under 6,000 miles of ownership, and within the

22    applicable warranty periods, the vehicle began experiencing serious problems with the engine and

23    transmission, including the vehicle not shifting properly and, at times, not responding when

24    accelerating.  (SM Dec., ¶ 4.)  Plaintiff delivered the vehicle to a Ford-authorized repair facility,

25    which attempted to correct the issues by reprogramming the Powertrain Control Module ("PCM")

26    and the Transmission Control Module ("TCM").  (*Id.*)  Approximately sixteen months later, Plaintiff

27    again delivered the vehicle for repair because the transmission was shuddering when taking off from

28

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR
ATTORNEY'S FEES, COSTS AND EXPENSES

1    a complete stop. (*Id.*)  The repair facility technicians inspected the transmission, re-flashed the

2    control modules and performed the adaptive learning procedure.  (*Id.*)  Despite being assured that the

3    vehicle had been repaired, the engine and transmission problems continued.  (*Id.*)  Approximately

4    five months later, the check engine light came on while driving on the freeway, and the vehicle shut

5    off completely. (*Id.*)  After restarting, the vehicle continued to run rough. (SM Dec., ¶ 4.)  Plaintiff

6    again brought the vehicle in for repair, at which time the repair facility attempted to correct the

7    issues by replacing the management valve and again recalibrating the system. (*Id.*)  Plaintiff

8    repeatedly took the vehicle in for repairs—a total of three (3) times during a period of less than two

9    years—but the engine and transmission problems persisted. (*Id.*)

10    Despite the ongoing repairs and continued manifestation of problems, Ford refused to

11    acknowledge the defective nature of Plaintiff's vehicle. (SM Dec., ¶ 5.)  At all times, however, Ford

12    had direct, contemporaneous knowledge of the vehicle's serious defects, which it records in a

13    database called "OASIS" and a warranty repair history database called "AWS." (*Id.*)  These repair

14    records indicate each time the vehicle was presented for repair during the warranty period, as well as

15    every time the Ford repair facility found a problem/defect attributable to Ford and billed Ford for the

16    work. (*Id.*)

17    Frustrated, concerned for her safety and having lost confidence in Ford's ability to repair the

18    vehicle, Plaintiff contacted Ford customer service directly on March 2, 2015 and requested Ford

19    repurchase the vehicle.  (SM Dec., ¶ 6.)  Despite Ford's affirmative duty under the law to perform an

20    investigation and offer relief, Ford rejected Plaintiff's request. (*Id.*)  Because Ford disregarded every

21    opportunity to do right by its customer, Plaintiff was forced to retain counsel and file suit. (*Id.*)

22    Plaintiff then contacted Knight Law and told the firm about the problems with her vehicle

23    and the way Ford treated her. (SM Dec., ¶ 7.)  After reviewing the repair history and discussions

24    with Plaintiff, Knight Law agreed to represent her and bear the risk of litigating the case on a fully

25    contingent basis. (*Id.*)  Because Knight Law's compensation was purely contingent, the firm faced a

26    genuine risk of not being paid for its services for years, if at all, while advancing thousands of

27    dollars in costs and expenses on Plaintiff's behalf. (*Id.*)  In taking on this duty, the firm was facing a

28

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR
ATTORNEY'S FEES, COSTS AND EXPENSES

1   litigation behemoth—Ford is a multi-billion-dollar company, with a virtually infinite litigation war-

2   chest, that wages a battle of attrition that most firms cannot withstand. (*Id.*)

3          As a result of Ford's failure to fix the material defects associated with Plaintiff's vehicle, or

4   otherwise comply with the Song-Beverly Act, Plaintiff filed a Complaint in this action on May 4,

5   2015, alleging, in part, willful violations of the Song-Beverly Act and seeking civil penalties. (SM

6   Dec., ¶ 8.)  Defendant filed its Answer, denying all liability and asserting numerous affirmative

7   defenses, on or about May 25, 2015.  (*Id.*)  Ford then began its vigorous defense in this case,

8   propounding requests for admissions, requests for production of documents, special and form

9   interrogatories upon Plaintiff. (SM Dec., ¶ 9.)  Plaintiff benefitted from Knight Law's expertise and

10  experience in litigating against Ford as <u>just 5.2 hours were billed for drafting initial responses to the</u>

11  <u>entirety of this discovery</u>. (*Id.*)

12         Meanwhile, Plaintiff was forced to continue driving her defective vehicle which continued to

13  shudder and stall, and would not shift properly, requiring yet another repair visit in January 2016.

14  (SM Dec., ¶ 10.)

