1

**KNIGHT LAW GROUP, LLP**
Steve Mikhov (SBN 224676)

2
Amy Morse (SBN 290502)
1801 Century Park East, Suite 2300

3
Los Angeles, CA 90067
Telephone: (310) 552-2250

4
Fax: (310) 552-7973

5

6
**LAW OFFICE OF MICHAEL H. ROSENSTEIN**
Michael H. Rosenstein (SBN 169091)

7
1801 Century Park East, Suite 2300
Los Angeles, CA 90067

8
Telephone: (310) 552-2250
Fax: (310) 552-7973

9

Attorneys for Plaintiff,

10
JAVIER B. MENDOZA

11
                    **SUPERIOR COURT OF CALIFORNIA**

12
                         **COUNTY OF RIVERSIDE**

13

14
**JAVIER B. MENDOZA,**                    | Case No. RIC1513777

15

16
                    Plaintiff,            | **PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR**

17
                                          | **ATTORNEY'S FEES, COSTS AND EXPENSES**

18
          vs.

19
                                          | [Filed concurrently with Plaintiff's Notice of Motion and Motion for Attorney's Fees,

20
                                          | Costs and Expenses; Declarations of Steve Mikhov and Michael H. Rosenstein]

21
**FORD MOTOR COMPANY, a Delaware Corporation, and DOES 1 through 10, inclusive,**

22
                                          | Date: April 18, 2018

23
                                          | Time: 8:30 am
          Defendants.                     | Dept.: 1

24
                                          | Reservation No. RES75927

25

26

27

28

---

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR
ATTORNEY'S FEES, COSTS AND EXPENSES

# TABLE OF CONTENTS

Page(s)

I.   INTRODUCTION ............................................................................................. 1

II.  STATEMENT OF FACTS ............................................................................... 2

III. ARGUMENT AND ANALYSIS ...................................................................... 6

    A.   Plaintiff's Attorneys Are Entitled to Fees, Costs and Expenses in this Action... 6

    B.   The Hourly Rates Sought by Plaintiff's Attorneys Are Reasonable. .................. 7

        1.   The Nature and Complexity of the Litigation Support the Attorney's Fees Requested. .................................................................................. 9

        2.   The Firm's Skill Justifies the Amount of Attorney's Fees Sought. ...... 10

    C.   The Settlement Amount Does Not Limit the Attorney's Fee Recovery. .......... 12

    D.   Plaintiff Should Be Granted a Lodestar Multiplier. .......................................... 13

    E.   Plaintiff Is Entitled to Recover All Costs and Expenses Reasonably Incurred in Connection with this Action. .......................................................................... 15

IV. CONCLUSION ................................................................................................ 15

i

<u>TABLE OF AUTHORITIES</u>

<u>Cases</u>

Page(s)

*Cazares v. Saenz*
  (1989) 208 Cal.App.3d 279 ............................................................................. 13

*City of Riverside v. Rivera*
  (1986) 477 U.S. 561 ....................................................................................... 12

*Dietrich v. Dietrich*
  (1953) 41 Cal.2d 497 ....................................................................................... 9

*En Palm, LLC v. Teitler*
  (2008) 162 Cal.App.4th 770 ........................................................................... 10

*Goglin v. BMW of North America, LLC*
  (2016) 4 Cal.App.5th 462, 470 ......................................................................... 7

*Graciano v. Robinson Ford Sales*
  (2006) 144 Cal.App.4th 140 .................................................................... passim

*Graham v. DaimlerChrysler Corp.*
  (2004) 34 Cal.4th 553 ....................................................................................... 6

*Hadley v. Repel*
  (1985) 167 Cal.App.3d 677 ............................................................................ 15

*Harman v. City and County of San Francisco*
  (2007) 158 Cal.App.4th 407 ........................................................................... 12

*In re Chiron Corp. Securities Litigation*
  (N.D. Cal. Nov. 30, 2007) No. C-04-4293 VRW, 2007 WL 4249902 ................. 13

*Independent Federation of Flight Attendants v. Zipes*
  (1989) 491 U.S. 754 ....................................................................................... 12

*Jensen v. BMW of North America, Inc.*
  (1995) 35 Cal.App.4th 112 ............................................................................. 15

*Ketchum v. Moses*
  *(2001) 24 Cal.4th 122* ............................................................................. 13, 14

*La Mesa-Spring Valley School Dist. v. Otsuka*
  (1962) 57 Cal.2d 309 ..................................................................................... 10

*Los Angeles Police Protective League v. City of Los Angeles*
  (1986) 188 Cal.App.3d 1 ................................................................................... 8

*Mandel v. Lackner*
  (1979) 92 Cal.App.3d 747 ................................................................................. 6

ii

*Molski v. Arclero Wine Group*
(2008) 164 Cal.App.4th 786 ................................................................. 10

*PLCM Group v. Drexler, supra*
22 Cal.4th at 1095 ........................................................................... 8, 13

*Reveles v. Ford by the Bay*
(1997) 57 Cal.App.4th 1139 ................................................................. 6

*Robertson v. Fleetwood Travel Trailers of California, Inc.*
(2006) 144 Cal.App.4th 785 ................................................................. 7

*Serrano v. Priest*
(1977) 20 Cal.3d 25 (*Serrano III*) ...................................................... 13

*Serrano v. Unruh*
(1982) 32 Cal.3d 621 ...................................................................... 6, 8

*Vo v. Las Virgenes Municipal Water District*
(2000) 79 Cal.App.4th 440 ................................................................. 12

<u>Statutes and Codes</u>

California Civil Code
Section 1794(d) ......................................................................... 2, 6, 15

California Code of Civil Procedure
Section 1032(a)(4) ............................................................................. 6
Section 1033.5 ................................................................................ 15

United States Code
Title 15, Section 2301 et seq. (Magnuson Moss Warranty Act) ............ 12
Title 42 ........................................................................................ 12

