Fuller, C v Ford 35596-01017
VAC, SGO, SMB, MBL,
KH, SM, LM, KS, STS
OCMail *EB* KSW

1 | **KNIGHT LAW GROUP, LLP**
Steve Mikhov (SBN 224676)
2 | 1801 Century Park East, Suite 2300
Los Angeles, CA 90067
3 | Telephone: (310) 552-2250
Fax: (310) 552-7973
4 | Email: stevem@knightlaw.com
5

6 | **LAW OFFICE OF MICHAEL H. ROSENSTEIN**
Michael H. Rosenstein (SBN 169091)
7 | 1801 Century Park East, Suite 2300
Los Angeles, CA 90067
8 | Telephone: (310) 286-0275
Fax: (310) 286-0274
9 | Email: mrosenstein@rose-lawoffice.com

10 | Attorneys for Plaintiff,
**CHELSEA K. FULLER**
11

12 | **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

13 | **COUNTY OF VENTURA**

14

15 | **CHELSEA K. FULLER,**

Case No.: 56-2016-00478316-CU-BC-VTA

16 | **PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR ATTORNEY'S FEES, COSTS AND EXPENSES**

17 | Plaintiff,

18

19 | vs.

20 | [Filed Concurrently with Plaintiff's Notice of Motion and Motion for Attorney's Fees, Costs and Expenses; Declarations of Steve Mikhov and Michael H. Rosenstein]

**FORD MOTOR COMPANY, a Delaware Corporation, and DOES 1 through 10, inclusive,**
21

22

23 | Defendants.

*Assigned for All Purposes to the Honorable Vincent J. O'Neill*

24

25 | Date:  May 3, 2018
Time: 8:30 a.m.
26 | Dept.: 41
27 | Reservation No: 2317527

28

Received
MAR 2 6 2018
Snell & Wilmer

---

1

2

## TABLE OF CONTENTS

Page(s)

3    I.    INTRODUCTION ...................................................................................1

4    II.   STATEMENT OF FACTS .....................................................................2

5    III.  ARGUMENT AND ANALYSIS .............................................................6

6          A.   Plaintiff's Attorneys Are Entitled to Fees, Costs and Expenses in this
7               Action.............................................................................................6

8          B.   The Hourly Rates Sought by Plaintiff's Attorneys Are Reasonable.................7

9               1.   The Nature and Complexity of the Litigation Support the
10                   Attorney's Fees Requested .......................................................8

11              2.   The Firm's Skill Justifies the Amount of Attorney's Fees
                     Sought ...............................................................................10

12         C.   The Settlement Amount Does Not Limit the Attorney's Fee Recovery ..........12

13         D.   Plaintiff Should Be Granted a Lodestar Multiplier ...........................13

14         E.   Plaintiff is Entitled to Recover All Costs and Expenses Reasonably
15              Incurred in Connection with this Action.........................................15

16   IV.   CONCLUSION.....................................................................................15

17

18

19

20

21

22

23

24

25

26

27

28

i

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

<u>TABLE OF AUTHORITIES</u>

Page(s)

<u>Cases</u>

*Cazares v. Saenz*
   (1989) 208 Cal.App.3d 279 ..................................................................13

*City of Riverside v. Rivera*
   (1986) 477 U.S. 561 ...........................................................................12

*Dietrich v. Dietrich*
   (1953) 41 Cal.2d 497 .............................................................................8

*En Palm, LLC v. Teitler*
   (2008) 162 Cal.App.4th 770 ...............................................................10

*Goglin v. BMW of North America, LLC*
   (2016) 4 Cal.App.5th 462 ................................................................7, 12

*Graciano v. Robinson Ford Sales*
   (2006) 144 Cal.App.4th 140 ....................................................7, 8, 12, 13

*Graham v. DaimlerChrysler Corp.*
   (2004) 34 Cal.4th 553 ......................................................................6, 13

*Hadley v. Krepel*
   (1985) 167 Cal.App.3d 677 .................................................................15

*Harman v. City and County of San Francisco*
   (2007) 158 Cal.App.4th 407 ...............................................................12

*Horsford v. Bd. of Trustees of Cal. State Univ.*
   (2005) 132 Cal. App. 4th 359 ..............................................................14

*In re Chiron Corp. Securities Litigation*
   (N.D. Cal. Nov. 30, 2007) No. C-04-4293 VRW, 2007 WL 4249902 ..............................13

*Independent Federation of Flight Attendants v. Zipes*
   (1989) 491 U.S. 754 ...........................................................................12

*Jensen v. BMW of North America, Inc.*
   (1995) 35 Cal.App.4th 112 ..................................................................15

*Ketchum v. Moses*
   (2001) 24 Cal.4th 1122 .................................................................12, 13, 14

ii

*La Mesa-Spring Valley School Dist. v. Otsuka*
    (1962) 57 Cal.2d 309 ...........................................................................................10

*Los Angeles Police Protective League v. City of Los Angeles*
    (1986) 188 Cal.App.3d 1.........................................................................................8

*Mandel v. Lackner*
    (1979) 92 Cal.App.3d 747.................................................................................... 6

*Molski v. Arclero Wine Group*
    (2008) 164 Cal.App.4th 786.................................................................................10

*PLCM Group v. Drexler*
    (2000) 22 Cal.4th 1084.................................................................................. 8, 13

*Reveles v. Toyota by the Bay*
    (1997) 57 Cal.App.4th 1139.................................................................................6

*Robertson v. Fleetwood Travel Trailers of California, Inc.*
    (2006) 144 Cal.App.4th 785 ...............................................................7, 8, 12, 13

*Serrano v. Priest*
    (1977) 20 Cal.3d 25 (*Serrano III*) .....................................................................13

*Serrano v. Unruh*
    (1982) 32 Cal.3d 621 ........................................................................................6, 8

*Vo v. Las Virgenes Municipal Water District*
    (2000) 79 Cal.App.4th 440 .................................................................................12


