1   **KNIGHT LAW GROUP, LLP**
    Steve Mikhov (SBN 224676)
2   1801 Century Park East, Suite 2300
3   Los Angeles, CA 90067
    Telephone: (310) 552-2250
4   Fax: (310) 552-7973

5   **LAW OFFICE OF MICHAEL H. ROSENSTEIN**
    Michael H. Rosenstein (SBN 169091)
6   1801 Century Park East, Suite 2300
    Los Angeles, CA 90067
7   Telephone: (310) 286-0275
    Fax: (310) 286-0274
8

9   Attorneys for Plaintiff,
    **RAUL FLORES**
10

11              **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

12                     **COUNTY OF LOS ANGELES**

13

| | |
|---|---|
| **RAUL FLORES,** | Case No.: BC635158 |
| Plaintiff, | **PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR ATTORNEY'S FEES, COSTS AND EXPENSES** |
| vs. | |
| **FORD MOTOR COMPANY, a Delaware Corporation, and DOES 1 through 10, inclusive,** | [Filed Concurrently with Plaintiff's Notice of Motion and Motion for Attorney's Fees, Costs and Expenses; Declarations of Steve Mikhov and Michael H. Rosenstein] |
| Defendant. | *Assigned for All Purposes to the Honorable Barbara M. Scheper* |
| | Date:  February 21, 2018 |
| | Time: 8:30 a.m. |
| | Dept.: 30 |
| | Reservation ID: 171110266146 |

14
15
16
17
18
19
20
21
22
23
24
25
26
27

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR
ATTORNEY'S FEES, COSTS AND EXPENSES

1

2

TABLE OF CONTENTS

Page(s)

3

I.      INTRODUCTION ........................................................................................... 1

4

II.     STATEMENT OF FACTS ............................................................................. 2

III.    ARGUMENT AND ANALYSIS .................................................................... 6

5

    A.    Plaintiff's Attorneys Are Entitled to Fees, Costs and Expenses in this Action ...... 6

6

    B.    The Hourly Rates Sought by Plaintiff's Attorneys Are Reasonable ....................... 7

7

        1.    The Nature and Complexity of the Litigation Support the Attorney's Fees Requested .................................................................................. 9

8

        2.    The Firm's Skill Justifies the Amount of Attorney's Fees Sought ........... 10

9

    C.    The Settlement Amount Does Not Limit the Attorney's Fee Recovery ............... 11

    D.    Plaintiff Should Be Granted a Lodestar Multiplier ................................................. 12

10

        1.    The Lodestar Multiplier Should Be Granted in Contingent Cases Due to Risk and Delay of Payment .................................................................. 13

11

    E.    Plaintiff is Entitled to Recover All Costs and Expenses Reasonably Incurred in Connection with this Action ...................................................................... 15

12

13

IV.    CONCLUSION ............................................................................................. 15

14

15

16

17

18

19

20

21

22

23

24

25

26

27

i

## TABLE OF AUTHORITIES

Page(s)

### Cases

*Cazares v. Saenz,*
(1989) 208 Cal.App.3d 279 ...............................................................................13

*City of Riverside v. Rivera*
(1986) 477 U.S. 561 ............................................................................................11

*Dietrich v. Dietrich*
(1953) 41 Cal.2d 497 .............................................................................................9

*En Palm, LLC v. Teitler*
(2008) 162 Cal.App.4th 770 ...............................................................................10

*Goglin v. BMW of North America, LLC*
(2016) 4 Cal.App.5th 462 ...............................................................................7, 12

*Graciano v. Robinson Ford Sales*
(2006) 144 Cal.App.4th 140 ...............................................................7, 8, 9, 11, 13

*Graham v. DaimlerChrysler Corp.*
(2004) 34 Cal.4th 553 .....................................................................................6, 13

*Hadley v. Krepel*
(1985) 167 Cal.App.3d 677 ................................................................................15

*Harman v. City and County of San Francisco*
(2007) 158 Cal.App.4th 407 ...............................................................................12

*Horsford v. Bd. of Trustees of Cal. State Univ.*
(2005) 132 Cal. App. 4th 359 .........................................................................8, 14

*In re Chiron Corp. Securities Litigation*
(N.D. Cal. Nov. 30, 2007) No. C-04-4293 VRW, 2007 WL 4249902 ..............13

*Independent Federation of Flight Attendants v. Zipes*
(1989) 491 U.S. 754............................................................................................12

*Jensen v. BMW of North America, Inc.*
(1995) 35 Cal.App.4th 112 ................................................................................15

*Ketchum v. Moses,*
(2001) 24 Cal.4th 1122 ..........................................................................12, 13, 14

ii

*La Mesa-Spring Valley School Dist. v. Otsuka*
(1962) 57 Cal.2d 309 ..................................................................10

*Los Angeles Police Protective League v. City of Los Angeles*
(1986) 188 Cal.App.3d 1..............................................................8

*Mandel v. Lackner*
(1979) 92 Cal.App.3d 747 ...........................................................6

*Molski v. Arclero Wine Group*
(2008) 164 Cal.App.4th 786.........................................................10

*PLCM Group v. Drexler*
(2000) 22 Cal.4th 1084................................................................8, 13

*Reveles v. Toyota by the Bay*
(1997) 57 Cal.App.4th 1139.........................................................6

*Robertson v. Fleetwood Travel Trailers of California, Inc.*
(2006) 144 Cal.App.4th 785 ........................................................7, 8, 12, 13

*Serrano v. Priest*
(1977) 20 Cal.3d 25 (*Serrano III*) ..............................................12

*Serrano v. Unruh,*
(1982) 32 Cal.3d 621 ...................................................................6, 8

*Vo v. Las Virgenes Municipal Water District*
(2000) 79 Cal.App.4th 440 ..........................................................12

