Rader, E v Ford 35596-01061
WEP, KTR, MBL,
BC, KS, LM, STS
OCMail ___ MBL

**KNIGHT LAW GROUP, LLP**
Steve Mikhov (SBN 224676)
1801 Century Park East, Suite 2300
Los Angeles, CA 90067
Email: stevem@knightlaw.com
Telephone: (310) 552-2250
Fax: (310) 552-7973

**DANIELS FINE ISRAEL SCHONBUCH & LEBOVITS LLP**
Moses Lebovits (SBN 66552)
1801 Century Park East, 9th Floor
Los Angeles, CA 90067
Email: lebovits@dfis-law.com
Telephone: (310) 556-7900
Fax: (310) 556-2807

Attorneys for Plaintiffs,
ERIC RADER and
GWYNETH RADER

Received
MAR 26 2018
Snell & Wilmer

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**COUNTY OF LOS ANGELES**

**ERIC RADER and GWYNETH RADER,**

Plaintiffs,

vs.

**FORD MOTOR COMPANY, a Delaware Corporation, and DOES 1 through 10, inclusive,**

Defendants.

Case No.: BC638953

**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR ATTORNEY'S FEES, COSTS AND EXPENSES**

[Filed Concurrently with Plaintiffs' Notice of Motion and Motion for Attorney's Fees, Costs and Expenses; Declarations of Steve Mikhov and Moses Lebovits]

*Assigned for All Purposes to the Honorable Gregory Alarcon*

Date: April 18, 2018
Time: 8:30 am
Dept.: 36
Reservation No. 180223292337

## TABLE OF CONTENTS

Page(s)

I. INTRODUCTION ........ 1

II. STATEMENT OF FACTS ........ 2

III. ARGUMENT AND ANALYSIS ........ 6

A. Plaintiffs' Attorneys Are Entitled to Fees, Costs and Expenses in this Action ........ 6

B. The Hourly Rates Sought by Plaintiffs' Attorneys Are Reasonable ........ 7

1. The Nature and Complexity of the Litigation Support the Attorney's Fees Requested ........ 9

2. The Firm's Skill Justifies the Amount of Attorney's Fees Sought ........ 10

C. The Settlement Amount Does Not Limit the Attorney's Fee Recovery ........ 12

D. Plaintiffs Should Be Granted a Lodestar Multiplier ........ 13

E. Plaintiffs are Entitled to Recover All Costs and Expenses Reasonably Incurred in Connection with this Action ........ 15

IV. CONCLUSION ........ 15

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Cazares v. Saenz* (1989) 208 Cal.App.3d 279 .......... 13

*City of Riverside v. Rivera* (1986) 477 U.S. 561 .......... 12

*Dietrich v. Dietrich* (1953) 41 Cal.2d 497 .......... 9

*En Palm, LLC v. Teitler* (2008) 162 Cal.App.4th 770 .......... 10

*Goglin v. BMW of North America, LLC* (2016) 4 Cal.App.5th 462 .......... 7

*Graciano v. Robinson Ford Sales* (2006) 144 Cal.App.4th 140 .......... 7

*Graham v. DaimlerChrysler Corp.* (2004) 34 Cal.4th 553 .......... 6

*Hadley v. Krepel* (1985) 167 Cal.App.3d 677 .......... 15

*Harman v. City and County of San Francisco* (2007) 158 Cal.App.4th 407 .......... 12

*Horsford v. Bd. of Trustees of Cal. State Univ.* (2005) 132 Cal. App. 4th 359 .......... 14

*In re Chiron Corp. Securities Litigation* (N.D. Cal. Nov. 30, 2007) No. C-04-4293 VRW, 2007 WL 4249902 .......... 13

*Independent Federation of Flight Attendants v. Zipes* (1989) 491 U.S. 754 .......... 12

*Jensen v. BMW of North America, Inc.* (1995) 35 Cal.App.4th 112 .......... 15

*Ketchum v. Moses* (2001) 24 Cal.4th 1122 .......... 13, 14

*La Mesa-Spring Valley School Dist. v. Otsuka* (1962) 57 Cal.2d 309 .......... 10

*Los Angeles Police Protective League v. City of Los Angeles* (1986) 188 Cal.App.3d 1 ... 8

*Mandel v. Lackner* (1979) 92 Cal.App.3d 747 ... 6

*Molski v. Arclero Wine Group* (2008) 164 Cal.App.4th 786 ... 10

*PLCM Group v. Drexler* (2000) 22 Cal.4th 1084 ... 8

*Reveles v. Toyota by the Bay* (1997) 57 Cal.App.4th 1139 ... 6

*Robertson v. Fleetwood Travel Trailers of California, Inc.* (2006) 144 Cal.App.4th 785 ... 7

*Serrano v. Priest* (1977) 20 Cal.3d 25 (*Serrano III)* ... 13

*Serrano v. Unruh* (1982) 32 Cal.3d 621 ... 6

*Vo v. Las Virgenes Municipal Water District* (2000) 79 Cal.App.4th 440 ... 12

Statutes and Codes

California Code of Civil Procedure Section 1032(a)(4) ... 6

California Code of Civil Procedure Section 1033.5 ... 15

California Code of Civil Procedure Section 1794(d) ... 2, 6, 13, 15

California Code Of Civil Procedure Section 998 ... 5, 6

Other Authorities

Pearl, *California Attorney Fee Awards* Sections 12.14A, 12.33 (2nd Ed. 2005) ....6

