**KNIGHT LAW GROUP, LLP**
Steve Mikhov (SBN 224676)
1801 Century Park East, Suite 2300
Los Angeles, California 90067
Telephone: (310)552-2250
Fax: (310)552-7973

**LAW OFFICE OF MICHAEL H. ROSENSTEIN**
Michael H. Rosenstein
1801 Century Park East, Suite 2300
Los Angeles, California 90067
Office: (310) 286-0275
Fax: (310) 286-0274

Attorneys for Plaintiff,
**MITCHELL E. KATZ**

## SUPERIOR COURT OF CALIFORNIA

## COUNTY OF LOS ANGELES

| | |
|---|---|
| **MITCHELL E. KATZ**<br><br>                    Plaintiff,<br><br>        vs.<br><br>**FORD MOTOR COMPANY, a Delaware Corporation, and DOES 1 through 10, inclusive,**<br><br>                    Defendants. | Case No.: BC 617552<br><br>**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR ATTORNEY'S FEES, COSTS AND EXPENSES**<br><br>[Filed Concurrently Notice of Motion and Motion; Declarations of Steve Mikhov and Michael Rosenstein in Support of Motion]<br><br>**Date:** December 26, 2017<br>**Time:** 8:30 a.m.<br>**Dept.:** 34<br>**Reservation No:** 171114266862 |

iii

# Table of Contents

I.     INTRODUCTION ................................................................................- 1 -

II.    STATEMENT OF FACTS .................................................................- 3 -

III.        ARGUMENT AND ANALYSIS ...................................................- 5 -

       A.    Plaintiff's Attorneys Are Entitled to Fees, Costs and Expenses in this Action ..- 5 -

       B.    The Hourly Rates Sought by Plaintiff's Attorneys Are Reasonable...................- 6 -

             1.    The Nature and Complexity of the Litigation Support the Attorney's Fees Requested.......................................................................- 8 -

             2.    The Firm's Skill Justifies the Amount of Attorney's Fees Sought.......................- 10 -

       C.    The Settlement Amount Does Not Limit the Attorney's Fee Recovery ............- 11 -

       D.    Plaintiff Should Be Granted a Lodestar Multiplier.................................- 12 -

             The Lodestar Multiplier Should Be Granted in Contingent Cases Due to Risk and Delay of Payment..........................................................- 13 -

       E.    Plaintiff is Entitled to Recover All Costs and Expenses Reasonably Incurred in Connection with this Action ................................................- 14 -

IV.         CONCLUSION...............................................................................- 15 -

iv

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# INDEX OF AUTHORITIES

**Cases**

*Adler v. Vaicius*, 21 Cal. App. 4th 1770, 1777, 27 Cal. Rptr. 2d 32 (1993) ............................... - 6 -

*Cazares v. Saenz*, 208 Cal.App.3d 279 .......................................................................... - 14 -

*City of Riverside v. Rivera*, 477 U.S. 561, 574, 106 S. Ct. 2686, 2694, 91 L.Ed.2d 466 (1986)- 12

*Dietrich v. Dietrich* (1953) 41 Cal. 2d 497 ..................................................................... - 9 -

*En Palm, LLC v. Teitler* (2008) 162 Cal.App.4th 770 ......................................................... - 10 -

*Goglin v. BMW of North America, LLC* (2016) 4 Cal.App.5th 462 ........................................ - 7 -

*Graciano v. Robinson Ford Sales* (2006) 144 Cal. App. 4th 140 ................. - 7 -, - 8 -, - 9 -, - 14 -

*Graham v. DaimlerChrysler Corp.* (2004) 34 Cal. 4th 553 ................................................... - 6 -

*Hadley v. Krepel* (1985) 167 Cal. App. 3d 677, 682, 214 Cal. Rptr. 461 ............................... - 16 -

*Harman v. City and County of San Francisco* (2007) 158 Cal.App.4th 407 ......................... - 13 -

*Horsford v. Bd. of Trustees of Cal. State Univ. (supra)* 132 Cal. App. 359 ........................... - 15 -

*In re Chiron Corp. Securities litigation*, 2007 WL 4249902 ................................................ - 14 -

*Jensen v. BMW of North America, Inc.* (1995) 35 Cal. App. 4th 112, 41 Cal. Rptr. 2d 295.. - 16 -

*Kim v. Euromotors West* (2007) 149 Cal. App. 4th 170 ...................................................... - 6 -

*La Mesa-Spring Valley School Dist. v. Otsuka* (1962) 57 Cal. 2d 309 ................................... - 11 -

*Los Angeles Police Protective League v. city of Los Angeles* (1986) 188 Cal. App. 3d 1, 17, 232

   Cal. Rptr.697 ......................................................................................................... - 9 -

*Los Angeles Police Protective League v. City of Los Angeles* (1986) 188 Cal.App.3d 1 .......... - 9 -

*Maher v. Gagne* (1980) 448 U.S. 122, 100 S. Ct. 2570 ....................................................... - 9 -

*Mandel v. Lackner*, 92 Cal.App.3d 747, 761 (1979) ......................................................... - 6 -

*Molski v. Arclero Wine Group* (2008) 164 Cal.App.4th 786 ................................................. - 11 -

*Robertson v. Fleetwood Travel Trailers of California, Inc.* (2006) 144 Cal. App. 4th 785 ...... - 7 -

*Serrano v. Priest* (1977) 20 Cal 3d 25 ............................................................................ - 13 -

*Vo v. Las Virgenes Municipal Water District* (2000) 79 Cal.App.4th 440 ............................. - 12 -

