**KNIGHT LAW GROUP, LLP**
Steve Mikhov (SBN 224676)
1801 Century Park East, Suite 2300
Los Angeles, CA 90067
Telephone: (310) 552-2250
Fax: (310) 552-7973
Email: stevem@knightlaw.com

**LAW OFFICE OF MICHAEL H. ROSENSTEIN**
Michael H. Rosenstein (SBN 169091)
1801 Century Park East, Suite 2300
Los Angeles, CA 90067
Telephone: (310) 286-0275
Fax: (310) 286-0274
Email: mrosenstein@rose-lawoffice.com

Attorneys for Plaintiff,
**CHRISTIAN B. VENEGAS**

## SUPERIOR COURT OF CALIFORNIA

## COUNTY OF SAN DIEGO

| | |
|---|---|
| **CHRISTIAN B. VENEGAS,** | Case No.: 37-2016-00041104-CU-BC-CTL |
| Plaintiff, | **PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR ATTORNEY'S FEES, COSTS AND EXPENSES** |
| vs. | |
| **FORD MOTOR COMPANY, a Delaware Corporation, and DOES 1 through 10, inclusive,** | [Filed Concurrently with Plaintiff's Notice of Motion and Motion for Attorney's Fees, Costs and Expenses; Declarations of Steve Mikhov and Michael H. Rosenstein] |
| Defendants. | |
| | *Assigned for All Purposes to the Honorable John S. Meyer* |
| | Date:  May 4, 2018<br>Time: 10:30 a.m.<br>Dept.: C-64 |

## TABLE OF CONTENTS

Page(s)

I.      INTRODUCTION ...................................................................................................1

II.     STATEMENT OF FACTS ......................................................................................2

III.    ARGUMENT AND ANALYSIS ............................................................................6

    A.    Plaintiff's Attorneys Are Entitled to Fees, Costs and Expenses in this Action...........................................................................................................6

    B.    The Hourly Rates Sought by Plaintiff's Attorneys Are Reasonable.................7

        1.    The Nature and Complexity of the Litigation Support the Attorney's Fees Requested ...................................................................8

        2.    The Firm's Skill Justifies the Amount of Attorney's Fees Sought ......................................................................................................10

    C.    The Settlement Amount Does Not Limit the Attorney's Fee Recovery..........12

    D.    Plaintiff Should Be Granted a Lodestar Multiplier...........................................13

    E.    Plaintiff is Entitled to Recover All Costs and Expenses Reasonably Incurred in Connection with this Action.........................................................15

IV.     CONCLUSION......................................................................................................15

1

## TABLE OF AUTHORITIES

2

Cases

Page(s)

3

*Cazares v. Saenz*
    (1989) 208 Cal.App.3d 279 ...................................................................................13

4

5

*City of Riverside v. Rivera*
    (1986) 477 U.S. 561 .........................................................................................12

6

7

*Dietrich v. Dietrich*
    (1953) 41 Cal.2d 497 .........................................................................................8

8

*En Palm, LLC v. Teitler*
    (2008) 162 Cal.App.4th 770 ...............................................................................10

9

10

*Goglin v. BMW of North America, LLC*
    (2016) 4 Cal.App.5th 462 ...........................................................................7, 12

11

12

*Graciano v. Robinson Ford Sales*
    (2006) 144 Cal.App.4th 140 .......................................................................*passim*

13

*Graham v. DaimlerChrysler Corp.*
    (2004) 34 Cal.4th 553 ...............................................................................6, 13

14

15

*Hadley v. Krepel*
    (1985) 167 Cal.App.3d 677 ...............................................................................15

16

*Harman v. City and County of San Francisco*
    (2007) 158 Cal.App.4th 407 ...............................................................................12

17

18

*Horsford v. Bd. of Trustees of Cal. State Univ.*
    (2005) 132 Cal. App. 4th 359 ...........................................................................14

19

20

*In re Chiron Corp. Securities Litigation*
    (N.D. Cal. Nov. 30, 2007) No. C-04-4293 VRW, 2007 WL 4249902 ...............13

21

*Independent Federation of Flight Attendants v. Zipes*
    (1989) 491 U.S. 754 .........................................................................................12

22

23

*Jensen v. BMW of North America, Inc.*
    (1995) 35 Cal.App.4th 112 ...............................................................................15

24

25

*Ketchum v. Moses*
    (2001) 24 Cal.4th 1122 ...........................................................................13, 14

26

27

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR
ATTORNEY'S FEES, COSTS AND EXPENSES

*La Mesa-Spring Valley School Dist. v. Otsuka*
     (1962) 57 Cal.2d 309 ........................................................................10

*Los Angeles Police Protective League v. City of Los Angeles*
     (1986) 188 Cal.App.3d 1......................................................................8

*Mandel v. Lackner*
     (1979) 92 Cal.App.3d 747.................................................................. 6

*Molski v. Arclero Wine Group*
     (2008) 164 Cal.App.4th 786................................................................10

*PLCM Group v. Drexler*
     (2000) 22 Cal.4th 1084................................................................. 8, 13

*Reveles v. Toyota by the Bay*
     (1997) 57 Cal.App.4th 1139.................................................................6

*Robertson v. Fleetwood Travel Trailers of California, Inc.*
     (2006) 144 Cal.App.4th 785 ..................................................... *passim*

*Serrano v. Priest*
     (1977) 20 Cal.3d 25 (*Serrano III*)........................................................13

*Serrano v. Unruh*
     (1982) 32 Cal.3d 621 ....................................................................6, 8

*Vo v. Las Virgenes Municipal Water District*
     (2000) 79 Cal.App.4th 440 ...............................................................12


