1

**KNIGHT LAW GROUP, LLP**

2

Steve Mikhov (SBN 224676)

1801 Century Park East, Suite 2300

3

Los Angeles, CA 90067

Telephone: (310) 552-2250

4

Fax: (310) 552-7973

Email: stevem@knightlaw.com

5

6

**WIRTZ LAW APC**

Richard M. Wirtz (SBN 137812)

7

4370 La Jolla Village Drive, Suite 800

San Diego, CA 92122

8

Telephone: (858) 259-5009

9

Fax: (858) 259-6008

Email: rwirtz@wirtzlaw.com

10

11

Attorneys for Plaintiff,

**DANIEL MARIO MORALES**

12

13

### SUPERIOR COURT OF THE STATE OF CALIFORNIA

14

### COUNTY OF MERCED

15

16

**DANIEL MARIO MORALES,**

17

Plaintiff,

18

vs.

19

20

**FORD MOTOR COMPANY, a Delaware Corporation, and DOES 1 through 10, inclusive,**

21

22

Defendants.

23

24

25

26

27

28

Case No.: 15CV-03200

**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR ATTORNEY'S FEES, COSTS AND EXPENSES**

[Filed Concurrently with Plaintiff's Notice of Motion and Motion for Attorney's Fees, Costs and Expenses; Declarations of Steve Mikhov and Richard M. Wirtz]

*Assigned for All Purposes to the Honorable Brian McCabe*

Date:  April 24, 2018

Time: 8:15 a.m.

Dept.: 8

1

## TABLE OF CONTENTS

2

Page(s)

3    I.    INTRODUCTION .................................................................................1

4    II.    STATEMENT OF FACTS ....................................................................2

5    III.    ARGUMENT AND ANALYSIS .........................................................6

6
        A.    Plaintiff's Attorneys Are Entitled to Fees, Costs and Expenses in this
7              Action.........................................................................................6

8        B.    The Hourly Rates Sought by Plaintiff's Attorneys Are Reasonable.................7

9              1.    The Nature and Complexity of the Litigation Support the
                      Attorney's Fees Requested ..............................................9
10
              2.    The Firm's Skill Justifies the Amount of Attorney's Fees
11                    Sought ...........................................................................10

12        C.    The Settlement Amount Does Not Limit the Attorney's Fee Recovery..........12

13        D.    Plaintiff Should Be Granted a Lodestar Multiplier.........................................13

14        E.    Plaintiff is Entitled to Recover All Costs and Expenses Reasonably
15              Incurred in Connection with this Action.........................................15

16    IV.    CONCLUSION.....................................................................................15

17

18

19

20

21

22

23

24

25

26

27

28

i

## TABLE OF AUTHORITIES

Page(s)

Cases

*Cazares v. Saenz*
(1989) 208 Cal.App.3d 279 ...................................................................13

*City of Riverside v. Rivera*
(1986) 477 U.S. 561 ...............................................................................12

*Dietrich v. Dietrich*
(1953) 41 Cal.2d 497 ...............................................................................9

*En Palm, LLC v. Teitler*
(2008) 162 Cal.App.4th 770 ..................................................................10

*Goglin v. BMW of North America, LLC*
(2016) 4 Cal.App.5th 462 ...................................................................7, 12

*Graciano v. Robinson Ford Sales*
(2006) 144 Cal.App.4th 140 ...................................................7, 8, 9, 12, 13

*Graham v. DaimlerChrysler Corp.*
(2004) 34 Cal.4th 553 ..........................................................................6, 13

*Hadley v. Krepel*
(1985) 167 Cal.App.3d 677 ...................................................................15

*Harman v. City and County of San Francisco*
(2007) 158 Cal.App.4th 407 ..................................................................12

*Horsford v. Bd. of Trustees of Cal. State Univ.*
(2005) 132 Cal. App. 4th 359 ...............................................................14

*In re Chiron Corp. Securities Litigation*
(N.D. Cal. Nov. 30, 2007) No. C-04-4293 VRW, 2007 WL 4249902 .....13

*Independent Federation of Flight Attendants v. Zipes*
(1989) 491 U.S. 754 ...............................................................................12

*Jensen v. BMW of North America, Inc.*
(1995) 35 Cal.App.4th 112 ...................................................................15

*Ketchum v. Moses*
(2001) 24 Cal.4th 1122 ....................................................................13, 14

ii

*La Mesa-Spring Valley School Dist. v. Otsuka*
   (1962) 57 Cal.2d 309 .................................................................10

*Los Angeles Police Protective League v. City of Los Angeles*
   (1986) 188 Cal.App.3d 1................................................................8

*Mandel v. Lackner*
   (1979) 92 Cal.App.3d 747..............................................................6

*Molski v. Arclero Wine Group*
   (2008) 164 Cal.App.4th 786..........................................................10

*PLCM Group v. Drexler*
   (2000) 22 Cal.4th 1084............................................................ 8, 13

*Reveles v. Toyota by the Bay*
   (1997) 57 Cal.App.4th 1139............................................................6

*Robertson v. Fleetwood Travel Trailers of California, Inc.*
   (2006) 144 Cal.App.4th 785 ............................................7, 8, 12, 13

*Serrano v. Priest*
   (1977) 20 Cal.3d 25 (*Serrano III*) .............................................13

*Serrano v. Unruh*
   (1982) 32 Cal.3d 621 ..............................................................6, 8

*Vo v. Las Virgenes Municipal Water District*
   (2000) 79 Cal.App.4th 440 .........................................................12


Statutes and Codes

California Code of Civil Procedure
   Section 1032(a)(4) .....................................................................6

California Code of Civil Procedure
   Section 1033.5...........................................................................15

California Code of Civil Procedure
   Section 1794(d)..........................................................2, 6, 13, 15

