1

**KNIGHT LAW GROUP, LLP**
Steve Mikhov (SBN 224676)

2
1801 Century Park East, Suite 2300
Los Angeles, CA 90067

3
Telephone: (310) 552-2250
Fax: (310) 552-7973

4

5
**WIRTZ LAW APC**
Richard M. Wirtz (SBN 137812)

6
4370 La Jolla Village Drive, Suite 800
San Diego, CA 92122

7
Telephone: (310) 556-2121
Fax: (858) 259-6008

8

9
Attorneys for Plaintiff,

10
**DIANNA M. ENCARNACION**

11

12
**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

13
**COUNTY OF LOS ANGELES**

14
**DIANNA M. ENCARNACION,**          | Case No. BC609972

15
                                    | **PLAINTIFF'S MEMORANDUM OF**

16
                Plaintiff,          | **POINTS AND AUTHORITIES IN**
                                    | **SUPPORT OF MOTION FOR**

17
        vs.                        | **ATTORNEY'S FEES, COSTS AND**
                                    | **EXPENSES**

18
**FORD MOTOR COMPANY, a Delaware**

19
**Corporation, and DOES 1 through 10,**   | [Filed concurrently with Plaintiff's Notice
**inclusive,**                            | Of Motion and Motion For Attorney's Fees,

20
                                          | Costs and Expenses; Declarations of Steve
                Defendants.               | Mikhov and Richard M. Wirtz]

21

22
*Assigned for All Purposes to the*
*Honorable Mark Mooney*

23
Date:  April 9, 2018

24
Time: 8:30 a.m.
Dept.: 68

25
RES ID: 180129285413

26

27

---

1

2

TABLE OF CONTENTS

Page(s)

3    I.    INTRODUCTION ............................................................................................1

4    II.   STATEMENT OF FACTS ...........................................................................2

5    III.  ARGUMENT AND ANALYSIS ..................................................................5

6         A.    Plaintiff's Attorneys Are Entitled to Fees, Costs and Expenses in this Action..................................................................................................5

7

8         B.    The Hourly Rates Sought by Plaintiff's Attorneys Are Reasonable.................6

9              1.    The Nature and Complexity of the Litigation Support the Attorney's Fees Requested .........................................................9

10             2.    The Firm's Skill Justifies the Amount of Attorney's Fees Sought ...............................................................................10

11

12        C.    The Settlement Amount Does Not Limit the Attorney's Fee Recovery..........11

          D.    Plaintiff Should Be Granted a Lodestar Multiplier...........................................12

13

14             1.    The Lodestar Multiplier Should Be Granted in Contingent Cases Due to Risk and Delay of Payment .............................13

15         E.    Plaintiff is Entitled to Recover All Costs and Expenses Reasonably Incurred in Connection with this Action.......................................................15

16

17    IV.  CONCLUSION..........................................................................................15

18

19

20

21

22

23

24

25

26

27

i

## TABLE OF AUTHORITIES

Page(s)

Cases

Cazares v. Saenz,
(1989) 208 Cal.App.3d 279 ..................................................................................13

City of Riverside v. Rivera
(1986) 477 U.S. 561 ...........................................................................................11

Dietrich v. Dietrich
(1953) 41 Cal.2d 497 ............................................................................................9

En Palm, LLC v. Teitler
(2008) 162 Cal.App.4th 770 ...............................................................................10

Goglin v. BMW of North America, LLC
(2016) 4 Cal.App.5th 462 ...........................................................................6, 7, 11

Graciano v. Robinson Ford Sales
(2006) 144 Cal.App.4th 140 .......................................................6, 7, 8, 9, 11, 13

Graham v. DaimlerChrysler Corp.
(2004) 34 Cal.4th 553 ....................................................................................6, 12

Hadley v. Krepel
(1985) 167 Cal.App.3d 677 ................................................................................15

Harman v. City and County of San Francisco
(2007) 158 Cal.App.4th 407 ...............................................................................12

Horsford v. Bd. of Trustees of Cal. State Univ.
(2005) 132 Cal. App. 4th 359 ........................................................................8, 14

In re Chiron Corp. Securities Litigation
(N.D. Cal. Nov. 30, 2007) No. C-04-4293 VRW, 2007 WL 4249902 ...............13

Independent Federation of Flight Attendants v. Zipes
(1989) 491 U.S. 754 ...........................................................................................11

Jensen v. BMW of North America, Inc.
(1995) 35 Cal.App.4th 112 .................................................................................15

Ketchum v. Moses,
(2001) 24 Cal.4th 1122 .........................................................................12, 13, 14

ii

*La Mesa-Spring Valley School Dist. v. Otsuka*
(1962) 57 Cal.2d 309 ........................................................................................10

*Los Angeles Police Protective League v. City of Los Angeles*
(1986) 188 Cal.App.3d 1 ....................................................................................8

*Mandel v. Lackner*
(1979) 92 Cal.App.3d 747 ..................................................................................6

*Molski v. Arclero Wine Group*
(2008) 164 Cal.App.4th 786 ............................................................................10

*PLCM Group v. Drexler, supra*
(2000) 22 Cal.4th 1084 ................................................................................7, 12

*Reveles v. Toyota by the Bay*
(1997) 57 Cal.App.4th 1139 ..............................................................................6

*Robertson v. Fleetwood Travel Trailers of California, Inc.*
(2006) 144 Cal.App.4th 785 ...........................................6, 7, 8, 11, 12, 13

*Serrano v. Priest*
(1977) 20 Cal.3d 25 (Serrano III) ...................................................................12

*Serrano v. Unruh*
(1982) 32 Cal.3d 621 .....................................................................................6, 8

