

RECEIVED
MAR 0 5 2018
BY: .......................

**KNIGHT LAW GROUP, LLP**
Steve Mikhov (SBN 224676)
1801 Century Park East, Suite 2300
Los Angeles, CA 90067
Telephone: (310) 552-2250
Fax: (310) 552-7973

**LAW OFFICE OF MICHAEL H. ROSENSTEIN**
Michael H. Rosenstein (SBN 169091)
1801 Century Park East, Suite 2300
Los Angeles, CA 90067
Telephone: (310) 552-2250
Fax: (310) 552-7973

Attorneys for Plaintiff,
**LISA M. SORBEL**

## SUPERIOR COURT OF CALIFORNIA

## COUNTY OF LOS ANGELES

| | |
|---|---|
| **LISA M. SORBEL,**<br><br>Plaintiff,<br><br>vs.<br><br>**FORD MOTOR COMPANY, a Delaware Corporation, and DOES 1 through 10, inclusive,**<br><br>Defendants. | Case No. BC633608<br><br>**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR ATTORNEY'S FEES, COSTS AND EXPENSES**<br><br>[Filed concurrently with Plaintiff's Notice of Motion and Motion for Attorney's Fees, Costs and Expenses; Declarations of Steve Mikhov and Michael H. Rosenstein]<br><br>*Assigned for All Purposes to the Honorable Barbara M. Scheper*<br><br>Date: March 27, 2018<br>Time: 8:30 a.m.<br>Dept.: 30<br>Reservation No. 180201286441 |

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ..................................................................................... 1

II.     STATEMENT OF FACTS ........................................................................ 2

III.    ARGUMENT AND ANALYSIS ............................................................... 5

    A.   Plaintiff's Attorneys Are Entitled to Fees, Costs and Expenses in this Action .......... 5

    B.   The Hourly Rates Sought by Plaintiff's Attorneys Are Reasonable ...................... 6

        1.   The Nature and Complexity of the Litigation Support the Attorney's Fees Requested ................................................................ 9

        2.   The Firm's Skill Justifies the Amount of Attorney's Fees Sought ............. 10

    C.   The Settlement Amount Does Not Limit the Attorney's Fee Recovery ................. 11

    D.   Plaintiff Should Be Granted a Lodestar Multiplier ......................................... 12

        1.   The Lodestar Multiplier Should Be Granted in Contingent Cases Due to Risk and Delay of Payment ........................................... 13

    E.   Plaintiff is Entitled to Recover All Costs and Expenses Reasonably Incurred in Connection with this Action ........................................................... 15

IV.    CONCLUSION ..................................................................................... 15

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR ATTORNEY'S FEES, COSTS AND EXPENSES

1

**TABLE OF AUTHORITIES**

2

<u>Page(s)</u>

3

**Cases**

4

*Cazares v. Saenz*
   (1989) 208 Cal.App.3d 279 ......................................................................... 12

5

6

City of Riverside v. Rivera
   (1986) 477 U.S. 561 ......................................................................... 11

7

8

*Dietrich v. Dietrich*
   (1953) 41 Cal.2d 497 ......................................................................... 9

9

*En Palm, LLC v. Teitler*
   (2008) 162 Cal.App.4th 770 ......................................................................... 10

10

11

Goglin v. BMW of North America, LLC
   (2016) 4 Cal.App.5th 462 ......................................................................... 6, 7, 11

12

*Graciano v. Robinson Ford Sales*
   (2006) 144 Cal.App.4th 140 ......................................................................... passim

13

14

Graham v. DaimlerChrysler Corp.
   (2004) 34 Cal.4th 553 ......................................................................... 5, 12

15

16

*Hadley v. Krepel*
   (1985) 167 Cal.App.3d 677 ......................................................................... 15

17

18

Harman v. City and County of San Francisco
   (2007) 158 Cal.App.4th 407 ......................................................................... 11

19

Horsford v. Bd. of Trustees of Cal. State Univ.
   (2005) 132 Cal. App. 4th 359 ......................................................................... 8, 14

20

21

*In re Chiron Corp. Securities Litigation*
   (N.D. Cal. Nov. 30, 2007) No. C-04-4293 VRW, 2007 WL 4249902 ......................................................................... 13

22

23

Independent Federation of Flight Attendants v. Zipes
   (1989) 491 U.S. 754 ......................................................................... 11

24

Jensen v. BMW of North America, Inc.
   (1995) 35 Cal.App.4th 112 ......................................................................... 15

25

26

*Ketchum v. Moses*
   (2001) 24 Cal.4th 1122 ......................................................................... 12, 13, 14

27

-ii-

La Mesa-Spring Valley School Dist. v. Otsuka
(1962) 57 Cal.2d 309 ................................................................................. 10

Los Angeles Police Protective League v. City of Los Angeles
(1986) 188 Cal.App.3d 1 ............................................................................ 8

*Mandel v. Lackner*
(1979) 92 Cal.App.3d 747 .......................................................................... 6

*Molski v. Arclero Wine Group*
(2008) 164 Cal.App.4th 786 ...................................................................... 10

*PLCM Group v. Drexler*
(2000) 22 Cal.4th 1084 ......................................................................... 7, 12

Reveles v. Toyota by the Bay
(1997) 57 Cal.App.4th 1139 ....................................................................... 6

Robertson v. Fleetwood Travel Trailers of California, Inc
(2006) 144 Cal.App.4th 785 ............................................................... passim

*Serrano v. Priest*
(1977) 20 Cal.3d 25 .................................................................................. 12

*Serrano v. Unruh*
(1982) 32 Cal.3d 621 .............................................................................. 6, 8

