**KNIGHT LAW GROUP, LLP**
Steve Mikhov (SBN 224676)
Amy Morse (SBN 290502)
1801 Century Park East, Suite 2300
Los Angeles, CA 90067
Telephone: (310) 552-2250
Fax: (310) 552-7973

Attorneys for Plaintiffs,
**EFRAIN VASQUEZ and**
**MICHELLE VASQUEZ**

RECEIVED
FEB 0 2 2018
BY: .......................

## SUPERIOR COURT OF CALIFORNIA

## COUNTY OF SAN LUIS OBISPO

| | |
|---|---|
| **EFRAIN VASQUEZ and**<br>**MICHELLE VASQUEZ,**<br><br>Plaintiffs,<br><br>vs.<br><br>**FORD MOTOR COMPANY, a Delaware**<br>**Corporation, and DOES 1 through 10,**<br>inclusive,<br><br>Defendants. | Case No. 16-CV-0075<br><br>**PLAINTIFFS' MEMORANDUM OF**<br>**POINTS AND AUTHORITIES IN**<br>**SUPPORT OF MOTION FOR**<br>**ATTORNEY'S FEES, COSTS AND**<br>**EXPENSES**<br><br>[Filed concurrently with Plaintiffs' Notice<br>of Motion and Motion for Attorney's Fees,<br>Costs and Expenses; Declaration of Steve<br>Mikhov]<br><br><br>Date: March 1, 2018<br>Time: 9:00 AM<br>Dept.: 2<br>Judge: Barry T. LaBarbera |

**TABLE OF CONTENTS**

I.    INTRODUCTION ........................................................................................................ 1

II.   STATEMENT OF FACTS ......................................................................................... 2

III.  ARGUMENT AND ANALYSIS ............................................................................. 6

    A.    Plaintiffs' Attorneys Are Entitled to Fees, Costs and Expenses in this Action ........................................................................................................ 6

    B.    The Hourly Rates Sought by Plaintiff's Attorneys Are Reasonable ........................ 7

        1.    The Nature and Complexity of the Litigation Support the Attorney's Fees Requested .......................................................................... 9

        2.    The Firm's Skill Justifies the Amount of Attorney's Fees Sought ...................................................................................................... 10

    C.    The Settlement Amount Does Not Limit the Attorney's Fee Recovery ................................................................................................... 11

    D.    Plaintiffs Should Be Granted a Lodestar Multiplier ............................................. 13

        1.    The Lodestar Multiplier Should Be Granted in Contingent Cases Due to Risk and Delay of Payment ..................................................... 14

    E.    Plaintiffs are Entitled to Recover All Costs and Expenses Reasonably Incurred in Connection with this Action ........................................... 15

IV.  CONCLUSION ......................................................................................................... 16

i

# TABLE OF AUTHORITIES

## Cases

*Cazares v. Saenz,*
(1989) 208 Cal.App.3d 279 ......................................................................... 12

*City of Riverside v. Rivera,*
(1986) 477 U.S. 561 .................................................................................... 11

*Dietrich v. Dietrich,*
(1953) 41 Cal.2d 497 .................................................................................... 9

*En Palm, LLC v. Teitler,*
(2008) 162 Cal.App.4th 770 ....................................................................... 10

*Goglin v. BMW of North America, LLC,*
(2016) 4 Cal.App.5th 462, 470 ............................................................... 7, 11

*Graciano v. Robinson Ford Sales,*
(2006) 144 Cal.App.4th 140 ................................................................. passim

*Graham v. DaimlerChrysler Corp.,*
(2004) 34 Cal.4th 553 ............................................................................ 6, 12

*Hadley v. Krepel,*
(1985) 167 Cal.App.3d 677 ........................................................................ 15

*Harman v. City and County of San Francisco,*
(2007) 158 Cal.App.4th 407 ...................................................................... 11

*Horsford v. Bd. of Trustees of Cal. State Univ.,*
(2005) 132 Cal. App. 4th 359 ................................................................. 8, 13

*In re Chiron Corp. Securities Litigation,*
(N.D. Cal. Nov. 30, 2007) No. C-04-4293 VRW, 2007 WL 4249902 .................................... 12

*Independent Federation of Flight Attendants v. Zipes,*
(1989) 491 U.S. 754 .................................................................................... 11

*Jensen v. BMW of North America, Inc.,*
(1995) 35 Cal.App.4th 112 ......................................................................... 15

*Ketchum v. Moses,*
(2001) 24 Cal.4th 1122 ..................................................................... 12, 13, 14

*La Mesa-Spring Valley School Dist. v. Otsuka,*
(1962) 57 Cal.2d 309 ................................................................................. 10

ii

*Los Angeles Police Protective League v. City of Los Angeles*,
    (1986) 188 Cal.App.3d 1 ................................................................................................ 8

*Mandel v. Lackner*,
    (1979) 92 Cal.App.3d 747 .............................................................................................. 6

*Molski v. Arclero Wine Group*,
    (2008) 164 Cal.App.4th 786 ......................................................................................... 10

*PLCM Group v. Drexler*,
    (2000) 22 Cal.4th 1084 ............................................................................................ 7, 12

*Reveles v. Toyota by the Bay*,
    (1997) 57 Cal.App.4th 1139 .......................................................................................... 6

*Robertson v. Fleetwood Travel Trailers of California, Inc.*,
    (2006) 144 Cal.App.4th 785 ................................................................................... passim

*Serrano v. Priest*,
    (1977) 20 Cal.3d 25 (*Serrano III*) .............................................................................. 12

*Serrano v. Unruh*,
    (1982) 32 Cal.3d 621 ................................................................................................. 6, 8

