**KNIGHT LAW GROUP, LLP**
Steve Mikhov (SBN 224676)
Amy Morse (SBN 290502)
1801 Century Park East, Suite 2300
Los Angeles, CA 90067
Telephone: (310) 552-2250
Fax: (310) 552-7973

**DANIELS FINE ISRAEL**
**SCHONBUCH & LEBOVITS LLP**
Moses Lebovits (SBN 66552)
1801 Century Park East, 9th Floor
Los Angeles, CA 90067
Telephone: (310) 556-7900
Fax: (310) 556-2807

Attorneys for Plaintiff,
JOSE CHIRINOS

## SUPERIOR COURT OF CALIFORNIA

### COUNTY OF LOS ANGELES

| | |
|---|---|
| JOSE CHIRINOS,<br><br>                    Plaintiff,<br><br>          vs.<br><br>FORD MOTOR COMPANY, a Delaware Corporation, and DOES 1 through 10, inclusive,<br><br>                    Defendant. | Case No. BC609909<br><br>**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR ATTORNEY'S FEES, COSTS AND EXPENSES**<br><br>[Filed concurrently with Plaintiff's Notice of Motion and Motion for Attorney's Fees, Costs and Expenses; Declarations of Steve Mikhov and Moses Lebovits]<br><br>Date: April 16, 2018<br>Time: 8:30 am<br>Dept.: 56<br>Reservation No. 180129285426<br><br>Hon. Michael Johnson |

1

## TABLE OF CONTENTS

2

Page

3    I.      INTRODUCTION ................................................................................................. 1

4    II.     STATEMENT OF FACTS .................................................................................... 2

5    III.    ARGUMENT AND ANALYSIS ........................................................................... 6

6            A.      Plaintiff's Attorneys Are Entitled to Fees, Costs and Expenses in this
                     Action........................................................................................................... 6

             B.      The Hourly Rates Sought by Plaintiff's Attorneys Are Reasonable....................... 6

7                    1.      The Nature and Complexity of the Litigation Support the Attorney's Fees
8                            Requested...........................................................................................9

                     2.      The Firm's Skill Justifies the Amount of Attorney's Fees Sought...........10

9            C.      The Settlement Amount Does Not Limit the Attorney's Fee Recovery.............. 11

10           D.      Plaintiff Should Be Granted a Lodestar Multiplier................................................. 12

11                   1.      The Lodestar Multiplier Should Be Granted in Contingent Cases Due to
                             Risk and Delay of Payment....................................................................13

12           E.      Plaintiff is Entitled to Recover All Costs and Expenses Reasonably
                     Incurred in Connection with this Action............................................................. 14

13   IV.     CONCLUSION....................................................................................................... 15

14

15

16

17

18

19

20

21

22

23

24

25

26

27

i

# INDEX OF AUTHORITIES

Page

**Cases**

*Cazares v. Saenz*
(1989) 208 Cal.App.3d 279 .................................................................................. 12

*City of Riverside v. Rivera*
(1986) 477 U.S. 561 ........................................................................................... 11

*Dietrich v. Dietrich*
(1953) 41 Cal.2d 497 ............................................................................................. 9

*En Palm, LLC v. Teitler*
(2008) 162 Cal.App.4th 770 ............................................................................... 10

*Goglin v. BMW of North America, LLC*
(2016) 4 Cal.App.5th 462 ..................................................................................... 7

*Graciano v. Robinson Ford Sales*
(2006) 144 Cal.App.4th 140 ......................................................................... passim

*Graham v. Daimler Chrysler Corp.*
(2004) 34 Cal.4th 553 ........................................................................................... 6

*Hadley v. Krepel*
(1985) 167 Cal.App.3d 677 ................................................................................ 15

*Harman v. City and County of San Francisco*
(2007) 158 Cal.App.4th 407 .............................................................................. 11

*Horsford v. Bd. of Trustees of Cal. State Univ.*
(2005) 132 Cal. App. 4th 359 ....................................................................... 8, 13

*In re Chiron Corp. Securities Litigation*
(N.D. Cal. Nov. 30, 2007) No. C-04-4293 VRW, 2007 WL 4249902 .................................... 13

*Independent Federation of Flight Attendants v. Zipes*
(1989) 491 U.S. 754 ........................................................................................... 11

*Jensen v. BMW of North America, Inc.*
(1995) 35 Cal.App.4th 112 ................................................................................. 15

*Ketchum v. Moses*
(2001) 24 Cal.4th 1122 ...................................................................................... 12

*La Mesa-Spring Valley School Dist. v. Otsuka*
(1962) 57 Cal.2d 309 .......................................................................................... 10

ii

*Los Angeles Police Protective League v. City of Los Angeles*
    (1986) 188 Cal.App.3d 1 ................................................................ 8

*Mandel v. Lackner*
    (1979) 92 Cal.App.3d 747 ............................................................. 6

*Molski v. Arclero Wine Group*
    (2008) 164 Cal.App.4th 786 ....................................................... 10

*PLCM Group v. Drexler*
    (2000) 22 Cal.4th 1084 ................................................................ 7

*Reveles v. Toyota by the Bay*
    (1997) 57 Cal.App.4th 1139 ......................................................... 6

*Robertson v. Fleetwood Travel Trailers of California, Inc.*
    (2006) 144 Cal.App.4th 785 ................................................... passim

*Serrano v. Unruh*
    (1982) 32 Cal.3d 621 ................................................................... 6

*Vo v. Las Virgenes Municipal Water District*
    (2000) 79 Cal.App.4th 440 ......................................................... 11

**Statutes and Codes**

California Civil Code
    Section 1790, *et seq.* .................................................................. 1

