**KNIGHT LAW GROUP, LLP**
Steve Mikhov (SBN 224676)
stevem@knightlaw.com
10250 Constellation Blvd., Suite 2500
Los Angeles, CA 90067
Telephone: (310) 552-2250
Fax: (310) 552-7973

Attorneys for Plaintiff
MARK PEDANTE

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **IN RE: FORD MOTOR CO. DPS6 POWERSHIFT TRANSMISSION PRODUCTS LIABILITY LITIGATION** | **Case No. 2:18-ML-02814 AB (FFMx)** |
| | *Assigned to: Hon. Andre Birotte, Jr. Courtroom 7B* |
| | *Magistrate Fredrick F. Mumm Courtroom 580* |
| **THIS DOCUMENT RELATES TO:** | |
| *MARK PEDANTE V. FORD MOTOR COMPANY, ET AL.*, Case No. 2:17-CV-06656-AB-FFM | **REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL** |
| | **FIRST AMENDED COMPLAINT FOR:** |
| | **1.     BREACH OF EXPRESS WARRANTY – VIOLATION OF SONG-BEVERLY ACT** |
| | **2.     BREACH OF IMPLIED WARRANTY – VIOLATION OF SONG-BEVERLY ACT** |
| | **3.     FRAUDULENT INDUCEMENT – CONCEALMENT** |
| | **4.     FRAUDULENT INDUCEMENT – INTENTIONAL MISREPRESENTATION** |
| | **5.     FRADULENT INDUCEMENT – NEGLIGENT MISREPRESENTATION** |

Plaintiff, MARK PEDANTE, ("Plaintiff") on information and belief formed after a inquiry reasonable under the circumstances presented, alleges as follows against Defendant FORD MOTOR COMPANY, a Delaware Corporation (hereinafter, "Ford," "FMC," or "Defendant"):

## OVERVIEW OF THE CASE: FORD'S WORLD-WIDE FOCUS AND FIESTA DPS6 POWERSHIFT TRANSMISSION FRAUD

1.      As alleged in greater detail below, this lawsuit is one of thousands, if not tens of thousands, of lawsuits and government regulatory/enforcement actions, arising out of Ford Motor Company's world-wide marketing and sale of 2011-2016 Ford Fiesta vehicles and 2012-2016 Ford Focus passenger automobiles equipped with a dangerously defective transmission known as the "DPS6 PowerShift Transmission" (hereinafter "PowerShift Transmission" or "DPS6").

2.      The PowerShift Transmissions in these Ford Focus and Fiesta autos were defective for a number of different reasons; and because of those defects, Ford Focus and Fiesta autos equipped with the DPS6 did not comply with Ford's express and implied warranties, and Ford's other obligations under law.

3.      Further, the DPS6-equipped Focus and Fiesta autos were dangerous to consumers and the public, because the defective DPS6 could and did cause such autos to lose power unexpectedly while driving (referred to as an "unintended neutral event" or "loss of motive power"); jerk and buck erratically, and otherwise

fail in ways that reportedly could and did cause accidents and injuries (even fatalities).

4.     Plaintiff is informed and believes, and on that basis alleges that Ford knew prior to the initial launch of DPS6-equipped vehicles, and at all times since then, that the defects in the PowerShift Transmission made the Focus and Fiesta defective and dangerous; and knew that such DPS6-equipped autos did not comply and could not be made to comply with Ford's warranty obligations and with consumers' reasonable expectations for passenger autos.

5.     Plaintiff is informed and believes, and on that basis alleges, that Ford told one or more suppliers of DPS6 components that PowerShift Transmissions were dangerously defective and could not be fixed; and that Ford demanded one or more suppliers compensate Ford for increased warranty costs related to the DPS6 Transmission – while continuing to sell vehicles with the DPS6 Transmission.

6.     Plaintiff is informed and believes, and on that basis alleges, that Ford and its suppliers ultimately entered into one or more secret agreements, negotiated at the highest levels of Ford's management, whereby the supplier(s) paid Ford hundreds of millions of dollars in compensation for increased warranty costs that Ford incurred due to these defects. Despite this payoff, Ford affirmatively misrepresented to third parties (e.g., consumers, governmental regulators such as the U.S. National Highway Safety Administration ["NHTSA"]) that there was nothing

wrong with the PowerShift Transmissions.

7.      Plaintiff is informed and believes, and on that basis alleges, that Ford fraudulently concealed the defects in the PowerShift Transmission and DPS6-equipped Focus and Fiesta autos from Plaintiff, other consumers, and governmental regulators both in the United States (e.g., NHTSA) and abroad (e.g, the Australian Consumer and Competition Comission ["ACCC"]).

8.      Ford affirmatively misrepresented to consumers and regulators that the DPS6 Transmissions' aberrant behaviors were "normal operating characteristics" and that there was nothing wrong with the Transmission, consistent with Ford's secret settlement deal. To this day, Ford continues to deny the defects in the DPS6-equipped Focus and Fiesta autos, even though it was forced to admit the contrary in a consent degree in a regulatory proceeding by the ACCC that is part of the public record of that Australian regulatory agency, and which resulted in Ford have to pay a (AUS) $10 million penalty/fine for engaging in unconscionable conduct regarding DPS6-equipped Focus and Fiesta autos. https://www.accc.gov.au/media-release/court-orders-ford-to-pay-10-million-penalty-for-unconscionable-conduct.

9.      This corporate misconduct and fraud by Ford is alleged in greater detail below, with specific references to, and quotations from, Ford's own internal corporate documents and other evidence.

FIRST AMENDED COMPLAINT – PEDANTE V. FORD
UNREDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

## **GENERAL ALLEGATIONS**

10.    Plaintiff, MARK PEDANTE ("Plaintiff") is an individual residing in the City of Van Nuys, County of Los Angeles, and State of California. As alleged in more detail in paragraphs 204-229 below under the heading "PLAINTIFF'S EXPERIENCES," Plaintiff purchased a 2013 Ford Focus passenger automobile equipped with a PowerShift Transmission and was a putative class member of the action titled *Omar Vargas, et al. v. Ford Motor Company*, 2:12-cv-008388-AB-FFMx (C.D. Cal.).

11.    Defendant Ford Motor Company is and was a Delaware Corporation, Company registered to do business in the State of California with its registered office in the City of Los Angeles, County of Los Angeles, State of California.

12.    This action is not a breach of contract case, but instead arises out of Ford Motor Company's violations of statutory and common-law warranty and disclosure obligations for a vehicle purchased by Plaintiff and for which Ford issued a written warranty. Plaintiff generally alleges, as further detailed herein, that Ford (whether directly or through its authorized repair facilities) failed to repair his vehicle to conform to its written warranty after a reasonable number of opportunities; and then failed to promptly replace his/her vehicle or make restitution for it. Plaintiff further generally alleges his vehicle was unmerchantable at the time of sale and unfit for its intended use, and that it failed to conform to the promises on

FIRST AMENDED COMPLAINT – PEDANTE V. FORD
UNREDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

its label. Plaintiff also generally alleges that Ford concealed one or more known defects at the time of sale (and thereafter), and affirmatively misrepresented the vehicle's qualities at the time of sale, thereby inducing Plaintiff into the purchase.

13.   All acts of corporate employees as alleged were authorized or ratified by an officer, director or managing agent of the corporate employer.

14.   Each Defendant was the principal, agent (actual or ostensible), or employee of each other Defendant and in acting as such principal or within the course and scope of such employment or agency, took some part in the acts and omissions hereinafter set forth by reason of which each Defendant is liable to Plaintiff for the relief prayed for herein.

## The Basic Design And Operating Principles Of The DPS6 Powershift Transmission

15.   Ford introduced the PowerShift Transmission in its Fiesta and Focus vehicles for the 2011 and 2012 model years, respectively.

16.   Plaintiff's vehicle was manufactured by Ford and delivered to Plaintiff with a PowerShift Transmission. Ford offered the PowerShift Transmission as the sole "automatic transmission" option in Plaintiff's vehicle.

17.   The PowerShift Transmission was designed, with input from Ford, by a German transmission manufacturer (Getrag) in concert with a German manufacturer of clutch components (LuK), and supplied to Ford by Getrag for incorporation as

original equipment into Ford Focus and Fiesta autos. According to Ford, the DPS6 was supposed to provide uninterrupted torque from "twin internal clutches to keep changes among its six forward gears smooth and seamless, automatically. One clutch supports the uneven gearset, one, three and five; while the other clutch controls the even gears, two, four and six. The powertrain control unit that electronically integrates and harmonizes engine and PowerShift automatic transmission operation keeps the engine in peak efficiency range at all times. In conjunction with six optimally spaced gears, PowerShift increases smoothness between gears, without engine torque falling off."

18.     The PowerShift Transmission is neither a traditional manual transmission, nor a typical automatic transmission, but is a computerized "automated manual" transmission.

19.     Traditional manual transmissions use a driver-controlled clutch. By pressing and releasing a foot pedal, the driver causes the clutch to mechanically engage and disengage the engine from the transmission, allowing the vehicle to travel continuously while the driver manually changes gears. The clutch in a traditional manual transmission is a "dry clutch," incorporating at least one clutch disc which is covered with a friction material (asbsestos, carbon fibers, describe material). The clutch disc is fixed to the input shaft of the transmission's gearbox. When the friction material on the face of the clutch disc is pressed against the

engine's rotating flywheel (which is done with a "pressure plate" utilizing strong springs), the clutch disc "locks onto" the flywheel with tremendous force, allowing the engine's flywheel to turn the transmission's input shaft with virtually no slippage or friction loss. Because a dry clutch allows for transfer of virtually all of the engine's power to the transmission without friction losses, a properly designed and operating manual transmission is highly fuel-efficient. However, operation of a manual transmission can be difficult for less experienced drivers, and can result in the vehicle jerking or shuddering during improper operation, manual transmissions are disfavored by some consumers. Moreover, the dry clutch will fail to operate properly if the friction material is contaminated by oil from either the engine or the tranmission's gearbox.

20.     Traditional manual transmissions are characterized by gear ratios that are selectable by locking selected gear pairs to the output shaft within the gearbox. All gears within the gearbox are and must remain lubricated by oil. The gears are arranged on parallel shafts: the input shaft, which is driven by the engine's rotation power transferred by the clutch as discussed above and which must be sealed to prevent gearbox oil from contaminating the dry clutch; and the output shaft, which transmits rotation power out to the vehicle's wheels. (Sometimes a different shaft, known as a countershaft or layshaft, is arranged in parallel alongside the output shaft; in those applications, the layshaft is turned by the input shaft and from there,

-8-

essentially serves as the input shaft for purposes of the gear arrangements and engagements with gears on the output shaft.) The input shaft (or layshaft) and its gears generally rotate at the same speed as the engine when the clutch disc is pressed to the flywheel. Each input shaft gear is enmeshed with companion gears on the output shaft; the gears slide along the shafts, when selected by the driver using the shift lever, to achieve different overall gear ratios for launching from a standstill, lower speeds, higher speeds, and so on. However, because the various pairs of gear sets are not always engaged with each other, shifting requires the gear speeds to be precisely synchronized and can result in difficult gear engagements (particularly for inexperienced drivers or with worn gear sets or worn synchronizers).

