1   Frank P. Kelly III (SBN 083473)
    fkelly@shb.com
2   Amir Nassihi (SBN 235936)
    anassihi@shb.com
3   Andrew Chang (SBN 222309)
    achang@shb.com
4   Shook, Hardy & Bacon LLP
    One Montgomery, Suite 2600
5   San Francisco, California 94104
    Tel: 415.544.1900 Fax: 415.391.0281
6
7
    Spencer P. Hugret (SBN 240424)
8   shugret@grsm.com
    Gordon Rees Scully Mansukhani LLP
9   Embarcadero Center West
    275 Battery Street, Suite 2000
10  San Francisco, CA 94111
    Tel: 415.986.5900 Fax: 415.986.8054
11
12  Attorneys for Defendant
    Ford Motor Company
13

14              UNITED STATES DISTRICT COURT
15              CENTRAL DISTRICT OF CALIFORNIA
                     WESTERN DIVISION
16

17  **IN RE: FORD MOTOR CO. DPS6**        Case No. 2:18-ML-02814 AB (FFMx)
    **POWERSHIFT TRANSMISSION**
18  **PRODUCTS LIABILITY**               Assigned to Hon. André Birotte Jr.
    **LITIGATION**                       Courtroom 7B
19

20  **THIS DOCUMENT RELATES**            **DEFENDANT FORD MOTOR**
    **ONLY TO:**                         **COMPANY'S MEMORANDUM OF**
21                                       **POINTS AND AUTHORITIES IN**
                                         **SUPPORT OF MOTION FOR NEW**
22  *Quintero v. Ford Motor Co.*,        **TRIAL [FED. R. CIV. PROC. 59]**
    Case No. 2:18-cv-01912-AB-FFM
23                                       Hearing Date:      July 8, 2020
                                         Hearing Time:      10:00 a.m.
24                                       Courtroom 7B

25
26
27
28

# TABLE OF CONTENTS

**INTRODUCTION** ..................................................................................................1

**ARGUMENT** ........................................................................................................2

I.    Standard for New Trial Motions ....................................................................2

II.   A New Trial Should be Granted Because the Verdict Went Against the Clear Weight of the Evidence..........................................................................2

    A.  Evidence Weighs Against a Finding that Ford Failed to Repair Particular Problems After a Reasonable Number Of Attempts. ....................3

    B.  Evidence Weighs Against a Finding that Ford Acted "Willfully."...........7

III.  New Trial is Warranted Because of Pervasive, Prejudicial Misconduct. .......8

    A.  Misconduct Relating to Irrelevant, Prejudicial, and Unsupported Incidents and Harms to Others Warrants a New Trial. ...................................9

    B.  Plaintiffs' "Trial by Ambush" Misconduct Warrants a New Trial. ........16

    C.  Additional Misconduct by Plaintiffs' Counsel Warrants a New Trial. ...18

IV.   New Trial is Warranted Based on Errors of Law..........................................21

    A.  Erroneous Denial of Ford's Mistrial Motions .......................................21

    B.  Erroneous Evidentiary Rulings...............................................................22

    C.  Erroneous Rulings on Jury Instructions and Verdict Form. ...................24

**CONCLUSION** ..................................................................................................25

# <u>TABLE OF AUTHORITIES</u>

**Cases**................................................................................................................**Page(s)**

*Anheuser-Busch, Inc. v. Nat. Beverage Dist.*,
  69 F.3d 337 (9th Cir. 1995) ............................................................... 2, 8

*Brownfield v. Jaguar Land Rover N. Am., LLC*,
  584 F. App'x 874 (9th Cir. 2014)..................................................... 3, 4, 25

*Christopher v. Fla.*,
  449 F.3d 1360 (11th Cir. 2006) ........................................................ 9, 20

*Clanahan v. McFarland Unified Sch. Dist.*,
  No. CVF 05-0796 LJO DLB, 2007 WL 2253597 (E.D. Cal. Aug. 3,
  2007) ................................................................................................ 19, 21

*Cnty. of Maricopa v. Maberry*,
  555 F.2d. 207 (9th Cir. 1977) ............................................................ 9, 12

*Draper v. Rosario*,
  836 F.3d 1072 (9th Cir. 2016) .............................................................. 22

*Figiel v. Hyundai Motor Am.*,
  2006 WL 2411460 (Cal. Ct. App. Aug. 22, 2006) ................................ 24

*Hammonds v. Yeager*,
  2017 WL 10560470 (C.D. Cal. Aug. 10, 2017) .................................... 16

*Harkins v. Ford Motor Co.*,
  437 F.2d 276 (3d Cir. 1970) ................................................................. 23

*Hemmings v. Tidyman's Inc.*,
  285 F.3d 1174 (9th Cir. 2002) ................................................................ 8

*Johnson v. Ford Motor Co.*,
  988 F.2d 573 (5th Cir. 1993) ................................................................ 23

*Jones v. Aero/Chem Corp.*,
  921 F.2d 875 (9th Cir. 1990) ............................................................. 9, 16

*Koo v. Stipek*,
  162 F.3d 1168 (9th Cir. 1998) .............................................................. 22

*Kwan v. Mercedes-Benz of N. Am., Inc.*,
  23 Cal. App. 4th 174 (1994) ........................................................................... 7

*Landes Const. Co. v. Royal Bank of Canada*,
  833 F.2d 1365 (9th Cir. 1987) .................................................................. 2, 3

*LaPorta v. BMW of N. Am., LLC*,
  2019 WL 988675 (C.D. Cal. Jan. 24, 2019) ............................................. 24

*Molski v. M.J. Cable, Inc.*,
  481 F.3d 724 (9th Cir. 2007) ......................................................................... 2

*Montgomery Ward & Co. v. Duncan*,
  311 U.S. 243 (1940) ........................................................................................ 2

*Moody v. Ford Motor Co.*,
  506 F. Supp. 2d 823 (N.D. Okla. 2007) ...................................................... 16

*Murphy v. City of Long Beach*,
  914 F.2d 183 (9th Cir. 1990) ......................................................................... 2

*Muth v. Ford Motor Co.*,
  461 F.3d 557 (5th Cir. 2006) ....................................................................... 23

*Nationwide Life Ins. Co. v. Richards*,
  541 F.3d 903 (9th Cir. 2008) ....................................................................... 16

*Ramirez v. ITW Food Equip. Group, LLC*,
  No. 12-10023-AB, 2018 WL 5816093 (C.D. Cal. July 3, 2018) ...................... 9, 11

*Robertson v. Fleetwood Travel Trailers of Cal., Inc.*,
  144 Cal. App. 4th 785 (2006) ........................................................................ 7

*Sana v. Hawaiian Cruises*,
  Ltd., 181 F.3d 1041, 1045 (9th Cir. 1999) ................................................. 24

*Schreidel v. Am. Honda Motor Co.*,
  34 Cal. App. 4th 1242 (1995) ........................................................................ 7

*Silvio v. Ford Motor Co.*,
  109 Cal. App. 4th 1205 (2003) ...................................................................... 3

*Stop Staring! Designs v. Tatyana, LLC*,
  625 Fed.Appx. 328 (9th Cir. Aug. 31, 2015) .............................................. 9

*U.S. v. Young,*
    470 U.S. 1 (1985)..................................................................................21

*White v. Ford Motor Co.,*
    312 F.3d 998 (9th Cir. 2002) ...............................................................23

**Statutes**

Cal. Civil Code § 1793.2(d)(1) ................................................................3

Song-Beverly Act ..................................................................................3, 5

**Rules**

Federal Rule of Evidence 612...................................................................23

FRCP 59(a)(1)(A) ....................................................................................2

Rule 701 ..................................................................................................23

# INTRODUCTION

Before trial, the Court recognized that "[t]he focus of these MDL cases is on whether the plaintiffs' specific vehicles had a non-conformity that Ford could not repair and that impaired its utility, value, or safety, and whether Ford willfully denied a buyback remedy." (MDL ECF[1] No. 695 at p. 4.)  The facts and evidence in this case clearly weigh in favor of judgment for Ford.  Faced with an extremely weak case, Plaintiffs' counsel and their retained expert, Anthony Micale, engaged in a trial strategy of pervasive misconduct calculated to result in a verdict based on passion and prejudice, rather than on the facts.  They were successful, obtaining a judgment for damages and the maximum award of civil penalties available.

