# EXHIBIT 1

**KNIGHT LAW GROUP LLP**
Roger Kirnos (SBN 283163)
kirnosrk@knightlaw.com
Daniel Kalinowski (SBN 305087)
danielk@knightlaw.com
10250 Constellation Blvd., Suite 2500
Los Angeles, CA   90067
Telephone: (310) 552-2250
Fax: (310) 552-7973

Attorneys for Plaintiff,
KAMISHA R. WARREN

### UNITED STATES DISTRICT COURT

### CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **KAMISHA R. WARREN,** | Case No.: 2:18-CV-01885-AB-FFM |
| Plaintiff, | **FIRST AMENDED COMPLAINT FOR:** |
| vs. | 1. **BREACH OF EXPRESS WARRANTY – VIOLATION OF SONG-BEVERLY ACT**<br>2. **BREACH OF IMPLIED WARRANTY – VIOLATION OF SONG-BEVERLY ACT**<br>3. **FRAUDULENT INDUCEMENT – CONCEALMENT**<br>4. **FRAUDULENT INDUCEMENT – INTENTIONAL MISREPRESENTATION**<br>5. **FRADULENT INDUCEMENT – NEGLIGENT MISREPRESENTATION**<br>6. **NEGLIGENT REPAIR** |
| **FORD MOTOR COMPANY, a Delaware Corporation; FOX HILLS AUTO, INC., a California Corporation, dba AIRPORT MARINA FORD; and DOES 1 through 10, inclusive,** | |
| Defendants. | |

-1-

Warren v. Ford – FIRST AMENDED COMPLAINT

Plaintiff, KAMISHA R. WARREN, alleges as follows against Defendants, FORD MOTOR COMPANY, a Delaware Corporation (hereinafter "Ford"); FOX HILLS AUTO, INC., a type of California Corporation, dba AIRPORT MARINA FORD, (hereinafter AIRPORT MARINA FORD); and DOES 1 through 10 inclusive, on information and belief, formed after an inquiry reasonable under the circumstances:

## DEMAND FOR JURY TRIAL

1.      Plaintiff, KAMISHA R. WARREN, hereby demands trial by jury in this action.

## GENERAL ALLEGATIONS

2.      Plaintiff KAMISHA R. WARREN is an individual residing in the City of Los Angeles, County of Los Angeles, and State of California.

3.      Defendant Ford Motor Company is and was a Delaware Corporation registered to do business in the State of California with its registered office in the City of Los Angeles, County of Los Angeles, and State of California.

4.      Defendant AIRPORT MARINA FORD is and at all relevant times was a California Corporation registered to do business in the State of California, with its principal place of business in the City of Los Angeles, County of Los Angeles, and State of California, and its registered agent for service of process in the City of Los Angeles, County of Los Angeles, and State of California.

5.      This cause of action arises out of the warranty obligations of Ford Motor Company for a vehicle purchased by Plaintiff and for which Ford Motor Company issued a written warranty.  Plaintiff also alleges that Ford concealed a known defect from Plaintiff. The defective component is called the DPS6 PowerShift Transmission (hereinafter "PowerShift Transmission").   The PowerShift Transmission is an "automated manual" transmission used by Ford in their 2011-2013 Ford Fiesta vehicles and 2012-2014 Ford Focus vehicles. Ford also misrepresented to Plaintiff the type of transmission the PowerShift transmission is/was.

6.      Plaintiff does not know the true names and capacities, whether corporate,

partnership, associate, individual or otherwise of Defendant issued herein as Does 1 through 10, inclusive, under the provisions of section 474 of the California Code of Civil Procedure.   Defendant Does 1 through 10, inclusive, are in some manner responsible for the acts, occurrences and transactions set forth herein, and are legally liable to Plaintiff.   Plaintiff will seek leave to amend this Complaint to set forth the true names and capacities of the fictitiously named Defendant, together with appropriate charging allegations, when ascertained.

7.     All acts of corporate employees as alleged were authorized or ratified by an officer, director or managing agent of the corporate employer.

8.     Each Defendant whether actually or fictitiously named herein, was the principal, agent (actual or ostensible), or employee of each other Defendant and in acting as such principal or within the course and scope of such employment or agency, took some part in the acts and omissions hereinafter set forth by reason of which each Defendant is liable to Plaintiff for the relief prayed for herein.

9.     On February 15, 2012, Plaintiff purchased a new 2012 Ford Focus, VIN: 1FAHP3F22CL285009, (hereinafter "the Vehicle" or "Subject Vehicle"), and express warranties accompanied the sale of the vehicle to Plaintiff by which Ford Motor Company undertook to preserve or maintain the utility or performance of Plaintiff's vehicle or provide compensation if there was a failure in such utility or performance. The sales contract is attached and incorporated by its reference as Exhibit 1.

10.     The vehicle was delivered to Plaintiffs with serious latent defects which later manifested and led to repairs performed under warranty for problems including, *but not limited to*, transmission issues.

11.     Plaintiff hereby revokes acceptance of the sales contract.

12.     Plaintiff hereby demands trial by jury in this action.

## The DPS6 PowerShift Transmission Defect

13.     The Vehicle was manufactured by Ford and delivered to Plaintiff with a PowerShift Transmission.   Ford offered the PowerShift Transmission as the sole

1  "automatic transmission" option in the Subject Vehicle.

2  14.    The PowerShift Transmission is neither a traditional manual transmission,
3  nor a typical automatic transmission, but is a computerized "automated manual"
4  transmission.

5  15.    Traditional manual transmissions use a driver-controlled clutch.  By
6  pressing and releasing a foot pedal, the driver causes the clutch to mechanically
7  engage and disengage the engine from the transmission, allowing the vehicle to travel
8  continuously while the driver manually changes gears. Because a clutch allows for
9  transfer of virtually all of the engine's power to the transmission, a properly designed
10  and operating manual transmission is highly efficient. However, operation of a manual
11  transmission can be difficult for less experienced drivers, and can result in the vehicle
12  jerking or shuddering during improper operation, manual transmissions are disfavored
13  by some consumers.

14  16.    In contrast, typical automatic transmissions free the driver from operating
15  the clutch through the use of a fluid-filled device called a torque converter.  The torque
16  converter substitutes for the manual transmission's clutch, transmitting power from
17  the engine to the transmission through a fluid medium.

18  17.    While automatic transmissions offer increased comfort and convenience,
19  they are generally less fuel efficient and slower-shifting than manual transmissions
20  because the torque converter transfers power through fluid less efficiently than a
21  mechanical clutch.

22  18.    Ford marketed and sold its PowerShift Transmission as an automatic
23  transmission that offered the "best of both worlds" combining a manual transmission's
24  fuel economy with an automatic transmission's ease of operation and shift quality.