15         Defendant's position in the litigation required extensive efforts on the part of Plaintiff's

16  counsel, and they in turn promptly began working up their case on behalf of Plaintiff.  (SM Dec., ¶

17  11.)  Written discovery was drafted and served on Defendant on or about July 28, 2015, consisting of

18  30 requests for admissions, 36 requests for production of documents, 52 special interrogatories and

19  24 form interrogatories.  (*Id.*)  Plaintiff again benefitted from Knight Law's expertise and experience

20  as <u>just 2.2 hours were billed for drafting the entirety of this discovery</u>.  Plaintiff's counsel is able to

21  use existing files as templates to conserve time and litigate efficiently.  (*Id.*)  Written discovery of

22  this magnitude, drafted from scratch and without the benefit of Plaintiff's attorneys' vast knowledge,

23  experience and specialized expertise, would have taken multitudes of the time expediently managed

24  here.  (*Id.*)  Due to Defendant's improper objections and/or incomplete and evasive responses to

25  Plaintiff's discovery, Plaintiff began "meet and confer" efforts in November 2015 in an attempt to

26  obtain adequate responses from Ford.  (SM Dec., ¶ 12.)

27         In December 2015, Ford petitioned to coordinate this case with hundreds of other cases in

28

4

1  Northern California involving Ford vehicles equipped with the defective "DPS6" transmission. (SM

2  Dec., ¶ 13.) As coordination would unduly delay resolution of the cases and lead to substantial

3  prejudice to clients who would be stuck driving defective vehicles, Plaintiff opposed the Petition.

4  (*Id.*) On January 26, 2016, the Court heard arguments on Defendant's Petition for Coordination and

5  took the matter under submission. (*Id.*) On February 4, 2016, Defendant's Petition was granted, in

6  part, but not with respect to cases filed in Stanislaus County. (*Id.*)

7       In March 2016, after much opposition from Defendant, Plaintiff was granted leave to file a

8  First Amended Complaint in this action adding allegations of fraudulent inducement -concealment,

9  intentional misrepresentation and negligent misrepresentation with regard to the known transmission

10  defects, and seeking punitive damages. (SM Dec., ¶ 14.) Defendant filed its Answer on or about

11  March 29, 2016, again denying all liability. (*Id.*) Ford then continued its vigorous defense in this

12  case, propounding supplemental and a second set of discovery requests upon Plaintiff. (SM Dec., ¶

13  15.) Ford also noticed the deposition of Plaintiff and noticed the inspection of Plaintiff's defective

14  vehicle. (*Id.*) On April 6, 2017, Plaintiff's counsel prepared for and defended Ford's deposition of

15  Plaintiff. (*Id.*) On April 19, 2017, the parties attended a mediation to discuss this case and several

16  others like it. (*Id.*) The case did not resolve at that time. (*Id.*) Only .3 hours were billed to this case

17  to prepare for and attend the mediation. (*Id.*)

18       In April 2017, Ford filed a second Petition for Coordination. (SM Dec., ¶ 16.) On September

19  13, 2017, the Court granted the petition, but specifically excluded this case as it was already in the

20  process of settlement by that point. (*Id.*) Also in April 2017, Ford filed a Motion for Summary

21  Adjudication. (*Id.*) Plaintiff's counsel filed their opposition and the parties attended a hearing on

22  the matter on June 29, 2017, during which the Court <u>denied</u> Ford's motion. (*Id.*)

23       On April 24, 2017, Ford served Plaintiff with an Offer to Compromise pursuant to the Code

24  of Civil Procedure section 998 ("998 Offer"), in the amount of $81,000.00. (SM Dec., ¶ 17.)

25  Plaintiff rejected the inadequate offer. (*Id.*)

26       In May 2017, Plaintiff noticed the depositions of several Ford employees and dealership

27  personnel, including Ford's PMK and PMQs, service advisors and service technicians. (SM Dec., ¶

28  

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR
ATTORNEY'S FEES, COSTS AND EXPENSES

1    18.)  These depositions were needed to obtain information regarding repairs to the vehicle,

2    authenticate the repair orders, and rebut Ford's anticipated argument that the problems with

3    Plaintiff's vehicle were somehow caused by Plaintiff's neglect or abuse.  (*Id.*)  True to form, Ford

4    served objections to all of the noticed depositions.  (*Id.*)

5         With the absence of any reasonable settlement offer from Ford accounting for its willful

6    violation of the Song-Beverly Act, the case appeared likely to go to trial.  (SM Dec., ¶ 19.)

7    Accordingly, on or about May 24, 2017, Michael H. Rosenstein formally associated into the case as

8    lead trial counsel to prepare the case for trial.  (SM Dec., ¶ 19, MR Dec., ¶ 9, Ex. C.)