<u>Other Authorities</u>

Pearl, *California Attorney Fee Awards*
Sections 12.14A, 12.33 (2nd Ed. 2005) ................................................. 7

Senate Report
No. 93-151, 1st Sess., pp. 23-24 (1973) ............................................... 12

iii

## I.    INTRODUCTION

After over one year and ten months of litigation, on October 4, 2017, the parties agreed to settle this matter following Plaintiff's acceptance of Ford's C.C.P. § 998 in the amount of $87,000.00. The final settlement is more than **three times** the total amount Plaintiff paid for the vehicle in what defense routinely calls a "simple lemon law" action. Plaintiff obtained this extraordinary sum, which included civil penalties, *without going to trial*. By any analysis, Plaintiff, Javier B. Mendoza ("Plaintiff") achieved an excellent settlement, particularly given Defendant Ford Motor Company's ("Defendant" or "Ford") initial refusal to even acknowledge the defects in Plaintiff's vehicle. This is a settlement that few, if any, firms in this state could achieve for its clients. The excellent result was achieved due to Plaintiff's attorneys' skill and expertise in lemon law cases, but arguably, the biggest factor in Plaintiff's success was his attorneys' zealous representation.

Plaintiff purchased a new 2012 Ford Focus on June 9, 2012 for $26,551.84. In the span of less than three years, among other issues, Plaintiff suffered through ongoing problems with the transmission and engine, seeking maintenance on these specific issues six times. Yet, the vehicle continued to shudder and feel like it was going to stall. Ford had direct knowledge of the ongoing problems with Plaintiff's vehicle. However, despite this knowledge and despite the fact that they were unable to adequately repair the defective vehicle, Ford never offered Plaintiff a buyback or replacement. Instead, Ford applied its tried and true internal policy of ignoring its statutory obligations under the Song-Beverly Act. By doing so, Ford made a business decision that, by its actions, Plaintiff (like many consumers) would walk away and Ford would save money. Plaintiff could not afford do that and so Plaintiff hired the Knight Law Group, LLP ("Knight Law") on a contingency basis to assist in vindicating his rights. Knowing that Ford had willfully violated Plaintiff's rights, Knight Law proceeded to file this case.

It should be noted that Plaintiff, like 100% of the clients of Knight Law first tried to obtain resolution prior to hiring attorneys by contacting the manufacturer or by going through the Better Business Bureau (an established resolution process). Knight Law does not jump head first into litigation. **Every single one of the firm's clients** was denied or the terms of an offer sought to steal monies that the consumer was lawfully owed. In pursuing lemon law cases, Knight Law and its

1   associating attorneys are exposing the truth about some of these vehicle manufacturers and causing

2   them to pay multiples of actual damages in the form of civil penalties (and punitive damages).  The

3   day Defendant starts honoring its obligations to consumers in this State is the day Knight Law goes

4   out of business.  This case, and others like it, could have been altogether avoided from the start.  Much

5   like products liability actions have paved the way for innovations in manufacturing, design and

6   marketing standards, Plaintiff's counsel hopes that one day these lemon law cases add up to actually

7   have an effect on the way manufacturers treat their consumers.  The firm is willing to stand up to

8   these mammoth companies, and then are vilified for doing so.

9        The Song-Beverly Act, Civil Code sections 1790, *et seq.*, entitles Plaintiff to seek reasonable

10  attorney's fees, costs and expenses from Ford. Moreover, the parties' settlement agreement provides

11  Plaintiff is the prevailing party and entitled to this noticed motion for attorney's fees.  Plaintiff now

12  moves the Court: (1) for an award of attorney's fees pursuant to Civil Code section 1794(d) under the

13  "lodestar" method in the amount of $72,015.00, (2) for a modest "lodestar" modifier of 1.5 in the

14  amount of $36,007.50, and (3) to award actual costs and expenses incurred in the amount of

15  $19,444.04.  (Civ. Code § 1794(d).)  Plaintiff requests a total of $127,466.54 in attorney's fees, costs

16  and expenses.  (Declaration of Steve Mikhov ("SM Dec.") ¶ 2, Exs. A-B; Declaration of Michael H.

17  Rosenstein ("MR Dec.") ¶ 8, Ex. A.)

18                              **II.    STATEMENT OF FACTS**

19        Plaintiff purchased a new 2012 Ford Focus on June 9, 2012—adding taxes, fees, an optional

20  service contract and financing charges on a six-year loan, the total purchase price was $26,551.84.

21  (SM Dec. ¶ 3, Ex. C.)

22        The vehicle was distributed by Ford Motor Company ("Defendant" or "Ford"), which

23  provided an express written warranty.  (*Id.*)

24        After seven months and 15,000 miles, and well within the applicable express warranty periods,

25  the vehicle began exhibiting problems with the suspension.  (SM Dec. ¶ 4.)  Plaintiff brought the

26  vehicle into a Ford-authorized repair facility to perform repairs. (*Id.*)  Approximately ten months later,

27  Plaintiff brought the vehicle back into the Ford-authorized repair facility because there was a leak

28  between the engine and transmission.  (*Id.*)  The service technician evaluated the vehicle and

2

1  instructed Plaintiff to come back to the repair facility if the leaking resumed.  Two weeks later, the

2  leak occurred again.  (*Id.*)  This time the technicians at the Ford-authorized repair facility removed

3  the transmission, replaced the rear main seal, resealed the engine oil pan and reinstalled the

4  transmission. (*Id.*)  Less than three months later, the transmission was shuddering at low speeds and

5  the vehicle felt like it was going to stall.  (*Id.*)  The technicians attempted to repair the vehicle.  (SM

6  Dec. ¶ 4.)  Just over three months later, the check engine light was illuminated, and the shuddering

7  and stalling feeling continued.  (*Id.*)  Plaintiff brought the vehicle into a Ford-authorized repair facility

8  for the transmission problems six (6) times in the span of less than three years.  (*Id.*)  Despite the

9  numerous times Plaintiff brought the vehicle in for repair, these problems continued and the