<u>Statutes and Codes</u>

California Code of Civil Procedure
    Section 1032(a)(4) ................................................................................................6

California Code of Civil Procedure
    Section 1033.5.....................................................................................................15

California Code of Civil Procedure
    Section 1794(d) ....................................................................................2, 6, 13, 15

California Code Of Civil Procedure
    Section 998...........................................................................................2, 5, 6

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR ATTORNEY'S FEES, COSTS AND EXPENSES

1

<u>Other Authorities</u>

2

3    Pearl, *California Attorney Fee Awards*
          Sections 12.14A, 12.33 (2nd Ed. 2005) ...........................................................6
4

5    Sen. Report No. 93-151,
          1st Sess., pp. 23 (1973) ...................................................................................12

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR
ATTORNEY'S FEES, COSTS AND EXPENSES

## I.   INTRODUCTION

On October 20, 2017, over twenty months after the complaint was filed in this action and just days before trial, the parties agreed to settle the case for $75,000.00. This settlement amount consisted of a full statutory "buy-back" of Plaintiff's defective vehicle, incidental and consequential damages, and a civil penalty. The final settlement is **four times** the total amount Plaintiff paid for the leased vehicle in what the defense routinely calls a "simple lemon law" action. Plaintiff obtained this extraordinary sum *without going to trial*. By any analysis, Plaintiff achieved an excellent settlement given Ford Motor Company's ("Defendant" or "Ford") initial refusal to even consider a buyback of Plaintiff's defective vehicle. The settlement is one that few, if any, firms in this state can achieve for its clients. The excellent result was achieved due to Plaintiff's attorneys' skill and expertise in lemon law cases but, arguably, the biggest factor in Plaintiff's success was Plaintiff's attorneys' zealous representation.

On May 15, 2013, Plaintiff leased a new 2013 Ford Fiesta. Throughout the lease period, Plaintiff suffered through ongoing transmission problems, including a persistent shudder and grinding noise, requiring multiple repair visits. In a period of less than two years, Plaintiff took her vehicle in for repairs a total of six (6) times, but the serious transmission problems continued. Plaintiff contacted Ford with the hope that Ford would repurchase her defective vehicle, but Ford refused. Rather, Ford applied its tried and true internal policy of ignoring its statutory obligations under the Song-Beverly Act. By doing so, Ford made a business decision that, by its actions, Plaintiff (like many consumers) would walk away and Ford would save money. Plaintiff could not afford to do that and so Plaintiff hired the Knight Law Group, LLP ("Knight Law") on a contingency basis to assist in vindicating her rights. Knowing that Ford had willfully violated Plaintiff's rights and had already rejected informal resolution, Knight Law proceeded to file this case.

It should be noted that Plaintiff, like 100% of the clients of Knight Law, first tried to obtain resolution prior to hiring attorneys by contacting the manufacturer or by going through the Better Business Bureau (an established resolution process). Knight Law does not jump head first into litigation. **Every single one of the firm's clients** were denied or the terms of an offer

1

1  sought to steal monies that the consumers were lawfully owed.  In pursuing lemon law cases,
2  Knight Law and its associating attorneys are exposing the truth about some of these vehicle
3  manufacturers and causing them to pay multiples of actual damages in the form of civil penalties
4  (and punitive damages).  The day Defendant starts honoring its obligations to consumers in this
5  State is the day Knight Law goes out of business.  This case, and others like it, could have been
6  altogether avoided from the start.  Much like products liability actions have paved the way for
7  innovations in manufacturing, design and marketing standards, Plaintiff's counsel hopes that one
8  day these lemon law cases add up to actually have an effect on the way manufacturers treat their
9  consumers.  The firm is willing to stand up to these mammoth companies, and then are vilified
10  for doing so.
11      The Song-Beverly Act, Civil Code sections 1790, *et seq.*, entitles Plaintiff to seek
12  reasonable attorney's fees, costs and expenses from Ford.  Moreover, the 998 Offer expressly
13  provides Plaintiff is the prevailing party and entitled to this noticed motion for attorney's fees.
14  Plaintiff now moves the Court: (1) for an award of attorney's fees pursuant to Civil Code section
15  1794(d) under the "lodestar" method in the amount of $68,258.75, (2) for a reasonable, modest,
16  "lodestar" modifier of 1.5 under California law, in the amount of $34,129.38, and (3) to award
17  actual costs and expenses incurred in the amount of $11,778.02. (Civ. Code § 1794(d).)  Plaintiff
18  requests a total of $114,166.15 in attorney's fees, costs and expenses.  (Declaration of Steve
19  Mikhov ("SM Dec.") ¶ 2, Exs. A-B; Declaration of Michael H. Rosenstein ("MR") ¶ 9, Ex. A.)
20          **II.    STATEMENT OF FACTS**
21      Plaintiff leased a new 2013 Ford Fiesta on May 15, 2013 for a term of 36 months at
22  $201.20 per month—the gross capitalized cost being $18,420.00. (SM Dec., ¶ 3, Ex. C.)  The
23  vehicle was distributed by Ford Motor Company, which provided an express written warranty.
24  (*Id.*)  After approximately five months and under 12,000 miles, and within the applicable
25  warranty periods, the vehicle began experiencing problems with the transmission, which was
26  making a grinding noise when shifting. (SM Dec., ¶ 4.)  Plaintiff delivered the vehicle to a Ford-
27  authorized repair facility where they attempted to correct the issues by performing a transmission
28  adaptive relearn. (*Id.*)  Despite being assured that the vehicle had been repaired and was safe to

2

1  drive, the transmission continued to make a grinding noise when shifting gears and shuddered

2  upon acceleration. (*Id.*)  Less than four months later, Plaintiff again delivered the vehicle to a

3  Ford-authorized repair facility where it remained for seven (7) days while the repair facility

4  technicians attempted to correct the issues by replacing the clutch and seals and performing