**Statutes and Codes**

15 United States Code

Section 2301 et seq. (Magnuson Moss Warranty Act) .................. 11, 12

42 United States Code.................................................................. 11

Cal. Civ. Code § 1794(d) ............................................................ 2, 6, 7, 13, 15

California Code of Civil Procedure

Section 1032(a)(4) ...................................................................... 6

California Code of Civil Procedure

Section 1033.5............................................................................. 15

iii

Other Authorities

Pearl, *California Attorney Fee Awards*
    Sections 12.14A, 12.33 (2nd Ed. 2005) ……………………………………………..6

Sen. Report No. 93-151,
    1st Sess., pp. 23 (1973) ................................................................................................11

iv

# I.   INTRODUCTION

Defendant Ford Motor Company (hereafter "Defendant" or "Ford") had three opportunities to avoid this lawsuit:  First, it had an opportunity to build a quality car.  Then, Ford had an opportunity to repair the material defects in Plaintiff's car within a reasonable number of repair attempts under California law.  Ford had a final opportunity to avoid this lawsuit when Plaintiff contacted Ford seeking a buy-back, but Ford summarily denied his lawful request despite its legal obligation.  Having squandered all three opportunities and violating the Song-Beverly Act in the process, Ford left Plaintiff with little choice but to pursue his rights in court.

On December 31, 2013, Plaintiff purchased a used 2012 Ford Fiesta for $20,590.16.  After just two weeks of ownership, the vehicle began exhibiting serious engine problems.  For the several months that followed, Plaintiff suffered through persistent engine problems, as well as problems with the electrical and transmission, requiring numerous repair visits.  In just over one year of ownership, <u>Plaintiff took his vehicle in for repair a total of seven (7) times</u>. Repeated failed attempts to repair the engine, electrical and transmission problems left Plaintiff without the use of his vehicle for a total of forty-three (43) days during this time period.

Plaintiff contacted Ford with the hope that Ford would repurchase his vehicle but Ford refused.  Instead of complying with its legal obligations, Ford applied its tried and true internal policy of rejecting its Song-Beverly Act obligations and refused to repurchase or replace Plaintiff's defective vehicle.  Ford simply made the same business decision that it always makes: blindly reject consumer requests and then expect the consumer to just go away.  Unfortunately for Ford, Plaintiff refused to just "go away" and eventually hired Knight Law Group on a contingency basis.  Knowing that Ford had willfully violated Plaintiff's rights and had already rejected informal resolution, Knight Law was forced to file this case.

On July 18, 2017, nearly ten months after the complaint was filed in this action, Ford served Plaintiff with an Offer to Compromise pursuant to the Code of Civil Procedure section 998 ("998 Offer"), in the amount $80,000.00, which consisted of a full statutory "buy-back" of his defective

1  vehicle, incidental and consequential damages, and a civil penalty. Plaintiff accepted the 998 Offer

2  on August 1, 2017. The final settlement is **nearly four times** the total amount Plaintiff paid for

3  the vehicle in what defense routinely calls a "simple lemon law" action. Plaintiff obtained this

4  extraordinary sum *without going to trial*. The settlement is, in essence, one that few, if any, firms

5  in this state could achieve for its clients. The excellent result was achieved due to Plaintiff's

6  attorneys' expertise in lemon law cases but, arguably, the biggest factor in Plaintiff's success was

7  Plaintiff's attorneys' zealous representation.

8      The Song-Beverly Act, Civil Code sections 1790, *et seq.*, entitles Plaintiff to seek

9  reasonable attorney's fees, costs and expenses from Ford. Moreover, the 998 Offer to Compromise

10  expressly provides Plaintiff is the prevailing party and entitled to this noticed motion for attorney's

11  fees. Plaintiff now moves the Court: (1) for an award of attorney's fees pursuant to Civil Code

12  section 1794(d) under the "lodestar" method in the amount of $61,035.00, (2) for a reasonable,

13  modest, "lodestar" modifier of 1.5 under California law, in the amount of $30,517.50, and (3) to

14  award actual costs and expenses incurred in the amount of $4,068.26. (Civ. Code § 1794(d).)

15  Plaintiff requests a total of $95,620.76 in attorney's fees, costs and expenses. (Declaration of Steve

16  Mikhov ("SM Dec.") ¶ 2, Exs. A-B; Declaration of Michael Rosenstein ("MR Dec.") ¶ 8, Ex. A.)

17                    **II.    STATEMENT OF FACTS**

18      Plaintiff purchased a used 2012 Ford Fiesta on December 31, 2013 for a total purchase

19  price of $20,590.16, inclusive of taxes, fees, and financing charges on a six-year loan. (SM Dec.,

20  ¶ 3, Ex. C.) The vehicle was distributed by Ford Motor Company, which provided an express

21  written warranty. (SM Dec., ¶ 3.) After approximately just two weeks and under 250 miles of

22  ownership, and within the applicable warranty periods, the vehicle began experiencing serious

23  problems with the engine. (SM Dec., ¶ 4.) Plaintiff took the vehicle to a Ford-authorized repair

24  facility, which attempted to correct the issues by replacing the faulty electronic throttle body. (SM

25  Dec., ¶ 4.) Despite being assured the vehicle was repaired, Plaintiff was forced to return the vehicle

26  to the repair facility the very next day because the check engine light remained on. (SM Dec., ¶

27                                  2

1  4.) The repair facility technicians replaced two coils in another attempt to correct the issues. (SM

2  Dec., ¶ 4.)  However, just two weeks later, the engine began smoking, requiring the vehicle to be

3  towed back to the repair facility, where they replaced the heater hose. (SM Dec., ¶ 4.)  After

4  another two weeks, Plaintiff again brought the vehicle in for repair because there was a knocking

5  noise coming from the engine compartment. (SM Dec., ¶ 4.)  The vehicle remained in the repair

6  facility for seven days during this repair visit while the repair facility technicians again attempted

7  to correct these issues, this time by replacing the intake manifold. (SM Dec., ¶ 4.)  Despite these

8  efforts, the persistent engine problems continued, later compounded by electrical and transmission

9  problems. (SM Dec., ¶ 4.)  Plaintiff repeatedly took the vehicle in for repairs, a total of seven (7)

10  times during just over one year of ownership, but the serious problems continued.  (SM Dec., ¶ 4.)