Sen. Report No. 93-151, 1st Sess., pp. 23 (1973) ....12

iv

PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR ATTORNEY'S FEES, COSTS AND EXPENSES

## I. INTRODUCTION

On December 11, 2017, over thirteen months after the complaint was filed in this action, the parties agreed to settle the case for $91,000.00, by way of Plaintiffs' acceptance of Ford Motor Company's ("Defendant" or "Ford") 998 Offer to Compromise. This settlement amount consisted of a full statutory "buy-back" of Plaintiffs' defective vehicle, incidental and consequential damages, and a civil penalty. The final settlement is **nearly four times** the total amount Plaintiffs paid for the vehicle in what the defense routinely calls a "simple lemon law" action. Plaintiffs obtained this extraordinary sum *without going to trial.* By any analysis, Plaintiffs achieved an excellent settlement given Ford's initial refusal to even consider a buyback of Plaintiffs' defective vehicle. The settlement is one that few, if any, firms in this state can achieve for its clients. The excellent result was achieved due to Plaintiffs' attorneys' skill and expertise in lemon law cases but, arguably, the biggest factor in Plaintiffs' success was Plaintiffs' attorneys' zealous representation.

On October 20, 2011, Plaintiffs purchased a new 2012 Ford Focus for $23,048.37. Throughout their ownership of the vehicle, Plaintiffs suffered through persistent transmission problems, requiring multiple repair visits. During a period of under four years, Plaintiffs took their vehicle in for repair a total of seven (7) times, but the serious transmission problems continued. Plaintiffs contacted Ford with the hope that Ford would repurchase their defective vehicle, but Ford refused. Rather, Ford applied its tried and true internal policy of ignoring its statutory obligations under the Song-Beverly Act. By doing so, Ford made a business decision that, by its actions, Plaintiffs (like many consumers) would walk away and Ford would save money. Plaintiffs could not afford to do that and so Plaintiffs hired the Knight Law Group, LLP ("Knight Law") on a contingency basis to assist in vindicating their rights. Knowing that Ford had willfully violated Plaintiffs' rights and had already rejected informal resolution, Knight Law proceeded to file this case.

It should be noted that Plaintiffs, like 100% of the clients of Knight Law, first tried to obtain resolution prior to hiring attorneys by contacting the manufacturer or by going through the Better Business Bureau (an established resolution process). Knight Law does not jump head

first into litigation. **Every single one of the firm's clients** were denied or the terms of an offer sought to steal monies that the consumers were lawfully owed. In pursuing lemon law cases, Knight Law and its associating attorneys are exposing the truth about some of these vehicle manufacturers and causing them to pay multiples of actual damages in the form of civil penalties (and punitive damages). The day Defendant starts honoring its obligations to consumers in this State is the day Knight Law goes out of business. This case, and others like it, could have been altogether avoided from the start. Much like products liability actions have paved the way for innovations in manufacturing, design and marketing standards, Plaintiffs' counsel hopes that one day these lemon law cases add up to actually have an effect on the way manufacturers treat their consumers. The firm is willing to stand up to these mammoth companies, and then are vilified for doing so.

The Song-Beverly Act, Civil Code sections 1790, *et seq.*, entitles Plaintiffs to seek reasonable attorney's fees, costs and expenses from Ford. Moreover, as the prevailing parties in this matter, Plaintiffs are entitled to this noticed motion for attorney's fees. Plaintiffs now move the Court: (1) for an award of attorney's fees pursuant to Civil Code section 1794(d) under the "lodestar" method in the amount of $55,232.50, (2) for a reasonable, modest, "lodestar" modifier of 1.5 under California law, in the amount of $27,616.25, and (3) to award actual costs and expenses incurred in the amount of $4,229.46. (Civ. Code § 1794(d).) Plaintiffs request a total of $87,078.21 in attorney's fees, costs and expenses. (Declaration of Steve Mikhov ("SM Dec.") ¶ 2, Exs. A-B; Declaration of Moses Lebovits ("ML") ¶ 7, Ex. B.)

## II. STATEMENT OF FACTS

Plaintiffs purchased a new 2012 Ford Focus on October 20, 2011 for a purchase price of $20,913.85—adding taxes and fees, the total purchase price was $23,048.37. (SM Dec., ¶ 3, Ex. C.) The vehicle was distributed by Ford Motor Company, which provided an express written warranty. (*Id.*) After approximately eight months and just 3,000 miles of ownership, and within the applicable warranty periods, the vehicle began exhibiting serious problems with the transmission, including a rattling/rumbling noise coming from the front of the vehicle. (SM Dec., ¶ 4.) The vehicle was also subject to two recalls at that time. (*Id.*) Plaintiffs delivered the vehicle

to a Ford-authorized repair facility where they attempted to correct the issues by reprogramming the powertrain control module ("PCM") and transmission control module ("TCM"). (*Id.*) Despite being assured that the vehicle had been repaired and was safe to drive, the transmission continued to shudder on acceleration and almost stall. (*Id.*) Approximately eighteen months later, Plaintiffs again delivered the vehicle to a Ford-authorized repair facility where the repair facility technicians found a bad leak at the clutch housing. (*Id.*) In an effort to correct the issues, the technicians reprogrammed the PCM and TCM, replaced the clutch assembly and output seals, and performed an adaptive relearn. (*Id.*) Despite these efforts, the transmission problems continued, later compounded by problems with the HVAC system and parking brake. (*Id.*) Plaintiffs repeatedly took the vehicle in for repairs, a total of seven (7) times in a period of less than four years, but the serious transmission problems persisted. (*Id.*)