Plaintiff's Motion for Attorney's Fees and Costs

1

**Statutes**

2

15 U.S.C. 2310(d) ................................................................................................- 6 -

3

Cal. Civ. Code § 1794(d) ........................................................- 6 -, - 7 -, - 12 -, - 15 -

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Plaintiff's Motion for Attorney's Fees and Costs

# I.    INTRODUCTION

This case is about Ford's policy of taking advantage of California consumers and Plaintiff's seventeen-month battle to vindicate his rights. Ford had three opportunities to avoid this lawsuit. First, Ford had an opportunity to build a quality car. Ford then had an opportunity to repair Plaintiff's vehicle within a reasonable number of repair attempts. Ford had a final opportunity to avoid this lawsuit when Plaintiff contacted Ford and asked for relief, which Ford rejected despite its legal obligation. Having squandered all three opportunities and having violated the Song-Beverly Act in the process, Ford left Plaintiff with little choice but to pursue his rights in court.

On or about September 1, 2013, Plaintiff purchased a 2013 Ford Focus. Over the next three-years, Plaintiff suffered through serious and repeated transmission problems. Plaintiff first took the car in to repair the car's transmission defects on December 29, 2014. The car was hesitating on acceleration, and the car shuddered at low speeds, both potentially dangerous conditions. The initial Ford repair was significant. The car required a reprograming of both the power control module ("PCM") and transmission control module ("TCM"), along with a replacement of the car's clutch.

Less than a year later, the car was still fraught with transmission problems and experiencing the same issues as it had from the outset, hesitation on acceleration and shuddering at low speeds. Plaintiff was forced to bring the car in again on December 8, 2015, where it was determined the car required a repeat reprogramming of the TCM and PCM and another defective clutch replacement. Two new clutches were installed on the car in less than one year.

Ten days later, on December 18, 2015, Plaintiff contacted customer service and requested a buy back. Nearly three weeks later, Ford applied its tried and true internal policy of rejecting its Song-Beverly Act obligations and refused to help Plaintiff. His request was denied. Ford made a business decision that by just saying no, the vast majority of consumers would just go away and Ford would save money. Plaintiff did not go away and his transmission problems continued. Without any other recourse, Plaintiff hired the Knight Law Group LLP (formerly O'Connor & Mikhov LLP and hereafter "Knight Law") on a contingency basis. Hearing

1  Plaintiff's story and knowing Ford had willfully violated Plaintiff's rights when it rejected

2  Plaintiff's buy-back request, Knight Law was forced to file a complaint.

3       The case was heavily litigated for ten months when Ford made its first Offer to

4  Compromise under C.C.P. Section 998 for $42,000.00 ("998 Offer One") on February 24, 2017.

5  The 998 Offer One was received on February 27, 2017, and though the offer included a modest

6  civil penalty, it was rejected. On March 8, 2017, just about one week later, Ford made a second

7  C.C.P. Section 998 Offer to Compromise in the sum of $120,000.00 ("998 Offer Two"), which

8  included incidental and consequential damages, along with a two-time civil penalty under the

9  Song-Beverly Act. As part of the offer, Plaintiff was acknowledged as the prevailing party and it

10  was also agreed Plaintiff could petition the court for his attorney's fees and costs by motion. <u>On

11  or about May 18, 2017 the case finally settled for $130,000.00, a sum more than 4 times the

12  purchase price for Plaintiff's car and more than three times the size of Ford's first 998 Offer.</u>

13       Without going to trial, Plaintiff settled for a sum greater than that achievable at trial.

14  Plaintiff achieved an excellent settlement given Ford's initial refusal to even consider

15  repurchasing Plaintiff's vehicle. It is a settlement few, if any, other firm in this state could

16  achieve for its clients. The excellent result in this case was achieved because of Plaintiff's

17  attorneys' skill and expertise in lemon law cases.  The biggest factor in Plaintiff receiving zero

18  from Ford before this lawsuit versus a $130,000.00 settlement was Plaintiff's attorneys' zealous

19  representation.

20       The Song-Beverly Consumer Warranty Act ("Song-Beverly Act"), Civil Code sections

21  1790, *et seq.*, entitles Plaintiff to seek reasonable attorney's fees, costs and expenses from Ford.

22  With a greater than four-times purchase settlement, it cannot be disputed that Plaintiff is the

23  prevailing party and entitled to this noticed motion for attorney's fees, costs and expenses.

24  Plaintiff now moves the Court: (1) for an award of attorney's fees pursuant to Civil Code section

25  1794(d) under the "lodestar" method in the amount of $55,027.50, (2) for a modest "lodestar"

26  modifier of 1.5, in the amount of $27,513.75, and (3) to award actual costs and expenses incurred

27  in the amount of $4,303.83. Civ. Code § 1794(d). Plaintiff requests a total of $86,845.08 in

28

1    attorney's fees, costs and expenses. (Declaration of Steve Mikhov ("SM Dec.") ¶ 2, Exs. A-B;

2    Declaration of Michael Rosenstein ("MR Dec.") ¶ 9, Ex. B.)

3    **II.     STATEMENT OF FACTS**

4         Plaintiff purchased a new 2013 Ford Focus on or about September 9, 2013, for a total

5    price of $32,310.90, inclusive of fees, taxes, an optional service contract, and financing charges

6    on a six-year loan. (SM Dec., ¶ 3, Exhibit C.) The vehicle was manufactured by Ford, which

7    provided an express written warranty.  (SM Dec., ¶ 3.)