Statutes and Codes

California Code of Civil Procedure
     Section 1032(a)(4) ...........................................................................6

California Code of Civil Procedure
     Section 1033.5.................................................................................15

California Code of Civil Procedure
     Section 1794(d) ....................................................................... *passim*

United States Code
     Title 15, Section 2301 et. Seq. (Magnuson Moss Warranty Act)......................12

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR
ATTORNEY'S FEES, COSTS AND EXPENSES

United States Code
    Title 42 § 1988 ........................................................................................................ 12

### Other Authorities

Pearl, *California Attorney Fee Awards*
    Sections 12.14A, 12.33 (2nd Ed. 2005) .................................................................. 6

Sen. Report No. 93-151,
    1st Sess., pp. 23 (1973) ....................................................................................... 12

iv

## I.   INTRODUCTION

On January 15, 2018, nearly thirteen months after the complaint was filed in this action, the parties agreed to settle the case for $98,500.00.  This settlement amount consisted of a full statutory "buy-back" of Plaintiff's defective vehicle, incidental and consequential damages, and a two-time civil penalty.  The final settlement is three and a half times the total amount Plaintiff paid for the vehicle in what the defense routinely calls a "simple lemon law" action.  Plaintiff obtained this extraordinary sum *without going to trial*.  Plaintiff achieved an excellent settlement given Ford Motor Company's ("Defendant" or "Ford") initial refusal to even consider a buyback of the defective vehicle.  The excellent result was achieved due to Plaintiff's attorneys' skill and expertise in lemon law cases but, arguably, the biggest factor in Plaintiff's success was Plaintiff's attorneys' zealous representation.

On May 17, 2015, Plaintiff purchased a used 2014 Ford Focus for $27,884.32.  Throughout his ownership of the vehicle, Plaintiff suffered through persistent transmission and engine problems, as well as issues with the electrical systems and battery.  During a period of approximately eleven months, Plaintiff took his vehicle in for repair twice and was deprived of his vehicle a total of thirteen (13) days, but the problems continued.

Ford had direct knowledge of the ongoing problems with Plaintiff's vehicle.  However, despite this knowledge and notwithstanding the fact that they were unable to adequately repair the defective vehicle, Ford never offered Plaintiff a buyback or replacement.  Rather, Ford applied its proven internal policy of ignoring its statutory obligations under the Song-Beverly Act, hoping that Plaintiff (like many consumers) would walk away and Ford would save money.  Plaintiff could not afford to do that and so he hired the Knight Law Group, LLP ("Knight Law") on a contingency basis to assist in vindicating his rights.  Knowing that Ford had willfully violated Plaintiff's rights, Knight Law proceeded to file this case.

The Song-Beverly Act, Civil Code sections 1790, *et seq.*, entitles Plaintiff to seek reasonable attorney's fees, costs and expenses from Ford.  Moreover, as the prevailing party in this matter, Plaintiff is entitled to this noticed motion for attorney's fees.  Plaintiff now moves

1

1   the Court: (1) for an award of attorney's fees pursuant to Civil Code section 1794(d) under the

2   "lodestar" method in the amount of $54,030.00, (2) for a reasonable, modest, "lodestar" modifier

3   of 0.5 under California law, in the amount of $27,015.00, and (3) to award actual costs and

4   expenses incurred in the amount of $5,402.86. (Civ. Code § 1794(d).) Plaintiff requests a total

5   of $86,447.86 in attorney's fees, costs and expenses. (Declaration of Steve Mikhov ("SM Dec.")

6   ¶ 2, Exs. A-B; Declaration of Michael H. Rosenstein ("MR Dec.") ¶ 9, Ex. A.)

7   ## II.   STATEMENT OF FACTS

8   Plaintiff purchased a used 2014 Ford Focus on May 17, 2015 for $14,722.20—adding

9   taxes, fees, and a six-year financing plan, the total purchase price was $27,884.32. (SM Dec., ¶

10   3, Ex. C.) The vehicle was distributed by Ford Motor Company, which provided an express

11   written warranty. (*Id.*) After approximately five months and under 10,000 miles, and within the

12   applicable warranty periods, the vehicle began experiencing problems with the transmission—it

13   would shudder upon acceleration. (SM Dec., ¶ 4.) The vehicle also exhibited problems with the

14   engine and electrical systems—the A/C would not blow cold air. (*Id.*) Plaintiff delivered the

15   vehicle to a Ford-authorized repair facility where upon inspection, the technician discovered an

16   undetermined engine leak and attempted to correct the issue by resealing the timing cover and

17   resealing the oil pan gasket. (*Id.*) The technician also performed a transmission adaptive relearn,

18   a recall protocol requiring reprogramming the Transmission Control Module ("TCM") and

19   replacing the battery. (*Id.*) Despite being assured that the vehicle had been repaired and was

20   safe to drive, the transmission continued to exhibit problems slipping and accelerating at freeway

21   speeds. (*Id.*) Less than seven months later, Plaintiff again delivered the vehicle to a Ford-

22   authorized repair facility where it remained for five (5) days while the repair facility technicians

23   attempted to correct the issues by removing the transmission, reprogramming the TCM and

24   Powertrain Control Module ("PCM"), replacing the clutch and seals and performing another

25   adaptive relearn. (*Id.*) Despite these efforts, the problems persisted. (*Id.*)

26   Notwithstanding the ongoing repairs and continued manifestation of problems, Ford

27   refused to acknowledge the defective nature of Plaintiff's vehicle. (SM Dec., ¶ 5.) At all times,

1    however, Ford had direct, contemporaneous knowledge of the vehicle's serious defects, which it