California Code Of Civil Procedure
   Section 998...............................................................................5

iii

1

## Other Authorities

2

3   Pearl, *California Attorney Fee Awards*
         Sections 12.14A, 12.33 (2nd Ed. 2005) ...........................................................6
4
5   Sen. Report No. 93-151,
         1st Sess., pp. 23 (1973) ..............................................................................12

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR
ATTORNEY'S FEES, COSTS AND EXPENSES

# I.   INTRODUCTION

On June 12, 2017, over nineteen months after the complaint was filed in this action, the parties agreed to settle the case at the Mandatory Settlement Conference for $88,000.00. This settlement amount consisted of a full statutory "buy-back" of Plaintiff's defective vehicle, incidental and consequential damages, and a civil penalty. <u>The final settlement is **over five times** the total amount Plaintiff paid for the vehicle</u> in what the defense routinely calls a "simple lemon law" action. Plaintiff obtained this extraordinary sum *without going to trial*. By any analysis, Plaintiff achieved an excellent settlement given Ford Motor Company's ("Defendant" or Ford") initial refusal to even consider a buyback of Plaintiff's defective vehicle. The settlement is one that few, if any, firms in this state can achieve for its clients. The excellent result was achieved due to Plaintiff's attorneys' skill and expertise in lemon law cases but, arguably, the biggest factor in Plaintiff's success was Plaintiff's attorneys' zealous representation.

On November 14, 2014, Plaintiff purchased a used 2013 Ford Fiesta for $16,475.36. Throughout his ownership of the vehicle, Plaintiff suffered through ongoing transmission and engine problems, including a persistent shudder, requiring multiple repair visits. During just over four months of ownership, <u>Plaintiff took his vehicle in for repair a total of four (4) times,</u> but the serious transmission problems continued. Plaintiff contacted Ford with the hope that Ford would repurchase his defective vehicle, but Ford refused. Rather, Ford applied its tried and true internal policy of ignoring its statutory obligations under the Song-Beverly Act. By doing so, Ford made a business decision that, by its actions, Plaintiff (like many consumers) would walk away and Ford would save money. Plaintiff could not afford do that and so Plaintiff hired the Knight Law Group, LLP ("Knight Law") on a contingency basis to assist in vindicating his rights. Knowing that Ford had willfully violated Plaintiff's rights and had already rejected informal resolution, Knight Law proceeded to file this case.

It should be noted that Plaintiff, like 100% of the clients of Knight Law, first tried to obtain resolution prior to hiring attorneys by contacting the manufacturer or by going through the Better Business Bureau (an established resolution process). Knight Law does not jump head first into litigation. **Every single one of the firm's clients** were denied or the terms of an offer

1

1 | sought to steal monies that the consumers were lawfully owed.  In pursuing lemon law cases,
2 | Knight Law and its associating attorneys are exposing the truth about some of these vehicle
3 | manufacturers and causing them to pay multiples of actual damages in the form of civil penalties
4 | (and punitive damages).  The day Ford starts honoring its obligations to consumers in this State
5 | is the day Knight Law goes out of business.  This case, and others like it, could have been
6 | altogether avoided.  Much like products liability actions have paved the way for innovations in
7 | manufacturing, design and marketing standards, Plaintiff's counsel hopes that one day these
8 | lemon law cases add up to actually have an effect on the way manufacturers treat their consumers.
9 | The firm is willing to stand up to these mammoth companies, and then are vilified for doing so.

10 | The Song-Beverly Act, Civil Code sections 1790, *et seq.*, entitles Plaintiff to seek
11 | reasonable attorney's fees, costs and expenses from Ford.  Moreover, Plaintiff is the prevailing
12 | party and entitled to this noticed motion for attorney's fees.  Plaintiff now moves the Court: (1)
13 | for an award of attorney's fees pursuant to Civil Code section 1794(d) under the "lodestar"
14 | method in the amount of $46,322.50[1], (2) for a reasonable, modest, "lodestar" modifier of 1.5
15 | under California law, in the amount of $23,161.25, and (3) to award actual costs and expenses
16 | incurred in the amount of $5,484.04. (Civ. Code § 1794(d).)  Plaintiff requests a total of
17 | $74,967.79 in attorney's fees, costs and expenses. (Declaration of Steve Mikhov ("SM Dec.") ¶
18 | 2, Exs. A-B; Declaration of Richard M. Wirtz ("RMW Dec") ¶ 7, Ex. A.)

## II.    STATEMENT OF FACTS

20 | Plaintiff purchased a used 2013 Ford Fiesta on November 14, 2014 for a purchase price
21 | of $12,000.00 – adding taxes, fees, an optional theft deterrent device and financing charges on a
22 | six-year loan, the total purchase price was $16,475.36. (SM Dec., ¶ 3, C.)  The vehicle was
23 | distributed by Ford Motor Company, which provided an express written warranty. (*Id.*)  After
24 | approximately two months and just over 3,000 miles of ownership, and within the applicable
25 | warranty periods, the vehicle began exhibiting serious problems with the transmission, including
26 | the transmission shuddering between gears. (SM Dec., ¶ 4.)  Plaintiff delivered the vehicle to a
27 | Ford-authorized repair facility where they attempted to correct the issues by reprogramming the

---

[1] Plaintiffs have subtracted $1,310.00 in sanctions that were paid by Ford Motor Company from the lodestar amount.

1    powertrain control module ("PCM") and transmission control module ("TCM"), and replacing

2    the clutch assembly. (*Id.*)  Despite being assured that the vehicle had been repaired and was safe

3    to drive, the transmission continued to shudder, requiring another repair visit just one month later.