*Vo v. Las Virgenes Municipal Water District*
(2000) 79 Cal.App.4th 440 ..............................................................................11

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

iii

## Statutes and Codes

California Code of Civil Procedure
    Section 1032(a)(4) .................................................................................................5

California Code of Civil Procedure
    Section 1033.5...........................................................................................................15

California Code of Civil Procedure
    Section 1794(d) ...........................................................................2, 5, 7, 13, 15

California Code Of Civil Procedure
    Section 998...................................................................................................................5

United States Code
    Title 42 ...........................................................................................................................11

## Other Authorities

Pearl, *California Attorney Fee Awards*

    Sections 12.14A, 12.33 (2nd Ed. 2005) .................................................6

Sen. Report No. 93-151,
    1st Sess., pp. 23 (1973) ...................................................................................11

iv

## I.   INTRODUCTION

After over eighteen months of litigation, the parties agreed to settle the matter in the amount of $99,000.00, consisting of a full refund of all monies paid towards the defective vehicle plus over $71,000.00 in civil penalties and/or punitive damages.  The final settlement is over three-and-a-half times the total amount Plaintiff paid for the vehicle in what defense routinely calls a "simple lemon law" action.  Plaintiff obtained this extraordinary sum, *without going to trial*.  By any analysis, Plaintiff Dianna M. Encarnacion ("Plaintiff") achieved an excellent settlement particularly given Defendant Ford Motor Company's ("Defendant" or "Ford") initial refusal to even consider repurchasing her vehicle under the Song-Berly Act. This is a settlement that no other firm in this state could achieve for its clients.  The result in this case was achieved because of Plaintiff's attorneys' skill and expertise in lemon law cases developed and honed over the course of many years of advocating on behalf of consumer rights. The biggest factor in Plaintiff receiving zero from Ford when she contacted Ford before this lawsuit versus a $99,000.00 settlement was her attorneys' knowledgeable approach to this case.

On or about August 16, 2010, Plaintiff purchased a new 2011 Ford Fiesta.  Over the next several years, Plaintiff suffered through multiple transmission and engine defects that caused the vehicle to seem sluggish, not accelerate, and feel like it was going to stall.  Plaintiff sought maintenance for issues five times throughout her ownership.  Frustrated, Plaintiff contacted Ford customer service on or about June 24, 2015, seeking a buyback of the defective vehicle.  Instead of complying with its legal obligations, Ford applied its tried and true internal policy of rejecting its Song-Beverly Consumer Warranty Act ("Song-Beverly Act") obligations and refused to help Plaintiff, denying the buyback request.  Ford made a business decision that it always makes: blindly reject consumer requests and then expect the consumer to just go away.  Without any other recourse, Plaintiff hired Knight Law Group on a contingency basis.  Knowing that Ford had willfully violated Plaintiff's rights and that Ford had already rejected informal resolution, Knight Law Group was forced to file this case.

The Song-Beverly Act, Civil Code sections 1790, *et seq.*, entitles Plaintiff to seek

1

1    reasonable attorney's fees, costs and expenses from Ford.  Moreover, the parties' settlement
2    agreement provides Plaintiff is the prevailing party and entitled to this noticed motion for
3    attorney's fees.  Plaintiff now moves the Court: (1) for an award of attorney's fees pursuant to
4    Civil Code section 1794(d) under the "lodestar" method in the amount of $44,557.50 (2) for a
5    modest "lodestar" modifier of 1.5, in the amount of $22,278.75, and (3) to award actual costs and
6    expenses incurred in the amount of $6,494.49.  (Civ. Code § 1794(d).)  Plaintiff requests a total
7    of $73,330.74 in attorney's fees, costs and expenses.  (Declaration of Steve Mikhov ("SM
8    Dec."), ¶ 2, Exs. A-B; Declaration of Richard M. Wirtz ("RW Dec."), ¶ 9, Ex. A.)

**II.    STATEMENT OF FACTS**

10       Plaintiff purchased a new 2011 Ford Fiesta sedan on August 16, 2010 for a purchase
11   price of $17,036.80—adding taxes, fees, and service plans, the total purchase price was
12   $27,958.20.  (SM Dec., ¶ 3, Ex. C.)  The vehicle was distributed by Ford Motor Company, which
13   provided an express written warranty.  (*Id.*)

14       Within the applicable express warranty periods, the vehicle began exhibiting serious
15   transmission problems after about 7,000 miles.  (SM Dec., ¶ 4.)

16       First, at around 7,300 miles, Plaintiff brought the vehicle in for maintenance because a
17   warning light came on while the vehicle was descending a hill and seemed to be running
18   sluggishly.  (SM Dec., ¶ 5.)  About 14,000 miles later, Plaintiff brought the vehicle in again
19   because the check engine came on, requiring replacement of bolts, a reflash of the powertrain
20   control module ("PCM") and transmission control module ("TCM"), and a replacement of the
21   TCM.  (*Id.*)  Less than 2,000 miles later, the vehicle would not accelerate and Plaintiff
22   complained that it felt like it was going to stall.  (*Id.*)  Over the next year, Plaintiff brought the
23   vehicle in another two times for issues related to electrical problems, the brakes, interior, and a
24   recall that required updating software.  (*Id.*)

25       Ultimately, Plaintiff presented her vehicle to a Ford-authorized repair facility a total of
26   five times, with three of those times specifically related to issues with the transmission and
27   engine, over a period of about three years and under 32,000 miles of ownership.  (SM Dec., ¶ 6.)