Vo v. Las Virgenes Municipal Water District
(2000) 79 Cal.App.4th 440 ....................................................................... 11

**Statutes and Codes**

California Civil Code
Section 1790, *et seq.* ........................................................................ passim
Section 1794(d) ................................................................................ passim

California Code of Civil Procedure
Section 1032(a)(4) ..................................................................................... 5
Section 1033.5 .......................................................................................... 15
Section 998 ............................................................................................ 1, 5

United States Code
Title 42 Section 1988 ............................................................................... 11

**Other Authorities**

Pearl, *California Attorney Fee Awards*
Section 12.14A (2nd Ed. 2005) .................................................................. 6

-iii-

Sen. Report
   No. 93-151, 1st Sess., pp. 23-24 (1973) .................................................................................. 11

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR
ATTORNEY'S FEES, COSTS AND EXPENSES

# I. INTRODUCTION

This case is about Defendant Ford Motor Company's ("Defendant" or "Ford") policy of taking advantage of California consumers, and Plaintiff Lisa M. Sorbel's ("Plaintiff") nearly year-long battle to vindicate her rights. Ford had three opportunities to avoid this lawsuit. First, Ford had an opportunity to build a quality car. Ford then had an opportunity to repair Plaintiff's vehicle within a reasonable number of repair attempts. Ford had a final opportunity to avoid this lawsuit when Plaintiff contacted Ford and asked for relief, which Ford rejected despite its legal obligation. Having squandered all three opportunities and violated the Song-Beverly Act in the process, Ford left Plaintiff with little choice but to pursue her rights in court.

Plaintiff purchased a new 2011 Ford Fiesta on March 18, 2011 for a total purchase price of $28,373.50. After less than two and one-half years and 31,500 miles of ownership, the vehicle began exhibiting serious transmission and engine problems. Plaintiff brought the vehicle into a Ford-authorized repair facility because it would jump when driving and, on two occasions, the vehicle stalled while stopped at a traffic light—a dangerous condition. For the next thirty-two months, Plaintiff suffered through ongoing problems with the transmission and engine, requiring additional visits for repair and recalls. Yet, the vehicle continued to shudder and, occasionally, stall while being driven. Plaintiff sought maintenance on these issues five times, but the serious problems continued. Frustrated, Plaintiff contacted Ford's customer service on or about April 6, 2016, seeking a buyback of the defective vehicle. Despite the serious transmission and engine problems, Ford refused the buyback, and Plaintiff was forced to continue driving her defective vehicle. The serious transmission problems continued, to the point of almost causing a traffic accident.

After ten months of litigation, the parties agreed to settle the matter following Plaintiff's acceptance of Ford's C.C.P § 998 in the amount of $100,000.00. The final settlement is more than **three and one-half times** the total amount Plaintiff paid for the vehicle in what defense routinely calls a "simple lemon law" action. Plaintiff obtained this extraordinary sum, which included civil penalties, *without going to trial*. Ford could have avoided this lawsuit completely had it only

-1-

1  bought back Plaintiff's defective automobile on day one. By any analysis, Plaintiff, Plaintiff

2  achieved a superlative settlement, particularly given Ford's initial summary rejection of Plaintiff's

3  buyback request under the Song-Beverly Act. This is a settlement that few, if any, firms in this

4  state could achieve for its clients. The excellent result was achieved due to Plaintiff's attorneys'

5  skill and expertise in lemon law cases, which been developed and honed over the course of many

6  years of advocating on behalf of consumers and their rights under California law. Arguably, the

7  biggest factor in Ford offering Plaintiff nothing, versus the $100,000.00 settlement secured by

8  Plaintiff's attorneys in this matter is the knowledgeable, zealous approach they took to this case.

9       The Song-Beverly Act, Civil Code sections 1790, *et seq.*, entitles Plaintiff to seek

10  reasonable attorney's fees, costs and expenses from Ford. Moreover, the parties' settlement

11  agreement provides Plaintiff is the prevailing party and entitled to this noticed motion for

12  attorney's fees. Plaintiff now moves the Court: (1) for an award of attorney's fees pursuant to Civil

13  Code section 1794(d) under the "lodestar" method in the amount of $42,375.00, (2) for a modest

14  "lodestar" modifier of 1.5 in the amount of $21,187.50 and (3) to award actual costs and expenses

15  incurred in the amount of $2,389.99. (Civ. Code § 1794(d).) Plaintiff requests a total of

16  $65,952.49 in attorney's fees, costs and expenses. (Declaration of Steve Mikhov ("SM Dec.") ¶ 2,

17  Exs. A-B; Declaration of Michael H. Rosenstein ("MR Dec" ¶ 8, Ex.A.)

18                    **II.    STATEMENT OF FACTS**

19       Plaintiff purchased a new 2011 Ford Fiesta on March 18, 2011—adding taxes, fees,

20  optional service contract, optional GAP contract and financing charges on a six-year loan, the total

21  purchase price was $28,373.50. (SM Dec. ¶ 3, Ex. C.) The vehicle was distributed by Ford Motor

22  Company (hereafter "Defendant" or "Ford"), which provided an express written warranty. (*Id.*)

23       After less than two and one-half years and 31,500 miles of ownership, and well within the

24  applicable express warranty periods, the vehicle began exhibiting serious transmission and engine

25  problems. (SM Dec. ¶ 4.) Plaintiff brought the vehicle into a Ford-authorized repair facility

26  because it would jump when driving and, on two occasions the vehicle actually stalled while