*Vo v. Las Virgenes Municipal Water District*,
    (2000) 79 Cal.App.4th 440 ........................................................................................... 11

## Administrative Proceedings

BMW under the Song-Beverly Act. (4 Cal.App.5th .) ....................................................... 7

## Statutes and Codes

California Code of Civil Procedure
    Section 1032(a)(4) ......................................................................................................... 6
    Section 1033.5 .............................................................................................................. 15
    Section 1794(d) .................................................................................................... passim
    Section 998 ................................................................................................................ 1, 5
    Sections 1790, *et seq.* ..................................................................................................... 1

## Other Authorities

Pearl, *California Attorney Fee Awards* (2nd Ed. 2005.) ..................................................... 6

Sen. Report No. 93-151, 1st Sess., pp. 23-24 (1973) ...................................................... 11

1       **I.      INTRODUCTION**

2       This case is about Ford Motor Company's (hereafter "Defendant" or "Ford") policy of

3   taking advantage of California consumers, and Plaintiffs Efrain Vasquez and Michelle Vasquez,

4   ("Plaintiffs") nearly year-and-a-half long battle to vindicate their rights. Ford three opportunities

5   to avoid this lawsuit. First, Ford had an opportunity to build a quality truck. Ford then had an

6   opportunity to repair the material defects in Plaintiffs' truck within a reasonable number of repair

7   attempts under California law. Ford had a final opportunity to avoid this lawsuit when Plaintiffs

8   contacted Ford seeking a buy-back, but Ford summarily denied their lawful request despite its

9   legal obligation. Having squandered all three opportunities and violated the Song-Beverly

10  Consumer Warranty Act ("Song-Beverly Act") in the process, Ford left Plaintiffs with little

11  choice but to pursue their rights in court.

12      Plaintiffs purchased a new 2014 Ford Focus on or about September 22, 2013 for a total

13  purchase price of $33,342.16. Within less than eight months of ownership, the vehicle began

14  exhibiting problems with the transmission. For the fourteen months that followed, Plaintiffs

15  suffered through ongoing problems with the transmission and engine, requiring numerous repair

16  visits. In less than two years, Plaintiffs brought their vehicle in for repair a total of four (4) times

17  and was without the use of their vehicle for fifty-eight (58) days during this time period.

18      After seventeen months of litigation, the parties agreed to settle the matter following

19  Plaintiffs' acceptance of Ford's Code of Civil Procedure section 998 ("998 Offer") in the

20  amount of $115,500.00. The final settlement is more than **three times** the total amount Plaintiffs

21  paid for the vehicle in what defense routinely calls a "simple lemon law" action. Plaintiffs'

22  obtained this extraordinary sum, *without going to trial,* and Ford could have avoided this lawsuit

23  completely had it only bought back Plaintiffs' defective automobile on Day One. By any

24  analysis, Plaintiffs Efrain Vasquez and Michelle Vasquez ("Plaintiffs") achieved a superlative

25  settlement, particularly given Defendant Ford Motor Company's ("Defendant" or "Ford")

26  summary rejection of Plaintiffs' buyback request under the Song-Beverly Act. It is a settlement

27  that few, if any, firms in this state could achieve for its clients. This excellent result was

1

1    achieved due to Plaintiffs' attorneys' skill and expertise in lemon law cases.  It has been

2    developed and honed over the course of many years of advocating on behalf of consumers and

3    their rights under California law.  Arguably, the biggest factor in Plaintiffs being offered nothing,

4    versus the $115,500.00 settlement secured by Plaintiffs' attorneys on their behalf, is the

5    knowledgeable approach they took to this case.

6           The Song-Beverly Act, Civil Code sections 1790, *et seq.*, entitles Plaintiffs to seek

7    reasonable attorney's fees, costs and expenses from Ford and, as prevailing parties, they are

8    entitled to this noticed motion for attorney's fees.  Plaintiffs now move the Court: (1) for an

9    award of attorney's fees pursuant to Civil Code section 1794(d) under the "lodestar" method in

10   the amount of $38,222.50, (2) for a modest "lodestar" modifier of 1.5 in the amount of

11   $19,111.25 and (3) to award actual costs and expenses incurred in the amount of $4,624.30.

12   (Civ. Code § 1794(d).)  Plaintiffs request a total of $61,958.05 in attorney's fees, costs and

13   expenses.  (Declaration of Steve Mikhov ("SM Dec.") ¶ 2, Exs. A-B.)

14                          **II.     STATEMENT OF FACTS**

15          Plaintiffs purchased a new 2014 Ford Focus on September 22, 2013.  Adding taxes, fees,

16   an optional service plan and financing charges on a six-year loan, the total purchase price was

17   $33,342.16.  (SM Dec., ¶ 3, Ex. C.)  The vehicle was distributed by Ford Motor Company, which

18   provided an express written warranty.  (*Id.*)

19          Within less than eight months and 20,000 miles of ownership, and well within the

20   applicable express warranty periods, the vehicle began exhibiting serious transmission problems.

21   (SM Dec., ¶ 4.)  Plaintiffs took the vehicle to a Ford-authorized repair facility, which attempted

22   to correct these problems.  (*Id.*)  Six months later, Plaintiffs brought the vehicle back in for repair

23   because it would shudder and jerk and was coming to a stop and then taking off, which required

24   the reprogramming of the power control module and then transmission control module.  (*Id.*)  It

25   The repair also required a replacement of the clutch.  (*Id.*)  Approximately four months later, the

26   vehicle began exhibiting engine problems in addition to the ongoing transmission problems.