California Civil Code
    Section 1794(d) ................................................................... passim

California Code of Civil Procedure
    Section 1032(a)(4) ........................................................................ 6

California Code of Civil Procedure
    Section 1033.5 ............................................................................ 15

California Code of Civil Procedure
    Section 998 ............................................................................. 1, 5

Song-Beverly Act.
    4 Cal.App.5th ...................................................................... passim

United States Code
    Title 42, section 1988 ................................................................ 11

iii

Case 2:18-ml-02814-AB-FFM   Document 85-28   Filed 07/20/18   Page 5 of 22   Page ID
#:2496

**Other Authorities**

Pearl, *California Attorney Fee Awards*
    (2nd Ed. 2005.) ..................................................................................................................... 6

Senate Report No. 93-151, 1st Sess., pp. 23-24 (1973) ............................................................ 11

iv

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR
ATTORNEY'S FEES, COSTS AND EXPENSES

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

## I.   INTRODUCTION

After sixteen months of litigation, the parties agreed to settle the matter by a Code of Civil Procedure section 998 agreement in the amount of $141,000.00. The final settlement is almost **four times** the total amount Plaintiff paid for the vehicle in what defense routinely calls a "simple lemon law" action. Plaintiff obtained this extraordinary sum, *without going to trial*. By any analysis, Plaintiff Jose Chirinos ("Plaintiff") achieved an excellent settlement particularly given Defendant Ford Motor Company's ("Defendant" or "Ford") initial refusal to even consider repurchasing his vehicle under the Song-Beverly Act. This is a settlement that no other firm in this state could achieve for its clients. The result in this case was achieved because of Plaintiff's attorneys' skill and expertise in lemon law cases developed and honed over the course of many years of advocating on behalf of consumer rights. The biggest factor in Plaintiff receiving zero from Ford when he contacted Ford before this lawsuit versus an $141,000.00 settlement was his attorneys' knowledgeable approach to this case.

Plaintiff purchased a new 2014 Ford Focus on December 16, 2013 for $35,890.68. Within less than two months of ownership, the vehicle began exhibiting problems with the suspension and the interior. For the several months that followed, Plaintiff suffered through ongoing problems with the suspension and interior, requiring numerous repair visits. These ongoing issues were later compounded by serious transmission and electrical problems. In just two years, Plaintiff brought his vehicle in for repair a total of twelve (12) times.

The Song-Beverly Act, Civil Code sections 1790, *et seq.*, entitles Plaintiff to seek reasonable attorney's fees, costs and expenses from Ford. Moreover, Plaintiff is the prevailing party and entitled to this noticed motion for attorney's fees. Plaintiff now moves the Court: (1) for an award of attorney's fees pursuant to Civil Code section 1794(d) under the "lodestar" method in the amount of $33,655.00, (2) for a modest "lodestar" modifier of 1.5 in the amount of $16,827.50 and (3) to award actual costs and expenses incurred in the amount of $4,131.55. (Civ. Code § 1794(d).) Plaintiff requests a total of $54,614.05 in attorney's fees, costs and expenses. (Declaration of Steve Mikhov ("SM Dec.") ¶ 2, Exs. A-B; Declaration of Moses Lebovits ("ML

1

1  Dec.") ¶ 10, Ex. A.)

2  **II.    STATEMENT OF FACTS**

3  Plaintiff purchased a new 2014 Ford Focus on December 16, 2013, adding taxes, fees,

4  optional service plan, and financing charges on a six-year loan, the total purchase price was

5  $35,890.68. (SM Dec., ¶ 3, Ex. C.) The vehicle was distributed by Ford Motor Company, which

6  provided an express written warranty. (*Id.*)

7  After barely one month and less than 2,000 miles of ownership, and well within the

8  applicable express warranty period, the vehicle began exhibiting problems with the suspension and

9  the interior. (SM Dec., ¶ 4.) Plaintiff brought the vehicle in for maintenance because it would pull

10  to the right when driving and the passenger side seatbelt would occasionally get stuck. (*Id.*) The

11  Ford-authorized repair facility attempted to correct these problems. (*Id.*) One week later, Plaintiff

12  brought the vehicle in because it would pull to the left when driving. (*Id.*) Again, the Ford-

13  authorized repair facility attempted to correct these problems. (*Id.*) About four months later,

14  Plaintiff brought the vehicle in because of problems with the driver's seat belt. (*Id.*) Plaintiff

15  returned just four days later because the same problems persisted. (*Id.*) In October 2014, Plaintiff

16  returned because the seat belt issue had still not been fixed and the switch for volume control

17  stopped working. (*Id.*) Plaintiff brought the vehicle in two more times in December 2014 and

18  January 2015 for the same seat belt issues. (*Id.*)

19  In March 2015, the vehicle began making a clunking noise. (*Id.*) Again, Plaintiff brought

20  the vehicle into the Ford-authorized repair facility. (*Id.*) After approximately eighteen months of

21  ownership, the vehicle began exhibiting serious transmission problems, which caused the car to

22  shudder and intermittently fail to start. (*Id.*) In addition, the vehicle continued to have numerous

23  electrical issues, including randomly shutting down while driving. (*Id.*) Plaintiff returned to the

24  dealership in July and August 2015 to attempt to remedy these issues. (*Id.*) Despite taking the

25  vehicle in for repairs multiple times, it continued to exhibit transmission and electrical problems.