21.   In contrast, typical automatic transmissions free the driver from operating the dry clutch through the use of a fluid-filled device called a torque converter. The torque converter is a fluid coupling, in which two turbines oppose each other within a sealed fluid-filled container. The engine is connected to one turbine and the transmission's input shaft is connected to the opposite turbine. When the engine rotates its turbine, the moving and pressurized fluid rotates the opposite turbine causing power to be transferred to the transmission's input shaft. Thus the torque converter substitutes for a dry clutch, transmitting power from the engine to the transmission's input shaft through a fluid medium rather than direct mechanical engagement to the flywheel.

FIRST AMENDED COMPLAINT – PEDANTE V. FORD
UNREDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

22.    Conventional automatic transmissions are characterized by more complicated "planetary gear sets," rather than the parallel gears on shafts as in a typical manual. The conventional automatic transmission's gearbox contains an input shaft with gears (known as "sun gears") that are surrounded by three or four smaller gears (known as "planetary gears"). The planetary gears are held in position relative to each other by a brace (known as a "carrier"). The planetary gears surround and are enmeshed with the sun gear. Meanwhile, the set of planetary gears is itself surrounded by (and each planetary gear is enmeshed with) an outer ring gear. If the sun gear is rotated and the ring gear held stationary, the planetary gears rotate in an orbit around the sun gear, thereby turning the carrier (and anything connected to the carrier). If the sun gear is rotated and the planetary carrier held stationary, the ring gear (and anything connected to that) will rotate around the entire assembly. The arrangements of sun, ring, and planetary gears are moved hydraulically forward and backward along the input shaft, and the different components variously allowed to spin or held stationary, to result in various overall gear ratios. As a result of this arrangement, the gear shifts are typically smoother than (because the sun, planetary, and ring gears are constantly engaged with each other).

23.    Automatic transmissions offer increased comfort and convenience to drivers because the torque converter's fluid coupling transmits power from the engine to the transmission smoothly and predictably, and because the planetary gear

arrangement is more stable and smooth in its operation. Also, there is no need to keep any friction surfaces "dry" or separate from the lubricating transmission fluid. However, conventional automatics are generally less fuel efficient than manual transmissions because the torque converter transfers power through fluid less efficiently than a mechanical dry clutch, and a conventional automatic's hydraulic shifts are not as "positive" as a manual transmission's shifts.

24.    Plaintiff is informed and believes, and thereon alleges, that Ford Motor Company utilizes and has always utilized manual transmissions featuring a dry clutch as described above, and featuring a gearbox housing input and output gears on parallel input and output shafts. Plaintiff is informed and believes, and thereon alleges, that Ford has never, in any instance, equipped any Ford vehicle for sale to the public with a manual transmission that used any different general type of clutch, nor any different general type of gearbox.

25.    Plaintiff is informed and believes, and thereon alleges, that Ford Motor Company utilizes, and at all times prior to 2010 had always utilized, automatic transmissions featuring a torque converter to provide a fluid coupling as described above, and featuring a gearbox housing planetary gear sets as described above, with a few notable exceptions: the continuously variable transmission (CVT) recently developed and used in some Ford vehicles; the dual-dry-clutch transmission used in the $200,000+ Ford GT; the dual-wet-clutch transmission used in some models in

FIRST AMENDED COMPLAINT – PEDANTE V. FORD
UNREDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

the European market; and the PowerShift "automatic" transmission used in Plaintiff's vehicle. Plaintiff is informed and believes and thereon alleges that Ford has never, in any other instance, equipped any Ford vehicle for sale to the public with an "automatic" transmission that used any different general type of power coupling, nor any different general type of gearbox.

26.    Ford marketed and sold its PowerShift Transmission as an automatic transmission that offered the "best of both worlds" combining a manual transmission's fuel economy with an automatic transmission's ease of operation and shift quality.

27.    Ford's PowerShift Transmission, while sometimes referred to as an automatic, is actually a set of computerized manual transmissions. It lacks a torque converter, instead using two clutches to mechanically engage and disengage the engine and transmission. Whereas similar "automated manual" transmissions on the market use "wet" clutches bathed in oil, Ford's PowerShift Transmission clutches lack the oil pumps and other components of a wet clutch system, and instead operate "dry."

28.    Ford incorporated the PowerShift Transmission into Fiesta and Focus autos an effort to meet heightened governmental and consumer expectations for fuel economy, performance, convenience, and efficiency. Ford designed and marketed its PowerShift Transmission as a more advanced and fuel efficient automatic

FIRST AMENDED COMPLAINT – PEDANTE V. FORD
UNREDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

transmission. According to Ford's press release dated March 10, 2010, "PowerShift with dry-clutch facings and new energy-saving electromechanical actuation for clutches and gear shifts saves weight, improves efficiency, increases smoothness, adds durability and is sealed with low-friction gear lubricant for the life of the vehicle. The transmission requires no regular maintenance."

29.   In theory, a computer-controlled, automated manual transmission may provide the convenience of an automatic transmission without sacrificing the fuel efficiency and shift speed of a manual transmission. In practice, however, Ford's PowerShift Transmission is plagued by numerous problems and safety concerns.

## The DPS6 Powershift Transmission Defects

### Overview

30.   The PowerShift Transmission is defective because it suffers from the following safety-related mechanical and electronic failures that arose following the initial launch of the transmission in late 2010 (for the 2011 MY Fiesta) and continuing over a six-year period: Wet Clutch" Shudder Attributed to Leaking Input Shaft Seals, Mechatronic Actuation Module (MAM) Failures, "Dry" Clutch Shudder, Software Calibration Issues (collectively the "Transmission Defects"). These Transmission Defects caused, either individually or together, the following "symptoms" in the DPS6's performance: constant gear slipping, bucking, kicking, jerking, harsh engagement, premature internal wear, sudden acceleration, delayed

FIRST AMENDED COMPLAINT – PEDANTE V. FORD
UNREDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

downshifts, delayed acceleration, difficulty stopping the vehicle, and, eventually, premature transmission failures.

31.     Transmission operating characteristics that cause passenger vehicles to jerk, buck, suddenly lurch forward, delay acceleration, delay deceleration, and/or suddenly lose forward propulsion present a safety hazard – particularly when they occur without warning – because they severely compromise the driver's ability to control the car's speed, position, acceleration (including from a stop), and deceleration.

32.     For example, these conditions make it difficult to safely merge into traffic. Even more troubling, the Transmission Defects can cause the vehicle to fail to downshift and decelerate, but instead continue to transfer power to the transmission and even surge the engine's RPMs, even when the brakes are depressed. As a result, drivers of vehicles equipped with the PowerShift Transmission have reported their vehicles lurching forward into intersections at red lights despite their braking efforts to stop the car.

33.     The Transmission Defects also causes premature wear to the PowerShift Transmission's clutch plates and other internal components, which results in premature transmission failure and requires expensive repairs, including premature transmission replacement.

34.     Almost immediately after it began selling DPS6-equipped autos, Ford

began receiving complaints and other information that the PowerShift Transmission was not working properly or "as advertised." For example, in a 2011 New York Times review of the Ford Focus, the reviewer stated that "Ford programmed the PowerShift Dual-clutch transmission to change gears in odd and infuriating ways" and that "[t]he transmission is often in the wrong gear at the wrong time, resulting in jerks, pauses and lethargic acceleration."

35.     In response to these criticisms, Greg Burgess, an engineer at Ford, conceded in the same New York Times article that "[i]t is quite a challenge to deliver something that is very, very fuel efficient and yet feels like a conventional automatic, and there are some balances and some trade-offs that we make."

36.     In response to complaints about the Transmission Defects, in 2010 and 2011, Ford issued multiple Technical Service Bulletins ("TSBs") to its dealers and authorized repair facilities acknowledging defects in the PowerShift Transmission. Ford's TSB from September 2010, covering the 2011 Ford Fiesta, informed dealers and service personnel of "concerns such as no engagement or intermittent no engagement in Drive or Reverse when shifting from Park to Drive or Reverse, grinding noise during engagement, and/or check engine light with transmission control module (CM) diagnostic trouble code..."

37.     Similarly, Ford's TSB released on January 1, 2011, covering the 2011 Ford Fiesta with the PowerShift Transmission, informs dealers and service personnel

-15-

of problems with the PowerShift Transmission causing "a loss of power, hesitation, surge, or lack of throttle response while driving."

38.   Ford's TSB from March 31, 2011 also covering the 2011 Ford Fiesta, informs dealers of problems where the PowerShift Transmission "exhibit[s] a rattle/grind noise in reverse only."

39.   Ford issued two separate TSBs in May 2011, both covering the Ford Fiesta. These TSBs addressed problems with the PowerShift Transmission including "concerns in Drive or Reverse when shifting from Park to Drive or reverse, no engagement, delayed engagement, intermittent engagement, noise during engagement…"

40.   Another Ford TSB released in September 2011 advised dealers to reprogram the transmission computer if 2011 Ford Fiesta owners complained about "hesitation when accelerating from a low speed after coast down, harsh or late 1-2 upshift, harsh shifting during low-speed tip-in or tip-out maneuvers and/or engine r.p.m. flare when coasting to a stop."

41.   The 2012 Ford Focus was the subject of a September 2011 Ford TSB, which informed dealers and service personnel of transmission problems including: "RPM flare on deceleration coming to a stop, rough idle on deceleration coming to a stop, intermittent engine idle fluctuations at a stop, intermittent vehicle speed control inoperative, intermittent harsh engagement/shift…"

42.   In May of 2012, Ford issued a "Customer Satisfaction Program: Program Number 12B37." In a letter sent to 2012 Ford Focus drivers, Ford indicated that drivers "may experience rough or jerky automatic transmission shifts. In addition, the vehicle may experience roll back when the driver is transitioning from the brake pedal to the accelerator pedal while on a slight incline." Ford, however, did not issue a recall and did not warn drivers of the safety risks associated with these known problems – even though, as alleged below, Ford was obligated to so do.

**Ford Knew, Even Before It Began Selling DPS6-Equipped Autos, That The PowerShift Transmission Was Defective And Unsafe**

43. ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

█████████████████

44. ████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████

45. ████████████████████████████████████████

████████████████████████████████████████████

FIRST AMENDED COMPLAINT – PEDANTE V. FORD
UNREDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL



46.

47.

48.

49.

FIRST AMENDED COMPLAINT – PEDANTE V. FORD
UNREDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL



50.

51.

FIRST AMENDED COMPLAINT – PEDANTE V. FORD
UNREDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL



52.

53.

FIRST AMENDED COMPLAINT – PEDANTE V. FORD
UNREDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL



54.

[8] VGS20386981; RE:Audi VOQ.xls; Johann Kirchoffer; Ford Motor Company;
February 20, 2008.
[9] VGS5-0018100; RE: 58 W Kostal Connector - B299 critical connection; Angela
Krieger; July 7, 2008.

FIRST AMENDED COMPLAINT – PEDANTE V. FORD
UNREDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

55.   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮

56.   As detailed, *infra*, Ford has issued safety recalls on other vehicle models for failure modes that caused a stall or loss of motive power event, including in circumstances when the driver was forewarned.

57.   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮

58.   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

FIRST AMENDED COMPLAINT – PEDANTE V. FORD
UNREDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL



59.

60.