To do so, Plaintiffs' counsel and Mr. Micale violated pretrial orders, engaged in trial by ambush, made inadmissible, irrelevant, and prejudicial arguments and comments to the jury about Ford and its counsel, and abused and contributed to several errors of law.  The goal of this misconduct was clear:  to distract the jury from the facts and claims in this case, imply that numerous injuries and accidents were caused by purported defects in the Quinteros' vehicle without the necessary proof, introduce elements of fraudulent concealment despite summary judgment in Ford's favor on that issue, and exacerbate that issue by forcing Ford to repeatedly object to antagonize the jury and create the prejudicial impression that Ford was trying to hide information from them.

Ford is not alone in reaching this conclusion about Plaintiffs' trial conduct.  During trial, this Court repeatedly warned and chastised Plaintiffs' counsel and Mr. Micale regarding their misconduct, but denied Ford's repeated mistrial motions.

Plaintiffs should not be permitted to benefit from their misconduct and Ford should not suffer for it.  In the event the Court denies Ford's concurrent motion for judgment as a matter of law ("JMOL"), the Court should grant a new trial.

---

[1] For ease of reference throughout, "MDL ECF" refers to entries in the MDL docket and "*Quintero* ECF" refers to entries in the case-specific docket.

MEMO ISO MOTION FOR NEW TRIAL
CASE NO. 2:18- ML-02814 (QUINTERO)

# ARGUMENT

## I.    Standard for New Trial Motions

FRCP 59(a)(1)(A) authorizes a court to grant a new trial on all or some issues "after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court."  "Historically recognized grounds include, but are not limited to, claims 'that the verdict is against the weight of the evidence, that the damages are excessive, or that, for other reasons, the trial was not fair to the party moving.'"  *Molski v. M.J. Cable, Inc.*, 481 F.3d 724, 729 (9th Cir. 2007).

Motions for new trial may also "raise questions of law arising out of alleged substantial errors in admission or rejection of evidence or instructions to the jury." *Montgomery Ward & Co. v. Duncan*, 311 U.S. 243, 251 (1940).  A new trial may also be required by misconduct by parties' counsel or witnesses at trial.  *See, e.g., Anheuser-Busch, Inc. v. Nat. Beverage Dist.*, 69 F.3d 337, 346 (9th Cir. 1995).

## II.    A New Trial Should be Granted Because the Verdict Went Against the Clear Weight of the Evidence.

As addressed in Ford's renewed JMOL motion, Plaintiffs failed to submit evidence to establish necessary elements of their express and implied warranty claims. As a ground for new trial, Ford addresses only the express-warranty claim because this Court entered judgment in Ford's favor on Plaintiffs' implied-warranty claim because Plaintiffs have abandoned it (*see Quintero* ECF Nos. 61, 62).

Even if the Court were to deny Ford's JMOL motion by finding that "substantial evidence" supported the verdict (it does not), this Court nevertheless has the authority and duty to grant a new trial because the verdict is against the clear weight of the evidence.  *Landes Const. Co. v. Royal Bank of Canada*, 833 F.2d 1365, 1371 (9th Cir. 1987); *Murphy v. City of Long Beach*, 914 F.2d 183, 187 (9th Cir. 1990) (trial court has "the right, and indeed the duty, to weigh the evidence as he saw it, and to set aside the verdict of the jury, even though supported by substantial

evidence, where, in his conscientious opinion, the verdict is contrary to the clear weight of the evidence") (citation omitted).

While there is no "verbal formula that will be of much use to trial courts in passing on motions [for a new trial because the verdict is against the clear weight of evidence]," a new trial should be granted "[i]f, having given full respect to the jury's findings, the judge on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Landes Const. Co.*, 833 F.2d at 1371-72.  There is no presumption favoring the verdict.  Rather, "[t]he judge … need not view the evidence from the perspective most favorable to the prevailing party." *Id.* at 1371.

## A. Evidence Weighs Against a Finding that Ford Failed to Repair Particular Problems After a Reasonable Number Of Attempts.

The Song-Beverly Act requires a plaintiff to prove that "the manufacturer or its representative in this state [did] not service or repair the goods to conform to the applicable express warranties after a reasonable number of attempts." Cal. Civil Code § 1793.2(d)(1).  Liability cannot be based on a "single failed attempt."  *Silvio v. Ford Motor Co.*, 109 Cal. App. 4th 1205, 1207-08 (2003) ("[t]he statute does not require the manufacturer to make restitution or replace a vehicle if it has had only one opportunity to repair that vehicle").  As the Ninth Circuit recognizes, the number of opportunities required to repair "is plural. That is because, under the law that applies in this case, for Plaintiff to be entitled to relief for any particular problem with her [vehicle], she must show that she brought the car in to [the manufacturer] for the repair *of that particular problem* on more than one occasion." *Brownfield v. Jaguar Land Rover N. Am., LLC*, 584 F. App'x 874, 875 (9th Cir. 2014) (emphasis added).

In other words, to establish Ford's liability for a Song-Beverly express-warranty claim, Plaintiffs were required to submit evidence that they presented their vehicle to Ford at least twice to repair a particular problem and that Ford's repair efforts failed (*i.e.,* that the same problems continued after a second repair presentation).

Here, trial focused on two problems the Quinteros allegedly experienced:  1) an

3

incident where Mrs. Quintero allegedly lost power while driving the vehicle; and 2) transmission shudder (also described as "juddering," "bucking," or "surging").

During their lease, there were two documented visits by Plaintiffs to separate Ford dealers complaining of problems with the vehicle. (*See* Trial Exs. 9, 13.)  One was to Puente Hills Ford in August 2015 complaining of "bucking and surging" and a second to Bob Wondries Ford on May 23, 2017, complaining of shuddering and sputtering. (*Id.*)  Consistent with these two documented visits, Mr. Quintero testified he only took the vehicle to each dealership once for a transmission problem. (12/12/19 Tr. (Declaration of Andrew Chang ("Decl."), Ex. D) at 747:18-748:7, 759:18-20).

There is no evidence that Plaintiffs experienced the same transmission-related problems, or any other problems, after the May 23, 2017 visit.  This is apparently because Plaintiffs did not care whether this second visit resolved their transmission problems. Plaintiffs had already made a request for Ford to reimburse their lease payments based only on the alleged loss-of-power incident, and Mrs. Quintero testified that they "just wanted [Ford] to confirm that it had a problem so [they] could get [their] money back … because [they] were a month away from bringing the car back off of lease," and had "already spent months paying [their] monthly payments but not driving the car," "so this was more to have Ford confirm that the problems existed so [Plaintiffs] could get [their] money back." (12/12/19 Tr. (Decl., Ex. D) at 676:24-677:18.)  Because the purpose of the dealer visit was to seek confirmation of a condition as the lease was ending rather than seek a final repair, this second visit does not constitute Plaintiffs providing Ford a second "opportunity" to repair.  And in the absence of any evidence that Plaintiffs continued to experience the same problems, there is no evidence Ford failed to repair their Focus after multiple opportunities.