25  19.    Ford's PowerShift Transmission is actually a set of computerized manual
26  transmissions.  It lacks a torque converter, instead using two clutches to mechanically
27  engage and disengage the engine and transmission.  Whereas similar "automated
28  manual" transmissions on the market use "wet" clutches bathed in oil, Ford's

-4-

Warren v. Ford – FIRST AMENDED COMPLAINT

PowerShift Transmission clutches lack the oil pumps and other components of a wet clutch system, and instead operate "dry."

20.   Ford designed the PowerShift Transmission in an effort to meet heightened governmental and consumer expectations for fuel economy, performance, convenience, and efficiency.   Ford designed and marketed its PowerShift Transmission as a more advanced and fuel efficient automatic transmission. According to Ford's press release dated March 10, 2010, "PowerShift with dry-clutch facings and new energy-saving electromechanical actuation for clutches and gear shifts saves weight, improves efficiency, increases smoothness, adds durability and is sealed with low-friction gear lubricant for the life of the vehicle.   The transmission requires no regular maintenance."

21.   In theory, a computer-controlled, automated manual transmission may provide the convenience of an automatic transmission without sacrificing the fuel efficiency and shift speed of a manual transmission.   In practice, however, Ford's PowerShift Transmission is plagued by numerous problems and safety concerns.

22.   Plaintiff is informed and believe, and based thereon allege, that the PowerShift Transmission is defective in its design and/or manufacture in that, among other problems, the transmission consistently slips, bucks, kicks, jerks, harshly engages, has premature internal wear, sudden acceleration, delay in downshifts, delayed acceleration, difficulty stopping the vehicle, and, eventually, premature transmission failure (the "Transmission Defect").

23.   The Transmission Defect causes unsafe conditions in vehicles equipped with the PowerShift Transmission, including, but not limited to suddenly lurching forward, delayed acceleration, and sudden loss of forward propulsion.   These conditions present a safety hazard because they severely affect the driver's ability to control the car's speed, acceleration, and deceleration.   For example, these conditions make it difficult to safely merge into traffic.   Even more troubling, the Transmission Defect can cause the vehicle to fail to downshift and decelerate, but instead continue to transfer power

to the transmission and even surge the engine's RPMs, when the brakes are depressed. As a result, drivers of vehicles equipped with the PowerShift Transmission have reported their vehicles lurching forward into intersections at red lights due to the failure of their braking efforts to stop the car.

24.     On information and belief, the Transmission Defect also causes premature wear to the PowerShift Transmission's clutch plates and other components, which results in premature transmission failure and requires expensive repairs, including premature transmission replacement.

25.     As early as 2010, Ford knew or should have known that the PowerShift Transmission contained one or more design and/or manufacturing defects that negatively affect drivability and cause safety hazards.

26.     Plaintiff is informed and believe, and based thereon allege, that prior to sale of the Vehicle, Ford knew, or should have known, about the Transmission Defect through its exclusive knowledge of non-public, internal data about the Transmission Defect, including: pre-releasing testing data; early consumer complaints about the Transmission Defect to Ford's dealers who are Ford's agents for vehicle repairs; dealership repair orders; testing conducted in response to those complaints; technical service bulletins ("TSBs") developed by Ford and communicated to its dealers and authorized repair facilities; the existence of substantially identical defects in substantially identical European and Australian model vehicles released prior to Ford's marketing and sale of the PowerShift Transmission domestically; and other internal sources of information possessed exclusively by Ford and its agents. Nevertheless, Ford and/or Ford through its agents have actively concealed the Transmission Defect, and failed to disclose this defect to Plaintiff at the time of purchase of the Vehicle or thereafter.

27.     Before offering vehicles equipped with the PowerShift Transmission (which Ford internally refers to as the "DPS6 automatic transmission") in the United States, Ford offered substantially identical vehicles, equipped with a similar dual-clutch

transmission, in Europe and Australia.   Although the domestic version of the transmission utilizes dry clutches as opposed to the European and Australian version's wet clutches, Ford acknowledges that the transmission offered for sale in the United States is "derivative" of the design from the European and Australian models. European and Australian versions of the dual-clutch transmission suffered from similar defects known to Ford as alleged herein.

28.     In addition to obtaining years of feedback and testing from its European and Australian dual-clutch transmission, according to Ford, its team:

> "logged approximately three years or 6,000 man-hours of computer aided mathematical modeling, simulation and analysis of engine speeds, torque and clutch capacity in only 24 months real time to prove the THF concept was production ready."

29.     In addition, Ford boasted about its extensive testing of the vehicle in its marketing brochures that were publicly distributed:

> "Obsessive was the starting point.  You'll enjoy every drive because Focus engineers obsessed over every last detail. Focus was thoroughly tested in an assortment of harsh environments and situations to make sure you get a car beyond your wildest imagination."

30.     The PowerShift Transmission uses a program called Torque Hole Filling ("THF"), which is a combination of computer algorithms and computer aided tools to fill the torque hole, or what is more commonly perceived as a hesitation, while shifting.   Ford claimed its THF technology would create a smoother driving experience for the customer to promote sales.

31.     Despite these claims, consumers have not experienced a smoother driving experience from THF or any other technology incorporated in the PowerShift Transmission. Multiple reviews in automotive journals and customer complaints have documented and confirmed that the PowerShift transmission has continuously

exhibited the defects, malfunctions, maladjustments, and nonconformities that the Plaintiff now complains of.

32.     In a 2011 *New York Times* review of the Ford Focus, Greg Burgess, an engineer at Ford, conceded that "[i]t is quite a challenge to deliver something that is very, very fuel efficient and yet feels like a conventional automatic, and there are some balances and some trade-offs that we make." There was no mention by Ford or anyone on behalf of Ford about what those "trade-offs" actually were, despite Ford's knowledge of problems at this early juncture.

33.     In response to complaints about the Transmission Defect, in 2010 and 2011, Ford issued several Technical Service Bulletins ("TSBs") to its dealers and authorized repair facilities acknowledging defects in the PowerShift Transmission.  TSBs are not issued to the public and are generally unknown to the average consumer, and were indeed unknown to Plaintiff. Ford's TSB from September 2010, covering the 2011 Ford Fiesta, informed dealers and service personnel of "concerns such as no engagement or intermittent no engagement in Drive or Reverse when shifting from Park to Drive or Reverse, grinding noise during engagement, and/or check engine light with transmission control module (CM) diagnostic trouble code…"

34.     Similarly, Ford's TSB released on January 1, 2011, covering the 2011 Ford Fiesta with the PowerShift Transmission, informs dealers and service personnel of problems with the PowerShift Transmission causing "a loss of power, hesitation, surge, or lack of throttle response while driving."