9         As the August trial date approached, Plaintiff's counsel kicked their trial preparation into

10   high gear.  (SM Dec., ¶ 20.)  In June and July 2017, Plaintiff's counsel prepared for and attended the

11   depositions of several Ford dealership personnel and noticed the deposition of Ford's expert.  (*Id.*)

12   Plaintiff's counsel also prepared for and attended the vehicle inspection of Plaintiff's defective

13   vehicle and defended the depositions of two of Plaintiff's percipient witnesses.  (SM Dec., ¶ 20, MR

14   Dec., ¶ 10.)

15        On July 24, 2017, Plaintiff's counsel attended the Mandatory Settlement Conference at which

16   the parties agreed to a settlement in the amount of $125,000.00.  (SM Dec., ¶ 21.)  This settlement

17   amount was inclusive of a full statutory "buy-back" of Plaintiff's defective vehicle, incidental and

18   consequential damages, and a civil penalty.  (*Id.*)

19        Plaintiff, as the prevailing party in this action, has made every reasonable effort to resolve the

20   payment of Plaintiff's attorney's fees by Ford but was forced to file this Motion with the Court. (SM

21   Dec., ¶ 22.)

22        **III.     ARGUMENT AND ANALYSIS**

23        A.     <u>Plaintiff's Attorneys Are Entitled to Fees, Costs and Expenses in this Action</u>

24        Plaintiff is the prevailing party in this action and, under the Song-Beverly Act, entitled to

25   recoup all reasonable attorney's fees, costs and expenses.  (Code Civ. Proc. § 1032(a)(4); Civ. Code

26   § 1794(d); *Graham v. DaimlerChrysler Corp.* (2004) 34 Cal.4th 553, 557; *Reveles v. Toyota by the*

27   *Bay* (1997) 57 Cal.App.4th 1139.)  Absent a contrary showing, both the number of hours that the

28

1   prevailing party's attorney spent litigating the case and his or her regular hourly rate are presumed to

2   be reasonable. (*Serrano v. Unruh* (1982) 32 Cal.3d 621, 639 (counsel is entitled to all hours actually

3   spent, absent a showing of "special circumstances" that would render such an award unjust); *Mandel*

4   *v. Lackner* (1979) 92 Cal.App.3d 747, 761 (an attorney's regular hourly rate is entitled to a

5   presumption of reasonableness); Pearl, <u>California Attorney Fee Awards</u>, at §§ 12.14A, 12.33 (2nd

6   Ed. 2005).)

7           In prosecuting this case, the efforts of Knight Law amount to $62,537.50, including drafting

8   this motion and time anticipated to be spent preparing the reply and attending the hearing. (SM

9   Dec., ¶ 2, Ex. A.) The billings by Rosenstein total $12,231.25. (MR Dec., ¶ 7, Ex. A.)   The

10  combined attorney's fees of Knight Law and Rosenstein amount to $74,768.75. Plaintiff's counsel

11  also requests a modest 1.5 enhancement, in the amount of $37,384.37, to account for the delay in

12  payment and contingent risk posed by this case. Lastly, the reimbursable costs and expenses set

13  forth in Plaintiff's memorandum of costs are $18,942.75. (SM Dec., ¶ 2, Ex. B.) In total, Plaintiff

14  requests $131,095.87 in fees, costs and expenses. (SM Dec., ¶ 2, Exs. A-B; MR Dec., ¶ 7, Ex. A.)

15          **B.       The Hourly Rates Sought by Plaintiff's Attorneys Are Reasonable**

16          The Court of Appeal has expressly held the lodestar method applies to determining attorney's

17  fees under the Song-Beverly Act. (*Robertson v. Fleetwood Travel Trailers of California, Inc.* (2006)

18  144 Cal.App.4th 785, 817.) The calculation of reasonable attorney's fees under the Song-Beverly

19  Act is based on the lodestar method, which entails multiplying the number of hours reasonably

20  expended by a reasonable hourly rate. (*Graciano v. Robinson Ford Sales* (2006) 144 Cal.App.4th

21  140, 154; *Robertson, supra,* 144 Cal.App.4th at 817.) The prevailing buyer has the burden of

22  showing that the fees incurred were "allowable," "reasonably necessary to the conduct of the

23  litigation," and "reasonable in amount." (*Goglin v. BMW of North America, LLC* (2016) 4

24  Cal.App.5th 462, 470.) In making such an evaluation, a court may consider "factors such as the

25  complexity of the case and procedural demands, the skill exhibited and the results achieved." (*Id.*)

26          In *Goglin v. BMW*, the appellate court recently affirmed the trial court's award of over

27  $185,000 in attorneys' fees and costs for a plaintiff who settled her claims against BMW under the

28

                                                          7

1     Song-Beverly Act. (4 Cal.App.5th at 464.) The court also found plaintiff's counsel's hourly rate of

2     $575 per hour was reasonable as supported by exhibits to counsel's declaration indicating various

3     state and federal courts had previously awarded him comparable hourly rates. (*Id.* at 473-74.) The

4     trial court was not obliged to consider that defendants paid their counsel a much lower hourly rate.