10  shuddering grew worse.  (*Id.*)

11        Frustrated, and having lost confidence in Ford's ability to repair the vehicle, Plaintiff contacted

12  Ford's customer service on July 1, 2015, seeking a buyback of the defective vehicle. (SM Dec. ¶ 5.)

13  On July 21, 2015, it appeared the vehicle met the buyback requirements and the issue was transferred

14  for review.  (*Id.*)  Hours later, Ford decided the vehicle did not meet the criteria.  (*Id.*)  On July 23,

15  2015, Ford denied Plaintiff's buyback request despite its affirmative duty under the law to perform

16  an investigation and offer a replacement or buyback of the defective vehicle.  (*Id.*)

17        Despite the ongoing repairs and continued manifestation of problems, Ford refused to

18  acknowledge the defective nature of Plaintiff's vehicle.  (SM Dec. ¶ 6.)  At all times, however, Ford

19  had direct, contemporaneous knowledge of the vehicle's serious defects, which it records in a database

20  called "OASIS" and a warranty repair history database called "AWS" as they are reported.  (*Id.*)

21  These repair records indicate each time the vehicle was presented for repair during the warranty

22  period, as well as every time the Ford repair facility found a problem/defect attributable to Ford and

23  billed Ford for the work.  (*Id.*)

24        Unwilling to walk away from his investment, Plaintiff contacted Knight Law and told the firm

25  about the problems with his vehicle and the way Ford treated him.  (SM Dec. ¶ 7.)  After reviewing

26  the repair history and discussions with Plaintiff, Knight Law agreed to represent him and bear the risk

27  of litigating the case on a fully contingent basis.  (*Id.*)  Because Knight Law's compensation was

28  purely contingent, the firm faced a genuine risk of not being paid for its services for years, if at all,

1   while advancing thousands of dollars in costs and expenses on Plaintiff's behalf. (*Id.*) In taking on

2   this duty, the firm was facing a litigation behemoth—Ford is a multi-billion-dollar company, with a

3   virtually infinite litigation war-chest, that wages a battle of attrition that most firms cannot withstand.

4   (*Id.*)

5       As a result of Ford's failure to take appropriate action, Plaintiff filed his complaint in this

6   matter on November 20, 2015, alleging violations of the Song-Beverly Act and seeking civil penalties.

7   (SM Dec. ¶ 8.) On or about January 4, 2016, Defendant filed an answer to the complaint. (*Id.*) On

8   or about February 10, 2016, Plaintiff filed a motion for leave to amend the complaint. (*Id.*) Plaintiff

9   filed his First Amended Complaint on March 10, 2016, alleging misrepresentation, concealment,

10   fraud and violations of the Song-Beverly Act and seeking civil penalties and punitive damages. (*Id.*)

11       On or about February 11, 2016, Ford served Plaintiff with a notice of deposition for Plaintiff

12   and a vehicle inspection demand. (SM Dec. ¶ 9.) Also, on or about February 11, 2016, Ford

13   propounded its Requests for Production of Documents, Special Interrogatories, Requests for

14   Admissions, and Form Interrogatories upon Plaintiff. (*Id.*) After review and analysis of the written

15   discovery, Plaintiff prepared and served responses to Ford's discovery requests on March 29, 2016.

16   (*Id.*) On or about March 31, 2016, Defendant filed a Notice of Petition for Coordination of Add-On

17   Cases. (SM Dec. ¶ 10.) This petition was subsequently denied. (*Id.*)

18       In October 2016, Plaintiff propounded written discovery on Ford consisting of 49 Requests

19   for Admissions, 95 Requests for Production of Documents, 96 Special Interrogatories and 28 Form

20   Interrogatories. (SM Dec. ¶ 11.) Plaintiff benefited from Knight Law's expertise and experience in

21   litigating against Ford insofar as just 4.4 hours were billed to draft the entirety of this discovery. (*Id.*)

22   Plaintiff's counsel is able to use existing files as templates to conserve time and litigate efficiently.

23   (*Id.*) Written discovery of this magnitude, drafted from scratch and without the benefit of Plaintiff's

24   attorneys' vast knowledge, experience and specialized expertise, would have taken multitudes of the

25   time expediently managed here. (*Id.*)

26       Meanwhile, due to Ford's improper objections and/or incomplete responses to Plaintiff's

27   written discovery, Plaintiff began "meet and confer" efforts in early December 2016. (SM Dec. ¶ 12.)

28   After the parties reached an impasse, despite Plaintiff's extensive efforts, Ford refused to fully comply

1   with its discovery obligations, leaving Plaintiff no choice but to file a motion to compel in March of

2   2017. (*Id.*)

3        On February 20, 2017, Plaintiff's counsel prepared for and defended Plaintiff's deposition.

4   (SM Dec. ¶ 13.)   On March 22, 2017, Plaintiff's counsel prepared for and attended Plaintiff's vehicle

5   inspection. (*Id.*)

6        On or about April 19, 2017, Ford served Plaintiff with an Offer to Compromise pursuant to

7   the Code of Civil Procedure section 998 ("998 Offer"), in the amount of $60,000.00. (SM Dec. ¶ 14.)

8   Plaintiff rejected the 998 Offer because of numerous deficiencies. (*Id.*)

9        In June 2017, Plaintiff noticed the depositions of numerous Ford employees, including Ford's

10  PMK and PMQ. (SM Dec. ¶ 15.) These depositions were needed to obtain information regarding

11  repairs to the vehicle, authenticate the repair orders and rebut Ford's anticipated argument that the

12  problems with Plaintiff's vehicle were somehow caused by Plaintiff's neglect or abuse. (*Id.*) True to

13  form, Ford served objections to the noticed deposition of its PMK. (*Id.*) On July 26, 2017, Plaintiff's

14  counsel prepared for, traveled to and attended the depositions of five dealership employees. (SM Dec.