5  another adaptive relearn. (*Id.*)  Despite these efforts, the transmission continued to shudder,

6  hesitate and make a grinding noise. (*Id.*)  Plaintiff repeatedly took the vehicle in for repairs, a

7  total of six (6) times in a period of about two years, but the serious transmission problems

8  persisted. (*Id.*)

9      Despite the ongoing repairs and continued manifestation of problems, Ford refused to

10  acknowledge the defective nature of Plaintiff's vehicle. (SM Dec., ¶ 5.)  At all times, however,

11  Ford had direct, contemporaneous knowledge of the vehicle's serious defects, which it records

12  in a database called "OASIS" and a warranty repair history database called "AWS." (*Id.*)  These

13  repair records indicate each time the vehicle was presented for repair during the warranty period,

14  as well as every time the Ford repair facility found a problem/defect attributable to Ford and

15  billed Ford for the work. (*Id.*)

16      Frustrated, concerned for her safety and having lost confidence in Ford's ability to repair

17  the vehicle, Plaintiff contacted Ford customer service directly on September 15, 2015, and

18  requested Ford repurchase the vehicle. (SM Dec., ¶ 6.)  Despite Ford's affirmative duty under

19  the law to perform an investigation and offer relief, Ford rejected Plaintiff's request. (*Id.*)

20      Plaintiff contacted Knight Law and told the firm about the problems with the vehicle and

21  the way Ford treated her. (SM Dec., ¶ 7.)  After reviewing the repair history and discussions with

22  Plaintiff, Knight Law agreed to represent her and bear the risk of litigating the case on a fully

23  contingent basis. (*Id.*)  Because Knight Law's compensation was purely contingent, the firm

24  faced a genuine risk of not being paid for its services for years, if at all, while advancing

25  thousands of dollars in costs and expenses on Plaintiff's behalf. (*Id.*)  In taking on this duty, the

26  firm was facing a litigation behemoth—Ford is a multi-billion-dollar company, with a virtually

27  infinite litigation war-chest, that wages a battle of attrition that most firms cannot withstand. (*Id.*)

28      As a result of Ford's failure to fix the material defects associated with Plaintiff's vehicle,

3

1    or otherwise comply with the Song-Beverly Act, Plaintiff filed a Complaint in this action on

2    February 16, 2016, alleging, in part, willful violations of the Song-Beverly Act and Fraud for

3    failing to disclose a known transmission defect, and seeking civil penalties and punitive damages.

4    (SM Dec., ¶ 8.)  Ford filed a Demurrer to Plaintiff's Complaint on or about March 31, 2016. (*Id.*)

5    Plaintiff filed her Opposition and the parties attended a hearing on the matter on May 24, 2016,

6    at which time the Court overruled the Demurrer. (*Id.*)  Ford then filed its Answer, denying all

7    liability and asserting numerous affirmative defenses, on or about August 10, 2016. (*Id.*)

8           Defendant's position in the litigation required extensive efforts on the part of Plaintiff's

9    counsel, and they promptly began working up their case on behalf of Plaintiff. (SM Dec., ¶ 9.)

10    Written discovery was drafted and served on Defendant on or about October 5, 2016, consisting

11    of 54 requests for admissions, 98 requests for production of documents, 105 special

12    interrogatories and 27 form interrogatories. (*Id.*)  Plaintiff benefitted from Knight Law's

13    expertise and experience in litigating against Ford as <u>just 4.4 hours were billed for drafting the</u>

14    <u>entirety of this discovery.</u> (*Id.*)  Plaintiff's counsel are able to use existing files as templates to

15    conserve time and litigate efficiently. (*Id.*)  Written discovery of this magnitude, drafted from

16    scratch and without the benefit of Plaintiff's attorneys' vast knowledge, experience and

17    specialized expertise, would have taken multitudes of the time expediently managed here. (*Id.*)

18    Due to Defendant's improper objections and/or incomplete and evasive responses to Plaintiff's

19    discovery, Plaintiff began "meet and confer" efforts in December 2016, and the meet and confer

20    process continued into February 2017, while Plaintiff worked hard to obtain adequate responses

21    from Ford. (SM Dec., ¶ 10.)

22           In March 2017, Ford continued its vigorous defense in this case, propounding requests

23    for admissions, requests for production of documents, special and form interrogatories upon

24    Plaintiff. (SM Dec., ¶ 11.)  Plaintiff again benefitted from Knight Law's expertise and experience

25    as <u>just 2.7 hours were billed for drafting responses to the entirety of this discovery.</u> (*Id.*)  Ford

26    also noticed the deposition of Plaintiff and made a demand for the inspection of Plaintiff's

27    defective vehicle. (*Id.*)  In April 2017, Plaintiff noticed the depositions of several Ford employees

28    and dealership personnel, including Ford's PMK and PMQ, service advisors and service

4

technicians. (SM Dec., ¶ 12.)  These depositions were needed to obtain information regarding repairs to the vehicle, authenticate the repair orders, and rebut Ford's anticipated argument that the problems with Plaintiff's vehicle were somehow caused by Plaintiff's neglect or abuse. (*Id.*)

With the absence of any reasonable settlement offer from Ford accounting for its willful violation of the Song-Beverly Act, the case appeared likely to go to trial. (SM Dec., ¶ 13.) Accordingly, on or about May 12, 2017, Michael H. Rosenstein formally associated into the case as lead trial counsel to prepare the case for trial. (*Id.*, MR Dec., ¶ 11, Ex. C.)  With the trial date approaching, Plaintiff's counsel kicked their trial preparation into high gear. (SM Dec., ¶ 14.)  In May 2017, Plaintiff's counsel drafted the Mandatory Settlement Conference Statement, and in June 2017, Plaintiff's counsel attended the Mandatory Settlement Conference. (*Id.*, MR Dec., ¶ 12.)  Also in June 2017, Plaintiff's counsel defended the deposition of Plaintiff and took the depositions of Ford's service advisor and PMQ. (*Id.*)  On June 20, 2017, Ford served Plaintiff with an Offer to Compromise pursuant to the Code of Civil Procedure section 998 ("998 Offer"), in the amount of $61,000.00. (SM Dec., ¶ 15.)  Plaintiff rejected this insufficient offer. (*Id.*)