11  Repeated failed attempts to repair the engine, electrical and transmission problems left Plaintiff

12  without the use of his vehicle for a total of forty-three (43) days.  (SM Dec., ¶ 4.)

13  　　　　Despite the ongoing repairs and continued manifestation of problems, Ford refused to

14  acknowledge the defective nature of Plaintiff's vehicle. (SM Dec., ¶ 5.)  At all times, however,

15  Ford had direct, contemporaneous knowledge of the vehicle's serious defects, which it records in

16  a database called "OASIS" and a warranty repair history database called "AWS." (SM Dec., ¶ 5.)

17  These repair records indicate each time the vehicle was presented for repair during the warranty

18  period, as well as every time the Ford repair facility found a problem/defect attributable to Ford

19  and billed Ford for the work. (SM Dec., ¶ 5.)

20  　　　　Frustrated, concerned for his safety and having lost confidence in Ford's ability to repair

21  the vehicle, Plaintiff contacted Ford customer service directly on February 29, 2016 and requested

22  Ford repurchase the vehicle. (SM Dec., ¶ 6.)  Despite Ford's affirmative duty under the law to

23  perform an investigation and offer relief, Ford rejected Plaintiff's request.  (SM Dec., ¶ 6.)

24  Because Ford disregarded every opportunity to do right by its customer, Plaintiff was forced to

25  retain counsel and file suit. (SM Dec., ¶ 7.)  Plaintiff contacted Knight Law and told the firm about

26  the problems with his vehicle and the way Ford treated him.  (SM Dec., ¶ 8.)  After reviewing the

27  　　　　　　　　　　　　　　　　　　　　　　　3

1   repair history and discussions with Plaintiff, Knight Law agreed to represent him and bear the risk

2   of litigating the case on a fully contingent basis.  (SM Dec., ¶ 8.)  Because Knight Law's

3   compensation was purely contingent, the firm faced a genuine risk of not being paid for its services

4   for years, if at all, while advancing thousands of dollars in costs and expenses on Plaintiff's behalf.

5   (SM Dec., ¶ 8.)  In taking on this duty, the firm was facing a litigation behemoth—Ford is a multi-

6   billion-dollar company, with a virtually infinite litigation war-chest, that wages a battle of attrition

7   that most firms cannot withstand. (SM Dec., ¶ 8.)

8           As a result of Ford's failure to fix the material defects associated with Plaintiff's vehicle,

9   or otherwise comply with the Song-Beverly Act, Plaintiff filed a Complaint in this action on

10  September 23, 2016, alleging, in part, willful violations of the Song-Beverly Act and Fraud and

11  seeking civil penalties and punitive damages.  (SM Dec., ¶ 9.)  Ford filed a Demurrer to Plaintiff's

12  Complaint on or about November 14, 2016.  (SM Dec., ¶ 9.)

13          Defendant's position in the litigation required extensive efforts on the part of Plaintiff's

14  counsel, and they promptly began working up their case on behalf of Plaintiff.  (SM Dec., ¶ 10.)

15  Written discovery was drafted and served on Defendant on or about November 29, 2016,

16  consisting of 49 requests for admissions, 95 requests for production of documents, 96 special

17  interrogatories and 28 form interrogatories.  (SM Dec., ¶ 10.)  Plaintiff benefitted from Knight

18  Law's expertise and experience in litigating against Ford as just 4.3 hours were billed for drafting

19  the entirety of this discovery.  (SM Dec., ¶ 10.)  Plaintiff's counsel is able to use existing files as

20  templates to conserve time and litigate efficiently.  (SM Dec., ¶ 10.)  Written discovery of this

21  magnitude, drafted from scratch and without the benefit of Plaintiff's attorneys' vast knowledge,

22  experience and specialized expertise, would have much longer than in this case.  (SM Dec., ¶ 10.)

23          On or about November 30, 2016, Plaintiff's counsel filed their Opposition to Defendant's

24  Demurrer to Plaintiff's Complaint, which was in turn followed by Defendant's Reply.  (SM Dec.,

25  ¶ 11.)  The parties attended a hearing on the matter on December 13, 2016, and the Court overruled

26  the Demurrer in its entirety.  (SM Dec., ¶ 11.)  In December 2016, Ford noticed the deposition of

27                                          4

1   Plaintiff and made a demand for the inspection of Plaintiff's defective vehicle. (SM Dec., ¶ 12.)

2   Ford then continued its vigorous defense in this case, propounding requests for admissions,

3   requests for production of documents, special and form interrogatories upon Plaintiff. (SM Dec.,

4   ¶ 13.) Plaintiff again benefitted from Knight Law's expertise and experience in litigating against

5   Ford as just 3.3 hours were billed for drafting responses to the entirety of this discovery. (SM

6   Dec., ¶ 13.) Ford filed its Answer to Plaintiff's Complaint, denying all liability and asserting

7   numerous affirmative defenses, on or about January 5, 2017. (SM Dec., ¶ 14.) Ford also made a

8   demand for a jury trial at this time. (SM Dec., ¶ 14.) Meanwhile, due to Defendant's improper

9   objections and/or incomplete and evasive responses to Plaintiff's discovery, Plaintiff began "meet

10  and confer" efforts in February 2017 to obtain adequate responses from Ford. (SM Dec., ¶ 15.)