Despite the ongoing repairs and continued manifestation of problems, Ford refused to acknowledge the defective nature of Plaintiffs' vehicle. (SM Dec., ¶ 5.) At all times, however, Ford had direct, contemporaneous knowledge of the vehicle's serious defects, which it records in a database called "OASIS" and a warranty repair history database called "AWS." (*Id.*) These repair records indicate each time the vehicle was presented for repair during the warranty period, as well as every time the Ford repair facility found a problem/defect attributable to Ford and billed Ford for the work. (*Id.*)

Frustrated, concerned for their safety and having lost confidence in Ford's ability to repair the vehicle, Plaintiffs contacted Ford customer service directly on June 3, 2016, and requested Ford repurchase the vehicle. (SM Dec., ¶ 6.) Despite Ford's affirmative duty under the law to perform an investigation and offer relief, Ford rejected Plaintiffs' request. (*Id.*)

Plaintiffs contacted Knight Law and told the firm about the problems with the vehicle and the way Ford treated them. (SM Dec., ¶ 7.) After reviewing the repair history and discussions with Plaintiffs, Knight Law agreed to represent them and bear the risk of litigating the case on a fully contingent basis. (*Id.*) Because Knight Law's compensation was purely contingent, the firm faced a genuine risk of not being paid for its services for years, if at all, while advancing thousands of dollars in costs and expenses on Plaintiffs' behalf. (*Id.*) In taking on this duty, the

firm was facing a litigation behemoth—Ford is a multi-billion-dollar company, with a virtually infinite litigation war-chest, that wages a battle of attrition that most firms cannot withstand. (*Id.*)

As a result of Ford's failure to fix the material defects associated with Plaintiffs' vehicle, or otherwise comply with the Song-Beverly Act, Plaintiffs filed a Complaint in this action on October 28, 2016, alleging, in part, willful violations of the Song-Beverly Act and Fraud for failing to disclose a known transmission defect, and seeking civil penalties and punitive damages. (SM Dec., ¶ 8.) Ford filed a Demurrer to Plaintiffs' Complaint on or about December 5, 2016, followed by an Amended Demurrer on or about January 26, 2017. (*Id.*) Plaintiffs' filed their Oppositions to both the Demurrer and Amended Demurrer, and the parties attended a hearing on the matter on March 3, 2017, during which the Court overruled Ford's Amended Demurrer. (*Id.*)

Defendant's position in the litigation required extensive efforts on the part of Plaintiffs' counsel, and they promptly began working up their case on behalf of Plaintiffs. (SM Dec., ¶ 9.) Written discovery was drafted and served on Defendant on or about February 28, 2017, consisting of 44 requests for admissions, 92 requests for production of documents, 87 special interrogatories and 27 form interrogatories. (*Id.*) Plaintiffs benefitted from Knight Law's expertise and experience in litigating against Ford as <u>just 3.9 hours were billed for drafting the entirety of this discovery</u>. (*Id.*) Plaintiffs' counsel are able to use existing files as templates to conserve time and litigate efficiently. (*Id.*) Written discovery of this magnitude, drafted from scratch and without the benefit of Plaintiffs' attorneys' vast knowledge, experience and specialized expertise, would have taken multitudes of the time expediently managed here. (*Id.*)

Due to Defendant's improper objections and/or incomplete and evasive responses to Plaintiffs' discovery, Plaintiffs began "meet and confer" efforts in May 2017, and the meet and confer process continued into July 2017, while Plaintiffs worked diligently to obtain adequate responses from Ford. (SM Dec., ¶ 10.)

Ford then began its vigorous defense in this case, propounding two sets of requests for admissions, requests for production of documents, special and form interrogatories upon Plaintiffs. (SM Dec., ¶ 11.) Plaintiffs again benefitted from Knight Law's expertise and experience as <u>just 6.2 hours were billed for drafting responses to the entirety of this discovery</u>.

(*Id.*) Ford also noticed the depositions of Plaintiffs and made a demand for the inspection of Plaintiffs' defective vehicle. (*Id.*) On May 25, 2017, Ford served Plaintiffs with an Offer to Compromise pursuant to the Code of Civil Procedure section 998 ("998 Offer"), in the amount of $85,000.00. (SM Dec., ¶ 12.) Plaintiffs rejected the inadequate offer, but invited Ford to participate in private mediation. (*Id.*)

Ford filed its Answer to Plaintiffs' Complaint, denying all liability and asserting numerous affirmative defenses, on or about July 10, 2017. (SM Dec., ¶ 13.) Plaintiffs' counsel then continued working up the case on behalf of Plaintiffs. (SM Dec., ¶ 14.) In August 2017, Plaintiffs noticed the depositions of several Ford employees and dealership personnel, including Ford's PMK and PMQ, service advisors and service technicians. (*Id.*) These depositions were needed to obtain information regarding repairs to the vehicle, authenticate the repair orders, and rebut Ford's anticipated argument that the problems with Plaintiffs' vehicle were somehow caused by Plaintiffs' neglect or abuse. (*Id.*) True to form, Ford served objections to several of the noticed depositions. (*Id.*) On August 21, 2017, Ford served Plaintiffs with a Second Offer to Compromise pursuant to the Code of Civil Procedure section 998 ("Second 998 Offer"), again in the amount of $85,000.00. (SM Dec., ¶ 15.) Plaintiffs rejected the inadequate offer. (*Id.*)