8         Having owned his new car for just over a year, the vehicle began exhibiting significant

9    transmission problems. (SM Dec., ¶ 4.)  Plaintiff presented the vehicle to a Ford-authorized

10    repair facility, which attempted repairs.  (SM Dec., ¶ 4.)  The problems persisted however,

11    requiring additional repairs for the ongoing transmission problems, as well as an attempt to

12    address problems with the PCM and TCM.   (SM Dec., ¶ 4.)  Plaintiff delivered the vehicle to

13    Ford-authorized repair facilities on three separate occasions for identical problems. (SM Dec., ¶

14    4.) The first two failed repair attempts included the extraordinary replacement of the clutch. (SM

15    Dec., ¶ 4.)

16         Despite the ongoing repairs and continued manifestation of problems, Ford refused to

17    acknowledge the defective nature of the vehicle. (SM Dec., ¶ 5.)  At all times, Ford had direct,

18    contemporaneous knowledge of the vehicle's issues, which it records in a database called

19    "OASIS" and a warranty repair history database called the "AWS."  (SM Dec., ¶ 5.)  These

20    repair records indicate each time the vehicle was presented for repair during the warranty period,

21    as well as every time the Ford repair facility found a problem attributable to Ford, and billed

22    Ford for the work. (SM Dec., ¶ 5.)

23         Despite Ford's affirmative duty under the Song-Beverly Act to repurchase or replace a

24    defective vehicle after a reasonable number of repair attempts, Ford never offered Plaintiff a

25    buyback or replacement. (SM Dec., ¶ 6.)  In fact, before hiring counsel, Plaintiff contacted Ford

26    directly on or about December 18, 2015 and requested that Ford repurchase his vehicle. (SM

27    Dec., ¶ 6.)  Less than three weeks later, Ford flatly denied his repurchase request. (SM Dec., ¶ 6.)

28    Ford's bad-faith denial is consistent with its internal policies, obtained by Plaintiff's counsel,

3

1  which instruct its customer service employees that their "primary goal is to reduce RAVs" (i.e.
2  buybacks), and to offer a buyback only in "extreme circumstances." (SM Dec., ¶ 6, Exs. D-E.)

3        Plaintiff contacted Knight Law and told the firm about the problems with his vehicle and
4  the way Ford treated him. (SM Dec., ¶ 7.) After reviewing the repair history and discussions
5  with Plaintiff, Knight Law agreed to represent him and bear the risk of litigating the case on a
6  contingent basis. (SM Dec., ¶ 7.) The firm faced a genuine risk of not being paid for its services
7  for years, if at all, while advancing thousands of dollars in costs. (SM Dec., ¶ 7.)

8        After Ford failed to repurchase his vehicle, Plaintiff filed his complaint on April 10,
9  2016. (SM Dec., ¶ 8.) Ford first filed a demurrer, and when its motion failed, Ford filed its
10 answer <u>denying all liability</u> and asserting numerous affirmative defenses on September 16,
11 2016. (SM Dec., ¶ 8.) Ford then began its vigorous defense of this case, where it noticed
12 Plaintiff's deposition, demanded a vehicle inspection, propounded form and special
13 interrogatories, requests for admission and requests for production of documents. (SM Dec., ¶
14 8.) In addition to responding to Ford's discovery, Plaintiff promptly began working up his
15 case by serving initial written discovery on Ford on or about September 29, 2016, consisting
16 of requests for admissions, requests for production of documents, special and form
17 interrogatories. (SM Dec., ¶ 9.) Plaintiff benefitted from Knight Law's expertise in litigating
18 against Ford as <u>just 3.9 hours were billed for drafting the entirety of this discovery.</u> (SM
19 Dec., ¶ 9.) Ford served its responses on November 10, 2016. (SM Dec., ¶ 9.)

20       Due to Ford's improper objections and/or incomplete responses to Plaintiff's written
21 discovery, Plaintiff began meet and confer efforts in December, 2016, and the meet and
22 confer process continued into January and included draft protective orders from both Plaintiff
23 and Defendant to get beyond the discovery impasse. (SM Dec., ¶ 10.) Meanwhile, multiple
24 depositions were noticed (15+), which included PMKs, PMQs, Ford technicians and experts.
25 SM Dec., ¶ 10.) These depositions were needed to obtain information regarding not only
26 repairs to the vehicle and to authenticate the repair orders, but to rebut Ford's affirmative
27 defense that the problems with Plaintiff's vehicle were somehow caused by Plaintiff's neglect
28 or abuse. (SM Dec., ¶ 10.)

4

1    With a trial date set for April 10, 2017, and Ford's consistent refusal to make a

2  reasonable settlement offer accounting for its willful violation of the Song-Beverly Act, the

3  case appeared likely to go to trial. (SM Dec., ¶ 11.) Ford made 998 Offer One on or about

4  February 24, 2017 for $42,000.00. (SM Dec., ¶ 12, Ex. F.) As Ford's 998 Offer One did not

5  account for its willful behavior, Plaintiff rejected the offer, a sum ***which was for less than 1/4***

6  ***of the final settlement***. (SM Dec., ¶ 12.). Accordingly, Plaintiff was forced to gear up for final

7  trial preparation and Michael H. Rosenstein formally associated into the case as lead trial

8  counsel on or about March 1, 2017 to prepare the case for trial.  (SM Dec., ¶ 13; MR Dec., ¶

9  3.)  In early March, Plaintiff's trial counsel began drafting trial-related documents and

10  exhibits. (MR Dec., ¶ 3.)   Plaintiff's trial counsel drafted 15 motions in limine, trial

11  subpoenas, special verdict forms on the issues of express warranty, implied warranty and

12  concealment, negligent and intentional misrepresentation. (MR Dec., ¶ 6.)