2    records in a database called "OASIS" and a warranty repair history database called "AWS." (*Id.*)

3    These repair records indicate each time the vehicle was presented for repair during the warranty

4    period, as well as every time the Ford repair facility found a problem/defect attributable to Ford

5    and billed Ford for the work. (*Id.*)

6         Frustrated, concerned for his safety and having lost confidence in Ford's ability to repair

7    the vehicle, Plaintiff contacted Ford customer service directly on May 9, 2016, and requested

8    Ford repurchase the vehicle. (SM Dec., ¶ 6.) Despite Ford's affirmative duty under the law to

9    perform an investigation and offer relief, Ford rejected Plaintiff's request in June. (*Id.*)

10        Plaintiff contacted Knight Law and told the firm about the problems with the vehicle and

11   the way Ford treated him. (SM Dec., ¶ 7.) After reviewing the repair history and discussions

12   with Plaintiff, Knight Law agreed to represent him and bear the risk of litigating the case on a

13   fully contingent basis. (*Id.*) Because Knight Law's compensation was purely contingent, the firm

14   faced a genuine risk of not being paid for its services for years, if at all, while advancing

15   thousands of dollars in costs and expenses on Plaintiff's behalf. (*Id.*) In taking on this duty, the

16   firm was facing a litigation behemoth—Ford is a multi-billion-dollar company, with a virtually

17   infinite litigation war-chest, that wages a battle of attrition that most firms cannot withstand. (*Id.*)

18        As a result of Ford's failure to fix the material defects associated with Plaintiff's vehicle,

19   or otherwise comply with the Song-Beverly Act, Plaintiff filed a Complaint in this action on

20   November 22, 2016, alleging, in part, willful violations of the Song-Beverly Act and Fraud for

21   failing to disclose a known transmission defect, and seeking civil penalties and punitive damages.

22   (SM Dec., ¶ 8.) Ford filed a Demurrer to Plaintiff's Complaint on or about December 27, 2016.

23   (*Id.*) Plaintiff filed his Opposition and the parties attended a hearing on the matter on March 30,

24   2017, at which time the Court overruled the Demurrer. (*Id.*) Ford then filed its Answer, denying

25   all liability and asserting numerous affirmative defenses, on or about April 19, 2017. (*Id.*)

26        Defendant's position in the litigation required extensive efforts on the part of Plaintiff's

27   counsel, and they promptly began working up their case on behalf of Plaintiff (SM Dec., ¶ 9.)

Written discovery was drafted and served on Defendant on or about January 11, 2017, consisting of 44 requests for admissions, 92 requests for production of documents, 87 special interrogatories and 28 form interrogatories. (*Id.*)   Plaintiff benefitted from Knight Law's expertise and experience in litigating against Ford as just 3.8 hours were billed for drafting the entirety of this discovery. (*Id.*)   Plaintiff's counsel are able to use existing files as templates to conserve time and litigate efficiently. (*Id.*)   Written discovery of this magnitude, drafted from scratch and without the benefit of Plaintiff's attorneys' vast knowledge, experience and specialized expertise, would have taken multitudes of the time expediently managed here. (*Id.*)

Due to Defendant's improper objections and/or incomplete and evasive responses to Plaintiff's discovery, Plaintiff began "meet and confer" efforts in April 2017, and the meet and confer process continued throughout the month. (SM Dec., ¶ 10.)   In May 25, 2017, Ford continued its vigorous defense in this case, propounding requests for admissions, requests for production of documents, special and form interrogatories upon Plaintiff.   (SM Dec., ¶ 11)   Plaintiff again benefitted from Knight Law's expertise and experience as just 2.9 hours were billed for drafting responses to the entirety of this discovery.   (*Id.*) Ford also noticed the deposition of Plaintiff and made a demand for the inspection of Plaintiff's defective vehicle. (*Id.*)

In October 2017, Plaintiff noticed the depositions of several Ford employees and dealership personnel, including Ford's PMK and the dealership's PMQ, service advisors and service technicians. (SM Dec., ¶ 12.)   These depositions were needed to obtain information regarding repairs to the vehicle, authenticate the repair orders, and rebut Ford's anticipated argument that the problems with Plaintiff's vehicle were somehow caused by Plaintiff's neglect or abuse. (*Id.*)   With the absence of any reasonable settlement offer from Ford accounting for its willful violation of the Song-Beverly Act, the case appeared likely to go to trial. (SM Dec., ¶ 13.) Accordingly, on or about October 27, 2017, Michael H. Rosenstein formally associated into the case as lead trial counsel to prepare the case for trial. (*Id.*; MR Dec. ¶ 11, Ex. C.)

With the trial date approaching, Ford continued its robust defense by propounding a second set of requests for production of documents, requests for admissions, and special

1   interrogatories. (SM Dec., ¶ 14.) Plaintiff once more benefitted from Knight Law's expertise

2   and experience as <u>just 4.2 hours were billed for drafting responses to the entirety of this</u>

3   <u>discovery</u>. (*Id*.)

4        In November 2017, Plaintiff's counsel defended the deposition of Plaintiff and took the

5   depositions of Ford's technicians, PMK and PMQ. (SM Dec., ¶ 15; MR Dec., ¶ 12.) Plaintiff's

6   counsel kicked their trial preparation into high gear by drafting trial-related documents including

7   sixteen (16) Motions in limine, joint witness and exhibit lists, proposed jury instructions and

8   special verdict forms, a joint trial readiness conference report, statement of the case, and joint list

9   of stipulated facts. (*Id*.) In further preparation for trial, Plaintiff's counsel reviewed Ford's

10  twenty-two (22) Motions in limine and prepared for oral argument on each. (*Id*.) Plaintiff also

11  drafted a Motion for Leave to File Amended Complaint and attended the hearing on the matter—

12  the Court granted Plaintiff's motion. (*Id*.) In December 2017, Plaintiff's counsel traveled to and

13  defended the deposition of Itzel Diaz. (*Id*.)