4    (*Id.*)  In another attempt to correct these issues, the repair facility technicians again updated the

5    PCM and TCM and performed a clutch adaptive relearn. (*Id.*)  Despite these efforts, the

6    transmission problems continued, later compounded by problems with the engine, requiring

7    replacement of the water pump and gasket. (*Id.*)  Plaintiff repeatedly took the vehicle in for

8    repairs, a total of four (4) times in just over four months of ownership, but the serious

9    transmission problems persisted. (*Id.*)

10          Despite the ongoing repairs and continued manifestation of problems, Ford refused to

11   acknowledge the defective nature of Plaintiff's vehicle. (SM Dec., ¶ 5.)  At all times, however,

12   Ford had direct, contemporaneous knowledge of the vehicle's serious defects, which it records

13   in a database called "OASIS" and a warranty repair history database called "AWS." (*Id.*)  These

14   repair records indicate each time the vehicle was presented for repair during the warranty period,

15   as weil as every time the Ford repair facility found a problem/defect attributable to Ford and

16   billed Ford for the work. (*Id.*)

17          Frustrated, concerned for his safety and having lost confidence in Ford's ability to repair

18   the vehicle, Plaintiff contacted Ford customer service directly on March 25, 2015, and requested

19   Ford repurchase the vehicle. (SM Dec., ¶ 6.)  Despite Ford's affirmative duty under the law to

20   perform an investigation and offer relief, Ford rejected Plaintiff's request. (*Id.*)  Because of

21   Ford's refusal to provide relief, Plaintiff was forced to continue driving his defective vehicle,

22   which continued to shudder and jerk, and lacked power on acceleration, requiring three more

23   repair visits over the next six months. (SM Dec., ¶ 7.)

24          With no other avenue, Plaintiff contacted Knight Law and told the firm about the

25   problems with the vehicle and the way Ford treated him. (SM Dec., ¶ 8.)  After reviewing the

26   repair history and discussions with Plaintiff, Knight Law agreed to represent him and bear the

27   risk of litigating the case on a fully contingent basis. (*Id.*)  Because Knight Law's compensation

28   was purely contingent, the firm faced a genuine risk of not being paid for its services for years,

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR
ATTORNEY'S FEES, COSTS AND EXPENSES

1    if at all, while advancing thousands of dollars in costs and expenses on Plaintiff's behalf. (*Id.*) In

2    taking on this duty, the firm was facing a litigation behemoth—Ford is a multi-billion-dollar

3    company, with a virtually infinite litigation war-chest, that wages a battle of attrition that most

4    firms cannot withstand. (*Id.*)

5       As a result of Ford's failure to fix the material defects associated with Plaintiff's vehicle,

6    or otherwise comply with the Song-Beverly Act, Plaintiff filed a Complaint in this action on

7    November 4, 2015, alleging, in part, willful violations of the Song-Beverly Act and seeking civil

8    penalties. (SM Dec., ¶ 9.)  Ford filed its Answer, denying all liability and asserting numerous

9    affirmative defenses, on or about December 7, 2015. (*Id.*)

10      In December 2015, Ford petitioned to coordinate this case with hundreds of other cases

11   in California involving Ford vehicles equipped with the defective "DPS6" transmission. (SM

12   Dec., ¶ 10.)  As coordination would unduly delay resolution of the cases and lead to substantial

13   prejudice to clients who would be stuck driving defective vehicles, Plaintiff opposed the Petition.

14   (*Id.*)   The Petition was ultimately granted on September 13, 2017, but the present case was

15   excluded from the coordination proceeding as it was already in the process of settlement at that

16   time. (*Id.*)

17      In February 2016, after much opposition from Defendant, Plaintiff was granted leave to

18   file a First Amended Complaint in this action adding allegations of fraudulent inducement -

19   concealment, intentional misrepresentation and negligent misrepresentation with regard to the

20   known transmission defects, and seeking punitive damages. (SM Dec., ¶ 11.) Defendant filed its

21   Answer to Plaintiff's First Amended Complaint on or about April 4, 2016, again denying all

22   liability. (*Id.*) Ford then began its vigorous defense in this case, propounding two sets of requests

23   for admissions, requests for production of documents, special and form interrogatories upon

24   Plaintiff. (SM Dec., ¶ 12.)  Plaintiff benefitted from Knight Law's expertise and experience in

25   litigating against Ford as <u>just 6.9 hours were billed for drafting responses to the entirety of this</u>

26   <u>discovery</u>. (*Id.*)

27      Defendant's position in the litigation required extensive efforts on the part of Plaintiff's

28   counsel, and they promptly began working up their case on behalf of Plaintiff.  (SM Dec., ¶ 13.)

4

1   Written discovery was drafted and served on Defendant on or about September 2, 2016,

2   consisting of 39 requests for admissions, 89 requests for production of documents, 78 special

3   interrogatories and 27 form interrogatories. (*Id.*)  Plaintiff again benefitted from Knight Law's

4   expertise and experience in litigating against Ford as just 3.3 hours were billed for drafting the

5   entirety of this discovery. (*Id.*)  Plaintiff's counsel are able to use existing files as templates to

6   conserve time and litigate efficiently. (*Id.*)  Written discovery of this magnitude, drafted from

7   scratch and without the benefit of Plaintiff's attorneys' vast knowledge, experience and

8   specialized expertise, would have taken multitudes of the time expediently managed here. (*Id.*)

9        Due to Defendant's improper objections and/or incomplete and evasive responses to

10  Plaintiff's discovery, Plaintiff began "meet and confer" efforts in November 2016, and the meet

11  and confer process continued into April 2017. (SM Dec., ¶ 14.)  After the parties reached an

12  impasse, despite Plaintiff's extensive meet and confer efforts, Ford refused to fully comply with

13  its discovery obligations, leaving Plaintiff no choice but to file a Motion to Compel. (*Id.*)  On

14  December 7, 2016, Ford served Plaintiff with an Offer to Compromise pursuant to the Code of

15  Civil Procedure section 998 ("998 Offer"), in the amount of $54,001.00, which Plaintiff rejected.

16  (SM Dec., ¶ 15.)