2

1    Frustrated, concerned for her safety, and having lost confidence in Ford's ability to repair

2    the vehicle, Plaintiff contacted Ford customer service on or about June 24, 2015, seeking a

3    buyback of the defective vehicle. (SM Dec., ¶ 7.)  Despite Ford's affirmative duty under the law

4    to perform an investigation and offer a buyback, Ford denied Plaintiff's request.  (*Id.*)  Because

5    Ford disregarded every opportunity to do right by its customer, Plaintiff was forced to retain

6    counsel and file suit.  (*Id.*)

7        Plaintiff contacted Knight Law Group, LLP (hereafter "Knight Law," formerly known as

8    O'Connor & Mikhov) in early 2016 and told the firm about the problems with her vehicle and

9    the way Ford treated her.  (SM Dec., ¶ 8.)    After reviewing the repair history and discussions

10   with Plaintiff, Knight Law agreed to represent her and bear the risk of litigating the case on a

11   fully contingent basis.  (*Id.*)  Because Knight Law's compensation was purely contingent, the

12   firm faced a genuine risk of not being paid for its services for years, if at all, while advancing

13   thousands of dollars in costs and expenses on Plaintiff's behalf.  (*Id.*)  In taking on this duty, the

14   firm was facing a litigation behemoth—Ford is a multi-billion-dollar company with a virtually

15   infinite litigation war-chest that wages a battle of attrition that most firms cannot withstand.  (*Id.*)

16       First, as a result of Ford's failure to repurchase Plaintiff's vehicle, Plaintiff filed her

17   complaint in this action on or about February 11, 2016, alleging intentional misrepresentation,

18   negligent misrepresentation, concealment, fraud, and violations of the Song-Beverly Act, and

19   seeking civil penalties and punitive damages.  (SM Dec., ¶ 9.)  The 26-page complaint took just

20   1.3 hours to draft.  (*Id.*)  The firm was able to utilize existing templates that attorneys tailor for

21   case specific facts to reduce billing time.  (*Id.*)  Defendant demurred and moved to strike on or

22   about March 21, 2016.  (*Id.*)  Additionally, Defendant filed a Petition for Coordination of Add-

23   On Cases on or about March 31, 2016.  (*Id.*)  Plaintiff opposed, incurring very minimal time for

24   responding to these pleadings from Ford.  (*Id.*)

25       On or about June 17, 2016, Plaintiff filed her First Amended Complaint.  Ford demurred

26   to the First Amended Complaint on or about October 31, 2016, ultimately filing its answer on or

27   about January 19, 2017 —*denying all liability*.  (SM Dec., ¶ 10.)

3

1       In September 2016, Ford launched the first phase of its aggressive written discovery

2   campaign by serving Requests for Production of Documents, Special Interrogatories, Requests

3   for Admissions, and Form Interrogatories.  Plaintiff supplied verified responses to the discovery

4   on or about October 25, 2016.  (SM Dec., ¶ 11.)  Ford served a demand for vehicle inspection on

5   or about September 22, 2016, and a notice for Plaintiff's deposition on or about November 4,

6   2016.  (*Id.*)  Plaintiff was ultimately deposed by Ford's counsel on June 5, 2017.  (*Id.*)

7       In October 2016, Plaintiff propounded written discovery on Ford consisting of 44

8   Requests for Admissions, 92 Requests for Production of Documents, 87 Special Interrogatories

9   and 28 Form Interrogatories.  (SM Dec., ¶ 12.)  In drafting this discovery, Plaintiff benefited

10  from Knight Law's expertise and experience in litigating against Ford insofar as just 3.6 hours

11  were billed to review the file and draft the entirety of this discovery.  (*Id.*)  Plaintiff's counsel is

12  able to use existing files as templates to conserve time and litigate efficiently.  (*Id.*)  Written

13  discovery of this magnitude, drafted from scratch and without the benefit of Plaintiff's attorneys'

14  vast knowledge, experience and specialized expertise, would have taken multitudes of the time

15  expediently managed here.  (*Id.*)  Ford provided responses to these discovery requests on or

16  about November 14, 2016.  (*Id.*)  However, due to Defendant's improper objections and/or

17  incomplete and evasive responses to Plaintiff's discovery, Plaintiff began meet and confer

18  efforts, including written communications on or about December 20, 2016 and January 23, 2017.

19  (*Id.*)

20      On April 19, 2017, the parties attended a mediation to discuss this case and others like it,

21  50 in total.  (SM Dec., ¶ 13.)  The case did not resolve at that time.  (*Id.*)  Only 0.3 hours were

22  billed to this case to attend the all-day mediation.  (*Id.*)

23      Considering Defendant's aggressive litigation of this case and the lack of *any* meaningful

24  offer by Ford to settle, the case appeared likely to go to trial.  (SM Dec., ¶ 14.)  On or about May

25  22, 2017, Wirtz Law APC was formally associated into the case to serve as lead trial counsel and

26  prepare the case for trial.  (*Id.*; RW Dec., ¶ 11, Ex. C.)

27      In June 2017, Plaintiff's counsel noticed the depositions of Ford's Person Most

1    Knowledgeable ("PMK") and Sunrise Ford's Person Most Qualified ("PMQ") and other

2    dealership personnel. (SM Dec., ¶ 15.) Defendant submitted its objections to the notice of

3    deposition of Defendant's PMQ on or about June 19, 2017. (*Id.*)

4         In July 2017, the parties drafted expert witness designations. (SM Dec., ¶ 16.)

5    Meanwhile, Defendant made a second demand for a vehicle inspection on or about July 13,

6    2017, with an *ex parte* hearing on a motion to compel the vehicle inspection and to continue the

7    trial. (*Id.*) On July 13, 2017, trial counsel attended the deposition of dealership personnel at

8    Sunrise Ford of North Hollywood, in addition to the vehicle inspection conducted at Sunrise

9    Ford of North Hollywood on July 31, 2017. (RW Dec., ¶ 12.) Trial counsel also prepared and

10   filed fourteen (14) Motions *in Limine*, in addition to preparing oppositions to eight (8) Motions

11   *in Limine* by Defendant. (RW Dec., ¶ 13.)