27  Plaintiff was stopped at a traffic light. (*Id.*) The Ford-authorized repair facility replaced the

-2-

1   throttle body. (*Id.*) After another seven months, Plaintiff brought the vehicle back in for repair

2   because it would shudder when accelerating from stop and the engine was leaking oil. (*Id.*) The

3   Ford-authorized repair facility reprogrammed the powertrain control module ("PCM") and

4   transmission control module ("TCM"), replaced the damaged clutch, clutch slave cylinder and

5   input seals. (*Id.*) About six months later, Plaintiff returned the vehicle to the repair facility with

6   complaints of the car jerking into gear upon acceleration. (*Id.*) Again, the Ford-authorized repair

7   facility reprogrammed the PCM and TCM. (SM Dec. ¶ 4.) Four months after that, the Plaintiff

8   brought the vehicle into the Ford-authorized repair facility because the engine was smoking. (*Id.*)

9   While at the repair facility the technicians performed recall repairs of reprogramming the PCM and

10  TCM. (*Id.*) Less than six weeks later, in addition to the continued shuddering, the vehicle's

11  steering column was rattling when turning. (*Id.*) The Ford-authorized repair facility replaced the

12  lower steering shaft and again reprogrammed the PCM and TCM. (*Id.*) Plaintiff brought the

13  vehicle in for repair five (5) times for transmission and engine problems in the span of less than

14  thirty-two months, but the serious problems persisted. (*Id.*)

15       Frustrated, concerned for her safety, and having lost confidence in Ford's ability to repair

16  the vehicle, Plaintiff contacted Ford's customer service on April 6, 2016, seeking a buyback of the

17  defective vehicle. (SM Dec. ¶ 5.) Despite Ford's affirmative duty under the law to perform an

18  investigation and offer a replacement or buyback of the defective vehicle, Ford elected to

19  summarily deny Plaintiff's request on April 26, 2016. (*Id.*)

20       Despite the ongoing repairs and continued manifestation of problems, Ford refused to

21  acknowledge the defective nature of Plaintiff's vehicle. (SM Dec. ¶ 6.) At all times, however, Ford

22  had direct, contemporaneous knowledge of the vehicles serious defects, which it records in a

23  database called "OASIS" and a warranty repair history database called "AWS" as they are

24  reported. (*Id.*) These repair records indicate each time the vehicle was presented for repair during

25  the warranty period, as well as every time the Ford repair facility found a problem/defect

26  attributable to Ford and billed Ford for the work. (*Id.*)

27       Meanwhile, Plaintiff was forced to continue driving her defective vehicle. (SM Dec. ¶ 7.)

-3-

On May 10, 2016, Plaintiff's vehicle lost momentum while attempting to accelerate from a traffic light almost causing a traffic accident. (*Id.*) Plaintiff had difficulty starting the vehicle, it would not go in reverse, and it made a horrible noise when getting it on the tow truck. (*Id.*) Again, the repair facility attempted to correct the serious transmission problem. (*Id.*)

With no other recourse, Plaintiff contacted Knight Law Group, LLP (hereafter "Knight Law," formerly known as O'Connor & Mikhov) and told the firm about the problems with her vehicle and the way Ford treated her. (SM Dec. ¶ 8.) After reviewing the repair history and discussions with Plaintiff, Knight Law agreed to represent her and bear the risk of litigating the case on a fully contingent basis. (*Id.*) Because Knight Law's compensation was purely contingent, the firm faced a genuine risk of not being paid for its services for years, if at all, while advancing thousands of dollars in costs and expenses on Plaintiff's behalf. (*Id.*) In taking on this duty, the firm was facing a litigation behemoth—Ford is a multi-billion-dollar company, with a virtually infinite litigation war-chest, that wages a battle of attrition that most firms cannot withstand. (*Id.*)

As a result of Ford's failure to repurchase Plaintiff's vehicle, Plaintiff filed her complaint in this action on or about September 9, 2016, alleging intentional misrepresentation, negligent misrepresentation, concealment, fraud and violations of the Song-Beverly Act and seeking civil penalties and punitive damages. (SM Dec. ¶ 9.) Ford filed a Demurrer, which Plaintiff opposed. The Court overruled the Demurrer on December 14, 2016. (*Id.*)

Plaintiff's counsel promptly began working up their case on behalf of Plaintiff. (SM Dec. ¶ 10.) Written discovery was drafted and served on Defendant on or about December 19, 2017, consisting of 54 Requests for Admissions, 98 Requests for Production of Documents, 105 Special Interrogatories and 28 Form Interrogatories. (*Id.*) Plaintiff benefited from Knight Law's expertise and experience in litigating against Ford insofar as just 4.5 hours were billed to review the file and draft the entirety of this discovery. (*Id.*) Plaintiff's counsel is able to use existing files as templates to conserve time and litigate efficiently. (*Id.*) Written discovery of this magnitude, drafted from scratch and without the benefit of Plaintiff's attorneys' vast knowledge, experience and specialized expertise, would have taken multitudes of the time expediently managed here. (*Id.*)

On or about December 16, 2016, Ford answered the complaint, denying all liability and demanding a jury trial. (SM Dec. ¶ 11.) In April, Ford propounded Requests for Production of Documents, Special Interrogatories, Requests for Admissions, and Form Interrogatories upon Plaintiff. Plaintiff benefited from Knight Law's expertise and experience insofar as <u>just 3.9 hours were billed for drafting responses to the entirety of this discovery.</u> (*Id.*)

In May 2017, Plaintiff noticed the depositions of numerous Ford employees, including Ford's PMK, and Defendant objected. (SM Dec. ¶ 12.) In June, Plaintiff noticed amended depositions of numerous Ford employees. (*Id.*)

By May 2017, the case appeared likely to go to trial. (SM Dec. ¶ 13.) Accordingly, on or about May 26, 2017, Michael H. Rosenstein of the Law Offices of Michael H. Rosenstein, LC formally associated into the case as lead counsel to prepare for trial. (MR Dec. ¶ 10, Ex. C.) Trial counsel defended Plaintiff's deposition, attempted to take depositions of Ford's employees, attended both the vehicle inspection and trial conference, and drafted 15 motions in limine. (MR Dec., ¶¶ 12, 14, 15.)