27   (*Id.*)  Plaintiffs' vehicle was at the Ford-authorized repair facility for 37 days while they

                                            2

1    attempted to correct these issues. (*Id.*) However, the transmission problems continued, requiring

2    another repair visit less than two months after getting the vehicle back from the facility. (*Id.*)

3    Plaintiffs brought the vehicle in for repair, a total of four (4) times in less than two years but the

4    serious transmission and engine problems persisted. (*Id.*) Throughout these repeated failed

5    attempts to repair the transmission and engine, Plaintiffs were left without the use of their vehicle

6    for fifty-eight (58) days. (*Id.*)

7           Frustrated, concerned for their safety, and having lost confidence in Ford's ability to

8    repair the vehicle, Plaintiffs contacted Ford's customer service in July 2015, seeking a buyback

9    of the defective vehicle. (SM Dec., ¶ 5.) Despite Ford's affirmative duty under the law to

10   perform an investigation and offer a buyback, Ford denied Plaintiffs' request. (*Id.*)

11          Despite the ongoing repairs and continued manifestation of problems, Ford refused to

12   acknowledge the defective nature of Plaintiffs' vehicle. (SM Dec., ¶ 6.) At all times, however,

13   Ford had direct, contemporaneous knowledge of the vehicles serious defects, which it records in

14   a database called "OASIS" and a warranty repair history database called "AWS" as they are

15   reported. (*Id.*) These repair records indicate each time the vehicle is presented for repair during

16   the warranty period, as well as every time the Ford repair facility found a problem/defect

17   attributable to Ford and billed Ford for the work. (*Id.*)

18          Not willing to walk away from such a huge investment, Plaintiffs contacted Knight Law

19   Group LLP (hereafter "Knight Law," formerly known as O'Connor & Mikhov, LLP) and told

20   the firm about the problems with the vehicle and the way Ford treated them. (SM Dec., ¶ 7.)

21   After review of the repair history and discussions with Plaintiffs, the firm agreed to represent

22   them and bear the risk associated with litigating the case on a fully contingent basis. (*Id.*)

23   Because Knight Law's compensation was purely contingent, the firm faced a genuine risk of not

24   being paid for its services for years, if at all, while advancing thousands of dollars in costs and

25   expenses on Plaintiffs' behalf. (*Id.*) In taking on this duty, the firm was facing a litigation

26   behemoth—Ford is a multi-billion-dollar company, with a virtually infinite litigation war-chest,

27   that wages a battle of attrition that most firms cannot withstand. (*Id.*)

3

1    As a result of Ford's failure to fix the material defects associated with Plaintiffs' vehicle,

2   or otherwise comply with the Song-Beverly Act, Plaintiffs filed their complaint in this action on

3   February 16, 2016, alleging, in part, willful violations of the Song-Beverly Act and fraudulent

4   inducement, and seeking civil penalties and punitive damages. (SM Dec., ¶ 8.) On or about

5   March 23, 2016, Ford filed a Demurrer to Plaintiff's Complaint. (SM Dec., ¶ 9.) Plaintiff's

6   counsel filed an Opposition to the Demurrer, and the Demurrer was overruled by the Court on or

7   about June 15, 2016. (*Id.*)

8    Also in March 2016, Defendant filed a Petition for Coordination of Add-On Cases. (SM

9   Dec., ¶ 10.) Plaintiffs' counsel filed an Opposition to the Petition for Coordination. (*Id.*)

10  Defendant's Petition for Coordination was denied on or about August 29, 2016. (*Id.*)

11   On or about June 30, 2016, Ford filed their answer denying all liability and asserting

12  numerous affirmative defenses. (SM Dec., ¶ 11.)

13   Defendant's position in the litigation required extensive efforts on the part of Plaintiffs'

14  counsel, and they promptly began working up their case on behalf of Plaintiffs. (SM Dec., ¶ 12.)

15  Written discovery was drafted and served on Defendant on or about September 13, 2016,

16  consisting of 54 Requests for Admissions, 98 Requests for Production of Documents, 105

17  Special Interrogatories, and 27 Form Interrogatories. (*Id.*) Plaintiffs benefited from Knight

18  Law's expertise and experience in litigating against Ford insofar as just 4.9 hours were billed to

19  review the file and draft the entirety of this discovery. (*Id.*) Plaintiffs' counsel is able to use

20  existing files as templates to conserve time and litigate efficiently. (*Id.*) Written discovery of

21  this magnitude, drafted from scratch and without the benefit of Plaintiffs' attorneys' vast

22  knowledge, experience and specialized expertise, would have taken multitudes of the time

23  expediently managed here. (*Id.*) Ford provided responses to the discovery requests on or about

24  October 20, 2016. (*Id.*)

25   Due to Ford's improper objections and/or incomplete responses to Plaintiffs' written

26  discovery, Plaintiffs began "meet and confer" efforts in November 2016. (SM Dec., ¶ 13.) After

27  the parties reached an impasse, despite Plaintiffs "meet and confer" efforts, Ford refused to fully

4

1 comply with its discovery obligations leaving Plaintiffs no choice but to file a Motion to Compel.
2 (*Id.*)

3       Meanwhile, Plaintiffs were forced to continue driving their defective vehicle. (SM
4 Dec., ¶ 14.) On January 23, 2017, Plaintiffs took the vehicle to a Ford-authorized repair facility
5 for the ongoing serious transmission problems. (*Id.*) Plaintiffs were without their vehicle for 15
6 days. (*Id.*)

7       On or about February 8, 2017, Ford propounded Requests for Production of Documents,
8 Requests for Admissions, Special Interrogatories and Form Interrogatories upon Plaintiffs. (SM
9 Dec., ¶ 15.) Plaintiffs again benefited from Knight Law's expertise and experience insofar as
10 just 6.3 hours were billed for drafting responses to the entirety of this discovery. (*Id.*)