26  (*Id.*) In November 2015 alone, Plaintiff visited the dealership twice within days because the vehicle

27  would not stop shuddering and jerking. (*Id.*) Plaintiff repeatedly brought the vehicle in for repair,

2

1   a total of twelve times (12), in just two years, but the multitude of problems persisted. (*Id.*)

2       Frustrated, concerned for his safety, and having lost confidence in Ford's ability to repair

3   the vehicle, Plaintiff contacted Ford's customer service on or about November 11, 2015, seeking

4   a buyback of the defective vehicle. (SM Dec., ¶ 5.) Despite Ford's affirmative duty under the law

5   to perform an investigation and offer a buyback, Ford denied Plaintiff's request. (*Id.*) Plaintiff had

6   to bring the vehicle in again in December 2015 due to the shuddering of the vehicle. (*Id.*)

7       Despite the ongoing repairs and continued manifestation of problems, Ford refused to

8   acknowledge the defective nature of Plaintiff's vehicle. (SM Dec., ¶ 6.) At all times, however,

9   Ford had direct, contemporaneous knowledge of the vehicle's serious defects, which it records in

10  a database called "OASIS" and a warranty repair history database called "AWS" as they are

11  reported. (*Id.*) These repair records indicate each time the vehicle was presented for repair during

12  the warranty period, as well as every time the Ford repair facility found a problem/defect

13  attributable to Ford and billed Ford for the work. (*Id.*)

14      Plaintiff contacted Knight Law Group LLP (hereafter "Knight Law," formerly known as

15  O'Connor & Mikhov, LLP) and told the firm about the problems with the vehicle and the way

16  Ford treated him. (*Id.*, ¶ 7.) After review of the repair history and discussions with Plaintiff, the

17  firm agreed to represent him and bear the risk associated with litigating the case on a fully

18  contingent basis. (*Id.*) Because Knight Law's compensation was purely contingent, the firm faced

19  a genuine risk of not being paid for its services for years, if at all, while advancing thousands of

20  dollars in costs and expenses on Plaintiff's behalf. (*Id.*) In taking on this duty, the firm was facing

21  a litigation behemoth—Ford is a multi-billion-dollar company, with a virtually infinite litigation

22  war-chest, that wages a battle of attrition that most firms cannot withstand. (*Id.*)

23      As a result of Ford's failure to fix the material defects associated with Plaintiff's vehicle,

24  or otherwise comply with the Song-Beverly Act, Plaintiff filed the complaint in this action on

25  February 11, 2016, alleging, in part, willful violations of the Song-Beverly Act and fraudulent

26  inducement, and seeking civil penalties and punitive damages. (SM Dec., ¶ 8.) On or about March

27  21, 2016, Ford filed a Demurrer to Plaintiff's Complaint. (SM Dec., ¶ 9.) Plaintiff's counsel filed

3

1  an Opposition to the Demurrer, and the Demurrer was overruled by the Court on June 7, 2016.

2  (*Id.*)

3        Also in March 2016, Defendant filed a Petition for Coordination of Add-On Cases. (SM

4  Dec., ¶ 10.) Plaintiff's counsel filed an Opposition to the Petition for Coordination. (*Id.*)

5  Defendant's Petition for Coordination was denied on or about August 29, 2016. (*Id.*)

6        On or about June 30, 2016, Ford filed their answer denying all liability and asserting

7  numerous affirmative defenses. (SM Dec., ¶ 11.)

8        Defendant's position in the litigation required extensive efforts on the part of Plaintiff's

9  counsel, and they promptly began working up their case on behalf of Plaintiff. (SM Dec., ¶ 12.)

10  Written discovery was drafted and served on Defendant in October 2016, consisting of 48 Requests

11  for Admissions, 92 Requests for Production of Documents, 89 Special Interrogatories and Form

12  Interrogatories. (*Id.*) Plaintiff benefited from Knight Law's expertise and experience in litigating

13  against Ford insofar as just 4.3 hours were billed to review the file and draft the entirety of this

14  discovery. (*Id.*) Plaintiff's counsel is able to use existing files as templates to conserve time and

15  litigate efficiently. (*Id.*) Written discovery of this magnitude, drafted from scratch and without the

16  benefit of Plaintiff's attorneys' vast knowledge, experience and specialized expertise, would have

17  taken multiples of the time expediently managed here. (*Id.*) Ford provided responses to the

18  discovery requests on or about November 21, 2016. (*Id.*)

19        Due to Ford's improper objections and/or incomplete responses to Plaintiff's written

20  discovery, Plaintiff began "meet and confer" efforts in December 2016. (SM Dec., ¶ 13.) After the

21  parties reached an impasse, despite Plaintiff's "meet and confer" efforts, Ford refused to fully

22  comply with its discovery obligations leaving Plaintiffs no choice but to contemplate filing a

23  motion to compel. (*Id.*) Plaintiff then obtained an extension to file the motion to compel while

24  working hard to obtain adequate responses from Ford. (*Id.*)

25        In March 2017, Plaintiff noticed the depositions of numerous Ford employees, including

26  Ford's Persons Most Knowledgeable ("PMK") and Persons Most Qualified ("PMQ"). (SM Dec.,

27  ¶ 14.) These depositions were needed to obtain information regarding repairs to the vehicle,

4

1  authenticate repair orders, and rebut Ford's argument that the problems with Plaintiff's vehicle

2  were somehow caused by Plaintiff's neglect or abuse. (*Id.*)

3          On or about May 26, 2017, Ford propounded Requests for Production of Documents,

4  Special Interrogatories, Requests for Admissions, and Form Interrogatories upon Plaintiff. (SM

5  Dec., ¶ 15.) Plaintiff again benefited from Knight Law's expertise and experience insofar as just

6  3.3 hours were billed for drafting responses to the entirety of this discovery. (*Id.*)

7          With the absence of any reasonable settlement offer from Ford accounting for its willful

8  violation of the Song-Beverly Act, the case appeared likely to go to trial. (SM Dec., ¶ 16.)