FIRST AMENDED COMPLAINT – PEDANTE V. FORD
UNREDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

**After Beginning to Sell DPS6-Equipped Autos, Ford Received More**

**Information That The Defects In The Transmission Were Dangerous,**

**Reportedly Causing Accidents, Injuries, And At Least One Fatality**

61. ███████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████

62. ███████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████

-24-



FIRST AMENDED COMPLAINT – PEDANTE V. FORD
UNREDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL



65.

66.

FIRST AMENDED COMPLAINT – PEDANTE V. FORD
UNREDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL



67.

68.

FIRST AMENDED COMPLAINT – PEDANTE V. FORD
UNREDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL



69.

FIRST AMENDED COMPLAINT – PEDANTE V. FORD
UNREDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL



FIRST AMENDED COMPLAINT – PEDANTE V. FORD
UNREDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

70.     As a result of one or more of these defects, acting either individually or in combination, the PowerShift Transmissions in Ford Focus and Fiesta autos consistently slip, buck, kick, jerk, harshly engage; and have premature internal wear, sudden acceleration, delay in downshifts, delayed acceleration, create difficulties in stopping the vehicle, and, eventually, premature transmission failure.

71.     The Transmission Defects cause unsafe conditions in vehicles equipped with the PowerShift Transmission, including, but not limited to suddenly lurching forward, delayed acceleration, and sudden loss of forward propulsion (i.e., the "unintended neutral events" referenced above). These conditions present a safety hazard because they severely affect the driver's ability to control the car's speed, acceleration, and deceleration. For example, these conditions make it difficult to safely merge into traffic. Even more troubling, the Transmission Defects can cause the vehicle to fail to downshift and decelerate, but instead continue to transfer power to the transmission and even surge the engine's RPMs, when the brakes are depressed. As a result, drivers of vehicles equipped with the PowerShift Transmission have reported their vehicles lurching forward into intersections at red

---

[34] Ford DPS6-SAC 00045387; RE: QSF do Fiesta – info; Colin Menapace; Ford Motor Company; November 29, 2016.

FIRST AMENDED COMPLAINT – PEDANTE V. FORD
UNREDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

lights due to the failure of their braking efforts to stop the car.

72.    On information and belief, the Transmission Defects also cause premature wear to the PowerShift Transmission's clutch plates and other components, which results in premature transmission failure and requires expensive repairs, including premature transmission replacement.

73.    As early as 2010, Ford knew or should have known that the PowerShift Transmission.

**<u>Despite Knowing That The DPS6 Transmission Had Safety Defects,</u>**

**<u>Ford Falsely And Publicly Represented – To Plaintiff, Other Consumers, And</u>**

**<u>Government Regulators -- That the Problems With the DPS6 Transmission</u>**

**<u>Were Not Safety- Related</u>**

74.    In its official communications with national agencies charged with consumer protection or auto safety, Ford characterized the DPS6's myriad defects as customer satisfaction or transmission quality issues and denied that they had caused any (or only a few) crashes.

75.    ████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████

██████

████████████████████████████

FIRST AMENDED COMPLAINT – PEDANTE V. FORD
UNREDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

76. 

77.

78.

FIRST AMENDED COMPLAINT – PEDANTE V. FORD
UNREDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL



79.

FIRST AMENDED COMPLAINT – PEDANTE V. FORD
UNREDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL



FIRST AMENDED COMPLAINT – PEDANTE V. FORD
UNREDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

83.

FIRST AMENDED COMPLAINT – PEDANTE V. FORD
UNREDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL



84.

85.

86.

FIRST AMENDED COMPLAINT – PEDANTE V. FORD
UNREDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL



87.

88.

89.

FIRST AMENDED COMPLAINT – PEDANTE V. FORD
UNREDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL



90.

91.

92.

[52] VGS20039744; RE: Vehicle located at Hampstead, N.Y. Tom Hamm; May 10, 2011.
[53] VGS7-0059304 Overt Detection and Early Warning of DPS6 Mechatronic Actuation Module (MAM) Issue. Ford Motor Company; 2014.
[54] VGS20149430; DPS6 NG MAM Paper; Jay Richardson; Ford Motor Company; August 13, 2012.

FIRST AMENDED COMPLAINT – PEDANTE V. FORD
UNREDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL



93.

94.

FIRST AMENDED COMPLAINT – PEDANTE V. FORD
UNREDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL



95.

96.

FIRST AMENDED COMPLAINT – PEDANTE V. FORD
UNREDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL



98.

---

[60] FMEA Handbook; Version 4.2; Pg Glossary-2; Ford Motor Company 2011.
[61] VGS7-0163133; 14D; 2010-2015 Multiple Vehicle Lines - DPS6 A/T Mechatronic Actuator Module (MAM) PCB Component Solder Joints Ford Motor Company; March 25, 2015.



99.

100.

FIRST AMENDED COMPLAINT – PEDANTE V. FORD
UNREDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL



101.

102.

103.

FIRST AMENDED COMPLAINT – PEDANTE V. FORD
UNREDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

████████████████████████████████

████████████████████████████████

██████

104.   In July 2017, the Australian Competition and Consumer Commission initiated proceedings against Ford, "alleging that it engaged in unconscionable and misleading or deceptive conduct, and made false or misleading representations in its response to customer complaints." Specifically, the ACCC alleged that Ford consistently "lied to its customers about the nature of the defect – blaming it on their driving styles, rather than the transmission. About 35,000 vehicles sold in Australia had at least one repair relating to the DPS6 transmission, yet, Ford refused to provide a refund or replacement vehicle to consumers, even after multiple repairs did not fix the issues. In most cases, Ford only provided replacement vehicles in accordance with its "PowerShift Ownership Loyalty Program," which required consumers to make a significant payment [$7,000] towards a replacement vehicle."[67]

105.   In April 2018, Australia's Federal Court ordered Ford to pay a (AUS) $10 million fine for "unconscionable conduct." In addition, Ford had to establish a program to review customer requests for refunds or replacement vehicles made

---

Customer Satisfaction Program 14M02; Ford Motor Company; February 20, 2015; Customer Satisfaction Program 15B22; Ford Motor Company; August 4, 2015.
[67] ACCC takes action against Ford; press release; Australian Competition & Consumer Commission; July 27, 2017.

FIRST AMENDED COMPLAINT – PEDANTE V. FORD
UNREDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

between May 1, 2015 and November 1, 2016, and to provide customers with access to more information about their cars, including the history of manufacturing defect repairs performed on their vehicles.[68]

106.   In 2018, Ford was forced in a civil trial in Thailand to compensate 291 Focus and Fiesta owners for selling substandard vehicles. In the country's first verdict in a class-action ruling, the South Bangkok Civil Court ordered Ford Sales & Service to pay between 20,000 and 200,000 baht each, plus a 7.5% interest rate a year, for repair costs and lost time. "The award was for the production of unsafe, substandard and defective vehicles which put drivers at risk."[69]

### Ford Failed To Comply With Its Regulatory Obligations And Reporting Responsbilities

107.   As a global automaker, Ford is aware of its safety recall obligations under controlling U.S. law; and has issued safety recalls for vehicles with defects that cause unintended stalls.

108.   This controlling U.S. law includes, but is not limited to, Title 49, section 573 of the Code of Federal Regulations, entitled, "Defect and Noncompliance Responsibility and Reports," sets forth the obligations and

---

[68] Court orders Ford to pay $10 million penalty for unconscionable conduct; press release; Australian Competition & Consumer Commission; April 26, 2018.
[69] Ford Thailand Ordered to Compensate Focus and Fiesta Owners for Selling Substandard Vehicles; Chiang Raj Times; September 22, 2018.

-45-

responsibilities of motor vehicle manufacturers such as Ford under 49 U.S.C. §§
30116-30121 (a portion of the National Traffic and Motor Vehicle Safety Act)
regarding safety-related defects and noncompliance with Federal Motor Vehicle
Safety Standards (FMVSSs).[70] Among those obligations are reporting requirements
to the National Highway Traffic Safety Administration ("NHTSA") to inform the
agency of defective and noncomplying vehicles and equipment, and to allow
NHTSA to assess the adequacy of manufacturers' defect and noncompliance
notification campaigns, of the corrective action, the owner response, and to compare
the defect incidence rate among different groups of vehicles.[71] Manufacturers are
required to furnish a report to NHTSA "for each defect in his vehicles or items of
original or replacement equipment that be or the Administrator determines to be
related to motor vehicle safety, and for each noncompliance with a motor vehicle
safety standard in such vehicles or items of equipment which either be or the
Administrator determines to exist."[72]

109.   Further, under the Motor Vehicle Safety Act, 49 U.S.C. 30101, "motor
vehicle safety" is defined in relation to NHTSA's enforcement and regulatory
authority as the "the performance of a motor vehicle or motor vehicle equipment in a
way that protects the public against unreasonable risk of accidents occurring because

---

[70] 49 CFR § 573.
[71] 49 CFR § 573.2.
[72] 49 CFR § 573.6.

FIRST AMENDED COMPLAINT – PEDANTE V. FORD
UNREDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

of the design, construction, or performance of a motor vehicle, and against unreasonable risk of death or injury in an accident, and includes nonoperational safety of a motor vehicle."[73] This regulation sets a "5 working day" deadline for a manufacturer to make such notification:

> Each report shall be submitted not more than 5 working days after a defect in a vehicle or item of equipment has been determined to be safety related, or a noncompliance with a motor vehicle safety standard has been determined to exist.[74]

110.   Plaintiff is informed and believes, and on that basis alleges, that Ford violated this reporting requirement by failing to report the safety-related defects, accidents, incidents and other matters alleged above to NHTSA within the mandatory five working day period.

111.   Moreover, Ford consciously avoided a recall of the DPS6 transmission by claiming to several governmental authorities around the globe, including NHTSA, that the DPS6 transmission's multiple malfunctions only amounted to "customer satisfaction issues" and had not been linked to crashes, injuries and fatalities.

112.   Ford understood its obligations under federal regulations to report these safety defects to the NHTSA, but rather than comply with federal law, Ford instead created a false narrative to NHTSA to forego a safety recall by focusing on

---

[73] 49 USC § 30102(a)(9).
[74] 49 CFR § 573.6.

-47-

improving the warning to customers before an impending transmission failure.

113.    Ford has two divisions devoted to ensuring that its products meet all Federal Motor Vehicle Safety Standards and regulatory responsibilities – the Automotive Safety Office (ASO) and the Office of the General Counsel (OGC). According to Ford: "The Automotive Safety Office Serves as primary interface with organizations that deal with vehicle safety and defect/compliance matters and contributes technical advice to government agencies regarding safety rulemaking. We also provide technical analysis related to field performance of Ford vehicles."[75] In addition, Ford's Office of General Counsel "interfaces with regulatory agencies, including EPA, NHTSA, EEOC and state attorneys general."[76] Further, in Ford's 2014 Corporate Sustainability Report, Ford demonstrates its knowledge of its obligations under the Safety Act:

> In the U.S., the National Traffic and Motor Vehicle Safety Act of 1966 (the "Safety Act") regulates vehicles and vehicle equipment in two primary ways. First, the Safety Act prohibits the sale in the United States of any new vehicle or equipment that does not conform to applicable vehicle safety standards established by the National Highway Traffic Safety Administration (NHTSA). Second, the Safety Act requires that defects related to motor vehicle safety be remedied through safety recall campaigns.