Evidence relating to any opportunities for Ford to repair the loss-of-power problem is even more striking in its absence.  The day before trial, Plaintiffs' counsel admitted there had been no such presentation and that loss of power had no relevance to their express-warranty claim. (12/9/19 Hr'g Tr. (Decl., Ex. A) at 15:13-16:1 ("Mr.

Kelly makes a very good point about the fact that the loss of power was not presented to Ford Motor Company for repair; so we don't have a repair presentation that would count with respect to the express warranty protections under the Song-Beverly Act").) And having abandoned the implied warranty claim, the alleged fact had no evidentiary value to any claim in the case, but certainly was highly prejudicial.

Plaintiffs also did not testify that they had brought their vehicle in for repair because Mrs. Quintero had lost power and there was no documented evidence they did so. Rather, the first time this alleged loss of power was communicated to Ford was as the sole basis for Plaintiffs' May 17, 2017 telephonic request that Ford reimburse their lease payments shortly before the end of their lease. (12/12/19 Tr. (Decl., Ex. D) at 675:1-677:18; Trial Ex. 28.) And when Plaintiffs brought the vehicle to Bob Wondries Ford a few days later, they did not mention or seek repair for the loss of power. (Trial Ex. 13.) Plaintiffs cannot justify their express-warranty verdict based on the loss-of-power problem because Ford was not given any, much less multiple, opportunities to repair that problem.

Despite Mr. Quinteros' corroborated testimony that he only brought the Focus to a dealership for repair once at Puente Hills Ford and once at Bob Wondries Ford, Plaintiffs will likely argue that evidence exists of a purported undocumented second visit to Bob Wondries Ford. During this purported visit, dealership employees allegedly turned Mr. Quintero away and refused to do any inspection or repair for an unidentified problem with their Focus. (12/10/19 Tr. (Decl., Ex. B) at 248:6-19; 12/11/19 Tr. (Decl., Ex. C) at 509:11-510:24.) Both Mr. Micale and Plaintiffs' counsel indicated Plaintiffs would describe this purported second visit to Bob Wondries Ford. (*Id.*) Plaintiffs never did.

Plaintiffs' counsel asked Mr. Quintero, "…between the La Puente repair August 15, 2015, and the time you brought it in to Bob Wondries Ford on May 23, 2017, did you ever bring the car back to any dealership between those two points in time?" (12/12/19 Tr. (Decl., Ex. D) at 747:18-22.) Mr. Quintero responded by identifying

MEMO ISO MOTION FOR NEW TRIAL
CASE NO. 2:18- ML-02814 (QUINTERO)

only visits to Sears for routine maintenance. (*Id.* at 747:23.) Unsatisfied with this candid answer, counsel tried to lead Mr. Quintero to the answer they had hoped for:

> Q:  I want to not focus on Sears but I want to ask if you recall—
> A.     Okay.
> Q: --did you bring it back to a Ford dealership –
> A: Uh-huh.
> Q: -- between August of 2015 and May of 2017.  In that two-year period, was there a time when you brought it back to a dealership?
> A: I would say back to Bob Wondries Ford…

(*Id.* at 747:18 – 748:7.) This was followed by further attempts to elicit testimony to suggest additional repair presentations. (*Id.* at 748:8-749:7.) But Mr. Quintero himself confirmed that there had ***not*** been multiple presentations at Bob Wondries Ford which would suggest the existence of any undocumented visit.  On cross-examination, Mr. Quintero candidly acknowledged the following:

> Q:  Okay.  So you only remember going to Bob Wondries Ford once for a transmission issue?
> A:     Yes.

(12/12/19 Tr. (Decl., Ex. D) at 759: 18-20.)

Even if the Court considers this unclear and contradicted testimony "substantial evidence" sufficient to avoid Ford's JMOL motion, it is nevertheless against the weight of the evidence.  As discussed, the timing and alleged problems presented at the dealership were necessary for the jury to determine whether Ford repaired a particular problem after multiple opportunities.  But there was no evidence to permit the jury to determine when this alleged event occurred or what problem this alleged visit was for.   While Mr. Micale testified that he believed this visit was a presentation for repair relating to loss of power, Plaintiffs' counsel and Plaintiffs themselves did not so specify.  (12/10/19 Tr. (Decl., Ex. B) at 248:6-19; 12/11/19 Tr. (Ex. C) at 509:24-510:24; 12/12/19 Tr. (Ex. D) at 748:8-749:7.)  Rather, they simply stated that Plaintiffs told the dealership, "we have a problem with the way [this car is] operating" or "there's a problem with the car.  It's not performing the proper way."  (*Id.*)

To the extent Plaintiffs rely on this purported incident as the basis for their express-warranty claim, that required the jury to speculate as to when this visit occurred, what problems Plaintiffs were experienced and reported for repair, and that this visit was separate from Plaintiffs' other documented repairs.  Such speculation cannot counterbalance the clear weight of evidence against the jury's finding.

### B.  Evidence Weighs Against a Finding that Ford Acted "Willfully."

Even if the Court permitted Plaintiffs' express-warranty verdict to stand, it could only do so by relying on the ambiguous and contradicted testimony of the undocumented dealership visit discussed above.  That shaky foundation cannot also support the jury's finding of willfulness, which is required for any award of civil penalties.  (Verdict Form (*Quintero* ECF 47), at p. 4.)

A manufacturer acts willfully only if it "knew of its obligations but intentionally declined to fulfill them."  *Schreidel v. Am. Honda Motor Co.,* 34 Cal. App. 4th 1242, 1249–50 (1995).  Put another way, "a violation is not willful if the defendant's failure to replace or refund was the result of a good faith and reasonable belief the facts imposing the statutory obligation were not present."  *Kwan v. Mercedes-Benz of N. Am., Inc.,* 23 Cal. App. 4th 174, 185 (1994); *see also Robertson v. Fleetwood Travel Trailers of Cal., Inc.,* 144 Cal. App. 4th 785, 815 (2006); CACI 3244.)  There is no evidence Ford was aware of this undocumented visit when it denied Plaintiffs' reimbursement request or at any time before trial.

As discussed above, Plaintiffs' May 17, 2017 reimbursement request was based solely on Plaintiffs' assertion that the Focus was unsafe because it had lost power once.  At that time, there had been only a single, documented repair visit for transmission shudder in August 2015 and no complaints since.  Again, a single repair visit is insufficient.  There is no evidence that Ford was aware, or even could have been aware, of an undocumented visit for unspecified problems in which Plaintiffs were purportedly turned away by a dealership employee.

Further, as discussed above, there was no evidence (then or at trial) that

1  Plaintiffs had sought a repair for the loss-of-power issue for which they requested
2  reimbursement.  There is no evidence that Plaintiffs sought reimbursement because of
3  the transmission shudder where there had been one repair visit.  This is fatal because,
4  even if there had been multiple repair visits for shudder, Plaintiffs' failure to identify
5  shudder as a continuing problem or as a basis for reimbursement precluded Ford from
6  knowing that the shudder was a "substantial impairment" to Plaintiffs.  As the Court
7  instructed, "substantial impairment" is determined by reference to a "reasonable
8  person in the Quinteros' situation." (*Quintero* ECF 42, p. 20.)