35.     Ford's TSB from March 31, 2011 also covering the 2011 Ford Fiesta, informs dealers of problems where the PowerShift Transmission "exhibit[s] a rattle/grind noise in reverse only."

36.     Ford issued two separate TSBs in May 2011, both covering the Ford Fiesta. These TSBs addressed problems with the PowerShift Transmission including "concerns in Drive or Reverse when shifting from Park to Drive or reverse, no engagement,   delayed   engagement,   intermittent   engagement,   noise   during

engagement…"

37.     Another Ford TSB released in September 2011 advised dealers to reprogram the transmission computer if 2011 Ford Fiesta owners complained about "hesitation when accelerating from a low speed after coast down, harsh or late 1-2 upshift, harsh shifting during low-speed tip-in or tip-out maneuvers and/or engine r.p.m. flare when coasting to a stop."

38.     The 2012 Ford Focus was the subject of a September 2011 Ford TSB, which informed dealers and service personnel of transmission problems including: "RPM flare on deceleration coming to a  stop, rough idle on deceleration coming to a stop, intermittent engine idle fluctuations at a stop, intermittent vehicle speed control inoperative, intermittent harsh engagement/shift…"

39.     In May of 2012, Ford issued a "Customer Satisfaction Program: Program Number 12B37."  In a letter sent to 2012 Ford Focus drivers, Ford indicated that drivers "may experience rough or jerky automatic transmission shifts.  In addition, the vehicle may experience roll back when the driver is transitioning from the brake pedal to the accelerator pedal while on a slight incline."  Significantly, Ford did not issue a recall and did not warn drivers of the safety risks associated with these known problems.

40.     Because Ford will not notify the public that the transmission is defective, Plaintiff (as well as members of the general public) is subjected to dangerous driving conditions that often occur without warning.

41.     Ford knew about, and concealed, the Transmission Defect present in the Vehicle, along with the Transmission Defect's attendant dangerous safety and drivability problems, from Plaintiff at the time of sale.  Instead of repairing the defects in the PowerShift Transmission, Ford and/or Marina Ford either refused to acknowledge their existence, or performed superficial and ineffectual software upgrades that simply masked the symptoms of the Transmission Defect.

42.     If Plaintiff knew about these defects at the time of sale, Plaintiff would not

have purchased the Vehicle or would have paid substantially less for it.

43.    As a result of Plaintiff's reliance on Ford's omissions and/or misrepresentations, Plaintiff suffered an ascertainable loss of money, property, and value to the Vehicle.  Additionally, as a result of the Transmission Defect, Plaintiff were harmed and suffered actual damages in that the Vehicle's transmission is substantially certain to fail before its expected useful life has run.

### Ford Had Exclusive Knowledge of the Transmission Defect

44.    Ford had superior and exclusive knowledge of the Transmission Defect, and knew or should have known that the Transmission Defect was not known or reasonably discoverable by Plaintiff, before Plaintiff purchased the Vehicle.

45.    Plaintiff is informed and believes and based thereon alleges that before Plaintiff purchased the Vehicle, and since at least 2010, Ford knew about the Transmission Defect through sources not available to consumers, including pre-release testing data, early consumer complaints about the transmission defects to Ford and its dealers, testing conducted in response to those complaints, high failure rates and replacement part sales data, aggregate data from Ford dealers, among other internal sources of aggregate information about the problem including, but not limited to, similar defects in the substantially identical European and Australian models.

46.    Before the Vehicle was available for sale in the United States, Ford offered the same vehicles, equipped with a similar dual-clutch transmission, in Europe and Australia, except that those regions used wet-clutches.The United States version utilizes an inferior set of dry-clutches. Ford acknowledged in its own press release that the transmission offered for sale in the United States is a "derivative" of the design of the European and Australian models.  European and Australian versions of the dual-clutch transmission suffered from similar defects as alleged herein.

47.    In addition to having access to years of analysis and feedback concerning the prior dual-clutch design, Ford also acknowledged in its own press releases the extensive pre-release testing and computer aided modeling, simulation, and analysis

it conducted before bringing the PowerShift Transmission to the United States market.

48.   Ford was also aware of the Transmission Defect through the numerous complaints it received, both from consumers and from automotive journalists, who roundly criticized the performance of the PowerShift Transmission.

49.   The existence of the Transmission Defect is a material fact that a reasonable consumer would consider when deciding whether to purchase or lease a vehicle equipped with a PowerShift Transmission.  Had Plaintiff known that the Vehicle was equipped with a defective transmission, they would not have purchased the Vehicle equipped with the PowerShift Transmission or would have paid substantially less for it.

50.   Reasonable consumers, like Plaintiff, reasonably expect that a vehicle's transmission is safe, will function in a manner that will not pose a safety hazard, and is free from defects. Plaintiff further reasonably expect that Ford will not sell or lease vehicles with known safety defects, such as the Transmission Defect, and will disclose any such defects to its consumers when it learns of them.  They did not expect Ford to fail to disclose the Transmission Defect to them and to continually deny the defect.

**Ford's Failure to Disclose the PowerShift Transmission Defect**

51.   Ford has never disclosed the PowerShift Transmission defect to Plaintiff prior to the purchase of the Subject Vehicle or at any point during ownership of the Subject Vehicle, and Ford has never instructed its dealerships to disclose the PowerShift Transmission defect to drivers or potential purchasers or lessees of vehicles equipped with the PowerShift Transmission.

52.   The PowerShift Transmission defect was not known or reasonably discoverable by the Plaintiff before purchase or lease, or without experiencing the defect first hand and exposing themselves to an unreasonable safety risk.

53.   Ford has remained silent even as it issued service bulletins, conducted internal investigations, and witnessed the failure of the transmission in earlier models of their vehicles distributed in Europe and Australia.

54.     As a result of Ford's inaction and silence, Plaintiff was entirely unaware that Plaintiff purchasedan unsafe and unreliable vehicle. As Ford knows, a reasonable person would consider the PowerShift Transmission defect important and would not purchase or lease a vehicle equipped with the PowerShift Transmission defect were the defect disclosed in advance, or would pay substantially less for the vehicle.

**Ford Has Actively Concealed the Transmission Defect**

55.     While Ford has been fully aware of the Transmission Defect affecting the Vehicle, Ford actively concealed the existence and nature of the Transmission Defect from Plaintiff at the time of purchase. Specifically, Ford failed to disclose or actively concealed, at the time of purchase or repair:

      a. any and all known material defects or material nonconformity of the Vehicle, including the defects relating to the PowerShift Transmission;

      b. that the Subject Vehicles, including their PowerShift Transmission, were not in good working order, were defective, and were not fit for the intended purposes; and

      c. that Subject Vehicles and their PowerShift Transmission were defective, despite the fact that Ford learned of such defects through alarming failure rates, customer complaints, as well as through other internal sources, as early as 2010.