5     (*Id.* at 474.)

6        In *Robertson*, the court observed that a prevailing buyer is entitled to an award of reasonable

7     attorney's fees for time reasonably expended by his attorney. (*Robertson, supra,* 144 Cal.App.4th at

8     817.) The court ruled the "statutory language in section 1794(d) is reasonably compatible with a

9     lodestar adjustment method of calculating attorney fees, including use of fee multipliers." (*Id.* at

10     819.) Indeed, in *Robertson*, the trial court awarded $231,187.45 in fees based on $145,080.50 in

11     fees through trial, plus a "multiplier" of 1.5 for a total of $217,620.75, and $13,566.70 for the

12     attorney's fee motion. (*Id.* at 817.) The appellate court upheld the trial court's ruling. (*Id.* at 822.)

13        In *Graciano*, the trial court initially rejected plaintiff's lodestar fees of $109,468.50 and

14     request for a multiplier of 2.0. In particular, the trial court reduced the plaintiff's attorney's hourly

15     rate from the requested $350/hour to $250/hour, which was the court's mandated maximum rate for

16     expert testimony. Plaintiff appealed the court's decision and in particular the hourly rate reduction.

17     The appellate court reversed, reasoning a court should determine the prevailing rate in the

18     community for comparable professional legal services. (*Graciano, supra,* 144 Cal.App.4th at 156

19     (*citing PLCM Group v. Drexler* (2000) 22 Cal.4th 1084, 1095).) The court found that plaintiff's

20     unrebutted declarations established the proper hourly rate at $350, and reducing that rate to $250 was

21     an abuse of discretion. (*Id.*) The court also reaffirmed attorney's fees are not limited to a proportion

22     of the recovery. (*Id.* at 164.) On remand, the trial court found that the lodestar rate of $350/hour

23     was reasonable *and added* a multiplier of 2.0 for a total fee award of over $380,000. The attorney

24     from *Graciano*, Hallen D. Rosner, now charges $620/hour. (SM Dec., ¶ 40 (a).)

25        Furthermore, the California Supreme Court has expressly ruled that prevailing parties who

26     are entitled to recover their attorney's fees are *also entitled* to recover their fees for the time spent

27     preparing fee applications such as this one. (*Serrano v. Unruh, supra,* 32 Cal.3d at 631; *Los Angeles*

28

1    *Police Protective League v. City of Los Angeles* (1986) 188 Cal.App.3d 1, 17; *Robertson, supra,* 144

2    Cal.App.4th at 817 (awarding $13,566.70 in fees for a fee motion).)

3         The hourly rates should be considered in the context of the rates charged by Plaintiff's

4    attorneys in the metropolitan community in which they practice, as opposed to the case venue.  In

5    *Horsford v. Bd. of Trustees of Cal. State Univ.,* the trial court was reversed for refusing to award the

6    higher rates to San Francisco-based attorneys who litigated a FEHA case in Fresno. (*Horsford v. Bd.*

7    *of Trustees of Cal. State Univ.* (2005) 132 Cal.App.4th 359, 399.)  The law "requires that the

8    *financial incentives be adjusted to attract attorneys* who are sufficient to the cause." (*Id.*)  In the

9    absence of any realistic indication plaintiffs could have found local counsel, it was an abuse of

10   discretion to fail to consider an hourly rate based on counsel's 'home' market rate. (*Id.*)

11        Plaintiff's attorneys' hourly rates should not vary depending on the venue of the lawsuit.  The

12   skill and experience of Ford's attorney does not change from venue to venue and Plaintiff's counsel

13   deserves to be compensated at the same rate they would receive given the same quantity and quality

14   of work they must perform regardless of the venue.

15        Consideration of the "lodestar" factors compels an award of attorney's fees based on: (i) the

16   hourly rates set forth of in the declarations filed concurrently herewith (SM Dec., ¶¶ 28-38; MR

17   Dec., ¶¶ 3, 5-6); (ii) a survey of rates charged by other well-known consumer law attorneys (SM

18   Dec., ¶ 40); (iii) over three dozen court orders confirming the reasonableness of Plaintiff's counsels'

19   hourly rates and time billed in other Song-Beverly Act cases (SM Dec., ¶¶ 42-83, Exs. D-SS); and

20   (iv) a National Survey further supporting the reasonableness of the hourly rates (MR Dec., ¶ 8, Ex.