15  ¶ 16.) On August 29, 2017, Ford's PMK failed to appear at the scheduled deposition. (*Id.*)

16       By August 25, 2017, the case appeared likely to go to trial. (SM Dec. ¶ 17.) Accordingly, on

17  or about August 29, 2017, Michael Rosenstein of the Law Office of Michael H. Rosenstein

18  ("Rosenstein") formally associated into the case as lead counsel to prepare the case for trial. (*Id.*; MR

19  Dec. ¶ 10, Ex. C.)

20       In September 2017, Plaintiff's counsel reviewed summaries of repair orders and prepared

21  subpoenas. (SM Dec. ¶ 18; MR Dec. ¶ 12.) Plaintiff's counsel reviewed the client file in preparation

22  of motions in limine, and drafted fifteen (15) motions in limine. (*Id.*) Then, Plaintiff's counsel

23  reviewed the deposition transcripts of Ford's technicians, service advisor and person most qualified

24  and prepared cross-examination of said witnesses. (*Id.*) Plaintiff's counsel continued with its

25  intensive trial preparation by drafting trial documents, including the proposed joint witness lists, list

26  of non-controverted issues, CACI instructions, proposed special verdict forms, proposed statement of

27  the case and jury instructions. (SM Dec. ¶ 18; MR Dec. ¶ 13.) Plaintiff's counsel received and

28  reviewed Defendant's 23 motion in limine, and prepared oral argument in opposition to said motions.

(SM Dec. ¶ 18; MR Dec. ¶ 13.)  Plaintiff's counsel gathered, organized and prepared exhibits, then drafted the exhibit list.  (SM Dec. ¶ 18; MR Dec. ¶ 13.)  On September 8, 2017, Plaintiff's counsel prepared for, traveled to and attended the Mandatory Settlement Conference. (SM Dec. ¶ 19.)  Then, on or about September 14, 2017, Ford made Plaintiff another inadequate offer, which Plaintiff rejected.  (*Id*.)  On September 22, 2017, Plaintiff's counsel prepared for, traveled to and attended Ford's Ex Parte hearing to amend its answer.  (*Id*.)

On or about September 28, 2017, trial counsel prepared for, traveled to and conducted the deposition of automotive expert Walter Smith.  (SM Dec. ¶ 20; MR Dec. ¶ 14.)  Trial counsel prepared for and, on October 2, 2017, traveled to and defended Dr. Barbara Luna's deposition.  (*Id*.)  Then, trial counsel prepared for and, on October 3, 2017, traveled to and deposed Defendant's expert witness.  (*Id*.)

On October 3, 2017, Ford served Plaintiff with an Amended 998 Offer to Compromise ("Amended 998 Offer") in the amount of $87,000.00.  (SM Dec. ¶ 21, Ex. D.)  On October 4, 2017, Plaintiff accepted Defendant's Amended 998 Offer.  (*Id*.)  This settlement amount was inclusive of a full statutory "buy-back" of his defective vehicle, incidental and consequential damages, and a civil penalty.  (*Id*.)  Plaintiff, as the prevailing party in this action, has made every reasonable effort to resolve the payment of Plaintiff's attorney's fees by Ford but was forced to file this Motion with the court.  (SM Dec. ¶ 22.)

### III.     ARGUMENT AND ANALYSIS

#### A.     <u>Plaintiff's Attorneys Are Entitled to Fees, Costs and Expenses in this Action.</u>

Plaintiff is the prevailing party in this action and, under the Song-Beverly Act, entitled to recoup all reasonable attorney's fees, costs and expenses.  (Code Civ. Proc. § 1032(a)(4); Civ. Code § 1794(d); *Graham v. DaimlerChrysler Corp.* (2004) 34 Cal.4th 553, 557; *Reveles v. Toyota by the Bay* (1997) 57 Cal.App.4th 1139.)  Absent a contrary showing, both the number of hours that the prevailing party's attorney spent litigating the case and his or her regular hourly rate are presumed to be reasonable.  (*Serrano v. Unruh* (1982) 32 Cal.3d 621, 639 [counsel is entitled to all hours actually spent, absent a showing of "special circumstances" that would render such an award unjust]; *Mandel v. Lackner* (1979) 92 Cal.App.3d 747, 761 [an attorney's regular hourly rate is entitled to a

1  presumption of reasonableness]; Pearl, <u>California Attorney Fee Awards</u>, at §§ 12.14A, 12.33 (2nd Ed.

2  2005).)

3       In prosecuting this case, the efforts of Knight Law amount to $46,290.00 including drafting

4  this motion and time anticipated to be spent preparing the reply and attending the hearing. (SM Dec.,

5  ¶ 2, Ex. A.) The billings by Rosenstein total $25,725.00 (MR Dec., ¶ 8, Ex. A.) The total billings

6  incurred for the entire litigation in $72,015.00. Plaintiff's counsel also requests a modest 1.5

7  enhancement, in the amount of $36,007.50 to account for the delay in payment and contingent risk

8  posed by this case. Lastly, the reimbursable costs and expenses set forth in Plaintiff's memoranda of

9  costs are $19,444.04. (SM Dec., ¶ 2, Ex. B.) In total, Plaintiff requests $127,466.54. (SM Dec., ¶ 2,

10  Exs. A-B; MR Dec., ¶ 8, Ex. A.)

11       While Ford will surely claim these amounts are unreasonable, Ford's own counsel admits in

12  a declaration filed in federal court that "it is not uncommon, and in fact quite regular, for attorney's

13  fee and cost awards (*or resolutions through informal discussions* with opposing counsel) to exceed

14  $100,000.00." (SM Dec., ¶ 39, Ex. F, p. 3, ¶ 4.) Few, if any, manufacturers cause this much work to

15  be performed in allegedly "simple lemon law actions."