Plaintiff's counsel then continued preparing for trial by drafting trial-related documents including fifteen (15) Motions *in limine*, joint witness and exhibit lists, proposed jury instructions and special verdict forms, a joint statement of the case, a joint list of stipulated facts and Plaintiff's trial brief. (SM Dec., ¶ 16, MR Dec., ¶ 12.)  Plaintiff's counsel also drafted a preliminary opening statement. (*Id.*)  On July 10, 2017, Plaintiff's counsel attended the Trial Call, as which time the trial date was continued to October 23, 2017. (*Id.*)  Accordingly, in September and October 2017, Plaintiff's counsel continued necessary trial preparations. (SM Dec., ¶ 17, MR Dec., ¶ 13.)  Plaintiff's counsel attended the non-appearance deposition of Ford's PMK, defended the depositions of Plaintiff's expert witnesses and deposed Ford's expert witness. (*Id.*)  Plaintiff's counsel also attended a hearing on Ford's *ex parte application* to file an amended Answer, which was denied. (*Id.*)

On October 13, 2017, after nearly twenty months of litigation and just days before trial, Ford served Plaintiff with a Second Offer to Compromise pursuant to the Code of Civil Procedure section 998 ("Second 998 Offer"), in the amount of $75,000.00.  (SM Dec., ¶ 18, Ex. D.)  Plaintiff

1    accepted the Second 998 Offer on October 20, 2017. (*Id.*) This settlement amount was inclusive

2    of a full statutory "buy-back" of Plaintiff's defective vehicle, incidental and consequential

3    damages, and a civil penalty. (*Id.*) Plaintiff, as the prevailing party in this action, has made every

4    reasonable effort to resolve the payment of Plaintiff's attorney's fees by Ford but was forced to

5    file this Motion with the Court. (SM Dec., ¶¶ 19-29.)

6                    **III.    ARGUMENT AND ANALYSIS**

7        **A.    Plaintiff's Attorneys Are Entitled to Fees, Costs and Expenses in this Action**

8            By agreement, Plaintiff is the prevailing party in this action and, under the Song-Berverly

9    Act, entitled to recoup all reasonable attorney's fees, costs and expenses. (Code Civ. Proc. §

10   1032(a)(4); Civ. Code § 1794(d); *Graham v. DaimlerChrysler Corp.* (2004) 34 Cal.4th 553, 557;

11   *Reveles v. Toyota by the Bay* (1997) 57 Cal.App.4th 1139.) Absent a contrary showing, both the

12   number of hours that the prevailing party's attorney spent litigating the case and his or her regular

13   hourly rate are presumed to be reasonable. (*Serrano v. Unruh* (1982) 32 Cal.3d 621, 639 (counsel

14   is entitled to all hours actually spent, absent a showing of "special circumstances" that would

15   render such an award unjust); *Mandel v. Lackner* (1979) 92 Cal.App.3d 747, 761 (an attorney's

16   regular hourly rate is entitled to a presumption of reasonableness); Pearl, California Attorney Fee

17   Awards, at §§ 12.14A, 12.33 (2nd Ed. 2005.)

18           In prosecuting this case, the efforts of Knight Law amount to $28,327.50, including

19   drafting this motion and time anticipated to be spent preparing the reply and attending the

20   hearing. (SM Dec., ¶ 2, Ex. A.) The billings by Rosenstein total $39,931.25. (MR Dec., ¶ 9, Ex.

21   A.) Plaintiff's counsel also requests a modest 1.5 enhancement, in the amount of $34,129.38, to

22   account for the delay in payment and contingent risk posed by this case. Lastly, the reimbursable

23   costs and expenses set forth in Plaintiff's memorandum of costs are $11,778.02. (SM Dec., ¶ 2,

24   Ex. B.) In total, Plaintiff requests $$114,166.15 in fees, costs and expenses. (SM Dec., ¶ 2, Exs.

25   A-B; MR Dec., ¶ 9, Ex. A.)

26           While Ford will surely claim these amounts are unreasonable, Ford's own counsel admits

27   in a declaration filed in federal court that "it is not uncommon, and in fact quite regular, for

28   attorney's fee and cost awards (*or resolutions through informal discussions* with opposing

                                    6

1  counsel) to exceed $100,000.00." (SM Dec., ¶ 36, Ex. F, p. 3, ¶ 4.)  Few, if any, manufacturers

2  cause this much work to be performed in allegedly "simple lemon law actions."

### B.   The Hourly Rates Sought by Plaintiff's Attorneys Are Reasonable

4       The Court of Appeal has expressly held the lodestar method applies to determining

5  attorney's fees under the Song-Beverly Act. (*Robertson v. Fleetwood Travel Trailers of*

6  *California, Inc.* (2006) 144 Cal.App.4th 785, 817.)  The calculation of reasonable attorney's fees

7  under the Song-Beverly Act is based on the lodestar method, which entails multiplying the

8  number of hours reasonably expended by a reasonable hourly rate. (*Graciano v. Robinson Ford*

9  *Sales* (2006) 144 Cal.App.4th 140, 154; *Robertson, supra,* 144 Cal.App.4th at 817.)  The

10 prevailing buyer has the burden of showing that the fees incurred were "allowable," "reasonably

11 necessary to the conduct of the litigation," and "reasonable in amount." (*Goglin v. BMW of North*

12 *America, LLC* (2016) 4 Cal.App.5th 462, 470.)  In making such an evaluation, a court may

13 consider "factors such as the complexity of the case and procedural demands, the skill exhibited

14 and the results achieved." (*Id.*)

15      In *Goglin v. BMW*, the appellate court recently affirmed the trial court's award of over

16 $185,000 in attorneys' fees and costs for a plaintiff who settled her claims against BMW under

17 the Song-Beverly Act. (*Id.* at 464.)  The court also found plaintiff's counsel's hourly rate of $575

18 per hour was reasonable as supported by exhibits to counsel's declaration indicating various state

19 and federal courts had previously awarded him comparable hourly rates. (*Id.* at 473-74.)  The

20 holding states that the trial court was not obliged to consider that defendants paid their counsel a

21 much lower hourly rate. (*Id.* at 474.)