11      With the absence of any reasonable settlement offer from Ford accounting for its willful

12  violation of the Song-Beverly Act, the case appeared likely to go to trial. (SM Dec., ¶ 16.)

13  Accordingly, on or about May 24, 2017, Michael H. Rosenstein formally associated into the case

14  as lead trial counsel to prepare the case for trial. (SM Dec., ¶ 16, MR Dec., ¶ 10, Ex. C.) In June

15  2017, Plaintiff noticed the depositions of several Ford employees and dealership personnel,

16  including Ford's PMK and PMQs, service advisors and service technicians. (SM Dec., ¶ 17.)

17  These depositions were needed to obtain information regarding repairs to the vehicle, authenticate

18  the repair orders, and rebut Ford's anticipated argument that the problems with Plaintiff's vehicle

19  were somehow caused by Plaintiff's neglect or abuse. (SM Dec., ¶ 17.) True to form, Ford

20  objected to the noticed deposition of their PMK. (SM Dec., ¶ 17.)

21      With the August trial date approaching, Plaintiff's counsel kicked their trial preparation

22  into high gear. (SM Dec., ¶ 18.) In June 2017, Plaintiff's counsel deposed several Ford dealership

23  personnel and drafted fifteen (15) motions in *limine*. (*Id.*, MR Dec., ¶ 11.) On July 10, 2017,

24  Plaintiff's counsel prepared for and defended Plaintiff's deposition. (SM Dec., ¶ 18.)

25      On July 18, 2017, after nearly ten months of litigation, Ford served Plaintiff with an Offer

26  to Compromise pursuant to the Code of Civil Procedure section 998 ("998 Offer"), in the amount

27                                              5

1    of $80,000.00. (SM Dec., ¶ 19, Ex. D.)  While Plaintiff contemplated the offer, Plaintiff's counsel

2    continued drafting trial-related documents such as trial subpoenas, joint witness and exhibit lists,

3    jury instructions, a joint statement of stipulated facts, a joint statement of the case and Plaintiff's

4    trial brief.  (SM Dec., ¶ 20; MR Dec., ¶ 11.)  In further preparation for trial, Plaintiff's counsel

5    conferred with Plaintiff's expert witness, reviewed Plaintiff's deposition and prepared Plaintiff's

6    trial examination outline. (SM Dec., ¶ 20; MR Dec., ¶ 11.)

7         Plaintiff accepted Ford's 998 Offer on August 1, 2017. (SM Dec., ¶ 21.)  This settlement

8    amount was inclusive of a full statutory "buy-back" of his defective vehicle, incidental and

9    consequential damages, and a civil penalty. (SM Dec., ¶ 21.)  Plaintiff, as the prevailing party in

10   this action, has made every reasonable effort to resolve the payment of Plaintiff's attorney's fees

11   by Ford but was forced to file this Motion with the Court. (SM Dec., ¶ 22.)

12                        **III.    ARGUMENT AND ANALYSIS**

13        **A.    Plaintiff's Attorneys Are Entitled to Fees, Costs and Expenses in this Action**

14        By agreement, Plaintiff is the prevailing party in this action and, under the Song-Beverly

15   Act, entitled to recoup all reasonable attorney's fees, costs and expenses. (Code Civ. Proc. §

16   1032(a)(4); Civ. Code § 1794(d); *Graham v. DaimlerChrysler Corp.* (2004) 34 Cal.4th 553, 557;

17   *Reveles v. Toyota by the Bay* (1997) 57 Cal.App.4th 1139.)  Absent a contrary showing, both the

18   number of hours that the prevailing party's attorney spent litigating the case and his or her regular

19   hourly rate are presumed to be reasonable. (*Serrano v. Unruh* (1982) 32 Cal.3d 621, 639 (counsel

20   is entitled to all hours actually spent, absent a showing of "special circumstances" that would

21   render such an award unjust); *Mandel v. Lackner* (1979) 92 Cal.App.3d 747, 761 (an attorney's

22   regular hourly rate is entitled to a presumption of reasonableness); Pearl, California Attorney Fee

23   Awards, at §§ 12.14A, 12.33 (2nd Ed. 2005.)

24        The efforts of Knight Law amount to $27,897.50, including drafting this motion and time

25   anticipated to be spent preparing the reply and attending the hearing. (SM Dec., ¶ 2, Ex. A.) The

26   billings by Rosenstein total $33,137.50. (MR Dec., ¶ 8, Ex. A.)    Plaintiff's counsel also requests

27                                         6

1   a modest 1.5 enhancement, in the amount of $30,517.50, to account for the delay in payment and

2   contingent risk posed by this case.   Lastly, the reimbursable costs and expenses set forth in

3   Plaintiff's memorandum of costs are $4,068.26. (SM Dec., ¶ 2, Ex. B.)  In total, Plaintiff requests

4   $95,620.76 in fees, costs and expenses. (SM Dec., ¶ 2, Exs. A-B; MR Dec., ¶ 8, Ex. A.)