With the absence of any reasonable settlement offer from Ford accounting for its willful violation of the Song-Beverly Act, the case appeared likely to go to trial. (SM Dec., ¶ 16.) Accordingly, on or about September 29, 2017, Moses Lebovits of Daniels Fine formally associated into the case as lead trial counsel to prepare the case for trial. (*Id.*, ML Dec., ¶ 9.) With the November 2017 trial date approaching, Plaintiffs' counsel kicked their trial preparation into high gear. (SM Dec., ¶ 17.) In October 2017, Plaintiffs' counsel drafted trial-related documents including ten (10) Motions *in limine*, joint witness and exhibit lists, proposed jury instructions and special verdict forms, and a joint statement of the case. (*Id.*, ML Dec., ¶ 11.) On October 6, 2017, Plaintiffs' counsel defended Ford's depositions of Plaintiffs. (SM Dec., ¶ 17.) In November 2017, Plaintiffs' counsel prepared for and attended the Final Status Conference. (SM Dec., ¶ 18, ML Dec., ¶ 10.) Plaintiffs' counsel then continued trial preparations by reviewing depositions and discovery responses, and drafting direct and re-direct examination

questions for Plaintiffs. (SM Dec., ¶ 18, ML Dec., ¶ 11.) Plaintiffs' counsel also reviewed voir dire questions and prepared notes for opening statement. (*Id.*) On November 15, 2017, Plaintiffs' counsel appeared for the first day of trial, at which time the trial date was continued. (*Id.*)

On or about November 15, 2017, over an entire year after the Complaint was filed in this action, Ford served Plaintiffs with a Third Offer to Compromise pursuant to the Code of Civil Procedure section 998 ("Third 998 Offer") in the amount of $91,000.00, which Plaintiffs accepted. (SM Dec., ¶ 19, Ex. D.) This settlement amount was inclusive of a full statutory "buy-back" of Plaintiffs' defective vehicle, incidental and consequential damages, and a two-time civil penalty. (*Id.*)

Plaintiffs, as the prevailing parties in this action, have made every reasonable effort to resolve the payment of Plaintiffs' attorney's fees by Ford but were forced to file this Motion with the Court. (SM Dec., ¶¶ 20-30.)

## III. ARGUMENT AND ANALYSIS

### A. Plaintiffs' Attorneys Are Entitled to Fees, Costs and Expenses in this Action

By agreement, Plaintiffs are the prevailing parties in this action and, under the Song-Beverly Act, entitled to recoup all reasonable attorney's fees, costs and expenses. (Code Civ. Proc. § 1032(a)(4); Civ. Code § 1794(d); *Graham v. DaimlerChrysler Corp.* (2004) 34 Cal.4th 553, 557; *Reveles v. Toyota by the Bay* (1997) 57 Cal.App.4th 1139.) Absent a contrary showing, both the number of hours that the prevailing party's attorney spent litigating the case and his or her regular hourly rate are presumed to be reasonable. (*Serrano v. Unruh* (1982) 32 Cal.3d 621, 639 (counsel is entitled to all hours actually spent, absent a showing of "special circumstances" that would render such an award unjust); *Mandel v. Lackner* (1979) 92 Cal.App.3d 747, 761 (an attorney's regular hourly rate is entitled to a presumption of reasonableness); Pearl, California Attorney Fee Awards, at §§ 12.14A, 12.33 (2nd Ed. 2005.)

In prosecuting this case, the efforts of Knight Law amount to $28,522.50, including drafting this motion and time anticipated to be spent preparing the reply and attending the hearing. (SM Dec., ¶ 2, Ex. A.) The billings by Daniels Fine total $26,710.00 (ML Dec., ¶ 7, Ex. B.) Plaintiffs' counsel also requests a modest 1.5 enhancement, in the amount of $55,232.50,

to account for the delay in payment and contingent risk posed by this case. Lastly, the reimbursable costs and expenses set forth in Plaintiffs' memorandum of costs are $4,229.46. (SM Dec., ¶ 2, Ex. B.) In total, Plaintiffs request $87,078.21 in fees, costs and expenses. (SM Dec., ¶ 2, Exs. A-B; ML Dec., ¶ 7, Ex. B.)

While Ford will surely claim these amounts are unreasonable, Ford's own counsel admits in a declaration filed in federal court that "it is not uncommon, and in fact quite regular, for attorney's fee and cost awards (*or resolutions through informal discussions* with opposing counsel) to exceed $100,000.00." (SM Dec., ¶ 37, Ex. F, p. 3, ¶ 4.) Few, if any, manufacturers cause this much work to be performed in allegedly "simple lemon law actions."