13    Following trial counsel's association into the case, Ford then made a second 998 Offer

14  to Compromise for $120,000.00 ("998 Offer Two") on or about March 8, 2017. (SM Dec., ¶

15  14.) Ford's 998 Offer Two expressly included incidental and consequential damages, a two-

16  time civil penalty, an agreement that Plaintiff is the prevailing party in the action, along with

17  the further agreement Plaintiff could pursue his attorneys' fees and costs by noticed motion

18  with this Court. (SM Dec., ¶ 14, Ex. G.) While evaluating 998 Offer Two, Plaintiff's counsel

19  continued trial preparation, collaborated with Ford regarding verdict forms and joint trial

20  documents, researching Plaintiff's trial brief, drafting trial subpoenas, reviewing Ford's

21  motions in limine and drafting replies to same. (MR Dec., ¶ 5.)  All the while, trial counsel

22  continued conferring with Ford on the prospect of settlement. (MR Dec., ¶ 10.)

23    The case ultimately settled on or about March 28th, 2017 for $130,000.00, a sum more

24  than 3 times the value of Ford's first 998 offer and $10,000.00 more than Ford's second 998

25  offer, including the maximum civil penalty, and with Plaintiff's attorney's fees to be decided

26  by the Court on noticed motion. (SM Dec., ¶ 15)

27                  **III.    ARGUMENT AND ANALYSIS**

28    A.     **Plaintiff's Attorneys Are Entitled to Fees, Costs and Expenses in this Action**

1      Plaintiff is the prevailing party in this action and, under the Song-Beverly Act, entitled to

2 recoup all reasonable attorney's fees, costs, and expenses as a prevailing party. Code Civ. Proc. §

3 1032(a)(4); Civ. Code § 1794(d); *Graham v. DaimlerChrysler Corp.* (2004) 34 Cal.4th 553, 557;

4 *Reveles v. Ford by the Bay (1997)* 57 Cal.App.4th 1139. Absent a contrary showing, both the

5 number of hours that the prevailing party's attorney spent litigating the case and his or her

6 regular hourly rate are presumed to be reasonable. *Serrano v. Unruh*, 32 Cal.3d 621, 639 (1982)

7 (counsel is entitled to all hours actually spent, absent a showing of "special circumstances" that

8 would render such an award unjust); *Mandel v. Lackner*, 92 Cal.App.3d 747, 761 (1979) (an

9 attorney's regular hourly rate is entitled to a presumption of reasonableness); Pearl, California

10 Attorney Fee Awards, at §§ 12.14A, 12.33 (2nd Ed. 2005).

11      In prosecuting this case, the efforts of Knight Law amount to $30,002.50, including

12 drafting this motion and time anticipated to be spent preparing the reply and attending the

13 hearing. (SM Dec., ¶ 2, Ex. A.) The billings by Michael H. Rosenstein total $25,025.00. (MR

14 Dec., ¶8, Ex. A.) The total billing incurred by both offices for the entire litigation is $55,027.50.

15 Plaintiff's counsel also requests a modest 1.5 enhancement, in the amount of $27,513.75, to

16 account for the delay in payment and contingent risk posed by this case. Lastly, the reimbursable

17 costs and expenses set forth in Plaintiff's memorandum of costs are $4,303.83. (SM Dec., ¶ 2,

18 Ex. B.) In total, Plaintiff requests $86,845.08. (SM Dec., ¶ 2, Exs. A-B; MR Dec., ¶ 9, Ex. B.)

19     **B.**   **The Hourly Rates Sought by Plaintiff's Attorneys Are Reasonable**

20      The Court of Appeal has expressly held the lodestar method applies to determining

21 attorney's fees under the Song-Beverly Act. *Robertson v. Fleetwood Travel Trailers of*

22 *California, Inc.* (2006) 144 Cal.App.4th 785, 817. The calculation of reasonable attorney's fees

23 under the Song-Beverly Act is based on the lodestar method, which entails multiplying the

24 number of hours reasonably expended by a reasonable hourly rate. *Graciano v. Robinson Ford*

25 *Sales* (2006) 144 Cal.App.4th 140, 154; *Robertson v. Fleetwood Travel Trailers of California,*

26 *Inc.* (2006) 144 Cal.App.4th 785, 817. The prevailing buyer has the burden of showing that the

27 fees incurred were "allowable," "reasonably necessary to the conduct of the litigation," and

28 "reasonable in amount." *Goglin v. BMW of North America, LLC* (2016) 4 Cal.App.5th 462, 470.

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR
ATTORNEY'S FEES, COSTS AND EXPENSES

In making such an evaluation, a court may consider "factors such as the complexity of the case and procedural demands, the skill exhibited and the results achieved." *Id.*

In *Goglin v. BMW*, the appellate court recently affirmed the trial court's award of over $185,000 in attorney's fees and costs for a plaintiff who settled her claims against BMW (represented by Lehrman Law) under the Song-Beverly Act just before trial. *Id.* at 464. First, the court found that the fees requested were reasonably necessary despite defendant's claim that plaintiff unreasonably refused to accept BMW's prior settlement offers. *Id.* at 471-72. Second, the fees were reasonable based on the complexity of the case and the amount of litigation activity involved: plaintiff had to conduct discovery, prepare to prove liability on her claims, and prepare to counter the numerous affirmative defenses defendants raised. *Id.* at 473. Finally, plaintiff's counsel's hourly rate of $575 per hour was found reasonable as supported by counsel's declaration indicating that various state and federal courts had previously awarded him comparable hourly rates. *Id.* at 473-74. The trial court was not obliged to consider defendants paid their counsel a lower hourly rate. *Id.* at 474.