14       Meanwhile, Ford filed a Motion for Summary Adjudication. (SM Dec., ¶ 16.) In

15  December 2017, Plaintiff's counsel drafted the Opposition to Ford's Motion for Summary

16  Adjudication. (*Id*.) On December 15, 2017, Counsel traveled to and attended the hearing at

17  which time the Court denied Ford's motion. (*Id*.)

18       In December 2017, Ford served Plaintiff with an Offer to Compromise pursuant to the

19  Code of Civil Procedure section 998 ("998 Offer"). (SM Dec., ¶ 17.) Plaintiff rejected the

20  ambiguous offer—it only allowed Counsel to apply for recovery of attorney fees up to the date

21  of the offer, substantially altering Plaintiff's statutory rights under the Song-Beverly Act. (*Id*.)

22       On or about January 9, 2018, after a little more than thirteen months of litigation and ten

23  days before trial, set for January 19, 2018, Ford served Plaintiff with a Renewed Offer to

24  Compromise pursuant to the Code of Civil Procedure section 998 ("Renewed 998 Offer"), in the

25  amount of $98,500.00. (SM Dec., ¶ 18, Ex. D.) Plaintiff accepted the Renewed 998 Offer on

26  January 15, 2018. (SM Dec., ¶ 19.) This settlement amount was inclusive of a full statutory

27

1  "buy-back" of Plaintiff's defective vehicle, incidental and consequential damages, and a two-

2  time civil penalty. (*Id.*)

3      Plaintiff, as the prevailing party in this action, has made every reasonable effort to resolve

4  the payment of Plaintiff's attorney's fees by Ford but was forced to file this Motion with the

5  Court. (SM Dec., ¶¶ 20-30.)

6              **III.    ARGUMENT AND ANALYSIS**

7      A.    <u>Plaintiff's Attorneys Are Entitled to Fees, Costs and Expenses in this Action</u>

8      Plaintiff is the prevailing party in this action and, under the Song-Beverly Act, entitled to

9  recoup all reasonable attorney's fees, costs and expenses. (Code Civ. Proc. § 1032(a)(4); Civ.

10  Code § 1794(d); *Graham v. DaimlerChrysler Corp.* (2004) 34 Cal.4th 553, 557; *Reveles v.*

11  *Toyota by the Bay* (1997) 57 Cal.App.4th 1139.)  Absent a contrary showing, both the number of

12  hours that the prevailing party's attorney spent litigating the case and his or her regular hourly

13  rate are presumed to be reasonable. (*Serrano v. Unruh* (1982) 32 Cal.3d 621, 639 (counsel is

14  entitled to all hours actually spent, absent a showing of "special circumstances" that would render

15  such an award unjust); *Mandel v. Lackner* (1979) 92 Cal.App.3d 747, 761 (an attorney's regular

16  hourly rate is entitled to a presumption of reasonableness); Pearl, <u>California Attorney Fee</u>

17  <u>Awards</u>, at §§ 12.14A, 12.33 (2nd Ed. 2005.)

18      In prosecuting this case, the efforts of Knight Law amount to $35,792.50, including

19  drafting this motion and time anticipated to be spent preparing the reply and attending the

20  hearing. (SM Dec., ¶ 2, Ex. A.)  The billings by Rosenstein total $18,237.50. (MR Dec., ¶ 9,

21  Ex. A.) Plaintiff's counsel also requests a modest 0.5 enhancement, in the amount of $27,015.00,

22  to account for the delay in payment and contingent risk posed by this case.  Lastly, the

23  reimbursable costs and expenses set forth in Plaintiff's memorandum of costs are $5,402.86.

24  (SM Dec., ¶ 2, Ex. B.)  In total, Plaintiff requests $86,447.86 in fees, costs and expenses. (SM

25  Dec., ¶ 2, Exs. A-B; MR Dec., ¶ 9, Ex. A.)  While Ford will surely claim these amounts are

26  unreasonable, Ford's own counsel admits in a declaration filed in federal court that "it is not

27  uncommon, and in fact quite regular, for attorney's fees and cost awards (*or resolutions through*

6

1  *informal discussions* with opposing counsel) to exceed $100,000.00." (SM Dec., ¶ 37, Ex. F, p.

2  3, ¶ 4.)  Few, if any, manufacturers cause this much work to be performed in allegedly "simple

3  lemon law actions."

4          **B.**    **The Hourly Rates Sought by Plaintiff's Attorneys Are Reasonable**

5        The Court of Appeal has expressly held the lodestar method applies to determining

6  attorney's fees under the Song-Beverly Act. (*Robertson v. Fleetwood Travel Trailers of*

7  *California, Inc.* (2006) 144 Cal.App.4th 785, 817.)  The calculation of reasonable attorney's fees

8  under the Song-Beverly Act is based on the lodestar method, which entails multiplying the

9  number of hours reasonably expended by a reasonable hourly rate. (*Graciano v. Robinson Ford*

10  *Sales* (2006) 144 Cal.App.4th 140, 154; *Robertson, supra,* 144 Cal.App.4th at 817.)  The

11  prevailing buyer has the burden of showing that the fees incurred were "allowable," "reasonably

12  necessary to the conduct of the litigation," and "reasonable in amount." (*Goglin v. BMW of North*

13  *America, LLC* (2016) 4 Cal.App.5th 462, 470.)  In making such an evaluation, a court may