17        Plaintiff's counsel then continued working up the case on behalf of Plaintiff. (SM Dec.,

18  ¶ 16.)  On February 13, 2017, Plaintiff's counsel defended the deposition of Plaintiff, and on

19  April 21, 2017, Plaintiff's counsel prepared for and attended the non-appearance deposition of

20  Ford's PMK. (*Id.*) Meanwhile, Ford had still not complied with its discovery obligations. (SM

21  Dec., ¶ 17.) Accordingly, the parties attended a hearing on Plaintiff's Motion to Compel on May

22  4, 2017, during which the Court granted the motion and imposed sanctions against Ford. (*Id.*)

23        With the absence of any reasonable settlement offer from Ford accounting for its willful

24  violation of the Song-Beverly Act, the case appeared likely to go to trial. (SM Dec., ¶ 18.)

25  Accordingly, on or about May 22, 2017, Richard M. Wirtz formally associated into the case as

26  lead trial counsel to prepare the case for trial. (*Id.*, RMW Dec., ¶ 8, Ex. B.)  With the trial date

27  approaching, Plaintiff's counsel kicked their trial preparation into high gear. (SM Dec., ¶ 19.)  In

28  June 2017, Plaintiff noticed the depositions of several Ford employees and dealership personnel,

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR
ATTORNEY'S FEES, COSTS AND EXPENSES

1  | including Ford's PMK, PMQ, service advisors and service technicians. (*Id.*)  These depositions
2  | were needed to obtain information regarding repairs to the vehicle, authenticate the repair orders,
3  | and rebut Ford's anticipated argument that the problems with Plaintiff's vehicle were somehow
4  | caused by Plaintiff's neglect or abuse. (*Id.*)

5  | On June 12, 2017, Plaintiff's counsel prepared for and attended the Mandatory Settlement
6  | Conference during which the parties agreed to settle the matter for the sum of $88,000.00. (SM
7  | Dec., ¶ 20, RMW Dec., ¶ 9.)  This settlement amount was inclusive of a full statutory "buy-back"
8  | of Plaintiff's defective vehicle, incidental and consequential damages, and a civil penalty. (*Id.*)
9  | Plaintiff, as the prevailing party in this action, has made every reasonable effort to resolve the
10 | payment of Plaintiff's attorney's fees by Ford but was forced to file this Motion with the Court.
11 | (SM Dec., ¶¶ 21-31.)

## III.  ARGUMENT AND ANALYSIS

### A.  Plaintiff's Attorneys Are Entitled to Fees, Costs and Expenses in this Action

Plaintiff is the prevailing party in this action and, under the Song-Beverly Act, entitled to recoup all reasonable attorney's fees, costs and expenses. (Code Civ. Proc. § 1032(a)(4); Civ. Code § 1794(d); *Graham v. DaimlerChrysler Corp.* (2004) 34 Cal.4th 553, 557; *Reveles v. Toyota by the Bay* (1997) 57 Cal.App.4th 1139.)  Absent a contrary showing, both the number of hours that the prevailing party's attorney spent litigating the case and his or her regular hourly rate are presumed to be reasonable. (*Serrano v. Unruh* (1982) 32 Cal.3d 621, 639 (counsel is entitled to all hours actually spent, absent a showing of "special circumstances" that would render such an award unjust); *Mandel v. Lackner* (1979) 92 Cal.App.3d 747, 761 (an attorney's regular hourly rate is entitled to a presumption of reasonableness); Pearl, California Attorney Fee Awards, at §§ 12.14A, 12.33 (2nd Ed. 2005.)

In prosecuting this case, the efforts of Knight Law amount to $41,505.00, including drafting this motion and time anticipated to be spent preparing the reply and attending the hearing. (SM Dec., ¶ 2, Ex. A.)  The billings by Wirtz Law total $4,817.50. (RMW Dec., ¶ 7, Ex. A.)  Plaintiff's counsel also requests a modest 1.5 enhancement, in the amount of $23,161.25, to account for the delay in payment and contingent risk posed by this case.  Lastly, the

6

1 | reimbursable costs and expenses set forth in Plaintiff's memorandum of costs are $5,484.04.

2 | (SM Dec., ¶ 2, Ex. B.)  In total, Plaintiff requests $74,967.79 in fees, costs and expenses.  (SM

3 | Dec., ¶ 2, Exs. A-B; RMW Dec., ¶ 7, Ex. A.)  While Ford will surely claim these amounts are

4 | unreasonable, Ford's own counsel admits in a declaration filed in federal court that "it is not

5 | uncommon, and in fact quite regular, for attorney's fee and cost awards (*or resolutions through*

6 | *informal discussions* with opposing counsel) to exceed $100,000.00." (SM Dec., ¶ 38, Ex. E, p.

7 | 3, ¶ 4.)  Few, if any, manufacturers cause this much work to be performed in allegedly "simple

8 | lemon law actions."

9 | **B.      The Hourly Rates Sought by Plaintiff's Attorneys Are Reasonable**

10 |        The Court of Appeal has expressly held the lodestar method applies to determining

11 | attorney's fees under the Song-Beverly Act. (*Robertson v. Fleetwood Travel Trailers of*

12 | *California, Inc.* (2006) 144 Cal.App.4th 785, 817.)  The calculation of reasonable attorney's fees

13 | under the Song-Beverly Act is based on the lodestar method, which entails multiplying the

14 | number of hours reasonably expended by a reasonable hourly rate. (*Graciano v. Robinson Ford*

15 | *Sales* (2006) 144 Cal.App.4th 140, 154; *Robertson, supra,* 144 Cal.App.4th at 817.)  The

16 | prevailing buyer has the burden of showing that the fees incurred were "allowable," "reasonably

17 | necessary to the conduct of the litigation," and "reasonable in amount." (*Goglin v. BMW of North*