12        On or about July 24, 2017, after nearly eighteen months of litigation, Ford served

13   Plaintiff with an Offer to Compromise pursuant to the Code of Civil Procedure section 998 ("998

14   Offer"). (SM Dec., ¶ 17, Ex. D.) The 998 Offer, which offered Plaintiff $99,000.00, was

15   accepted by Plaintiff on September 7, 2017. (*Id.*) This settlement amount was inclusive of a full

16   statutory "buy-back" of her defective vehicle, incidental and consequential damages, and a civil

17   penalty. (*Id.*) Additionally, in the 998 Offer, Ford agreed to pay Plaintiff's attorney's fees in the

18   amount of only $5,000.00, or if Plaintiff refused, an amount to be determined by noticed motion.

19   (*Id.*)

20        Prior to filing this motion, Plaintiff entered into negotiations with Ford to settle the

21   amount of attorney's fees. (SM Dec., ¶ 18.) After several months of unsuccessful back and

22   forth, counsel had no other avenue but to file this motion. (*Id.*)

23                   **III.    ARGUMENT AND ANALYSIS**

24      **A.**    **Plaintiff's Attorneys Are Entitled to Fees, Costs and Expenses in this Action**

25        Pursuant to the terms of the parties' settlement, Plaintiff is the prevailing party in this

26   action and, under the Song-Beverly Act, entitled to recoup all reasonable attorney's fees, costs

27   and expenses as the prevailing party. (Code Civ. Proc. § 1032(a)(4); Civ. Code § 1794(d);

1   *Graham v. DaimlerChrysler Corp.* (2004) 34 Cal.4th 553, 557; *Reveles v. Toyota by the Bay*

2   (1997) 57 Cal.App.4th 1139.)  Absent a contrary showing, both the number of hours that the

3   prevailing party's attorney spent litigating the case and his or her regular hourly rate are

4   presumed to be reasonable. (*Serrano v. Unruh* (1982) 32 Cal.3d 621, 639 (counsel is entitled to

5   all hours actually spent, absent a showing of "special circumstances" that would render such an

6   award unjust); *Mandel v. Lackner* (1979) 92 Cal.App.3d 747, 761 (an attorney's regular hourly

7   rate is entitled to a presumption of reasonableness); Pearl, <u>California Attorney Fee Awards</u>, at §§

8   12.14A, 12.33 (2nd Ed. 2005.)

9        In prosecuting this case, the efforts of Knight Law and Wirtz Law APC amount to

10   $44,557.50, including drafting this motion and time anticipated to be spent preparing the reply

11   and attending the hearing.  SM Dec., ¶ 2, Ex. A.; RW Dec., ¶ 9, Ex. A.)  Plaintiff's counsel also

12   requests a modest 1.5 enhancement, in the amount of $22,278.75, to account for the delay in

13   payment and contingent risk posed by this case.  Lastly, the reimbursable costs and expenses set

14   forth in Plaintiff's memorandum of costs are $6,494.49. (SM Dec., ¶ 2, Ex. B.)  In total, Plaintiff

15   requests $73,330.74. (SM Dec., ¶ 2, Exs. A-B; RW Dec., ¶ 9, Ex. A.)

16        **B.    <u>The Hourly Rates Sought by Plaintiff's Attorneys Are Reasonable</u>**

17        The Court of Appeal has expressly held the lodestar method applies to determining

18   attorney's fees under the Song-Beverly Act.  (*Robertson v. Fleetwood Travel Trailers of*

19   *California, Inc.* (2006) 144 Cal.App.4th 785, 817.)  The calculation of reasonable attorney's fees

20   under the Song-Beverly Act is based on the lodestar method, which entails multiplying the

21   number of hours reasonably expended by a reasonable hourly rate. (*Graciano v. Robinson Ford*

22   *Sales* (2006) 144 Cal.App.4th 140, 154; *Robertson, supra* 144 Cal.App.4th at 817.)   The

23   prevailing buyer has the burden of showing that the fees incurred were "allowable," "reasonably

24   necessary to the conduct of the litigation," and "reasonable in amount." (*Goglin v. BMW of*

25   *North America, LLC* (2016) 4 Cal.App.5th 462, 470.)  In making such an evaluation, a court may

26   consider "factors such as the complexity of the case and procedural demands, the skill exhibited

27   and the results achieved." (*Id.*)

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR
ATTORNEY'S FEES, COSTS AND EXPENSES

1    In *Goglin v. BMW*, the appellate court recently affirmed the trial court's award of over

2    $185,000 in attorneys' fees and costs for a plaintiff who settled her claims against BMW under

3    the Song-Beverly Act. (4 Cal.App.5th at 464.)  The court also found plaintiff's counsel's hourly

4    rate of $575 per hour was reasonable as supported by exhibits to counsel's declaration indicating

5    various state and federal courts had previously awarded him comparable hourly rates. (*Id.* at

6    473-74.)  The trial court was not obliged to consider that defendants paid their counsel a much

7    lower hourly rate. (*Id.* at 474.)