On or about July 14, 2017, after ten months of litigation, Ford served Plaintiff with an Offer to Compromise pursuant to the Code of Civil Procedure section 998 ("998 Offer"), in the amount of $100,000. (SM Dec. ¶ 14, Ex. D) The 998 Offer was accepted by Plaintiff on August 15, 2017. This settlement amount was inclusive of a full statutory "buy-back" of her defective vehicle, incidental and consequential damages, and a civil penalty. (*Id.*)

Plaintiff, as the prevailing party in this action, has made every reasonable effort to resolve the payment of Plaintiff's attorney's fees by Ford but was forced to file this Motion with the court. (SM Dec. ¶ 15.)

## III.   ARGUMENT AND ANALYSIS

### A.   <u>Plaintiff's Attorneys Are Entitled to Fees, Costs and Expenses in this Action</u>

Pursuant to the terms of the parties' settlement, Plaintiff is the prevailing party in this action and, under the Song-Beverly Act, entitled to recoup all reasonable attorney's fees, costs and expenses as the prevailing party. (Code Civ. Proc. § 1032(a)(4); Civ. Code § 1794(d); *Graham v.*

1 *DaimlerChrysler Corp.* (2004) 34 Cal.4th 553, 557; *Reveles v. Toyota by the Bay* (1997) 57

2 Cal.App.4th 1139.)  Absent a contrary showing, both the number of hours that the prevailing

3 party's attorney spent litigating the case and his or her regular hourly rate are presumed to be

4 reasonable.  (*Serrano v. Unruh* (1982) 32 Cal.3d 621, 639 (counsel is entitled to all hours actually

5 spent, absent a showing of "special circumstances" that would render such an award unjust);

6 *Mandel v. Lackner* (1979) 92 Cal.App.3d 747, 761 (an attorney's regular hourly rate is entitled to a

7 presumption of reasonableness); Pearl, *California Attorney Fee Awards*, at §§ 12.14A, 12.33 (2nd

8 Ed. 2005).)

9       In prosecuting this case, the efforts of Knight Law and Rosenstein amount to $42,375.00,

10 including drafting this motion and time anticipated to be spent preparing the reply and attending

11 the hearing.  (SM Dec., ¶ 2, Ex. A,: MR Dec., ¶ 8, Ex. A.)  Plaintiff's counsel also requests a

12 modest 1.5 enhancement, in the amount of $21,187.50, to account for the delay in payment and

13 contingent risk posed by this case.  Lastly, the reimbursable costs and expenses set forth in

14 Plaintiff's memoranda of costs are $2,389.99.  (SM Dec., ¶ 2, Ex. B.)  In total, Plaintiff requests

15 $65,952.49.  (SM Dec., ¶ 2, Exs. A-B; MR Dec., ¶ 8, Ex. A)

16     **B.**    **The Hourly Rates Sought by Plaintiff's Attorneys Are Reasonable**

17       The Court of Appeal has expressly held the lodestar method applies to determining

18 attorney's fees under the Song-Beverly Act.  (*Robertson v. Fleetwood Travel Trailers of*

19 *California, Inc.* (2006) 144 Cal.App.4th 785, 817.)  The calculation of reasonable attorney's fees

20 under the Song-Beverly Act is based on the lodestar method, which entails multiplying the number

21 of hours reasonably expended by a reasonable hourly rate.  (*Graciano v. Robinson Ford Sales*

22 (2006) 144 Cal.App.4th 140, 154; *Robertson, supra,* 144 Cal.App.4th 817.)  The prevailing buyer

23 has the burden of showing that the fees incurred were "allowable," "reasonably necessary to the

24 conduct of the litigation," and "reasonable in amount."  (*Goglin v. BMW of North America, LLC*

25 (2016) 4 Cal.App.5th 462, 470.)  In making such an evaluation, a court may consider "factors such

26 as the complexity of the case and procedural demands, the skill exhibited and the results achieved."

27 (*Id.*)

1        In *Goglin v. BMW*, the appellate court recently affirmed the trial court's award of over

2   $185,000 in attorneys' fees and costs for a plaintiff who settled her claims against BMW under the

3   Song-Beverly Act. (4 Cal.App.5th at 464.)  The court also found plaintiff's counsel's hourly rate

4   of $575 per hour was reasonable as supported by exhibits to counsel's declaration indicating

5   various state and federal courts had previously awarded him comparable hourly rates. (*Goglin,*

6   *supra,* 4 Cal.App.5th at 464.)  The trial court was not obliged to consider that defendants paid their

7   counsel a much lower hourly rate. (*Id.* at 474.)

8        In *Robertson*, the court observed a prevailing buyer is entitled to an award of reasonable

9   attorney's fees for time reasonably expended by his attorney. (*Robertson, supra,* 144 Cal.App.4th

10  at 817.)  The court ruled the "statutory language in section 1794(d) is reasonably compatible with

11  a lodestar adjustment method of calculating attorney fees, including use of fee multipliers."