11       On or about February 14, 2017, Ford filed an Opposition to the Plaintiffs' Motion to
12 Compel. (SM Dec., ¶ 16.) On or about February 23, 201, Plaintiffs' counsel prepared for and
13 attended the hearing on Plaintiffs' Motion to Compel. (*Id.*)

14       On or about March 31, 2017, Ford served Plaintiffs with an Offer to Compromise
15 pursuant to the Code of Civil Procedure section 998 ("998 Offer"), in the amount of $75,000.00.
16 (SM Dec., ¶ 17.) Plaintiffs rejected this offer because it did not account for the statutory civil
17 penalties sought by Plaintiffs. (*Id.*) However, Plaintiffs' rejection letter dated May 2, 2017,
18 invited Defendants to participate in private mediation. (*Id.*)

19       With the absence of any reasonable settlement offer from Ford accounting for its willful
20 violation of the Song-Beverly Act, the case appeared likely to go to trial. (SM Dec., ¶ 18.) As
21 the trial date approached, on June 13, 2017, Plaintiffs' counsel prepared for and attended
22 Plaintiffs' depositions. (*Id.*)

23       In July 2017, Plaintiffs noticed the depositions of numerous Ford employees including
24 Ford's PMK and PMQ. (SM Dec., ¶ 19.) These depositions were needed to obtain information
25 regarding repairs to the vehicle, authenticate repair orders, and rebut Ford's anticipated argument
26 that the problems with Plaintiffs' vehicle were somehow caused by Plaintiffs' neglect or abuse.
27 (*Id.*)

5

1    On July 14, 2017, Ford served Plaintiffs with a second 998 Offer in the amount of

2  $115,500.00.  (SM Dec., ¶ 20.)

3    Almost simultaneously, on or about July 27, 2017, after over seventeen months of

4  litigation, Ford served Plaintiffs with Second Amended 998 Offer in the amount of $115,500.00.

5  (SM Dec., ¶ 21; Ex. D)  The Second Amended 998 Offer was accepted by Plaintiffs on August

6  31, 2017.  (*Id.*)  This settlement amount was inclusive of a full statutory "buy-back" of the

7  defective vehicle, incidental and consequential damages, and a civil penalty.  (*Id.*)

8    Plaintiffs, as the prevailing party in this matter, have made every reasonable effort to

9  resolve the payment of Plaintiffs' attorney fees by Ford, but was forced to file this Motion with

10  the court. (SM Dec., ¶ 22.)

11               **III.    ARGUMENT AND ANALYSIS**

12      **A.    Plaintiffs' Attorneys Are Entitled to Fees, Costs and Expenses in this Action**

13    Plaintiffs are the prevailing party in this action and, under the Song-Beverly Act, entitled

14  to recoup all reasonable attorney's fees, costs and expenses.  (Code Civ. Proc. § 1032(a)(4); Civ.

15  Code § 1794(d); *Graham v. DaimlerChrysler Corp.* (2004) 34 Cal.4th 553, 557; *Reveles v.*

16  *Toyota by the Bay* (1997) 57 Cal.App.4th 1139.)  Absent a contrary showing, both the number of

17  hours that the prevailing party's attorney spent litigating the case and his or her regular hourly

18  rate are presumed to be reasonable.  (*Serrano v. Unruh* (1982) 32 Cal.3d 621, 639 (counsel is

19  entitled to all hours actually spent, absent a showing of "special circumstances" that would

20  render such an award unjust); *Mandel v. Lackner* (1979) 92 Cal.App.3d 747, 761 (an attorney's

21  regular hourly rate is entitled to a presumption of reasonableness); Pearl, California Attorney Fee

22  Awards, at §§ 12.14A, 12.33 (2nd Ed. 2005).)

23    In prosecuting this case, the efforts of Knight Law amount to $38,222.50, including

24  drafting this motion and time anticipated to be spent preparing the reply and attending the

25  hearing.  (SM Dec., ¶ 2, Ex. A.)  Plaintiffs' counsel also requests a modest 1.5 enhancement, in

26  the amount of $19,111.25, to account for the delay in payment and contingent risk posed by this

27  case.  Lastly, the reimbursable costs and expenses set forth in Plaintiffs' memorandum of costs

6

1  are $4,624.30. (SM Dec., ¶ 2, Ex. B) In total, Plaintiffs request $61,958.05. (SM Dec., ¶ 2, Exs.

2  A-B)

3          **B.**      **The Hourly Rates Sought by Plaintiff's Attorneys Are Reasonable**

4          The Court of Appeal has expressly held the lodestar method applies to determining

5  attorney's fees under the Song-Beverly Act. (*Robertson v. Fleetwood Travel Trailers of*

6  *California, Inc.* (2006) 144 Cal.App.4th 785, 817.) The calculation of reasonable attorney's fees

7  under the Song-Beverly Act is based on the lodestar method, which entails multiplying the

8  number of hours reasonably expended by a reasonable hourly rate. (*Graciano v. Robinson Ford*

9  *Sales* (2006) 144 Cal.App.4th 140, 154; *Robertson, supra,* 144 Cal.App.4th 817.) The prevailing

10  buyer has the burden of showing that the fees incurred were "allowable," "reasonably necessary

11  to the conduct of the litigation," and "reasonable in amount." (*Goglin v. BMW of North America,*

12  *LLC* (2016) 4 Cal.App.5th 462, 470.) In making such an evaluation, a court may consider

13  "factors such as the complexity of the case and procedural demands, the skill exhibited and the

14  results achieved." (*Id.*)

15          In *Goglin v. BMW*, the appellate court recently affirmed the trial court's award of over

16  $185,000 in attorneys' fees and costs for a plaintiff who settled her claims against BMW under

17  the Song-Beverly Act. (4 Cal.App.5th at 464.) The court also found plaintiff's counsel's hourly

18  rate of $575 per hour was reasonable as supported by exhibits to counsel's declaration indicating

19  various state and federal courts had previously awarded him comparable hourly rates. (*Goglin,*

20  *supra,* 4 Cal.App.5th at 464.) The trial court was not obliged to consider that defendants paid

21  their counsel a much lower hourly rate. (*Id.* at 474.)