9  Accordingly, on or about May 1, 2017, Moses Lebovits of Daniels, Fine, Israel, Schonbuch &

10  Lebovits, LLP, (hereafter "Daniels Fine") formally associated into the case as lead trial counsel to

11  prepare the case for trial. (*Id.*) As the trial date approached, Plaintiff's counsel drafted trial related

12  documents including motions *in limine*, witness and exhibit lists and jury instructions. (ML Dec.,

13  ¶ 12.) Plaintiff's counsel also prepared for and attended depositions of Ford's employees, including

14  Ford's PMK. (SM Dec., ¶ 17; ML Dec., ¶ 12.)

15          On May 25, 2017, Ford served Plaintiff with an Offer to Compromise pursuant to Code of

16  Civil Procedure section 998 ("998 Offer"), in the amount of $126,000.00. (SM Dec., ¶ 18). Plaintiff

17  rejected the inadequate 998 Offer. (*Id.*)

18          Just two weeks later, on June 7, 2017, and after nearly sixteen months of litigation, Ford

19  served Plaintiff with an Amended Offer to Compromise pursuant to Code of Civil Procedure

20  section 998 ("Amended 998 Offer'), in the amount of $141,000.00. (SM Dec., ¶ 19, Ex. D.) The

21  Amended 998 Offer was accepted by the Plaintiff on June 12, 2017. (*Id.*) This settlement amount

22  was inclusive of a full statutory "buy-back" of his defective vehicle, incidental and consequential

23  damages, and a civil penalty. (*Id.*)

24          Plaintiff, as the prevailing party in this matter, has made every reasonable effort to resolve

25  the payment of Plaintiff's attorney fees by Ford, but was forced to file this Motion with the court.

26  (SM Dec., ¶ 20.)

27

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR
ATTORNEY'S FEES, COSTS AND EXPENSES

## III.   ARGUMENT AND ANALYSIS

### A.   Plaintiff's Attorneys Are Entitled to Fees, Costs and Expenses in this Action

Plaintiff is the prevailing party in this action and, under the Song-Beverly Act, entitled to recoup all reasonable attorney's fees, costs and expenses as the prevailing party. (Code Civ. Proc. § 1032(a)(4); Civ. Code § 1794(d); *Graham v. Daimler Chrysler Corp.* (2004) 34 Cal.4th 553, 557; *Reveles v. Toyota by the Bay* (1997) 57 Cal.App.4th 1139.) Absent a contrary showing, both the number of hours that the prevailing party's attorney spent litigating the case and his or her regular hourly rate are presumed to be reasonable. (*Serrano v. Unruh* (1982) 32 Cal.3d 621, 639 (counsel is entitled to all hours actually spent, absent a showing of "special circumstances" that would render such an award unjust; *Mandel v. Lackner* (1979) 92 Cal.App.3d 747, 761 (an attorney's regular hourly rate is entitled to a presumption of reasonableness); Pearl, California Attorney Fee Awards, at §§ 12.14A, 12.33 (2nd Ed. 2005).))

In prosecuting this case, the efforts of Knight Law amount to $25,845.00, including drafting this motion and time anticipated to be spent preparing the reply and attending the hearing. (SM Dec., ¶ 2, Ex. A.) The billings by Daniels Fine total $7,810.00. (ML Dec., ¶ 10, Ex. A.) The total billing incurred by both offices for the entire litigation is $33,655.00. (ML Dec., ¶ 10, Ex. A.) Plaintiff's counsel also requests a modest 1.5 enhancement, in the amount of $16,827.50, to account for the delay in payment and contingent risk posed by this case. Lastly, the reimbursable costs and expenses set forth in Plaintiff's memorandum of costs are $4,131.55. (SM Dec., ¶ 2, Ex. B; ML Dec., ¶ 10, Ex. A.) In total, Plaintiff requests $54,614.05. (SM Dec., ¶ 2, Exs. A-B; ML Dec., ¶ 10, Ex. A.)

### B.   The Hourly Rates Sought by Plaintiff's Attorneys Are Reasonable

The Court of Appeal has expressly held the lodestar method applies to determining attorney's fees under the Song-Beverly Act. (*Robertson v. Fleetwood Travel Trailers of California, Inc.* (2006) 144 Cal.App.4th 785, 817.) The calculation of reasonable attorney's fees under the Song-Beverly Act is based on the lodestar method, which entails multiplying the number of hours reasonably expended by a reasonable hourly rate. (*Graciano v. Robinson Ford Sales* (2006) 144

6

1   Cal.App.4th 140, 154; *Robertson, supra,* 144 Cal.App.4th 817.) The prevailing buyer has the

2   burden of showing that the fees incurred were "allowable," "reasonably necessary to the conduct

3   of the litigation," and "reasonable in amount." (*Goglin v. BMW of North America, LLC* (2016) 4

4   Cal.App.5th 462, 470.) In making such an evaluation, a court may consider "factors such as the

5   complexity of the case and procedural demands, the skill exhibited and the results achieved." (*Id.*)

6        In *Goglin v. BMW*, the appellate court recently affirmed the trial court's award of over

7   $185,000 in attorneys' fees and costs for a plaintiff who settled her claims against BMW under the

8   Song-Beverly Act. (4 Cal.App.5th at 464.) The court also found plaintiff's counsel's hourly rate

9   of $575 per hour was reasonable as supported by exhibits to counsel's declaration indicating

10  various state and federal courts had previously awarded him comparable hourly rates. (*Goglin,*

11  *supra,* 4 Cal.App.5th at 464.) The trial court was not obliged to consider that defendants paid their

12  counsel a much lower hourly rate. (*Id.* at 474.)