---

[75] Ford Automotive Safety Office;
https://corporate.ford.com/careers/departments/sustainability-environment-and-safety-engineering.html
[76] Ford Office of the General Counsel;
https://corporate.ford.com/careers/departments/office-of-the-general- counsel.html

FIRST AMENDED COMPLAINT – PEDANTE V. FORD
UNREDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

Manufacturers are obligated to recall vehicles if they determine the vehicles do not comply with a safety standard or contain a defect affecting safety.[77]

114. 

115.

---

[77] 2014-15 Ford Sustainability Report.

116. ████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
██████████████████████████████

117. ██████████████████████████████████
████████████████████████

████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████

118. ████████████████████████████████████

████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████

FIRST AMENDED COMPLAINT – PEDANTE V. FORD
UNREDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL



119.

120.

FIRST AMENDED COMPLAINT – PEDANTE V. FORD
UNREDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL



121.

122.

[83] VGS20020225; RE: P2832 & P2837 Back Ground Info On Shift Drum Reference; Piero Aversa; Ford Motor Company; March 2, 2013.

FIRST AMENDED COMPLAINT – PEDANTE V. FORD
UNREDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL



123.

124.

125.

FIRST AMENDED COMPLAINT – PEDANTE V. FORD
UNREDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

126.   Ford knew from years of experience of working with the NHTSA that the agency tended to evaluate the recall potential for a defect that caused an engine stall or a loss of motive power, based on whether the particular condition gave the driver any warning of the impending stall and whether the driver could quickly recover motive power.

127.   The NHTSA's position has its roots in a 1986 study commissioned by the U.S. Department of Transportation Research and Special Programs Administration. The Transportation Systems Center issued a report which attempted to identify "patterns which could yield insight concerning the safety implications of

[87] VGS20415045; Alan Draper Letter; Ford Motor Company; March 10, 2014.

-54-

stalling," "high-risk stalling situations;" and "high-risk vehicles/components."[88] The researchers looked at complaints, calculated crash rates and compared these data to a sample of investigations which resulted in recalls or were closed with no findings. The researchers also analyzed a sample of the crash reports "to determine which vehicle characteristics and stalling circumstances were related to serious safety problems."[89]

128.   The researchers concluded that stalling incidents that occur without warning, at high speeds, or upon acceleration are associated with stalling-related accidents more frequently than other types of stalling problems. For example, loss of power steering or brakes due to stalling is cited as a common accident cause.[90] In cases of a total loss of control, nearly half were involved in accidents. In addition, the 4.8 percent of drivers who had no warning of the stalling incident before it occurred were involved in accidents approximately 13 times more other than those

---

[88] Analysis of Stalling Problems; Simon Prensky; Pg. ii; U.S. Department of Transportation Research and Special Programs Administration Transportation Systems Center; November 1986.

[89] Analysis of Stalling Problems; Simon Prensky; Pg. ii; U.S. Department of Transportation Research and Special Programs Administration Transportation Systems Center; November 1986.

[90] Analysis of Stalling Problems; Simon Prensky; Pg. ii; U.S. Department of Transportation Research and Special Programs Administration Transportation Systems Center; November 1986.

FIRST AMENDED COMPLAINT – PEDANTE V. FORD
UNREDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

who had some warning prior to their stalling incident.[91]

129. 

130.

[91] Analysis of Stalling Problems; Simon Prensky; Pg. ii; U.S. Department of Transportation Research and Special Programs Administration Transportation Systems Center; November 1986.

-56-



131.

132.

FIRST AMENDED COMPLAINT – PEDANTE V. FORD
UNREDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

[REDACTED]

**Ford Has Conducted Safety Recalls As To Defects That Caused Stalls Virtually Identical To The Unintended Unneutral Events That Make DP6-Equipped Focus And Fiesta Autos Dangerous**

133.   Ford is "on notice," due to it history of selling defective vehicles and regulatory enforcement actions and court proceedings, that it is legally required to recall vehicles that suffer from unintended neutral/loss of motive power/stall condition events.

134.   In the last 15 years, Ford has launched seven (7) such recalls – including four between 2012 and 2016, the same period in which Ford avoided recalls for unintended neutral/loss of motive power conditions caused by the DPS6

[REDACTED]

FIRST AMENDED COMPLAINT – PEDANTE V. FORD
UNREDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

transmission.

135.   In 2003, Ford became the only automaker to issue a <u>judicially ordered</u> recall for a stalling condition, after two decades of failed NHTSA investigations. From 1982 to 1997, the NHTSA investigated ignition module failures, but Ford misled the agency for years about the causes of stalling (affecting multiple models and model years) with no consequences to the company. In the absence of accurate information from Ford, NHTSA's Office of Defect Investigations ("ODI") was unable to identify the failure. Thus, the ignition defect bears the distinction of being the first court-ordered recall outside of the NHTSA.

136.   The ignition module defect caused loss of power similar to that affecting the DPS6 equipped vehicles. Ford's ignition system[99] was heat- sensitive, yet Ford placed it in the hottest location under the hood; at certain temperatures the module would cut out, causing the vehicle to stall at highway speeds.[100] After four years Ford's warranty data showed that the return rate far exceeded projections, but many of the returned parts did not exhibit the failure mechanism because, once cooled down, the component would resume working. Ford eventually identified the

---

[99] The "trouble not identified" phenomenon in automotive electronics; Dawn Thomas, et al; Microelectronics Reliability; January 23, 2002.
[100] The "trouble not identified" phenomenon in automotive electronics; Dawn Thomas, et al; Microelectronics Reliability; January 23, 2002.

problem, but failed to act on its knowledge.[101]

137. The NHTSA launched five investigations but could not definitively isolate a root cause of the stalling, in part because Ford withheld documents that would have shown the effect of thermal stress on the ignition modules resulted in stalling, instead of a range of drivability issues.

138. In 1987, the NHTSA examined the stalling issue in 2.6 million 1983 through 1986 Escort, Tempo, Mustang, LTD, Thunderbird, EXP, Cougar, Topaz, Capri, Merkur, Lynx and Marquis vehicles equipped with 1.6 liter or 2.3 liter engines. The NHTSA's Office of Defects Investigation investigated based on 33 stalling complaints; Ford located another 1,819 field reports and 649 complaints, but it combined different complaints into one pool of "failure to start the engine, poor engine performance and engine stalling."[102]

139. Ford cast it as a drivability issue: "As we have stated to the agency in the past, today's engine and emission system controls have become very intricate and the diagnoses of drivability and/or stalling conditions have likewise become very difficult."[103]

---

[101] The "trouble not identified" phenomenon in automotive electronics; Dawn Thomas, et al; Microelectronics Reliability; January 23, 2002.
[102] PE87-028; Opening Letter; National Highway Traffic Safety Administration; May 12, 1987.
[103] PE87-028; Closing Resume; National Highway Traffic Safety Administration; May 1, 1987; PDF pg. 11.

FIRST AMENDED COMPLAINT – PEDANTE V. FORD
UNREDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

140.   Both Ford and NHTSA conceded that the ignition module was to blame:

> Clearly evident is the fact that Ford experienced a massive engine controllability problem with the introduction of a new thick film ignition module (TFI) in the 1.6 and 2.3 liter engines…Ultimately, Ford engineers identified the root cause of the problem to be thermal fatigue of the TFI ~ transistor assembly and integrated circuit failures which were aggravated by elevated engine compartment temperatures and by thermal cycling.[104]

141.   But Ford misled the NHTSA about the scope of the problem and oversold its ability to resolve the issue.[105]

142.   A class action lawsuit on behalf of Ford owners prompted the NHTSA to open a sixth investigation in 1997, which revealed that Ford had failed to produce documents to the agency. By then, the eight-year statute of limitations on recalls had passed, and the civil penalties the agency could have imposed were low.[106] In 1999, the lawsuit ended in a hung jury, but resulted in a judicially ordered recall. Ford eventually settled the litigation in 2003 by doubling the component's warranty.

143.   Another recall also illustrates Ford's refusals to accept responsibility for loss of power problems. In April 2004, a NHTSA probe forced Ford to recall 321,903 2001-2003 Escape vehicles for a condition in which a fuel-rich mixture

[104] PE87-028; Closing Resume; National Highway Traffic Safety Administration; May 1, 1987; PDF pg. 11.
[105] Howard v. Ford' Plaintiff's Opening Trial Brief; Phase Two; June 12, 2000.
[106] Lawsuit Asserts Ford Knowingly Installed Defective Mechanism in Millions of Vehicles; Tim Golden; The New York Times; September 6, 1997.

could cause the vehicles to stall during decelerations at speeds below 40 mph.[107] In its Part 573 Notice of Defect and Noncompliance, Ford argued that the vehicles were still controllable and re-started immediately:

> Ford's investigation found that the vehicles remained controllable after such engine stalls and can readily be maneuvered off the roadway. Further, the vehicles typically restart immediately, and some owners reported starting their vehicle without coming to a stop coming to a stop. While it may be argued that stalling under certain conditions may increase the risk to safely, the stalling characteristics in this population of vehicles do not pose an unreasonable risk of accident or injury. The reports in this investigation clearly bear this out....Ford does not, by taking this action, admit that a safety defect exists in these vehicles nor does Ford believe that engine stalling presents an unreasonable risk to motor vehicle safety. Ford Believes that the agency should update its earlier study of engine stalling as a sequel to the earlier "Analysis of Stalling Problems," sponsored by The Transportation System Center.[108]

144.    In June 2005, Ford recalled 180,104 Ford F-SuperDuty, Excursion, and E-Series vehicles from the 2004-2005 model years, equipped with 6.0l diesel engines, for reported engine stalling to address two wiring related conditions, specifically that the FICM wire harness chafing or improper ICP sensor connector crimps could cause the vehicle to stall without warning, with no re-start.[109] Ford argued that the stalling hadn't caused any injuries or crashes:

---

[107] Recall 04V165; Notice of Defect and Noncompliance; Ford Motor Company; April 5, 2004.

[108] Recall 04V165; Notice of Defect and Noncompliance; Ford Motor Company; April 5, 2004.

[109] Recall 05V270; Notice of Defect and Noncompliance; Ford Motor Company; June 7, 2005.

Ford's investigation has demonstrated that the reported stalling incidents in the affected vehicles do not present an unreasonable risk to safety. The vehicles remain controllable in the event of stalling. Real world performance, with virtually no accidents or injuries, supports our analysis. Nonetheless, to address customer satisfaction concerns and to avoid prolonged discussions with the agency, we are conducting this recall.[110]

145.   In January 2012, the NHTSA compelled Ford to recall 205,896 2004 and 2005 model year Ford Freestar and Mercury Monterey vehicles for problems that cause torque converter malfunctions and engine stalls. In its responses to an agency investigation, Ford laid out all of the same "controllability" arguments against a finding of a safety defect: According to Ford, the vehicle "remains readily controllable; the vehicle will coast during which it can be safely maneuvered and stopped because the engine continues to run. Because the engine continues to run, steering and braking are unaffected, and the vehicle's electrical system and directional signals remain functional. Further, the transmission park system remains fully functional. At that time only one ambiguous, alleged minor accident involving a vehicle trailing behind the Freestar was identified with no alleged injuries."[111] Ford eventually launched a recall to "avoid a protracted dispute with the agency."[112]

146.   In October 2013, Ford recalled 2,456 Focus Electric vehicles (model

---

[110] Recall 05V270; Notice of Defect and Noncompliance; Ford Motor Company; June 7, 2005.