9       Here, the evidence available to Ford when it denied Plaintiffs' reimbursement
10  request was that Plaintiffs had made a single complaint and repair visit for
11  transmission shudder in August of 2015, did not seek reimbursement because of that
12  shudder, and did not complain that the subsequent May 23, 2017 repair visit failed to
13  repair the shudder.  The clear weight of evidence is against the finding of willfulness.

14       Based on the paucity of evidence described above, the jury's verdict against
15  Ford can only be explained as the result of passion and prejudice caused by Plaintiffs'
16  misconduct and/or erroneous rulings that prejudiced Ford.

17  **III.    New Trial is Warranted Because of Pervasive, Prejudicial Misconduct.**

18       Misconduct by counsel and witnesses warrants a new trial "where the flavor of
19  misconduct ... sufficiently permeates an entire proceeding to provide conviction that
20  the jury was influenced by passion and prejudice in reaching its verdict.  Where
21  misconduct permeates the proceeding, the jury is necessarily prejudiced.  Constant
22  objections are certainly not required, as they could antagonize the jury...." *Anheuser-*
23  *Busch, Inc.*, 69 F.3d at 346 (internal quotations and citations omitted).

24       A court evaluating prejudice from misconduct should consider "the totality of
25  circumstances, including the nature of the comments, their frequency, their possible
26  relevancy to the real issues before the jury, the manner in which the parties and the
27  court treated the comments, the strength of the case, and the verdict itself."
28  *Hemmings v. Tidyman's Inc.*, 285 F.3d 1174, 1193 (9th Cir. 2002).  Even a single act

MEMO ISO MOTION FOR NEW TRIAL
CASE NO. 2:18- ML-02814 (QUINTERO)

of misconduct may warrant a new trial. *See Cnty. of Maricopa v. Maberry*, 555 F.2d. 207, 219, 222 (9th Cir. 1977) (a single improper question sufficient to require new trial where the misconduct was "an intentional act, done with the sole purpose of bringing to the jury something it should not have heard"). Prejudicial misconduct warranting a new trial can take many forms, including comments during opening statement and closing argument, discovery misconduct, introduction of inadmissible prejudicial evidence, and expert testimony beyond the scope of their report and disclosure. *See, e.g., Stop Staring! Designs v. Tatyana, LLC*, 625 Fed.Appx. 328, 330 (9th Cir. Aug. 31, 2015) (expert testifying outside scope of report); *Jones v. Aero/Chem Corp.*, 921 F.2d 875, 878-79 (9th Cir. 1990) ("Failure to disclose or produce materials requested in discovery can constitute 'misconduct'"); *Christopher v. Fla.*, 449 F.3d 1360, 1367 (11th Cir. 2006) (improper closing argument).

Here, Plaintiffs' counsel and Mr. Micale engaged in a calculated pattern of misconduct intended to distract from the weak facts of Plaintiffs' case and obtain a verdict by inflaming the passions and prejudice of the jury. As shown below, this pattern of misconduct primarily involved: 1) knowingly offering irrelevant, inadmissible, and prejudicial information through Plaintiffs' counsel's loaded questions and statements to the jury, and by Mr. Micale's spontaneous and nonresponsive testimony; 2) representing to the Court that certain prejudicial evidence may have marginal relevance to a limited issue, but then using that evidence for improper purposes; 3) introducing improper evidence to support a factual narrative never disclosed during discovery; and 4) improper attacks on Ford and its counsel.

### A. Misconduct Relating to Irrelevant, Prejudicial, and Unsupported Incidents and Harms to Others Warrants a New Trial.

In both *Quintero* and the preceding *Pedante* trial, Ford moved *in limine* to exclude evidence of other, unrelated incidents having nothing to do with Plaintiffs' vehicles as irrelevant, prejudicial, and based on the lack of any evidence of substantial similarity. *See* MDL ECF Nos. 512 and 654; *Ramirez v. ITW Food Equip. Group,*

*LLC*, No. 12-10023-AB, 2018 WL 5816093, *6 (C.D. Cal. July 3, 2018) (party proffering other-incident evidence must show substantial similarity).) In granting and denying the motions in part in both cases, the Court recognized the limited relevance, substantial prejudice, and evidentiary burden required for such evidence. For example, in *Pedante*, the Court ruled:

> Although other incidents may in theory be admissible, the real issue is how to determine which incidents are "substantially similar," and as discussed below, the other incidents Plaintiff discussed in the papers and at oral argument are not admissible. Therefore, the Court **ORDERS** that before seeking to introduce such evidence, Plaintiff must make an offer of proof out of the hearing of the jury.
> …
> Furthermore, telling the jury that a class action [*Vargas*] was filed against Ford regarding the same transmission is highly likely to invite the jury to simply conclude that Plaintiff's vehicle is necessarily defective, and thus invites the jury to speculate and base its decision on improper considerations.

(MDL ECF 613 at p. 4.) In *Quintero*, the Court further ruled:

> This issue was litigated ad nauseam in the *Pedante* trial. The Court sees no reason to depart from the rulings it made in *Pedante,* and will restate them briefly. The focus of these MDL cases is on whether the plaintiffs' specific vehicles had a non-conformity that Ford could not repair and that impaired its utility, value, or safety, and whether Ford wilfully denied a buyback remedy. Ford's knowledge that vehicles equipped with DPS6 transmissions were susceptible to certain undesirable symptoms and defects is relevant to wilfulness, and to the extent the Motion seeks to exclude such evidence it is **DENIED.** But specific other incidents and specific other complaints are far less relevant, because they do not necessarily show Ford's knowledge of a widespread problem. Likewise, the fact that there were lawsuits and investigations does not establish that *Plaintiffs'* vehicle was a lemon, and Ford's knowledge will be established by other more direct means, specifically by Ford witnesses testifying about it.

(MDL ECF 695 at p. 4 (emphasis in original).)

The Court specifically described the prejudicial intent and effect of such evidence: "The unspoken purpose of introducing such episodes, other litigation, and

other lawsuits and investigations is to invite the jury to decide on improper grounds, such as speculation and passion. The Court will not permit this." (*Id.*)

Despite the Court's prohibitions based on the substantial prejudice and limited relevance even if Plaintiffs had been able to establish the required substantial similarity, Plaintiffs' counsel and Mr. Micale repeatedly sought to introduce unsupported evidence of other incidents and harms to non-parties through loaded questions, comments to the jury, and nonresponsive answers. (*See, e.g.,* 12/10/19 Tr. (Decl., Ex. B) at 249:12-250:3, 251:12-252:3; 12/11/19 Tr. (Decl., Ex. C) at 343:12-16; 344:20-345:2; 357:9-358:10, 359:3-8; 383:15-384:8, 446:6-12, 487:8-14, 513:4-13; 12/12/19 Tr. (Decl., Ex. D) at 580:15-581:3, 586:15-593:5, 597:9-598:6, 626:20-628:14; 12/17/19 Tr. (Decl., Ex. E) at 1253:7-12, 1265:5-11). They repeatedly did so despite early admonitions from the Court to "focus on the Quinteros, please." (12/11/19 Tr. (Decl., Ex. C) at 446:6-12.)

Two related examples particularly illustrate the prejudicial nature and intent of this misconduct to inflame the jury. On cross-examination, Ford's counsel asked Mr. Micale whether there was greater acceleration in a vehicle interior "going over a lane marker or experiencing 400 rpms of this shudder…." (12/12/19 Tr. (Decl., Ex. D) at 580:15-20.) This innocuous question resulted in the following exchange:

> A. Based on the on the data I've looked at and the injuries in the data from Ford that have occurred, I would have to say, you know, ***when I hear a woman with osteoporosis breaking a rib*** --
> MR. KELLY: Objection, Your Honor.
> THE WITNESS: I have to say --
> MR. KELLY: Move to strike as nonresponsive.
> THE COURT: Stricken.