56.     As a result of the Transmission Defect, Ford was inundated with complaints regarding the PowerShift Transmission.   In July 2011, Ford implemented a communications strategy intended to enlighten consumers about some of the behavior characteristics of the PowerShift Transmission in order to "improve customer expectations."  In a memo with instructions sent to Ford dealers and service personnel, which Ford intended its dealers and service personnel to communicate to consumers, Ford noted that some of the common and normal characteristics of the PowerShift Transmission include double clicking metal sounds, coast down whine, low speed grinding, and reverse gear whine.

-12-

57.     However, despite Ford's public insistence that these behavioral characteristics of the PowerShift Transmission were normal, in 2010 and 2011, Ford issued several TSBs to its dealers in the United States acknowledging defects in the PowerShift Transmission.  Ford's TSB from September 2010, covering the 2011 Ford Fiesta, informs dealers how to address and attempt to repair the PowerShift Transmission in response to "concerns such as no engagement or intermittent no engagement in Drive or Reverse when shifting from Park to Drive or Reverse, grinding noise during engagement, and/or a check engine light with transmission control module (TCM) diagnostic trouble code…"

58.     Ford's dealers knew or should have known that these problems were not normal characteristics, but failed to, or refused to, identify the means for repairing these problems.

59.     Ford's TSB released on January 1, 2011, covering the 2011 Fiesta with the PowerShift Transmission, informs dealers of problems with the PowerShift Transmission causing "a loss of power, hesitation, surge, or lack of throttle response while driving."

60.     Ford's TSB from March 31, 2011, also covering the 2011 Ford Fiesta, informs dealers of problems where the PowerShift Transmission "exhibit[s] a rattle/grind noise in reverse only."

61.     Ford issued two separate TSBs in May 2011, both covering the Ford Fiesta. These TSBs addressed problems with the PowerShift Transmission including "concerns in Drive or Reverse when shifting from Park to Drive or reverse, no engagement, delayed engagement, intermittent engagement, noise during engagement…"

62.     On information and belief, another Ford TSB released in September 2011 advised dealers to reprogram the transmission computer if 2011 Fiesta owners complained about "hesitation when accelerating from a low speed after coast down, harsh or late 1-2 upshift, harsh shifting during low-speed tip-in or tip-out maneuvers

and/or engine r.p.m. flare when coasting to a stop."

63.    The 2012 Ford Focus was the subject of a Ford TSB in September 2011, which informed dealers of transmission problems including: "RPM flare on deceleration coming to a stop, rough idle on deceleration coming to a stop, intermittent engine idle fluctuations at a stop, intermittent vehicle speed control inoperative, intermittent harsh engagement/shift…"

64.    On information and belief, the software upgrades recommended and encouraged by the various TSBs issued by Ford were completely ineffective at addressing the Transmission Defect or ineffectively implemented by AIRPORT MARINA FORD.

65.    When consumers present vehicles equipped with the PowerShift Transmission to an authorized Ford dealer for repair to the transmission, rather than inform consumers of the Transmission Defect or conclusively repair the problem under warranty, Ford's dealers and authorized repair facilities either inform consumers that their vehicles are functioning properly, or perform superficial and ineffectual software updates that delay or mask the manifestation of the Transmission Defect in an attempt to avoid more comprehensive and expensive repairs or replacements under the warranty.

## **PLAINTIFF'S EXPERIENCES**

66.    The Vehicle was equipped with a DPS6 Ford PowerShift Transmission.

67.    On or about February 15, 2012, Plaintiff visited South Bay Ford in Los Angeles, California in hopes of purchasing a new Ford Focus vehicle. Plaintiff walked the dealership in search of a vehicle to meet Plaintiff's needs, assisted by a salesperson. Plaintiff was specifically searching for a Ford Focus vehicle with an automatic transmission for a smoother and more effortless drive. In searching the car inventory on the car lot, Plaintiff reviewed the window stickers of multiple Ford Focus vehicles that caught her eye.  The window stickers on these vehicles identified them as having an automatic transmission. Plaintiff identified a 2012 Ford Focus she was

interested in purchasing.

68.     Prior to purchasing the Vehicle, Plaintiff reviewed marketing brochures, viewed television commercials and/or heard radio commercials about the qualities of the Ford Focus.  Plaintiff also relied on Ford's reputation as an established and experienced auto manufacturer.  Plaintiff further relied on the statements made during the sales process and within the marketing brochures provided by Ford.  However, Ford directly and/or Ford through its authorized agents did not publicly or privately disclose to Plaintiff any information about the Transmission Defect. These omissions were material to Plaintiff's decision to purchase the Vehicle.  Had Ford and/or its authorized agents publicly or privately disclosed the Transmission Defect before Plaintiff purchased the Vehicle, Plaintiff would have been aware of such disclosures, and would not have purchased the Vehicle.

69.     On or around May 4, 2013, Plaintiff delivered the Vehicle to an authorized Ford repair facility for repair. Plaintiff complained of issues with the transmission. The repair facility technicians reprogrammed powertrain control module ("PCM"), transmission control module ("TCM") and the antilock brake system module.  The Vehicle was returned to Plaintiff and the service technician represented to Plaintiff that the Vehicle had been repaired and was safe to drive. Plaintiff reasonably relied on this representation by the service technician at the authorized Ford repair facility. All repairs were covered under Ford's written warranty.

70.     On or around February 18, 2016, Plaintiff again delivered the Vehicle to an authorized Ford repair facility AIRPORT MARINA FORD for repair with complaints concerning the transmission.   The repair facility technicians again reprogrammed the TCM and the PCM under Recall 15B22. The repair facility did not perform any diagnosis of the transmission or test drive of the Vehicle. When the Vehicle was returned to Plaintiff, the service technician represented to Plaintiff that the Vehicle had been repaired and was safe to drive. Plaintiff reasonably relied on this representation by the service technician at the authorized Ford repair facility. All

repairs were covered under Ford's written warranty.

71.     On or around May 3, 2016, Plaintiff delivered the Vehicle to an authorized Ford repair facility AIRPORT MARINA FORD for repair. Plaintiff again complained that the transmission malfunction message on the dash was alerted. The repair facility technicians replaced the TCM, under TSB 15-0121, and reprogrammed the TCM and PCM again. The Vehicle was then returned to Plaintiff, and the service technician represented to Plaintiff that the Vehicle had been repaired and was safe to drive. Plaintiff reasonably relied on this representation by the service technician at the authorized Ford repair facility.   All repairs were covered under Ford's written warranty.