21   B, at pp. 42-45).  Plaintiff's counsels' rates are within the range of rates charged by other attorneys

22   with similar experience in this area of law.

23        1.    **The Nature and Complexity of the Litigation Support the Attorney's Fees**

24              **Requested**

25        Determining the amount of reasonable attorney's fees may involve consideration of the

26   nature and complexity of the case. (*Dietrich v. Dietrich* (1953) 41 Cal.2d 497, 506; *Graciano, supra,*

27   144 Cal.App.4th at 147.)  Ford routinely claims that cases like this one are "simple lemon law cases"

28

9

1   and, therefore, Plaintiff's fee requests are always unjustified as excessive.  However, lemon law

2   cases that find their way into litigation are hardly routine and rarely are they simple. This case

3   required a range of specialized knowledge including: (1) an understanding of the full scope of

4   consumer protection laws, which are highly nuanced; (2) knowledge of the intricacies of

5   automobiles and the lexicon associated with them, as well as knowledge concerning how to

6   investigate issues with automobiles; and (3) knowledge of auto manufacturers' and dealers' policies

7   and protocols for repairing vehicles and complying with their legal obligations.  (SM Dec., ¶ 86.)

8   Plaintiff's attorneys have acquired knowledge and insight about these issues and this experience

9   typically results in significantly higher judgments or settlements for their clients, like Plaintiff here.

10       Moreover, Ford made this matter even more complex by maintaining it had no liability and

11   declining to submit any reasonable offers to settle the matter for over two years of litigation.  Prior to

12   commencing litigation, Plaintiff first sought relief by requesting a buyback from Ford, which Ford

13   rejected.  Ford is an expert and should have acknowledged the material defects in Plaintiff's vehicle

14   and resolved the matter before this case was ever filed.  Instead, Ford engaged in expensive

15   litigation, including extensive written discovery, stone-walling Plaintiff's discovery efforts, and

16   forcing Plaintiff's counsel to expend numerous hours preparing for trial.  With little effort, Ford

17   could have resolved this matter much earlier and saved tens of thousands in attorney's fees, costs

18   and expenses by doing so.  Ford ultimately came around to doing the right thing, but not before

19   causing substantial fees to be incurred.

20       When Ford causes the entirety of fees to be incurred, it has no legitimate basis for

21   complaining about the amount of attorney's fees reasonably and actually incurred, <u>especially when

22   Ford was given the opportunity to resolve the matter before a lawsuit was even filed</u>.  "A party

23   cannot litigate tenaciously and then be heard to complain about the time necessarily spent by the

24   opposition in response." (*En Palm, LLC v. Teitler* (2008) 162 Cal.App.4th 770, 786; *see also Molski

25   v. Arclero Wine Group* (2008) 164 Cal.App.4th 786.)

26       **2.    The Firm's Skill Justifies the Amount of Attorney's Fees Sought**

27       A trial court may also take into account the skill of the attorneys when determining

28

1   reasonable attorney's fees.  (*La Mesa-Spring Valley School Dist. v. Otsuka* (1962) 57 Cal.2d 309,

2   316.)  Despite the case's difficulties, Plaintiff ultimately recovered $125,000.00 in damages, which

3   is <u>nearly five-and-a-half times the vehicle's purchase price</u> (four-and-a-half years ago).  The vehicle

4   was no more or less defective on the date of settlement than it was when Plaintiff first requested a

5   repurchase, so there is no rational explanation why Ford waged a lengthy and costly legal battle only

6   to settle for a sum equal to Plaintiff's best possible outcome via trial on the merits.

7          The final resolution is the direct result of the skill and preparation of Plaintiff's attorneys,

8   who specialize in consumer law and did not balk at Ford's aggressive litigation tactics.  Plaintiff's

9   attorneys know the many nuances in these types of cases, and this experience has enabled them to

10  develop litigation strategies that are highly effective and both cost and time efficient.  Plaintiff's

11  attorneys' specialized knowledge and experience in lemon law frequently results in outcomes far

12  better than those obtained by attorneys who do not specialize in this specific area of law.  Because of

13  this experience, knowledge and expertise, ***Plaintiff went from a ZERO offer to a $125,000.00***

14  ***settlement***.