16      **B.**    **<u>The Hourly Rates Sought by Plaintiff's Attorneys Are Reasonable.</u>**

17       The Court of Appeal has expressly held the lodestar method applies to determining attorney's

18  fees under the Song-Beverly Act. (*Robertson v. Fleetwood Travel Trailers of California, Inc.* (2006)

19  144 Cal.App.4th 785, 817.) The calculation of reasonable attorney's fees under the Song-Beverly

20  Act is based on the lodestar method, which entails multiplying the number of hours reasonably

21  expended by a reasonable hourly rate. (*Graciano v. Robinson Ford Sales* (2006) 144 Cal.App.4th

22  140, 154; *Robertson, supra,* 144 Cal.App.4th 817.) The prevailing buyer has the burden of showing

23  that the fees incurred were "allowable," "reasonably necessary to the conduct of the litigation," and

24  "reasonable in amount." (*Goglin v. BMW of North America, LLC* (2016) 4 Cal.App.5th 462, 470.)

25  In making such an evaluation, a court may consider "factors such as the complexity of the case and

26  procedural demands, the skill exhibited and the results achieved." (*Goglin, supra,* Cal.App.5th at

27  470.)

28       In *Goglin v. BMW*, the appellate court recently affirmed the trial court's award of over

1  $185,000 in attorneys' fees and costs for a plaintiff who settled her claims against BMW under the

2  Song-Beverly Act.  (4 Cal.App.5th at 464.)  The court also found plaintiff's counsel's rate of $575

3  per hour was reasonable as supported by exhibits to counsel's declaration indicating various state and

4  federal courts had previously awarded him comparable hourly rates.  (*Id.* at 473-474.)  The holding

5  states that the trial court was not obliged to consider that defendants paid their counsel a much lower

6  hourly rate.  (*Id.* at 474.)

7        In *Robertson*, the trial court awarded $231,187.45 in fees based on $145,080.50 in fees through

8  trial plus a "multiplier" of 1.5, for a total of $217,620.75, and $13,566.70 for the attorney's fee motion.

9  (*Id.* at 817.)  The appellate court upheld the ruling.  (*Id.* at 822.)

10       In *Graciano*, the trial court initially rejected plaintiff's lodestar fees of $109,468.50 and

11 request for a multiplier of 2.0.  In particular, the trial court reduced the plaintiff's attorney's rate from

12 the requested $350/hour to $250/hour, which was the court's mandated maximum rate for expert

13 testimony.  The appellate court reversed, reasoning a court should determine the prevailing rate in the

14 community for comparable professional legal services.  (*Graciano, supra,* 144 Cal.App.4th at 156

15 [*citing PLCM Group v. Drexler* (2000) 22 Cal.4th 1084, 1095].)  The court found the plaintiff's un-

16 rebutted declarations established the proper hourly rate at $350 (for work in 2004) and reducing that

17 rate to $250 was an abuse of discretion.  (*Id.*)  The court also reaffirmed attorney's fees <u>are not limited</u>

18 <u>to a proportion</u> of the recovery.  (*Id.* at 164.)  On remand, the trial court found that the lodestar rate of

19 $350/hour was reasonable *and added* a multiplier of 2.0 for a total fee award of over $380,000.  The

20 attorney from *Graciano*, Hallen D. Rosner, now charges $695/hour.  (SM Dec., ¶ 55 (a).)

21       Furthermore, the California Supreme Court has expressly ruled that prevailing parties who are

22 entitled to recover their attorney's fees are *also entitled* to recover their fees for the time spent

23 preparing fee applications such as this one.  (*Serrano v. Unruh, supra,* 32 Cal.3d at 631; *Los Angeles*

24 *Police Protective League v. City of Los Angeles* (1986) 188 Cal.App.3d 1, 17; *Robertson, supra,* 144

25 Cal.App.4th at 817 [awarding $13,566.70 in fees for a fee motion].)  Consideration of the "lodestar"

26 factors compels an award of attorney's fees based on (i) the hourly rates set forth in the declarations

27 filed concurrently herewith (SM Dec., ¶¶ 43-52), (ii) a survey of rates charged by other well-known

28 consumer law attorneys (SM Dec., ¶ 55),  (iii) over three dozen court orders confirming the

1  reasonableness of Plaintiff's counsel's hourly rates and time billed in other Song-Beverly Act cases

2  (SM Dec, ¶¶ 56-100, Exs. G-YY) and (iv) a National Survey further supporting the reasonableness of

3  hourly rates (MR Dec., ¶ 9, Ex. B at pp.42-45).  Plaintiff's counsel's rates are within the range of rates

4  charged by other attorneys with similar experience in this area of law.

1.  **The Nature and Complexity of the Litigation Support the Attorney's Fees Requested.**

Determining the amount of reasonable attorney's fees may involve consideration of the nature and complexity of the case.  (*Dietrich v. Dietrich* (1953) 41 Cal.2d 497, 506; *Graciano, supra,* 144 Cal.App.4th at 147.)  Ford routinely claims that cases like this one are "simple lemon law cases" and therefore Plaintiff's fee requests are always unjustified as excessive.  However, this case required a range of specialized knowledge including: (1) an understanding of the full scope of consumer protection laws, which are highly nuanced; (2) knowledge of the intricacies of automobiles and the lexicon associated with them, as well as knowledge concerning how to investigate issues with automobiles; and (3) knowledge of auto manufacturers' and dealers' policies and protocols for repairing vehicles and complying with their legal obligations. (SM Dec., ¶ 103.)  Plaintiff's attorneys have acquired knowledge and insight about Ford over the course of many years of litigation, and this experience typically results in significantly higher judgments or settlements for their clients. Plaintiff's attorneys have dared to make these matters more complex, testing the boundaries of car manufacturer's cheating ways.  The firm's attorneys have traveled all over the country to depose individuals from the auto industry, in New Jersey, Texas, Michigan, Florida and Utah, as well as countless counties throughout California.  The firm has successfully fought to compel the production of millions of internal communications and confidential documents from Ford.  No other firm is litigating "simple lemon law" cases like Knight Law and its associating attorneys.