22      In *Robertson*, the trial court awarded $231,187.45 in fees based on $145,080.50 in fees

23 through trial, plus a "multiplier" of 1.5 for a total of $217,620.75, and $13,566.70 for the

24 attorney's fee motion. (*Robertson, supra,* 144 Cal.App.4th at 817.)  The appellate court upheld

25 the ruling. (*Id.* at 822.)

26      In *Graciano*, the trial court initially rejected plaintiff's lodestar fees of $109,468.50 and

27 request for a multiplier of 2.0.  In particular, the trial court reduced the plaintiff's attorney's

28 hourly rate from the requested $350/hour to $250/hour, which was the court's mandated

7

---

maximum rate for expert testimony.  The appellate court reversed, reasoning a court should determine the prevailing rate in the community for comparable professional legal services. (*Graciano, supra,* 144 Cal.App.4th at 156 (*citing PLCM Group v. Drexler* (2000) 22 Cal.4th 1084, 1095).)  The court found the plaintiff's unrebutted declarations established the proper hourly rate at $350 (for work in 2004), and reducing that rate to $250 was an abuse of discretion. (*Id.*)  The court also reaffirmed attorney's fees are not limited to a proportion of the recovery. (*Id.* at 164.)  On remand, the trial court found that the lodestar rate of $350/hour was reasonable *and added* a multiplier of 2.0 for a total fee award of over $380,000.00.  The attorney from *Graciano,* Hallen D. Rosner, now charges $695/hour.  (SM Dec., ¶ 51 (a).)

Furthermore, the California Supreme Court has expressly ruled that prevailing parties who are entitled to recover their attorney's fees are *also entitled* to recover their fees for the time spent preparing fee applications such as this one.  (*Serrano v. Unruh, supra,* 32 Cal.3d at 631; *Los Angeles Police Protective League v. City of Los Angeles* (1986) 188 Cal.App.3d 1, 17; *Robertson, supra,* 144 Cal.App.4th at 817 (awarding $13,566.70 in fees for a fee motion).)

Consideration of the "lodestar" factors compels an award of attorney's fees based on (i) the hourly rates set forth of in the declarations filed concurrently herewith (SM Dec., ¶¶ 40-48; MR Dec., ¶¶ 3-8), (ii) a survey of rates charged by other well-known consumer law attorneys (SM Dec., ¶ 51), (iii) over three dozen court orders confirming the reasonableness of Plaintiff's counsels' hourly rates and time billed in other Song-Beverly Act cases (SM Dec., ¶¶ 52-96, Exs. G-YY), and (iv) a National Survey further supporting the reasonableness of the hourly rates. (MR Dec., ¶ 10, Ex. B, at pp. 42-45.)  Plaintiff's counsels' rates are within the range of rates charged by other attorneys with similar experience in this area of law.

### 1.   The Nature and Complexity of the Litigation Support the Attorney's Fees Requested

Determining the amount of reasonable attorney's fees may involve consideration of the nature and complexity of the case. (*Dietrich v. Dietrich* (1953) 41 Cal.2d 497, 506; *Graciano, supra,* 144 Cal.App.4th at 147.)  Ford routinely claims that cases like this one are "simple lemon law cases" and, therefore, Plaintiffs' fee requests are always unjustified as excessive.  This case

1  required a range of specialized knowledge including: (1) an understanding of the full scope of

2  consumer protection laws, which are highly nuanced; (2) knowledge of the intricacies of

3  automobiles and the lexicon associated with them, as well as knowledge concerning how to

4  investigate issues with automobiles; and (3) knowledge of auto manufacturers' and dealers'

5  policies and protocols for repairing vehicles and complying with their legal obligations. (SM

6  Dec., ¶ 99.) Plaintiff's attorneys have acquired knowledge and insight about Ford over the course

7  of many years of litigation, and this experience typically results in significantly higher judgments

8  or settlements for their clients.  Plaintiff's attorneys have dared to make these matters more

9  complex, testing the boundaries of car manufacturer's cheating ways.  The firm's attorneys have

10  traveled all over the country to depose individuals from the auto industry, including New Jersey,

11  Texas, Michigan, Florida and Utah, as well as countless counties throughout California.  The

12  firm has successfully fought to compel the production of millions of internal communications

13  and confidential documents from Ford.  No other firm is litigating "simple lemon law" cases like

14  Knight Law and its associating attorneys.

15         Moreover, Ford made this matter even more complex by maintaining it had no liability

16  and declining to submit any reasonable offers to settle the matter for nearly twenty months of

17  litigation.  Ford should have acknowledged the defects in Plaintiff's vehicle and resolved the

18  matter before this case was ever filed.  Yet, this case was never just about whether or not a car

19  was a lemon; this case and others like it are a test of Ford's very corporate structure and the

20  relationship between a corporation and the customers it so depends on for its profits.  Plaintiff's

21  attorneys have the resolve to investigate those policies and procedures and have discovered tens

22  of thousands of internal documents that elucidate Ford's disregard to consumers.  Plaintiff's

23  attorneys delve deeper into these matters and bring a level of lawyering to this area of law that

24  most other firms either may not care to or do not have the wherewithal to provide.  Undoubtedly,

25  a quick and secure buck could be made with an early settlement but that leaves the violating

26  companies like Ford left to just apply the status quo.