5         **B.     The Hourly Rates Sought by Plaintiff's Attorneys Are Reasonable**

6              The Court of Appeal has expressly held the lodestar method applies to determining

7   attorney's fees under the Song-Beverly Act. (*Robertson v. Fleetwood Travel Trailers of California,*

8   *Inc.* (2006) 144 Cal.App.4th 785, 817.)  The calculation of reasonable attorney's fees under the

9   Song-Beverly Act is based on the lodestar method, which entails multiplying the number of hours

10  reasonably expended by a reasonable hourly rate. (*Graciano v. Robinson Ford Sales* (2006) 144

11  Cal.App.4th 140, 154; *Robertson, supra,* 144 Cal.App.4th at 817.)  The prevailing buyer has the

12  burden of showing that the fees incurred were "allowable," "reasonably necessary to the conduct

13  of the litigation," and "reasonable in amount."  (*Goglin v. BMW of North America, LLC* (2016) 4

14  Cal.App.5th 462, 470.)  In making such an evaluation, a court may consider "factors such as the

15  complexity of the case and procedural demands, the skill exhibited and the results achieved." (*Id.*)

16             In *Goglin v. BMW*, the appellate court recently affirmed the trial court's award of over

17  $185,000 in attorneys' fees and costs for a plaintiff who settled her claims against BMW under the

18  Song-Beverly Act.  (4 Cal.App.5th at 464.)  The court also found plaintiff's counsel's hourly rate

19  of $575 per hour was reasonable as supported by exhibits to counsel's declaration indicating

20  various state and federal courts had previously awarded him comparable hourly rates. (*Id.* at 473-

21  74.)  The trial court was not obliged to consider that defendants paid their counsel a much lower

22  hourly rate.  (*Id.* at 474.)  In *Robertson*, the court observed a prevailing buyer is entitled to an

23  award of reasonable attorney's fees for time reasonably expended by his attorney.  (*Robertson,*

24  *supra,* 144 Cal.App.4th at 817.)  The court ruled the "statutory language in section 1794(d) is

25  reasonably compatible with a lodestar adjustment method of calculating attorney fees, including

26  use of fee multipliers."  (*Id.* at 819.)  Indeed, in *Robertson*, the trial court awarded $231,187.45 in

27                                              7

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR
ATTORNEY'S FEES, COSTS AND EXPENSES

1  fees based on $145,080.50 in fees through trial, plus a "multiplier" of 1.5 for a total of $217,620.75,

2  and $13,566.70 for the attorney's fee motion. (*Id.* at 817.)  The appellate court upheld the trial

3  court's ruling. (*Id.* at 822.)

4      In *Graciano*, the trial court initially rejected plaintiff's lodestar fees of $109,468.50 and

5  request for a multiplier of 2.0. In particular, the trial court reduced the plaintiff's attorney's hourly

6  rate from the requested $350/hour to $250/hour, which was the court's mandated maximum rate

7  for expert testimony. Plaintiff appealed the court's decision and in particular the hourly rate

8  reduction. The appellate court reversed, reasoning a court should determine the prevailing rate in

9  the community for comparable professional legal services. (*Graciano, supra*, 144 Cal.App.4th at

10  156 (*citing PLCM Group v. Drexler* (2000) 22 Cal.4th 1084, 1095).)  The court found the

11  plaintiff's unrebutted declarations established the proper hourly rate at $350, and reducing that rate

12  to $250 was an abuse of discretion. (*Id.*) The court also reaffirmed attorney's fees <u>are not limited</u>

13  <u>to a proportion</u> of the recovery. (*Id.* at 164.) On remand, the trial court found that the lodestar rate

14  of $350/hour was reasonable *and added* a multiplier of 2.0 for a total fee award of over $380,000.

15  The attorney from *Graciano*, Hallen D. Rosner, now charges $620/hour. (SM Dec., ¶ 41 (a).)

16      Furthermore, the California Supreme Court has expressly ruled that prevailing parties who

17  are entitled to recover their attorney's fees are *also entitled* to recover their fees for the time spent

18  preparing fee applications such as this one. (*Serrano v. Unruh, supra*, 32 Cal.3d at 631; *Los*

19  *Angeles Police Protective League v. City of Los Angeles* (1986) 188 Cal.App.3d 1, 17; *Robertson,*

20  *supra*, 144 Cal.App.4th at 817 (awarding $13,566.70 in fees for a fee motion).)

21      The hourly rates should be considered in the context of the rates charged by Plaintiff's

22  attorneys in the metropolitan community in which they practice, as opposed to the case venue. In

23  *Horsford v. Bd. of Trustees of Cal. State Univ.*, the trial court was reversed for refusing to award

24  the higher rates to San Francisco-based attorneys who litigated a FEHA case in Fresno. (*Horsford*

25  *v. Bd. of Trustees of Cal. State Univ.* (2005) 132 Cal. App. 4th 359, 399.) The law "requires that

26  the *financial incentives be adjusted to attract attorneys* who are sufficient to the cause." (*Id.*) In

27

8

the absence of any realistic indication plaintiffs could have found local counsel, it was an abuse of discretion to fail to consider an hourly rate based on counsel's 'home' market rate. (*Id.*) Plaintiff's attorneys' hourly rates should not vary depending on the venue of the lawsuit. The skill and experience of Ford's attorneys does not change from venue to venue and Plaintiff's counsel deserves to be compensated at the same rate they would receive given the same quantity and quality of work they must perform regardless of the venue.

Consideration of the "lodestar" factors compels an award of attorney's fees based on (i) the hourly rates set forth of in the declarations filed concurrently herewith (SM Dec., ¶¶ 28-39, MR Dec. ¶¶ 3, 5-7), (ii) a survey of rates charged by other well-known consumer law attorneys (SM Dec., ¶ 41), (iii) over three dozen court orders confirming the reasonableness of Plaintiff's counsels' hourly rates and time billed in other Song-Beverly Act cases (SM Dec., ¶¶ 43-84, Exs. E-TT), and (iv) a National Survey further supporting the reasonableness of the hourly rates (MR Dec., ¶ 9, Ex. B, at pp. 42-45). Plaintiff's counsels' rates are within the range of rates charged by other attorneys with similar experience in this area of law.