**B. <u>The Hourly Rates Sought by Plaintiffs' Attorneys Are Reasonable</u>**

The Court of Appeal has expressly held the lodestar method applies to determining attorney's fees under the Song-Beverly Act. (*Robertson v. Fleetwood Travel Trailers of California, Inc.* (2006) 144 Cal.App.4th 785, 817.) The calculation of reasonable attorney's fees under the Song-Beverly Act is based on the lodestar method, which entails multiplying the number of hours reasonably expended by a reasonable hourly rate. (*Graciano v. Robinson Ford Sales* (2006) 144 Cal.App.4th 140, 154; *Robertson, supra,* 144 Cal.App.4th at 817.) The prevailing buyer has the burden of showing that the fees incurred were "allowable," "reasonably necessary to the conduct of the litigation," and "reasonable in amount." (*Goglin v. BMW of North America, LLC* (2016) 4 Cal.App.5th 462, 470.) In making such an evaluation, a court may consider "factors such as the complexity of the case and procedural demands, the skill exhibited and the results achieved." (*Id.*)

In *Goglin v. BMW*, the appellate court recently affirmed the trial court's award of over $185,000 in attorneys' fees and costs for a plaintiff who settled her claims against BMW under the Song-Beverly Act. (*Id.* at 464.) The court also found plaintiff's counsel's hourly rate of $575 per hour was reasonable as supported by exhibits to counsel's declaration indicating various state and federal courts had previously awarded him comparable hourly rates. (*Id.* at 473-74.) The holding states that the trial court was not obliged to consider that defendants paid their counsel a much lower hourly rate. (*Id.* at 474.) In *Robertson*, the trial court awarded $231,187.45 in fees

based on $145,080.50 in fees through trial, plus a "multiplier" of 1.5 for a total of $217,620.75, and $13,566.70 for the attorney's fee motion. (*Robertson, supra,* 144 Cal.App.4th at 817.) The appellate court upheld the ruling. (*Id.* at 822.)

In *Graciano*, the trial court initially rejected plaintiff's lodestar fees of $109,468.50 and request for a multiplier of 2.0. In particular, the trial court reduced the plaintiff's attorney's hourly rate from the requested $350/hour to $250/hour, which was the court's mandated maximum rate for expert testimony. The appellate court reversed, reasoning a court should determine the prevailing rate in the community for comparable professional legal services. (*Graciano, supra,* 144 Cal.App.4th at 156 (*citing PLCM Group v. Drexler* (2000) 22 Cal.4th 1084, 1095).) The court found the plaintiff's unrebutted declarations established the proper hourly rate at $350 (for work in 2004), and reducing that rate to $250 was an abuse of discretion. (*Id.*) The court also reaffirmed attorney's fees <u>are not limited to a proportion</u> of the recovery. (*Id.* at 164.) On remand, the trial court found that the lodestar rate of $350/hour was reasonable *and added* a multiplier of 2.0 for a total fee award of over $380,000.00. The attorney from *Graciano*, Hallen D. Rosner, now charges $695/hour. (SM Dec., ¶ 51 (a).)

Furthermore, the California Supreme Court has expressly ruled that prevailing parties who are entitled to recover their attorney's fees are *also entitled* to recover their fees for the time spent preparing fee applications such as this one. (*Serrano v. Unruh*, *supra,* 32 Cal.3d at 631; *Los Angeles Police Protective League v. City of Los Angeles* (1986) 188 Cal.App.3d 1, 17; *Robertson, supra,* 144 Cal.App.4th at 817 (awarding $13,566.70 in fees for a fee motion).)

Consideration of the "lodestar" factors compels an award of attorney's fees based on (i) the hourly rates set forth of in the declarations filed concurrently herewith (SM Dec., ¶¶ 41-48; ML Dec., ¶¶ 3-6), (ii) a survey of rates charged by other well-known consumer law attorneys (SM Dec., ¶ 51), (iii) over three dozen court orders confirming the reasonableness of Plaintiffs' counsels' hourly rates and time billed in other Song-Beverly Act cases (SM Dec., ¶¶ 52-96, Exs. G-YY), and (iv) a National Survey further supporting the reasonableness of the hourly rates. (ML Dec., ¶ 8, Ex. C, at pp. 42-45.) Plaintiffs' counsels' rates are within the range of rates charged by other attorneys with similar experience in this area of law.

**1. The Nature and Complexity of the Litigation Support the Attorney's Fees Requested**

Determining the amount of reasonable attorney's fees may involve consideration of the nature and complexity of the case. (*Dietrich v. Dietrich* (1953) 41 Cal.2d 497, 506; *Graciano, supra,* 144 Cal.App.4th at 147.) Ford routinely claims that cases like this one are "simple lemon law cases" and, therefore, Plaintiffs' fee requests are always unjustified as excessive. This case required a range of specialized knowledge including: (1) an understanding of the full scope of consumer protection laws, which are highly nuanced; (2) knowledge of the intricacies of automobiles and the lexicon associated with them, as well as knowledge concerning how to investigate issues with automobiles; and (3) knowledge of auto manufacturers' and dealers' policies and protocols for repairing vehicles and complying with their legal obligations. (SM Dec., ¶ 99.) Plaintiffs' attorneys have acquired knowledge and insight about Ford over the course of many years of litigation, and this experience typically results in significantly higher judgments or settlements for their clients. Plaintiffs' attorneys have dared to make these matters more complex, testing the boundaries of car manufacturer's cheating ways. The firm's attorneys have traveled all over the country to depose individuals from the auto industry, including New Jersey, Texas, Michigan, Florida and Utah, as well as countless counties throughout California. The firm has successfully fought to compel the production of millions of internal communications and confidential documents from Ford. No other firm is litigating "simple lemon law" cases like Knight Law and its associating attorneys.