In *Robertson*, the court observed a prevailing buyer is entitled to an award of reasonable attorney's fees for time reasonably expended by his attorney. *Robertson, supra*, 144 Cal.App.4th at 817. The court ruled the "statutory language in section 1794(d) is reasonably compatible with a lodestar adjustment method of calculating attorney fees, including use of fee multipliers." *Id.* at 819. Indeed, in *Robertson*, the trial court awarded $231,187.45 in fees based on $145,080.50 in fees through trial, plus a "multiplier" of 1.5 for a total of $217,620.75, and $13,566.70 for the attorney's fee motion. *Id.* at 817. The appellate court upheld the trial court's ruling. *Id.* at 822.

In *Graciano*, the trial court initially rejected plaintiff's lodestar fees of $109,468.50 and request for a multiplier of 2.0. In particular, the trial court reduced the plaintiff's attorney's hourly rate from the requested $350/hour to $250/hour, which was the court's mandated maximum rate for expert testimony. Plaintiff appealed the court's decision and in particular the hourly rate reduction. The appellate court reversed, reasoning a court should determine the prevailing rate in the community for comparable professional legal services. *Graciano, supra,* 144 Cal.App.4th at 156 (*citing PLCM Group v. Drexler, supra,* 22 Cal.4th at 1095). The court

7

1  found the plaintiff's unrebutted declarations established the proper hourly rate at $350, and

2  reducing that rate to $250 was an abuse of discretion. *Id.* The court also reaffirmed attorney's

3  fees <u>are not limited to a proportion</u> of the recovery. *Id.* at 164. On remand, the trial court found

4  that the lodestar rate of $350/hour was reasonable *and added* a multiplier of 2.0 for a total fee

5  award of over $380,000.   The attorney from *Graciano*, Hallen D. Rosner, now charges

6  $620/hour.  (SM Dec., ¶ 30(a)).

7      Furthermore, the California Supreme Court has expressly ruled that prevailing parties

8  who are entitled to recover their attorney's fees are *also entitled* to recover their fees for the time

9  spent preparing fee applications such as this one. *Serrano v. Unruh, supra,* 32 Cal.3d at 631; *Los*

10  *Angeles Police Protective League v. City of Los Angeles* (1986) 188 Cal.App.3d 1, 17;

11  *Robertson, supra,* 144 Cal.App.4th at 817 (awarding $13,566.70 in fees for a fee motion.)

12      Consideration of the "lodestar" factors compels an award of attorney's fees based on (i)

13  the hourly rates set forth of in the declarations filed concurrently herewith (SM Dec., ¶¶ 21-30;

14  MR Dec., ¶¶ 4-9, Ex. A), (ii) a survey of rates charged by other well-known consumer law

15  attorneys (SM Dec., ¶ 30), (iii) over two dozen court orders confirming the reasonableness of

16  Plaintiff's counsels' hourly rates and time billed in other Song-Beverly Act cases (SM Dec., ¶¶

17  32-70, Exs. H-TT, and (iv) a National Survey further supporting the reasonableness of the hourly

18  rates (MR Dec., ¶ 5, Ex. A). Plaintiff's counsels' rates are within the range of rates charged by

19  other attorneys with similar experience in this area of law.

20      1.    The Nature and Complexity of the Litigation Support the Attorney's Fees
            Requested

21

22      Determining the amount of reasonable attorney's fees may involve consideration of the

23  nature and complexity of the case.  *Dietrich v. Dietrich* (1953) 41 Cal.2d 497, 506; *Graciano,*

24  *supra,* 144 Cal.App.4th at 147.

25      Ford is likely to claim that "this is a simple lemon law case," and therefore Plaintiff's fee

26  request is unjustified. This case, however, required a range of specialized knowledge, such as:

27  (1) understanding of the full scope of consumer protection laws, which are highly nuanced; (2)

28  knowledge of the intricacies of automobiles and the lexicon associated with them, as well as

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR
ATTORNEY'S FEES, COSTS AND EXPENSES

1  knowledge concerning how to investigate issues with automobiles; and (3) knowledge of auto
2  manufacturers' and dealers' policies and protocols for repairing vehicles and complying with
3  their legal obligations. (SM Dec., ¶ 73.)  Plaintiff's attorneys have acquired knowledge and
4  insight about these issues and this experience typically results in significantly higher judgments
5  or settlements for their clients, like Plaintiff here.

6       Moreover, Ford itself made this matter more complex by maintaining it had no liability
7  and declining to submit any reasonable offers for almost a year of litigation.  Prior to
8  commencing litigation, Plaintiff first sought relief by requesting a buyback directly from Ford,
9  which Ford summarily denied. Such conduct is consistent with Ford's policies at its customer
10 service center to repurchase vehicles only in "extreme circumstances" in order to achieve its
11 "Primary Goal" of reducing buybacks. (SM Dec., ¶ 6, Exs. D-E.)  Ford should have recognized
12 the defects in Plaintiff's vehicle and resolved the matter before this case was ever filed.  Ford
13 ultimately did just that, but not before causing substantial fees to be incurred.