14  consider "factors such as the complexity of the case and procedural demands, the skill exhibited

15  and the results achieved." (*Id.*)

16        In *Goglin v. BMW*, the appellate court recently affirmed the trial court's award of over

17  $185,000 in attorneys' fees and costs for a plaintiff who settled her claims against BMW under

18  the Song-Beverly Act. (*Id.* at 464.)  The court also found plaintiff's counsel's rate of $575 per

19  hour was reasonable as supported by exhibits to counsel's declaration indicating various state

20  and federal courts had previously awarded him comparable hourly rates. (*Id.* at 473-74.)  The

21  holding states that the trial court was not obliged to consider that defendants paid their counsel a

22  much lower hourly rate. (*Id.* at 474.)  In *Robertson*, the trial court awarded $231,187.45 in fees

23  based on $145,080.50 in fees through trial, plus a "multiplier" of 1.5 for a total of $217,620.75,

24  and $13,566.70 for the attorney's fee motion. (*Robertson, supra,* 144 Cal.App.4th at 817.)  The

25  appellate court upheld the ruling. (*Id.* at 822.)  In *Graciano*, the trial court initially rejected

26  plaintiff's lodestar fees of $109,468.50 and request for a multiplier of 2.0. In particular, the trial

27  court reduced the plaintiff's attorney's rate from the requested $350/hour to $250/hour, which

1   was the court's mandated maximum rate for expert testimony.  The appellate court reversed,

2   reasoning a court should determine the prevailing rate in the community for comparable

3   professional legal services. (*Graciano, supra,* 144 Cal.App.4th at 156 (*citing PLCM Group v.*

4   *Drexler* (2000) 22 Cal.4th 1084, 1095).)  The court found the plaintiff's unrebutted declarations

5   established the proper hourly rate at $350 (for work in 2004), and reducing that rate to $250 was

6   an abuse of discretion.  (*Id.*)  The court also reaffirmed attorney's fees <u>are not limited to a</u>

7   <u>proportion</u> of the recovery. (*Id.* at 164.)  On remand, the trial court found that the lodestar rate of

8   $350/hour was reasonable *and added* a multiplier of 2.0 for a total fee award of over $380,000.00.

9   The attorney from *Graciano,* Hallen D. Rosner, now charges $695/hour.  (SM Dec., ¶ 51 (a).)

10          Furthermore, the California Supreme Court has expressly ruled that prevailing parties

11   who are entitled to recover their attorney's fees are *also entitled* to recover their fees for the time

12   spent preparing fee applications such as this one. (*Serrano v. Unruh, supra,* 32 Cal.3d at 631;

13   *Los Angeles Police Protective League v. City of Los Angeles* (1986) 188 Cal.App.3d 1, 17;

14   *Robertson, supra,* 144 Cal.App.4th at 817 (awarding $13,566.70 in fees for a fee motion).)

15          Consideration of the "lodestar" factors compels an award of attorney's fees based on (i)

16   the hourly rates set forth of in the declarations filed concurrently herewith (SM Dec., ¶¶ 41-48;

17   MR Dec., ¶¶ 3-8 ), (ii) a survey of rates charged by other well-known consumer law attorneys

18   (SM Dec., ¶ 51), (iii) over three dozen court orders confirming the reasonableness of Plaintiff's

19   counsels' hourly rates and time billed in other Song-Beverly Act cases (SM Dec., ¶¶ 52-96, Exs.

20   G-YY), and (iv) a National Survey further supporting the reasonableness of the hourly rates. (MR

21   Dec., ¶ 10, Ex. B, at pp. 42-45.)  Plaintiff's counsels' rates are within the range of rates charged

22   by other attorneys with similar experience in this area of law.

23                    **1.    <u>The Nature and Complexity of the Litigation Support the Attorney's</u>**

24                                **<u>Fees Requested</u>**

25          Determining the amount of reasonable attorney's fees may involve consideration of the

26   nature and complexity of the case. (*Dietrich v. Dietrich* (1953) 41 Cal.2d 497, 506; *Graciano,*

27   *supra,* 144 Cal.App.4th at 147.)  Ford routinely claims that cases like this one are "simple lemon

8

1  law cases" and, therefore, Plaintiff's fee requests are always unjustified as excessive.  This case
2  required a range of specialized knowledge including: (1) an understanding of the full scope of
3  consumer protection laws, which are highly nuanced; (2) knowledge of the intricacies of
4  automobiles and the lexicon associated with them, as well as knowledge concerning how to
5  investigate issues with automobiles; and (3) knowledge of auto manufacturers' and dealers'
6  policies and protocols for repairing vehicles and complying with their legal obligations. (SM
7  Dec., ¶ 99.)  Plaintiff's attorneys have acquired knowledge and insight about Ford over the course
8  of many years of litigation, and this experience typically results in significantly higher judgments
9  or settlements for their clients.  Plaintiff's attorneys have dared to make these matters more
10 complex, testing the boundaries of car manufacturer's cheating ways.  The firm's attorneys have
11 traveled all over the country to depose individuals from the auto industry, including New Jersey,
12 Texas, Michigan, Florida and Utah, as well as countless counties throughout California.  The
13 firm has successfully fought to compel the production of millions of internal communications
14 and confidential documents from Ford.  No other firm is litigating "simple lemon law" cases like
15 Knight Law and its associating attorneys.