18 | *America, LLC* (2016) 4 Cal.App.5th 462, 470.)  In making such an evaluation, a court may

19 | consider "factors such as the complexity of the case and procedural demands, the skill exhibited

20 | and the results achieved." (*Id.*)

21 |        In *Goglin v. BMW*, the appellate court recently affirmed the trial court's award of over

22 | $185,000 in attorneys' fees and costs for a plaintiff who settled her claims against BMW under

23 | the Song-Beverly Act. (*Id.* at 464.)  The court also found plaintiff's counsel's rate of $575 per

24 | hour was reasonable as supported by exhibits to counsel's declaration indicating various state

25 | and federal courts had previously awarded him comparable hourly rates. (*Id.* at 473-74.)  The

26 | holding states that the trial court was not obliged to consider that defendants paid their counsel a

27 | much lower hourly rate. (*Id.* at 474.)  In *Robertson*, the trial court awarded $231,187.45 in fees

28 | based on $145,080.50 in fees through trial, plus a "multiplier" of 1.5 for a total of $217,620.75,

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR
ATTORNEY'S FEES, COSTS AND EXPENSES

1   and $13,566.70 for the attorney's fee motion. (*Robertson, supra,* 144 Cal.App.4th at 817.)  The

2   appellate court upheld the ruling. (*Id.* at 822.)

3         In *Graciano*, the trial court initially rejected plaintiff's lodestar fees of $109,468.50 and

4   request for a multiplier of 2.0.  In particular, the trial court reduced the plaintiff's attorney's rate

5   from the requested $350/hour to $250/hour, which was the court's mandated maximum rate for

6   expert testimony.  The appellate court reversed, reasoning a court should determine the prevailing

7   rate in the community for comparable professional legal services. (*Graciano, supra,* 144

8   Cal.App.4th at 156 (*citing PLCM Group v. Drexler* (2000) 22 Cal.4th 1084, 1095).)  The court

9   found the plaintiff's unrebutted declarations established the proper hourly rate at $350 (for work

10  in 2004), and reducing that rate to $250 was an abuse of discretion. (*Id.*)   The court also

11  reaffirmed attorney's fees <u>are not limited to a proportion</u> of the recovery. (*Id.* at 164.) On remand,

12  the trial court found that the lodestar rate of $350/hour was reasonable *and added* a multiplier of

13  2.0 for a total fee award of over $380,000.00.  The attorney from *Graciano*, Hallen D. Rosner,

14  now charges $695/hour.  (SM Dec., ¶ 54 (a).)

15        Furthermore, the California Supreme Court has expressly ruled that prevailing parties

16  who are entitled to recover their attorney's fees are *also entitled* to recover their fees for the time

17  spent preparing fee applications such as this one. (*Serrano v. Unruh, supra,* 32 Cal.3d at 631;

18  *Los Angeles Police Protective League v. City of Los Angeles* (1986) 188 Cal.App.3d 1, 17;

19  *Robertson, supra,* 144 Cal.App.4th at 817 [awarding $13,566.70 in fees for a fee motion].)

20        Consideration of the "lodestar" factors compels an award of attorney's fees based on (i)

21  the hourly rates set forth of in the declarations filed concurrently herewith (SM Dec., ¶¶ 42-51;

22  RMW Dec., ¶¶ 3-6), (ii) a survey of rates charged by other well-known consumer law attorneys

23  (SM Dec., ¶ 54), (iii) over three dozen court orders confirming the reasonableness of Plaintiff's

24  counsels' hourly rates and time billed in other Song-Beverly Act cases (SM Dec., ¶¶ 55-99 Exs.

25  F-XX), and (iv) a National Survey further supporting the reasonableness of the hourly rates.

26  (RMW Dec., ¶ 10, Ex. C, at pp. 7 and 13). Plaintiff's counsels' rates are within the range of rates

27  charged by other attorneys with similar experience in this area of law.

28  ///

8

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR
ATTORNEY'S FEES, COSTS AND EXPENSES

1.      **The Nature and Complexity of the Litigation Support the Attorney's Fees Requested**

Determining the amount of reasonable attorney's fees may involve consideration of the nature and complexity of the case. (*Dietrich v. Dietrich* (1953) 41 Cal.2d 497, 506; *Graciano, supra,* 144 Cal.App.4th at 147.) Ford routinely claims that cases like this one are "simple lemon law cases" and, therefore, Plaintiffs' fee requests are always unjustified as excessive.  This case required a range of specialized knowledge including: (1) an understanding of the full scope of consumer protection laws, which are highly nuanced; (2) knowledge of the intricacies of automobiles and the lexicon associated with them, as well as knowledge concerning how to investigate issues with automobiles; and (3) knowledge of auto manufacturers' and dealers' policies and protocols for repairing vehicles and complying with their legal obligations. (SM Dec., ¶ 102.)  Plaintiff's attorneys have acquired knowledge and insight about Ford over the course of many years of litigation, and this experience typically results in significantly higher judgments or settlements for their clients.  Plaintiff's attorneys have dared to make these matters more complex, testing the boundaries of car manufacturer's cheating ways.  The firm's attorneys have traveled all over the country to depose individuals from the auto industry, including New Jersey, Texas, Michigan, Florida and Utah, as well as countless counties throughout California.  The firm has successfully fought to compel the production of millions of internal communications and confidential documents from Ford.  No other firm is litigating "simple lemon law" cases like Knight Law and its associating attorneys.