8    In *Robertson*, the court observed a prevailing buyer is entitled to an award of reasonable

9    attorney's fees for time reasonably expended by his attorney.   (*Robertson*, *supra*, 144

10   Cal.App.4th at 817.)  The court ruled the "statutory language in section 1794(d) is reasonably

11   compatible with a lodestar adjustment method of calculating attorney fees, including use of fee

12   multipliers." (*Id.* at 819.)  Indeed, in *Robertson*, the trial court awarded $231,187.45 in fees

13   based on $145,080.50 in fees through trial, plus a "multiplier" of 1.5 for a total of $217,620.75,

14   and $13,566.70 for the attorney's fee motion. (*Id.* at 817.)  The appellate court upheld the trial

15   court's ruling. (*Id.* at 822.)

16   In *Graciano*, the trial court initially rejected plaintiff's lodestar fees of $109,468.50 and

17   request for a multiplier of 2.0.  In particular, the trial court reduced the plaintiff's attorney's

18   hourly rate from the requested $350/hour to $250/hour, which was the court's mandated

19   maximum rate for expert testimony.  Plaintiff appealed the court's decision and in particular the

20   hourly rate reduction.  The appellate court reversed, reasoning a court should determine the

21   prevailing rate in the community for comparable professional legal services. (*Graciano*, *supra*,

22   144 Cal.App.4th at 156 (*citing PLCM Group v. Drexler* (2000) 22 Cal.4th 1084, 1095).)  The

23   court found the plaintiff's unrebutted declarations established the proper hourly rate at $350, and

24   reducing that rate to $250 was an abuse of discretion. (*Id.*)  The court also reaffirmed attorney's

25   fees <u>are not limited to a proportion</u> of the recovery. (*Id.* at 164.)  On remand, the trial court

26   found that the lodestar rate of $350/hour was reasonable *and added* a multiplier of 2.0 for a total

27

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR
ATTORNEY'S FEES, COSTS AND EXPENSES

1  fee award of over $380,000.  The attorney from *Graciano*, Hallen D. Rosner, now charges

2  $620/hour.  (SM Dec., ¶ 34 (a).)

3      Furthermore, the California Supreme Court has expressly ruled that prevailing parties

4  who are entitled to recover their attorney's fees are *also entitled* to recover their fees for the time

5  spent preparing fee applications such as this one.  (*Serrano v. Unruh, supra,* 32 Cal.3d at 631;

6  *Los Angeles Police Protective League v. City of Los Angeles* (1986) 188 Cal.App.3d 1, 17;

7  *Robertson, supra,* 144 Cal.App.4th at 817 (awarding $13,566.70 in fees for a fee motion).)

8      The hourly rates should be considered in the context of the rates charged by Plaintiff's

9  attorneys in the metropolitan community in which they practice, as opposed to the case venue. In

10  *Horsford v. Bd. of Trustees of Cal. State Univ.,* the trial court was reversed for refusing to award

11  the higher rates to San Francisco-based attorneys who litigated a FEHA case in Fresno. (*See*

12  *Horsford v. Bd. of Trustees of Cal. State Univ.* (2005) 132 Cal. App. 4th 359, 399.)  The law

13  "requires that the *financial incentives be adjusted to attract attorneys* who are sufficient to the

14  cause. *Id.*  In the absence of any realistic indication plaintiffs could have found local counsel, it

15  was an abuse of discretion to fail to consider an hourly rate based on counsel's 'home' market

16  rate." *Id.*  Plaintiff's attorneys' hourly rates should not vary depending on the venue of the

17  lawsuit.  The skill and experience of Ford's attorneys does not change from venue to venue and

18  Plaintiff's counsel deserves to be compensated at the same rate they would receive given the

19  same quantity and quality of work they must perform regardless of the venue.

20      Consideration of the "lodestar" factors compels an award of attorney's fees based on (i)

21  the hourly rates set forth of in the declarations filed concurrently herewith (SM Dec., ¶¶ 24-32),

22  (ii) a survey of rates charged by other well-known consumer law attorneys (*Id.,* ¶ 34), (iii) over

23  three dozen court orders confirming the reasonableness of Plaintiff's counsels' hourly rates and

24  time billed in other Song-Beverly Act cases (*Id.,* ¶¶ 40-81, Exs. E-WW), and (iv) a National

25  Survey further supporting the reasonableness of the hourly rates. (RW Dec., ¶ 10, Ex. B, at p. 42-

26  45.)  Plaintiff's counsels' rates are within the range of rates charged by other attorneys with

27  similar experience in this area of law.

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR
ATTORNEY'S FEES, COSTS AND EXPENSES

1.   **The Nature and Complexity of the Litigation Support the Attorney's Fees Requested**

Determining the amount of reasonable attorney's fees may involve consideration of the nature and complexity of the case. (*Dietrich v. Dietrich* (1953) 41 Cal.2d 497, 506; *Graciano, supra,* 144 Cal.App.4th at 147.)

Ford will likely claim that "this is a simple lemon law case," and therefore Plaintiff's fee request is unjustified. However, this case required a range of specialized knowledge: (1) an understanding of the full scope of consumer protection laws, which are highly nuanced; (2) knowledge of the intricacies of automobiles and the lexicon associated with them, as well as knowledge concerning how to investigate issues with automobiles; and (3) knowledge auto manufacturers' and dealers' policies and protocols for repairing vehicles and complying with their legal obligations. (SM Dec., ¶ 83.) This case also involves fraud allegations based on Ford's ongoing misrepresentations regarding PowerShift Transmission vehicles, which were inextricably intertwined with the defective condition of the subject vehicle under the Song-Beverly Act. Plaintiff's attorneys have acquired knowledge and insight about these issues and this experience typically results in significantly higher judgments or settlements for their clients, like Plaintiff here.