12  (*Robertson, supra,* 144 Cal.App.4th at 819.)  Indeed, in *Robertson*, the trial court awarded

13  $231,187.45 in fees based on $145,080.50 in fees through trial, plus a "multiplier" of 1.5 for a total

14  of $217,620.75, and $13,566.70 for the attorney's fee motion. (*Id.* at 817.)  The appellate court

15  upheld the trial court's ruling. (*Id.* at 822.)

16       In *Graciano*, the trial court initially rejected plaintiff's lodestar fees of $109,468.50 and

17  request for a multiplier of 2.0.  In particular, the trial court reduced the plaintiff's attorney's hourly

18  rate from the requested $350/hour to $250/hour, which was the court's mandated maximum rate for

19  expert testimony.  Plaintiff appealed the court's decision and in particular the hourly rate reduction.

20  The appellate court reversed, reasoning a court should determine the prevailing rate in the

21  community for comparable professional legal services. (*Graciano, supra,* 144 Cal.App.4th at 156

22  (*citing PLCM Group v. Drexler* (2000) 22 Cal.4th 1084, 1095).)  The court found the plaintiff's un-

23  rebutted declarations established the proper hourly rate at $350, and reducing that rate to $250 was

24  an abuse of discretion. (*Id.*)  The court also reaffirmed attorney's fees are not limited to a

25  proportion of the recovery. (*Id.* at 164. )  On remand, the trial court found that the lodestar rate of

26  $350/hour was reasonable *and added* a multiplier of 2.0 for a total fee award of over $380,000.

27  The attorney from *Graciano*, Hallen D. Rosner, now charges $620/hour.  (SM Dec., ¶ 29 (a).)

1    Furthermore, the California Supreme Court has expressly ruled that prevailing parties who

2   are entitled to recover their attorney's fees are *also entitled* to recover their fees for the time spent

3   preparing fee applications such as this one. (*Serrano v. Unruh, supra,* 32 Cal.3d at 631; *Los*

4   *Angeles Police Protective League v. City of Los Angeles* (1986) 188 Cal.App.3d 1, 17; *Robertson,*

5   *supra,* 144 Cal.App.4th at 817 (awarding $13,566.70 in fees for a fee motion).)

6    The hourly rates should be considered in the context of the rates charged by Plaintiff's

7   attorneys in the metropolitan community in which they practice, as opposed to the case venue.  In

8   *Horsford v. Bd. of Trustees of Cal. State Univ.,* the trial court was reversed for refusing to award

9   the higher rates to San Francisco-based attorneys who litigated a FEHA case in Fresno. (*Horsford*

10   *v. Bd. of Trustees of Cal. State Univ.* (2005) 132 Cal. App. 4th 359, 399.)  The law "requires that

11   the *financial incentives be adjusted to attract attorneys* who are sufficient to the cause." (*Id.*) "In

12   the absence of any realistic indication plaintiffs could have found local counsel, it was an abuse of

13   discretion to fail to consider an hourly rate based on counsel's 'home' market rate." (*Id.*)

14   Plaintiff's attorneys' hourly rates should not vary depending on the venue of the lawsuit.  The skill

15   and experience of Ford's attorneys does not change from venue to venue and Plaintiff's counsel

16   deserves to be compensated at the same rate they would receive given the same quantity and

17   quality of work they must perform regardless of the venue.

18    Consideration of the "lodestar" factors compels an award of attorney's fees based on (i) the

19   hourly rates set forth in the declarations filed concurrently herewith (SM Dec., ¶¶ 21-27), (ii) a

20   survey of rates charged by other well-known consumer law attorneys (SM Dec., ¶ 29),  (iii) over

21   three dozen court orders confirming the reasonableness of Plaintiff's counsels' hourly rates and

22   time billed in other Song-Beverly Act cases (*Id.,*  ¶¶ 31-75, Exs. E-WW) and (iv) a National

23   Survey further supporting the reasonableness of hourly rates. (MR Dec., ¶ 9, Ex. B at pp.42-45).

24   Plaintiff's counsels' rates are within the range of rates charged by other attorneys with similar

25   experience in this area of law.

26   ///

27   ///

-8-

1     **1.   The Nature and Complexity of the Litigation Support the Attorney's**

2          **Fees Requested**

3          Determining the amount of reasonable attorney's fees may involve consideration of the

4     nature and complexity of the case. (*Dietrich v. Dietrich* (1953) 41 Cal.2d 497, 506; *Graciano,*

5     *supra,* 144 Cal.App.4th at 147.) Ford will likely claim that "this is a simple lemon law case," and

6     therefore Plaintiff's fee request is unjustified. However, this case required a range of specialized

7     knowledge including: (1) an understanding of the full scope of consumer protection laws, which

8     are highly nuanced; (2) knowledge of the intricacies of automobiles and the lexicon associated with

9     them, as well as knowledge concerning how to investigate issues with automobiles; and (3)

10    knowledge of auto manufacturers' and dealers' policies and protocols for repairing vehicles and

11    complying with their legal obligations. (SM Dec., ¶ 78.) This case involves fraud allegations based

12    on Ford's ongoing misrepresentations regarding the PowerShift Transmission's performance,

13    which was the defective condition of the subject vehicle under the Song-Beverly Act. Plaintiff's

14    attorneys have acquired knowledge and insight about these issues and this experience typically

15    results in significantly higher judgments or settlements for their clients, like Plaintiff here.

16         Moreover, Ford made this matter even more complex by maintaining it had no liability and

17    declining to submit any reasonable offers to settle the matter for ten months while compelling

18    Plaintiff's counsel to litigate this matter. Prior to commencing litigation, Plaintiff first sought relief

19    by requesting a buyback from Ford, which Ford rejected. Ford should have acknowledged the

20    well-known defects in Plaintiff's vehicle and resolved the matter before this case was ever filed.