22          In *Robertson*, the court observed a prevailing buyer is entitled to an award of reasonable

23  attorney's fees for time reasonably expended by his attorney. (*Robertson, supra,* 144

24  Cal.App.4th at 817.) The court ruled the "statutory language in section 1794(d) is reasonably

25  compatible with a lodestar adjustment method of calculating attorney fees, including use of fee

26  multipliers." (*Id.* at 819.) Indeed, in *Robertson*, the trial court awarded $231,187.45 in fees

27  based on $145,080.50 in fees through trial, plus a "multiplier" of 1.5 for a total of $217,620.75,

7

1   and $13,566.70 for the attorney's fee motion. (*Id.* at 817.) The appellate court upheld the trial

2   court's ruling. (*Id.* at 822.)

3        In *Graciano*, the trial court initially rejected plaintiff's lodestar fees of $109,468.50 and

4   request for a multiplier of 2.0. In particular, the trial court reduced the plaintiff's attorney's

5   hourly rate from the requested $350/hour to $250/hour, which was the court's mandated

6   maximum rate for expert testimony. Plaintiff appealed the court's decision and in particular the

7   hourly rate reduction. The appellate court reversed, reasoning a court should determine the

8   prevailing rate in the community for comparable professional legal services. (*Graciano, supra,*

9   144 Cal.App.4th at 156 (*citing PLCM Group v. Drexler* (2000) 22 Cal.4th 1084, 1095).) The

10  court found the plaintiff's unrebutted declarations established the proper hourly rate at $350, and

11  reducing that rate to $250 was an abuse of discretion. (*Id.*) The court also reaffirmed attorney's

12  fees are not limited to a proportion of the recovery. (*Id.* at 164.) On remand, the trial court

13  found that the lodestar rate of $350/hour was reasonable *and added* a multiplier of 2.0 for a total

14  fee award of over $380,000. The attorney from *Graciano,* Hallen D. Rosner, now charges

15  $620/hour. (SM Dec., ¶ 38 (a).)

16       Furthermore, the California Supreme Court has expressly ruled that prevailing parties

17  who are entitled to recover their attorney's fees are *also entitled* to recover their fees for the time

18  spent preparing fee applications such as this one. (*Serrano v. Unruh, supra,* 32 Cal.3d at 631;

19  *Los Angeles Police Protective League v. City of Los Angeles* (1986) 188 Cal.App.3d 1, 17;

20  *Robertson, supra,* 144 Cal.App.4th at 817 (awarding $13,566.70 in fees for a fee motion).)

21       The hourly rates should be considered in the context of the rates charged by Plaintiff's

22  attorneys in the metropolitan community in which they practice, as opposed to the case venue.

23  In *Horsford v. Bd. of Trustees of Cal. State Univ.,* the trial court was reversed for refusing to

24  award the higher rates to San Francisco-based attorneys who litigated a FEHA case in Fresno.

25  (*Horsford v. Bd. of Trustees of Cal. State Univ.* (2005) 132 Cal. App. 4th 359, 399.) The law

26  "requires that the *financial incentives be adjusted to attract attorneys* who are sufficient to the

27  cause." (*Id.*) "In the absence of any realistic indication plaintiffs could have found local

8

1 counsel, it was an abuse of discretion to fail to consider an hourly rate based on counsel's 'home'

2 market rate." *(Id.)* Plaintiffs' attorneys' hourly rates should not vary depending on the venue of

3 the lawsuit. The skill and experience of Ford's attorneys does not change from venue to venue

4 and Plaintiff's counsel deserves to be compensated at the same rate they would receive given the

5 same quantity and quality of work they must perform regardless of the venue.

6         Consideration of the "lodestar" factors compels an award of attorney's fees based on (i)

7 the hourly rates set forth of in the declarations filed concurrently herewith (SM Dec., ¶¶ 28-35);

8 (ii) a survey of rates charged by other well-known consumer law attorneys (SM Dec., ¶ 38); (iii)

9 over three dozen court orders confirming the reasonableness of Plaintiffs' counsels' hourly rates

10 and time billed in other Song-Beverly Act cases *(Id.,* ¶¶ 40-79, Exs. E-RR); and (iv) a National

11 Survey further supporting the reasonableness of the hourly rates. (SM Dec., ¶ 89, Ex. VV, at p.

12 42-45). Plaintiffs' counsels' rates are within the range of rates charged by other attorneys with

13 similar experience in this area of law.

14                 **1.**     **The Nature and Complexity of the Litigation Support the Attorney's**
                         **Fees Requested**

15

16         Determining the amount of reasonable attorney's fees may involve consideration of the

17 nature and complexity of the case. *(Dietrich v. Dietrich* (1953) 41 Cal.2d 497, 506; *Graciano,*

18 *supra,* 144 Cal.App.4th at 147.) Ford will likely claim that "this is a simple lemon law case,"

19 and therefore Plaintiff's fee request is unjustified. However, this case required a range of

20 specialized knowledge including: (1) an understanding of the full scope of consumer protection

21 laws, which are highly nuanced; (2) knowledge of the intricacies of automobiles and the lexicon

22 associated with them, as well as knowledge concerning how to investigate issues with

23 automobiles; and (3) knowledge of auto manufacturers' and dealers' policies and protocols for

24 repairing vehicles and complying with their legal obligations. (SM Dec., ¶ 85.) Plaintiffs'

25 attorneys have acquired knowledge and insight about these issues and this experience typically

26 results in significantly higher judgments or settlements for their clients, like Plaintiffs here.