13       In *Robertson*, the court observed a prevailing buyer is entitled to an award of reasonable

14  attorney's fees for time reasonably expended by his attorney. (*Robertson, supra,* 144 Cal.App.4th

15  at 817.) The court ruled the "statutory language in section 1794(d) is reasonably compatible with

16  a lodestar adjustment method of calculating attorney fees, including use of fee multipliers." (*Id.* at

17  819.) Indeed, in *Robertson*, the trial court awarded $231,187.45 in fees based on $145,080.50 in

18  fees through trial, plus a "multiplier" of 1.5 for a total of $217,620.75, and $13,566.70 for the

19  attorney's fee motion. (*Id.* at 817.) The appellate court upheld the trial court's ruling. (*Id.* at 822.)

20       In *Graciano*, the trial court initially rejected plaintiff's lodestar fees of $109,468.50 and

21  request for a multiplier of 2.0. In particular, the trial court reduced the plaintiff's attorney's hourly

22  rate from the requested $350/hour to $250/hour, which was the court's mandated maximum rate

23  for expert testimony. Plaintiff appealed the court's decision and in particular the hourly rate

24  reduction. The appellate court reversed, reasoning a court should determine the prevailing rate in

25  the community for comparable professional legal services. (*Graciano, supra,* 144 Cal.App.4th at

26  156 (*citing PLCM Group v. Drexler* (2000) 22 Cal.4th 1084, 1095).) The court found the plaintiff's

27  unrebutted declarations established the proper hourly rate at $350, and reducing that rate to $250

7

1    was an abuse of discretion. (*Id.*) The court also reaffirmed attorney's fees <u>are not limited to a</u>

2    <u>proportion</u> of the recovery. (*Id.* at 164.) On remand, the trial court found that the lodestar rate of

3    $350/hour was reasonable *and added* a multiplier of 2.0 for a total fee award of over $380,000.

4    The attorney from *Graciano*, Hallen D. Rosner, now charges $620/hour. (SM Dec., ¶ 35 (a).)

5         Furthermore, the California Supreme Court has expressly ruled that prevailing parties who

6    are entitled to recover their attorney's fees are *also entitled* to recover their fees for the time spent

7    preparing fee applications such as this one. (*Serrano v. Unruh, supra,* 32 Cal.3d at 631; *Los*

8    *Angeles Police Protective League v. City of Los Angeles* (1986) 188 Cal.App.3d 1, 17; *Robertson,*

9    *supra,* 144 Cal.App.4th at 817 (awarding $13,566.70 in fees for a fee motion).)

10        The hourly rates should be considered in the context of the rates charged by Plaintiff's

11   attorneys in the metropolitan community in which they practice, as opposed to the case venue. In

12   *Horsford v. Bd. of Trustees of Cal. State Univ.,* the trial court was reversed for refusing to award

13   the higher rates to San Francisco-based attorneys who litigated a FEHA case in Fresno. (*Horsford*

14   *v. Bd. of Trustees of Cal. State Univ.* (2005) 132 Cal. App. 4th 359, 399.) The law "requires that

15   the *financial incentives be adjusted to attract attorneys* who are sufficient to the cause." (*Id.*) "In

16   the absence of any realistic indication plaintiffs could have found local counsel, it was an abuse of

17   discretion to fail to consider an hourly rate based on counsel's 'home' market rate." (*Id.*) Plaintiff's

18   attorneys' hourly rates should not vary depending on the venue of the lawsuit. The skill and

19   experience of Ford's attorneys does not change from venue to venue and Plaintiff's counsel

20   deserves to be compensated at the same rate they would receive given the same quantity and quality

21   of work they must perform regardless of the venue.

22        Consideration of the "lodestar" factors compels an award of attorney's fees based on (i)

23   the hourly rates set forth of in the declarations filed concurrently herewith (SM Dec., ¶¶ 26-33;

24   ML Dec., ¶¶ 7-9), (ii) a survey of rates charged by other well-known consumer law attorneys (SM

25   Dec., ¶ 35), (iii) over three dozen court orders confirming the reasonableness of Plaintiff's

26   counsels' hourly rates and time billed in other Song-Beverly Act cases (*Id.*, ¶¶ 39-78, Exs. E-RR)

27   and (iv) a National Survey further supporting the reasonableness of the hourly rates. (ML Dec., ¶

1   11, Ex. B, at pp. 42-45). Plaintiff's counsels' rates are within the range of rates charged by other

2   attorneys with similar experience in this area of law.

3               **1.**      **The Nature and Complexity of the Litigation Support the Attorney's**

4                      **Fees Requested**

5       Determining the amount of reasonable attorney's fees may involve consideration of the

6   nature and complexity of the case. (*Dietrich v. Dietrich* (1953) 41 Cal.2d 497, 506; *Graciano,*

7   *supra,* 144 Cal.App.4th at 147.) Ford will likely claim that "this is a simple lemon law case," and

8   therefore Plaintiff's fee request is unjustified. However, this case required a range of specialized

9   knowledge including: (1) an understanding of the full scope of consumer protection laws, which

10   are highly nuanced; (2) knowledge of the intricacies of automobiles and the lexicon associated

11   with them, as well as knowledge concerning how to investigate issues with automobiles; and (3)

12   knowledge of auto manufacturers' and dealers' policies and protocols for repairing vehicles and

13   complying with their legal obligations. (SM Dec., ¶ 84.) Plaintiff's attorneys have acquired

14   knowledge and insight about these issues and this experience typically results in significantly

15   higher judgments or settlements for their clients, like Plaintiff here.