[111] Recall 12V006; Defect and Noncompliance Notice; January 9, 2012.

[112] Recall 12V006; Defect and Noncompliance Notice; January 9, 2012.

-63-

years 2012-2014) for a failure of the Power Control Module. The defect caused "a sudden loss of motive power while driving, increasing the risk of a crash."[113] Drivers received warning in the form of "a red triangle indicator and the message 'Stop Safely Now' in the instrument cluster." Ford's Part 573 Recall Notice further stated that other safety-critical functions – "vehicle brake and steering systems will continue to operate normally and vehicle can often be restarted after going through a shutdown process."[114] According to the chronology Ford filed with its Part 573, Ford's Critical Concern Review Group initially wanted to pass off the issue as a customer satisfaction matter – despite 16 reports of "Focus Electric vehicles experiencing loss of mobility accompanied by a "Stop Safely Now" message in the instrument cluster." However, after the NHTSA opened a preliminary evaluation (PE13-031) into the issue as it affected 2012-2013 Focus Electric vehicles, the CCRG found additional reports and recommended a recall in October 2013.[115]

147.   In 2016, Ford recalled 865 Focus Electric vehicles (2015-2016 modely years) because increased friction and excessive wear of a certain gear shaft could result in overheating and eventual fracture of the shaft or pinion gears. This could lead to loss of motive power while driving and loss of the transmission park function without warning, increasing the risk of a crash." Ford claimed it was not aware of

---

[113] Recall 13V523; Defect and Noncompliance Notice; October 21, 2013.
[114] Recall 13V523; Defect and Noncompliance Notice; October 21, 2013.
[115] Recall 13V523; Defect and Noncompliance Notice; October 21, 2013.

FIRST AMENDED COMPLAINT – PEDANTE V. FORD
UNREDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

any warranty reports, accidents or injuries related to the defect.[116]

148.   In August 2016, Ford recalled 77,502 2013-2015 Ford Taurus and 2013-2015 Ford Taurus Police Interceptor, Lincoln MKS and MKT vehicles, due to the malfunction of a component within the fuel Pump Electric Module (PEM) caused by elevated temperatures within the module. "Malfunction of the fuel PEM may result in an open circuit causing a loss of electrical power to the fuel pump. If this occurs, the customer may experience an engine no start or an engine stall. In some cases, the engine may stall without warning or the ability to restart."[117]

149.   In October 2018, Ford recalled more than 1.2 million 2012-2018 Ford Focus vehicles due to a malfunctioning Canister Purge Valve (CPV) that can stick open and a Powertrain Control Module (PCM) software that does not adequately detect a stuck-open CPV.[118] In its Defect and Noncompliance notice, Ford noted that a stuck CPV "can cause excessive vacuum in the fuel vapor management system, potentially deforming the fuel tank. If this occurs, the customer may observe a Malfunction Indicator Light (MIL), inaccurate or erratic fuel gauge indication, drivability concerns or loss of motive power."

150.   In the case of the DPS6 Transmission, as in those prior cases, Ford actively concealed from the NHTSA its knowledge about the extent of the safety-

---

[116] Recall 16V479; Defect and Noncompliance Notice; June 27, 2016.
[117] Recall 16V621; Defect and Noncompliance Notice; August 22, 2016.
[118] Recall 18V735; Defect and Noncompliance Notice; October 22, 2018.

FIRST AMENDED COMPLAINT – PEDANTE V. FORD
UNREDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

related problems, and about the total number of crashes and injuries associated with the multiple DPS6 Transmission Defects. Ford took this course – not guided by engineering safety concerns – but out of political expediency with its supplier Getrag, and concerns about the enormous costs in delivering an effective repair or initiating a buyback program.

### Ford Had Exclusive Knowledge of the Transmission Defects, And Failed To Disclose, And Fraudulently Concealed, This Information.

151. Ford had superior and exclusive knowledge of the Transmission Defects with respect to consumers, and Ford knew or should have known that the Transmission Defects were not known or reasonably discoverable by consumers before purchase or lease of the affected Focus and Fiesta autos.

152. Since at least 2010, Ford has known about the Transmission Defects through sources not available to consumers, including Ford's pre-release testing data, early consumer complaints to Ford and its dealers about the Transmission Defects, testing conducted by Ford in response to those complaints, Ford's internal data showing high failure rates and replacement part sales, aggregate data from Ford dealers, and other Ford-proprietary sources of aggregate information about the problem including, but not limited to, similar defects in the substantially identical models sold overseas.

153. Ford knew about, and and a matter of business practice, failed to

disclose and concealed, the Transmission Defects present in the DPS6-equipped Focus and Fiesta autos, along with the Transmission Defects' dangerous safety and drivability problems, from consumers at the times of sale, repair, and thereafter. In fact, instead of repairing defects in the PowerShift Transmission, Ford frequently either refused to acknowledge their existence or performed superficial and ineffectual software upgrades that simply masked the symptoms of the Transmission Defects.

154.   The existence of the Transmission Defects is a material fact that a reasonable consumer would consider when deciding whether to purchase or lease a vehicle equipped with a PowerShift Transmission.

155.   Ordinary consumers reasonably expect that a vehicle's transmission is safe, will function in a manner that will not pose a safety hazard, and is free from manufacturing defects. Ordinary consumers further reasonably expect that a car manufacturer will not sell or lease vehicles with known safety defects, such as the Transmission Defects, and will disclose any such defects to its consumers when it learns of them. They would not expect Ford to fail to disclose the Transmission Defects to them and to continually deny the defect.

**Ford's Failure to Disclose the PowerShift Transmission Defects**

156.   Ford has never disclosed the PowerShift Transmission Defects to consumers prior to their purchases or leases of affectred vehicles, nor at any point

-67-

during their ownership of such vehicles, and Ford has never instructed its dealerships to disclose the PowerShift Transmission Defects to potential purchasers or lessees of vehicles equipped with the PowerShift Transmission.

157.   The PowerShift Transmission defect was not known or reasonably discoverable by ordinary consumers before purchase or lease, or without experiencing the defect firsthand and exposing themselves to an unreasonable safety risk.

158.   Ford has remained silent publicly even as it issued service bulletins, conducted internal investigations, and witnessed the increasing failures of the DPS6 Transmission in its vehicles domestically and abroad.

159.   Ford's refusal to publicly acknowledge the defect has created widespread confusion. Ford's failure to notify consumers, dealerships, or auto-technicians prevents PowerShift Transmission problems from being efficiently diagnosed. Drivers are led to believe that the problems they are experiencing are actually "normal characteristics" of the PowerShift Transmission. Likewise, the lack of information makes it less likely that dealerships and auto-technicians will be able to diagnose and fix the PowerShift Transmission Defects, or advise a consumer about the dangers of driving the affected vehicle.

160.   As a result of Ford's inaction and silence, consumers were entirely unaware that they had purchased, and were continuing to drive, an unsafe and

-68-

unreliable vehicle. As Ford knows, a reasonable person would consider the PowerShift Transmission Defects important and would not purchase or lease a vehicle equipped with the PowerShift Transmission were its defects disclosed in advance, or would pay substantially less for the vehicle.

### Ford Has Actively Concealed the Transmission Defects

161.   As a result of the Transmission Defects, Ford was inundated with complaints regarding the PowerShift Transmission. In July 2011, Ford implemented a communications strategy intended to minimize certain behavior of the PowerShift Transmission in order to "improve customer expectations." In a memo with instructions sent to Ford dealers and service personnel, which Ford intended its dealers and service personnel to rely on in their communications to consumers, Ford noted that "PowerShift optimizes fuel efficiency with up to 40MPG and driving dynamic 'Fun to Drive' performance." It further noted, "The PowerShift is really like two 3-speed manual transmissions put together, with the freedom of operating a clutch as the components are controlled electronically. Since most of the components are derived from a manual transmission, the PowerShift transmission will drive, sound, or feel like a manual transmission only the driver does not have to shift gears."

162.   Some of the common and "normal characteristics" of the PowerShift Transmission were listed as "double clicking metal sounds ... of gears shifting and

synchronizers (similar to a manual transmission);" a "slight gear whine while slowing or coasting," and "a reverse trailer hitching feel (or a slight bumping feel) … at about 2MPH." Ford also advised its dealers about low speed grinding, reverse gear whine, and "Green Clutches" which can "lead to a rattle noise" and "a take-off shudder / launch judder (shaky vs. smooth)." According to Ford, the shudder would become "progressively better … as the clutch breaks-in."[119]

163.   However, despite Ford's public insistence that these performance problems with the PowerShift Transmission were normal, in 2010 and 2011, Ford issued several TSBs to its dealers in the United States acknowledging defects in the PowerShift Transmission. Ford's TSB from September 2010, covering the 2011 Ford Fiesta, informs dealers how to address and attempt to repair the PowerShift Transmission in response to "concerns such as no engagement or intermittent no engagement in Drive or Reverse when shifting from Park to Drive or Reverse, grinding noise during engagement, and/or a check engine light with transmission control module (TCM) diagnostic trouble code…"

164.   Ford's TSB released on January 1, 2011, covering the 2011 Fiesta with the PowerShift Transmission, informs dealers of problems with the PowerShift Transmission causing "a loss of power, hesitation, surge, or lack of throttle response while driving."

---

[119] VGS21630260, EFC000562DC, Ford Motor Company, July 25, 2011.

FIRST AMENDED COMPLAINT – PEDANTE V. FORD
UNREDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

165.   Ford's TSB from March 31, 2011, also covering the 2011 Ford Fiesta,
informs dealers of problems where the PowerShift Transmission "exhibit[s] a
rattle/grind noise in reverse only."

166.   Ford issued two separate TSBs in May 2011, both covering the Ford
Fiesta. These TSBs addressed problems with the PowerShift Transmission including
"concerns in Drive or Reverse when shifting from Park to Drive or reverse, no
engagement, delayed engagement, intermittent engagement, noise during
engagement…"

167.   On information and belief, another Ford TSB released in September
2011 advised dealers to reprogram the transmission computer if 2011 Fiesta owners
complained about "hesitation when accelerating from a low speed after coast down,
harsh or late 1-2 upshift, harsh shifting during low-speed tip-in or tip-out maneuvers
and/or engine r.p.m. flare when coasting to a stop."

168.   The 2012 Ford Focus was the subject of a Ford TSB in September
2011, which informed dealers of transmission problems including: "RPM flare on
deceleration coming to a stop, rough idle on deceleration coming to a stop,
intermittent engine idle fluctuations at a stop, intermittent vehicle speed control
inoperative, intermittent harsh engagement/shift…"

169.   In December of 2011, *Motor Trend* magazine called these efforts by
Ford a "stealth upgrade" and noted that while "[t]here's no official recall or service

campaign… anybody who complains or requests an upgrade at the dealership can have their powertrain control computer re-flashed."

170.   On information and belief, the software upgrades recommended and encouraged by the various TSBs issued by Ford were completely ineffective at addressing the Transmission Defects.