(*Id.* at 580:21-581:3 (emphasis added).) As subsequent questioning established (*id.* at 581:5-582:4), Mr. Micale did not know the answer to Ford's question and rather than admit that inability, Mr. Micale chose to lob a grenade into the jury box: an unsupported, inadmissible, Court-excluded hearsay statement that "data from Ford" showed the shudder in Ford's vehicles caused multiple injuries, including causing a

MEMO ISO MOTION FOR NEW TRIAL
CASE NO. 2:18- ML-02814 (QUINTERO)

woman with osteoporosis to break a rib and that Ford was aware of that injury.  The irrelevance, prejudice, and impropriety of this statement was manifold.  First, by claiming that this information came from Ford's data implies that Ford was aware of and confirmed that its shuddering caused injuries, including to a likely elderly and frail woman.  Even if it had been relevant (it was not), Plaintiffs and Mr. Micale sidestepped their burden of proving substantial similarity.  Second, forcing Ford to object and move to strike exacerbated the prejudice by giving the jury the impression that Ford was seeking to "hide" its purported knowledge of injuries from the jury.

Standing alone, and despite the Court striking that testimony, Mr. Micale's testimony warrants a new trial.  *Cnty. of Maricopa*, 555 F.2d. 207, 219, 222 (a single improper question, which the court struck and admonished the jury to disregard, warranted new trial where it was "an intentional act, done with the sole purpose of bringing to the jury something it should not have heard").  Not content with the enormous prejudice caused by Mr. Micale's comments, Plaintiffs' counsel and Mr. Micale doubled down.  Merely five transcript pages later on re-direct, Mr. Micale again volunteered the same prejudicial statements and Plaintiffs' counsel twice asked Mr. Micale to confirm, forcing Ford to object again and approach at sidebar:

> Q.   …Isn't there a whole range of bucking and jerking, even according to Ford, some less perceptible and getting gradually significantly perceptible?
> A.   Absolutely. The data -- the Ford information that I've seen shows even injuries occurring from the bucking and jerking.
> Q.  From Ford?
> A.  From Ford.
> …
> Q.   You've seen Ford documentation of injuries and accidents related to this -- let's use the term, of Ford jerking?
> MR. KELLY: Objection, Your Honor. That violates the motion in limine. I'd like to approach.
> THE COURT: Sustained.
> MR. KELLY: I'd like to approach, Your Honor.

(12/12/19 Tr. (Decl., Ex. D) at 586:10-587:11.)

MEMO ISO MOTION FOR NEW TRIAL
CASE NO. 2:18- ML-02814 (QUINTERO)

At sidebar, Ford moved for mistrial "based on the continued misconduct of counsel in conjunction with this witness" by "intentionally violat[ing] an order in limine that is of substantial prejudice to the defense." (*Id.* at 587:12-18.)  The Court agreed that Mr. Micale had intentionally volunteered information excluded by the Court and that Plaintiffs' counsel had then improperly asked Mr. Micale questions about that information even after it had been stricken by the Court:

> THE COURT:  I thought it was pretty clear we're not going to discuss other injuries, other incidents involving Ford, other incidents of injuries related to -- at any point related to the DPS6.
>
> Mr. Micale volunteered on his own and actually, you're going to try to pounce on it, but I thought we were clear that that was not going to come out in this trial.
> …
> I think the reference to other injuries volunteered by Mr. Micale is clearly violating the Court's order, and he did it on purpose. I mean, there's no – I don't think there's any way any objective person could say that was not on purpose.
>
> I thought it was clear we were not going to have all this testimony about people getting injured in car accidents as a result of this, and he did it.
> …
> THE COURT: But that's what Mr. Micale just did. He just referenced something completely out of the blue. I mean, he did. And now you can be upset about the question, but if we're just focused on the issue, he referenced something completely out of the blue.
> …
> THE COURT: It was already stricken. But you come back and start asking questions about it --
>
> MR. ALTMAN: Well, I'm not asking -- I'm not going --
>
> THE COURT: Well, you already -- wait a minute.  Wait a minute. Mr. Altman, just to tease you, I'm going to order the transcript. I'll pull up the transcript and show you what you just asked.

(*Id.* at 588:9-593:5.)

The Court nevertheless denied Ford's mistrial motion.  (*Id.*)  After Mr. Micale was excused, the Court further commented and chastised Plaintiffs' counsel based on the above and the improper interplay between Plaintiffs' counsel and Mr. Micale, who

the Court recognized "had gone rogue":

> THE COURT: …   At sidebar, we were talking about this whole back-and-forth with Mr. Micale and whether -- how this issue came up. You had said you were trying to only deal with those documents, and I think in answering the question, "I agree with the Court that the woman's injuries -- that was clearly something that we had not talked about," we, meaning you and Mr. Micale, and you made that representation to the Court, and I accept that.
>
> But I think he was going along with answering --answering and then I said, "But that part was stricken," and you came back and started asking questions about it.
>
> Your response was, "I'm not asking any questions about it." The transcript right before the break was – the question you asked that raised the issue at sidebar, "You have seen Ford documentation of injuries and accidents related to this."
>
> …
>
> THE COURT: Well, I just -- Mr. Altman, look. You know my opinion of you. You are an outstanding lawyer. I learned well as a baby public defender from you, but ***I think your zealousness in this has made the lines blurry***.
>
> And so we'll keep doing this dance, but I think this is an example where you say one thing and I know in your mind you believe it to be true, but I think the lines are blurred. ***And combining that with a witness who's also just gone completely rogue*** -- I'm sorry. At a certain point, I thought an expert was supposed to be -- I thought supposed to be neutral, just state their opinions. That's not what's happening here, in my opinion. ***He has clearly become an advocate. And when you combine the two, I don't think it's appropriate.***
>
> And so I would hope going forward, we will just get to the facts. ***This family deserves to have a jury decide this case on its merits without all these other shenanigans***.

(*Id.* at 626:20-628:14 (emphasis added).)   Ford likewise deserved "to have a jury decide this case on its merits," but intentional misconduct by Plaintiffs' counsel and Mr. Micale prevented that.  As the Court later noted regarding Ford's mistrial motion based on numerous issues, Mr. Micale's misconduct was knowing:

> But I think the point that you may not want to address or -- is that Mr. Micale is just going to get up here and say what he wants.

I'm sorry. And you can smirk, you can disagree; but I have never seen an expert be more of an advocate than the witness in any case I've tried.

I mean, *he was destined to say what he wanted to say on the stand despite your telling me that you spoke to this witness at length. He got up and did what he wanted to do.*

*There's no logical -- no basis for it other than to think that he intentionally did it; and it's hard to get around that.*

…

THE COURT: Right. But, again, Mr. Altman, I'm sorry. I'm just not going to allow you to just gloss over this. That man sat in this trial -- two trials – every day, heard all the motions in limine, heard everything. *He knew exactly what was supposed to come in and what was not.*

But when it's convenient for him to play: I don't know. I'm not a lawyer. Now he's using it as a shield. He was here up until he finished his testimony every day.

*He knew what was supposed to come in and what wasn't supposed to come in and he chose, because he didn't like the questions that counsel posed him, to inject stuff that he knew was not permitted in this trial.*

And look. I get it. You need to do what you need to. But I'm not falling for this notion that he somehow he wasn't aware of what was permissible and what was not. He knew exactly what he was doing when he made those statements.

(*Id.* at 708:4-16, 708:25-709:16 (emphasis added).)