72.     On or around June 16, 2017, Plaintiff delivered the Vehicle to an authorized Ford repair facility AIRPORT MARINA FORD for repair. Plaintiff complained that the transmission is shuddering and slipping. The repair facility determined that the cause owas a malfunction in the clutch. The repair facility technicians again reprogrammed the PCM and TCM under TSB 16-0109, and replaced the clutch. The repair facility also removed the transmission from the Vehicle, including the clutch and cleaned the transmission and bell housing, and replaced axle seals as well, among other transmission related items. The repair facility then put the transmission back into the Vehicle and road tested it. After seven (7) days, the Vehicle was then returned to Plaintiff, and the service technician represented to Plaintiff that the Vehicle had been repaired and was safe to drive. Plaintiff reasonably relied on this representation by the service technician at the authorized Ford repair facility.   All repairs were covered under Ford's written warranty.

<u>All Statute of Limitations Periods are Tolled by the Discovery Rule and the Doctrine of Fraudulent Concealment</u>

73.     Ford misrepresented the qualities of the transmission in the Vehicle to Plaintiff at the time of the sale of the vehicle.  Ford also concealed the material facts that the transmission was defective.

74.     At all relevant times, Ford was aware of the defects in the Powershift transmission.

75.     As described in more detail above, as early as 2010, Ford began issuing significant technical service bulletins to its authorized dealers explaining the widespread issues with the Powershift transmission.  At no point prior to the sale of the vehicle to Plaintiff or during Plaintiff's ownership of the Vehicle did Ford or an authorized dealer ever inform Plaintiff of the ongoing defect.

76.     Ford had a duty to disclose the concealed facts alleged above because Ford had exclsive knowledge of the defect, and because Ford knew that Plaintiff did not know a material fact and further knew that such facts were not readily accessible to the Plaintiff since Ford actively concealed those facts.

77.     Ford had a duty to disclose the concealed facts alleged above because Ford made misrepresentations in its marketing materials and window stickers and through its authorized sales representatives about the quality, characteristics, and safety of the Powershift transmission.

78.      Ford had a duty to disclose the concealed facts alleged above because Ford actively concealed material facts in order to induce a false belief.

79.     Prior to the sale of the Vehicle, and at all times thereafter, Defendant therefore failed to disclose the existence of the vehicle's inherent defects to Plaintiff. Moreover, Ford's dealers who perform warranty repairs did not adequately diagnose, and/or perform repairs for the defects. In effect, after the sale of the Vehicle, Plaintiff was unaware of the fact that the dealers were not properly repairing the defects to the Powershift transmission, and knew that the limited work that Ford had authorized its dealerships to perform on those vehicles would not properly repair them.

80. On July 7, 2017, Defendant mailed Plaintiff class notice as a putative class member in the class action, *Vargas v. Ford Motor Company*, United States District Court, Central District of California, Case No. 2:12-cv-08388 ABC (FFMx). Plaintiff received this notice shortly thereafter. This date was the earliest date that Plaintiff

could have had any sort of notice of the facts which give rise to Plaintiff's fraud causes of action. Ford did not disclose any of this information prior to the sale of the vehicle to Plaintiff or at any earlier date during ownership. Accordingly, Plaintiff could not have discovered her claims prior to July 7, 2017."Plaintiff could not, despite reasonable and diligent investigation, have discovered such on an earlier date because of Ford's fraudulent misrepresentations and concealment of the defects in the PowerShift transmission in Plaintiff's vehicle, as previously alleged above. Additionally, the repeated false assurances of Ford and its service dealership agents made to Plaintiff, on which Plaintiff reasonably relied, that Ford had and would repair any problems with the transmission in Plaintiff's vehicle that occurred during the express warranty period and that said problems would not be repeating further delayed Plaintiff's discovery of her claims.   The statute of limitations for each of Plaintiff's claims against Ford was therefore tolled under the delayed discovery rule and the doctrine of fraudulent concealment until Plaintiff could have first discovered on or around July 7, 2017 that Ford had misrepresented the characteristics of the transmission and concealed the known defects during the ownership of the Vehicle.

81.   Because Ford failed to disclose these foregoing facts to Plaintiff, all statute of limitations periods with respect to sale of the Vehicle were tolled by the doctrines of fraudulent concealment, the discovery rule, and/or equitable tolling.  As alleged herein, Ford wrongfully concealed the fact (1) that the Vehicle was equipped with a defective transmission (the PowerShift transmission), and (2) that its dealerships were making inadequate repairs to adress the root causes of the Vehicle's malfunctions.

82.   Plaintiff did not discover the operative facts that are the basis of the claims alleged herein because the facts were concealed in confidential and privileged documents, which a consumer would not know about and could not obtain.

83.   No amount of diligence by Plaintiff could have led to the discovery of these facts because they were kept secret by Ford and, therefore, Plaintiff was not at fault for failing to discover these facts.

Warren v. Ford – FIRST AMENDED COMPLAINT

84.    Plaintiff did not have actual knowledge of facts sufficient to put them on notice.  Plaintiff did not know, nor could have known, about Ford's inability to repair the defects in its PowerShift transmission because, as alleged above, Ford kept this information highly confidential, and its dealership assured Plaintiff that its repairs were effective.

<u>All Statute of Limitations Periods are Tolled by the Tolling Doctrine Established in *American Pipe & Construction Co. v. Utah* (1974) 414 U.S. 538 As a Result of the Class Action *Vargas v. Ford Motor Company*</u>

85.    Plaintiff gave timely notice of Plaintiff's claims against Ford in the present action as putative class members in a class action, *Vargas v. Ford Motor Company*, United States District Court, Central District of California, Case No. 2:12-cv-08388 ABC (FFMx), which was filed on September 28, 2012.  That action was filed within three years of the date of Plaintiff's discovery of her claims against Ford in the present action, as previously described in detail above.

86.    There is no prejudice to Ford in gathering evidence to defend against Plaintiff's individual claims because the class definition in the class action complaint within which Plaintiff were putative class members and the allegations in the class action lawsuit, *Vargas v. Ford Motor Company*, United States District Court, Central District of California, Case No. 2:12-cv-08388 ABC (FFMx), put Ford on notice of the facts that give rise to Plaintiff's individual action, the witnesses necessary for Ford to defend Plaintiff's individual action, and the causes of action against Ford asserted in Plaintiff's individual action.

87.    *Vargas v. Ford Motor Company*, United States District Court, Central District of California, Case No. 2:12-cv-08388 ABC (FFMx) alleged the material facts on behalf of Plaintiff as putative class members as are being alleged by Plaintiff in the present individual action.

88.    The facts alleged in *Vargas v. Ford Motor Company*, United States District Court, Central District of California, Case No. 2:12-cv-08388 ABC (FFMx) are substantially similar, if not identical to the facts alleged herein.