15         Counsels' skill is evidenced by the size of the settlement as well as the nominal time

16  expended on litigation tasks, which results in lower overall billing.  Plaintiff's attorneys do not spend

17  inordinate time researching because they specialize in this area of law. (SM Dec., ¶ 87.)  Nor do they

18  spend unreasonable time preparing pleadings and other documents because they are able to use

19  documents from other cases that need only be edited, rather than written from scratch. (SM Dec., ¶

20  87.)  While substantial fees have been incurred, those fees were caused by Ford and led to the

21  execution of effective strategies that typically result in superlative results for Knight Law clients,

22  like Plaintiff here.

23         On the other side, Ford is represented by large national firms with attorneys who specialize in

24  representing automobile manufacturers in lemon law cases.  Ford is a corporate behemoth with the

25  resources to easily overwhelm a consumer or an inexperienced attorney.  Plaintiff required skilled

26  and experienced attorneys to prosecute her claims against Ford and its formidable resources.

27  Plaintiff's attorneys were well-suited for the task.

28

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR
ATTORNEY'S FEES, COSTS AND EXPENSES

**C.** **The Settlement Amount Does Not Limit the Attorney's Fee Recovery**

Ford may argue that damages in the amount of $125,000.00 do not justify an attorney's fee award in the amount requested by Plaintiff.  Such an argument is starkly against the weight of the law.  The amount of attorney's fees *must not be tied to any percentage of recovery*.  (*Graciano, supra,* 144 Cal.App.4th at 164.)  In fact, a trial court may abuse its discretion if it applies a rule of proportionality to a fee award.  The U.S. Supreme Court has previously considered the question of proportionality in attorney fee awards and held: "[w]e reject the proposition that fee awards under section [42 U.S.C.] 1988 should necessarily be proportionate to the amount of damages a civil rights Plaintiff actually recovers."  (*City of Riverside v. Rivera* (1986) 477 U.S. 561, 574; *see also* Sen. Report No. 93-151, 1st Sess., pp. 23-24 (1973) (attorney's fees under the Magnuson Moss Warranty Act are based on actual time, not a percentage of the recovery); *Robertson, supra,* 144 Cal.App.4th at 820; *Independent Federation of Flight Attendants v. Zipes* (1989) 491 U.S. 754, fn.2 (fee shifting provisions under Magnuson-Moss and Song-Beverly "are to be interpreted alike"); *Goglin, supra,* 5 Cal.App.5th at 468-69 (affirming award of $185,000 in fees and costs in a Song-Beverly Act case that settled for $75,000); *Vo v. Las Virgenes Municipal Water District* (2000) 79 Cal.App.4th 440, 446 (affirming $470,000 fee award after $40,000 judgment because the defendant was excessively litigious and took a non-settlement posture); *Harman v. City and County of San Francisco* (2007) 158 Cal.App.4th 407 (affirming award of approximately $1.1 million in fees where plaintiffs recovered $30,300).)

It is not uncommon for attorney's fees and costs to exceed the client's damages, although that did not happen here, because the settlement was so large and the fees were efficiently incurred. The Legislature acknowledged that substantial work might be needed to prosecute such claims against large corporations, which is the reason behind the fee shifting provision of the Song-Beverly Act.  (SM Dec., ¶ 85.)  Otherwise, consumers would be left without opportunity for redress when their damages were not enough for an attorney to take the case on a contingent fee or hourly rate basis.  "The purpose of statutory attorney fee provisions is to provide financial incentives necessary for the private enforcement of important civil rights."  (*Ketchum v. Moses* (2001) 24 Cal.4th 1122, 1132.)

1   Thus, the Song-Beverly Act gives consumers the opportunity to seek legal redress even if

2   their damages would not be high enough to warrant legal representation.  The award of attorney's

3   fees *cannot* be limited by the damages recovered by Plaintiff.  Any argument by Ford to the contrary

4   would be entirely insincere, as the law is clear on this point. (*Ketchum*, *supra*, 24 Cal.4th at 1138.)

5   ### D.   Plaintiff Should Be Granted a Lodestar Multiplier

6   As part of the Song-Beverly Act, a prevailing buyer may also receive a lodestar multiplier,

7   sometimes referred to as an adjustment or enhancement.  (*Robertson*, *supra,* 144 Cal.App.4th at

8   817.)  Once a lodestar amount is determined, which involves a "careful compilation of the actual

9   time spent and reasonable hourly compensation for each attorney," (*Id.* at 819 (*citing Serrano v.*

10   *Priest* (1977) 20 Cal.3d 25, 48-49 (*Serrano III*)), the amount may then be augmented by taking

11   various relevant factors into account, including: (1) the novelty and difficulty of the questions

12   involved and the skill displayed in presenting them; (2) the extent to which the nature of the

13   litigation precluded other employment by the attorneys; and (3) the contingent nature of the fee