Moreover, Ford made this matter even more complex by maintaining it had no liability and declining to submit any reasonable offers to settle the matter for over one year and ten months of litigation.  Ford should have acknowledged the defects in Plaintiff's vehicle and resolved the matter before this case was ever filed.  Ford was well aware of the 2012 Ford Focus having problems with the defective "DPS6" PowerShift Transmission.  Yet, this case was never just about whether or not a

9

1   car was a lemon; this case and others like it are a test of Ford's very corporate structure and the

2   relationship between a corporation and the customers it so depends on for its profits.  Plaintiff's

3   attorneys have the resolve to investigate those policies and procedures, and have discovered tens of

4   thousands of internal documents that elucidate Ford's disregard to consumers.  Plaintiff's attorneys

5   delve deeper into these matters and bring a level of lawyering to this area of law that most other firms

6   either may not care to or do not have the wherewithal to provide.  Undoubtedly, a quick and secure

7   buck could be made with an early settlement, but that leaves the violating companies like Ford to just

8   apply the status quo.

9           Ford engaged in expensive litigation, including denying all liability, stonewalling Plaintiff's

10   discovery efforts, and forcing Plaintiff's counsel to expend numerous hours preparing for trial.  Ford

11   could have resolved this matter much earlier and saved thousands of dollars in attorney's fees, costs

12   and expenses. Ford ultimately capitulated, but not before causing substantial fees to be incurred. When

13   Ford causes these fees, it has no legitimate basis for complaining about the amount of attorney's fees

14   reasonably and actually incurred, especially when Ford had the ability to resolve the matter before a

15   lawsuit was even filed.  "A party cannot litigate tenaciously and then be heard to complain about the

16   time necessarily spent by the opposition in response."  (*En Palm, LLC v. Teitler* (2008) 162

17   Cal.App.4th 770, 786; *see also Molski v. Arclero Wine Group* (2008) 164 Cal.App.4th 786.)

18   **2.      The Firm's Skill Justifies the Amount of Attorney's Fees Sought.**

19           A trial court may also take into account the skill of the attorneys when determining reasonable

20   attorney's fees. (*La Mesa-Spring Valley School Dist. v. Otsuka* (1962) 57 Cal.2d 309, 316.)  Despite

21   the case's difficulties, Plaintiff ultimately recovered $87,000.00 in damages, which is more than three

22   times the vehicle's purchase price.  The vehicle was no more or less defective on the date of settlement

23   than it was when Plaintiff first requested a repurchase before hiring legal counsel.  So, there is no

24   rational explanation why Ford waged a legal battle only to settle for a sum equal to Plaintiff's best

25   possible outcome via trial on the merits

26           Plaintiff's attorneys specialize in consumer law and did not balk at Ford's aggressive litigation

27   tactics.  Plaintiff's attorneys' experience has enabled them to develop litigation strategies that are

28   highly effective and cost and time efficient. Plaintiff's attorneys' specialized knowledge and

10

1   experience in lemon law frequently results in outcomes far better than those obtained by attorneys

2   who do not specialize in lemon law.  This experience provided a resolution to this matter far beyond

3   that which Ford's original offer.  Because of this experience, knowledge and expertise, ***Plaintiff went***

4   ***from a ZERO offer to an $87,000.00 settlement***. Getting civil penalties, and often punitive damages,

5   like this is not easy and most firms do not know how to seek exemplary damages or do not care to

6   seek them.  Plaintiff's attorneys believe they distinguish themselves from others based on many years

7   of focused pursuit of the truth.

8           Counsel's skill is evidenced by the size of the settlement as well as the nominal time expended

9   on litigation tasks, which results in lower overall billing.  Plaintiff's attorneys do not spend inordinate

10  time researching because they specialize in this area of law.  (SM Dec., ¶ 104.)  Nor do they spend

11  unreasonable time preparing pleadings because they are able to use documents from other cases that

12  need only be edited, rather than written from scratch.  (*Id.*)  While substantial fees have been incurred,

13  those fees led to the execution of effective strategies that result in superlative results for Knight Law

14  clients, like Plaintiff here.

15          On the other side, Ford is represented by large national firms – now totaling **eleven** separate

16  law firms – with attorneys who specialize in representing automobile manufacturers in lemon law

17  cases.  (SM Dec, ¶ 37.)  Ford is a corporate behemoth with the resources to easily overwhelm a

18  consumer or an inexperienced attorney. It is Defendant and its bevy of attorneys that drive this

19  litigation and then settle for an amount they knew the entire time would be satisfactory, but instead

20  waited until the eve of trial while amassing their billable hours.  Based on a random sample of cases,

21  74% of the cases against Ford were settled six months before trial instead of much earlier.  (SM Dec.,

22  ¶ 35.)  Of those cases, 50% were settled just one month before trial. Plaintiff required skilled and

23  experienced attorneys to prosecute his claims against Ford and its formidable resources.  Plaintiff's

24  attorneys were well-suited for the task.  Now, Ford appears to have dug its heals even deeper by

25  outright proclaiming in a letter that Ford is no longer willing to discuss settlement, does not want to

26  engage in any further mediations, and fully intends to bring every case to trial unless the firm's clients

27  accept Ford's existing offers.  (SM Dec., ¶ 38, Ex. E.)  To date, 25% of all of 55 cases that Knight

28  Law and its trial attorneys have taken to trial since 2012 have involved Ford as the named defendant.

11

1   (SM Dec., ¶ 33.)

2       As such, Plaintiff's counsel requests to be compensated not only for the quantity of the work

3   but for the quality of the work.  To do so, the firm calls upon a brave judiciary to award counsel the

4   compensation for its hard work.  Eventually, this litigation will reduce lawsuits and the need for

5   attorneys in this area of law, but change can and will only happen over time.