27         Ford engaged in expensive litigation in this case, including denying all liability and

28  forcing Plaintiff's counsel to expend numerous hours preparing for trial.  Ford could have

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR
ATTORNEY'S FEES, COSTS AND EXPENSES

1  resolved this matter much earlier and saved tens of thousands in attorney's fees, costs and
2  expenses by doing so.  Ford ultimately capitulated, but not before causing substantial fees to be
3  incurred.

4         When Ford causes the entirety of fees to be incurred, it has no legitimate basis for
5  complaining about the amount of attorney's fees reasonably and actually incurred, especially
6  when Ford had the ability to resolve the matter before a lawsuit was even filed. "A party cannot
7  litigate tenaciously and then be heard to complain about the time necessarily spent by the
8  opposition in response." (*En Palm, LLC v. Teitler* (2008) 162 Cal.App.4th 770, 786; *see also*
9  *Molski v. Arclero Wine Group* (2008) 164 Cal.App.4th 786.)

10             **2.      The Firm's Skill Justifies the Amount of Attorney's Fees Sought**
11        A trial court may also take into account the skill of the attorneys when determining
12  reasonable attorney's fees. (*La Mesa-Spring Valley School Dist. v. Otsuka* (1962) 57 Cal.2d 309,
13  316.) Despite the case's difficulties, Plaintiff ultimately recovered $75,000.00 in damages, which
14  is four times the vehicle's lease price (almost four-and-half years ago).  The vehicle was no more
15  or less defective on the date of settlement than it was when Plaintiff first asked for her money
16  back before hiring legal counsel, so there is no rational explanation why Ford waged a lengthy
17  and costly legal battle only to settle for a sum equal to Plaintiff's best possible outcome via trial
18  on the merits.

19        Plaintiff's attorneys specialize in consumer law and did not balk at Ford's aggressive
20  litigation tactics.   Plaintiff's attorneys' experience has enabled them to develop litigation
21  strategies that are highly effective and cost and time efficient.  Plaintiff's attorneys' specialized
22  knowledge and experience in lemon law frequently results in outcomes far better than those
23  obtained by attorneys who do not specialize in this specific area of law.  This experience provided
24  a resolution to this matter far beyond that which Ford was previously willing to entertain.
25  Because of this experience, knowledge and expertise, ***Plaintiff went from a ZERO offer to a***
26  ***$75,000.00 settlement***.  Getting civil penalties, and often punitive damages, like this is not easy
27  and most firms do not know how to seek exemplary damages or do not care to seek them.
28  Plaintiff's attorneys believe they distinguish themselves from others based on many years of

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR
ATTORNEY'S FEES, COSTS AND EXPENSES

1 | focused pursuit of the truth.

2 |      Counsels' skill is evidenced by the size of the settlement as well as the nominal time

3 | expended on litigation tasks, which results in lower overall billing.  Plaintiff's attorneys do not

4 | spend inordinate time researching because they specialize in this area of law. (SM Dec., ¶ 100.)

5 | Nor do they spend unreasonable time preparing pleadings because they are able to use documents

6 | from other cases that need only be edited, rather than written from scratch. (*Id.*)  While substantial

7 | fees have been incurred, those fees led to the execution of effective strategies that result in

8 | superlative results for Knight Law clients, like Plaintiff here.

9 |      On the other side, Ford is represented by large national firms – now totaling **eleven**

10 | separate law firms – with attorneys who specialize in representing automobile manufacturers in

11 | lemon law cases. (SM Dec., ¶ 34.)  Ford is a corporate behemoth with the resources to easily

12 | overwhelm a consumer or an inexperienced attorney.  It is Defendant and its bevy of attorneys

13 | that drive this litigation and then settle for an amount they knew the entire time would be

14 | satisfactory, but instead waited until the eve of trial while amassing their billable hours.  Based

15 | on a random sample of cases, 74% of the cases against Ford were settled six months before trial

16 | instead of much earlier. (SM Dec., ¶ 32.)  Of those cases, 50% were settled just one month before

17 | trial. (*Id.*)  Plaintiff required skilled and experienced attorneys to prosecute her claims against

18 | Ford and its formidable resources.  Plaintiff's attorneys were well-suited for the task.

19 |      Now, Ford appears to have dug its heals even deeper by outright proclaiming in a letter

20 | that Ford is no longer willing to discuss settlement, does not want to engage in any further

21 | mediations and fully intends to bring every case to trial unless the firm's clients accept Ford's

22 | existing offers. (SM Dec., ¶ 35, Ex. E.)  To date, 25% of all of 55 cases that Knight Law and its

23 | trial attorneys have taken to trial since 2012 have involved Ford as the named defendant. (SM

24 | Dec., ¶ 30.)

25 |      As such, Plaintiff's counsel request to be compensated not only for the quantity of the

26 | work but for the quality of the work.  To do so, the firm calls upon a brave judiciary to award

27 | counsel the compensation for their hard work.  Eventually, this litigation will reduce lawsuits and

28 | the need for attorneys in this area of law, but change can and will only happen over time.