1. **The Nature and Complexity of the Litigation Support the Attorney's Fees Requested**

Determining the amount of reasonable attorney's fees may involve consideration of the nature and complexity of the case. (*Dietrich v. Dietrich* (1953) 41 Cal.2d 497, 506; *Graciano, supra,* 144 Cal.App.4th at 147.) Ford routinely claims that cases like this one are "simple lemon law cases" and, therefore, Plaintiff's fee requests are always unjustified as excessive. For starters, lemon law cases that find their way into litigation are hardly routine and rarely are they simple. This case required a range of specialized knowledge including: (1) an understanding of the full scope of consumer protection laws, which are highly nuanced; (2) knowledge of the intricacies of automobiles and the lexicon associated with them, as well as knowledge concerning how to investigate issues with automobiles; and (3) knowledge of auto manufacturers' and dealers' policies and protocols for repairing vehicles and complying with their legal obligations. (SM Dec.,

9

1   ¶ 87.) Plaintiff's attorneys have acquired knowledge and insight about these issues, and this

2   experience typically results in significantly higher judgments or settlements for their clients.

3       Moreover, Ford made this matter even more complex by maintaining it had no liability and

4   declining to submit any reasonable offers to settle the matter for nearly ten months of litigation.

5   Ford is an expert and should have acknowledged the defects in Plaintiff's vehicle and resolved the

6   matter before this case was ever filed.  Instead, Ford engaged in expensive litigation, including

7   extensive written discovery, stone-walling Plaintiff's discovery efforts, and forcing Plaintiff's

8   counsel to expend numerous hours preparing for trial.  Ford could have resolved this matter much

9   earlier and saved tens of thousands in attorney's fees, costs and expenses.  Ford ultimately came

10  around to doing the right thing, but not before causing substantial fees to be incurred.

11      When Ford causes the entirety of fees to be incurred, it has no legitimate basis for

12  complaining about the amount of attorney's fees reasonably and actually incurred, especially when

13  Ford had the opportunity to resolve the matter before a lawsuit was even filed.  "A party cannot

14  litigate tenaciously and then be heard to complain about the time necessarily spent by the

15  opposition in response."  (*En Palm, LLC v. Teitler* (2008) 162 Cal.App.4th 770, 786; *see also*

16  *Molski v. Arclero Wine Group* (2008) 164 Cal.App.4th 786.)

17         **2.**    **The Firm's Skill Justifies the Amount of Attorney's Fees Sought**

18      A trial court may also take into account the skill of the attorneys when determining

19  reasonable attorney's fees.  (*La Mesa-Spring Valley School Dist. v. Otsuka* (1962) 57 Cal.2d 309,

20  316.) Despite the case's difficulties, Plaintiff ultimately recovered $80,000.00 in damages, which

21  is nearly four times the vehicle's purchase price (over three-and-a-half years ago).  The vehicle

22  was no more or less defective on the date of settlement than it was when Plaintiff first requested

23  a buyback, so there is no rational explanation why Ford waged a lengthy and costly legal battle

24  only to settle for a sum equal to Plaintiff's best possible outcome via trial on the merits.

25      The final resolution is the direct result of the skill and preparation of Plaintiff's attorneys,

26  who specialize in consumer law and did not balk at Ford's aggressive litigation tactics.  Plaintiff's

27                    10

1  attorneys know the many nuances in these types of cases, and this experience has enabled them

2  to develop litigation strategies that are highly effective and both cost and time efficient.  Plaintiff's

3  attorneys' knowledge and experience in lemon law frequently results in outcomes far better than

4  those obtained by attorneys who do not specialize in lemon law.  Because of this experience,

5  knowledge and expertise, *Plaintiff went from a ZERO offer to a $80,000.00 settlement*.

6        Counsels' skill is evidenced by the size of the settlement as well as the nominal time

7  expended on litigation tasks, which results in lower overall billing.  Plaintiff's attorneys do not

8  spend inordinate time researching because they specialize in this area of law.  (SM Dec., ¶ 88.)

9  Nor do they spend unreasonable time preparing pleadings and other documents because they are

10  able to use documents from other cases that need only be edited, rather than written from scratch.

11  (SM Dec., ¶ 88.)  While substantial fees have been incurred, those fees were caused by Ford.

12        On the other side, Ford is represented by large national firms with attorneys who specialize

13  in representing automobile manufacturers in lemon law cases.  Ford is a corporate behemoth with

14  the resources to easily overwhelm a consumer or an inexperienced attorney.  Plaintiff required

15  skilled and experienced attorneys to prosecute his claims against Ford and its formidable

16  resources.  Plaintiff's attorneys were well-suited for the task.

17      **C.**    **The Settlement Amount Does Not Limit the Attorney's Fee Recovery**

18        Ford may argue that damages in the amount of $80,000.00 do not justify an attorney's fee

19  award in the amount requested by Plaintiff.  Such an argument is starkly against the weight of the

20  law. The amount of attorney's fees *must not be tied to any percentage of recovery*. (*Graciano,*

21  *supra*, 144 Cal.App.4th at 164.)  In fact, a trial court may abuse its discretion if it applies a rule of

22  proportionality to a fee award.  The U.S. Supreme Court has previously considered the question

23  of proportionality in attorney fee awards and held: "[w]e reject the proposition that fee awards

24  under section [42 U.S.C.] 1988 should necessarily be proportionate to the amount of damages a

25  civil rights Plaintiff actually recovers." (*City of Riverside v. Rivera* (1986) 477 U.S. 561, 574; *see*

26  *also* Sen. Report No. 93-151, 1st Sess., pp. 23-24 (1973) (attorney's fees under the Magnuson

27                                         11

1    Moss Warranty Act are based on actual time, not a percentage of the recovery); *Robertson, supra,*

2    144 Cal.App.4th at 820; *Independent Federation of Flight Attendants v. Zipes* (1989) 491 U.S.