Moreover, Ford made this matter even more complex by maintaining it had no liability and declining to submit any reasonable offers to settle the matter for over an entire year of litigation. Ford should have acknowledged the defects in Plaintiffs' vehicle and resolved the matter before this case was ever filed. Yet, this case was never just about whether or not a car was a lemon; this case and others like it are a test of Ford's very corporate structure and the relationship between a corporation and the customers it so depends on for its profits. Plaintiffs' attorneys have the resolve to investigate those policies and procedures and have discovered tens of thousands of internal documents that elucidate Ford's disregard to consumers. Plaintiffs'

attorneys delve deeper into these matters and bring a level of lawyering to this area of law that most other firms either may not care to or do not have the wherewithal to provide. Undoubtedly, a quick and secure buck could be made with an early settlement but that leaves the violating companies like Ford left to just apply the status quo.

Ford engaged in expensive litigation in this case, including denying all liability, stone-walling Plaintiffs' discovery efforts, and forcing Plaintiffs' counsel to expend numerous hours preparing for trial. Ford could have resolved this matter much earlier and saved tens of thousands in attorney's fees, costs and expenses by doing so. Ford ultimately capitulated, but not before causing substantial fees to be incurred. When Ford causes the entirety of fees to be incurred, it has no legitimate basis for complaining about the amount of attorney's fees reasonably and actually incurred, especially when Ford had the ability to resolve the matter before a lawsuit was even filed. "A party cannot litigate tenaciously and then be heard to complain about the time necessarily spent by the opposition in response." (*En Palm, LLC v. Teitler* (2008) 162 Cal.App.4th 770, 786; *see also Molski v. Arclero Wine Group* (2008) 164 Cal.App.4th 786.)

**2. The Firm's Skill Justifies the Amount of Attorney's Fees Sought**

A trial court may also take into account the skill of the attorneys when determining reasonable attorney's fees. (*La Mesa-Spring Valley School Dist. v. Otsuka* (1962) 57 Cal.2d 309, 316.) Despite the case's difficulties, Plaintiffs ultimately recovered $91,000.00 in damages, which is nearly four times the vehicle's purchase price (over six years ago). The vehicle was no more or less defective on the date of settlement than it was when Plaintiffs first asked for their money back before hiring legal counsel, so there is no rational explanation why Ford waged a lengthy and costly legal battle only to settle for a sum equal to Plaintiffs' best possible outcome via trial on the merits.

Plaintiffs' attorneys specialize in consumer law and did not balk at Ford's aggressive litigation tactics. Plaintiffs' attorneys' experience has enabled them to develop litigation strategies that are highly effective and cost and time efficient. Plaintiffs' attorneys' specialized knowledge and experience in lemon law frequently results in outcomes far better than those obtained by attorneys who do not specialize in this specific area of law. This experience provided

a resolution to this matter far beyond that which Ford was previously willing to entertain. Because of this experience, knowledge and expertise, ***Plaintiffs went from a ZERO offer to a $91,000.00 settlement***. Getting civil penalties, and often punitive damages, like this is not easy and most firms do not know how to seek exemplary damages or do not care to seek them. Plaintiffs' attorneys believe they distinguish themselves from others based on many years of focused pursuit of the truth.

Counsels' skill is evidenced by the size of the settlement as well as the nominal time expended on litigation tasks, which results in lower overall billing. Plaintiffs' attorneys do not spend inordinate time researching because they specialize in this area of law. (SM Dec., ¶ 100.) Nor do they spend unreasonable time preparing pleadings because they are able to use documents from other cases that need only be edited, rather than written from scratch. (*Id.*) While substantial fees have been incurred, those fees led to the execution of effective strategies that result in superlative results for Knight Law clients, like Plaintiffs here.

On the other side, Ford is represented by large national firms—now totaling **eleven** separate law firms—with attorneys who specialize in representing automobile manufacturers in lemon law cases. (SM Dec, ¶ 35.) Ford is a corporate behemoth with the resources to easily overwhelm a consumer or an inexperienced attorney. It is Defendant and its bevy of attorneys that drive this litigation and then settle for an amount they knew the entire time would be satisfactory, but instead waited until the eve of trial while amassing their billable hours. Based on a random sample of cases, 74% of the cases against Ford were settled six months before trial instead of much earlier. (SM Dec., ¶ 33.) Of those cases, 50% were settled just one month before trial. (*Id.*) Plaintiffs required skilled and experienced attorneys to prosecute their claims against Ford and its formidable resources. Plaintiffs' attorneys were well-suited for the task. Now, Ford appears to have dug its heals even deeper by outright proclaiming in a letter that Ford is no longer willing to discuss settlement, does not want to engage in any further mediations and fully intends to bring every case to trial unless the firm's clients accept Ford's existing offers. (SM Dec., ¶ 36, Ex. E.) To date, 25% of all of 55 cases that Knight Law and its trial attorneys have taken to trial since 2012 have involved Ford as the named defendant. (SM Dec., ¶ 31.)

As such, Plaintiffs' counsel request to be compensated not only for the quantity of the work but for the quality of the work. To do so, the firm calls upon a brave judiciary to award counsel the compensation for their hard work. Eventually, this litigation will reduce lawsuits and the need for attorneys in this area of law, but change can and will only happen over time.