14      From the outset, Ford engaged in expensive litigation, including the filing of a demurrer
15 before answering, propounding extensive written discovery, stone-walling Plaintiff's discovery
16 efforts, compelling Plaintiff to associate trial counsel and ready the case for trial, and all of the
17 intense effort and detail that process entails. For nearly a year of litigation, Ford failed to make a
18 meaningful settlement offer, and once it did, the offer was inadequate, as it failed to consider
19 Ford's willful conduct and civil penalties. Ford made two 998 offers, the second almost 3x more
20 than its first, and then Ford ultimately settled for a sum greater than 999 Offer Two. Ford could
21 have resolved this matter from the outset and saved tens of thousands in attorney's fees, costs
22 and expenses.

23      When Ford causes the entirety of fees to be incurred, it has no legitimate basis for
24 complaining about the amount of attorney's fees reasonably and actually incurred, especially
25 when Ford was given the opportunity to resolve the matter before a lawsuit was even filed. "A
26 party cannot litigate tenaciously and then be heard to complain about the time necessarily spent
27 by the opposition in response." *En Palm, LLC v. Teitler* (2008) 162 Cal.App.4th 770, 786; *see*
28 *also Molski v. Arclero Wine Group* (2008) 164 Cal.App.4th 786.

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR
ATTORNEY'S FEES, COSTS AND EXPENSES

## 2.   The Firm's Skill Justifies the Amount of Attorney's Fees Sought

A trial court may also take into account the skill of the attorneys when determining reasonable attorney's fees. *La Mesa-Spring Valley School Dist. v. Otsuka* (1962) 57 Cal.2d 309, 316. Despite the case's difficulties, Plaintiff ultimately recovered $130,000.00 in damages, which is **QUADRUPLE** the vehicle's purchase price in 2013, and an almost unheard of sum for a lemon law matter. Plaintiff's settlement exceeds the maximum possible statutory award with maximum civil penalties. Critically, the vehicle was no more or less defective on the date of settlement than it was when Plaintiff first requested a repurchase, so there is no rational explanation why Ford waged a lengthy and costly legal battle only to settle for an amount exceeding the best possible result Plaintiff could have achieved via trial.

The final resolution is the direct result of skill and preparation by Plaintiff's attorneys, who specialize in consumer law and did not balk at Ford's aggressive litigation tactics. Plaintiff's attorneys' experience in this area have enabled them to develop litigation strategies that are both highly effective and cost and time efficient. Plaintiff's attorneys know the many nuances in these types of cases. This specialized knowledge and experience in lemon law frequently achieves results better than attorneys who do not specialize in this specific area of law. This experience provided a resolution to this matter far beyond that which Ford was previously willing to entertain. The biggest difference *between Plaintiff getting zero and Plaintiff receiving a $130,000.00 recovery* was his attorneys' knowledge and expertise.

Counsels' skill is evidenced by the size of the settlement as well as the relatively nominal time expended on various tasks, which results in lower overall billing. Plaintiff's attorneys don't spend inordinate time researching because they specialize in this area of law. (SM Dec., ¶ 74.) Nor do they spend unreasonable time preparing pleadings and other documents because they are able to use documents from other cases that need only be edited, rather than written from scratch. While substantial fees have been incurred, the fees were caused by Ford, which led to the execution of effective strategies that typically result in superlative results for clients, like Plaintiff here.

On the other side, Ford is represented by four different law firms (two of which are large

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR ATTORNEY'S FEES, COSTS AND EXPENSES

1  national firms) with attorneys who specialize in representing automobile manufacturers in lemon

2  law cases.  Ford is a corporate giant with the resources to easily overwhelm a consumer or an

3  inexperienced attorney.  Plaintiff required skilled and experienced attorneys to prosecute his

4  claims against Ford and its formidable resources.

5  ///

6      **C.**     <u>**The Settlement Amount Does Not Limit the Attorney's Fee Recovery**</u>

7         Ford may speciously attempt to argue that damages in the amount of $130,000.00 do not

8  justify an attorney's fee award in the amount requested by Plaintiff.  Such an argument is starkly

9  against the weight of the law.  The amount of attorney's fees *must not be tied to any percentage*

10 *of recovery. Graciano, supra,* 144 Cal.App.4th at 164.  In fact, a trial court may abuse its

11 discretion if it applies a rule of proportionality to a fee award.  The U.S. Supreme Court has

12 previously considered the question of proportionality in attorney fee awards and held: "[w]e

13 reject the proposition that fee awards under section [42 U.S.C.] 1988 should necessarily be

14 proportionate to the amount of damages a civil rights plaintiff actually recovers."  *City of*

15 *Riverside v. Rivera* (1986) 477 U.S. 561, 574; *see also* Sen. Report No. 93-151, 1st Sess., pp. 23-

16 24 (1973) (attorney's fees under the Magnuson Moss Warranty Act are based on actual time, not

17 a percentage of the recovery); *Robertson, supra,* 144 Cal.App.4th at 820; *Independent*

18 *Federation of Flight Attendants v. Zipes* (1989) 491 U.S. 754, fn.2 (fee shifting provisions under

19 Magnuson-Moss and Song-Beverly "are to be interpreted alike"); *Goglin, supra,* 5 Cal.App.5th

20 at 468-69 (affirming award of $185,000 in fees and costs in a Song-Beverly Act case that settled

21 for $75,000); *Vo v. Las Virgenes Municipal Water District* (2000) 79 Cal.App.4th 440, 446

22 (affirming $470,000 fee award after $40,000 judgment because the defendant was excessively

23 litigious and took a non-settlement posture); *Harman v. City and County of San Francisco*

24 (2007) 158 Cal.App.4th 407 (affirming award of approximately $1.1 million in fees where

25 plaintiff recovered $30,300).