16      Moreover, Ford made this matter even more complex by maintaining it had no liability
17 and declining to submit any reasonable offers to settle the matter for nearly thirteen months of
18 litigation.  Ford should have acknowledged the defects in Plaintiff's vehicle and resolved the
19 matter before this case was ever filed.  Yet, this case was never just about whether or not a car
20 was a lemon, this case and others like it are a test of Ford's very corporate structure and the
21 relationship between a corporation and the customers it so depends on for its profits.  Plaintiff's
22 attorneys have the resolve to investigate those policies and procedures and have discovered tens
23 of thousands of internal documents that elucidate Ford's disregard to consumers.  Plaintiff's
24 attorneys delve deeper into these matters and bring a level of lawyering to this area of law that
25 most other firms either may not care to or do not have the wherewithal to provide.  Undoubtedly,
26 a quick and secure buck could be made with an early settlement but that leaves the violating
27 companies like Ford left to just apply the status quo.

1    Ford engaged in expensive litigation in this case, including denying all liability and stone-

2    walling Plaintiff's discovery efforts. Ford could have resolved this matter much earlier and saved

3    thousands in attorney's fees, costs and expenses by doing so. Ford ultimately capitulated, but

4    not before causing substantial fees to be incurred. When Ford causes the entirety of fees to be

5    incurred, it has no legitimate basis for complaining about the amount of attorney's fees

6    reasonably and actually incurred, especially when Ford had the ability to resolve the matter

7    before a lawsuit was even filed. "A party cannot litigate tenaciously and then be heard to

8    complain about the time necessarily spent by the opposition in response." (*En Palm, LLC v.*

9    *Teitler* (2008) 162 Cal.App.4th 770, 786; *see also Molski v. Arclero Wine Group* (2008) 164

10   Cal.App.4th 786.)

11            **2.    The Firm's Skill Justifies the Amount of Attorney's Fees Sought**

12           A trial court may also take into account the skill of the attorneys when determining

13   reasonable attorney's fees. (*La Mesa-Spring Valley School Dist. v. Otsuka* (1962) 57 Cal.2d 309,

14   316.) Despite the case's difficulties, Plaintiff ultimately recovered $98,500.00 in damages, which

15   is three and a half times the vehicle's purchase price (almost three years ago). The vehicle was

16   no more or less defective on the date of settlement than it was when Plaintiff first asked for his

17   money back before hiring legal counsel, so there is no rational explanation why Ford waged a

18   lengthy and costly legal battle only to settle for a sum equal to Plaintiff's best possible outcome

19   via trial on the merits.

20           Plaintiff's attorneys specialize in consumer law and did not balk at Ford's aggressive

21   litigation tactics. Plaintiff's attorneys' specialized knowledge and experience in lemon law

22   frequently results in outcomes far better than those obtained by attorneys who do not specialize

23   in this specific area of law. This experience provided a resolution to this matter far beyond that

24   which Ford was previously willing to entertain. Because of this experience, knowledge and

25   expertise, ***Plaintiff went from a ZERO offer to a $98,500.00 settlement***. Getting civil penalties,

26   and often punitive damages, like this is not easy and most firms do not know how to seek

27   exemplary damages or do not care to seek them. Plaintiff's attorneys believe they distinguish

1  themselves from others based on many years of focused pursuit of the truth.

2          Counsels' skill is evidenced by the size of the settlement as well as the nominal time

3  expended on litigation tasks, which results in lower overall billing.  Plaintiff's attorneys do not

4  spend inordinate time researching because they specialize in this area of law. (SM Dec., ¶ 100.)

5  Nor do they spend unreasonable time preparing pleadings because they are able to use documents

6  from other cases that need only be edited, rather than written from scratch. (*Id.*)  While substantial

7  fees have been incurred, those fees led to the execution of effective strategies that result in

8  superlative results for Knight Law clients, like Plaintiff here.

9          On the other side, Ford is represented by large national firms—now totaling **eleven**

10  separate law firms – with attorneys who specialize in representing automobile manufacturers in

11  lemon law cases. (SM Dec, ¶ 35.) Ford is a corporate behemoth with the resources to easily

12  overwhelm a consumer or an inexperienced attorney.  It is Defendant and its bevy of attorneys

13  that drive this litigation and then settle for an amount they knew the entire time would be

14  satisfactory, but instead waited until the eve of trial while amassing their billable hours.  Based

15  on a random sample of cases, 74% of the cases against Ford were settled six months before trial

16  instead of much earlier. (SM Dec., ¶ 33.)  Of those cases, 50% were settled just one month before

17  trial. (*Id.*)  Plaintiff required skilled and experienced attorneys to prosecute his claims against

18  Ford and its formidable resources.  Plaintiff's attorneys were well-suited for the task.  Now, Ford

19  appears to have dug its heals even deeper by outright proclaiming in a letter that Ford is no longer

20  willing to discuss settlement, does not want to engage in any further mediations and fully intends

21  to bring every case to trial unless the firm's clients accept Ford's existing offers. (SM Dec., ¶ 36,

22  Ex. E.) To date, 25% of all of 55 cases that Knight Law and its trial attorneys have taken to trial

23  since 2012 have involved Ford as the named defendant. (SM Dec., ¶ 31.)

24          As such, Plaintiff's counsel request to be compensated not only for the quantity of the

25  work but for the quality of the work.  To do so, the firm calls upon a brave judiciary to award

26  counsel the compensation for their hard work.  Eventually, this litigation will reduce lawsuits and

27  the need for attorneys in this area of law, but change can and will only happen over time.