Moreover, Ford made this matter even more complex by maintaining it had no liability and declining to submit any reasonable offers to settle the matter for over nineteen months of litigation.  Ford should have acknowledged the defects in Plaintiff's vehicle and resolved the matter before this case was ever filed.  Yet, this case was never just about whether or not a car was a lemon; this case and others like it are a test of Ford's very corporate structure and the relationship between a corporation and the customers it so depends on for its profits.  Plaintiff's attorneys have the resolve to investigate those policies and procedures and have discovered tens of thousands of internal documents that elucidate Ford's disregard to consumers.  Plaintiff's

9

1    attorneys delve deeper into these matters and bring a level of lawyering to this area of law that

2    most other firms either may not care to or do not have the wherewithal to provide.  Undoubtedly,

3    a quick and secure buck could be made with an early settlement but that leaves the violating

4    companies like Ford left to just apply the status quo.

5         Ford engaged in expensive litigation in this case, including denying all liability, stone-

6    walling Plaintiff's discovery efforts, and forcing Plaintiff's counsel to expend numerous hours

7    preparing for trial.  Ford could have resolved this matter much earlier and saved tens of thousands

8    in attorney's fees, costs and expenses by doing so.  Ford ultimately capitulated, but not before

9    causing substantial fees to be incurred.  When Ford causes the entirety of fees to be incurred, it

10   has no legitimate basis for complaining about the amount of attorney's fees reasonably and

11   actually incurred, especially when Ford had the opportunity to resolve the matter before a lawsuit

12   was even filed.  "A party cannot litigate tenaciously and then be heard to complain about the time

13   necessarily spent by the opposition in response." (*En Palm, LLC v. Teitler* (2008) 162

14   Cal.App.4th 770, 786; *see also Molski v. Arclero Wine Group* (2008) 164 Cal.App.4th 786.)

15        **2.**   **The Firm's Skill Justifies the Amount of Attorney's Fees Sought**

16        A trial court may also take into account the skill of the attorneys when determining

17   reasonable attorney's fees. (*La Mesa-Spring Valley School Dist. v. Otsuka* (1962) 57 Cal.2d 309,

18   316.) Despite the case's difficulties, Plaintiff ultimately recovered $88,000.00 in damages, which

19   is over five times the vehicle's purchase price (over two-and-a-half years ago).  The vehicle was

20   no more or less defective on the date of settlement than it was when Plaintiff first asked for his

21   money back before hiring legal counsel, so there is no rational explanation why Ford waged a

22   lengthy and costly legal battle only to settle for a sum equal to Plaintiff's best possible outcome

23   via trial on the merits.

24        Plaintiff's attorneys specialize in consumer law and did not balk at Ford's aggressive

25   litigation tactics.  Plaintiff's attorneys' experience has enabled them to develop litigation

26   strategies that are highly effective and cost and time efficient.  Plaintiff's attorneys' specialized

27   knowledge and experience in lemon law frequently results in outcomes far better than those

28   obtained by attorneys who do not specialize in this specific area of law.   Because of this

knowledge and expertise, ***Plaintiff went from a ZERO offer to a $88,000.00 settlement***.  Getting civil penalties, and often punitive damages, like this is not easy and most firms do not know how to seek exemplary damages or do not care to seek them.  Plaintiff's attorneys believe they distinguish themselves from others based on many years of focused pursuit of the truth.

Counsels' skill is evidenced by the size of the settlement as well as the nominal time expended on litigation tasks, which results in lower overall billing.  Plaintiff's attorneys do not spend inordinate time researching because they specialize in this area of law. (SM Dec., ¶ 103.) Nor do they spend unreasonable time preparing pleadings because they are able to use documents from other cases that need only be edited, rather than written from scratch. (*Id.*) While substantial fees have been incurred, those fees led to the execution of effective strategies that result in superlative results for Knight Law clients, like Plaintiff here.

On the other side, Ford is represented by large national firms – now totaling **eleven** separate law firms – with attorneys who specialize in representing automobile manufacturers in lemon law cases. (SM Dec, ¶ 36.)  Ford is a corporate behemoth with the resources to easily overwhelm a consumer or an inexperienced attorney.  It is Defendant and its bevy of attorneys that drive this litigation and then settle for an amount they knew the entire time would be satisfactory, but instead waited until the eve of trial while amassing their billable hours.  Based on a random sample of cases, 74% of the cases against Ford were settled six months before trial instead of much earlier. (SM Dec., ¶ 34.)  Of those cases, 50% were settled just one month before trial. (*Id.*)  Plaintiff required skilled and experienced attorneys to prosecute his claims against Ford and its formidable resources.  Plaintiff's attorneys were well-suited for the task.

Now, Ford appears to have dug its heals even deeper by outright proclaiming in a letter that Ford is no longer willing to discuss settlement, does not want to engage in any further mediations and fully intends to bring every case to trial unless the firm's clients accept Ford's existing offers. (SM Dec., ¶ 37, Ex. D.)  To date, 25% of all of 55 cases that Knight Law and its trial attorneys have taken to trial since 2012 have involved Ford as the named defendant. (SM Dec., ¶ 32.)  As such, Plaintiff's counsel request to be compensated not only for the quantity of the work but for the quality of the work.  To do so, the firm calls upon a brave judiciary to award

11

1  counsel the compensation for their hard work.  Eventually, this litigation will reduce lawsuits and

2  the need for attorneys in this area of law, but change can and will only happen over time.