Moreover, Ford made this matter even more complex by maintaining it had no liability and declining to submit any reasonable offers to settle the matter for nearly eighteen months, while pursuing discovery with full force and compelling Plaintiff's counsel to litigate this matter exhaustively for almost two years. Prior to commencing litigation, Plaintiff first sought relief by requesting a buyback from Ford, which it denied. Ford should have acknowledged the well-known defects in Plaintiff's vehicle and resolved the matter before this case was ever filed. Ford ultimately did just that, but not before causing substantial fees to be incurred.

Ford engaged in expensive litigation, including extensive written discovery, petitioning to add on cases in this "simple lemon law" action and filing two demurrers. Ford easily could have resolved this matter earlier and saved tens of thousands in attorney's fees, costs and expenses.

9

1   When Ford causes the entirety of fees to be incurred, it has no legitimate basis for
2   complaining about the amount of attorney's fees reasonably and actually incurred, especially
3   when Ford was given the opportunity to resolve the matter before a lawsuit was even filed. "A
4   party cannot litigate tenaciously and then be heard to complain about the time necessarily spent
5   by the opposition in response." (*En Palm, LLC v. Teitler* (2008) 162 Cal.App.4th 770, 786; *see*
6   *also Molski v. Arclero Wine Group* (2008) 164 Cal.App.4th 786.)

7   **2.    The Firm's Skill Justifies the Amount of Attorney's Fees Sought**

8   A trial court may also take into account the skill of the attorneys when determining
9   reasonable attorney's fees. (*La Mesa-Spring Valley School Dist. v. Otsuka* (1962) 57 Cal.2d 309,
10  316.)  Despite the case's difficulties, Plaintiff ultimately recovered $99,000.00 in damages,
11  which is more than three-and-a-half times the vehicle's purchase price.  The vehicle was no more
12  or less defective on the date of settlement than it was when Plaintiff first requested a repurchase,
13  so there is no rational explanation why Ford waged a lengthy and costly legal battle only to settle
14  for an amount that included civil penalties.

15  The final resolution is the direct result of skill and preparation by Plaintiff's attorneys,
16  who specialize in consumer law and did not balk at Ford's aggressive litigation tactics.
17  Plaintiff's attorneys' experience in this area has enabled them to develop litigation strategies that
18  are both highly effective and cost and time efficient.  Plaintiff's attorneys know the many
19  nuances in these types of cases.  This specialized knowledge and experience in lemon law
20  frequently achieves results better than attorneys who do not specialize in this specific area of
21  law.  This experience provided a resolution to this matter far beyond that which Ford was
22  previously willing to entertain.  Ford engages specialized attorneys from big firms, and Plaintiff
23  needed skilled attorneys to prosecute her claims.  The biggest difference between Plaintiff
24  getting zero and Plaintiff receiving a $99,000.00 recovery was her attorneys' knowledge and
25  expertise.

26  Counsels' skill is evidenced by the size of the settlement as well as the nominal time
27  expended on litigation tasks, which results in lower overall billing.  Plaintiff's attorneys do not

10

1  spend inordinate time researching because they specialize in this area of law.  (SM Dec., ¶ 84.)

2  Nor do they spend unreasonable time preparing pleadings and other documents because they are

3  able to use documents from other cases that need only be edited, rather than written from scratch.

4  While substantial fees have been incurred, those fees result from the execution of effective

5  strategies that typically result in superlative results for clients, like Plaintiff here.

6        On the other side, Ford is represented by large national firms with attorneys who

7  specialize in representing automobile manufacturers in lemon law cases.  Ford is a corporate

8  behemoth with the resources to easily overwhelm a consumer or an inexperienced attorney.

9  Plaintiff required skilled and experienced attorneys to prosecute her claims against Ford and its

10  formidable resources.

11      **C.**   **The Settlement Amount Does Not Limit the Attorney's Fee Recovery**

12        Ford may argue that damages in the amount of $99,000.00 do not justify an attorney's fee

13  award in the amount requested by Plaintiff.  Such an argument is starkly against the weight of the

14  law.  The amount of attorney's fees *must not be tied to any percentage of recovery.*  (*Graciano,*

15  *supra,* 144 Cal.App.4th at 164.)  In fact, a trial court may abuse its discretion if it applies a rule

16  of proportionality to a fee award.  The U.S. Supreme Court has previously considered the

17  question of proportionality in attorney fee awards and held: "[w]e reject the proposition that fee

18  awards under section [42 U.S.C.] 1988 should necessarily be proportionate to the amount of

19  damages a civil rights Plaintiff actually recovers."  (*City of Riverside v. Rivera* (1986) 477 U.S.

20  561, 574; *see also* Sen. Report No. 93-151, 1st Sess., pp. 23-24 (1973) (attorney's fees under the

21  Magnuson Moss Warranty Act are based on actual time, not a percentage of the recovery);

22  *Robertson, supra,* 144 Cal.App.4th at 820; *Independent Federation of Flight Attendants v. Zipes*

23  (1989) 491 U.S. 754, fn.2 (fee shifting provisions under Magnuson-Moss and Song-Beverly "are

24  to be interpreted alike"); *Goglin, supra,* 5 Cal.App.5th at 468-69 (affirming award of $185,000 in

25  fees and costs in a Song-Beverly Act case that settled for $75,000); *Vo v. Las Virgenes*

26  *Municipal Water District* (2000) 79 Cal.App.4th 440, 446 (affirming $470,000 fee award after

27  $40,000 judgment because the defendant was excessively litigious and took a non-settlement

11

1    posture); *Harman v. City and County of San Francisco* (2007) 158 Cal.App.4th 407 (affirming

2    award of approximately $1.1 million in fees where plaintiffs recovered $30,300).)