21    Instead, Ford engaged in expensive litigation, forcing trial counsel to expend numerous hours

22    working up and litigating the case on behalf of Plaintiff. Ford easily could have resolved this

23    matter earlier and saved thousands in attorney's fees, costs and expenses. Ford ultimately came

24    around to doing the right thing, but not before causing substantial fees to be incurred.

25         When Ford causes the entirety of fees to be incurred, it has no legitimate basis for

26    complaining about the amount of attorney's fees reasonably and actually incurred, especially when

27    Ford was given the opportunity to resolve the matter before a lawsuit was even filed. "A party

-9-

1   cannot litigate tenaciously and then be heard to complain about the time necessarily spent by the

2   opposition in response." (*En Palm, LLC v. Teitler* (2008) 162 Cal.App.4th 770, 786; *see also*

3   *Molski v. Arclero Wine Group* (2008) 164 Cal.App.4th 786.)

**2.    The Firm's Skill Justifies the Amount of Attorney's Fees Sought**

5          A trial court may also take into account the skill of the attorneys when determining

6   reasonable attorney's fees. (*La Mesa-Spring Valley School Dist. v. Otsuka* (1962) 57 Cal.2d 309,

7   316.)  Despite the case's difficulties, Plaintiff ultimately recovered $100,000.00 in damages, which

8   is more than three and one-half times the vehicle's purchase price.  The vehicle was no more or

9   less defective on the date of settlement than it was when Plaintiff first requested a repurchase, so

10   there is no rational explanation why Ford waged a legal battle only to settle for an amount that

11   included civil penalties.

12          The final resolution is the direct result of skill and preparation by Plaintiff's attorneys, who

13   specialize in consumer law and did not balk at Ford's aggressive litigation tactics.  Plaintiff's

14   attorneys' experience in this area has enabled them to develop litigation strategies that are both

15   highly effective and cost and time efficient.  Plaintiff's attorneys know the many nuances in these

16   types of cases, and having this specialized knowledge and experience frequently allows them to

17   achieve results that are much better than attorneys who do not specialize in this specific area of

18   law.  This experience was fundamental to Plaintiff obtaining a resolution to this matter far beyond

19   that which Ford was previously willing to entertain.  Ford engages specialized attorneys from big

20   firms, and Plaintiff needed skilled attorneys to prosecute her claims.  The difference between

21   Plaintiff initially getting zero versus Plaintiff obtaining a $100,000 recovery including civil

22   penalties is Plaintiff's counsels' critical experience and zealous representation.

23          Counsels' skill is evidenced by the size of the settlement as well as the nominal time

24   expended on litigation tasks, which results in lower overall billing.  Plaintiff's attorneys do not

25   spend inordinate time researching because they specialize in this area of law.  (SM Dec., ¶ 79.)

26   Nor do they spend unreasonable time preparing pleadings and other documents because they are

27   able to use documents from other cases that need only be edited, rather than written from scratch.

-10-

1    While substantial fees have been incurred, those fees result from the execution of effective

2    strategies that typically result in superlative results for clients, like Plaintiff here.

3        On the other side, Ford is represented by large national firms with attorneys who specialize

4    in representing automobile manufacturers in lemon law cases. Ford is a corporate behemoth with

5    the resources to easily overwhelm a consumer or an inexperienced attorney. Plaintiff required

6    skilled and experienced attorneys to prosecute her claims against Ford and its formidable resources.

7    Plaintiff's attorneys were well suited for this task.

8        **C.    The Settlement Amount Does Not Limit the Attorney's Fee Recovery**

9        Ford may argue that damages in the amount of $100,000.00 do not justify an attorney's fee

10   award in the amount requested by Plaintiff. Such an argument is starkly against the weight of the

11   law. The amount of attorney's fees *must not be tied to any percentage of recovery*. (*Graciano,*

12   *supra,* 144 Cal.App.4th at 164.) In fact, a trial court may abuse its discretion if it applies a rule of

13   proportionality to a fee award. The U.S. Supreme Court has previously considered the question of

14   proportionality in attorney fee awards and held: "[w]e reject the proposition that fee awards under

15   section [42 U.S.C.] 1988 should necessarily be proportionate to the amount of damages a civil

16   rights Plaintiff actually recovers." (*City of Riverside v. Rivera* (1986) 477 U.S. 561, 574; *see also*

17   Sen. Report No. 93-151, 1st Sess., pp. 23-24 (1973) (attorney's fees under the Magnuson Moss

18   Warranty Act are based on actual time, not a percentage of the recovery); *Robertson, supra,* 144

19   Cal.App.4th at 820; *Independent Federation of Flight Attendants v. Zipes* (1989) 491 U.S. 754,

20   fn.2 (fee shifting provisions under Magnuson-Moss and Song-Beverly "are to be interpreted

21   alike"); *Goglin, supra,* 5 Cal.App.5th at 468-69 (affirming award of $185,000 in fees and costs in a

22   Song-Beverly Act case that settled for $75,000); *Vo v. Las Virgenes Municipal Water District*

23   (2000) 79 Cal.App.4th 440, 446 (affirming $470,000 fee award after $40,000 judgment because the

24   defendant was excessively litigious and took a non-settlement posture); *Harman v. City and County*

25   *of San Francisco* (2007) 158 Cal.App.4th 407 (affirming award of approximately $1.1 million in

26   fees where plaintiffs recovered $30,300).