27

9

1        Moreover, Ford made this matter even more complex by maintaining it had no liability

2  and declining to submit any reasonable offers to settle the matter for seventeen months, while

3  pursuing discovery with full force and compelling Plaintiffs' counsel to litigate this matter

4  exhaustively.  Prior to commencing litigation, Plaintiffs first sought relief by requesting a

5  buyback from Ford, which Ford rejected.  Ford should have acknowledged the well-known

6  defects in Plaintiffs' vehicle and resolved the matter before this case was ever filed.  Instead,

7  Ford engaged in expensive litigation, including denying all liability, stone-walling Plaintiffs'

8  discovery efforts, and forcing trial counsel to expend numerous hours preparing for trial.  Ford

9  easily could have resolved this matter earlier and saved thousands in attorney's fees, costs and

10 expenses.  Ford ultimately came around to doing the right thing, but not before causing

11 substantial fees to be incurred.

12       When Ford causes the entirety of fees to be incurred, it has no legitimate basis for

13 complaining about the amount of attorney's fees reasonably and actually incurred, especially

14 when Ford was given the opportunity to resolve the matter before a lawsuit was even filed.  "A

15 party cannot litigate tenaciously and then be heard to complain about the time necessarily spent

16 by the opposition in response." (*En Palm, LLC v. Teitler* (2008) 162 Cal.App.4th 770, 786; *see*

17 *also Molski v. Arclero Wine Group* (2008) 164 Cal.App.4th 786.)

18       **2.**    **The Firm's Skill Justifies the Amount of Attorney's Fees Sought**

19       A trial court may also take into account the skill of the attorneys when determining

20 reasonable attorney's fees. (*La Mesa-Spring Valley School Dist. v. Otsuka* (1962) 57 Cal.2d 309,

21 316.) Despite the case's difficulties, Plaintiffs ultimately recovered $115,500.00 in damages,

22 which is more than three times the vehicle's purchase price.  The vehicle was no more or less

23 defective on the date of settlement than it was when Plaintiffs first requested a repurchase, so

24 there is no rational explanation why Ford waged a lengthy and costly legal battle only to settle

25 for an amount that included civil penalties.

26       The final resolution is the direct result of skill and preparation by Plaintiffs' attorneys,

27 who specialize in consumer law and did not balk at Ford's aggressive litigation tactics.

10

1    Plaintiffs' attorneys' experience in this area has enabled them to develop litigation strategies that

2    are both highly effective and cost and time efficient.  Plaintiffs' attorneys know the many

3    nuances in these types of cases.  This specialized knowledge and experience in lemon law

4    frequently achieves results better than attorneys who do not specialize in this specific area of

5    law.  This experience provided a resolution to this matter far beyond that which Ford was

6    previously willing to entertain.  Ford engages specialized attorneys from big firms, and Plaintiffs

7    needed skilled attorneys to prosecute their claims.  The biggest difference between Plaintiffs

8    getting zero and Plaintiffs receiving an $115,500.00 recovery was their attorneys' knowledge and

9    expertise.

10            Counsels' skill is evidenced by the size of the settlement as well as the nominal time

11    expended on litigation tasks, which results in lower overall billing.  Plaintiffs' attorneys do not

12    spend inordinate time researching because they specialize in this area of law.  (SM Dec., ¶ 86.)

13    Nor do they spend unreasonable time preparing pleadings and other documents because they are

14    able to use documents from other cases that need only be edited, rather than written from scratch.

15    While substantial fees have been incurred, those fees result from the execution of effective

16    strategies that typically result in superlative results for clients, like Plaintiffs here.

17            On the other side, Ford is represented by large national firms with attorneys who

18    specialize in representing automobile manufacturers in lemon law cases.  Ford is a corporate

19    behemoth with the resources to easily overwhelm a consumer or an inexperienced attorney.

20    Plaintiffs required skilled and experienced attorneys to prosecute their claims against Ford and

21    its formidable resources.  Plaintiffs' attorneys were well-suited for this task.

22            **C.    The Settlement Amount Does Not Limit the Attorney's Fee Recovery**

23            Ford may argue that damages in the amount of $115,500.00 do not justify an attorney's

24    fee award in the amount requested by Plaintiffs.  Such an argument is starkly against the weight

25    of the law.  The amount of attorney's fees *must not be tied to any percentage of recovery*.

26    (*Graciano, supra,* 144 Cal.App.4th at 164.)  In fact, a trial court may abuse its discretion if it

27    applies a rule of proportionality to a fee award.  The U.S. Supreme Court has previously

11

1    considered the question of proportionality in attorney fee awards and held: "[w]e reject the

2    proposition that fee awards under section [42 U.S.C.] 1988 should necessarily be proportionate

3    to the amount of damages a civil rights Plaintiff actually recovers." (*City of Riverside v. Rivera*

4    (1986) 477 U.S. 561, 574; *see also* Sen. Report No. 93-151, 1st Sess., pp. 23-24 (1973)

5    (attorney's fees under the Magnuson Moss Warranty Act are based on actual time, not a

6    percentage of the recovery); *Robertson, supra,* 144 Cal.App.4th at 820; *Independent Federation*

7    *of Flight Attendants v. Zipes* (1989) 491 U.S. 754, fn.2 (fee shifting provisions under Magnuson-

8    Moss and Song-Beverly "are to be interpreted alike"); *Goglin, supra,* 5 Cal.App.5th at 468-69

9    (affirming award of $185,000 in fees and costs in a Song-Beverly Act case that settled for

10   $75,000); *Vo v. Las Virgenes Municipal Water District* (2000) 79 Cal.App.4th 440, 446

11   (affirming $470,000 fee award after $40,000 judgment because the defendant was excessively

12   litigious and took a non-settlement posture); *Harman v. City and County of San Francisco*

13   (2007) 158 Cal.App.4th 407 (affirming award of approximately $1.1 million in fees where

14   plaintiffs recovered $30,300).)