16       Moreover, Ford made this matter even more complex by maintaining it had no liability and

17   declining to submit any reasonable offers to settle the matter for nearly sixteen months, while

18   pursuing discovery with full force and compelling Plaintiff's counsel to litigate this matter

19   exhaustively. Prior to commencing litigation, Plaintiff first sought relief by requesting a buyback

20   from Ford, which Ford rejected. Ford should have acknowledged the well-known defects in

21   Plaintiff's vehicle and resolved the matter before this case was ever filed. Instead, Ford engaged

22   in expensive litigation, including denying all liability, stone-walling Plaintiff's discovery efforts,

23   and forcing trial counsel to expend numerous hours preparing for trial. Ford easily could have

24   resolved this matter earlier and saved thousands in attorney's fees, costs and expenses. Ford

25   ultimately came around to doing the right thing, but not before causing substantial fees to be

26   incurred.

27

1   When Ford causes the entirety of fees to be incurred, it has no legitimate basis for

2   complaining about the amount of attorney's fees reasonably and actually incurred, especially when

3   Ford was given the opportunity to resolve the matter before a lawsuit was even filed. "A party

4   cannot litigate tenaciously and then be heard to complain about the time necessarily spent by the

5   opposition in response." (*En Palm, LLC v. Teitler* (2008) 162 Cal.App.4th 770, 786; *see also*

6   *Molski v. Arclero Wine Group* (2008) 164 Cal.App.4th 786.)

### 2.   The Firm's Skill Justifies the Amount of Attorney's Fees Sought

8   A trial court may also take into account the skill of the attorneys when determining

9   reasonable attorney's fees. (*La Mesa-Spring Valley School Dist. v. Otsuka* (1962) 57 Cal.2d 309,

10  316.) Despite the case's difficulties, Plaintiff ultimately recovered $141,000.00 in damages, which

11  is almost four times the vehicle's purchase price. The vehicle was no more or less defective on the

12  date of settlement than it was when Plaintiff first requested a repurchase, so there is no rational

13  explanation why Ford waged a lengthy and costly legal battle only to settle for an amount that

14  included civil penalties.

15  The final resolution is the direct result of skill and preparation by Plaintiff's attorneys, who

16  specialize in consumer law and did not balk at Ford's aggressive litigation tactics. Plaintiff's

17  attorneys' experience in this area has enabled them to develop litigation strategies that are both

18  highly effective and cost and time efficient. Plaintiff's attorneys know the many nuances in these

19  types of cases. This specialized knowledge and experience in lemon law frequently achieves

20  results better than attorneys who do not specialize in this specific area of law. This experience

21  provided a resolution to this matter far beyond that which Ford was previously willing to entertain.

22  Ford engages specialized attorneys from big firms, and Plaintiff needed skilled attorneys to

23  prosecute his claims. The biggest difference between Plaintiff getting zero and Plaintiff receiving

24  a $141,000.00 recovery was his attorneys' knowledge and expertise.

25  Counsels' skill is evidenced by the size of the settlement as well as the nominal time

26  expended on litigation tasks, which results in lower overall billing. Plaintiff's attorneys do not

27  spend inordinate time researching because they specialize in this area of law. (SM Dec., ¶ 85.) Nor

10

1    do they spend unreasonable time preparing pleadings and other documents because they are able

2    to use documents from other cases that need only be edited, rather than written from scratch. While

3    substantial fees have been incurred, those fees result from the execution of effective strategies that

4    typically result in superlative results for clients, like Plaintiff here.

5        On the other side, Ford is represented by large national firms with attorneys who specialize

6    in representing automobile manufacturers in lemon law cases. Ford is a corporate behemoth with

7    the resources to easily overwhelm a consumer or an inexperienced attorney. Plaintiff required

8    skilled and experienced attorneys to prosecute his claims against Ford and its formidable resources.

9    Plaintiff's attorneys were well-suited for this task.

10    **C.**     **The Settlement Amount Does Not Limit the Attorney's Fee Recovery**

11        Ford may argue that damages in the amount of $141,000.00 do not justify an attorney's fee

12    award in the amount requested by Plaintiff. Such an argument is starkly against the weight of the

13    law. The amount of attorney's fees *must not be tied to any percentage of recovery*. (*Graciano,*

14    *supra,* 144 Cal.App.4th at 164.) In fact, a trial court may abuse its discretion if it applies a rule of

15    proportionality to a fee award. The U.S. Supreme Court has previously considered the question of

16    proportionality in attorney fee awards and held: "[w]e reject the proposition that fee awards under

17    [42 U.S.C.] section 1988 should necessarily be proportionate to the amount of damages a civil

18    rights Plaintiff actually recovers." (*City of Riverside v. Rivera* (1986) 477 U.S. 561, 574; *see also*

19    Sen. Report No. 93-151, 1st Sess., pp. 23-24 (1973) (attorney's fees under the Magnuson Moss

20    Warranty Act are based on actual time, not a percentage of the recovery); *Robertson, supra,* 144

21    Cal.App.4th at 820; *Independent Federation of Flight Attendants v. Zipes* (1989) 491 U.S. 754,

22    fn.2 (fee shifting provisions under Magnuson-Moss and Song-Beverly "are to be interpreted

23    alike"); *Goglin, supra,* 5 Cal.App.5th at 468-69 (affirming award of $185,000 in fees and costs in

24    a Song-Beverly Act case that settled for $75,000); *Vo v. Las Virgenes Municipal Water District*

25    (2000) 79 Cal.App.4th 440, 446 (affirming $470,000 fee award after $40,000 judgment because

26    the defendant was excessively litigious and took a non-settlement posture); *Harman v. City and*

27    *County of San Francisco* (2007) 158 Cal.App.4th 407 (affirming award of approximately $1.1

11

1    million in fees where plaintiffs recovered $30,300).)