171.   When consumers present vehicles equipped with the PowerShift Transmission to an authorized Ford dealer for repair to the transmission, rather than inform consumers of the Transmission Defects or conclusively repair the problem under warranty, Ford's dealers and authorized repair facilities either inform consumers that their vehicles are functioning properly, or perform superficial and ineffectual software updates that delay or mask the manifestation of the Transmission Defects in an attempt to avoid more comprehensive and expensive repairs or replacements under the warranty.

172.   To this day, Ford still has not publicly acknowledged that the Powershift Transmission suffers from a systemic defect or defects, that cause(s) the transmission to malfunction.

## **PLAINTIFFS CLAIMS ARE TIMELY AND NOT BARRED BY UNDER LAW OR EQUITY**

### **All Statute of Limitations Periods are Tolled by the Discovery Rule and by the Doctrine of Fraudulent Concealment**

FIRST AMENDED COMPLAINT – PEDANTE V. FORD
UNREDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

173.   Ford misrepresented the qualities of the transmission in the Vehicle to Plaintiff at the time of the sale of the vehicle. Ford also concealed the fact that the transmission was defective.

174.   Ford continued to misrepresent its ability to repair the vehicle in conformity with the warranty throughout the warranty period.

175.   At all relevant times, Ford was aware of the defects in the Powershift transmission.

176.   As described in more detail above, as early as 2010, Ford began issuing significant technical service bulletins to its authorized dealers explaining the widespread issues with the Powershift transmission. At no point prior to the sale of the vehicle to Plaintiff or during Plaintiff's ownership of the Vehicle did Ford or an authorized dealer ever inform Plaintiff of the ongoing defect or the fact that Plaintiff's Vehicle was not actually equipped with an automatic transmission.

177.   Ford had a duty to disclose the concealed facts alleged above because Ford knew that Plaintiff did not know a material fact and further knew that such facts were not readily accessible to the Plaintiff because Ford actively concealed those facts.

178.   Ford had a duty to disclose the concealed facts alleged above because Ford made misrepresentations in its marketing materials and window stickers and through its authorized sales representatives about the quality, characteristics, and

-73-

safety of the Powershift transmission.

179.   Ford had a duty to disclose the concealed facts alleged above because Ford actively concealed material facts in order to induce a false belief.

180.   Ford intended for Plaintiff to rely on those misrepresentations to conceal the fact that the defective Powershift Transmission could not be repaired.

181.   Prior to the sale of the Vehicle, and at all times thereafter, Defendant therefore failed to disclose the existence of the vehicle's inherent defects to Plaintiff, and Defendant failed to disclose its inability to repair these inherent defects, which prevented the Vehicle from conforming to its applicable warranties. In effect, after the sale of the Vehicle, Defendant fraudulently concealed from purchasers, including Plaintiff, the fact that the dealers were not properly repairing the defects to the Powershift transmission, and knew that the limited work that Ford had authorized its dealerships to perform on those vehicles would not properly repair them. Ford also continued to conceal the fact that Plaintiff's vehicle was not in fact equipped with an automatic transmission as advertised.

182.   On or around March 27, 2015, in response to complaints about the Transmission Defects to date, Ford issued a TSB to its dealers and authorized repair facilities acknowledging defects in the PowerShift Transmission. Ford's March 27, 2015 TSB, covering the 2013 Ford Focus, informed dealers and service personnel that "FORD 2011-2014 MODEL YEAR FIESTA AND FOCUS VEHICLES

EQUIPPED WITH A DPS6 AUTOMATIC TRANSMISSION WILL EXPERIENCE, ON LIGHT ACCELERATION, CLUTCH SHUDDERING." Ford's March 27, 2015 TSB states, *unequivocally*, that the Vehicle's transmissions will experience transmission shudder on acceleration. This was the earliest known date that Ford made any attempt to notify Plaintiff through Ford's authorized repair technicians of any of the known defects in the transmission or the implication that the vehicle's transmission was problematic. This date was the earliest date that Plaintiff could have had any sort of notice of the facts which give rise to Plaintiff's fraud causes of action. Ford did not disclose any of this information prior to the sale of the vehicle to Plaintiff or at any earlier date during ownership. Accordingly, Plaintiff could not have discovered Plaintiff's claims prior to March 27, 2015. Plaintiff could not, despite reasonable and diligent investigation, have discovered such on an earlier date because of Ford's fraudulent misrepresentations and concealment of the defects in the PowerShift transmission in Plaintiff's vehicle, as previously alleged above. Additionally, the repeated false assurances of Ford and its service dealership agents made to Plaintiff, on which Plaintiff reasonably relied, that Ford had and would repair any problems with the transmission in Plaintiff's vehicle that occurred during the express warranty period and that the Vehicle and that said problems would not be repeating further delayed Plaintiff's discovery of his claims. The statute of limitations for each of Plaintiff's claims against Ford was therefore

tolled under the delayed discovery rule and the doctrine of fraudulent concealment until Plaintiff could have first discovered on or around March 27, 2015, that Ford had misrepresented the characteristics of the transmission and concealed the known defects during the ownership of the Vehicle.

183.   Because Ford failed to disclose these foregoing facts to Plaintiff, all statute of limitations periods with respect to sale of the Vehicle were tolled by the doctrines of fraudulent concealment, the discovery rule, and/or equitable tolling. As alleged herein, Ford wrongfully concealed the fact (1) that the Vehicle was equipped with a manual transmission (the PowerShift transmission), and (2) that its dealerships were making inadequate repairs that were incapable of addressing the root cause of the Vehicle's malfunctions.

184.   Plaintiff did not discover the operative facts that are the basis of the claims alleged herein because the facts were concealed in confidential and privileged documents, which a consumer would not know about and could not obtain.

185.   No amount of diligence by Plaintiff could have led to the discovery of these facts because they were kept secret by Ford and, therefore, Plaintiff was not at fault for failing to discover these facts.

186.   Plaintiff did not have actual knowledge of facts sufficient to put them on notice. Plaintiff did not know, nor could have known, about Ford's inability to repair the defects in its PowerShift transmission because, as alleged above, Ford kept

FIRST AMENDED COMPLAINT – PEDANTE V. FORD
UNREDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

this information highly confidential, and its dealership assured Plaintiff that its repairs were effective.

### All Statute of Limitations are Tolled by the Tolling Doctrine Established in *American Pipe & Construction Co. v. Utah* (1974) 414 U.S. 538 As a Result of the Class Action *Vargas v. Ford Motor Company*

187.   Plaintiff gave timely notice of Plaintiff's claims against Ford in the present action as putative class members in a class action, *Vargas v. Ford Motor Company*, United States District Court, Central District of California, Case No. 2:12-cv-08388 ABC (FFMx), which was filed on September 28, 2012. That action was filed within three years of the date of Plaintiff's discovery of their claims against Ford in the present action, as previously described in detail above.

188.   There is no prejudice to Ford in gathering evidence to defend against Plaintiff's individual claims because the class definition in the class action complaint within which Plaintiff were putative class members and the allegations in the class action lawsuit, *Vargas v. Ford Motor Company*, United States District Court, Central District of California, Case No. 2:12-cv-08388 ABC (FFMx), put Ford on notice of the facts that give rise to Plaintiff's individual action, the witnesses necessary for Ford to defend Plaintiff's individual action, and the causes of action against Ford asserted in Plaintiff's individual action.

189.   *Vargas v. Ford Motor Company*, United States District Court, Central

-77-

District of California, Case No. 2:12-cv-08388 ABC (FFMx) alleged the material

facts on behalf of Plaintiff as putative class members as are being alleged by

Plaintiff in the present individual action.

190.   The facts alleged in *Vargas v. Ford Motor Company*, United States

District Court, Central District of California, Case No. 2:12-cv-08388 ABC (FFMx)

are substantially similar, if not identical to the facts alleged herein.

191.   The allegations in *Vargas v. Ford Motor Company*, United States

District Court, Central District of California, Case No. 2:12-cv-08388 ABC (FFMx)

are based on the same subject matter and similar evidence as the instant complaint.

Those allegations concern the same evidence, memories, and witnesses as the

subject matter in the instant complaint.

192.   The *Vargas* class action certainly protected the efficiency and economy

of litigation because that class action is protecting the rights of thousands of

consumers nationwide through a single action. Consumer class actions regarding

defective vehicles brought against manufacturers are regularly certified, making a

class action lawsuit an efficient means of pursuing such claims.

193.   The tolling of Plaintiff's individual statute of limitations encourages the

protection of efficiency and economy in litigation as promoted by the class action

devise, so that putative class members would not find it necessary to seek to

intervene or to join individually because of fear the class might never be certified or

-78-

putative class members may subsequently seek to request exclusion.

194.   The running of all statute of limitations on each of Plaintiff's claims asserted against Ford in the present action were therefore tolled by *American-Pipe* tolling during the entire pendency of the *Vargas* class action (i.e., from the date on which the *Vargas* class action was filed on September 28, 2012 to the date on which Plaintiff filed the instant action).

## All Limitations Periods are Tolled Under California Law by the Doctrine of Equitable Tolling As a Result of the Class Action *Vargas v. Ford Motor Company*

195.   Plaintiff gave timely notice of Plaintiff's claims against Ford in the present action as putative class members in a class action, *Vargas v. Ford Motor Company*, United States District Court, Central District of California, Case No. 2:12-cv-08388 ABC (FFMx), which was filed on September 28, 2012. That action was filed within three years of the date of Plaintiff's discovery of their claims against Ford in the present action, as previously described in detail above.

196.   There is no prejudice to Ford in gathering evidence to defend against Plaintiff's individual claims because the class definition in the class action complaint within which Plaintiff were putative class members and the allegations in the class action lawsuit, *Vargas v. Ford Motor Company*, United States District Court, Central District of California, Case No. 2:12-cv-08388 ABC (FFMx), put Ford on

-79-

notice of the facts that give rise to Plaintiff's individual action, the witnesses necessary for Ford to defend Plaintiff's individual action, and the causes of action against Ford asserted in Plaintiff's individual action.

197. *Vargas v. Ford Motor Company*, United States District Court, Central District of California, Case No. 2:12-cv-08388 ABC (FFMx) alleged the material facts on behalf of Plaintiff as putative class members as are being alleged by Plaintiff in the present individual action.

198. The facts alleged in *Vargas v. Ford Motor Company*, United States District Court, Central District of California, Case No. 2:12-cv-08388 ABC (FFMx) are substantially similar, if not identical to the facts alleged herein.

199. The allegations in *Vargas v. Ford Motor Company*, United States District Court, Central District of California, Case No. 2:12-cv-08388 ABC (FFMx) are based on the same subject matter and similar evidence as the instant complaint. Those allegations concern the same evidence, memories, and witnesses as the subject matter in the instant complaint.

200. The *Vargas* class action certainly protected the efficiency and economy of litigation because that class action is protecting the rights of thousands of consumers nationwide through a single action. Consumer class actions regarding defective vehicles brought against manufacturers are regularly certified, making a class action lawsuit an efficient means of pursuing such claims.

201.   Plaintiff acted reasonably and in good faith in filing the instant action. Shortly after discovering Ford's fraudulent behavior, Plaintiff filed the instant action to pursue their individual rights without delay.