The Court's aspiration about future conduct was in vain.  Again ignoring the repeated warnings and chastisement from the Court about inadmissibility of alleged injuries from purported Ford documents, Mr. Altman's closing argument admitted the improper goal of their repeated misconduct, which was to convince the jury that Ford was hiding information from them about purported injuries:

[MR. ALTMAN:]  Ask yourself in terms of who was transparent. Why can't we see the 14-D reports and show you, have someone from the Automotive Safety Office –
MR. KELLY: Objection, Your Honor.
I'm sorry, Counsel.
Improper argument, Your Honor.
THE COURT: Overruled.

MEMO ISO MOTION FOR NEW TRIAL
CASE NO. 2:18- ML-02814 (QUINTERO)

MR. ALTMAN: Why can't someone from the Automotive Safety Office [of Ford] appear before you and answer questions about the accidents and injuries and property damage related to shudder, related to loss of power.

MR. KELLY: Objection, Your Honor. Improper argument.

THE COURT: Sustained.

(12/17/19 Tr. (Decl., Ex. E) at 1264:23-1265:11.)

Courts recognize that "this type of evidence has a strong impact on juries, as it tends to imply that a product is defective based simply on the occurrence of other accidents." *Moody v. Ford Motor Co.*, 506 F. Supp. 2d 823, 834-35 (N.D. Okla. 2007). Based on strikingly similar misconduct, the court in *Moody* granted a new trial, in part, based on plaintiff's repeated reference to other incidents throughout trial without any effort to establish "substantial similarity" as required by the court's *in limine* order. *Id.* at 834, 847. Similarly here, Plaintiffs' counsel and Mr. Micale improperly tried to have the jury consider stories of injuries and harm to others purportedly caused, and known, by Ford. This required Ford to repeatedly object before the jury, and have testimony and comments stricken. Plaintiffs' counsel then argued in closing that the jury should disbelieve Ford because it purportedly kept that excluded information from the jury. Given the weakness of Plaintiffs' case, there can be no question that the jury improperly did so. Ford is entitled to a new trial on Plaintiffs' express-warranty claim.

## B. Plaintiffs' "Trial by Ambush" Misconduct Warrants a New Trial.

The discovery and disclosure requirements of the Federal Rules of Civil Procedure is intended to prevent "trial by ambush." *See Hammonds v. Yeager*, 2017 WL 10560470, at *2 (C.D. Cal. Aug. 10, 2017); *see also Nationwide Life Ins. Co. v. Richards*, 541 F.3d 903, 910 (9th Cir. 2008). "Failure to disclose or produce materials requested in discovery can constitute 'misconduct.'" *Jones*, 921 F.2d at 878-79.

Here, Plaintiffs' counsel and Mr. Micale engaged in prejudicial misconduct by introducing facts and evidence at trial that they did not disclose during discovery and which, in fact, contradicted prior representations and disclosures.

MEMO ISO MOTION FOR NEW TRIAL
CASE NO. 2:18- ML-02814 (QUINTERO)

Going into trial, a central fact on which Ford relied was that Plaintiffs had never sought repair for their claimed lost-power incident nor had they communicated that incident to Ford (through dealership visits or otherwise) until they requested lease-reimbursement in May 2017. Up until the day before trial, Plaintiffs' counsel conceded that was true and admitted that the loss of power incident had no relevance to their express-warranty claim but was relevant to their implied-warranty claim. (Dec. 9, 2019 Hr'g Tr. (Decl., Ex. A) at 15:13-16:1.)

For the first time at trial, Mr. Micale relayed purported hearsay that during an undocumented dealership visit, not even validated by either plaintiff, Plaintiffs complained that they had lost power while driving. (12/11/19 Tr. (Decl., Ex. C) at 509:11-510:21.) Mr. Micale conceded that his expert report did not state he was relying on Plaintiffs' depositions nor did it contain any reference to the Quinteros' vehicle having lost power at all. (*Id.* at 491:11-20; 12/12/19 Tr. (Decl., Ex. D) at 568:16-19.) Mr. Micale relayed this hearsay experience based on conversations he purported to have with the Quinteros ***during trial***. (12/11/19 Tr. (Decl., Ex. C) at 442:12-443:5; 12/12/19 Tr. (Decl., Ex. D) at 568:23-569:7.) Plaintiffs never supported or contradicted Mr. Micale's testimony, simply testifying that they told the dealership that "there's a problem with the car. It's not performing the proper way." (*Id.* at 748:9-749:7.)

There can be no dispute that Ford was ambushed and prejudiced by this previously undisclosed testimony by Mr. Micale. Despite Plaintiffs' day-before-trial concession that the loss-of-power was irrelevant to their express-warranty claim because there had never been a related repair presentation, Plaintiffs' closing argument on substantial impairment for the express-warranty claim focused largely on the loss-of-power. (12/17/19 Tr. (Decl., Ex. E) at 1239:23-1240:1, 1241:25-1242:9, 1245:12-17, 1252:6-11.)

Relatedly, Ford relied on uncontradicted testimony before trial that Plaintiffs did not contact Ford or present their vehicle to a dealership a second time until after

MEMO ISO MOTION FOR NEW TRIAL
CASE NO. 2:18- ML-02814 (QUINTERO)

they had hired counsel.  (*See, e.g.,* Ford's Opp. to Pl.s' MIL No. 2 (MDL ECF 671) at 3:20-4:7; Dec. 9, 2019 Order (MDL ECF 695) at p. 2 ("Pedante had numerous repair attempts before he contacted counsel, whereas the Quinteros had only 1 repair attempt before contacting counsel.  The Court agrees with Ford that, at a minimum, the chronology leading up to Plaintiffs' filing this case is relevant and admissible".)

For the first time at trial, Plaintiffs' counsel disputed this timeline, seeking to use a redacted version of their retainer agreement to "refresh" Mrs. Quintero's recollection that she had hired counsel after they contacted Ford and presented their vehicle to a dealer.  (12/12/19 Tr. (Decl., Ex. D) at 679:7-684:4; Trial Ex. 49.)  The Court recognized that "plaintiffs have been silent about, oh, we have this – there's never been any mention of this document to suggest that what Ford said is inaccurate" and warned that Plaintiffs had "put this now in play." (*Id.* at 682:6-12.)

Plaintiffs should not have been permitted to use this document at all.  In discovery, Plaintiffs refused Ford's request to produce the retainer agreement.  (Decl., Ex. F at pp. 28:19-29:4 (objecting to Ford's request to produce Plaintiffs' "fee agreement"); Ex. G, Req. for Prod. 52-54 (same).)  Similarly, at deposition, Plaintiffs refused to answer questions about how they retained counsel (other than that it occurred before they called Ford), claiming privilege.  (Y. Quintero Dep. Tr. (Decl., Ex. H) at 176:7-177:4.)  Plaintiffs should not have been permitted to use privilege as a shield to prevent Ford from obtaining material and then seek to use that same material at trial to contradict one of Ford's defense themes.

### C. Additional Misconduct by Plaintiffs' Counsel Warrants a New Trial.

While the above misconduct is sufficient to warrant a new trial, repeated additional misconduct also support the need for a new trial.  These include:

- **Further Argumentative, Leading, and Loaded Questions by Counsel**

As this Court repeatedly recognized, Plaintiffs' counsel's "questioning" at trial was marked by repeated and improper argumentative, leading, and loaded questions.  (12/11/19 Tr. (Decl., Ex. C) at 388:2-7 ("Mr. Altman, you need to do what you need

1   to do but you are testifying.  You are testifying half of your questions."); 12/17/19 Tr.