89.     The allegations in *Vargas v. Ford Motor Company*, United States District Court, Central District of California, Case No. 2:12-cv-08388 ABC (FFMx) are based on the same subject matter and similar evidence as the instant complaint.  Those allegations concern the same evidence, memories, and witnesses as the subject matter in the instant complaint.

90.     The *Vargas* class action certainly protected the efficiency and economy of litigation because that class action is protecting the rights of thousands of consumers nationwide through a single action.  Consumer class actions regarding defective vehicles brought against manufacturers are regularly certified, making a class action lawsuit an efficient means of pursuing such claims.

91.     The tolling of Plaintiff's individual statute of limitations encourages the protection of efficiency and economy in litigation as promoted by the class action devise, so that putative class members would not find it necessary to seek to intervene or to join individually because of fear the class might never be certified or putative class members may subsequently seek to request exclusion.

92.     The running of all statute of limitations on each of Plaintiff's claims asserted against Ford in the present action were therefore tolled by *American-Pipe* tolling during the entire pendency of the *Vargas* class action (i.e., from the date on which the Vargas class action was filed on September 28, 2012 to the date on which Plaintiff[s] opted out of the Vargas class action litigation, on or around August 30, 2017.)

**All Statute of Limitations Periods are Tolled Under California Law by the Doctrine of Equitable Tolling As a Result of the Class Action *Vargas v. Ford Motor Company***

93.     Plaintiff gave timely notice of Plaintiff's claims against Ford in the present action as putative class members in a class action, *Vargas v. Ford Motor Company*, United States District Court, Central District of California, Case No. 2:12-cv-08388 ABC (FFMx), which was filed on September 28, 2012.  That action was filed within three years of the date of Plaintiff's discovery of her claims against Ford in the present

1  action, as previously described in detail above.

2      94.    There is no prejudice to Ford in gathering evidence to defend against

3  Plaintiff's individual claims because the class definition in the class action complaint

4  within which Plaintiff were putative class members and the allegations in the class

5  action lawsuit, *Vargas v. Ford Motor Company*, United States District Court, Central

6  District of California, Case No. 2:12-cv-08388 ABC (FFMx), put Ford on notice of

7  the facts that give rise to Plaintiff's individual action, the witnesses necessary for Ford

8  to defend Plaintiff's individual action, and the causes of action against Ford asserted

9  in Plaintiff's individual action.

10      95.    *Vargas v. Ford Motor Company*, United States District Court, Central

11  District of California, Case No. 2:12-cv-08388 ABC (FFMx) alleged the material facts

12  on behalf of Plaintiff as putative class members as are being alleged by Plaintiff in the

13  present individual action.

14      96.    The facts alleged in *Vargas v. Ford Motor Company*, United States District

15  Court, Central District of California, Case No. 2:12-cv-08388 ABC (FFMx) are

16  substantially similar, if not identical to the facts alleged herein.

17      97.    The allegations in *Vargas v. Ford Motor Company*, United States District

18  Court, Central District of California, Case No. 2:12-cv-08388 ABC (FFMx) are based

19  on the same subject matter and similar evidence as the instant complaint.  Those

20  allegations concern the same evidence, memories, and witnesses as the subject matter

21  in the instant complaint.

22      98.    The *Vargas* class action certainly protected the efficiency and economy of

23  litigation because that class action is protecting the rights of thousands of consumers

24  nationwide through a single action.  Consumer class actions regarding defective

25  vehicles brought against manufacturers are regularly certified, making a class action

26  lawsuit an efficient means of pursuing such claims.

27      99.    Plaintiff acted reasonably and in good faith in filing the instant action.

28  Shortly after discovering Ford's fraudulent behavior, Plaintiff filed the instant action

-21-

Warren v. Ford – FIRST AMENDED COMPLAINT

to pursue her individual rights without delay.

100.   The tolling of Plaintiff's individual statute of limitations encourages the protection of efficiency and economy in litigation as promoted by the class action devise, so that putative class members would not find it necessary to seek to intervene or to join individually because of fear the class might never be certified or putative class members may subsequently seek to request exclusion.

101.   The running of all statute of limitations on each of Plaintiff's claims asserted against Ford in the present action were therefore tolled by *American-Pipe* tolling during the entire pendency of the *Vargas* class action (i.e., from the date on which the Vargas class action was filed on September 28, 2012 to the date on which Plaintiff[s] opted out of the Vargas class action litigation, on or around August 30, 2017.)

## FIRST CAUSE OF ACTION

### Violation of the Song-Beverly Act – Breach of Express Warranty
### (Against Defendant Ford Only)

102.   Plaintiff incorporates herein by reference each and every allegation contained in the preceding and succeeding paragraphs as though herein fully restated and re-alleged.

103.   Express warranties accompanied the sale of the vehicle to Plaintiff by which Ford undertook to preserve or maintain the utility or performance of Plaintiff's vehicle or provide compensation if there was a failure in such utility or performance.

104.   The vehicle was delivered to Plaintiff with serious defects and nonconformities to warranty and developed other serious defects and nonconformities to warranty including, but not limited to a transmission.

105.   Pursuant to the Song-Beverly Consumer Warranty Act (herein after the "Act") Civil Code sections 1790 *et seq.* the vehicle constitutes "consumer goods" used primarily for family or household purposes, and Plaintiff have used the vehicle primarily for those purposes.

106.   Plaintiff is a "buyer" of consumer goods under the Act.

107.   Defendant Ford is a "manufacturer" and/or "distributor" under the Act.

108.   The foregoing defects and nonconformities to warranty manifested themselves within the applicable express warranty period. The nonconformities substantially impair the use, value and/or safety of the vehicle.

109.   Plaintiff delivered the vehicle to an authorized Ford repair facility for repair of the nonconformities.

110.   Defendant was unable to conform Plaintiff's vehicle to the applicable express warranty after a reasonable number of repair attempts.

111.   Notwithstanding Plaintiff's entitlement, Defendant Ford has failed to either promptly replace the new motor vehicle or promptly make restitution in accordance with the Song-Beverly Act.

112.   By failure of Defendant to remedy the defects as alleged above, or to issue a refund or replacement, Defendant is in breach of its obligations under the Song-Beverly Act.

113.   Under the Act, Plaintiff is entitled to reimbursement of the price paid for the vehicle less that amount directly attributable to use by the Plaintiff prior to discovery of the nonconformities.

114.   Plaintiff is entitled to all incidental, consequential, and general damages resulting from Defendant's failure to comply with their obligations under the Song-Beverly Act.

115.   Plaintiff is entitled under the Song-Beverly Act to recover as part of the judgment a sum equal to the aggregate amount of costs and expenses, including attorney's fees, reasonably incurred in connection with the commencement and prosecution of this action.