14   award, based on the uncertainty of prevailing on the merits and of establishing eligibility for the

15   award.  (*Id.*; *see also Graham*, *supra*, 34 Cal.4th at 579; *PLCM Group v. Drexler*, 22 Cal.4th at

16   1096.)  "[T]he purpose of a fee enhancement is primarily to compensate the attorney for the

17   prevailing party at a rate reflecting the risk of nonpayment in contingency cases."  (*Ketchum, supra,*

18   24 Cal.4th at 1138; *Cazares v. Saenz* (1989) 208 Cal.App.3d 279, 287-88 (risk factor alone justifies

19   a 2.0 multiplier for a 50% chance of prevailing).)  "A 50 percent chance of recovery implies a

20   multiplier of 2, a 25 percent chance of recovery implies a multiplier of 4, and so on." (*In re Chiron*

21   *Corp. Securities Litigation* (N.D. Cal. Nov. 30, 2007) No. C-04-4293 VRW, 2007 WL 4249902, *9.)

22   In *Robertson*, a case brought under the Song-Beverly Act, the court ruled that the "statutory

23   language in section 1794(d) is reasonably compatible with a lodestar adjustment method of

24   calculating attorney fees, including use of fee multipliers." (144 Cal.App.4th at 819.)  The trial court

25   awarded a total of $231,187.45 in fees consisting of: $145,080.50 in fees incurred through trial, plus

26   a "multiplier" of 1.5 for a total of $217,620.75, and $13,566.70 for fees in preparing the fees motion.

27   (*Id.* at 817.)  The appellate court held the trial court properly conducted a lodestar analysis and the

28

1     award was not an abuse of discretion. (*Id.* at 822.)

2     In *Graciano*, the appellate court actually *increased* the trial court's award of fees after

3 finding that the lodestar rate of $350/hour was reasonable (in 2006) and adding a 2.0 multiplier for a

4 total award of over $380,000. (144 Cal.App.4th at 156.) The court also reaffirmed attorney's fees

5 are not limited to a proportion of the recovery. (*Id.* at 164.)

6     Ford may argue a multiplier is not permitted, and cite to the *Ketchum* case to support that

7 argument. To the contrary, *Ketchum* actually <u>confirms</u> the granting of a multiplier in contingency

8 fee cases. (*Ketchum, supra,* 24 Cal.4th at 1132.) A lodestar multiplier is in fact available and it has

9 been awarded to Plaintiff's counsel in several cases. (SM Dec., ¶¶ 54, 58, 67, 68, 70, 71, 75, 81, 82,

10 83, Exs. P, T, CC, DD, FF, GG, KK, QQ, RR, SS.)

11          **3.**     <u>**The Lodestar Multiplier Should Be Granted in Contingent Cases Due to**</u>

12              <u>**Risk and Delay of Payment**</u>

13     The lodestar is intended to reflect the basic fee for comparable non-contingent legal services

14 and should be enhanced by an appropriate multiplier to reflect the risk and delay in payment

15 associated with taking a contingent case, as well as the result achieved. The lodestar "multiplier" is

16 meant to increase or decrease the fee award based on factors not already taken into account when

17 setting the hourly rate, such as the <u>risk</u> of taking a case on a contingency basis, and <u>delay</u> in

18 receiving payment. (*See Horsford, supra,* 132 Cal. App. 4th at 394-95.)

19     In *Ketchum*, the California Supreme Court wrote, "[a] contingent fee contract, since it

20 involves a gamble on the result, may properly provide for a *larger compensation* than would

21 otherwise be reasonable." (24 Cal.4th at 1132 [emphasis added].)

22       <u>A contingent fee must be higher than a fee for the same legal services paid as they</u>
<u>are performed</u>. The contingent fee compensates the lawyer not only for the legal

23       services he renders but for the loan of those services. The implicit interest rate on such
a loan is higher because the risk of default (the loss of the case, which cancels the debt

24       of the client to the lawyer) is much higher than that of conventional loans. (Posner,
Economic Analysis of Law (4th ed.1992) pp. 534, 567, emphasis added.) <u>A lawyer</u>

25       <u>who both bears the risk of not being paid and provides legal services is not receiving</u>
<u>the fair market value of his work if he is paid only for the second of these functions.</u> If

26       he is paid no more, competent counsel will be reluctant to accept fee award cases.