6       **C.      The Settlement Amount Does Not Limit the Attorney's Fee Recovery.**

7       Ford may argue that damages in the amount of $87,000.00 do not justify an attorney's fee

8   award in the amount requested by Plaintiff.  However, such an argument is starkly against the weight

9   of the law.  The amount of attorney's fees *must not be tied to any percentage of recovery.*  (*Graciano,*

10  *supra,* 144 Cal.App.4th at 164.)  In fact, a trial court may abuse its discretion if it applies a rule of

11  proportionality to a fee award.  The U.S. Supreme Court has previously considered the question of

12  proportionality in attorney fee awards and held: "[w]e reject the proposition that fee awards under

13  section [42 U.S.C.] 1988 should necessarily be proportionate to the amount of damages a civil rights

14  plaintiff actually recovers."  (*City of Riverside v. Rivera* (1986) 477 U.S. 561, 574; *see also* Sen.

15  Report No. 93-151, 1st Sess., pp. 23-24 (1973) [attorney's fees under the Magnuson Moss Warranty

16  Act are based on actual time, not a percentage of the recovery]; *Robertson, supra,* 144 Cal.App.4th at

17  820; *Independent Federation of Flight Attendants v. Zipes* (1989) 491 U.S. 754, fn.2 [fee shifting

18  provisions under Magnuson-Moss and Song-Beverly "are to be interpreted alike"]; *Goglin, supra,* 5

19  Cal.App.5th at 468-69 [affirming award of $185,000 in fees and costs in a Song-Beverly Act case that

20  settled for $75,000]; *Vo v. Las Virgenes Municipal Water District* (2000) 79 Cal.App.4th 440, 446

21  [affirming $470,000 fee award after $40,000 judgment because the defendant was excessively

22  litigious and took a non-settlement posture]; *Harman v. City and County of San Francisco* (2007) 158

23  Cal.App.4th 407 [affirming award of approximately $1.1 million in fees where plaintiffs recovered

24  $30,300].)

25      It is not uncommon for attorney's fees and costs to exceed the client's damages, although that

26  did not happen here because the settlement was large and the fees were efficiently incurred.  The

27  Legislature acknowledged that substantial work might be needed to prosecute such claims against

28  large corporations, which is the reason behind the fee shifting provision of the Song-Beverly Act.

12

1 | (SM Dec., ¶ 104.)  Otherwise, consumers would be left without opportunity to redress when their
2 | damages were not enough for an attorney to take the case on a contingent fee or hourly rate basis.
3 | "The purpose of statutory attorney fee provisions is to provide financial incentives necessary for the
4 | private enforcement of important civil rights." (*Ketchum v. Moses* (2001) 24 Cal.4th 1122, 1132.)
5 | Thus, the Song-Beverly Act gives consumers the opportunity to seek legal redress even if their
6 | damages would not be high enough to warrant legal representation.  The award of attorney's fees
7 | *cannot* be limited by the damages recovered by Plaintiff.  (*Ketchum, supra,* 24 Cal.4th at 1132.)

8 | ### D.    Plaintiff Should Be Granted a Lodestar Multiplier.

9 | As part of the Song-Beverly Act, a prevailing buyer may also receive a lodestar multiplier.
10 | (*Robertson, supra,* 144 Cal.App.4th at 817.)  Once a lodestar amount is determined, which involves
11 | a "careful compilation of the actual time spent and reasonable hourly compensation for each attorney,"
12 | (*Id.* at 819 (*citing Serrano v. Priest* (1977) 20 Cal.3d 25, 48-49 (*Serrano III*)), the amount may then
13 | be augmented by taking various relevant factors into account, including: (1) the novelty and difficulty
14 | of the questions involved and the skill displayed in presenting them; (2) the extent to which the nature
15 | of the litigation precluded other employment by the attorneys; and (3) the contingent nature of the fee
16 | award, based on the uncertainty of prevailing on the merits and of establishing eligibility for the
17 | award. (*Id.; see also Graham, supra,* 34 Cal.4th at 579; *PLCM Group v. Drexler,* 22 Cal.4th at 1096.)
18 | "[T]he purpose of a fee enhancement is primarily to compensate the attorney for the prevailing party
19 | at a rate reflecting the risk of nonpayment in contingency cases." (*Ketchum, supra,* 24 Cal.4th at
20 | 1138; *Cazares v. Saenz* (1989) 208 Cal.App.3d 279, 287-88 [risk factor alone justifies a 2.0 multiplier
21 | for a 50% chance of prevailing].)  "A 50 percent chance of recovery implies a multiplier of 2, a 25
22 | percent chance of recovery implies a multiplier of 4, and so on." (*In re Chiron Corp. Securities*
23 | *Litigation* (N.D. Cal. Nov. 30, 2007) No. C-04-4293 VRW, 2007 WL 4249902, *9.)  Plaintiff asks
24 | for far less.

25 | In *Robertson*, a case brought under the Song-Beverly Act, the court ruled that the "statutory
26 | language in section 1974(d) is reasonably compatible with a lodestar adjustment method of calculating
27 | attorney fees, including use of fee multipliers," and the court granted a 1.5 multiplier.  (144
28 | Cal.App.4th 817, 819.)

1    In *Graciano*, the appellate court actually *increased* the trial court's award of fees after finding

2    that the lodestar rate of $350/hour was reasonable and adding a 2.0 multiplier for a total award of over

3    $380,000.  (144 Cal.App.4th at 156.)

4    The lodestar is intended to reflect the basic fee for comparable non-contingent legal services

5    and should be enhanced by an appropriate multiplier to reflect the risk and delay in payment

6    associated with taking a contingent case, as well as the result achieved.  The lodestar "multiplier" is

7    meant to increase or decrease the fee award based on factors not already taken into account when

8    setting the hourly rate, such as the risk of taking a case on a contingency basis, and delay in receiving

9    payment.  (*See Horsford v. Bd. of Trustees of Cal. State Univ.* (2005) 132 Cal. App. 4th 359, 394-95.)

10   In *Ketchum*, the California Supreme Court wrote, "[a] contingent fee contract, since it involves

11   a gamble on the result, may properly provide for a *larger compensation* than would otherwise be

12   reasonable."  (24 Cal.4th at 1132 [emphasis added].)