| | |
|---|---|
| 1 | **C.**    <u>**The Settlement Amount Does Not Limit the Attorney's Fee Recovery**</u> |
| 2 |       Ford may argue that damages in the amount of $75,000.00 do not justify an attorney's fee |
| 3 | award in the amount requested by Plaintiff, but such an argument is starkly against the weight of |
| 4 | California law.  The amount of attorney's fees *must not be tied to any percentage of recovery.* |
| 5 | (*Graciano, supra,* 144 Cal.App.4th at 164.)  In fact, a trial court may abuse its discretion if it |
| 6 | applies a rule of proportionality to a fee award.  The U.S. Supreme Court has previously |
| 7 | considered the question of proportionality in attorney fee awards and held: "[w]e reject the |
| 8 | proposition that fee awards under [42 U.S.C.] section 1988 should necessarily be proportionate |
| 9 | to the amount of damages a civil rights plaintiff actually recovers." (*City of Riverside v. Rivera* |
| 10 | (1986) 477 U.S. 561, 574; *see also* Sen. Report No. 93-151, 1st Sess., pp. 23-24 (1973) |
| 11 | (attorney's fees under the Magnuson Moss Warranty Act are based on actual time, not a |
| 12 | percentage of the recovery); *Robertson, supra,* 144 Cal.App.4th at 820; *Independent Federation* |
| 13 | *of Flight Attendants v. Zipes* (1989) 491 U.S. 754, fn.2 (fee shifting provisions under Magnuson-|
| 14 | Moss and Song-Beverly "are to be interpreted alike"); *Goglin, supra,* 5 Cal.App.5th at 468-69 |
| 15 | (affirming award of $185,000 in fees and costs in a Song-Beverly Act case that settled for |
| 16 | $75,000); *Vo v. Las Virgenes Municipal Water District* (2000) 79 Cal.App.4th 440, 446 |
| 17 | (affirming $470,000 fee award after $40,000 judgment because the defendant was excessively |
| 18 | litigious and took a non-settlement posture); *Harman v. City and County of San Francisco* (2007) |
| 19 | 158 Cal.App.4th 407 (affirming award of approximately $1.1 million in fees where plaintiffs |
| 20 | recovered $30,300).) |
| 21 |       Attorney's fees and costs commonly exceed the client's damages.  The Legislature |
| 22 | acknowledged that substantial work might be needed to prosecute such claims against large |
| 23 | corporations, which is the reason behind the fee shifting provision of the Song-Beverly Act. (SM |
| 24 | Dec., ¶ 98.)  Otherwise, consumers would be left without opportunity for redress when their |
| 25 | damages were not enough for an attorney to take the case on a contingent fee or hourly rate basis. |
| 26 | "The purpose of statutory attorney fee provisions is to provide financial incentives necessary for |
| 27 | the private enforcement of important civil rights." (*Ketchum v. Moses* (2001) 24 Cal.4th 1122, |
| 28 | 1132.)  Thus, the Song-Beverly Act gives consumers the opportunity to seek legal redress even |

12

1  | if their damages would not be high enough to warrant legal representation.  The award of

2  | attorney's fees *cannot* be limited by damages recovered.  (*Ketchum*, *supra*, 24 Cal.4th at 1138.)

3  | **D.    Plaintiff Should Be Granted a Lodestar Multiplier**

4  | As part of the Song-Beverly Act, a prevailing buyer may also receive a lodestar multiplier.

5  | (*Robertson, supra,* 144 Cal.App.4th at 817.)  Once a lodestar amount is determined, which

6  | involves a "careful compilation of the actual time spent and reasonable hourly compensation for

7  | each attorney," (*Id.* at 819 (*citing Serrano v. Priest* (1977) 20 Cal.3d 25, 48-49 (*Serrano III*)),

8  | the amount may then be augmented by taking various relevant factors into account, including (1)

9  | the novelty and difficulty of the questions involved and the skill displayed in presenting them;

10 | (2) the extent to which the nature of the litigation precluded other employment by the attorneys;

11 | and (3) the contingent nature of the fee award, based on the uncertainty of prevailing on the

12 | merits and of establishing eligibility for the award. (*Id.*; *see also Graham, supra,* 34 Cal.4th at

13 | 579; *PLCM Group v. Drexler*, 22 Cal.4th at 1096.)  "[T]he purpose of a fee enhancement is

14 | primarily to compensate the attorney for the prevailing party at a rate reflecting the risk of

15 | nonpayment in contingency cases."  (*Ketchum, supra,* 24 Cal.4th at 1138; *Cazares v. Saenz*

16 | (1989) 208 Cal.App.3d 279, 287-88 (risk factor alone justifies a 2.0 multiplier for a 50% chance

17 | of prevailing).)  "A 50 percent chance of recovery implies a multiplier of 2, a 25 percent chance

18 | of recovery implies a multiplier of 4, and so on." (*In re Chiron Corp. Securities Litigation* (N.D.

19 | Cal. Nov. 30, 2007) No. C-04-4293 VRW, 2007 WL 4249902, *9.)  Plaintiff asks for far less.

20 | In *Robertson*, a case brought under the Song-Beverly Act, the court ruled that the

21 | "statutory language in section 1794(d) is reasonably compatible with a lodestar adjustment

22 | method of calculating attorney fees, including use of fee multipliers," and the court granted a 1.5

23 | multiplier. (144 Cal.App.4th at 817, 819.)  In *Graciano*, the appellate court actually *increased*

24 | the trial court's award of fees after finding that the lodestar rate of $350/hour was reasonable and

25 | adding a 2.0 multiplier for a total award of over $380,000.00. (144 Cal.App.4th at 156.)

26 | The lodestar is intended to reflect the basic fee for comparable non-contingent legal

27 | services and should be enhanced by an appropriate multiplier to reflect the risk and delay in

28 | payment associated with taking a contingent case, as well as the result achieved.  The lodestar

13

1   "multiplier" is meant to increase or decrease the fee award based on factors not already taken

2   into account when setting the hourly rate, such as the risk of taking a case on a contingency basis,

3   and delay in receiving payment. (*See Horsford v. Bd. of Trustees of Cal. State Univ.* (2005) 132

4   Cal. App. 4th 359, 394-95.)

5          In *Ketchum*, the California Supreme Court wrote, "[a] contingent fee contract, since it

6   involves a gamble on the result, may properly provide for a *larger compensation* than would

7   otherwise be reasonable." (24 Cal.4th at 1132 [emphasis added].)