3    754, fn.2 (fee shifting provisions under Magnuson-Moss and Song-Beverly "are to be interpreted

4    alike"); *Goglin, supra,* 5 Cal.App.5th at 468-69 (affirming award of $185,000 in fees and costs in

5    a Song-Beverly Act case that settled for $75,000); *Vo v. Las Virgenes Municipal Water District*

6    (2000) 79 Cal.App.4th 440, 446 (affirming $470,000 fee award after $40,000 judgment because

7    the defendant was excessively litigious and took a non-settlement posture); *Harman v. City and*

8    *County of San Francisco* (2007) 158 Cal.App.4th 407 (affirming award of approximately $1.1

9    million in fees where plaintiffs recovered $30,300).

10        It is not uncommon for attorney's fees and costs to exceed the client's damages. The

11   Legislature acknowledged that substantial work might be needed to prosecute such claims against

12   large corporations, which is the reason behind the fee shifting provision of the Song-Beverly Act.

13   (SM Dec., ¶ 86.)  "The purpose of statutory attorney fee provisions is to provide financial

14   incentives necessary for the private enforcement of important civil rights." (*Ketchum v. Moses*

15   (2001) 24 Cal.4th 1122, 1132.) Thus, the Song-Beverly Act gives consumers the opportunity to

16   seek legal redress even if their damages would not be high enough to warrant legal representation.

17   The award of attorney's fees *cannot* be limited by the damages recovered by Plaintiff.  The law is

18   clear on this point. (*Ketchum, supra*, 24 Cal.4th at 1138.)

19        **D.    Plaintiff Should Be Granted a Lodestar Multiplier**

20        As part of the Song-Beverly Act, a prevailing buyer may also receive a lodestar multiplier.

21   (*Robertson, supra,* 144 Cal.App.4th at 817.)   Once a lodestar amount is determined, which

22   involves a "careful compilation of the actual time spent and reasonable hourly compensation for

23   each attorney," (*Id.* at 819 (*citing Serrano v. Priest* (1977) 20 Cal.3d 25, 48-49 (*Serrano III*)), the

24   amount may then be augmented by taking various relevant factors into account, including (1) the

25   novelty and difficulty of the questions involved and the skill displayed in presenting them; (2) the

26   extent to which the nature of the litigation precluded other employment by the attorneys; and (3)

27                                                    12

the contingent nature of the fee award, based on the uncertainty of prevailing on the merits and of establishing eligibility for the award. (*Id.*; *see also Graham, supra,* 34 Cal.4th at 579; *PLCM Group v. Drexler*, 22 Cal.4th at 1096.) "[T]he purpose of a fee enhancement is primarily to compensate the attorney for the prevailing party at a rate reflecting the risk of nonpayment in contingency cases." (*Ketchum, supra,* 24 Cal.4th at 1138; *Cazares v. Saenz* (1989) 208 Cal.App.3d 279, 287-88 (risk factor alone justifies a 2.0 multiplier for a 50% chance of prevailing).) "A 50 percent chance of recovery implies a multiplier of 2, a 25 percent chance of recovery implies a multiplier of 4, and so on." (*In re Chiron Corp. Securities Litigation* (N.D. Cal. Nov. 30, 2007) No. C-04-4293 VRW, 2007 WL 4249902, *9.)

In *Robertson*, the court ruled that the "statutory language in section 1794(d) is reasonably compatible with a lodestar adjustment method of calculating attorney fees, including use of fee multipliers." (144 Cal.App.4th at 819.) The trial court awarded a total of $231,187.45 in fees consisting of: $145,080.50 in fees incurred through trial, plus a "multiplier" of 1.5 for a total of $217,620.75, and $13,566.70 for fees in preparing the fees motion. (*Id.* at 817.) The appellate court held the trial court properly conducted a lodestar analysis and the award was not an abuse of discretion. (*Id.* at 822.) In *Graciano*, the appellate court actually *increased* the trial court's award of fees after finding that the lodestar rate of $350/hour was reasonable (in 2006) and adding a 2.0 multiplier for a total award of over $380,000. (144 Cal.App.4th at 156.) The court also reaffirmed attorney's fees are not limited to a proportion of the recovery. (*Id.* at 164.)

Ford may argue a multiplier is not permitted, and cite to the *Ketchum* case to support that argument. To the contrary, *Ketchum* actually <u>confirms</u> the granting of a multiplier in contingency fee cases. (*Ketchum, supra,* 24 Cal.4th at 1132.) A lodestar multiplier is in fact available and it has been awarded to Plaintiff's counsel in several cases. (SM Dec., ¶¶ 55, 59, 68, 69, 71, 72, 76, 82, 83, 84, Exs. Q, U, DD, EE, GG, HH, LL, RR, SS, TT.)

### 1. <u>The Lodestar Multiplier Should Be Granted in Contingent Cases Due to Risk and Delay of Payment</u>

13

1    The lodestar is intended to reflect the basic fee for comparable non-contingent legal

2    services and should be enhanced by an appropriate multiplier to reflect the risk and delay in

3    payment associated with taking a contingent case, as well as the result achieved.  The lodestar

4    "multiplier" is meant to increase or decrease the fee award based on factors not already taken into

5    account when setting the hourly rate, such as the <u>risk</u> of taking a case on a contingency basis,

6    and <u>delay</u> in receiving payment.  (*See Horsford, supra,* 132 Cal. App. 4th at 394-95.)

7    In *Ketchum*, the California Supreme Court wrote, "[a] contingent fee contract, since it

8    involves a gamble on the result, may properly provide for a *larger compensation* than would

9    otherwise be reasonable."  (24 Cal.4th at 1132 [emphasis added].)

10   
> <u>A contingent fee must be higher than a fee for the same legal services paid as</u>
11   > <u>they are performed.</u>  The contingent fee compensates the lawyer not only for the legal services he renders but for the loan of those services.  The implicit interest
12   > rate on such a loan is higher because the risk of default (the loss of the case, which cancels the debt of the client to the lawyer) is much higher than that of
13   > conventional loans. (Posner, Economic Analysis of Law (4th ed.1992) pp. 534, 567, emphasis added.)  <u>A lawyer who both bears the risk of not being paid and</u>
14   > <u>provides legal services is not receiving the fair market value of his work if he is</u> <u>paid only for the second of these functions.</u>  If he is paid no more, competent
15   > counsel will be reluctant to accept fee award cases.