**C. <u>The Settlement Amount Does Not Limit the Attorney's Fee Recovery</u>**

Ford may argue that damages in the amount of $91,000.00 do not justify an attorney's fee award in the amount requested by Plaintiffs, but such an argument is starkly against the weight of California law. The amount of attorney's fees *must not be tied to any percentage of recovery.* (*Graciano, supra,* 144 Cal.App.4th at 164.) In fact, a trial court may abuse its discretion if it applies a rule of proportionality to a fee award. The U.S. Supreme Court has previously considered the question of proportionality in attorney fee awards and held: "[w]e reject the proposition that fee awards under [42 U.S.C.] section 1988 should necessarily be proportionate to the amount of damages a civil rights plaintiff actually recovers." (*City of Riverside v. Rivera* (1986) 477 U.S. 561, 574; *see also* Sen. Report No. 93-151, 1st Sess., pp. 23-24 (1973) (attorney's fees under the Magnuson Moss Warranty Act are based on actual time, not a percentage of the recovery); *Robertson, supra,* 144 Cal.App.4th at 820; *Independent Federation of Flight Attendants v. Zipes* (1989) 491 U.S. 754, fn.2 (fee shifting provisions under Magnuson-Moss and Song-Beverly "are to be interpreted alike"); *Goglin, supra,* 5 Cal.App.5th at 468-69 (affirming award of $185,000 in fees and costs in a Song-Beverly Act case that settled for $75,000); *Vo v. Las Virgenes Municipal Water District* (2000) 79 Cal.App.4th 440, 446 (affirming $470,000 fee award after $40,000 judgment because the defendant was excessively litigious and took a non-settlement posture); *Harman v. City and County of San Francisco* (2007) 158 Cal.App.4th 407 (affirming award of approximately $1.1 million in fees where plaintiffs recovered $30,300).)

Attorney's fees and costs commonly exceed the client's damages. The Legislature acknowledged that substantial work might be needed to prosecute such claims against large corporations, which is the reason behind the fee shifting provision of the Song-Beverly Act. (SM Dec., ¶ 98.) Otherwise, consumers would be left without opportunity for redress when their

damages were not enough for an attorney to take the case on a contingent fee or hourly rate basis. "The purpose of statutory attorney fee provisions is to provide financial incentives necessary for the private enforcement of important civil rights." (*Ketchum v. Moses* (2001) 24 Cal.4th 1122, 1132.) Thus, the Song-Beverly Act gives consumers the opportunity to seek legal redress even if their damages would not be high enough to warrant legal representation. The award of attorney's fees *cannot* be limited by damages recovered. (*Ketchum*, *supra*, 24 Cal.4th at 1138.)

**D. Plaintiffs Should Be Granted a Lodestar Multiplier**

As part of the Song-Beverly Act, a prevailing buyer may also receive a lodestar multiplier. (*Robertson, supra,* 144 Cal.App.4th at 817.) Once a lodestar amount is determined, which involves a "careful compilation of the actual time spent and reasonable hourly compensation for each attorney," (*Id.* at 819 (*citing Serrano v. Priest* (1977) 20 Cal.3d 25, 48-49 (*Serrano III*)), the amount may then be augmented by taking various relevant factors into account, including (1) the novelty and difficulty of the questions involved and the skill displayed in presenting them; (2) the extent to which the nature of the litigation precluded other employment by the attorneys; and (3) the contingent nature of the fee award, based on the uncertainty of prevailing on the merits and of establishing eligibility for the award. (*Id.*; *see also Graham, supra,* 34 Cal.4th at 579; *PLCM Group v. Drexler*, 22 Cal.4th at 1096.) "[T]he purpose of a fee enhancement is primarily to compensate the attorney for the prevailing party at a rate reflecting the risk of nonpayment in contingency cases." (*Ketchum, supra,* 24 Cal.4th at 1138; *Cazares v. Saenz* (1989) 208 Cal.App.3d 279, 287-88 (risk factor alone justifies a 2.0 multiplier for a 50% chance of prevailing).) "A 50 percent chance of recovery implies a multiplier of 2, a 25 percent chance of recovery implies a multiplier of 4, and so on." (*In re Chiron Corp. Securities Litigation* (N.D. Cal. Nov. 30, 2007) No. C-04-4293 VRW, 2007 WL 4249902, *9.) Plaintiffs ask for far less.

In *Robertson*, a case brought under the Song-Beverly Act, the court ruled that the "statutory language in section 1794(d) is reasonably compatible with a lodestar adjustment method of calculating attorney fees, including use of fee multipliers," and the court granted a 1.5 multiplier. (144 Cal.App.4th at 817, 819.) In *Graciano*, the appellate court actually *increased* the trial court's award of fees after finding that the lodestar rate of $350/hour was reasonable and

adding a 2.0 multiplier for a total award of over $380,000.00. (144 Cal.App.4th at 156.)

The lodestar is intended to reflect the basic fee for comparable non-contingent legal services and should be enhanced by an appropriate multiplier to reflect the risk and delay in payment associated with taking a contingent case, as well as the result achieved. The lodestar "multiplier" is meant to increase or decrease the fee award based on factors not already taken into account when setting the hourly rate, such as the risk of taking a case on a contingency basis, and delay in receiving payment. (*See Horsford v. Bd. of Trustees of Cal. State Univ.* (2005) 132 Cal. App. 4th 359, 394-95.)