26

27        It is not uncommon for attorney's fees and costs to exceed the client's damages.  The

28 Legislature acknowledged such a circumstance, which is the reason behind the fee shifting

11

1  provision of the Song-Beverly Act.  (SM Dec., ¶ 72.)  Otherwise, consumers would be left

2  without opportunity for redress when their damages were not enough for an attorney to take the

3  case on a contingent fee or hourly rate basis.  The award of attorney's fees *cannot* be limited by

4  the damages recovered by Plaintiff.  Any argument by Ford to the contrary would be

5  disingenuous, as the law is clear on this point. *Ketchum, supra,* 24 Cal.4th at 1132.

6  ///

7  **D.  Plaintiff Should Be Granted a Lodestar Multiplier**

8  As part of the Song-Beverly Act, a prevailing buyer may also receive a lodestar

9  multiplier, sometimes referred to as an adjustment or enhancement. *Robertson, supra,* 144

10  Cal.App.4th at 817.  Once a lodestar amount is determined, which involves a "careful

11  compilation of the actual time spent and reasonable hourly compensation for each attorney," *Id.*

12  at 819 (*citing Serrano v. Priest* (1977) 20 Cal.3d 25, 48-49 (*Serrano III*), the amount may then

13  be augmented by taking various relevant factors into account, including (1) the novelty and

14  difficulty of the questions involved and the skill displayed in presenting them; (2) the extent to

15  which the nature of the litigation precluded other employment by the attorneys; and (3) the

16  contingent nature of the fee award, based on the uncertainty of prevailing on the merits and of

17  establishing eligibility for the award. *Id.; see also Graham, supra,* 34 Cal.4th at 579; *PLCM*

18  *Group v. Drexler* (2000) 22 Cal.4th 1084, 1096. "[T]he purpose of a fee enhancement is

19  primarily to compensate the attorney for the prevailing party at a rate reflecting the risk of

20  nonpayment in contingency cases." *Ketchum v. Moses,* 24 Cal.4th 122, 1138 (2001); *Cazares v.*

21  *Saenz,* 208 Cal.App.3d 279, 287-88 (1989) (risk factor alone justifies a 2.0 multiplier for a 50%

22  chance of prevailing).

23  In *Robertson,* a case brought under the Song-Beverly Act, the court ruled that the

24  "statutory language in section 1794(d) is reasonably compatible with a lodestar adjustment

25  method of calculating attorney fees, including use of fee multipliers." *Id.* at 819.  The trial court

26  awarded a total of $231,187.45 in fees consisting of: $145,080.50 in fees incurred through trial,

27  plus a "multiplier" of 1.5 for a total of $217,620.75, and $13,566.70 for fees in preparing the fees

28

12

1  motion. *Id.* at 817.  The appellate court held the trial court properly conducted a lodestar analysis

2  and the award was not an abuse of discretion. *Id.* at 822.

3       In *Graciano*, the appellate court actually *increased* the trial court's award of fees after

4  finding that the lodestar rate of $350/hour was reasonable (in 2006) and adding a 2.0 multiplier

5  for a total award of over $380,000.  *Graciano, supra,* 144 Cal.App.4th at 156.  The trial court

6  had initially reduced plaintiff's request for fees down to $250/hour and rejected the 2.0 lodestar

7  multiplier.  *Id.* at 147.  The court found the plaintiff's unrebutted declarations established the

8  proper hourly rate at $350, and reducing that rate to $250 was an abuse of discretion. *Id.*  The

9  court also reaffirmed attorney's fees are not limited to a proportion of the recovery. *Id.* at 164.

10      Ford will tiredly argue a multiplier is not permitted, and cite to the *Ketchum* case to

11 support that argument.  Unfortunately for Ford, *Ketchum* <u>does not</u> hold a multiplier is improper.

12 To the contrary, *Ketchum* actually <u>confirms</u> the granting of a multiplier in contingency fee cases.

13 *Ketchum, supra,* 24 Cal.4th at 1132.  A lodestar multiplier is in fact available and it has been

14 awarded to Plaintiff's counsel in several cases. (SM Dec., ¶¶ 45, 54, 55, 57, 58, 62, 68-70, Exs.

15 U-DD, EE, GG, HH, LL, RR, SS, TT.)

16

17          <u>The Lodestar Multiplier Should Be Granted in Contingent Cases Due to Risk and
            Delay of Payment</u>

18      The lodestar is intended to reflect the basic fee for comparable non-contingent legal

19 services and should be enhanced by an appropriate multiplier to reflect the risk and delay in

20 payment associated with taking a contingent case, as well as the result achieved.  The lodestar

21 "multiplier" is meant to increase or decrease the fee award based on factors not already taken

22 into account when setting the hourly rate, such as the <u>risk</u> of taking a case on a contingency

23 basis, and <u>delay</u> in receiving payment. *See Horsford v. Bd. of Trustees of Cal. State Univ.* (2005)

24 132 Cal. App. 4th 359, 394-95.

25      In *Ketchum v. Moses*, the California Supreme Court wrote, "[a] contingent fee contract,

26 since it involves a gamble on the result, may properly provide for a *larger compensation* than

27 would otherwise be reasonable."  (2001) 24 Cal.4th 1122, 1132 [emphasis added].

28

13

1
2
3
4
5
6

> A contingent fee must be higher than a fee for the same legal services paid as they are performed. The contingent fee compensates the lawyer not only for the legal services he renders but for the loan of those services. The implicit interest rate on such a loan is higher because the risk of default (the loss of the case, which cancels the debt of the client to the lawyer) is much higher than that of conventional loans. (Posner, Economic Analysis of Law (4th ed.1992) pp. 534, 567, emphasis added.) A lawyer who both bears the risk of not being paid and provides legal services is not receiving the fair market value of his work if he is paid only for the second of these functions. If he is paid no more, competent counsel will be reluctant to accept fee award cases.