C.     The Settlement Amount Does Not Limit the Attorney's Fee Recovery

Depending upon the amount of attorney's fees incurred in resolving the claim, Ford may argue that damages in the amount of $98,500.00 do not justify an attorney's fee award in the amount requested by Plaintiff, but such an argument is starkly against the weight of California law. The amount of attorney's fees must not be tied to any percentage of recovery. (*Graciano, supra,* 144 Cal.App.4th at 164.) In fact, a trial court may abuse its discretion if it applies a rule of proportionality to a fee award.   The U.S. Supreme Court has previously considered the question of proportionality in attorney fee awards and held: "[w]e reject the proposition that fee awards under [42 U.S.C.] section 1988 should necessarily be proportionate to the amount of damages a civil rights plaintiff actually recovers." (*City of Riverside v. Rivera* (1986) 477 U.S. 561, 574; *see also* Sen. Report No. 93-151, 1st Sess., pp. 23-24 (1973) (attorney's fees under the Magnuson Moss Warranty Act are based on actual time, not a percentage of the recovery); *Robertson, supra,* 144 Cal.App.4th at 820; *Independent Federation of Flight Attendants v. Zipes* (1989) 491 U.S. 754, fn.2 (fee shifting provisions under Magnuson-Moss and Song-Beverly "are to be interpreted alike"); *Goglin, supra,* 5 Cal.App.5th at 468-69 (affirming award of $185,000 in fees and costs in a Song-Beverly Act case that settled for $75,000); *Vo v. Las Virgenes Municipal Water District* (2000) 79 Cal.App.4th 440, 446 (affirming $470,000 fee award after $40,000 judgment because the defendant was excessively litigious and took a non-settlement posture); *Harman v. City and County of San Francisco* (2007) 158 Cal.App.4th 407 (affirming award of approximately $1.1 million in fees where plaintiffs recovered $30,300).)

Attorney's fees and costs commonly exceed the client's damages, although that did not happen here because the settlement was so large, and the fees were efficiently incurred.  The Legislature acknowledged that substantial work might be needed to prosecute such claims against large corporations, which is the reason behind the fee shifting provision of the Song-Beverly Act. (SM Dec., ¶ 98.) Otherwise, consumers would be left without opportunity for redress when their damages were not enough for an attorney to take the case on a contingent fee or hourly rate basis. "The purpose of statutory attorney fee provisions is to provide financial incentives necessary for

12

1   the private enforcement of important civil rights." (*Ketchum v. Moses* (2001) 24 Cal.4th 1122,

2   1132.)  Thus, the Song-Beverly Act gives consumers the opportunity to seek legal redress even

3   if their damages would not be high enough to warrant legal representation.   The award of

4   attorney's fees *cannot* be limited by damages recovered.  (*Ketchum*, *supra*, 24 Cal.4th at 1138.)

5       **D.**    <u>Plaintiff Should Be Granted a Lodestar Multiplier</u>

6       As part of the Song-Beverly Act, a prevailing buyer may also receive a lodestar multiplier.

7   (*Robertson*, *supra*, 144 Cal.App.4th at 817.)   Once a lodestar amount is determined, which

8   involves a "careful compilation of the actual time spent and reasonable hourly compensation for

9   each attorney," (*Id.* at 819 (*citing Serrano v. Priest* (1977) 20 Cal.3d 25, 48-49 (*Serrano III*)),

10  the amount may then be augmented by taking various relevant factors into account, including (1)

11  the novelty and difficulty of the questions involved and the skill displayed in presenting them;

12  (2) the extent to which the nature of the litigation precluded other employment by the attorneys;

13  and (3) the contingent nature of the fee award, based on the uncertainty of prevailing on the

14  merits and of establishing eligibility for the award.  (*Id.*; *see also Graham, supra*, 34 Cal.4th at

15  579; *PLCM Group v. Drexler*, 22 Cal.4th at 1096.)  "[T]he purpose of a fee enhancement is

16  primarily to compensate the attorney for the prevailing party at a rate reflecting the risk of

17  nonpayment in contingency cases."  (*Ketchum*, *supra*, 24 Cal.4th at 1138; *Cazares v. Saenz*

18  (1989) 208 Cal.App.3d 279, 287-88 (risk factor alone justifies a 2.0 multiplier for a 50% chance

19  of prevailing).)  "A 50 percent chance of recovery implies a multiplier of 2, a 25 percent chance

20  of recovery implies a multiplier of 4, and so on."  (*In re Chiron Corp. Securities Litigation* (N.D.

21  Cal. Nov. 30, 2007) No. C-04-4293 VRW, 2007 WL 4249902, *9.)  Plaintiff asks for far less.

22      In *Robertson*, a case brought under the Song-Beverly Act, the court ruled that the

23  "statutory language in section 1794(d) is reasonably compatible with a lodestar adjustment

24  method of calculating attorney fees, including use of fee multipliers," and the court granted a 1.5

25  multiplier. (144 Cal.App.4th at 817, 819.)  In *Graciano*, the appellate court actually *increased*

26  the trial court's award of fees after finding that the lodestar rate of $350/hour was reasonable and

27  adding a 2.0 multiplier for a total award of over $380,000.00. (144 Cal.App.4th at 156.)

13

1   The lodestar is intended to reflect the basic fee for comparable non-contingent legal

2   services and should be enhanced by an appropriate multiplier to reflect the risk and delay in

3   payment associated with taking a contingent case, as well as the result achieved.  The lodestar

4   "multiplier" is meant to increase or decrease the fee award based on factors not already taken

5   into account when setting the hourly rate, such as the risk of taking a case on a contingency basis,

6   and delay in receiving payment.  (*See Horsford v. Bd. of Trustees of Cal. State Univ.* (2005) 132

7   Cal. App. 4th 359, 394-95.)

8   In *Ketchum*, the California Supreme Court wrote, "[a] contingent fee contract, since it

9   involves a gamble on the result, may properly provide for a *larger compensation* than would

10  otherwise be reasonable." (24 Cal.4th at 1132 [emphasis added].)