3      **C.**    **The Settlement Amount Does Not Limit the Attorney's Fee Recovery**

4      Ford may argue that damages in the amount of $88,000.00 do not justify an attorney's fee

5  award in the amount requested by Plaintiff, but such an argument is starkly against the weight of

6  California law.  The amount of attorney's fees *must not be tied to any percentage of recovery*.

7  (*Graciano, supra,* 144 Cal.App.4th at 164.)  In fact, a trial court may abuse its discretion if it

8  applies a rule of proportionality to a fee award.  The U.S. Supreme Court has previously

9  considered the question of proportionality in attorney fee awards and held: "[w]e reject the

10  proposition that fee awards under section [42 U.S.C.] 1988 should necessarily be proportionate

11  to the amount of damages a civil rights plaintiff actually recovers." (*City of Riverside v. Rivera*

12  (1986) 477 U.S. 561, 574; *see also* Sen. Report No. 93-151, 1st Sess., pp. 23-24 (1973)

13  [attorney's fees under the Magnuson Moss Warranty Act are based on actual time, not a

14  percentage of the recovery]; *Robertson, supra,* 144 Cal.App.4th at 820; *Independent Federation*

15  *of Flight Attendants v. Zipes* (1989) 491 U.S. 754, fn.2 [fee shifting provisions under Magnuson-

16  Moss and Song-Beverly "are to be interpreted alike"]; *Goglin, supra,* 5 Cal.App.5th at 468-69

17  [affirming award of $185,000 in fees and costs in a Song-Beverly Act case that settled for

18  $75,000]; *Vo v. Las Virgenes Municipal Water District* (2000) 79 Cal.App.4th 440, 446

19  [affirming $470,000 fee award after $40,000 judgment because the defendant was excessively

20  litigious and took a non-settlement posture]; *Harman v. City and County of San Francisco* (2007)

21  158 Cal.App.4th 407 [affirming award of approximately $1.1 million in fees where plaintiffs

22  recovered $30,300].)

23      Attorney's fees and costs commonly exceed the client's damages, although that did not

24  happen here because the settlement was so large and the fees were efficiently incurred.  The

25  Legislature acknowledged that substantial work might be needed to prosecute such claims against

26  large corporations, which is the reason behind the fee shifting provision of the Song-Beverly Act.

27  (SM Dec., ¶ 101.)  Otherwise, consumers would be left without opportunity for redress when

28  their damages were not enough for an attorney to take the case on a contingent fee or hourly rate

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR
ATTORNEY'S FEES, COSTS AND EXPENSES

1   basis. "The purpose of statutory attorney fee provisions is to provide financial incentives

2   necessary for the private enforcement of important civil rights." (*Ketchum v. Moses* (2001) 24

3   Cal.4th 1122, 1132.) Thus, the Song-Beverly Act gives consumers the opportunity to seek legal

4   redress even if their damages would not be high enough to warrant legal representation.  The

5   award of attorney's fees *cannot* be limited by damages recovered. (*Ketchum, supra,* 24 Cal.4th

6   at 1138.)

7        **D.    Plaintiff Should Be Granted a Lodestar Multiplier**

8        As part of the Song-Beverly Act, a prevailing buyer may also receive a lodestar multiplier.

9   (*Robertson, supra,* 144 Cal.App.4th at 817.)   Once a lodestar amount is determined, which

10  involves a "careful compilation of the actual time spent and reasonable hourly compensation for

11  each attorney," (*Id.* at 819 (*citing Serrano v. Priest* (1977) 20 Cal.3d 25, 48-49 (*Serrano III*)),

12  the amount may then be augmented by taking various relevant factors into account, including (1)

13  the novelty and difficulty of the questions involved and the skill displayed in presenting them;

14  (2) the extent to which the nature of the litigation precluded other employment by the attorneys;

15  and (3) the contingent nature of the fee award, based on the uncertainty of prevailing on the

16  merits and of establishing eligibility for the award. (*Id.; see also Graham, supra,* 34 Cal.4th at

17  579; *PLCM Group v. Drexler*, 22 Cal.4th at 1096.)   "[T]he purpose of a fee enhancement is

18  primarily to compensate the attorney for the prevailing party at a rate reflecting the risk of

19  nonpayment in contingency cases." (*Ketchum, supra,* 24 Cal.4th at 1138; *Cazares v. Saenz*

20  (1989) 208 Cal.App.3d 279, 287-88 [risk factor alone justifies a 2.0 multiplier for a 50% chance

21  of prevailing].)  "A 50 percent chance of recovery implies a multiplier of 2, a 25 percent chance

22  of recovery implies a multiplier of 4, and so on." (*In re Chiron Corp. Securities Litigation* (N.D.

23  Cal. Nov. 30, 2007) No. C-04-4293 VRW, 2007 WL 4249902, *9.) Plaintiff asks for far less.

24        In *Robertson*, a case brought under the Song-Beverly Act, the court ruled that the

25  "statutory language in section 1794(d) is reasonably compatible with a lodestar adjustment

26  method of calculating attorney fees, including use of fee multipliers," and the court granted a 1.5

27  multiplier. (144 Cal.App.4th at 817, 819.)  In *Graciano*, the appellate court actually *increased*

28  the trial court's award of fees after finding that the lodestar rate of $350/hour was reasonable and

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR
ATTORNEY'S FEES, COSTS AND EXPENSES

1   adding a 2.0 multiplier for a total award of over $380,000.00. (144 Cal.App.4th at 156.)

2       The lodestar is intended to reflect the basic fee for comparable non-contingent legal

3   services and should be enhanced by an appropriate multiplier to reflect the risk and delay in

4   payment associated with taking a contingent case, as well as the result achieved.  The lodestar

5   "multiplier" is meant to increase or decrease the fee award based on factors not already taken

6   into account when setting the hourly rate, such as the <u>risk</u> of taking a case on a contingency basis,

7   and <u>delay</u> in receiving payment.  (*See Horsford v. Bd. of Trustees of Cal. State Univ.* (2005) 132

8   Cal. App. 4th 359, 394-95.)

9       In *Ketchum*, the California Supreme Court wrote, "[a] contingent fee contract, since it

10   involves a gamble on the result, may properly provide for a *larger compensation* than would

11   otherwise be reasonable." (24 Cal.4th at 1132 [emphasis added].)