3              It is not uncommon for attorney's fees and costs to exceed the client's damages, although

4    that did not happen here because the settlement was so large and the fees were efficiently

5    incurred.  The Legislature acknowledged that substantial work might be needed to prosecute

6    such claims against large corporation, which is the reason behind the fee shifting provision of the

7    Song-Beverly Act. (SM Dec., ¶ 82.)  "The purpose of statutory attorney fee provisions is to

8    provide financial incentives necessary for the private enforcement of important civil rights."

9    (*Ketchum v. Moses* (2001) 24 Cal.4th 1122, 1132.)  Thus, the Song-Beverly Act gives consumers

10   the opportunity to seek legal redress even if their damages would not be high enough to warrant

11   legal representation.  The award of attorney's fees *cannot* be limited by the damages recovered

12   by Plaintiff.  Any argument by Ford to the contrary would be disingenuous, as the law is clear on

13   this point. (*Ketchum, supra,* 24 Cal.4th at 1132.)

### D.    Plaintiff Should Be Granted a Lodestar Multiplier

         As part of the Song-Beverly Act, a prevailing buyer may also receive a lodestar multiplier, sometimes referred to as an adjustment or enhancement. (*Robertson, supra,* 144 Cal.App.4th at 817.)   Once a lodestar amount is determined, which involves a "careful compilation of the actual time spent and reasonable hourly compensation for each attorney," (*Id.* at 819 (*citing Serrano v. Priest* (1977) 20 Cal.3d 25, 48-49 (*Serrano III*)), the amount may then be augmented by taking various relevant factors into account, including (1) the novelty and difficulty of the questions involved and the skill displayed in presenting them; (2) the extent to which the nature of the litigation precluded other employment by the attorneys; and (3) the contingent nature of the fee award, based on the uncertainty of prevailing on the merits and of establishing eligibility for the award. (*Id.; see also Graham, supra,* 34 Cal.4th at 579; *PLCM Group v. Drexler,* 22 Cal.4th at 1096.)  "[T]he purpose of a fee enhancement is primarily to compensate the attorney for the prevailing party at a rate reflecting the risk of nonpayment in

12

1  contingency cases." (*Ketchum, supra,* 24 Cal.4th at 1138; *Cazares v. Saenz* (1989) 208
2  Cal.App.3d 279, 287-88 (risk factor alone justifies a 2.0 multiplier for a 50% chance of
3  prevailing).) "A 50 percent chance of recovery implies a multiplier of 2, a 25 percent chance of
4  recovery implies a multiplier of 4, and so on." (*In re Chiron Corp. Securities Litigation* (N.D.
5  Cal. Nov. 30, 2007) No. C-04-4293 VRW, 2007 WL 4249902, *9.)

6      In *Robertson*, a case brought under the Song-Beverly Act, the court ruled that the
7  "statutory language in section 1794(d) is reasonably compatible with a lodestar adjustment
8  method of calculating attorney fees, including use of fee multipliers." (144 Cal.App.4th at 819.)
9  The trial court awarded a total of $231,187.45 in fees consisting of: $145,080.50 in fees incurred
10  through trial, plus a "multiplier" of 1.5 for a total of $217,620.75, and $13,566.70 for fees in
11  preparing the fees motion. (*Id.* at 817.)   The appellate court held the trial court properly
12  conducted a lodestar analysis and the award was not an abuse of discretion. (*Id.* at 822.)

13      In *Graciano*, the appellate court actually *increased* the trial court's award of fees after
14  finding that the lodestar rate of $350/hour was reasonable (in 2006) and adding a 2.0 multiplier
15  for a total award of over $380,000. (144 Cal.App.4th at 156.)   The court also reaffirmed
16  attorney's fees are not limited to a proportion of the recovery. (*Id.* at 164.)

17      Ford may argue a multiplier is not permitted, and cite to the *Ketchum* case to support that
18  argument. To the contrary, *Ketchum* actually <u>confirms</u> the granting of a multiplier in contingency
19  fee cases. (*Ketchum, supra,* 24 Cal.4th at 1132.) A lodestar multiplier is in fact available and it
20  has been awarded to Plaintiff's counsel in several cases. (SM Dec., ¶¶ 51, 55, 64, 65, 67, 68, 72,
21  78, 79, 80, Exs. T, X, GG, HH, JJ, KK, OO, UU, VV, WW.)

22      **1.    <u>The Lodestar Multiplier Should Be Granted in Contingent Cases</u>**
23           **<u>Due to Risk and Delay of Payment</u>**

24      The lodestar is intended to reflect the basic fee for comparable non-contingent legal
25  services and should be enhanced by an appropriate multiplier to reflect the risk and delay in
26  payment associated with taking a contingent case, as well as the result achieved. The lodestar
27  "multiplier" is meant to increase or decrease the fee award based on factors not already taken

13

1  into account when setting the hourly rate, such as the <u>risk</u> of taking a case on a contingency

2  basis, and <u>delay</u> in receiving payment.  (*See Horsford v. Bd. of Trustees of Cal. State Univ.*

3  (2005) 132 Cal. App. 4th 359, 394-95.)

4      In *Ketchum*, the California Supreme Court wrote, "[a] contingent fee contract, since it

5  involves a gamble on the result, may properly provide for a *larger compensation* than would

6  otherwise be reasonable." (24 Cal.4th at 1132 [emphasis added].)