27       It is not uncommon for attorney's fees and costs to exceed the client's damages, although

-11-

1  that did not happen here because the settlement was so large and the fees were efficiently incurred.

2  The Legislature acknowledged that substantial work might be needed to prosecute such claims

3  against large corporations, which is the reason behind the fee shifting provision of the Song-

4  Beverly Act.  (SM Dec., ¶ 77.)  "The purpose of statutory attorney fee provisions is to provide

5  financial incentives necessary for the private enforcement of important civil rights." (*Ketchum v.*

6  *Moses* (2001) 24 Cal.4th 1122, 1132.)  Thus, the Song-Beverly Act gives consumers the

7  opportunity to seek legal redress even if their damages would not be high enough to warrant legal

8  representation.  The award of attorney's fees *cannot* be limited by the damages recovered by

9  Plaintiff.  Any argument by Ford to the contrary would be disingenuous, as the law is clear on this

10  point. (*Ketchum, supra,* 24 Cal.4th at 1132.)  Ford is not likely to make that argument here because

11  Plaintiff's attorneys fees are modest, even with the addition of a lodestar multiplier. Regardless of

12  whether the fees earned are a little or a lot, the law in this regard is clear: They may not be tied to

13  Plaintiff's settlement. (*Graciano, supra.*).

14        **D.**    **Plaintiff Should Be Granted a Lodestar Multiplier**

15        As part of the Song-Beverly Act, a prevailing buyer may also receive a lodestar multiplier,

16  sometimes referred to as an adjustment or enhancement. (*Robertson, supra,* 144 Cal.App.4th at

17  817.)  Once a lodestar amount is determined, which involves a "careful compilation of the actual

18  time spent and reasonable hourly compensation for each attorney," (*Id.* at 819 (*citing Serrano v.*

19  *Priest* (1977) 20 Cal.3d 25, 48-49 (*Serrano III*)), the amount may then be augmented by taking

20  various relevant factors into account, including: (1) the novelty and difficulty of the questions

21  involved and the skill displayed in presenting them; (2) the extent to which the nature of the

22  litigation precluded other employment by the attorneys; and (3) the contingent nature of the fee

23  award, based on the uncertainty of prevailing on the merits and of establishing eligibility for the

24  award. (*Id.*; *see also Graham, supra,* 34 Cal.4th at 579; *PLCM Group v. Drexler,* 22 Cal.4th at

25  1096.)  "[T]he purpose of a fee enhancement is primarily to compensate the attorney for the

26  prevailing party at a rate reflecting the risk of nonpayment in contingency cases." (*Ketchum,*

27  *supra,* 24 Cal.4th at 1138; *Cazares v. Saenz* (1989) 208 Cal.App.3d 279, 287-88 (risk factor alone

1  justifies a 2.0 multiplier for a 50% chance of prevailing).)  "A 50 percent chance of recovery

2  implies a multiplier of 2, a 25 percent chance of recovery implies a multiplier of 4, and so on." (*In*

3  *re Chiron Corp. Securities Litigation* (N.D. Cal. Nov. 30, 2007) No. C-04-4293 VRW, 2007 WL

4  4249902, *9.)

5       In *Robertson*, a case brought under the Song-Beverly Act, the court ruled that the "statutory

6  language in section 1794(d)  is reasonably compatible with a lodestar adjustment method of

7  calculating attorney fees, including use of fee multipliers." (144 Cal.App.4th at 819.)  The trial

8  court awarded a total of $231,187.45 in fees consisting of: $145,080.50 in fees incurred through

9  trial, plus a "multiplier" of 1.5 for a total of $217,620.75, and $13,566.70 for fees in preparing the

10  fees motion. (*Id*. at 817.)  The appellate court held the trial court properly conducted a lodestar

11  analysis and the award was not an abuse of discretion. (*Id*. at 822.)

12       In *Graciano*, the appellate court actually *increased* the trial court's award of fees after

13  finding that the lodestar rate of $350/hour was reasonable (in 2006) and adding a 2.0 multiplier for

14  a total award of over $380,000. (*Graciano, supra,* 144 Cal.App.4th at 156.)  The trial court had

15  initially reduced plaintiff's request for fees down to $250/hour and rejected the 2.0 lodestar

16  multiplier. (*Id*. at 147.)  The court found the plaintiff's un-rebutted declarations established the

17  proper hourly rate at $350, and reducing that rate to $250 was an abuse of discretion. (*Id*.)  The

18  court also reaffirmed attorney's fees are not limited to a proportion of the recovery. (*Id*.  at 164.)

19  Ford may argue a multiplier is not permitted, and cite to the *Ketchum* case to support that

20  argument.  To the contrary, *Ketchum* actually <u>confirms</u> the granting of a multiplier in contingency

21  fee cases (*Ketchum, supra,* 24 Cal.4th at 1132.)  A lodestar multiplier is, in fact, available, and it

22  has been awarded to Plaintiff's counsel in multiple, factually disparate, cases. (SM Dec., ¶¶ 46, 50,

23  59, 60, 62, 63, 67, 73, 74, 75; Exs. T, X, GG, HH, JJ, KK, OO, UU, VV, WW.)

24       **1.**    <u>**The Lodestar Multiplier Should Be Granted in Contingent Cases Due to**</u>

25          <u>**Risk and Delay of Payment**</u>

26       The lodestar is intended to reflect the basic fee for comparable non-contingent legal

27  services and should be enhanced by an appropriate multiplier to reflect the risk and delay in

-13-

payment associated with taking a contingent case, as well as the result achieved. The lodestar "multiplier" is meant to increase or decrease the fee award based on factors not already taken into account when setting the hourly rate, such as the <u>risk</u> of taking a case on a contingence basis, and <u>delay</u> in receiving payment. (*See Horsford v. Bd. of Trustees of Cal. State Univ.* (2005) 132 Cal. App. 4th 359, 394-95.)