15          It is not uncommon for attorney's fees and costs to exceed the client's damages, although

16   that did not happen here because the settlement was so large and the fees were efficiently

17   incurred. The Legislature acknowledged that substantial work might be needed to prosecute

18   such claims against large corporation, which is the reason behind the fee shifting provision of the

19   Song-Beverly Act. (SM Dec., ¶ 84.) "The purpose of statutory attorney fee provisions is to

20   provide financial incentives necessary for the private enforcement of important civil rights."

21   (*Ketchum v. Moses* (2001) 24 Cal.4th 1122, 1132.) Thus, the Song-Beverly Act gives consumers

22   the opportunity to seek legal redress even if their damages would not be high enough to warrant

23   legal representation. The award of attorney's fees *cannot* be limited by the damages recovered

24   by Plaintiff. Any argument by Ford to the contrary would be disingenuous, as the law is clear on

25   this point. (*Ketchum, supra,* 24 Cal.4th at 1132.)

26

27

12

1       **D.    Plaintiffs Should Be Granted a Lodestar Multiplier**

2           As part of the Song-Beverly Act, a prevailing buyer may also receive a lodestar

3   multiplier, sometimes referred to as an adjustment or enhancement. (*Robertson, supra,* 144

4   Cal.App.4th at 817.)  Once a lodestar amount is determined, which involves a "careful

5   compilation of the actual time spent and reasonable hourly compensation for each attorney," (*Id.*

6   at 819 (*citing Serrano v. Priest* (1977) 20 Cal.3d 25, 48-49 (*Serrano III*)), the amount may then

7   be augmented by taking various relevant factors into account, including: (1) the novelty and

8   difficulty of the questions involved and the skill displayed in presenting them; (2) the extent to

9   which the nature of the litigation precluded other employment by the attorneys; and (3) the

10  contingent nature of the fee award, based on the uncertainty of prevailing on the merits and of

11  establishing eligibility for the award. (*Id.*; *see also Graham, supra,* 34 Cal.4th at 579; *PLCM*

12  *Group v. Drexler*, 22 Cal.4th at 1096.)  "[T]he purpose of a fee enhancement is primarily to

13  compensate the attorney for the prevailing party at a rate reflecting the risk of nonpayment in

14  contingency cases." (*Ketchum, supra,* 24 Cal.4th at 1138; *Cazares v. Saenz* (1989) 208

15  Cal.App.3d 279, 287-88 (risk factor alone justifies a 2.0 multiplier for a 50% chance of

16  prevailing).)  "A 50 percent chance of recovery implies a multiplier of 2, a 25 percent chance of

17  recovery implies a multiplier of 4, and so on." (*In re Chiron Corp. Securities Litigation* (N.D.

18  Cal. Nov. 30, 2007) No. C-04-4293 VRW, 2007 WL 4249902, *9.)

19          In *Robertson*, a case brought under the Song-Beverly Act, the court ruled that the

20  "statutory language in section 1794(d) is reasonably compatible with a lodestar adjustment

21  method of calculating attorney fees, including use of fee multipliers." (144 Cal.App.4th at 819.)

22  The trial court awarded a total of $231,187.45 in fees consisting of: $145,080.50 in fees incurred

23  through trial, plus a "multiplier" of 1.5 for a total of $217,620.75, and $13,566.70 for fees in

24  preparing the fees motion. (*Id.* at 817.)  The appellate court held the trial court properly

25  conducted a lodestar analysis and the award was not an abuse of discretion. (*Id.* at 822.)

26          In *Graciano*, the appellate court actually *increased* the trial court's award of fees after

27  finding that the lodestar rate of $350/hour was reasonable (in 2006) and adding a 2.0 multiplier

13

1    for a total award of over $380,000. (144 Cal.App.4th at 156.) The court also reaffirmed

2    attorney's fees are not limited to a proportion of the recovery. (*Id.* at 164.)

3        Ford may argue a multiplier is not permitted, and cite to the *Ketchum* case to support that

4    argument. To the contrary, *Ketchum* actually confirms the granting of a multiplier in

5    contingency fee cases (*Ketchum, supra,* 24 Cal.4th at 1132.) A lodestar multiplier is in fact

6    available and it has been awarded to Plaintiff's counsel in multiple, factually disparate, cases.

7    (SM Dec., ¶¶ 53, 57, 66, 67, 69, 70, 74, 80, 81, 82; Exs. R, V, EE, FF, HH, II, MM, SS, TT, UU.)

8        **1.    The Lodestar Multiplier Should Be Granted in Contingent Cases Due
             to Risk and Delay of Payment**

9

10        The lodestar is intended to reflect the basic fee for comparable non-contingent legal

11    services and should be enhanced by an appropriate multiplier to reflect the risk and delay in

12    payment associated with taking a contingent case, as well as the result achieved. The lodestar

13    "multiplier" is meant to increase or decrease the fee award based on factors not already taken

14    into account when setting the hourly rate, such as the risk of taking a case on a contingency

15    basis, and delay in receiving payment. (*See Horsford v. Bd. of Trustees of Cal. State Univ.*

16    (2005) 132 Cal. App. 4th 359, 394-95.)