2          It is not uncommon for attorney's fees and costs to exceed the client's damages, although

3    that did not happen here because the settlement was so large and the fees were efficiently incurred.

4    The Legislature acknowledged that substantial work might be needed to prosecute such claims

5    against large corporations, which is the reason behind the fee shifting provision of the Song-

6    Beverly Act. (SM Dec., ¶ 83.) "The purpose of statutory attorney fee provisions is to provide

7    financial incentives necessary for the private enforcement of important civil rights." (*Ketchum v.*

8    *Moses* (2001) 24 Cal.4th 1122, 1132.) Thus, the Song-Beverly Act gives consumers the

9    opportunity to seek legal redress even if their damages would not be high enough to warrant legal

10   representation. The award of attorney's fees *cannot* be limited by the damages recovered by

11   Plaintiff. Any argument by Ford to the contrary would be disingenuous, as the law is clear on this

12   point. (*Ketchum, supra,* 24 Cal.4th at 1132.)

13         **D.    Plaintiff Should Be Granted a Lodestar Multiplier**

14         As part of the Song-Beverly Act, a prevailing buyer may also receive a lodestar multiplier,

15   sometimes referred to as an adjustment or enhancement. (*Robertson, supra,* 144 Cal.App.4th at

16   817.) Once a lodestar amount is determined, which involves a "careful compilation of the actual

17   time spent and reasonable hourly compensation for each attorney," (*Id.* at 819 (*citing Serrano v.*

18   *Priest* (1977) 20 Cal.3d 25, 48-49 (*Serrano III*)), the amount may then be augmented by taking

19   various relevant factors into account, including (1) the novelty and difficulty of the questions

20   involved and the skill displayed in presenting them; (2) the extent to which the nature of the

21   litigation precluded other employment by the attorneys; and (3) the contingent nature of the fee

22   award, based on the uncertainty of prevailing on the merits and of establishing eligibility for the

23   award. (*Id.*; *see also Graham, supra,* 34 Cal.4th at 579; *PLCM Group v. Drexler*, 22 Cal.4th at

24   1096.) "[T]he purpose of a fee enhancement is primarily to compensate the attorney for the

25   prevailing party at a rate reflecting the risk of nonpayment in contingency cases." (*Ketchum, supra,*

26   24 Cal.4th at 1138; *Cazares v. Saenz* (1989) 208 Cal.App.3d 279, 287-88 (risk factor alone justifies

27   a 2.0 multiplier for a 50% chance of prevailing).) "A 50 percent chance of recovery implies a

12

1 | multiplier of 2, a 25 percent chance of recovery implies a multiplier of 4, and so on." (*In re Chiron*
2 | *Corp. Securities Litigation* (N.D. Cal. Nov. 30, 2007) No. C-04-4293 VRW, 2007 WL 4249902,
3 | at *9.)

4 |       In *Robertson*, a case brought under the Song-Beverly Act, the court ruled that the "statutory
5 | language in section 1794(d) is reasonably compatible with a lodestar adjustment method of
6 | calculating attorney fees, including use of fee multipliers." (144 Cal.App.4th at 819.) The trial
7 | court awarded a total of $231,187.45 in fees consisting of: $145,080.50 in fees incurred through
8 | trial, plus a "multiplier" of 1.5 for a total of $217,620.75, and $13,566.70 for fees in preparing the
9 | fees motion. (*Id.* at 817.) The appellate court held the trial court properly conducted a lodestar
10 | analysis and the award was not an abuse of discretion. (*Id.* at 822.)

11 |       In *Graciano*, the appellate court actually *increased* the trial court's award of fees after
12 | finding that the lodestar rate of $350/hour was reasonable (in 2006) and adding a 2.0 multiplier for
13 | a total award of over $380,000. (144 Cal.App.4th at 156.) The court also reaffirmed attorney's fees
14 | are not limited to a proportion of the recovery. (*Id.* at 164.)

15 |       Ford may argue a multiplier is not permitted, and cite to the *Ketchum* case to support that
16 | argument. To the contrary, *Ketchum* actually confirms the granting of a multiplier in contingency
17 | fee cases (*Ketchum, supra,* 24 Cal.4th at 1132.) A lodestar multiplier is in fact available and it has
18 | been awarded to Plaintiff's counsel in multiple, factually disparate, cases. (SM Dec., ¶¶ 52, 56, 65,
19 | 66, 68, 69, 73, 79, 80, 81; Exs. T, X, GG, HH, JJ, KK, OO, UU, VV, WW.)

20 |       **1.**    **The Lodestar Multiplier Should Be Granted in Contingent Cases Due**
21 |             **to Risk and Delay of Payment**

22 |       The lodestar is intended to reflect the basic fee for comparable non-contingent legal
23 | services and should be enhanced by an appropriate multiplier to reflect the risk and delay in
24 | payment associated with taking a contingent case, as well as the result achieved. The lodestar
25 | "multiplier" is meant to increase or decrease the fee award based on factors not already taken into
26 | account when setting the hourly rate, such as the risk of taking a case on a contingency basis, and
27 | delay in receiving payment. (*See Horsford v. Bd. of Trustees of Cal. State Univ.* (2005) 132 Cal.

13

1 | App. 4th 359, 394-95.)

2 |     In *Ketchum*, the California Supreme Court wrote, "[a] contingent fee contract, since it

3 | involves a gamble on the result, may properly provide for a *larger compensation* than would

4 | otherwise be reasonable." (24 Cal.4th at 1132 [emphasis added].)