202.   The tolling of Plaintiff's individual statute of limitations encourages the protection of efficiency and economy in litigation as promoted by the class action devise, so that putative class members would not find it necessary to seek to intervene or to join individually because of fear the class might never be certified or putative class members may subsequently seek to request exclusion.

203.   The running of all statute of limitations on each of Plaintiff's claims asserted against Ford in the present action were therefore tolled by *American-Pipe* tolling during the entire pendency of the *Vargas* class action (i.e., from the date on which the *Vargas* class action was filed on September 28, 2012 to the date on which Plaintiff filed the instant action).

## **PLAINTIFF'S EXPERIENCES**

204.   The experiences of the Plaintiff in this case are consistent with the General Allegations detailed above.

205.   Plaintiff hereby revokes acceptance of the sales contract.

206.   Plaintiff's 2013 Ford Focus (the "Vehicle") was equipped with a DPS6 Ford PowerShift Transmission.

207.   On or about March 10, 2013, Plaintiff visited Galpin Motors, Inc. in

-81-

North Hills, California in hopes of purchasing a new Ford vehicle. Plaintiff walked the dealership in search of a vehicle to meet Plaintiff's needs, assisted by a salesperson. Plaintiff was specifically searching for a Ford vehicle with an automatic transmission for a smoother and more effortless drive. In searching the car inventory on the car lot, Plaintiff reviewed the window stickers of multiple Ford Focus vehicles that caught his eye.  The window stickers on these vehicles identified them as having an "automatic" transmission. Plaintiff identified a 2013 Ford Focus he was interested in purchasing. Plaintiff's conversations with the salesperson, the window sticker on the vehicle, and a test drive of the vehicle all reinforced Plaintiff's belief that the Vehicle was in fact equipped with an automatic transmission.   The salesperson never disclosed to Plaintiff that the vehicle was not actually equipped with an automatic transmission, nor did he disclose any of the known problems with the DPS6 Transmission.

208.   Prior to purchasing the Vehicle, Plaintiff reviewed marketing brochures, about the qualities of the Ford Focus.  Plaintiff also relied on Ford's reputation as an established and experienced auto manufacturer; Plaintiff relied on the statements made during the sales process by Ford's agents and within the marketing brochures provided by Ford.  However, Ford and its authorized agents did not publicly or privately disclose to Plaintiff any information about the Transmission Defect. These omissions were material to Plaintiff's decision to purchase the

-82-

Vehicle.  Had Ford and/or its authorized agents publicly or privately disclosed the Transmission Defect before Plaintiff purchased the Vehicle, Plaintiff would have been aware of such disclosures, and would not have purchased the Vehicle.

209.   Plaintiff first experienced a problem while driving on the freeway in rush hour traffic when, upon acceleration, the Vehicle hesitated, jolted, and made a grinding noice. However, there were no warning lights that turned on when this occurred.

210.   On or around August 13, 2014, Plaintiff delivered the Vehicle to an authorized Ford repair facility for repair. Plaintiff complained that the Vehicle shudders when accelerating from slow speeds, and that it made a grinding noise. The repair facility technicians reprogrammed the transmission control module ("TCM") and powertrain control module ("PCM"), replaced the clutch, and replaced both inner shaft seals. After three (3) days at the repair facility, the Vehicle was returned to Plaintiff and the service technician represented to Plaintiff that the Vehicle had been repaired and was safe to drive. Plaintiff reasonably relied on this representation by the service technician at the authorized Ford repair facility. All repairs were covered under Ford's written warranty.

211.   On or around July 20, 2015, Plaintiff again delivered the Vehicle to an authorized Ford repair facility for repair. Plaintiff complained that the Vehicle shudders when accelerating from slow speeds, and, while driving in traffic, a

FIRST AMENDED COMPLAINT – PEDANTE V. FORD
UNREDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

warning message illuminates that the transmission is overheating. The repair facility technicians reprogrammed the TCM and performed adaptive relearn pursuant to a recall. When the Vehicle was returned to Plaintiff, the service technician represented to Plaintiff that the Vehicle had been repaired and was safe to drive. Plaintiff reasonably relied on this representation by the service technician at the authorized Ford repair facility. All repairs were covered under Ford's written warranty.

212.   On or around August 3, 2016, Plaintiff delivered the Vehicle to an authorized Ford repair facility for repair. Plaintiff complained that the Vehicle lost all power while driving at freeway speeds, and that the Vehicle still suffered from excessive shuddering at slow speeds. The repair facility technicians replaced the clutch again, and replaced the TCM. After thirteen (13) days in the repair facilty, the Vehicle was then returned to Plaintiff, and the service technician represented to Plaintiff that the Vehicle had been repaired and was safe to drive. Plaintiff reasonably relied on this representation by the service technician at the authorized Ford repair facility.  All repairs were covered under Ford's written warranty.

213.   On or around October 2, 2017, Plaintiff delivered the Vehicle to an authorized Ford repair facility for repair. Plaintiff complained that the Vehicle continued to shudder, shake, and make a ratchet sound. The repair facility technicians replaced the clutch for a third time. After five (5) days in the repair facilty, the Vehicle was then returned to Plaintiff, and the service technician

represented to Plaintiff that the Vehicle had been repaired and was safe to drive. All repairs were covered under Ford's written warranty.

214.   On or around September 7, 2018, Plaintiff delivered the Vehicle to an authorized Ford repair facility for repair as the Vehicle was unable to start, and Plaintiff complained that the Vehicle continues to shudder upon acceleration. The repair facility technicians again replaced the clutch for a fourth time as well as the seal and forks. After nineteen (19) days in the repair facilty, the Vehicle was then returned to Plaintiff, and the service technician represented to Plaintiff that the Vehicle had been repaired and was safe to drive.

215.   Plaintiff testified that he continued to have all of the problems in paragraphs 210-214 no matter how many times Ford attempted to fix them. Because of these problems, Plaintiff was and still is concerned for his safety and that of any of his passengers and thus, uses the Vehicle sparingly. In fact, he testified that he and his wife will use the wife's vehicle in the event they have to drive their son somewhere.

216.   On or around April 11, 2019, Plaintiff delivered the Vehicle to an authorized Ford repair facility for repair. Plaintiff complained that the Vehicle still continues to shudder and the check engine light comes on. The repair facility technicians again replaced the clutch for a fifth time. After two (2) days in the repair facilty, the Vehicle was then returned to Plaintiff, and the service technician

-85-

FIRST AMENDED COMPLAINT – PEDANTE V. FORD
UNREDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

represented to Plaintiff that the Vehicle had been repaired and was safe to drive.

217.   On information and belief, Plaintff's problems with the Vehicle, as described above, persisted and have never been fixed by Ford's authorized repair facilities. As such, these problems continue to plague the Vehicle to this day.

218.   On information and belief, the Vehicle's acceleration, shuddering and grinding problems experienced by Plaintiff, as described above, are consistent to the DPS6 transmission problems as explained in detail in paragraphs 30-42, and 61-73.

219.   Plaintiff is informed and believes and thereon alleges that the acceleration, jerking, shuddering, and grinding problems experienced by Plaintiff with the Vehicle, as described in paragraphs 209-216 above, are consistent with and were caused by the DPS6 Transmission Droblems described in detail above in paragraphs 30-42, and 61-73.

220.   Ford and its agents never disclosed to Plaintiff, at the time of sale or thereafter, any of the information set forth in paragraphs 30-42, and 61-73.

221.   As a result of Ford's inaction and silence, Plaintiff was entirely unaware that he had purchased, and was continuing to drive, an unsafe and unreliable vehicle. As a reasonable person, Plaintiff would consider the PowerShift Transmission Defects important and would not purchase or lease a vehicle equipped with the PowerShift Transmission were its defects disclosed in advance, or would pay substantially less for the vehicle.

-86-

222.   Intentionally left blank.

223.   Intentionally left blank.

224.   Intentionally left blank.

225.   Intentionally left blank.

226.   Intentionally left blank.

227.   Intentionally left blank.

228.   Intentionally left blank.

229.   Intentionally left blank.

## FIRST CAUSE OF ACTION

### Violation of the Song-Beverly Act – Breach of Express Warranty

230.   Plaintiff incorporates herein by reference each and every allegation contained in the preceding and succeeding paragraphs as though herein fully restated and re-alleged.

231.   Express warranties accompanied the sale of the Vehicle to Plaintiff by which Ford undertook to preserve or maintain the utility or performance of Plaintiff's Vehicle or provide compensation if there was a failure in such utility or performance.

232.   The Vehicle was delivered to Plaintiff with serious defects and nonconformities to warranty and developed other serious defects and nonconformities to warranty including, but not limited to the transmission problems

set forth in paragraphs 204-229

233.   Pursuant to the Song-Beverly Consumer Warranty Act (hereinafter the "Act") Civil Code sections 1790 *et seq.* the Vehicle constitutes "consumer goods" used primarily for family or household purposes, and Plaintiff has used the Vehicle primarily for those purposes.

234.   Pursuant to the Act, the Vehicle constitutes a "new motor vehicle."

235.   Plaintiff is a "buyer" as defined under the Act.

236.   Ford is a "manufacturer" and/or "distributor" as defined under the Act.

237.   The foregoing defects and nonconformities to warranty manifested themselves within the applicable express warranty period. The nonconformities substantially impair the use, value and/or safety of the Vehicle.

238.   Plaintiff delivered the Vehicle to an authorized Ford repair facility, as defined in the Act, for repair of the nonconformities, as described in the section to this Complaint entitled, "Plaintiff's Experiences," *supra.*

239.   Defendant was unable to conform Plaintiff's Vehicle to the applicable express warranty after a reasonable number of repair attempts, as described in the section to this Complaint entitled, "Plaintiff's Experiences," *supra.*

240.   Notwithstanding the foregoing, Ford has failed to either promptly replace the new motor vehicle (i.e., the Vehicle) or promptly make restitution in accordance with the Song-Beverly Act.

241.   By failing to remedy the Vehicle's defects within a reasonable number of opportunities as alleged above, or to promptly issue a refund or replacement vehicle, Ford is in breach of its obligations to Plaintiff under the Song-Beverly Act.

242.   Under the Act, Plaintiff is entitled to reimbursement of the price paid for the Vehicle less that amount directly attributable to use by the Plaintiff prior to discovery of the nonconformities.

243.   Plaintiff is entitled to all incidental, consequential, and general damages resulting from Defendant's failure to comply with their obligations under the Song-Beverly Act.

244.   Plaintiff is entitled under the Song-Beverly Act to recover as part of the judgment a sum equal to the aggregate amount of costs and expenses, including attorney's fees, reasonably incurred in connection with the commencement and prosecution of this action.

245.   Plaintiff is entitled to, in addition to the amounts recovered, a civil penalty of up to two times the amount of actual damages in that Ford, has willfully failed to comply with its responsibilities under the Act.

## SECOND CAUSE OF ACTION

### Violation of the Song-Beverly Act – Breach of Implied Warranty

246.   Plaintiff incorporates herein by reference each and every allegation contained in the preceding and succeeding paragraphs as though herein fully restated

and re-alleged.

247. Ford and its authorized dealership at which Plaintiff purchased the Vehicle had reason to know the purpose of the Vehicle at the time of sale of the Vehicle. The sale of the Vehicle was accompanied by an implied warranty of fitness.