2   (Decl., Ex. E) at 1155:4-8 ("Mr. Altman, look.  I'll try it again.  You know you cannot

3   – you cannot argue the case in front of the jury through the question.")  After one

4   particularly egregious exchange between Mr. Altman and Mr. Micale, Ford moved for

5   mistrial because the improper questioning appeared intentional, requiring Ford to

6   repeatedly object and appear obstructive.  (12/12/19 Tr. (Decl., Ex. D) at 601:2-

7   604:22.)  The Court did not grant a mistrial but warned, "You're leading him through

8   this examination.  You can't do it.  So find a way to get the answer out without

9   leading him, and let's move on, please."  (*Id.* at 604:19-22.)

10   Courts recognize substantial prejudice warranting mistrial may arise from

11   leading, loaded, and argumentative questions, including "tipp[ing] witnesses how to

12   answer[,] … suggest[ing] inadmissible evidence[,] … compel[ing] defense counsel to

13   preserve the record again and again at the risk of impressing on the jury that they

14   attempted to hide evidence."  *Clanahan v. McFarland Unified Sch. Dist.*, No. CVF

15   05-0796 LJO DLB, 2007 WL 2253597, at *2 (E.D. Cal. Aug. 3, 2007).

16   Illustrative examples of this improper questioning include questions implying

17   the existence of unidentified and unadmitted "exposes on the DPS6" and "complaints

18   to the National Highway Traffic Safety Administration about the DPS6" (12/11/19 Tr.

19   (Decl., Ex. C) at 344:16-345:1), implying the DPS6 design "violat[es] Federal Vehicle

20   Motor Safety Standards" (*Id.* at 449:13-16), and suggesting that Plaintiffs did seek

21   repair for the loss-of-power incident but Ford "did not input" that information in

22   repair orders (*id.* at 443:18-444:5).  *See also, e.g., id.* at 339:4-9, 359:16-21, 380:25-

23   381:5; 12/12/19 Tr. (Decl., Ex. D) at 597:9-598:6, 598:22-599:2, 600:24-601:6.)

24   • **Reference to Inadmissible Evidence by Mr. Micale and Counsel**

25   Further misconduct was not limited to loaded, leading, and argumentative

26   questions.  As discussed above, Mr. Micale and Mr. Altman often appeared to operate

27   in tandem to present inadmissible and hearsay evidence to the jury, even where

28   subsequent questioning required the jury to consider testimony the Court had stricken.

MEMO ISO MOTION FOR NEW TRIAL
CASE NO. 2:18- ML-02814 (QUINTERO)

For example, questioning Mr. Micale about safety impairment for "bucking and jerking" resulted in the following exchange:

> Q. If you were to qualify it or quantify it, is it a nominal impairment or a significant one or somewhere else?
> A. Why rely on me? The Ford chief engineer called it a severe -- I think it was a severity 10.
> MR. KELLY: Objection, Your Honor. I move to strike as nonresponsive, Your Honor.
> THE COURT: Sustained; stricken.
> BY MR. ALTMAN:
> Q. What is a severity level 10 in the automotive industry?
> A. It's the worst possible.

(12/11/19 Tr. (Decl., Ex. C) at 454:2-18.)

- **Taking Away Benefit of Summary Judgment for Ford.**

Despite Ford obtaining summary judgment on Plaintiffs' fraud claims (MDL ECF 661, p. 10), Plaintiffs' counsel asked questions and made arguments implying that Ford engaged in fraud by failing to disclose information to Plaintiffs and the public. (*See, e.g.,* 12/11/19 Tr. (Decl., Ex. C) at 418:20-419:7, 431:22-432:4.)

Whether Ford ever gave certain information to Plaintiffs is irrelevant to any element of the claims at trial. Coupled with Plaintiffs' pervasive efforts to convince the jury that Ford was concealing information from them at trial, there can be no question that this misconduct was intended to deprive Ford of the benefit of the summary judgment ruling. This warrants a new trial. *Christopher*, 449 F.3d at 1367 (new trial granted where "Plaintiff's counsel's improper closing argument prejudiced the substantial rights of Defendants by taking away from Defendants the benefits of the partial summary judgment they had won before trial and by incorrectly expanding the grounds for liability at trial to include grounds ruled out by the court").

- **Improper Attacks on Ford's Counsel**

In combination with forcing Ford's counsel to make repeated and numerous objections and thereby raise the risk of impressing on the jury that Ford was hiding evidence, Plaintiffs' counsel also made several improper and argumentative attacks

20

implying Ford's counsel was hiding information or misstating the record.  (12/11/19 Tr. (Decl., Ex. C) at 384:25-385:16; 12/12/19 Tr. (Decl., Ex. D) at 586:10-14.)

These attacks were improper in the abstract but the prejudice is heightened here, where a theme of Plaintiffs' misconduct was that Ford withheld evidence from both Plaintiffs and the jury.  *See U.S. v. Young*, 470 U.S. 1, 9 (1985) (counsel "must not be permitted to make unfounded and inflammatory attacks on the opposing advocate")

Plaintiffs' counsel's misconduct permeated the trial.  Viewed individually, the above incidents would support a new trial.  Viewed in their totality, the effect is overwhelming.  As one court aptly described under similar circumstances:

> Under the totality of the circumstances, [counsel's] cumulative misconduct from jury selection to closing argument circumvented the trial's purpose-to find the truth while following the law. This activity is best characterized as "synergistic misconduct." The end result was a tainted and unfairly influenced jury verdict. [Counsel's] misconduct so permeated the proceedings that defense objections and Court remedial measures were insufficient to immunize the jury. The flavor of counsel misconduct influenced the jury by passion, prejudice and consideration of precluded evidence and counsel-created suggestions. [Citations]. A miscarriage of justice would arise if the verdict were allowed to stand. [Counsel's] misconduct constituted an intentional diminution of the duty to abide by and respect the Rule of Law.

*Clanahan v. McFarland Unif. Sch.*, 2007 WL 2253597, *8 (E.D.Cal. Aug. 3, 2007).

Given the weakness of Plaintiffs' evidence and the baselessness of the resulting verdict of maximum civil penalties, there can be no question that the misconduct of Plaintiffs' counsel and Mr. Micale permeated the trial and inflamed the passion and prejudice of the jury.  As this Court repeatedly recognized, this misconduct was intentional and intended to present inadmissible and excluded evidence to the jury.

## IV.  New Trial is Warranted Based on Errors of Law.

Certain errors of law also contributed to the improper verdict, particularly those used by Plaintiffs to further the prejudice of the misconduct described above.

### A. Erroneous Denial of Ford's Mistrial Motions

As discussed above, Ford moved for mistrial several times based on much of Plaintiffs' misconduct.  (*See* 12/12/19 Tr. (Decl., Ex. D) at 586:15-593:5 (moving for mistrial based on violation of order excluding "other incidents"), 601:2-604:22 (moving for mistrial based on improper questions), 701:11-718:15 (moving for mistrial based on trial by ambush, Mr. Micale's references inadmissible and excluded evidence, and prejudice caused by Plaintiffs' counsel's loaded and leading questions).

The standard for mistrial based on attorney misconduct mirrors that for a new trial.  *Koo v. Stipek*, 162 F.3d 1168 (9th Cir. 1998).  The Court erred in denying them.

### B. Erroneous Evidentiary Rulings

Second, based in large part on Plaintiffs' misuse and misconduct, the Court erred in ruling on certain evidentiary issues, including:

- Erroneous Admission and Use of Trial Exhibit 48 (the "Garza video")

Over Ford's objection, Plaintiffs convinced the Court of the "marginal relevance" of portions of the Garza video (purporting to depict another consumers' loss of power incident), arguing that Mrs. Quintero would testify that the depiction reflected her own experience.  (*See* MDL ECF 698.)  Aware of its prejudicial impact and lack of probative value, Plaintiffs' counsel nonetheless vouched for the accuracy of the video to the jury, providing the entire background of the video, the history of the drivers' purported multiple problems, and that he "went to Connecticut and took the deposition of Mr. Garza to confirm what he testified happened to him in his Ford Focus."  (12/10/19 Tr. (Decl., Ex. B) at 251:12-252:3.)  Plaintiffs' counsel acted as a conduit for evidence he knew would not be admitted, which is necessarily improper. *See Draper v. Rosario*, 836 F.3d 1072, 1083 (9th Cir. 2016) (asking the jury to rely on evidence outside the record is improper).  After this misconduct, Ford again moved to exclude the video (MDL ECF 698)  Plaintiffs' counsel then admitted that the purpose of his opening was to "set the foundation" before the jury or, in other words, to have the jury consider it as an "other incident" based solely on Plaintiffs' counsel's confirmation.  (12/11/19 Tr. (Decl., Ex. D at 523:13-525:13.)  While the Court agreed

that Plaintiffs' opening was improper, it declined to exclude the video and also rejected Ford's alternative requests intended to minimize prejudice.  (12/12/19 Tr. (Decl., Ex. D) at 561:2-565:20.)  Those requests included striking and instructing the jury to disregard those portions of opening statement, removing the sound, and excluding the image of Mrs. Garza.  (*Id.*)

Plaintiffs' and their counsel's opinions concerning the Garza incident was improper lay opinion under Rule 701.   Where demonstrative or other incident evidence is used to prove or replicate disputed events, the proponent must establish substantial similarity.  *White v. Ford Motor Co.*, 312 F.3d 998, 1009 (9th Cir. 2002); *Johnson v. Ford Motor Co.*, 988 F.2d 573, 579 (5th Cir. 1993); *Muth v. Ford Motor Co.*, 461 F.3d 557, 566 (5th Cir. 2006); *see also Harkins v. Ford Motor Co.*, 437 F.2d 276, 278 (3d Cir. 1970).  The Quinteros were not qualified to, nor timely disclosed to, unfairly ambush Ford with this opinion testimony.

Particularly given Plaintiffs' improper focus on irrelevant other incidents and lack of foundation to establish substantial similarity of the Garza's experience, the Court's admission of the video and refusal to minimize the prejudice was error.

- The Court's Treatment of Trial Exhibit 49 (the retainer agreement)

Following Plaintiffs' improper use of a heavily redacted copy of their retainer agreement to refresh Mrs. Quintero's recollection, as discussed above, Ford requested an opportunity to review an unredacted copy for cross-examination and to admit portions into evidence.  Federal Rule of Evidence 612 governs and states:

> [A]n adverse party is entitled to have the writing produced at the hearing, to inspect it, to cross-examine the witness about it, and to introduce in evidence any portion that relates to the witness's testimony. If the producing party claims that the writing includes unrelated matter, the court must examine the writing in camera, delete any unrelated portion, and order that the rest be delivered to the adverse party. ***Any portion deleted over objection must be preserved for the record***.

(emphasis added).   After review of the redacted and unredacted copies, the Court denied Ford's request to: 1) review the unredacted version; 2) obtain a copy of the

redacted version used at trial and marked in the record; 3) admit the redacted version into evidence; and 4) returned both versions to Plaintiffs' counsel, thereby failing to preserve Trial Exhibit 49 for the record, and precluding any appellate review of the Court's ruling or allow Ford to determine the prejudice it suffered.   The Court's treatment of this exhibit was error.   Ford again requests the Court order both the unredacted and redacted copies be produced and made a part of the trial record.

- Erroneous Admission of Trial Exhibits 99, 371, 373, 568, 569, and 2393

Over Ford's objection, the Court erroneously admitted portions of Trial Exhibits 99, 371, 373, 568, 569, and 2393.   Plaintiffs failed to lay the necessary foundation for their admission and, even to the extent they did so, they each constitute hearsay or multiple levels of hearsay without proof of an applicable exceptions.   *Sana v. Hawaiian Cruises*, Ltd., 181 F.3d 1041, 1045 (9th Cir. 1999) ("For the document to be admissible, each layer of hearsay must satisfy an exception to the hearsay rule").

## C. Erroneous Rulings on Jury Instructions and Verdict Form.

The Court erred in denying Ford's request to eliminate the "value" prong of the "substantial impairment" element from the jury instructions and verdict form.   (*See, e.g., Quintero* ECF 42, Nos. 16 and 18; 12/17/19 Tr. (Decl., Ex. E) at 1097:13-1101:1).   Substantial impairment is measured by an objective test.   *LaPorta v. BMW of N. Am., LLC*, 2019 WL 988675, at *4 (C.D. Cal. Jan. 24, 2019).   Plaintiffs introduced no evidence of any objective impairment to the value of their vehicle.   In the absence of such evidence, the jury should not have been permitted to find liability based on any impairment of value.   *See, e.g., Figiel v. Hyundai Motor Am.*, 2006 WL 2411460, at *5 (Cal. Ct. App. Aug. 22, 2006) (no evidence of substantial impairment of value where plaintiff failed to "present any evidence showing that" the claimed defect "substantially lessened the resale value of the car").

The Court erred in rejecting Ford's requested language as to the "'Reasonable Opportunities' Explained" jury instruction.   (*See* Closing Jury Instructions (*Quintero* ECF 42), No. 17; Disputed Jury Instructions (MDL ECF 687 at pp. 5-6); 12/17/19 Tr.

(Decl., Ex. E) at 1102:2-21.)  As discussed above, Plaintiffs' express warranty claim required Plaintiffs to provide Ford at least two opportunities to repair ***each particular problem***.  *See Brownfield v. Jaguar Land Rover N. Am., LLC*, 584 F. App'x 874, 875 (9th Cir. 2014) (holding that similar modification to the same CACI instruction "correctly stated the law").  Given the lack of evidence of any opportunity to repair the loss-of-power defect, and Plaintiffs' misconduct arguing that alleged defect as a basis for their claim, the Court's rejection of Ford's proposed modification was prejudicial error.

The Court further erred in rejecting Ford's request that the jury "may consider [Plaintiffs'] continued use of the Focus when determining whether the use, value, or safety of the vehicle was substantially impaired" be added to Instruction No. 19.  (*See* Closing Jury Instructions (*Quintero* ECF 42), No. 19; Disputed Jury Instructions (MDL ECF 687 at p. 10); 12/17/19 Tr. (Decl., Ex. E) at 1105:16-20.)  This language is based on a distinction recognized in the "Directions for Use" in CACI 3230, on which this instruction is based.  The additional sentence results in an instruction that more accurately and clearly states the law. Without it, the instruction gave only Plaintiffs' side of the story.  Here, Ford contended that the Quinteros' continued use of the vehicle for years without complaint to Ford after their first repair presentation is relevant to substantial impairment, and it was entitled to an accurate and complete instruction that reflected its theory of the case.

## CONCLUSION

For all of the foregoing reasons, in the event the Court denies Ford's renewed JMOL motion, Ford respectfully requests the Court order a new trial limited to Plaintiffs' express-warranty claim.

June 5, 2019                                        Respectfully submitted,

SHOOK, HARDY & BACON LLP

By: /s/ *Andrew Chang*

Attorneys for Defendant Ford Motor Company