116.   Plaintiff is entitled in addition to the amounts recovered, a civil penalty of up to two times the amount of actual damages in that Ford, has willfully failed to comply with its responsibilities under the Act.

## SECOND CAUSE OF ACTION

### Violation of the Song-Beverly Act – Breach of Implied Warranty

### (Against Defendant Ford Only)

117.   Plaintiff incorporates herein by reference each and every allegation contained in the preceding and succeeding paragraphs as though herein fully restated and re-alleged.

118.   Ford and its authorized dealership at which Plaintiff purchased the Subject Vehicle had reason to know the purpose of the Subject Vehicle at the time of sale of the Subject Vehicle.  The sale of the Subject Vehicle was accompanied by an implied warranty of fitness.

119.   The sale of the Subject Vehicle was accompanied by an implied warranty that the Subject Vehicle was merchantable pursuant to Civil Code section 1792.

120.   The Subject Vehicle was not of the same quality as those generally acceptable in the trade because it was equipped with a defective transmission.

121.   The Subject Vehicle was not fit for the ordinary purpose for which such goods are used because it was equipped with a defective transmission.

122.   The Subject Vehicle did not measure up to the promises or facts stated on the container or label because it was equipped with a defective transmission.

123.   Plaintiff is entitled to justifiably revoke acceptance of the Subject Vehicle under Civil Code section 1794, *et seq*; Plaintiff hereby revoke acceptance of the Subject Vehicle.

124.   Plaintiff is entitled to replacement or reimbursement pursuant to Civil Code section 1794, *et seq.*

125.   Plaintiff is entitled to rescission of the contract pursuant to Civil Code section 1794, *et seq.* and Commercial Code section 2711.

126.   Plaintiff is entitled to recover any "cover" damages under Commercial Code sections 2711, 2712, and Civil Code section 1794, *et seq.*

127.   Plaintiff is entitled to recover all incidental and consequential damages

pursuant to 1794 *et seq* and Commercial Code sections 2711, 2712, and 2713 *et seq.*

## THIRD CAUSE OF ACTION

### Fraudulent Inducement – Concealment

### (Against Defendant Ford Only)

128.   Plaintiff incorporates herein by reference each and every allegation contained in the preceding and succeeding paragraphs as though herein fully restated and re-alleged.

129. Ford directly and through its agents intentionally concealed and failed to disclose facts relating to the Transmission Defects prior to and at the time Plaintiff purchased the Vehicle as explained in detail in paragraphs 13-65.

130.   Defendant was the only party, other than its own dealer network, with knowledge of the Transmission Defects because that knowledge came from internal reports such as pre-release testing data, customer complaints made directly to Defendant or its authorized dealers, and technical service bulletins.  None of this information was available to the public, nor did Defendant publicly or privately disclose any of the information to Plaintiff.  Ford had exclusive knowledge of the defect as described in detail in paragraphs 44-50.

131. Ford actively concealed information from the public, preventing Plaintiff from discovering any of the concealed facts as described in detail in paragraphs 51-61.

132.   Prior to the date of sale and on the date of sale, Ford had an opportunity to disclose to Plaintiff, but instead concealed from and failed to disclose to Plaintiff, any of the known issues with the Vehicle that were either irreparable or could not be repaired by the dealer despite the instructions released by Ford, such as TSBs, demonstrating how to perform an authorized repair.

133. Ford intended to deceive Plaintiff by concealing the known issues with the PowerShift Transmission, including the Transmission Defect, in an effort to sell the Vehicle at a maximum price.

134. Ford knew of the specific transmission issues affecting the Vehicle, including the Transmission Defect, prior to the sale of the Vehicle.  For example, in 2010, Ford released a TSB after months of research relating to "concerns such as no engage or intermittent no engage in Drive or Reverse when shifting from Park to Drive or Reverse" for certain vehicles equipped with the PowerShift Transmission.  Plaintiff's vehicle was sold after Ford acknowledged these problems in a TSB without any sort of disclosure being made to the Plaintiff.

135.   Plaintiff did not know about the Transmission Defects at the time of sale.

136.   Had Ford and/or its agents publicly or privately disclosed the Transmission Defect to Plaintiff at or prior to the sale, Plaintiff would not have purchased the Vehicle.

137.   Plaintiff was harmed by Defendant's concealment of the Transmission Defect because Plaintiff was induced to enter into the sale of a vehicle that Plaintiff would not have otherwise purchased.

138.   Defendant's concealment of the defects at the time of purchase was a substantial factor in causing Plaintiff's harm.

## FOURTH CAUSE OF ACTION

### Fraudulent Inducement – Intentional Misrepresentation

### (Against Defendant Ford Only)

139.   Plaintiff incorporates herein by reference each and every allegation contained in the preceding and succeeding paragraphs as though herein fully restated and re-alleged.

140.   Ford drafted, produced, and distributed marketing brochures to the public containing factual representations about the PowerShift Transmission.   Ford's marketing brochure for the Vehicle represented the PowerShift Transmission had the following qualities:

a.   With the available PowerShift 6-speed transmission in Focus, you get the performance of a manual. From an automatic. It delivers seamless gear changes for amazingresponsiveness."

141.   Unfortunately, the Vehicle as delivered to Plaintiff had extremely poor handling on all roads, as Plaintiff's drive was repeatedly interrupted by jerky shifts and hesitation.   Plaintiff's Vehicle was also not equipped with an "automatic" transmission, contrary to Ford's suggestion that the transmission is a traditional "automatic."  Plaintiff's Vehicle in fact contained an unproven automated dual clutch manual transmission.   Plaintiff's Vehicle did not have seamless gear changes – it experienced jerky gear changes and hesitation between shifts, which necessitated several repairs and repeated reprogramming of the transmission control module – none of which were sufficient to resolve the Transmission Defect.

142.   Ford made such representations regarding PowerShift Transmission in the 2012 Ford Focus despite its extensive internal knowledge of the Transmission Defect and other problems.  Ford's knowledge of the Transmission Defect is laid out in detail in paragraphs 44-50.

143.   Ford informed its dealers and authorized service facilities and personnel, about common behavior characteristics of the PowerShift Transmission in July 2011. In a memo with instructions sent to Ford dealers and authorized service personnel, Ford noted that some of the common characteristics of the PowerShift Transmission include double clicking metal sounds, coast down whine, low speed grinding, and reverse gear whine.  Despite this admission by Ford to its dealers, repair facilities, and agents, Ford continued to represent to the public that the PowerShift Transmission offered "great handling on all roads," and "the performance of a manual," and seamless gear changes for amazing responsiveness," a wildly different picture from the reality.  Ford made the statements in its marketing brochures recklessly and without regard for their truth.

144.   In addition, Ford misrepresented the type of transmission equipped in the Vehicle.  Throughout its marketing brochure, Ford states that the vehicle is equipped with a 6-speed automatic transmission.  That representation is false.  The vehicle is actually equipped with the Ford PowerShift Transmission, which is in fact a dual clutch transmission, which operates using direct mechanical engagement and disengagement similar to a manual transmission.  This information is material for a consumer to know in making a purchasing decision, because unlike a traditional automatic transmission, Ford's PowerShift dual clutch transmission powers the drive wheels through a clutch, rather than a torque converter.  The use of a clutch can result in a substantially jerkier ride than that produced using a torque converter, particularly in an unproven design.  Plaintiff would not have purchased the Vehicle had Plaintiff known the vehicle's transmission technology would cause the drive to be jerky, unreliable, and dangerous as a result of the unproven dual-clutch (rather than automatic) system.

145.   Defendants intended that Plaintiff rely on the representations made in the marketing brochure related to the transmission in inducing Plaintiff to purchase the Vehicle.

146.   Plaintiff reasonably relied on Defendant's representations related to the transmission being "automatic" and providing a smooth ride, because Ford was the manufacturer of the vehicle and claimed to have performed and relied upon extensive pre-release testing of the PowerShift Transmission.  Ford was in a superior position of knowledge.

147.   Plaintiff was harmed by purchasing a vehicle that Plaintiff would not have purchased had they known the true facts about the transmission, and the Transmission Defects, affecting it.

148.   Plaintiff's reliance on Defendants' representations about the transmission qualities was a substantial factor in Plaintiff's harm, as Ford and its agents were the exclusive source of information about the qualities of the transmission.

Warren v. Ford – FIRST AMENDED COMPLAINT

## FIFTH CAUSE OF ACTION

### Fraudulent Inducement – Negligent Misrepresentation

### (Against Defendant Ford Only)

149.   Plaintiff incorporates herein by reference each and every allegation contained in the preceding and succeeding paragraphs as though herein fully restated and re-alleged.

150.   At the time Ford made the misrepresentations identified in paragraph 13-65 above, they had no reasonable grounds for believing the representations to be true, because Ford was simultaneously issuing internal memoranda to its agents and dealerships about the characteristics of the PowerShift Transmission causing "a loss of power, hesitation, surge, or lack of throttle response while driving."  None of those characteristics can be reasonably construed to provide "great handling on all roads," "seamless gear changes," or "amazing responsiveness," as the PowerShift Transmission was described to the Plaintiff in marketing materials.  Ford's knowledge of the Transmission Defect is outlined in more detail in paragraphs 45-52.

## SIXTH CAUSE OF ACTION

### Negligent Repair

### (Against AIRPORT MARINA FORD Only)

151.   Plaintiff incorporates herein by reference each and every allegation contained in the preceding and succeeding paragraphs as though herein fully restated and re-alleged.

152.   Plaintiff delivered the Subject Vehicle to Defendant Dealer for repair on numerous occasions.

153.   AIRPORT MARINA FORD owed a duty to Plaintiff to use ordinary care and skill in storage, preparation and repair of the Subject Vehicle in accordance with industry standards.

154.   AIRPORT MARINA FORD breached its duty to Plaintiff to use ordinary care and skill by failing to properly store, prepare and repair of the Subject Vehicle in

accordance with industry standards. As set forth in paragraph 69-72 and below, AIRPORT MARINA FORD was negligent in performing repairs on the Vehicle by failing to, or refusing to, diagnose the root problem and/or failing to perform the necessary and adequate repairs to conform the Vehicle to warranty and ensure it's able to be safely driven, thereby exacerbating and not resolving the problems with the Vehicle, some of which were known by it and Ford, or, alternatively, AIRPORT MARINA FORD was negligent in failing to inform Plaintiff that it was making inadequate repairs that did not address nor resolve the root cause of the Vehicle's malfunctions.

a. On May 4, 2013, Plaitniff brought the Vehicle in for a transmission related concern. The repair facility just reprogrammed the PCM and TCM. Since the repair was performed under warranty, it was saved in Ford's internal database accessbile by its authorized repair faciltiies, such as AIRPORT MARINA FORD.

b. On February 18, 2016, Plaintiff brought the Vehicle to AIRPORT MARINA FORD for its second transmission related concern. Despite it being the second transmission related issue, AIRPORT MARINA FORD did the same exact repair - merely reprogrammed modules again. Despite the existence of available TSBs and the known existence of the Transmission Defect, no mechanical work on the transmission was performed.

c. On May 3, 2016, Plaitniff brought the Vehicle to AIRPORT MARINA FORD for its third transmission related concern. This time, AIRPORT MARINA FORD replaced the TCM but again reprogrammed modules like the prior two repairs. Despite the existence of available TSBs and the known existence of the Transmission Defect, no mechanical work on the transmission was performed.

d. On June 6, 2017, Plaintiff brought the Vehicle to AIRPORT MARINA

FORD for its fourth transmission related concern. This time, AIPORT MARINA FORD performed mechanical work on the Vehicle, removing the transmission and replacing components such as the clutch. Prior to this repair, AIRPORT MARINA FORD failed to adequately diagnosis the problem and failed to perform the necessary and appropriate repairs to fix the transmission issues in the Vehicle to ensure it could safely an reliably be drive. Thus, AIRPORT MARINA FORD exacterbated the Vehicle's problems for years. At no point did AIRPORT MARINA inform Plaintiff of its inadequate repairs or failure to diagnose or resolve the transmission issues in the Vehicle.

155.   AIRPORT MARINA FORD's negligent breach of its duties owed to Plaintiff was a proximate cause of Plaintiff's damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against Defendants and each of them, as follows:

a.  For general, special and actual damages according to proof at trial;

b.  For rescission of the purchase contract and restitution of all monies expended;

c.  For diminution in value;

d.  For incidental and consequential damages according to proof at trial;

e.  For civil penalty in the amount up to two times Plaintiff's actual damages;

f.  For prejudgment interest at the legal rate;

g.  For punitive damages pursuant to Civil Code section 3294;

h.  For reasonable attorney fees and costs of suit; and

i.  For such other relief as the Court deems just and proper under the circumstances.

Warren v. Ford – FIRST AMENDED COMPLAINT

Dated: _____                    **KNIGHT LAW GROUP, LLP**

                                          _____
                                          ROGER KIRNOS (SBN 283163)
                                          DANIEL KALINOWSKI
                                          (SBN 305087)
                                          Attorneys for Plaintiff,
                                          KAMISHA R. WARREN

   Plaintiff KAMISHA R. WARREN hereby demands trial by jury in this action.

Warren v. Ford – FIRST AMENDED COMPLAINT