27

28

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR
ATTORNEY'S FEES, COSTS AND EXPENSES

1    *(Id. at 1132 [citations omitted; emphasis added].)*

2        Throughout the litigation, there always existed the real possibility Plaintiff would not prevail.

3    Indeed, Defendant's 998 Offer created *additional risk* because Plaintiff would need to prevail with

4    civil penalties at trial, since anything less would have cut off attorney's fees as of the date of the

5    offer.  The risk was further compounded by the fact that Plaintiff's attorneys advanced all litigation

6    costs and expenses without reimbursement.  Thus, if Plaintiff did not prevail, her attorneys would

7    have suffered a loss of numerous hours in uncompensated work and thousands of dollars in out-of-

8    pocket expenses.  Plaintiff requests a 0.2 enhancement based on that risk.

9        Further, Ford dragged this case out for over two years before agreeing to a reasonable

10   settlement. Unlike Ford's attorneys, who are paid monthly regardless of outcome, Plaintiff's

11   attorneys are not paid at all if they lose, and need to absorb significant delay in being paid if Plaintiff

12   does win. On account of the substantial delay in payment, Plaintiff requests a 0.3 enhancement.

13   Based on the risk of taking this case on a contingent fee basis and the delay in payment since May

14   2015, Plaintiff requests a nominal multiplier of 1.5.

15       **E.**    **Plaintiff is Entitled to Recover All Costs and Expenses Reasonably Incurred in**

16           **Connection with this Action**

17       Under the Song-Beverly Act, a prevailing buyer shall be allowed to recover as part of the

18   judgment a sum equal to the aggregate amount of costs <u>and expenses</u>. (Civ. Code § 1794(d)

19   [emphasis added].)  The California Legislature intended the word "expenses" to cover outlays not

20   included in the detailed statutory definition of "costs," and the Song-Beverly Act's legislative history

21   demonstrates the Legislature exercised its power to permit recovery of a host of litigation

22   expenditures beyond those permitted by Code of Civil Procedure § 1033.5.  *(Jensen v. BMW of*

23   *North America, Inc.* (1995) 35 Cal.App.4th 112, 137-138.)

24       A verified memorandum of costs generally satisfies the moving party's burden of

25   establishing costs were necessarily incurred.  *(Hadley v. Krepel* (1985) 167 Cal.App.3d 677, 682.)

26   The verified memorandum of costs demonstrates what Plaintiff's attorneys incurred in costs and

27   expenses prosecuting this matter, which counsel advanced on Plaintiff's behalf.  (SM Dec. ¶ 2, Ex.

28

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR
ATTORNEY'S FEES, COSTS AND EXPENSES

1  B; Civ. Code § 1794(d).)  The burden shifts to Ford to properly rebut the claimed costs.

2  **IV.      CONCLUSION**

3  For the reasons above, Plaintiff respectfully requests this Honorable Court award attorney's

4  fees, costs and expenses as follows:

|  | |
|---|---|
| Lodestar Fees: | $ 74,768.75 |
| +Lodestar Enhancement: | $ 37,384.37 |
| Total Fees Requested: | $112,153.12 |
| +Costs and Expenses: | $ 18,942.75 |
| =**Total Fees and Costs/Expenses:** | **$ 131,095.87** |

Dated: January 22, 2018

KNIGHT LAW GROUP, LLP

Steve Mikhov (SBN 224676)
Attorneys for Plaintiff,
**MARY A. JACQUEZ**

16

PROOF OF SERVICE
(Code of Civil Procedure §1013a)

I am employed in the County of Los Angeles, State of California.  I am over the age of 18 years and not a party to the within action.  My business address is 1801 Century Park East, Suite 2300, Los Angeles, CA 90067.

I served the foregoing document described as:

**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR ATTORNEY'S FEES, COSTS AND EXPENSES**

Said document was served on the interested parties in this action, by placing true copies thereof enclosed in sealed envelopes, with postage prepaid, addressed as follows:

Spencer P. Hugret, Esq.                        Michael H. Rosenstein, Esq.
GORDON & REES LLP                       Law Offices of Michael H. Rosenstein
275 Battery Street, Suite 2000            1801 Century Park East., Suite 2300
San Francisco, CA 94111                    Los Angeles, CA 90067
**Counsel for Defendant,**                    **Associated Counsel for Plaintiff,**
**FORD MOTOR COMPANY**             **MARY A. JACQUEZ**
(via Personal Service only)                    (via E-mail only)

<u>XX</u>   PERSONAL SERVICE:  I caused the above documents to be sent to our court services provider to be personally served.

<u>XX</u>   BY E-MAIL OR ELECTRONIC TRANSMISSION: Based on a court order or an agreement of the parties to accept service by e-mail or electronic transmission, I caused the documents to be sent to the persons at the e-mail addresses listed above.  I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

<u>XX</u>   I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on January 22, 2018 at Los Angeles, California.

_____
Hector Almeyda

-1-