13   A contingent fee must be higher than a fee for the same legal services paid as they are
     performed.  The contingent fee compensates the lawyer not only for the legal services

14   he renders but for the loan of those services.  The implicit interest rate on such a loan
     is higher because the risk of default (the loss of the case, which cancels the debt of the

15   client to the lawyer) is much higher than that of conventional loans.  (Posner,
     Economic Analysis of Law (4th ed.1992) pp. 534, 567, emphasis added.)  A lawyer

16   who both bears the risk of not being paid and provides legal services is not receiving
     the fair market value of his work if he is paid only for the second of these functions.

17   If he is paid no more, competent counsel will be reluctant to accept fee award cases.

18   (*Id.* at 1132 [citations omitted; emphasis added].)

19   Throughout the litigation, there always existed the real possibility Plaintiff would not prevail.

20   The risk was further compounded by the fact that Plaintiff's attorneys advanced all litigation costs

21   and expenses.  Thus, if Plaintiff did not prevail, his attorneys would have suffered a loss of numerous

22   hours in uncompensated work and thousands of dollars in out-of-pocket expenses.  Plaintiff requests

23   a 0.2 enhancement based on that risk.  Further, Ford dragged this case out for over one year and ten

24   months before making an acceptable offer.  Unlike Ford's attorneys, who are paid monthly regardless

25   of outcome, Plaintiff's attorneys are not paid at all if they lose, and need to absorb significant delay

26   in being paid if Plaintiff does win.  On account of the delay in payment, Plaintiff requests a 0.3

27   enhancement.  Based on the risk of taking this case on a contingent fee basis and the delay in payment

28   since November 20, 2015, Plaintiff requests a nominal multiplier of 1.5.  Courts have awarded a

14

1   lodestar multiplier to Plaintiff's counsel in numerous cases.  (SM Dec., ¶¶ 71, 75, 84, 85, 87, 88, 92,

2   98, 99, 100; Exs. V, Z, II, JJ, LL, MM, QQ, WW, XX, YY.)

3       **E.**     **Plaintiff Is Entitled to Recover All Costs and Expenses Reasonably Incurred in Connection with this Action.**

4

5       Under the Song-Beverly Act, a prevailing buyer shall be allowed to recover as part of the

6   judgment a sum equal to the aggregate amount of costs <u>and expenses</u>.  (Civ. Code § 1794(d) [emphasis

7   added].)  The California Legislature intended the word "expenses" to cover outlays not included in

8   the detailed statutory definition of "costs," and the Song-Beverly Act's legislative history

9   demonstrates the Legislature exercised its power to permit recovery of a host of litigation expenditures

10   beyond those permitted by Code of Civil Procedure § 1033.5.  (*Jensen v. BMW of North America,*

11   *Inc.* (1995) 35 Cal.App.4th 112, 137-138.)

12       A verified memorandum of costs generally satisfies the moving party's burden of establishing

13   costs were necessarily incurred.  (*Hadley v. Krepel* (1985) 167 Cal.App.3d 677, 682.)  The verified

14   memorandum demonstrates what Plaintiff's attorneys incurred in costs and expenses prosecuting this

15   matter, which counsel advanced on Plaintiff's behalf.  (SM Dec. ¶ 2, Ex. B); Civ. Code § 1794(d).

16   The burden shifts to Ford to properly rebut the claimed costs.

17             **IV.**   **CONCLUSION**

18       For the reasons above, Plaintiff respectfully requests this Honorable Court award attorney's

19   fees, costs and expenses as follows:

20       Lodestar Fees:             $ 72,015.00

      +Lodestar Enhancement:     <u>$ 36,007.50</u>

21       Total Fees Requested:      $108,022.50

      +Costs and Expenses:      <u>$ 19,444.04</u>

22       **=Total Fees and Costs/Expenses:**   **$127,466.54**

23

24   Dated: March 14, 2018            **KNIGHT LAW GROUP, LLP**

25

26

27                       Steve Mikhov (SBN 224676)

                      Amy Morse (SBN 290502)

                      Attorneys for Plaintiff,

28                       **JAVIER B. MENDOZA**

PROOF OF SERVICE
(Code of Civil Procedure §1013a)

I am employed in the County of Los Angeles, State of California.  I am over the age of 18 years and not a party to the within action.  My business address is 1801 Century Park East, Suite 2300, Los Angeles, CA 90067.

I served the foregoing document described as:

**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR ATTORNEY'S FEES, COSTS AND EXPENSES**

Said document was served on the interested parties in this action, by placing true copies thereof enclosed in sealed envelopes, with postage prepaid, addressed as follows:

Michael D. Mortenson, Esq.
BAKER HOSTETLER
600 Anton Boulevard, Ste. 900
Costa Mesa, CA 92626-7689
**Counsel for Defendant,**
**FORD MOTOR COMPANY**
(Via Mail Only)

Michael H. Rosenstein, Esq.
LAW OFFICES OF MICHAEL H.
ROSENSTEIN
1801 Century Park East, Suite 2300
Los Angeles, CA 90067
Email: mrosenstein@rose-lawoffice.com
**Co-Counsel for Plaintiff,**
**JAVIER B. MENDOZA**
(via email only)

XX    BY MAIL:  I am readily familiar with this firm's practice of collection and processing correspondence for mailing with the United States Postal Service.  Under that practice, it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid at a Postal Service collection box at Los Angeles, California, in the ordinary course of business. The envelope was sealed and placed for collection that same day following ordinary business practices, addressed to the above-referenced attorney.

XX    BY E-MAIL OR ELECTRONIC TRANSMISSION: Based on a court order or an agreement of the parties to accept service by e-mail or electronic transmission, I caused the documents to be sent to the persons at the e-mail addresses listed above.  I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on March 14, 2018 at Los Angeles, California.

_____
Monica Gomez

-1-

PROOF OF SERVICE