8          A contingent fee must be higher than a fee for the same legal services paid as they
    are performed. The contingent fee compensates the lawyer not only for the legal
9   services he renders but for the loan of those services. The implicit interest rate on
    such a loan is higher (because the risk of default (the loss of the case, which cancels
10  the debt of the client to the lawyer) is much higher than that of conventional loans.
    (Posner, Economic Analysis of Law (4th ed.1992) pp. 534, 567, emphasis
11  added.) A lawyer who both bears the risk of not being paid and provides legal
    services is not receiving the fair market value of his work if he is paid only for the
12  second of these functions. If he is paid no more, competent counsel will be
    reluctant to accept fee award cases.
13

14  (*Id.* at 1132 [citations omitted; emphasis added].)

15         Throughout the litigation, there always existed the real possibility Plaintiff would not

16  prevail. The risk was compounded by the fact that Plaintiff's attorneys advanced all litigation

17  costs and expenses without reimbursement. Thus, if Plaintiff did not prevail, her attorneys would

18  have suffered a substantial loss of uncompensated attorney hours and thousands of dollars in out-

19  of-pocket expenses. Plaintiff requests a 0.2 enhancement based on that risk.

20         Further, Ford dragged this case out for nearly twenty months before finally making a

21  reasonable settlement offer. Unlike Ford's attorneys, who are paid monthly regardless of

22  outcome, Plaintiff's attorneys are not paid at all if they lose, and need to absorb significant delay

23  in being paid if Plaintiff does win. On account of the substantial delay in payment, Plaintiff

24  requests a 0.3 enhancement.

25         Based on the risk of taking this case on a contingent fee basis and the delay in payment

26  since February 2016, Plaintiff requests a nominal multiplier of 1.5. Courts have awarded a

27  lodestar multiplier to Plaintiff's counsel in numerous cases. (SM Dec., ¶¶ 67, 71, 80, 81, 83, 84,

28  88, 94, 95, 96, Exs. V, Z, II, JJ, LL, MM, QQ, WW, XX, YY.)

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR
ATTORNEY'S FEES, COSTS AND EXPENSES

E.    **Plaintiff is Entitled to Recover All Costs and Expenses Reasonably Incurred in Connection with this Action**

Under the Song-Beverly Act, a prevailing buyer shall be allowed to recover as part of the judgment a sum equal to the aggregate amount of costs and expenses. (Civ. Code § 1794(d) [emphasis added].)  The California Legislature intended the word "expenses" to cover outlays not included in the detailed statutory definition of "costs," and the Song-Beverly Act's legislative history demonstrates the Legislature exercised its power to permit recovery of a host of litigation expenditures beyond those permitted by Code of Civil Procedure § 1033.5. (*Jensen v. BMW of North America, Inc.* (1995) 35 Cal.App.4th 112, 137-138.)

A verified memorandum of costs generally satisfies the moving party's burden of establishing costs necessarily incurred. (*Hadley v. Krepel* (1985) 167 Cal.App.3d 677, 682.)  The verified memorandum of costs demonstrates Plaintiff's attorneys' costs and expenses prosecuting this matter, which counsel advanced on Plaintiff's behalf. (SM Dec. ¶ 2, Ex. B.)  The burden shifts to Ford to properly rebut the claimed costs.

### IV.    CONCLUSION

For the reasons above, Plaintiff respectfully requests this Honorable Court award attorney's fees, costs and expenses as follows:

|  |  |
|---|---|
| Lodestar Fees: | $ 68,258.75 |
| +Lodestar Enhancement: | $ 34,129.38 |
| Total Fees Requested: | $102,388.13 |
| +Costs and Expenses: | $ 11,778.02 |
| =**Total Fees and Costs/Expenses:** | **$114,166.15** |

Dated:  March 22, 2018

KNIGHT LAW GROUP, LLP

Steve Mikhov (SBN 224676)
Attorneys for Plaintiff,
**CHELSEA K. FULLER**

15

1

PROOF OF SERVICE
(Code of Civil Procedure §1013a)

2

3        I am employed in the County of Los Angeles, State of California.  I am over the age of 18
years and not a party to the within action.  My business address is 1801 Century Park East, Suite

4    2300, Los Angeles, CA 90067.

5        I served the foregoing document described as:

6    **PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN**
     **SUPPORT OF MOTION FOR ATTORNEY'S FEES, COSTS AND EXPENSES**

7

8        Said document was served on the interested parties in this action, by placing true copies
     thereof enclosed in sealed envelopes, with postage prepaid, addressed as follows:

9

10   Warren E. Platt, Esq.                     Michael H. Rosenstein, Esq.
     SNELL & WILMER, LLP                       Law Offices of Michael H. Rosenstein

11   600 Anton Blvd., Suite 1400               1801 Century Park East., Suite 2300
     Costa Mesa, CA 92626                      Los Angeles, CA 90067

12   **Counsel for Defendant,**               mrosenstein@rose-lawoffice.com
     **FORD MOTOR COMPANY**                   **Associated Counsel for Plaintiff,**

13   (via mail only)                           **CHELSEA A. FULLER**
                                                (via E-mail only)

14

15   XX   BY MAIL:  I am readily familiar with this firm's practice of collection and processing
          correspondence for mailing with the United States Postal Service.  Under that practice, it

16        would be deposited with the U.S. Postal Service on that same day with postage thereon
          fully prepaid at a Postal Service collection box at Los Angeles, California, in the ordinary

17        course of business. The envelope was sealed and placed for collection that same day
          following ordinary business practices, addressed to the above-referenced attorney.

18

19   XX   BY E-MAIL OR ELECTRONIC TRANSMISSION: Based on a court order or an
          agreement of the parties to accept service by e-mail or electronic transmission, I caused

20        the documents to be sent to the persons at the e-mail addresses listed above.  I did not
          receive, within a reasonable time after the transmission, any electronic message or other

21        indication that the transmission was unsuccessful.

22

23   XX   I declare under penalty of perjury under the laws of the State of California that the
          foregoing is true and correct.

24

25   Executed on March 22, 2018 at Los Angeles, California.

26

27                                             _Hector Almeyda_
                                               Hector Almeyda

28

-1-

PROOF OF SERVICE