16   (*Id.* at 1132 [citations omitted; emphasis added].)

17   Throughout the litigation, there always existed the real possibility Plaintiff would not

18   prevail.  The risk was compounded by the fact that Plaintiff's attorneys advanced all costs and

19   expenses without reimbursement. Thus, if Plaintiff did not prevail, his attorneys would have

20   suffered a loss of numerous hours in uncompensated work and thousands of dollars in out-of-

21   pocket expenses. Plaintiff requests a 0.2 enhancement based on that risk.

22   Further, Ford dragged this case out for nearly ten months before making an acceptable

23   offer.  Unlike Ford's attorneys, who are paid monthly regardless of outcome, Plaintiff's attorneys

24   are not paid at all if they lose, and need to absorb significant delay in being paid if Plaintiff does

25   win.  On account of the substantial delay in payment, Plaintiff requests a 0.3 enhancement.

26   Based on the risk of taking this case on a contingent fee basis and the delay in payment

27

14

1 | since September 2016, Plaintiff requests a nominal multiplier of 1.5.

2 |      **E.**    <u>**Plaintiff is Entitled to Recover All Costs and Expenses Reasonably Incurred**</u>

3 |          <u>**in Connection with this Action**</u>

4 |      Under the Song-Beverly Act, a prevailing buyer shall be allowed to recover as part of the

5 | judgment a sum equal to the aggregate amount of costs <u>and expenses</u>.  (Civ. Code § 1794(d)

6 | [emphasis added].)  The California Legislature intended the word "expenses" to cover outlays not

7 | included in the detailed statutory definition of "costs," and the Song-Beverly Act's legislative

8 | history demonstrates the Legislature exercised its power to permit recovery of a host of litigation

9 | expenditures beyond those permitted by Code of Civil Procedure § 1033.5.  (*Jensen v. BMW of*

10 | *North America, Inc.* (1995) 35 Cal.App.4th 112, 137-138.)

11 |      A verified memorandum of costs generally satisfies the moving party's burden of

12 | establishing costs were necessarily incurred.  (*Hadley v. Krepel* (1985) 167 Cal.App.3d 677, 682.)

13 | The verified memorandum of costs demonstrates what Plaintiff's attorneys incurred in costs and

14 | expenses prosecuting this matter, which counsel advanced on Plaintiff's behalf.  (SM Dec. ¶ 2, Ex.

15 | B.); Civ. Code § 1794(d).  The burden shifts to Ford to properly rebut the claimed costs.

16 |                **IV.**    **CONCLUSION**

17 |      For the reasons above, Plaintiff respectfully requests this Honorable Court award attorney's

18 | fees, costs and expenses as follows:

| | |
|---|---|
| Lodestar Fees: | $61,035.00 |
| +Lodestar Enhancement: | $30,517.50 |
| Total Fees Requested: | $91,552.50 |
| +Costs and Expenses: | $ 4,068.26 |
| **=Total Fees and Costs/Expenses:** | **$95,620.76** |

23 | Dated:  January 19, 2018                     **KNIGHT LAW GROUP, LLP**

25 |                         Steve Mikhov (SBN 224676)

26 |                         Attorneys for Plaintiff,
                        **RAUL FLORES**

27 | 15

1

**PROOF OF SERVICE**
(Code of Civil Procedure §1013a)

2

3    I am employed in the County of Los Angeles, State of California.  I am over the age of 18 years and not a party to the within action.  My business address is 1801 Century Park East, Suite 2300, Los Angeles, CA 90067.

4

5    I served the foregoing document described as:

6    **PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR ATTORNEY'S FEES, COSTS AND EXPENSES**

7

8    Said document was served on the interested parties in this action, by placing true copies thereof enclosed in sealed envelopes, with postage prepaid, addressed as follows:

9

10    **SEE ATTACHED SERVICE LIST**

11    <u>XX</u>    BY MAIL:  I am readily familiar with this firm's practice of collection and processing correspondence for mailing with the United States Postal Service.  Under that practice, it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid at a Postal Service collection box at Los Angeles, California, in the ordinary course of business. The envelope was sealed and placed for collection that same day following ordinary business practices, addressed to the above-referenced attorney.

12

13

14

15    <u>XX</u>    BY E-MAIL OR ELECTRONIC TRANSMISSION: Based on a court order or an agreement of the parties to accept service by e-mail or electronic transmission, I caused the documents to be sent to the persons at the e-mail addresses listed above.  I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

16

17

18

19    I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

20

21    Executed on January 19, 2018 at Los Angeles, California.

22

23    _____
         Monica Gomez

24

25

26

27

28

-1-

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## SERVICE LIST

Matthew M. Proudfoot, Esq.
GATES, O'DOHERTY, GONTER & GUY LLP
38 Discovery, Suite 200
Irvine, CA 92618
**Counsel for Defendant,**
**FORD MOTOR COMPANY**
(via mail only)

Daniel S. Rodman, Esq.
SNELL & WILMER
600 Anton Blvd., Suite 1400
Costa Mesa, CA 92626
**Co-Counsel for Defendant,**
**FORD MOTOR COMPANY**
(via mail only)

Michael H. Rosenstein, Esq.
LAW OFFICES OF MICHAEL H. ROSENSTEIN
1801 Century Park East, Suite 2300
Los Angeles, CA 90067
Email: mrosenstein@rose-lawoffice.com
**Co-Counsel for Plaintiff,**
**RAUL FLORES**
(via email only)

-2-