In *Ketchum*, the California Supreme Court wrote, "[a] contingent fee contract, since it involves a gamble on the result, may properly provide for a *larger compensation* than would otherwise be reasonable." (24 Cal.4th at 1132 [emphasis added].)

> A contingent fee must be higher than a fee for the same legal services paid as they are performed. The contingent fee compensates the lawyer not only for the legal services he renders but for the loan of those services. The implicit interest rate on such a loan is higher because the risk of default (the loss of the case, which cancels the debt of the client to the lawyer) is much higher than that of conventional loans. (Posner, Economic Analysis of Law (4th ed.1992) pp. 534, 567, emphasis added.) A lawyer who both bears the risk of not being paid and provides legal services is not receiving the fair market value of his work if he is paid only for the second of these functions. If he is paid no more, competent counsel will be reluctant to accept fee award cases.

(*Id.* at 1132 [citations omitted; emphasis added].)

Throughout the litigation, there always existed the possibility Plaintiffs would not prevail. The risk was compounded by the fact that Plaintiffs' attorneys advanced all litigation costs and expenses without reimbursement. Thus, if Plaintiffs did not prevail, their attorneys would have suffered a substantial loss of uncompensated attorney hours and thousands of dollars in out-of-pocket expenses. Plaintiffs request a 0.2 enhancement based on that risk. Further, Ford dragged this case out for over an entire year before finally making a reasonable settlement offer. Unlike Ford's attorneys, who are paid monthly regardless of outcome, Plaintiffs' attorneys are not paid at all if they lose, and need to absorb significant delay in being paid if Plaintiffs do win. On account of the substantial delay in payment, Plaintiffs request a 0.3 enhancement.

Based on the risk of taking this case on a contingent fee basis and the delay in payment

since October 2016, Plaintiffs request a nominal multiplier of 1.5. Courts have awarded a lodestar multiplier to Plaintiffs' counsel in numerous cases. (SM Dec., ¶¶ 67, 71, 80, 81, 83, 84, 88, 94, 95, 96, Exs. V, Z, II, JJ, LL, MM, QQ, WW, XX, YY.)

### E. Plaintiffs are Entitled to Recover All Costs and Expenses Reasonably Incurred in Connection with this Action

Under the Song-Beverly Act, a prevailing buyer shall be allowed to recover as part of the judgment a sum equal to the aggregate amount of costs and expenses. (Civ. Code § 1794(d) [emphasis added].) The California Legislature intended the word "expenses" to cover outlays not included in the detailed statutory definition of "costs," and the Song-Beverly Act's legislative history demonstrates the Legislature exercised its power to permit recovery of a host of litigation expenditures beyond those permitted by Code of Civil Procedure § 1033.5. (*Jensen v. BMW of North America, Inc.* (1995) 35 Cal.App.4th 112, 137-138.) A verified memorandum of costs generally satisfies the moving party's burden of establishing costs necessarily incurred (*Hadley v. Krepel* (1985) 167 Cal.App.3d 677, 682, and demonstrates Plaintiffs' attorneys' costs and expenses prosecuting this matter, which counsel advanced on Plaintiffs' behalf. (SM Dec. ¶ 2, Ex. B.) The burden shifts to Ford to properly rebut the claimed costs.

## IV. CONCLUSION

For the reasons above, Plaintiffs respectfully request this Honorable Court award attorney's fees, costs and expenses as follows:

| | |
|---|---|
| Lodestar Fees: | $ 55,232.50 |
| +Lodestar Enhancement: | $ 27,616.25 |
| Total Fees Requested: | $ 82,848.75 |
| +Costs and Expenses: | $ 4,229.46 |
| **=Total Fees and Costs/Expenses:** | **$ 87,078.21** |

Dated: March 23, 2018

**KNIGHT LAW GROUP, LLP**

Steve Mikhov (SBN 224676)
Attorneys for Plaintiffs,
**ERIC RADER and GWYENTH RADER**

PROOF OF SERVICE
(Code of Civil Procedure §1013a)

I am employed in the County of Los Angeles, State of California. I am over the age of 18 years and not a party to the within action. My business address is 1801 Century Park East, Suite 2300, Los Angeles, CA 90067.

I served the foregoing document described as:

**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR ATTORNEY'S FEES, COSTS AND EXPENSES**

Said document was served on the interested parties in this action, addressed as follows:

Warren E. Platt, Esq.
SNELL & WILMER LLP
600 Anton Blvd., Suite 1400
Costa Mesa, CA 92626-7689
**Counsel for Defendant,**
**FORD MOTOR COMPANY**
(via Personal Service only)

Moses Lebovits Esq.
DANIELS FINE ISRAEL
SCHONBUCH & LEBOVITS LLP
1801 Century Park East, 9th Floor
Los Angeles, CA 90067
lebovits@dfis-law.com
**Associated Counsel for Plaintiffs,**
**ERIC RADER and**
**GWYNETH RADER**
(via E-mail only)

XX PERSONAL SERVICE: I caused the above documents to be sent to our court services provider to be personally served.

XX BY E-MAIL OR ELECTRONIC TRANSMISSION: Based on a court order or an agreement of the parties to accept service by e-mail or electronic transmission, I caused the documents to be sent to the persons at the e-mail addresses listed above. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on March 26, 2018 at Los Angeles, California.

JANETH TAPIA