7    *Id.* at 1132 [citations omitted; emphasis added].

8    Throughout the litigation, there always existed the real possibility Plaintiff would not

9    prevail. Indeed, Defendant's first 998 Offer created *additional risk* because Plaintiff would need

10   to prevail with civil penalties at trial, since anything less would have cut off attorney's fees as of

11   the date of the offer. Plaintiff's risk grew larger when Defendant made a much larger second 998

12   Offer. Thus, if Plaintiff did not prevail, his attorneys would have suffered a loss of hundreds of

13   hours in uncompensated work and thousands of dollars in out-of-pocket expenses. The risk was

14   further compounded by the fact that Plaintiff's attorneys advanced all costs, and yet Plaintiff

15   ultimately settled for a sum higher than both of Defendant's 998 offers. Plaintiff requests a 0.3

16   enhancement based on the risk.

17   Unlike Defendant's attorneys, who are paid monthly regardless of outcome, Plaintiff's

18   attorneys are not paid at all if he loses, and need to absorb significant delay in being paid if

19   Plaintiff does win. On account of the substantial delay in payment, Plaintiff requests a 0.2

20   enhancement. Based on the risk of taking this case on a contingent fee basis and the delay in

21   payment since April 2016, Plaintiff requests a nominal multiplier of 1.5.

22

23   **E.    Plaintiff is Entitled to Recover All Costs and Expenses Reasonably Incurred in Connection with this Action**

24   Under the Song-Beverly Act, a prevailing buyer shall be allowed to recover as part of the

25   judgment a sum equal to the aggregate amount of costs and expenses. Civ. Code § 1794(d)

26   [emphasis added]. The California Legislature intended the word "expenses" to cover outlays not

27   included in the detailed statutory definition of "costs," and the Song-Beverly Act's legislative

28

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR ATTORNEY'S FEES, COSTS AND EXPENSES

1  history demonstrates the Legislature exercised its power to permit recovery of a host of litigation

2  expenditures beyond those permitted by Code of Civil Procedure § 1033.5.  *Jensen v. BMW of*

3  *North America, Inc.* (1995) 35 Cal.App.4th 112, 137-138.

4        A verified memorandum of costs generally satisfies the moving party's burden of

5  establishing costs were necessarily incurred.  *Hadley v. Krepel* (1985) 167 Cal.App.3d 677, 682.

6  The verified memorandum of costs demonstrates what Plaintiff's attorneys incurred in costs and

7  expenses prosecuting this matter, which counsel advanced on Plaintiff's behalf. (SM Dec. ¶ 2,

8  Ex. B); Civ. Code § 1794(d).  The burden shifts to Defendant to properly rebut the claimed costs.

9                  **IV.    CONCLUSION**

10        For the reasons above, Plaintiff respectfully requests this Honorable Court award

11  attorney's fees, costs and expenses as follows:

12

13

| | |
|---|---|
| Lodestar Fees: | $55,027.50 |
| +Lodestar Enhancement: | $27,513.75 |
|   Total Fees Requested: | $82,541.25 |
| +Costs and Expenses: | $ 4,303.83 |
| **=Total Fees and Costs/Expenses:** | **$86,845.08** |

14

15

16

17

Dated:  November 14 2017                    **KNIGHT LAW GROUP, LLP**

18

19

20                                    Steve Mikhov (SBN 224676)

21                                    Attorneys for Plaintiff,
                                  **MITCHELL E. KATZ**

22

23

24

25

26

27

28

15

PROOF OF SERVICE
(Code of Civil Procedure §1013a)

I am employed in the County of Los Angeles, State of California. I am over the age of 18 years and not a party to the within action. My business address is 1801 Century Park East, Suite 2300, Los Angeles, CA 90067.

I served the foregoing document described as:

**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR ATTORNEY'S FEES, COSTS AND EXPENSES**

Said document was served on the interested parties in this action, by placing true copies thereof enclosed in sealed envelopes, with postage prepaid, addressed as follows:

| | |
|---|---|
| Matthew Proudfoot, Esq. | Michael H. Rosenstein, Esq. |
| GATES, O'DOHERTY | Law Offices of Michael H. Rosenstein |
| GONTER & GUY, LLP | 1801 Century Park East., Suite 2300 |
| 38 Discovery, Suite 200 | Los Angeles, CA 90067 |
| Irvine, CA 92618 | **Associated Counsel for Plaintiff,** |
| **Counsel for Defendant,** | **MITCHELL E. KATZ** |
| **FORD MOTOR COMPANY** | (via E-mail only) |
| (via MAIL only) | |

**XX** BY MAIL: I am readily familiar with this firm's practice of collection and processing correspondence for mailing with the United States Postal Service. Under that practice, it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid at a Postal Service collection box at Los Angeles, California, in the ordinary course of business. The envelope was sealed and placed for collection that same day following ordinary business practices, addressed to the above-referenced attorney.

**XX** BY E-MAIL OR ELECTRONIC TRANSMISSION: Based on a court order or an agreement of the parties to accept service by e-mail or electronic transmission, I caused the documents to be sent to the persons at the e-mail addresses listed above. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on November 14, 2017 at Los Angeles, California.

Mirka Arellano

-1-

PROOF OF SERVICE



RECEIVED

NOV 1 5 2017

BY: ..............................