11  A contingent fee must be higher than a fee for the same legal services paid as they are performed.  The contingent fee compensates the lawyer not only for the legal

12  services he renders but for the loan of those services.  The implicit interest rate on such a loan is higher because the risk of default (the loss of the case, which cancels

13  the debt of the client to the lawyer) is much higher than that of conventional loans. (Posner, Economic Analysis of Law (4th ed.1992) pp. 534, 567, emphasis added.)

14  A lawyer who both bears the risk of not being paid and provides legal services is not receiving the fair market value of his work if he is paid only for the second of

15  these functions.  If he is paid no more, competent counsel will be reluctant to accept fee award cases.

16  (*Id.* at 1132 [citations omitted; emphasis added].)

17  Throughout the litigation, there always existed the possibility Plaintiff would not prevail.

18  The risk was compounded by the fact that Plaintiff's attorneys advanced all litigation costs and

19  expenses without reimbursement.  Thus, if Plaintiff did not prevail, his attorneys would have

20  suffered a substantial loss of uncompensated attorney hours and out-of-pocket expenses.  Plaintiff

21  requests a 0.2 enhancement based on that risk.  Further, Ford dragged this case out for nearly

22  thirteen months before agreeing to a reasonable settlement.  Unlike Ford's attorneys, who are

23  paid monthly regardless of outcome, Plaintiff's attorneys are not paid at all if they lose and need

24  to absorb significant delay in being paid if Plaintiff does win.  On account of the substantial delay

25  in payment, Plaintiff requests a 0.3 enhancement.

26  Based on the risk of taking this case on a contingent fee basis and the delay in payment

27  since November 2016, Plaintiff requests a nominal multiplier of 0.5.  Courts have awarded a

1  lodestar multiplier to Plaintiff's counsel in numerous cases.  (SM Dec., ¶¶ 67, 71, 80, 81, 83, 84,

2  88, 94, 95, 96, Exs. V, Z, II, JJ, LL, MM, QQ, WW, XX, YY.)

3      **E.**    **Plaintiff is Entitled to Recover All Costs and Expenses Reasonably Incurred**

4          **in Connection with this Action**

5      Under the Song-Beverly Act, a prevailing buyer shall be allowed to recover as part of the

6  judgment a sum equal to the aggregate amount of costs and expenses. (Civ. Code § 1794(d)

7  [emphasis added].)  The California Legislature intended the word "expenses" to cover outlays

8  not included in the detailed statutory definition of "costs," and the Song-Beverly Act's legislative

9  history demonstrates the Legislature exercised its power to permit recovery of a host of litigation

10  expenditures beyond those permitted by Code of Civil Procedure § 1033.5. (*Jensen v. BMW of*

11  *North America, Inc.* (1995) 35 Cal.App.4th 112, 137-138.)

12      A verified memorandum of costs generally satisfies the moving party's burden of

13  establishing costs necessarily incurred. (*Hadley v. Krepel* (1985) 167 Cal.App.3d 677, 682.) The

14  verified memorandum of costs demonstrates Plaintiff's attorneys' costs and expenses prosecuting

15  this matter, which counsel advanced on Plaintiff's behalf. (SM Dec. ¶ 2, Ex. B.)  The burden

16  shifts to Ford to properly rebut the claimed costs.

17                  **IV.**    **CONCLUSION**

18      For the reasons above, Plaintiff respectfully requests this Honorable Court award

19  attorney's fees, costs and expenses as follows:

20  | Lodestar Fees: | $54,030.00 |
| +Lodestar Enhancement: | $27,015.00 |
| Total Fees Requested: | $81,045.00 |
| +Costs and Expenses: | $ 5,402.86 |
| =**Total Fees and Costs/Expenses:** | **$86,447.86** |

23  Dated: April 10, 2018          **KNIGHT LAW GROUP, LLP**

25

26  Steve Mikhov (SBN 224676)

    Attorneys for Plaintiff,

27      **CHRISTIAN B. VENEGAS**

PROOF OF SERVICE
(Code of Civil Procedure §1013a)

I am employed in the County of Los Angeles, State of California.  I am over the age of 18 years and not a party to the within action.  My business address is 1801 Century Park East, Suite 2300, Los Angeles, CA 90067.

I served the foregoing document described as:

**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR ATTORNEY'S FEES, COSTS AND EXPENSES**

Said document was served on the interested parties in this action, by placing true copies thereof enclosed in sealed envelopes, with postage prepaid, addressed as follows:

| | |
|---|---|
| Alexander G. Calfo, Esq. | Michael H. Rosenstein, Esq. |
| KING & SPALDING LLP | Law Offices of Michael H. Rosenstein |
| 633 West 5th Street, Suite 1700 | 1801 Century Park East, Suite 2300 |
| Los Angeles, CA 90071 | Los Angeles, CA 90067 |
| **Counsel for Defendant,** | **Associated Counsel for Plaintiff,** |
| **FORD MOTOR COMPANY** | **CHRISTIAN B. VENEGAS** |
| (via Overnight Mail Only) | (via E-mail only) |

<u>XX</u>   BY OVERNIGHT MAIL/DELIVERY: I caused such envelope to be delivered by hand to the office(s) of the addressee(s) via OVERNIGHT EXPRESS or by local courier service.

<u>XX</u>   BY E-MAIL OR ELECTRONIC TRANSMISSION: Based on a court order or an agreement of the parties to accept service by e-mail or electronic transmission, I caused the documents to be sent to the persons at the e-mail addresses listed above.  I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

<u>XX</u>   I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on April 10, 2018 at Los Angeles, California.

Hector Almeyda

-1-



RECEIVED

APR 1 1 2018

BY: ...........................