> <u>A contingent fee must be higher than a fee for the same legal services paid as they</u>
> <u>are performed</u>.  The contingent fee compensates the lawyer not only for the legal
> services he renders but for the loan of those services.  The implicit interest rate on
> such a loan is higher because the risk of default (the loss of the case, which cancels
> the debt of the client to the lawyer) is much higher than that of conventional loans.
> (Posner, Economic Analysis of Law (4th ed.1992) pp. 534, 567, emphasis added.)
> <u>A lawyer who both bears the risk of not being paid and provides legal services is</u>
> <u>not receiving the fair market value of his work if he is paid only for the second of</u>
> <u>these functions</u>.  If he is paid no more, competent counsel will be reluctant to
> accept fee award cases.

18   (*Id.* at 1132 [citations omitted; emphasis added].)

19       Throughout the litigation, there always existed the real possibility Plaintiff would not

20   prevail.  The risk was compounded by the fact that Plaintiff's attorneys advanced all litigation

21   costs and expenses without reimbursement.  Thus, if Plaintiff did not prevail, his attorneys would

22   have suffered a substantial loss of uncompensated attorney hours and thousands of dollars in out-

23   of-pocket expenses.  Plaintiff requests a 0.2 enhancement based on that risk.  Further, Ford

24   dragged this case out for over nineteen months before agreeing to a reasonable settlement.  Unlike

25   Ford's attorneys, who are paid monthly regardless of outcome, Plaintiff's attorneys are not paid

26   at all if they lose, and need to absorb significant delay in being paid if Plaintiff does win.  On

27   account of the substantial delay in payment, Plaintiff requests a 0.3 enhancement.

28       Based on the risk of taking this case on a contingent fee basis and the delay in payment

14

1  since November 2015, Plaintiff requests a nominal multiplier of 1.5.  Courts have awarded a

2  lodestar multiplier to Plaintiff's counsel in numerous cases.  (SM Dec., ¶¶ 70, 74, 83, 84, 86, 87,

3  91, 97, 98, 99, Exs. U, Y, HH, II, KK, LL, PP, VV, WW, XX.)

4  **E.      Plaintiff is Entitled to Recover All Costs and Expenses Reasonably Incurred**

5  **in Connection with this Action**

6  Under the Song-Beverly Act, a prevailing buyer shall be allowed to recover as part of the

7  judgment a sum equal to the aggregate amount of costs <u>and expenses</u>. (Civ. Code § 1794(d)

8  [emphasis added].)  The California Legislature intended the word "expenses" to cover outlays

9  not included in the detailed statutory definition of "costs," and the Song-Beverly Act's legislative

10  history demonstrates the Legislature exercised its power to permit recovery of a host of litigation

11  expenditures beyond those permitted by Code of Civil Procedure § 1033.5.  (*Jensen v. BMW of*

12  *North America, Inc.* (1995) 35 Cal.App.4th 112, 137-138.)

13  A verified memorandum of costs generally satisfies the moving party's burden of

14  establishing costs necessarily incurred. (*Hadley v. Krepel* (1985) 167 Cal.App.3d 677, 682.)  The

15  verified memorandum of costs demonstrates Plaintiff's attorneys' costs and expenses prosecuting

16  this matter, which counsel advanced on Plaintiff's behalf.  (SM Dec. ¶ 2, Ex. B.)  The burden

17  shifts to Ford to properly rebut the claimed costs.

18  **IV.      CONCLUSION**

19  For the reasons above, Plaintiff respectfully requests this Honorable Court award

20  attorney's fees, costs and expenses as follows:

Lodestar Fees:              $47,632.50
-Paid Sanctions:            $ 1,310.00
+Lodestar Enhancement:      $23,161.25
+Costs and Expenses:        $ 5,484.04
**=Total Fees and Costs/Expenses:   $74,967.79**

Dated: March 23, 2018                    **KNIGHT LAW GROUP, LLP**

Steve Mikhov (SBN 224676)
Attorneys for Plaintiff,
**DANIEL MARIO MORALES**

15

1

PROOF OF SERVICE
(Code of Civil Procedure §1013a)

2

3       I am employed in the County of Los Angeles, State of California.  I am over the age of 18

4   years and not a party to the within action.  My business address is 1801 Century Park East, Suite
    2300, Los Angeles, CA 90067.

5       I served the foregoing document described as:

6   **PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN**

7   **SUPPORT OF MOTION FOR ATTORNEY'S FEES, COSTS AND EXPENSES**

8       Said document was served on the interested parties in this action, by placing true copies
    thereof enclosed in sealed envelopes, with postage prepaid, addressed as follows:

9

10  Spencer P. Hugret, Esq.            Richard Wirtz, Esq.
    GORDON & REES LLP                  Wirtz Law APC

11  275 Battery Street, Suite 2000     4370 La Jolla Village Drive, Suite 800
    San Francisco, CA 94111            San Diego, CA 92122

12  **Counsel for Defendant,**         **Associated Counsel for Plaintiff,**
    **FORD MOTOR COMPANY**             **LORRAINE RALPH**

13  (via Mail only)                    (via E-mail only)

14
    <u>XX</u>   BY MAIL:  I am readily familiar with this firm's practice of collection and processing

15         correspondence for mailing with the United States Postal Service.  Under that practice, it
           would be deposited with the U.S. Postal Service on that same day with postage thereon

16         fully prepaid at a Postal Service collection box at Los Angeles, California, in the ordinary
           course of business. The envelope was sealed and placed for collection that same day

17         following ordinary business practices, addressed to the above-referenced attorney.

18
    <u>XX</u>   BY E-MAIL OR ELECTRONIC TRANSMISSION: Based on a court order or an

19         agreement of the parties to accept service by e-mail or electronic transmission, I caused

20         the documents to be sent to the persons at the e-mail addresses listed above.  I did not
           receive, within a reasonable time after the transmission, any electronic message or other

21         indication that the transmission was unsuccessful.

22      I declare under penalty of perjury under the laws of the State of California that the

23  foregoing is true and correct.

24  Executed on March 23, 2018 at Los Angeles, California.

25

26  _____

27  JENNIFER GUERRERO

28

-1-