7

> <u>A contingent fee must be higher than a fee for the same legal services paid as they</u>
> <u>are performed</u>.  The contingent fee compensates the lawyer not only for the legal
> services he renders but for the loan of those services.  The implicit interest rate on
> such a loan is higher because the risk of default (the loss of the case, which
> cancels the debt of the client to the lawyer) is much higher than that of
> conventional loans. (Posner, Economic Analysis of Law (4th ed.1992) pp. 534,
> 567, emphasis added.)  <u>A lawyer who both bears the risk of not being paid and</u>
> <u>provides legal services is not receiving the fair market value of his work if he is</u>
> <u>paid only for the second of these functions</u>.  If he is paid no more, competent
> counsel will be reluctant to accept fee award cases.

8

9

10

11

12

13  (*Id.* at 1132 [citations omitted; emphasis added].)

14      Throughout the litigation, there always existed the possibility Plaintiff would not prevail.

15  The risk was further compounded by the fact that Plaintiff's attorneys advanced all litigation

16  costs and expenses without reimbursement.  Thus, if Plaintiff did not prevail, her attorneys

17  would have suffered a loss of dozens of hours in uncompensated work and thousands of dollars

18  in out-of-pocket expenses.  Plaintiff requests a 0.2 enhancement based on that risk.

19      Further, Ford dragged this case out for nearly eighteen months before making an

20  acceptable offer.  Unlike Ford's attorneys, who are paid monthly regardless of outcome,

21  Plaintiff's attorneys are not paid at all if they lose, and need to absorb significant delay in being

22  paid if Plaintiff does win.  On account of the substantial delay in payment, Plaintiff requests a 0.3

23  enhancement.

24      Based on the risk of taking this case on a contingent fee basis and the delay in payment

25  since February 2016, Plaintiff requests a nominal multiplier of 1.5.

26  ///

27  ///

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR
ATTORNEY'S FEES, COSTS AND EXPENSES

1   **E.     Plaintiff is Entitled to Recover All Costs and Expenses Reasonably Incurred**

2          **in Connection with this Action**

3          Under the Song-Beverly Act, a prevailing buyer shall be allowed to recover as part of the

4   judgment a sum equal to the aggregate amount of costs and expenses.  (Civ. Code § 1794(d)

5   [emphasis added].)  The California Legislature intended the word "expenses" to cover outlays

6   not included in the detailed statutory definition of "costs," and the Song-Beverly Act's legislative

7   history demonstrates the Legislature exercised its power to permit recovery of a host of litigation

8   expenditures beyond those permitted by Code of Civil Procedure § 1033.5.  (*Jensen v. BMW of*

9   *North America, Inc.* (1995) 35 Cal.App.4th 112, 137-138.)

10          A verified memorandum of costs generally satisfies the moving party's burden of

11   establishing costs were necessarily incurred.  (*Hadley v. Krepel* (1985) 167 Cal.App.3d 677,

12   682.)  The verified memorandum of costs demonstrates what Plaintiff's attorneys incurred in

13   costs and expenses prosecuting this matter, which counsel advanced on Plaintiff's behalf.  (SM

14   Dec. ¶ 2, Ex. B; Civ. Code § 1794(d).)  The burden shifts to Ford to properly rebut the claimed

15   costs.

16                          **IV.     CONCLUSION**

17          For the reasons above, Plaintiff respectfully requests this Honorable Court award

18   attorney's fees, costs and expenses as follows:

19          | | |
    |---|---|
    | Lodestar Fees: | $44,557.50 |
    | +Lodestar Enhancement: | $22,278.75 |
    | Total Fees Requested: | $66,836.25 |
    | +Costs and Expenses: | $ 6,494.49 |
    | =**Total Fees and Costs/Expenses:** | **$73,330.74** |

23   Dated:  March 7, 2018                          KNIGHT LAW GROUP, LLP

25                                                  Steve Mikhov (SBN 224676)
                                                    Amy Morse (SBN 290502)
26                                                  Attorneys for Plaintiff,
                                                    **DIANNA M. ENCARNACION**
27

15

**PROOF OF SERVICE**
(Code of Civil Procedure §1013a)

I am employed in the County of Los Angeles, State of California.  I am over the age of 18 years and not a party to the within action.  My business address is 1801 Century Park East, Suite 2300, Los Angeles, CA 90067.

I served the foregoing document described as:

**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR ATTORNEY'S FEES, COSTS AND EXPENSES**

Said document was served on the interested parties in this action, addressed as follows:

| | |
|---|---|
| Matthew M. Proudfoot, Esq. | Richard Wirtz, Esq. |
| GATES, O'DOHERTY, GONTER & | Wirtz Law APC |
| GUY LLP | 4370 La Jolla Village Drive, Suite 800 |
| 38 Discovery, Suite 200 | San Diego, CA 92122 |
| Irvine, CA 92618 | rwirtz@wirtzlaw.com |
| **Counsel for Defendant,** | **Associated Counsel for Plaintiff,** |
| **FORD MOTOR COMPANY** | **DIANNA M. ENCARNACION** |
| (via Mail only) | (via E-mail only) |

XX   BY MAIL:  I am readily familiar with this firm's practice of collection and processing correspondence for mailing with the United States Postal Service.  Under that practice, it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid at a Postal Service collection box at Los Angeles, California, in the ordinary course of business. The envelope was sealed and placed for collection that same day following ordinary business practices, addressed to the above-referenced attorney.

XX   BY E-MAIL OR ELECTRONIC TRANSMISSION: Based on a court order or an agreement of the parties to accept service by e-mail or electronic transmission, I caused the documents to be sent to the persons at the e-mail addresses listed above.  I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on March 9, 2018 at Los Angeles, California.

JANETH TAPIA

-1-

**PROOF OF SERVICE**