In *Ketchum*, the California Supreme Court wrote, "[a] contingent fee contract, since it involves a gamble on the result, may properly provide for a *larger compensation* than would otherwise be reasonable." (24 Cal.4th at 1132 [emphasis added].)

> <u>A contingent fee must be higher than a fee for the same legal services paid as they are performed.</u> The contingent fee compensates the lawyer not only for the legal services he renders but for the loan of those services. The implicit interest rate on such a loan is higher because the risk of default (the loss of the case, which cancels the debt of the client to the lawyer) is much higher than that of conventional loans. (Posner, Economic Analysis of Law (4th ed.1992) pp. 534, 567, emphasis added.) <u>A lawyer who both bears the risk of not being paid and provides legal services is not receiving the fair market value of his work if he is paid only for the second of these functions.</u> If he is paid no more, competent counsel will be reluctant to accept fee award cases.

(*Id.* at 1132 [citations omitted; emphasis added].)

Throughout the litigation, there always existed the real possibility Plaintiff would not prevail. After all, Plaintiff's attorneys do not win every case they litigate. Sometimes, they lose. The risk was further compounded by the fact that Plaintiff's attorneys advanced all litigation costs and expenses without reimbursement. Thus, if Plaintiff did not prevail, her attorneys would have suffered a substantial loss of uncompensated attorney hours and thousands of dollars in out-of-pocket expenses. Plaintiff requests a 0.2 enhancement based on that risk.

Further, Ford dragged this case out for ten months before making an acceptable offer. Unlike Ford's attorneys, who are paid monthly regardless of outcome, Plaintiff's attorneys are not paid at all if they lose, and need to absorb significant delay in being paid if Plaintiff does win. On account of the delay in payment, Plaintiff requests a 0.3 enhancement.

Based on the risk of taking this case on a contingent fee basis and the delay in payment since September 9, 2016, Plaintiff requests a nominal multiplier of 1.5.

E.  **Plaintiff is Entitled to Recover All Costs and Expenses Reasonably Incurred in Connection with this Action**

Under the Song-Beverly Act, a prevailing buyer shall be allowed to recover as part of the judgment a sum equal to the aggregate amount of costs <u>and expenses</u>.  (Civ. Code § 1794(d) [emphasis added].)  The California Legislature intended the word "expenses" to cover outlays not included in the detailed statutory definition of "costs," and the Song-Beverly Act's legislative history demonstrates the Legislature exercised its power to permit recovery of a host of litigation expenditures beyond those permitted by Code of Civil Procedure § 1033.5.  (*Jensen v. BMW of North America, Inc.* (1995) 35 Cal.App.4th 112, 137-138.)

A verified memorandum of costs generally satisfies the moving party's burden of establishing costs were necessarily incurred.  (*Hadley v. Krepel* (1985) 167 Cal.App.3d 677, 682.)  The verified memorandum of costs demonstrates what Plaintiff's attorneys incurred in costs and expenses prosecuting this matter, which counsel advanced on Plaintiff's behalf.  (SM Dec. ¶ 2, Ex. B); Civ. Code § 1794(d) .  The burden shifts to Ford to properly rebut the claimed costs.

## IV.   CONCLUSION

For the reasons above, Plaintiff respectfully requests this Honorable Court award attorney's fees, costs and expenses as follows:

| | |
|---|---|
| Lodestar Fees: | $ 42,375.00 |
| +Lodestar Enhancement: | $ 21,187.50 |
| Total Fees Requested: | $ 63,562.50 |
| +Costs and Expenses: | $  2,389.99 |
| **=Total Fees and Costs/Expenses:** | **$ 65,952.49** |

Dated: March 2, 2018

KNIGHT LAW GROUP, LLP

Steve Mikhov (SBN 224676)
Attorneys for Plaintiff,
Lisa M. Sorbel

-15-

PROOF OF SERVICE
(Code of Civil Procedure §1013a)

I am employed in the County of Los Angeles, State of California. I am over the age of 18 years and not a party to the within action. My business address is 1801 Century Park East, Suite 2300, Los Angeles, CA 90067.

I served the foregoing document described as:

**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR ATTORNEY'S FEES, COSTS AND EXPENSES**

Said document was served on the interested parties in this action, addressed as follows:

Alexander G. Calfo, Esq.                     Michael H. Rosenstein
KING & SPALDING LLP                      LAW OFFICES OF
633 West 5th Street. Suite 1700             MICHAEL H. ROSENSTEIN
Los Angeles, CA 90071                        1801 Century Park East, Suite 2300
**Counsel for Defendant,**                    Los Angeles, CA 90067
**FORD MOTOR COMPANY**                **Associated Counsel for Plaintiff,**
(Via Overnight Only)                          **LISA M. SORBEL**
                                                            (Via E-Mail only)

XX     BY OVERNIGHT MAIL/DELIVERY: I caused such envelope to be delivered by hand to the office(s) of the addressee(s) via OVERNIGHT EXPRESS or by local courier service.

XX     BY E-MAIL OR ELECTRONIC TRANSMISSION: Based on a court order or an agreement of the parties to accept service by e-mail or electronic transmission, I caused the documents to be sent to the persons at the e-mail addresses listed above. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on March 2, 2018 at Los Angeles, California.

_____
Hector Almeyda

-1-
PROOF OF SERVICE