17        In *Ketchum*, the California Supreme Court wrote, "[a] contingent fee contract, since it

18    involves a gamble on the result, may properly provide for a *larger compensation* than would

19    otherwise be reasonable." (24 Cal.4th at 1132 [emphasis added].)

20        A contingent fee must be higher than a fee for the same legal services paid as they
         are performed. The contingent fee compensates the lawyer not only for the legal

21       services he renders but for the loan of those services. The implicit interest rate on
         such a loan is higher because the risk of default (the loss of the case, which

22       cancels the debt of the client to the lawyer) is much higher than that of
         conventional loans. (Posner, Economic Analysis of Law (4th ed.1992) pp. 534,

23       567, emphasis added.) A lawyer who both bears the risk of not being paid and

24       provides legal services is not receiving the fair market value of his work if he is
         paid only for the second of these functions. If he is paid no more, competent

25       counsel will be reluctant to accept fee award cases.

26    (*Id.* at 1132 [citations omitted; emphasis added].)

27

14

1       Throughout the litigation, there always existed the real possibility Plaintiffs would not

2 prevail. The risk was further compounded by the fact that Plaintiffs' attorneys advanced all

3 litigation costs and expenses without reimbursement. Thus, if Plaintiffs did not prevail, their

4 attorneys would have suffered a loss of a substantial number hours in uncompensated work and

5 thousands of dollars in out-of-pocket expenses. Plaintiffs request a 0.3 enhancement based on

6 that risk.

7       Further, Ford dragged this case out for seventeen months before making an acceptable

8 offer. Unlike Ford's attorneys, who are paid monthly regardless of outcome, Plaintiffs' attorneys

9 are not paid at all if they lose, and need to absorb significant delay in being paid if Plaintiffs do

10 win. On account of the delay in payment, Plaintiffs request a 0.2 enhancement.

11       Based on the risk of taking this case on a contingent fee basis and the delay in payment

12 since February 2016, Plaintiffs request a nominal multiplier of 1.5.

13      **E.**   **Plaintiffs are Entitled to Recover All Costs and Expenses Reasonably
Incurred in Connection with this Action**

14

15       Under the Song Beverly Act, a prevailing buyer shall be allowed to recover as part of the

16 judgment a sum equal to the aggregate amount of costs <u>and expenses.</u> (Civ. Code § 1794(d)

17 [emphasis added].) The California Legislature intended the word "expenses" to cover outlays

18 not included in the detailed statutory definition of "costs," and the Song-Beverly Act's legislative

19 history demonstrates the Legislature exercised its power to permit recovery of a host of litigation

20 expenditures beyond those permitted by Code of Civil Procedure § 1033.5. (*Jensen v. BMW of*

21 *North America, Inc.* (1995) 35 Cal.App.4th 112, 137-138.)

22       A verified memorandum of costs generally satisfies the moving party's burden of

23 establishing costs were necessarily incurred. (*Hadley v. Krepel* (1985) 167 Cal.App.3d 677,

24 682.) The verified memorandum of costs demonstrates what Plaintiffs' attorneys incurred in

25 costs and expenses prosecuting this matter, which counsel advanced on Plaintiffs' behalf. (SM

26 Dec. ¶ 2, Ex. B); Civ. Code § 1794(d). The burden shifts to Ford to properly rebut the claimed

27 costs.

15

IV.    CONCLUSION

For the reasons above, Plaintiffs respectfully request this Honorable Court award attorney's fees, costs and expenses as follows:

| | | |
|---|---|---|
| Lodestar Fees: | $ | 38,222.50 |
| +Lodestar Enhancement: | $ | 19,111.25 |
| Total Fees Requested: | $ | 57,333.75 |
| +Costs and Expenses: | $ | 4,624.30 |
| **=Total Fees and Costs/Expenses:** | **$** | **61,958.05** |

Dated: January 31, 2018                    KNIGHT LAW GROUP, LLP


                                           _____
                                           Steve Mikhov (SBN 224676)
                                           Attorneys for Plaintiffs,
                                           **EFRAIN VASQUEZ and**
                                           **MICHELLE VASQUEZ**

16

PROOF OF SERVICE
(Code of Civil Procedure §1013a)

1

2

I am employed in the County of Los Angeles, State of California. I am over the age of 18 years and not a party to the within action. My business address is 1801 Century Park East, Suite 2300, Los Angeles, CA 90067.

3

4

5    I served the foregoing document described as:

6    **PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR ATTORNEY'S FEES, COSTS AND EXPENSES**

7

8    Said document was served on the interested parties in this action, by placing true copies thereof enclosed in sealed envelopes, with postage prepaid, addressed as follows:

9

10   Vincent Tremonti, Esq.
     KING & SPALDING LLP

11   633 West 5th Street, Suite 1700
     Los Angeles, CA 90071

12   **Counsel for Defendant,**

13   **FORD MOTOR COMPANY**
     (Via Mail Only)

14

15   <u>XX</u>    BY MAIL: I am readily familiar with this firm's practice of collection and processing correspondence for mailing with the United States Postal Service. Under that practice, it

16   would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid at a Postal Service collection box at Los Angeles, California, in the ordinary

17   course of business. The envelope was sealed and placed for collection that same day following ordinary business practices, addressed to the above-referenced attorney.

18

19   I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

20

21   Executed on January 31, 2018 at Los Angeles, California.

22

23                                          Monica Gomez

24

25

26

27

28

-1-

PROOF OF SERVICE