> A contingent fee must be higher than a fee for the same legal services paid as they
> are performed. The contingent fee compensates the lawyer not only for the legal
> services he renders but for the loan of those services. The implicit interest rate on
> such a loan is higher because the risk of default (the loss of the case, which cancels
> the debt of the client to the lawyer) is much higher than that of conventional loans.
> (Posner, Economic Analysis of Law (4th ed.1992) pp. 534, 567, emphasis added.)
> A lawyer who both bears the risk of not being paid and provides legal services is
> not receiving the fair market value of his work if he is paid only for the second of
> these functions. If he is paid no more, competent counsel will be reluctant to accept
> fee award cases.

11 | (*Id.* at 1132 [citations omitted; emphasis added].)

12 |     Throughout the litigation, there always existed the real possibility Plaintiff would not

13 | prevail. The risk was further compounded by the fact that Plaintiff's attorneys advanced all

14 | litigation costs and expenses without reimbursement. Thus, if Plaintiff did not prevail, his attorneys

15 | would have suffered a loss of numerous hours in uncompensated work and thousands of dollars in

16 | out-of-pocket expenses. Plaintiff requests a 0.2 enhancement based on that risk.

17 |     Further, Ford dragged this case out for almost sixteen months before making an acceptable

18 | offer. Unlike Ford's attorneys, who are paid monthly regardless of outcome, Plaintiff's attorneys

19 | are not paid at all if they lose, and need to absorb significant delay in being paid if Plaintiff does

20 | win. On account of the delay in payment, Plaintiff requests a 0.3 enhancement.

21 |     Based on the risk of taking this case on a contingent fee basis and the delay in payment

22 | since February 2016, Plaintiff requests a nominal multiplier of 1.5.

23 |     **E.**     **Plaintiff is Entitled to Recover All Costs and Expenses Reasonably Incurred**

24 |         **in Connection with this Action**

25 |     Under the Song-Beverly Act, a prevailing buyer shall be allowed to recover as part of the

26 | judgment a sum equal to the aggregate amount of costs <u>and expenses</u>. (Civ. Code § 1794(d)

27 | [emphasis added].) The California Legislature intended the word "expenses" to cover outlays not

14

1   included in the detailed statutory definition of "costs," and the Song-Beverly Act's legislative

2   history demonstrates the Legislature exercised its power to permit recovery of a host of litigation

3   expenditures beyond those permitted by Code of Civil Procedure section 1033.5. (*Jensen v. BMW*

4   *of North America, Inc.* (1995) 35 Cal.App.4th 112, 137-138.)

5       A verified memorandum of costs generally satisfies the moving party's burden of

6   establishing costs were necessarily incurred. (*Hadley v. Krepel* (1985) 167 Cal.App.3d 677, 682.)

7   The verified memorandum of costs demonstrates what Plaintiff's attorneys incurred in costs and

8   expenses prosecuting this matter, which counsel advanced on Plaintiff's behalf. (SM Dec. ¶ 2, Ex.

9   B; ML Dec. ¶ 10, Ex. A); Civ. Code § 1794(d). The burden shifts to Ford to properly rebut the

10   claimed costs.

11                 **IV.**    **CONCLUSION**

12       For the reasons above, Plaintiff respectfully requests this Honorable Court award attorney's

13   fees, costs and expenses as follows:

14

15         Lodestar Fees:          $ 33,655.00

        +Lodestar Enhancement:    $ 16,827.00

16         Total Fees Requested:     $ 50,482.50

        +Costs and Expenses:      $  4,131.55

17         **=Total Fees and Costs/Expenses:  $ 54,614.05**

18

19   Dated: March 19, 2018                  **KNIGHT LAW GROUP, LLP**

20

21

22                                    Steve Mikhov (SBN 224676)

                                   Amy Morse (SBN 290502)

23                                    Attorneys for Plaintiff,

                                   **JOSE CHIRINOS**

24

25

26

27

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR
ATTORNEY'S FEES, COSTS AND EXPENSES

**PROOF OF SERVICE**
(Code of Civil Procedure §1013a)

I am employed in the County of Los Angeles, State of California.  I am over the age of 18 years and not a party to the action.  My business address is 1801 Century Park East, Suite 2300, Los Angeles, CA 90067.

I served the foregoing document described as:

**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR ATTORNEY'S FEES, COSTS AND EXPENSES**

Said document was served on the interested parties in this action, by placing true copies thereof enclosed in sealed envelopes, with postage prepaid, addressed as follows:

| | |
|---|---|
| Matthew M. Proudfoot, Esq. | Moses Lebovits Esq. |
| GATES, O'DOHERTY, | DANIELS FINE ISRAEL |
| GONTER & GUY LLP | SCHONBUCH & LEBOVITS LLP |
| 38 Discovery, Suite 200 | 1801 Century Park East, 9th Floor |
| Irvine, CA 92618 | Los Angeles, CA 90067 |
| **Counsel for Defendant,** | lebovits@dfis-law.com |
| **FORD MOTOR COMPANY** | **Associated Counsel for Plaintiffs,** |
| (via Overnight only) | **JOSE CHIRINOS** |
| | (via E-Mail only) |

**XX**   BY OVERNIGHT MAIL/DELIVERY: I caused such envelope to be delivered by hand to the office(s) of the addressee(s) via OVERNIGHT EXPRESS or by local courier service.

**XX**   BY E-MAIL OR ELECTRONIC TRANSMISSION: Based on a court order or an agreement of the parties to accept service by e-mail or electronic transmission, I caused the documents to be sent to the persons at the e-mail addresses listed above.  I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on March 20, 2018 at Los Angeles, California.

Monica Gomez

-1-
**PROOF OF SERVICE**

RECEIVED

MAR 2 1 2018

BY:.............................