248. The sale/lease of the Vehicle was accompanied by an implied warranty that the Vehicle was merchantable pursuant to Civil Code section 1792.

249. The Vehicle was not of the same quality as those generally acceptable in the trade because it was equipped with a defective transmission, which caused the problems set forth in paragraphs 204-229 above.

250. The Vehicle was not fit for the ordinary purpose for which such goods are used because it was equipped with a defective transmission, which caused the problems set forth in paragraphs 204-229 above.

251. The Vehicle did not measure up to the promises or facts stated on the container or label because it was equipped with a defective transmission, which caused the problems set forth in paragraphs 204-229 above.

252. The Vehicle did not measure up to the promises or facts stated on the container or label because it was equipped with an automated manual transmission rather than the automatic transmission as labeled.

253. Plaintiff is entitled to justifiably revoke acceptance of the Vehicle under Civil Code section 1794, *et seq*; Plaintiff hereby revokes acceptance of the Vehicle.

254.   Plaintiff is entitled to replacement or reimbursement pursuant to Civil Code section 1794, *et seq.*

255.   Plaintiff is entitled to rescission of the contract pursuant to Civil Code section 1794, *et seq.* and Commercial Code section 2711.

256.   Plaintiff is entitled to recover any "cover" damages under Commercial Code sections 2711, 2712, and Civil Code section 1794, *et seq.*

257.   Plaintiff is entitled to recover all incidental and consequential damages pursuant to 1794 *et seq* and Commercial Code sections 2711, 2712, and 2713 *et seq.*

## THIRD CAUSE OF ACTION

### Fraudulent Inducement – Concealment

258.   Plaintiff incorporates herein by reference each and every allegation contained in the preceding and succeeding paragraphs as though herein fully restated and re-alleged.

259.   Ford and its agents intentionally concealed and failed to disclose facts relating to the Transmission Defects as explained in detail in paragraphs 15-186.

260.   Ford was the only party with knowledge of the Transmission Defects because that knowledge came from internal reports such as pre-release testing data, customer complaints made directly to Ford, and technical service bulletins. None of this information was available to the public, nor did Ford publicly or privately disclose any of the information to Plaintiff. Ford had exclusive knowledge of the

-91-

Transmission Defects as described in detail in paragraphs 151-155.

261.   While Ford has been fully aware of the Transmission Defects, Ford and its agents have actively concealed the existence and nature of the Transmission Defects from consumers, including Plaintiff, at the times of Plaintiff's purchase, repair, and thereafter. Specifically, Ford failed to disclose or actively concealed, at and after the times of Plaintiff's purchase and repair:

    a. The known material defects and material nonconformity of Ford vehicles equipped with the PowerShift Transmission, including the Vehicle, as particularly specified in paragraphs 30-73;

    b. That the Vehicle, including its PowerShift Transmission, was not in good working order, was defective, and was not fit for its intended purposes; and

    c. The Vehicle and its PowerShift Transmission were defective, despite the fact that Ford learned of such defects through alarming failure rates, customer complaints, as well as through other internal sources, as early as 2010, if not before.

262.   Ford actively concealed information from the public, preventing Plaintiff from discovering any of the concealed facts as described in detail in paragraphs 74-172.

263.   Prior to the date of sale, on the date of sale, and on the date of each of

the repair attempts, Ford had an opportunity to disclose to Plaintiff, but instead concealed from and failed to disclose to Plaintiff, any of the known irreparable issues with the Vehicle.

264.   Ford intended to deceive Plaintiff by concealing the known issues with the PowerShift Transmission, including the Transmission Defects, in an effort to sell the Vehicle at a maximum price.

265.   Ford knew of the specific transmission issues affecting the Vehicle, including the Transmission Defects, prior to the sale of the Vehicle. For example, in 2010, Ford released a TSB after months of research relating to "concerns such as no engage or intermittent no engage in Drive or Reverse when shifting from Park to Drive or Reverse" for certain vehicles equipped with the PowerShift Transmission.

266.   Plaintiff's Vehicle was sold after Ford acknowledged these problems in a TSB without any sort of disclosure being made to Plaintiff. When Plaintiff experienced repeated problems with the shifting of the transmission in the Vehicle, and at each time Plaintiff brought the Vehicle to Ford's authorized repair facility for evaluation and repair, Ford and its agents continued to conceal the known Transmission Defects and repeatedly represented to Plaintiff that it was able to fix the issue.

267.   Plaintiff did not know about the Transmission Defects at the time of sale. Plaintiff also did not know of the irreparable nature of the transmission

-93-

problems at the time of any of the repair attempts because Ford and its agents repeatedly represented that it was able to fix the Vehicle upon return of the Vehicle to Plaintiff.

268. If Plaintiff knew about the Transmission Defects at the time of sale/lease, Plaintiff would not have purchased the Vehicle or would have paid substantially less for it.

269. As a result of Plaintiff's reliance on Ford and its agent's omissions and/or misrepresentations, Plaintiff suffered an ascertainable loss of money, property, and value to the Vehicle. Additionally, as a result of the Transmission Defects, Plaintiff was harmed and suffered actual damages in that the Vehicle's transmission is substantially certain to fail before its expected useful life has run.

270. Had Ford and/or its agents publicly or privately disclosed the Transmission Defects to Plaintiff at or prior to the sale, Plaintiff would not have purchased the Vehicle.

271. Plaintiff was harmed by Ford's concealment of the Transmission Defects because Plaintiff was induced to enter into the sale of a vehicle that Plaintiff would not have otherwise purchased.

272. Ford's concealment of the Transmission Defects was a substantial factor in causing Plaintiff's harm.

-94-

## **FOURTH CAUSE OF ACTION**

### **Fraudulent Inducement – Intentional Misrepresentation**

273.   Plaintiff incorporates herein by reference each and every allegation contained in the preceding and succeeding paragraphs as though herein fully restated and re-alleged.

274.   Ford drafted, produced, and distributed marketing brochures to the public containing factual representations about the PowerShift Transmission. Ford's marketing brochure for the Vehicle represented the PowerShift Transmission had the following qualities:

> a.   "A PowerShift 6-speed automatic delivers torque to the wheels 100% of the time during shifts, supplying excellent responsiveness."

275.   Unfortunately, the Vehicle as delivered to Plaintiff had extremely poor handling on all roads, as Plaintiff's drive was repeatedly interrupted by jerky shifts and hesitation. Plaintiff's Vehicle was also not equipped with an "automatic" transmission, contrary to Ford's suggestion that the transmission is a traditional "automatic." Plaintiff's Vehicle in fact contained an unproven automated dual clutch manual transmission. Plaintiff's Vehicle did not have seamless gear changes – it experienced jerky gear changes and hesitation between shifts, which necessitated several repairs and repeated reprogramming of the transmission control module –

none of which were sufficient to resolve the Transmission Defects.

276.  Ford made such representations regarding the PowerShift Transmission in the YEAR Ford Focus/Fiesta despite its extensive internal knowledge of the Transmission Defects and other problems. Ford's knowledge of the Transmission Defects is laid out in detail in paragraphs 30-172.

277.  Ford informed its dealers and authorized service facilities and personnel, about common behavior characteristics of the PowerShift Transmission in July 2011. In a memo with instructions sent to Ford dealers and authorized service personnel, Ford noted that some of the common characteristics of the PowerShift Transmission include double clicking metal sounds, coast down whine, low speed grinding, and reverse gear whine. Despite this admission by Ford to its dealers, repair facilities, and agents, Ford continued to represent to the public that the PowerShift Transmission offered "great handling on all roads," and "the performance of a manual," and seamless gear changes for amazing responsiveness," a wildly different picture from the reality. Ford made the statements in its marketing brochures recklessly and without regard for their truth.

278.  In addition, Ford misrepresented the type of transmission equipped in the Vehicle. Throughout its marketing brochure, and on the Vehicle's window sticker, which Plaintiff viewed prior to the sale of the Vehicle, Ford states that the Vehicle is equipped with a 6-speed automatic transmission. That representation is

false. The Vehicle is actually equipped with the Ford PowerShift Transmission, which is in fact a dual clutch transmission, which operates using direct mechanical engagement and disengagement similar to a manual transmission. This information is material for a consumer to know in making a purchasing decision, because unlike a traditional automatic transmission, Ford's PowerShift dual clutch transmission powers the drive wheels through a clutch, rather than a torque converter. The use of a clutch can result in a substantially jerkier ride than that produced using a torque converter, particularly in an unproven design. Plaintiff would not have purchased the Vehicle had Plaintiff known the Vehicle's transmission technology would cause the drive to be jerky, unreliable, and dangerous as a result of the unproven dual-clutch (rather than automatic) system.

279.   Ford intended that Plaintiff rely on the representations made in the marketing brochure and window sticker related to the transmission in inducing Plaintiff to purchase the Vehicle.

280.   Plaintiff reasonably relied on Ford's representations related to the transmission being "automatic" and providing a smooth ride, because Ford was the manufacturer of the Vehicle and claimed to have performed and relied upon extensive pre-release testing of the PowerShift Transmission. Ford was in a superior position of knowledge.

281.   Plaintiff was harmed by purchasing a vehicle that Plaintiff would not

have purchased had he known the true facts about the transmission, and the

Transmission Defects, affecting it.

282.    Plaintiff's reliance on Ford's representations about the transmission

qualities was a substantial factor in Plaintiff's harm, as Ford and its agents were the

exclusive source of information about the qualities of the transmission.

## FIFTH CAUSE OF ACTION

### Fraudulent Inducement – Negligent Misrepresentation

283.    Plaintiff incorporates herein by reference each and every allegation

contained in the preceding and succeeding paragraphs as though herein fully restated

and re-alleged.

284.    At the time Ford made the misrepresentations identified in paragraph

274-280 above, it had no reasonable grounds for believing the representations to be

true, because Ford was simultaneously issuing internal memoranda to its agents and

dealerships about the characteristics of the PowerShift Transmission causing "a loss

of power, hesitation, surge, or lack of throttle response while driving." None of those

characteristics can be reasonably construed to provide "great handling on all roads,"

"seamless gear changes," or "amazing responsiveness," as the PowerShift

Transmission was described to the Plaintiff in marketing materials. Ford's

knowledge of the Transmission Defects is outlined in more detail in paragraphs 30-

172.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against Ford, as follows:

a.   For general, special and actual damages according to proof at trial;

b.   For rescission of the purchase contract and restitution of all monies expended;

c.   For diminution in value;

d.   For incidental and consequential damages according to proof at trial;

e.   For a civil penalty in the amount of two times Plaintiff's actual damages;

f.   For prejudgment interest at the legal rate;

g.   For punitive damages;

h.   For reasonable attorney fees and costs of suit; and

i.   For such other relief as the Court deems just and proper under the circumstances.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands trial by jury in this action.

Dated: June 21, 2019

KNIGHT LAW GROUP, LLP

/S/ Russell Higgins

STEVE MIKHOV (SBN 224676)
RUSSELL HIGGINS (SBN 226124)
Attorney for Plaintiffs,
YVONNE QUINTERO
and SALVADOR QUINTERO

-99-

FIRST AMENDED COMPLAINT – PEDANTE V. FORD
UNREDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL